IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **EDWARD LEE BUSBY,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 4:09-CV-160-Y |
| | § | |
| | § | *CAPITAL CASE* |
| | § | |
| **RICK THALER**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

_____

**AMENDED PETITION FOR A WRIT OF HABEAS CORPUS**
_____

**THIS IS A DEATH PENALTY CASE**

David R. Dow
Texas Bar No. 06064900

Katherine C. Black
Texas Bar. No. 24064907

TEXAS DEFENDER SERVICE
1927 Blodgett Street
Houston, Texas 77004
Tel. (713) 222-7788
Fax (713) 222-0260

*Counsel to Edward Lee Busby, Petitioner–Appellant*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ vi

TABLE OF EXHIBITS ..................................................................................... xii

PETITION FOR A WRIT OF HABEAS CORPUS .................................................. 1

JURISDICTION .............................................................................................. 1

PRIOR PROCEEDINGS .................................................................................. 1

STATEMENT OF THE CASE ............................................................................ 2

CLAIMS FOR RELIEF .................................................................................... 3

I.    MR. BUSBY WAS DEPRIVED EFFECTIVE ASSISTANCE OF COUNSEL IN
      THE SENTENCING PHASE OF HIS CAPITAL MURDER TRIAL IN
      VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE
      UNITED STATES CONSTITUTION .......................................................... 3

      A.    Trial Counsel Rendered Deficient Performance by Failing to Conduct a
            Reasonable Sentencing Investigation and by Failing to Seek and Obtain
            Admittance of Co-Defendant Kathleen Latimer's Statements. ............. 10

            1.    Trial Counsel Failed to Conduct a Reasonable Sentencing
                  Investigation. ........................................................................ 10

                  a.    Prevailing Professional Norms. ...................................... 11

                  b.    Application of *Strickland* to Allegations That Trial Counsel
                        Failed to Conduct Reasonable Sentencing Investigations ............. 21

                  c.    Trial Counsel's Performance Fell Below Prevailing
                        Professional Norms. ...................................................... 44

            2.    Trial Counsel Failed to Seek and Obtain Admittance of Co-
                  defendant Kathleen Latimer's Statements Relevant to Mr. Busby's
                  Moral Culpability. ................................................................... 48

                  a.    Latimer's Statement was Admissible at Guilt-Innocence
                        Pursuant to Mr. Busby's Right to Present a Defense ................... 51

                  b.    Latimer's Statement was Admissible at Sentencing
                        Pursuant to Mr. Busby's Eighth and Fourteenth

Amendment Rights to Individualized Sentencing and Due Process ..........................................................................................52

3.   A Reasonable Probability Exists the Jury Would Have Answered the Second Special Issue Differently or Not at All, Resulting in a Life Sentence, Had Trial Counsel Conducted a Reasonable Sentencing Investigation and Admitted Kathleen Latimer's Statements.. ...............................................................................................53

a.   The Sentencing Case Presented at Trial.........................................53

b.   The Sentencing Case That Would Have Been Presented Had Trial Counsel Rendered Effective Assistance .......................54

1.   The mitigating evidence a reasonable sentencing investigation would have uncovered..................................54

2.   The mental health evidence that could have been presented had the results of a reasonable sentencing investigation been provided to an appropriate mental health expert timely retained according to prevailing professional norms............................................74

3.   The circumstances of the offense that would have been presented had trial counsel admitted Kathleen Latimer's statement...........................................................92

4.   A Reasonable Probability Exists the Jury Would Have Been Given and Answered a Mental Retardation Special Issue Affirmatively, Resulting in a Life Sentence, Had Trial Counsel Conducted a Reasonable Sentencing Investigation. ......................................................93

5.   The Sentencing Case The Jury Would Have Heard Absent Counsel's Errors Places the Entire Case in Such a Different Light as to Undermine Confidence in the Verdict...............................................94

II.   MR. BUSBY'S DEATH SENTENCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE HE IS A MENTALLY RETARDED PERSON ...............................................................................................101

A.   The Mental Retardation Standard ......................................................101

B.   The Stereotype, Stigma, and Reality of Mild Mental Retardation ......................103

C.   Edward Lee Busby, Jr. Is Mentally Retarded ......................................112

        1.      Evidence of Impairments in Intellectual Functioning.............................112

               a.     WAIS-IV (February 11, 2010)...................................................112
               b.     WAIS-III (2005) ........................................................................114
               c.     BETA-III (November 4, 2005) ..................................................117
               d.     WAIS-III (October 14, 2005) ....................................................118
               e.     Unknown Test (January 1, 2001)...............................................118

        2.      Evidence of Significant Limitations in Adaptive Behavior....................118

               a.     Conceptual Skills .......................................................................118
               b.     Social Skills ...............................................................................123
               c.     Practical Skills ...........................................................................125

    D.      The Presence of Risk Factors and Other Indicia of Reliability Confirm That Mr. Busby Is a Person with Mental Retardation .........................................128

III.    MR. BUSBY WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO SEEK AND OBTAIN ADMITTANCE OF KATHLEEN LATIMER'S STATEMENTS PURSUANT TO MR. BUSBY'S CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE...........................................130

    A.      Trial Counsel's Failure to Seek and Obtain Admittance of Kathleen Latimer's Statements Pursuant to Mr. Busby's Constitutional Right to Present a Defense Was Deficient........................................................................131

    B.      Trial Counsel's Omission Prejudiced Mr. Busby .................................................133

IV.    MR. BUSBY WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL BY COUNSEL'S FAILURE TO RAISE AS A GROUND OF ERROR THE DENIAL OF THE ADMISSIBILITY OF KATHLEEN LATIMER'S STATEMENTS PURSUANT TO TEX. R. EVID. 803(24) ....................136

V.    MR. BUSBY WAS DEPRIVED OF COUNSEL AT A CRITICAL STAGE OF THE PROCEEDINGS .................................................................................138

VI.    MR. BUSBY WAS DEPRIVED OF HIS FIFTH AMENDMENT RIGHT TO REMAIN SILENT..........................................................................................142

    A.      Legal Standard .....................................................................................142

    B.      The State Commented On Mr. Busby's Failure to Testify ...................143

VII.    MR. BUSBY'S RIGHT TO DUE PROCESS UNDER THE UNITED STATES CONSTITUTION WAS VIOLATED WHEN THE STATE FAILED TO

DISCLOSE FAVORABLE EVIDENCE MATERIAL TO THE GUILT AND SENTENCING PHASES OF HIS CAPITAL MURDER TRIAL ..................................146

    A.    Legal Standard ........................................................................................146

    B.    The State Failed to Disclose Favorable Evidence Material to Guilt-Innocence and to Sentencing ...............................................................148

CONCLUSION AND PRAYER FOR RELIEF ........................................................149

VERIFICATION...................................................................................................149

CERTIFICATE OF SERVICE ..............................................................................150

TABLE OF AUTHORITIES

**<u>Cases</u>**

*Armour v. Salisbury*,
  492 F.2d 1032 (6th Cir. 1974) .....................................................135
*Atkins v. Virginia*,
  536 U.S. 304 (2002)............................................................ *passim*
*Banks v. Dretke*,
  40 U.S. 668 (2004)...............................................................148
*Barnhill v. State*,
  57 S.W.2d 131 (Tex. Crim. App. 1983)...................................139
*Battenfield v. Gibson*,
  236 F.3d 1215 (10th Cir. 2001) ..............................................13
*Berger v. United States*,
  295 U.S. 78 (1935)...............................................................135
*Blackmon v. Scott*,
  2 F.3d 560 (5th Cir. 1994) .....................................................148
*Bobby v. Van Hook*,
  ___ U.S. ___, 130 S. Ct. 13 (2009)........................................13
*Bouchillon v. Collins*,
  907 F.2d 589 (5th Cir. 1990) ...................................................4
*Brady v. Maryland*,
  73 U.S. 83 (1963)................................................................146
*Buckner v. Polk*,
  453 F.3d 195 (4th Cir. 2006) ....................................................4
*Chambers v. Mississippi*,
  410 U.S. 284 (1973)........................................................51, 131
*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)......................................................... 104-05
*Commonwealth v. Rompilla*,
  653 A.2d 626 (Pa. 1995)..........................................................34
*Davis v. United States*,
  57 F.2d 438, 441 (5th Cir. 1966) ...........................................143
*Dewberry v. State*,
  4 S.W.3d 735 (Tex. Crim. App. 1999)................................ 137-38
*Dutton v. Brown*,
  812 F.2d 593 (10th Cir. 1987) .................................................52
*Eddings v. Oklahoma*,
  455 U.S. 104 (1982)........................................................12, 52
*Ex parte Briseno*,
  135 S.W.3d 1 (Tex. Crim. App. 2004)...........................80, 101, 116
*Ex parte Gonzales*,
  204 S.W.3d 391 (Tex. Crim. App. 2006)............................. 9-10, 20
*Frierson v. Woodford*,
  463 F.3d 982 (9th Cir. 2006) ..................................................13

*Garcia v. State,*
    816 So. 2d 554 (Fla. 1998)..................................................................52-53

*Gardner v. Johnson,*
    247 F.3d 551 (5th Cir. 2001) ...............................................................43-44

*Giglio v. United States,*
    405 U.S. 150 (1970)..............................................................................135

*Green v. Georgia,*
    442 U.S. 95 (1979)...................................................................................52

*Green v. Johnson,*
    No. 2:05-cv-340, 2007 WL 951686 (E.D. Va. Mar. 26, 2007)............116

*Green v. State,*
    2009 Tex. App. LEXIS 2416 (Tex. App. Beaumont Apr. 1, 2009)..........93

*Gregg v. Georgia,*
    428 U.S. 153 (1976)................................................................................11

*Griffin v. California,*
    80 U.S. 609 (1965)................................................................................143

*Hodge v. Hurley,*
    426 F.3d 368 (6th Cir. 2005) ...................................................................4

*Holmes v. South Carolina,*
    547 U.S. 319 (2006)..............................................................51, 52, 131

*Howell v. State,*
    151 S.W.3d 450 (Tenn. 2004)........................................................79, 113

*Kirby v. Illinois,*
    406 U.S. 682 (1972)..............................................................................139

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ........................................................................ *passim*

*Lambright v. Schriro,*
    490 F.3d 1103 (9th Cir. 2007) ..........................................................12, 16

*Lewis v. Dretke,*
    355 F.3d 364 (5th Cir. 2003) ...................................................................7

*Lockett v. Ohio,*
    438 U.S. 586 (1978)......................................................................11, 12, 52

*Martinez v. Wainwright,*
    21 F.2d 184 (5th Cir. 1980) ..................................................................146

*Michigan v. Jackson,*
    75 U.S. 625 (1986)................................................................................141

*Montejo v. Louisiana,*
    __ U.S. ___, 129 S. Ct. 2079 (2009)....................................................141

*Moore v. Quarterman,*
    491 F.3d 213 (5th Cir. 2007) ........................................................ *passim*

*Muniz v. State,*
    573 S.W.2d 792 (Tex. Crim. App. 1978)..................................................44

*Padilla v. Kentucky,*
    ___ U.S. ___, No. 08-651, slip op. (2010)..............................................14

*Paxton v. Ward,*
    199 F.3d 1197 (10th Cir. 1999) ...............................................................52

*People v. Superior Court,*
    155 P.3d 259 (Cal. 2007) ............................................................117
*Poindexter v. Mitchell,*
    454 F.3d 564 (6th Cir. 2006) .........................................................16
*Porter v. McCollum,*
    ___ U.S. ___, 130 S. Ct. 447 (2009)................................................16
*Reyna v. State,*
    168 S.W.3d 173 (Tex. Crim. App. 2005)..................................50, 133
*Rivera v. Quarterman,*
    505 F.3d 349 (5th Cir. 2007) ........................................................82
*Rock v. Arkansas,*
    483 U.S. 44 (1987)...............................................................51, 131
*Rompilla v. Beard,*
    545 U.S. 374 (2005) ............................................................ *passim*
*Rothgery v. Gillespie County,*
    ___ U.S. ___, 128 S. Ct. 2578 (2008)............................................139
*Rupe v. Wood,*
    93 F.3d 1434 (9th Cir. 1996) ........................................................52
*Skipper v. South Carolina,*
    476 U.S. 1 (1986).................................................................12, 52
*Shiflet v. State,*
    732 S.W.2d 622 (Tex. Crim. App. 1985)........................................138
*State v. Phillips,*
    940 S.W.2d 512 (Mo. 1997) .........................................................53
*Strickland v. Washington,*
    466 U.S. 668 (1984)............................................................ *passim*
*Tennard v. Dretke,*
    542 U.S. 274 (2004)...................................................................12
*Thomas v. Allen,*
    614 F. Supp. 2d 1257 (N.D. Ala. 2009) .........................................116
*Trevino v. State,*
    100 S.W.3d 232 (Tex. Crim. App. 2003).........................................93
*United States v. Agurs,*
    427 U.S. 97 (1976).......................................................................3
*United States v. Auten,*
    32 F.2d 478 (5th Cir. 1980) ........................................................146
*United States v. Bagley,*
    73 U.S. 667 (1985)............................................................. 147-48
*United States v. Coppa,*
    67 F.3d 132 (2d Cir. 2001)..........................................................147
*United States v. Davis,*
    611 F.Supp.2d 472 (D. Md. 2009) ........................................112, 115
*United States v. Deutsch,*
    75 F.2d 55 (5th Cir. 1973) ..........................................................146
*United States v. Gouveia,*
    467 U.S. 180 (1984)...................................................................138

*United States ex rel. Emerson v. Gramley,*
    883 F. Supp. 225 (N.D. Ill. 1995) ...................................................................13

*United States v. Miranne,*
    88 F.2d 980 (5th Cir. 1982) ......................................................................146

*United States v. Parker,*
    65 M.J. 626 (N.M. Ct. Crim. App. 2007) ..............................................116

*United States v. Ringwalt,*
    213 F. Supp. 2d 499 (E.D. Pa. 2002) ....................................................134

*United States v. Shields,*
    No. 2:04-cr-20254-BBD (W.D. Tenn. May 11, 2009) ..................................115

*United States v. Udechukwu,*
    11 F.3d 1101 (1st Cir. 1993) ...................................................................134

*United States v. Valentine,*
    820 F.2d 565 (2d Cir. 1987).....................................................................134

*Walbey v. Quarterman,*
    309 Fed.Appx. 795 (5th Cir. 2009).......................................................... *passim*

*Walbey v. State,*
    926 S.W.2d 307 (Tex. Crim. App. 1996)...................................................40

*Walker v. True,*
    399 F.3d 315 (4th Cir. 2005) ...................................................................115

*Washington v. Texas,*
    388 U.S. 14 (1967)...........................................................................51, 130

*Wiggins v. Smith,*
    539 U.S. 510 (2003) ............................................................................. *passim*

*Williams v. Taylor,*
    529 U.S. 362 (2000) ............................................................................. *passim*

*Woodson v. North Carolina,*
    428 U.S. 280 (1976) .................................................................................11

## **Rules and Statutes**

Cal. Penal Code § 190.3 ..................................................................................5

Fla. Stat. ch. 921.141 ......................................................................................5

Md. Code Ann., Criminal Law § 2-303 ..........................................................5

Tex. Code Crim. Proc. art. 37.071 ...............................................................6, 7

Tex. Penal Code § 7.02(a)(2) .................................................................. 136-37

TEX. R. EVID. 801, 803 ........................................................................... *passim*

Va. Code § 19.2-264.4 ....................................................................................8

## **Other Authority**

AAIDD, USER'S GUIDE: MENTAL RETARDATION, DEFINITION, CLASSIFICATION,
    AND SYSTEMS OF SUPPORTS—10TH EDITION 20-21 (2007) ...................................... *passim*

AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 1
    (10th ed. 2002) ("2002 AAMR Manual")................................................................. *passim*

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases,
    31 HOFSTRA L. REV. 913 (2003)............................................................................ *passim*

APA, *Diagnostic and Statistical Manual of Mental Disorders* 41
    (Text Revision, 4th ed 2000) ("DSM-IV") ............................................................. *passim*

Baroff, George S., *Establishing Mental Retardation in Capital Cases: A Potential Matter of Life
    and Death*, Mental Retardation, Vol. 29, No. 6, 1991 ......................................................81

Baroff, George S., MENTAL RETARDATION: NATURE, CAUSE, AND MANAGEMENT 31 (3d ed.)
    Philadelphia Brunner/Mazel (1999)................................................................................81

Bright, Stephen B., *Advocate in Residence: The Death Penalty As the Answer to Crime: Costly,
    Counterproductive and Corrupting*, 36 SANTA CLARA L. REV. 1069 (1996)....................13

Diekema, Douglas S., *Involuntary Sterilization of Persons with Mental Retardation: An Ethical
    Analysis*, 9 MENTAL RETARDATION & DEV. DISABILITIES RES. REVS. 21, 24 (2003) .....110

Edgerton, Robert B., THE CLOAK OF COMPETENCE
    (Univ. of Cal. Press Rev. Updated 1993)................................................................ *passim*

Feldman, Maurice A., *Research on Parenting by Mentally Retarded Persons*,
    9 PSYCH. CLINICS OF NORTH AMERICA 777 (1986) .......................................................111

Flynn, James R., *IQ Gains over Time, in* ENCYCLOPEDIA OF HUMAN INTELLIGENCE 617 (Robert
    J. Stenberg ed., 1994)........................................................................................................82

Flynn, James R., *The WAIS-III and WAIS-IV: Daubert Motions Favor the Certainly False over
    the Approximately True, 16 Applied Neuropsychology 98...............................80, 113, 115

Hall, I., et. al., Social Outcomes in Adulthood of Children with Intellectual Impairment:
    *Evidence from a Birth Cohort*, 49 J. INTELL. DISABILITY RES. 171 (2005) ....................107

Jacobs, Angeline M., *et. al.*, HANDBOOK FOR JOB PLACEMENT OF MENTALLY RETARDED
    WORKERS: TRAINING, OPPORTUNITIES, AND CAREER AREAS (Eileen M. Oullette ed.,
    Garland STPM Press 3d ed. 1979)................................................................................108

Koller, H., *et. al., Marriage in a Young Adult Mentally Retarded Population*,
    32 J. MENTAL DEFICIENCY RES. 93 (1988)....................................................................110

x

Maughan, B., *et. al.*, *Mild Mental Retardation: Psychosocial Functioning in Adulthood*,
    29 PSYCHOL. MED. 351 ..........................................................................................110, 111

State Bar of Texas Guidelines and Standards for Texas Capital Counsel,
    69 TEX. BAR J. 966 (2006) ........................................................................... *passim*

TABLE OF EXHIBITS

| Exhibit | Document |
| --- | --- |
| 1 | Jury Charge from *State v. Juan Lizcano* |
| 2 | Declaration of Richard H. Burr |
| 3 | "The Team Concept in a Capital Case" |
| 4 | Graph of Jack Strickland's Caseload from February 2004 to November 2005 |
| 5 | Findings of Fact, *Ex Parte Quintin Phillippe Jones*, Cause No. 57,299-01 |
| 6 | Invoices of Linda Sanders |
| 7 | Affidavit of Linda Sanders |
| 8 | Declaration of Alma Lagarda |
| 9 | Declaration of Tarsharn Busby |
| 10 | Declaration of Kimiko Coleman |
| 11 | Declaration of Merlyn Rogers |
| 12 | Declaration of Pamela Harris |
| 13 | Declaration of James Bybee |
| 14 | Declaration of Steve Porter |
| 15 | Coronado Hospital Records |
| 16 | John Peter Smith Hospital Records |
| 17 | Tarrant County MHMR Records |
| 18 | Declaration of Willard Farr |
| 19 | Declaration of Eddy Pouncy |
| 20 | Declaration of Renee Boyd |
| 21 | Declaration of Raquel Farr |

22          Report of Dr. Bekh Bradley-Davino, Ph.D., May 19, 2010

23          Report of Dr. Gilbert Martinez, Ph.D., February 24, 2010

24          Pampa ISD Records

25          Affidavit of Dr. Gilda Kessner, Psy.D.

26          AAIDD, User's Guide: Mental Retardation, Definition, Classification, and Systems of Supports—10TH Edition 20-21 (2007) (excerpt)

27          Angeline M. Jacobs, *et. al.*, Handbook for Job Placement of Mentally Retarded Workers: Training, Opportunities, and Career Areas (Eileen M. Oullette ed., Garland STPM Press 3d ed. 1979) (excerpt)

28          Robert B. Edgerton, The Cloak of Competence (Univ. of Cal. Press Rev. Updated 1993) (excerpt)

29          2002 AAMR Manual (excerpt)

30          Report of Eric Holden

31          FBI Records (excerpt)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **EDWARD LEE BUSBY,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 4:09-CV-160-Y |
| | § | |
| | § | *CAPITAL CASE* |
| | § | |
| **RICK THALER**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

_____

**PETITION FOR A WRIT OF HABEAS CORPUS**
_____

Petitioner Edward Lee Busby, Jr. asks this Court to issue a writ of habeas corpus and

grant him relief from his unconstitutional death sentence.

**JURISDICTION**

This court has jurisdiction pursuant to 28 U.S.C. § 2241 and § 2254.

**PRIOR PROCEEDINGS**

Mr. Busby was convicted of capital murder and sentenced to death in November 2005.

The conviction and death sentence were affirmed by the Texas Court of Criminal Appeals on

May 14, 2008. *State v. Busby*, No. AP-75,300 (Tex. Crim. App. 2008).  The conviction became

final on December 1, 2008 when the United States Supreme Court denied Mr. Busby's petition

for writ of *certiorari*.  *Busby v. Texas*, 129 S. Ct. 625, 172 L. Ed. 2d 617 (2008).

Mr. Busby filed an application for writ of habeas corpus in the state convicting court on March 4, 2008. The convicting court recommended that relief be denied and the Texas Court of Criminal Appeals accepted the recommendation, denying relief on February 25, 2009. *Ex parte Busby*, No. 70,747-01 (Tex. Crim. App. 2009) (unpublished).

## STATEMENT OF THE CASE

Mr. Busby, a person with mental retardation, was arrested and charged on February 6, 2004 for the kidnapping and death of Laura Lee Crane in January 2004. Mr. Busby was accused of having placed Ms. Crane in the trunk of her car and subsequently binding her face and body with duct tape, causing death due to asphyxiation.

Despite the filing of charges against Mr. Busby for capital murder on February 6, 2004, Mr. Busby was not appointed counsel to advise him until a full 17 days later, during which time Mr. Busby made damaging statements that were used against him at trial. Although counsel was finally appointed on February 23, 2004, counsel did not begin investigation into Mr. Busby's case until a full *19 months* later—effectively on the eve of trial. During trial, counsel inexplicably failed to admit critical evidence that Mr. Busby had a constitutional right to present, evidence that was relevant to both guilt-innocence and sentencing.

As a result of trial counsel's failure to adhere to professional norms, Mr. Busby's jury heard only a fraction of important and readily-available evidence about the circumstances of the offense and Mr. Busby's character and background. The jury did not hear, for example, that Mr. Busby's co-defendant, who initially tried to shift blame for the crime entirely on Mr. Busby, subsequently told prosecution team members that it was she who directed Mr. Busby—not once, but twice—to bind Ms. Crane. The jury also did not hear about Mr. Busby's mental retardation, bipolar disorder, possible post-traumatic stress disorder, and his history of complete dependence

on—and manipulation by—the women in his life.  Nor did the jury hear about the physical, verbal, and emotional abuse Mr. Busby suffered while growing up in a poverty-stricken household, or his abandonment and neglect by his mother and biological father.

Because of the constitutional violations that occurred in the prosecution of Mr. Busby, the jury's verdict rested on a wholly incomplete picture of both the circumstances of the offense and Mr. Busby's character and background.  The evidence developed and presented herein was readily available had trial counsel adhered to prevailing professional norms for capital representation.

## CLAIMS FOR RELIEF

**I.  MR. BUSBY WAS DEPRIVED EFFECTIVE ASSISTANCE OF COUNSEL IN THE SENTENCING PHASE OF HIS CAPITAL MURDER TRIAL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

A criminal defendant is deprived of effective assistance of counsel when (1) counsel's performance falls below an objective standard of reasonableness, as judged by prevailing professional norms, and (2) a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland v. Washington*, 466. U.S. 668, 688, 694 (1984).

The prejudice inquiry "finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution."  *Strickland*, 466 U.S. at 694 (citing *United States v. Agurs*, 427 U.S. 97, 104, 112-13 (1976)).  Consequently, to prove prejudice, "a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*.

This test is not outcome determinative.  The *Strickland* Court itself expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case.  *Strickland*, 466 U.S. at 693-94.  Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."  *Id*.  Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard.[1]  The Supreme Court reiterated this point in *Williams v. Taylor*, 529 U.S. 362 (2000), expressly noting that a state court's use of a preponderance of the evidence standard rather than the less-onerous reasonable probability standard would result in a decision that was contrary to federal law as determined by that Court.  *Id*. at 405-06 ("If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a 'reasonable probability that...the result of the proceeding would have been different.'").

With respect to how a court should analytically conduct the prejudice inquiry in an individual case, several points require mentioning.  First, in determining whether counsel's errors

---

[1] In *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), the Fifth Circuit recognized that the prejudice prong imposes "a lower burden of proof than the preponderance standard."  *Id*. at 595.  Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard."  *Id*.; s*ee also Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) (reciting *Strickland* prejudice standard of "reasonable probability" as "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley*, 426 F.3d 368, 376 n.18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of the evidence").

resulted in the required prejudice, a court must presume that the jury acted according to law. *Strickland*, 466 U.S. at 694. In other words, "The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id*. at 695. Therefore, not only does one presume that the decisionmaker followed the law, the law itself, *i.e.*, "the standards that govern the [sentencing] decision," must be considered when determining whether a probability sufficient to undermine confidence in the outcome exists.

The prejudice inquiry is therefore case specific, in that it is an attempt to assess the effect that trial counsel's deficient performance had on the reliability of the outcome of a particular proceeding. In many death penalty states, sentencing laws require that the sentence in a capital case—life or death—be determined by weighing aggravating factors found to exist by the decisionmaker against mitigating factors found to exist by the decisionmaker. If the jury determines that the mitigating factors outweigh the aggravating factors, the jury is instructed to return a verdict of life. If, however, the jury determines that the aggravating factors outweigh the mitigating factors, then the jury is instructed to return a verdict of death.[2] In these cases, "the question is whether there is a reasonable probability that, absent the errors, the sentencer…would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

---

[2] *See, e.g.,* Cal. Penal Code § 190.3 ("[T]he trier of fact…shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole"); Fla. Stat. ch. 921.141 (trier of fact must determine "[w]hether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist"); Md. Code Ann., Criminal Law § 2-303(i)(1) ("If the court or jury finds that one or more of the mitigating circumstances…of this section exists, it shall determine by a preponderance of the evidence whether the aggravating circumstances…of this section outweigh the mitigating circumstances.").

A court reviewing a judgment imposing death from Texas, however, would not ask this precise question, because the laws governing sentencing in Texas capital trials do not require the decisionmaker to weigh aggravating factors and mitigating factors when deciding what penalty to assess.  Instead, Texas asks jurors to answer "special issues."   The special issues are questions of fact that the jury must answer either "yes" or "no."  Depending upon how these questions are answered, the trial court sentences the defendant to either life or death.

The first special issue a Texas jury is required to answer is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).  The second special issue a Texas jury is required to answer (assuming the defendant was not convicted as a party) is "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."[3]  Acts 1991, 72nd Leg., ch. 838, § 1 (1991) (amended 2005).  The jury is instructed on these two special issues in every capital sentencing proceeding in Texas.  Where only these two questions are asked, if the jury answers the first special issue "yes" and the second special issue "no," the trial court must impose a sentence of death.  For any other combination of answers—including the inability of the jury to unanimously agree on an answer for either question—the trial court must assess a sentence of life.  Tex. Code Crim. Proc. art. 37.071, § 2(g).

---

[3] Texas has since amended the sentencing options in capital cases to death and life without parole.  Accordingly, special issue two now asks whether sufficient mitigating circumstances exist to warrant that a sentence of "life imprisonment without parole rather than a death sentence be imposed."  Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).

Two additional special issues may be applicable under certain circumstances, one of which is relevant to Mr. Busby's case. In 2002, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), which prohibits capital punishment for persons who have mental retardation. At the time of Mr. Busby's trial—and still today—the Texas legislature has yet to pass a law prohibiting capital punishment for the mentally retarded or to create procedures by which courts are to enforce the prohibition. Texas courts have therefore enforced the *Atkins* prohibition by providing the defendant's capital sentencing jury a third special issue when the evidence at trial has raised the question of whether the defendant is a person with mental retardation. The special issue asks the jury to factually determine whether the preponderance of the evidence shows that the defendant is a person with mental retardation.[4] *See* Exhibit 1 (Jury Charge from *State v. Juan Lizcano*).

In light of these standards governing capital sentencing in Texas, the question in this case is whether there is a reasonable probability that, absent counsel's errors, the jury would have answered differently any of the special issues the defendant would have been entitled to have the jury receive.[5] *See Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003) (noting that the relevant question is whether totality of evidence "would have affected the sentencing decision of at least one juror").

---

[4] In a minority of capital cases, the sentencing jury is asked, in addition to the two standard special issues, whether the defendant intended or anticipated loss of life. The jury is given this additional special issue only when the jury was charged in the guilt phase under Texas's law of parties. See Tex. Code Crim. Proc. art. 37.071 § 2(b)(2). Mr. Busby's jury was not instructed under the law of parties, and his capital sentencing was accordingly not required to answer this special issue, rendering this special issue irrelevant to his case and the present petition.

[5] With respect to the two standard special issues, answering those issues "differently" includes not answering them at all. Under Tex. Code Crim. Proc. art. 37.071, § 2(g), if the sentencing jury is unable to agree on the answers to these special issues, the jury must leave the issue blank, requiring the trial judge to sentence the defendant to life.

Second, in making the prejudice determination, a court must consider the totality of the evidence before the jury before assessing the effect that counsel's errors might have had on any of the fact-findings.  As the *Strickland* Court observed:

> Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695-96.  Thus, a court reviewing how counsel's errors affected the punishment phase of a Texas capital proceeding must examine the relevant special issue (*i.e.*, the "factual findings") to determine whether, and to what extent, it may have been affected in light of the evidence before the jury.[6]

---

[6] The Supreme Court's opinion in *Williams v. Taylor*, 529 U.S. 362 (2000), is instructive for Texas cases.  In that case, the Court considered whether Williams was prejudiced during the punishment phase of his Virginia capital murder trial by his trial counsel's failure to discover and present relevant mitigating evidence.  Although not identical, the standards governing Virginia's capital sentencing scheme are similar to those governing capital sentencing in Texas.  At the time of Williams' capital murder trial, Virginia law required the jury's verdict to be in one of the following forms:
For a death sentence:

> We, the jury, on the issue joined, having found the defendant guilty of (here set out statutory language of the offense charged) and that (after consideration of his prior history that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society) or his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved (torture) (depravity of mind) (aggravated battery to the victim), and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death.

Va. Code § 19.2-264.4.  For a life sentence:

In *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006), Texas's Court of Criminal Appeals (CCA) affirmed this analytical framework for reviewing the prejudice prong of a *Strickland* claim in the sentencing phase of a Texas capital trial. There, the Texas court wrote:

> Second, the applicant must show that counsel's performance prejudiced his defense at trial. In order to satisfy this prong, an applicant must show there was a reasonable probability that, absent the errors, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death. Texas' capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances. It asks the jury to answer a mitigation issue. We have adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently. 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'

*Gonzales*, 204 S.W.3d at 393-94 (footnotes omitted). In making the prejudice inquiry, the Texas court considered "the totality of the evidence, 'both that adduced at trial, and the evidence adduced in the habeas proceeding.'" *Id*. at 398 (citing *Wiggins*, 539 U.S. at 534). The CCA determined that Gonzales had suffered prejudice from his counsel's failure to locate and present

---

> We, the jury, on the issue joined, having found the defendant guilty of (here set out statutory language of the offense charged) and having considered all of the evidence in aggravation and mitigation of such offense, fix his punishment at imprisonment for life.

*Id*. Unlike Texas, Virginia jurors were not required to answer "yes" or "no" to specific questions. Like Texas, however, Virginia did not require jurors to weigh aggravating factors against mitigating factors in order to make a decision, instead requiring them simply to find one of two aggravating factors and then consider the mitigating evidence. Consequently, the Supreme Court was able to conclude that Williams suffered prejudice even while conceding that the undiscovered mitigating evidence "may not have overcome a finding of future dangerousness," because that mitigating evidence "might well have influenced the jury's appraisal of his moral culpability." Because Texas is like Virginia in that it does not require the jury to find one set of factors to outweigh another set, this standard is appropriate to review allegations of ineffective assistance of counsel in the punishment phase of Texas capital cases. *See also Wiggins v. Smith*, 539 U.S. 510, 538 (2003) ("[A]vailable mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of Wiggins' moral culpability") (internal quotations omitted); *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) ("[U]ndiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of Rompilla's culpability.") (internal quotations and brackets omitted).

mitigating evidence because "the applicant's mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of the applicant's moral culpability." *Id*. at 399 (quoting and citing *Wiggins*, 539 U.S. at 538).

Mr. Busby alleges two errors by trial counsel, but for which a reasonable probability of a different sentencing result exists. First, trial counsel failed to conduct a reasonable sentencing-phase investigation in accordance with prevailing professional norms. Second, trial counsel failed to admit the statements against interest of Mr. Busby's co-defendant, Kathleen Latimer, accepting leadership responsibility in the complainant's death. Latimer's statements corroborated Mr. Busby's admitted statements and directly contradicted the State's theory of the case.

Both errors infected the jury's consideration of the mitigation special issue, discussed *supra*. In addition, the first error affected the jury's consideration of the mental retardation special issue; indeed, trial counsel's failure *entirely deprived* the jury of considering the mental retardation special issue at all. But for these unprofessional errors, there is a reasonable probability the result of the sentencing proceeding would have been different.

A.   **Trial Counsel Rendered Deficient Performance By Failing to Conduct a Reasonable Sentencing Investigation and by Failing to Seek and Obtain Admittance of Co-Defendant Kathleen Latimer's Statements.**

1.   **Trial Counsel Failed to Conduct a Reasonable Sentencing Investigation.**

A body of Supreme Court case law has developed to address allegations that trial counsel conducted unreasonable sentencing investigation. Because this allegation constitutes a sizeable portion of Mr. Busby's *Strickland* claim, he will discuss this body of case law in some depth.

10

In determining whether trial counsel were ineffective in failing to adequately investigate and present the available mitigating evidence during sentencing, this Court must apply the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   Under *Strickland*, the defendant first "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms." *Id*. at 688.   In evaluating a claim that counsel failed to adequately investigate, *Strickland* held that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691.      Second, the defendant must satisfy the prejudice requirement by showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

### a.      Prevailing Professional Norms.

In capital sentencing, the United States Supreme Court has held that the Eighth and Fourteenth Amendments require that sentencing procedures "focus the jury's attention on the particularized nature of the crime," *Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (plurality opinion), while also allowing "the particularized consideration of relevant aspects of the character and record" of the individual defendant, *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976).  Because "an individualized decision is essential," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), the Eighth Amendment mandates that the sentencer "not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id*. at 604 (emphasis in original).  Likewise, the sentencer may not "refuse to consider, *as a*

*matter of law*, any relevant mitigating evidence," *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982), such as a "troubled youth." *Id.* at 107.[7]

Relevant mitigating evidence is not limited only to evidence that would "relate specifically to petitioner's culpability for the crime he committed." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). Likewise, there is no requirement that mitigating evidence even have a "nexus" to the offenses or that the defendant make any showing that "the criminal act was attributable" in any way to the mitigating factors. *Tennard v. Dretke*, 542 U.S. 274, 286 (2004). Relevant mitigating evidence includes any evidence that would be "mitigating" in the sense that it "might serve 'as a basis for a sentence less than death.'" *Skipper*, 476 U.S. at 5 (quoting *Lockett*, 438 U.S. at 604)*; see also Lambright v. Schriro*, 490 F.3d 1103, 1115 (9th Cir. 2007) ("If evidence relating to life circumstances with no causal relationship to the crime were to be eliminated, significant aspects of a defendant's disadvantaged background, emotional and mental problems, and adverse history, as well as his positive character traits, would not be considered, even though some of these factors, both positive and negative, might cause a sentencer to determine that a life sentence, rather than death at the hands of the state, is the appropriate punishment for the particular defendant").

In essence, the fundamental Eighth Amendment premise is that if the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of those factors that warrant a less severe penalty. *Woodson*, 428 U.S. at 304. A jury can consider

---

[7] In *Eddings*, the sentencing judge believed that he was legally prohibited from considering as mitigation that: the defendant was "raised without proper guidance;" his parents were divorced; he lived "without rules or supervision" with a mother who was possibly an alcoholic and a prostitute; when he stayed with his father he was subjected to "excessive physical punishment" and "physical violence;" he was "emotionally disturbed;" and "his mental and emotional development" were less than his 16 years of age. *Id.* at 107.

evidence in mitigation, however, only if defense counsel at trial competently investigates and presents the available evidence at trial.

"The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." *Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir. 2001). "Because the scope of mitigation evidence which may be considered by the jury in sentencing is much broader than the range of relevant information which may be considered in determining guilt or innocence, counsel is under a greater obligation to discover and evaluate potential evidence of mitigation." *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 243 (N.D. Ill. 1995), *aff'd*, 91 F.3d 898 (7th Cir. 1996); *see also Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006) ("The imperative to cast a wide net for all relevant mitigating evidence is heightened at a capital sentencing hearing"). In short, the responsibility of defense counsel is to walk a mile in the shoes of the client, to see who he is, and to present information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community. *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (quoting Stephen B. Bright, *Advocate in Residence: The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting*, 36 SANTA CLARA L. REV. 1069, 1085-86 (1996)).

The American Bar Association's (ABA) revised Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, published in 2003, articulates professional norms for capital defense counsel, ensuring that constitutionally-relevant evidence necessary to a reliable individualized assessment of the defendant's moral culpability is presented to the sentencing jury for consideration. ABA, *Guidelines for the Appointment and*

*Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003), reprinted in 31

HOFSTRA L. REV. 913, 1027 (2003) [hereinafter ABA Guidelines].  The ABA's standards for

capital defense work have long been referred by the Supreme Court as "guides to determining

what [performance] is reasonable."  *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting

*Strickland v. Washington*, 466 U.S. 668, 688 (1984)); *see also Rompilla v. Beard*, 545 U.S. 374,

387 n.7 (2005) (relying on the ABA Guidelines).[8]  The State Bar of Texas has likewise issued

guidelines that "articulate the statewide standard of practice for the defense of capital cases" in

Texas, the nation's most active death penalty state.  State Bar of Texas, *The State Bar of Texas*

*Guidelines and Standards for Texas Capital Counsel*, 69 TEX. BAR J. 966 (2006) [hereinafter

SBOT Guidelines].

 The ABA Guidelines unequivocally provide that lead counsel assemble a defense team

"as soon as possible after designation" in order to conduct a thorough and independent

investigation relating to sentencing.  *See* ABA Guideline 10.4(C); *see also* ABA Guideline 10.7

cmt. ("The mitigation investigation should begin *as quickly as possible*, because it may affect the

investigation of first phase defenses (e.g., by suggesting additional areas for questioning police

officers or other witnesses), decisions about the need for expert evaluations (including

competency, mental retardation, or insanity), motion practice, and plea negotiations.") (emphasis

added); ABA Guideline 10.4 cmt. ("After designation, lead counsel should assemble the rest of

the defense team."); ABA Guideline 1.1 cmt. ("Investigation and planning for both phases must

begin *immediately* upon counsel's entry into the case, even before the prosecution has

affirmatively indicated that it will seek the death penalty.") (emphasis added); *id.* ("[I]t is

---

 [8] While the ABA Guidelines are only guides and not "inexorable commands," *Bobby v. Van Hook*, ___ U.S. ___, 130 S. Ct. 13, 17 (2009), the standards are "valuable measures of the prevailing professional norms of effective representation."  *Padilla v. Kentucky*, ___ U.S. ___, No. 08-651, slip op. at 20 (2010).

*imperative* that counsel begin investigating mitigating evidence and assembling the defense team *as early as possible*…") (emphasis added); ABA Guideline 1.2 cmt. ("…[E]arly investigation to…uncover mitigating evidence is *a necessity*….") (emphasis added); ABA Guideline 10.2 cmt. ("[Early] investigation may uncover mitigating circumstances or other information that will convince the prosecutor to forego pursuit of a death sentence."); SBOT Guideline 10.1(B); Exhibit 2 (Declaration of Richard H. Burr) ("Because of the extensive time and work involved in a mitigation investigation, trial counsel must obtain funding for a mitigation specialist shortly after he or she is appointed."). "Because the sentencer in a capital case must consider in mitigation anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant, penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." ABA Guideline 10.7 cmt. (citing Russell Stetler, *Mitigation Evidence in Death Penalty Cases*, The Champion, Jan./Feb. 1999, at 35) (internal quotations omitted).

The "core" defense team that lead capital defense counsel should immediately assemble upon appointment includes (1) at least one co-counsel; (2) an investigator; and (3) a mitigation specialist. ABA Guideline 10.4(C); SBOT Guideline 10.1(B). "Lead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with [the ABA] Guidelines and professional standards." ABA Guideline 10.4(B); SBOT Guideline 10.1(A). Capital counsel's duty to use his or her assembled defense team to conduct a thorough sentencing phase investigation is well established:

> The duty to investigate exists regardless of the expressed desires of a client. Nor may counsel "sit idly by, thinking that investigation would be futile." Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case.

15

ABA Guideline 10.7 cmt.; SBOT Guideline 11.1(A) ("Counsel ... have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."); *see also Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 452 (2009) ("It is unquestioned that under the prevailing professional norms at the time of [the petitioner's] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'") (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).

Counsel's duty to conduct a reasonable sentencing phase investigation "is not discharged merely by conducting a limited investigation." *Lambright*, 490 F.3d at 1120. The defense team must "seek records, interview family members and friends, and obtain appropriate mental evaluations well in advance of trial." *Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006). This is a time-consuming and work-intensive process. In order to dedicate the time required to conduct a thorough investigation of a client's background, counsel has a corresponding duty to limit his or her caseload while preparing for a capital trial. ABA Guideline 10.3 ("Counsel representing clients in death penalty cases should limit their caseloads to the level needed to provide each client with high quality legal representation in accordance with [the ABA] guidelines."); SBOT Guideline 9.3(A) (same); SBOT Guideline 9.3(B) ("Counsel representing the death penalty clients must, due to the severity of nature of the case and the necessity for time-consuming research and preparation, give priority to death penalty clients over their other caseload."). The ABA Guidelines exhort, "[A]n attorney whose workload threatens to cause a breach of his or her obligations under these Guidelines has a duty to take corrective action. Counsel in that situation may not simply attempt to muddle through." ABA Guideline 10.3 cmt.

***Mitigation Specialists***

The use of a qualified mitigation specialist has become part of the well-established standard of care, and ensures that a reasonable mitigation investigation is conducted. ABA Guideline 4.1(A)(1) cmt. (citing Subcomm. on Federal Death Penalty Cases, Comm. on Defender Services, Judicial Conference of the United States, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* (1998) [hereinafter *Federal Death Penalty Cases*] (discussing federal death penalty cases), available at http://www.uscourts.gov/dpenalty/1COVER.htm); SBOT Guideline 10.1(B)(2)(b).

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. Moreover, they may be critical to assuring that the client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning his case.

> Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict. The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

*Id.*

**Mental Health Experts**

"[B]ecause mental health issues pervade capital cases, a psychologist or other mental health expert may well be a needed member of the defense team." ABA Guideline 10.4 cmt.

> [M]ental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses on death row. Evidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctures during the proceedings, including competency to stand trial, sanity at the time of the offense, capacity to intend or premeditate death, ability to comprehend Miranda warnings, and competency to waive constitutional rights. The Constitution forbids the execution of persons with mental retardation, making this a necessary area of inquiry in every case. Further, the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase. Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process. Counsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary.

ABA Guideline 4.1 cmt. "Capital defense counsel must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, and must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination."

ABA Guideline 1.1 cmt.

> Since an understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning, construction of the narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present. Expert witnesses may be useful for this purpose and may assist the jury in understanding the significance of the observations. For example, expert testimony may explain the permanent neurological damage caused by fetal alcohol syndrome or childhood abuse, or the hereditary nature of mental illness, and the effects of these impairments on the client's judgment and impulse control. Counsel should choose experts who are tailored specifically to the needs of the case, rather than relying on an "all-purpose" expert who may have insufficient knowledge or experience to testify persuasively. In order to prepare effectively for trial, and to choose the best experts, counsel should take advantage of training materials and seminars and remain current on developments in fields such as neurology and psychology, which often have important implications for understanding clients' behavior. Counsel should also seek advice and assistance from colleagues and experts in the field of capital litigation.

ABA Guideline 10.11 cmt.; *see also* SBOT Guideline 10.1(B)(2)(c) ("In the event that the mental health associate determines the possibility of legitimate mental health issues, lead counsel should then make application to the Court that the appropriate experts be appointed by the Court for making expert of valuations of the defendant's condition.")

These professional norms with respect to sentencing investigation in capital cases are reflected by continuing legal education seminars. Legal education seminars further delineate the constitutionally-mandated duties of capital defense counsel described by the courts, the ABA, and the SBOT. For example, materials distributed at a February 2001 seminar in Austin, Texas, explain that every capital defense team must include a mitigation specialist hired at the earliest possible moment after designation:

> In a death case, the ultimate goal is the preservation of the client's life. The entire preparation of the case must be directed to that end. Because of this all-important goal, these cases are, in essence, prepared in reverse order. Regardless of guilt, the attorneys must aim their efforts ***from the beginning*** at saving the client's life. For this reason and because the death penalty is, in part, a sociological issue, counsel must include human service professionals on the defense team. ***The mitigation specialist is the first,*** and usually most important, expert that should be consulted in every capital case. They should have both sound, clinical skills for interviewing and assessment and a thorough working knowledge of the court system.[9]

---

[9] Because the mitigation specialist plays such a critical role in preparing for sentencing, the standard of care as reflected by continuing legal education requires entrusting the social history investigation only to someone with the appropriate expertise and training:

> The lawyer must also take care in hiring the mitigation specialist. This is not someone who will just go out and talk to people. This should be a professional who is trained in conducting mitigation investigations. This can be a licensed social worker with an MSW or Ph.D. This is an expert. Someone who can testify at trial as to her findings, conclusions and opinions.
>
> * * * *
>
> A mitigation specialist should possess an understanding of the psycho-social aspects of human development, human relations skills, and management skills. Try to select a mitigation specialist with a background in any combination of clinical social work, counseling other human service professions coupled with some sort of forensic or criminal justice knowledge.

Exhibit 3 at 2 ("The Team Concept in a Capital Case") (emphasis added).

The seminar materials emphasize the important preparatory role that mitigation specialists play in capital defense, including development of the accused's social history, which will be heavily relied upon by the trial attorneys and mental health experts:

> The largest role of the mitigation specialist is that of a psycho-social investigator. The **complete** social investigation compiled by the mitigation specialist is the base upon which a successful mitigation is built.
>
> * * * *
>
> The social history helps the attorney understand the client and what happened and aids the attorney in explaining to the court and jury what the client is about and why. ***The social history also contains invaluable information for other team members, such as the psychologists and psychiatrists. This material guides the lawyers and mental health experts in determining what to test for and why.***

Exhibit 3 at 4 (emphasis added).

Finally, the Texas Court of Criminal Appeals decision in *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006), is another source from which professional norms in Texas may be discerned. Gonzales's capital murder trial occurred in 1997. *Id*. at 393. After trial, post-conviction counsel discovered, through interviews with Gonzales's family, that Gonzales had been physically and sexually abused as a child. *Id*. at 394. Although Gonzales's trial counsel had interviewed both Gonzales's mother and sister about Gonzales's background—the latter of whom even testified at punishment to Gonzales's difficult childhood and his borderline mental retardation—Gonzales's counsel never specifically inquired into whether Gonzales had been abused with these potential witnesses and thus did not present evidence of abuse at sentencing. *Id*. at 394-95. The CCA held that this failure to investigate and inquire into the subject of abuse when interviewing the client and relevant witnesses fell below an objective standard of

---

Exhibit 3 at 2-3.

reasonableness for Texas capital trial counsel in 1997 and rendered trial counsel's mitigation investigation unreasonable.[10] *Id.* at 397.

---

[10] Judge Cochran wrote a concurring opinion, in which she expanded upon the professional norms in place in Texas capital sentencing proceedings in 1997:

> The underlying message of *Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005) is that defense counsel must fully investigate any and all potential mitigating circumstances in his client's background which might conceivably persuade a jury not to impose the death penalty. The failure to investigate will not be excused simply because the defendant failed to mention such evidence himself. Indeed, under *Rompilla v. Beard*, defense counsel may be required to investigate potential mitigating facts even when the defendant is "uninterested in helping" or is "even actively obstructive" in developing a mitigation defense.

> Under both current Supreme Court standards and Texas statutes, defense counsel has a constitutional duty to seek out all of the "circumstances of the offense, the defendant's character and background, and [any evidence that lessens] the personal moral culpability of the defendant[.]"…Like a doctor, defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic. Such topics might include:

> - Childhood accidents and injuries;
> - Trips to the emergency room;
> - Serious illnesses at any time;
> - Physical abuse to the defendant or any other member of the family;
> - Any sexual abuse to the defendant or any other member of the family;
> - Size of the immediate family, and a history of the physical, educational, and emotional background of each member;
> - The defendant's relationship with and attitudes toward every member of the family;
> - Drug or alcohol use or abuse by himself and any or all members of the family;
> - Any mental health treatment of any member of the family, including the defendant;
> - The cohesiveness of the family;
> - The family's standard of living and living conditions;
> - Any and all available school records;
> - Any record of learning disabilities;
> - Childhood and adult social relationships with members of the same and opposite sex;
> - Any marriage, divorce, children, step-children, or surrogate family relationships, and their positive or negative influence upon the defendant;

### b.      Application of *Strickland* to Allegations That Trial Counsel Failed to Conduct Reasonable Sentencing Investigations.

From 2000 to 2005, the Supreme Court accepted three cases to address claims of inadequate investigation at the sentencing phase of a capital trial. *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). This trio of decisions addressed death penalty cases tried in the 1980's, and the Supreme Court held in each instance that the clearly established law of *Strickland* mandated a finding of ineffective assistance of counsel.

The significance of these decisions cannot be overstated.  While they are not ground-breaking in the sense that they represented clearly established law at the time they were made, they offer a detailed set of instructions to lower courts on the proper application of *Strickland* to capital sentencing proceedings.  That the Court deemed such instruction necessary is evident from the fact that it devoted its scarce resources to taking—not one, but—three, relatively speaking, unremarkable capital cases and modeling how to adjudicate claims of ineffective assistance of counsel.  The Court scrupulously enforced the right to effective assistance of counsel in capital sentencing proceedings, even under the deferential scheme of AEDPA.

### *Williams v. Taylor*, 529 U.S. 362 (2000)

In *Williams* the Supreme Court addressed

whether Terry Williams' constitutional right to the effective assistance of counsel as defined in *Strickland v. Washington* was violated, and whether the judgment of the Virginia Supreme Court refusing to set aside his death sentence "was contrary

---

- Any and all awards, honors, or special accomplishments, as well as any and all convictions, arrests, expulsions or suspensions from school, job firings, etc.;
- Any and all traumatic experiences; …

*Gonzales*, 204 S.W.3d at 400-01 (Cochran, J., concurring).

to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," within the meaning of 28 U.S.C. § 2254(d)(1) (1994 ed., Supp. III).

*Williams*, 529 U.S. at 367 (citations omitted).

Terry Williams confessed to murdering Harris Stone because Mr. Stone would not lend him "a couple of dollars." *Id*. at 367-68. According to Williams's confession, he had gone to Stone's house to see Stone's daughter, Dee Dee, but she was not there. Mr. Stone was lying on a bed, alone and very drunk. After Stone refused to loan Williams a couple of dollars, Stone "laid back like he had passed out." *Id*. at 368 n.1. Williams searched the house for a weapon and found a mattock, which is a tool for digging out stumps. *Id*. Williams returned to the room in which Stone was lying on the bed, fatally beat the helpless Stone with the mattock, took $3.00 from his wallet, and left him there "still grasping for breath." *Id*.

In addition to the cold-blooded beating death of a defenseless man for $3.00, the prosecution proved an extensive case in aggravation. Williams had been convicted of armed robbery in 1976 and grand larceny in 1982. *Id*. at 368. One month after murdering Mr. Stone in 1985, Williams committed "two auto thefts and two separate violent assaults on elderly victims." *Id*. In the first assault, Williams "started a fire outside of the victim's residence before attacking and robbing him." Four months later, Williams "brutally assaulted an elderly woman" and left her in a vegetative state from which she was not expected to recover. *Id*. The jury also heard that, while awaiting trial for capital murder, Williams was convicted of arson for setting fire to the jail. *Id*. Finally, two expert witnesses "testified that there was a high probability that Williams would pose a serious continuing threat to society.[11] *Id*. at 368-69.

---

[11] The Fourth Circuit summed up the case in aggravation in this way:

During the sentencing phase of the trial, Williams's counsel presented the testimony of Williams's mother, two neighbors, and a taped statement by a psychiatrist. *Id*. at 369. The Supreme Court concluded that trial counsel's performance was below professional norms because they failed to investigate and discover extensive records describing Mr. Williams's childhood. *Id*. at 395. This failure was not based on any strategic calculation. Counsel mistakenly believed that any such records would not have been admissible. *Id*.

The Court noted, as is frequently true of a capital defendant's juvenile history, that "not all of the additional evidence was favorable to" the defendant. *Id*. at 396. In fact, Williams's records revealed additional criminal offenses for which he was incarcerated as a juvenile, including aiding and abetting larceny at age 11, pulling a false fire alarm at age 12, and breaking and entering at age 15. *Id*. However, the failure to introduce records that were never located and reviewed by trial counsel could not have been based on strategic considerations related to the negative information in the records:

> [T]he failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession. Whether or not those omissions were sufficiently prejudicial to have affected the outcome of sentencing, they clearly demonstrate that trial counsel did not fulfill their ***obligation*** to conduct a thorough investigation of the defendant's background.

*Id*. (emphasis added) (internal citations omitted).

---

> The murder of Mr. Stone was just one act in a crime spree that lasted most of Williams's life. Indeed, the jury heard evidence that, in the months following the murder of Mr. Stone, Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw.

*Williams v. Taylor*, 163 F.3d 860, 868 (4th Cir. 1998).

After concluding that counsel's failure to conduct a thorough social history investigation was deficient, the Court determined that Williams was prejudiced by his counsel's omissions. Available social history records contained compelling information about Williams's background:

> [T]he jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.
>
> Counsel failed to introduce available evidence that Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school. They failed to seek prison records recording Williams' commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, or the testimony of prison officials who described Williams as among the inmates "least likely to act in a violent, dangerous or provocative way." Counsel failed even to return the phone call of a certified public accountant who had offered to testify that he had visited Williams frequently when Williams was incarcerated as part of a prison ministry program, that Williams "seemed to thrive in a more regimented and structured environment," and that Williams was proud of the carpentry degree he earned while in prison.

*Id.* at 395-96 (citations and footnote omitted).

When assessing the potential impact of the mitigating evidence, the *Williams* Court emphasized that whether the mitigating evidence might have resulted in a different outcome is an entirely separate question from whether it negates future dangerousness or the prosecution's case for death eligibility:

> While [evidence of Williams' voluntary surrender, co-operation with the police and remorse], coupled with the prison records and guard testimony, may not have overcome a finding of future dangerousness, the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was "borderline mentally retarded," might well have influenced the jury's appraisal of his moral culpability. *See Boyde v. California*, 494 U.S. 370, 387, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). The circumstances recited in his several confessions are consistent with the view that in each case his violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation. ***Mitigating***

> ***evidence unrelated to dangerousness may alter the jury's selection of penalty,
> even if it does not undermine or rebut the prosecution's death-eligibility case.***[12]

*Id*. at 398 (emphasis added).  The Court made it clear that prejudice inures even if the omitted evidence does not rebut the State's case for death eligibility.  The question is not whether there is sufficient evidence to justify a death sentence, *see e.g. Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995) (the *Brady* and *Strickland* prejudice test is "not a sufficiency of evidence test"); the question is whether the totality of the mitigating evidence "might well have influenced the jury's appraisal of [the defendant's] moral culpability."  *Williams*, 529 U.S. at 398.

As the Court noted, either Williams's tragic childhood or his borderline mental retardation was sufficient to justify a finding of *Strickland* prejudice, *id*., even though the prosecution proved that Williams was very dangerous defendant who had repeatedly committed vicious crimes.

The Virginia Supreme Court's conclusion to the contrary that Williams had not shown prejudice "was unreasonable in at least two respects."  *Id*. at 397.  First, it had mistakenly read *Lockhart v. Fretwell*, 506 U.S. 364 (1993), as having grafted on an additional requirement to *Strickland's* test for prejudice.  *Id*.  Second, "the State Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation."  *Id*. at 397-98; *see also id*. at 416 (O'Connor, J., concurring) (the Virginia Supreme Court's application of Strickland was unreasonable because of the "failure to consider the totality of the omitted mitigation evidence.").

---

[12] This is particularly true in Texas cases because the jury is asked to assess the defendant's future dangerousness in the first special issue.  The jury proceeds to the mitigation special issue only if it unanimously determines that the defendant may pose a future danger.  The mitigation special issue is an entirely separate and distinct inquiry into the defendant's moral culpability in light of any mitigating evidence.

*Wiggins v. Smith*, **539 U.S. 510 (2003)**

In the October 2002 term, the Court revisited the issue of capital defense investigation and representation in *Wiggins v. Smith*, 539 U.S. 510 (2003). Wiggins was convicted of drowning 77-year-old Florence Lacs in her bathtub and ransacking her apartment. *Id*. at 514. In preparation for the sentencing proceeding, trial counsel investigated and developed mitigating evidence, including "psychological reports and expert testimony demonstrating Wiggins' limited intellectual capacities and childlike emotional state on the one hand, and the absence of aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world on the other." *Id*. at 516. "At no point did [trial counsel] proffer any evidence of petitioner's life history or family background." *Id*.

In post-conviction proceedings, Wiggins "challenged the adequacy of his representation at sentencing, arguing that his attorneys had rendered constitutionally defective assistance by failing to investigate and present mitigating evidence of his dysfunctional background." *Id*. Wiggins

> presented testimony by Hans Selvog, a licensed social worker certified as an expert by the court. Selvog testified concerning an elaborate social history report he had prepared containing evidence of the severe physical and sexual abuse petitioner suffered at the hands of his mother and while in the care of a series of foster parents. Relying on state social services, medical, and school records, as well as interviews with petitioner and numerous family members, Selvog chronicled petitioner's bleak life history.
>
> According to Selvog's report, petitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner—an incident that led to petitioner's hospitalization. At the age of six, the State placed Wiggins in foster care. Petitioner's first and second foster mothers abused him physically [] and, as petitioner explained to Selvog, the father in his second foster home repeatedly molested and raped him. At age 16, petitioner ran away from his foster

home and began living on the streets.  He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion.  After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor.

*Id*. at 516-17 (internal citations omitted).

Wiggins's trial counsel acknowledged that he did not retain "a forensic social worker to prepare a social history, even though the State made funds available for that purpose."  *Id*. at 517.  The Maryland Court of Appeals held that trial counsel made "'a deliberate, tactical decision to concentrate their effort at convincing the jury' that appellant was not directly responsible for the murder."  *Id*. at 518 (quoting *Wiggins v. State*, 724 A.2d 1, 15 (Md. 1999)).  Trial counsel "knew of Wiggins' unfortunate childhood" and had "'social service records that recorded incidences of physical and sexual abuse, an alcoholic mother, placements in foster care, and borderline retardation.'"  *Id*. (quoting *Wiggins*, 724 A.2d at 15).  The Maryland court "acknowledged that this evidence was neither as detailed nor as graphic as the history elaborated in the Selvog report but emphasized that 'counsel did investigate and were aware of appellant's background.'"  *Id*. (quoting *Wiggins*, 724 A.2d at 16).  Because counsel knew that "at least one uncontested mitigating factor—Wiggins' lack of prior convictions—would be before the jury should their attempt to disprove Wiggins' direct responsibility for the murder fail," the state court concluded that trial counsel "'made a reasoned choice to proceed with what they thought was their best defense.'"  *Id*. (quoting 724 A.2d at 17).

The federal district court granted habeas corpus relief but the Fourth Circuit reversed, holding that counsel "had made a reasonable strategic decision to focus on petitioner's direct responsibility."  *Id*. at 519.  Counsel knew "at least some details of Wiggins' childhood," though the Fourth Circuit "acknowledged that counsel likely knew further investigation 'would have

resulted in more sordid details surfacing.'"  *Id*.  The court thus determined that counsel's knowledge was sufficient to make an informed strategic decision.  *Id*.

Justice O'Connor, writing for a seven-member majority of the Court, concluded that Wiggins's counsel were ineffective during his 1989 capital trial because their investigation failed to satisfy *Strickland's* performance standards, and the Maryland court's conclusion to the contrary was objectively unreasonable.

> After identifying the two-part *Strickland* test as controlling, the Court emphasized:
>
> Our opinion in *Williams v. Taylor* is illustrative of the proper application of these standards.  In finding Williams' ineffectiveness claim meritorious, we applied *Strickland* and concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background."  529 U.S., at 396, 120 S.Ct. 1495 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1980))….In highlighting counsel's duty to investigate, and in referring to the ABA Standards for Criminal Justice as guides, we applied the same "clearly established" precedent of *Strickland* we apply today.

*Id*. at 522.

Because Wiggins's complaint was that his counsel failed to conduct a thorough social history investigation, the Court's "principal concern in deciding whether [trial counsel] exercised 'reasonable professional judgment[t],' is not whether counsel should have presented a mitigation case.  Rather, [the Court] focus[ed] on whether the ***investigation*** supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was ***itself reasonable***."  *Id*. at 522-23 (quoting *Strickland*, at 691) (emphasis added and in original).

The Court then catalogued the investigative efforts of Wiggins's counsel.  Counsel retained a psychologist who evaluated Wiggins and determined that he had a low IQ, "difficulty coping with demanding situations," and features of a personality disorder.  *Id*. at 523.  Counsel

had a pre-sentencing report, which included a one-page personal history noting Wiggins's "misery as a youth," his self-reported "disgusting" background, and noting that he had spent most of his life in foster care. *Id.* Counsel also located and obtained Baltimore's Department of Social Services records documenting Wiggins's placements in foster care. *Id.*

The Court held that "counsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards that prevailed in Maryland in 1989." *Id.* at 524. The Court explained:

> [S]tandard practice in Maryland in capital cases at the time of Wiggins' trial included the preparation of a social history report. Despite the fact that the Public Defender's office made funds available for the retention of a forensic social worker, counsel chose not to commission such a report. Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long have referred as "guides to determining what is reasonable." *Strickland*, *supra*, at 688, 104 S.Ct. 2052; *Williams v. Taylor*, *supra*, at 396, 120 S.Ct. 1495. The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added).

*Id.* More specifically, the Court faulted counsel for obtaining only a rudimentary understanding of the client's social history, from a narrow range of sources, before making their allegedly strategic decision:

> Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. *Cf. id.*, 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences (emphasis added)); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1982) ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing . . . . Investigation is essential to fulfillment of these functions").

*Id*. at 524-25.

Further, "[t]he scope of their investigation was also unreasonable in light of what counsel actually discovered in the DSS records." *Id*. at 525. The documents collected by counsel revealed that Wiggins's "mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food." *Id*.

The Court also scrutinized counsel's conduct of the case and concluded "[t]he record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Id*. at 526. For example, in her opening statement counsel entreated the jury to consider Wiggins's "difficult life," even though counsel later failed to present any details of Wiggins's social history. *Id*.

After reviewing counsel's actions before and during the trial, the Court concluded: "the 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Id*. at 526-27.

The Court faulted the state court for "assum[ing] that because counsel had *some* information with respect to petitioner's background—the information in the PSI and the DSS records—they were in a position to make a tactical choice not to present a mitigation defense." *Id*. 527 (emphasis in the original). "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known

to counsel, but also whether the known evidence would lead a reasonable attorney to investigate

further." *Id*.

Rejecting the dissent's contention that the Court's "hands are tied, under § 2254(d), 'by

the state court's factual determinations that Wiggins' trial counsel did investigate and were

aware of [Wiggins'] background,'"[13] the Court held that:

> [t]he Maryland Court of Appeals' application of *Strickland's* governing legal
> principles was objectively unreasonable.  Though the state court acknowledged
> petitioner's claim that counsel's failure to prepare a social history "did not meet
> the minimum standards of the profession," the court did not conduct an
> assessment of whether the decision to cease all investigation upon obtaining the
> PSI and the DSS records actually demonstrated reasonable professional judgment.
> The state court merely assumed that the investigation was adequate.  In light of
> what the PSI and the DSS records actually revealed, however, counsel chose to
> abandon their investigation at an unreasonable juncture, making a fully informed
> decision with respect to sentencing strategy impossible.  The Court of Appeals'
> assumption that the investigation was adequate thus reflected an unreasonable
> application of *Strickland*. 28 U.S.C. § 2254(d)(1)….As we established in
> *Strickland*, "strategic choices made after less than complete investigation are
> reasonable precisely to the extent that reasonable professional judgments support
> the limitations on investigation."  466 U.S., at 690-691, 104 S.Ct. 2052

*Id*. at 527-28 (citations omitted).  In other words, the state court unreasonably applied *Strickland*

because it was excessively deferential to counsel's invocation of strategy by failing to examine

whether they were justified in making such decisions.

Because the state courts never reached the prejudice inquiry, the Supreme Court reviewed

the question of prejudice *de novo*.  The Court described the evidence counsel failed to discover

as "powerful."  *Id*. at 534.  The social worker reported, based on his conversations with Wiggins'

sfamily, that Wiggins

> experienced severe privation and abuse in the first six years of his life while in the
> custody of his alcoholic, absentee mother.  He suffered physical torment, sexual
> molestation, and repeated rape during his subsequent years in foster care.  The

---

[13] *Wiggins*, 539 U.S. at 528 (internal quotation marks omitted).

time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case.

*Id*. at 535.  The Court concluded that Wiggins had "the kind of troubled history we have declared relevant to assessing a defendant's moral culpability."  *Id*.

Thus, despite the trial lawyers' testimony regarding their strategic reasons for not further pursuing mitigating evidence, the Court held that "[g]iven both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form."  *Id*.  "[H]ad the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence."  *Id*. at 536.

Finally, the Court noted that in reaching its conclusion, "we need not, as the dissent suggests…make the state-law evidentiary findings that would have been at issue at sentencing. Rather, we evaluate the totality of the evidence –'both that adduced at trial, *and the evidence adduced in the habeas proceeding[s]*.'" *Id*. (quoting *Williams v. Taylor*, 529 U.S. at 397-98).

### *Rompilla v. Beard*, 545 U.S. 374 (2005)

Two years later, in *Rompilla v. Beard*, the Court held that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."  *Rompilla*, 545 U.S. at 377.

Ronald Rompilla was sentenced to death for the 1988 murder of James Scanlon.  Mr. Scanlon was discovered dead outside of his bar; he had been stabbed repeatedly and then set on fire.  One of the three aggravating factors justifying Mr. Rompilla's death sentence was that the

murder was committed by torture. *Id*. at 378. In finding the evidence sufficient to uphold the

jury's finding of a torture-killing, the state court cited to the medical examiner's testimony:

> Dr. Isidore Mihalakis, a forensic pathologist, testified at the sentencing hearing that the victim was alive during the infliction of almost all of the injuries that he received. These injuries included abrasions, lacerations, blunt force injuries, a fractured nose, and multiple stab wounds. Dr. Mihalakis further testified that the number and location of the various wounds on the victim's body were indicative of injuries that were inflicted with the intent of causing pain.

*Commonwealth v. Rompilla*, 653 A.2d 626, 634 (Pa. 1995) (citations omitted). In addition to

torture, the jury also found that the murder was committed in the course of another felony and

that Rompilla had a "significant history of felony convictions indicating the use or threat of

violence." *Rompilla*, 534 U.S. at 378. In support of the latter aggravating factor, the prosecution

presented evidence of a burglary and that Rompilla raped a woman at knifepoint. An assistant

district attorney read the rape victim's testimony to Rompilla's jury in the sentencing phase of

his capital trial. *Rompilla*, 653 A.2d at 633.

The defense case at punishment "consisted of relatively brief testimony: five of his

family members argued in effect for residual doubt, and beseeched the jury for mercy, saying

that they believed Rompilla was innocent and a good man. Rompilla's 14-year-old son testified

that he loved his father and would visit him in prison." *Rompilla*, 545 U.S. at 378.

Rompilla sought post-conviction relief in state court on the basis that the defense failed to

present "significant mitigating evidence about Rompilla's childhood, mental capacity and health,

and alcoholism," but the state court deemed sufficient trial counsel's investigation. *Id*.

The federal district court held that the state court had unreasonably applied *Strickland*

and granted habeas corpus relief. "The court found that in preparing the mitigation case the

defense lawyers had failed to investigate 'pretty obvious signs' that Rompilla had a troubled

childhood and suffered from mental illness and alcoholism, and instead had relied unjustifiably

on Rompilla's own description of an unexceptional background." *Id.* at 379. A divided panel of the Third Circuit reversed. The panel acknowledged that trial counsel failed to discover mitigating evidence located in Rompilla's school, medical, police, and prison records, but it held that—based on the information they had—trial counsel were justified in failing to look. *Id.* Thus, unlike *Wiggins*, in which counsel ignored obvious leads, Rompilla's counsel did enough to reasonably conclude that further investigation would be a waste of limited resources. *Id.*

The Supreme Court observed at the outset that

> [t]his is not a case in which defense counsel simply ignored their obligation to find mitigating evidence, and their workload as busy public defenders did not keep them from making a number of efforts, including interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase. None of the sources proved particularly helpful.

*Id.* at 381. In particular, Rompilla himself was not helpful:

> Rompilla's own contributions to any mitigation case were minimal. Counsel found him uninterested in helping, as on their visit to his prison to go over a proposed mitigation strategy, when Rompilla told them he was 'bored being here listening' and returned to his cell. To questions about childhood and schooling, his answers indicated they had been normal, save for quitting school in the ninth grade. There were times when Rompilla was even actively obstructive by sending counsel off on false leads.

*Id.*

Yet, even without promising leads, the Court found trial counsel's investigation deficient because they failed to examine the public files on Rompilla's prior conviction that they knew would be used to support the prosecution's case for a death sentence:

> Counsel knew that the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla's prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in that earlier trial. There is no question that defense counsel were on notice, since they

> acknowledge that a "plea letter," written by one of them four days prior to trial, mentioned the prosecutor's plans.

*Id*. at 383-84 (citations omitted).  It was clear from the record that counsel failed to review these files prior to trial.  *Id*. at 384-85.

The Court believed it beyond cavil that reasonably diligent counsel would obtain all available evidence related to the prosecution's case in aggravation:

> The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense.  Reasonable efforts certainly included obtaining the Commonwealth's own readily available file on the prior conviction to learn what the Commonwealth knew about the crime, to discover any mitigating evidence the Commonwealth would downplay, and to anticipate the details of the aggravating evidence the Commonwealth would emphasize.  Without making reasonable efforts to review the file, defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the transcript, or whether there were circumstances extenuating the behavior described by the victim.

*Id*. at 385-86.  The Court again relied on the ABA Guidelines for the standard of care, *id*. at 387, and it emphatically rejected the state court's conclusion that trial counsel were excused from looking at the case files based on their other efforts to seek mitigation:

> We think this conclusion of the state court fails to answer the considerations we have set out, to the point of being an objectively unreasonable conclusion.  It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking.  No reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations whether they recalled anything helpful or damaging in the prior victim's testimony.  Nor would a reasonable lawyer compare possible searches for school reports, juvenile records, and evidence of drinking habits to the opportunity to take a look at a file disclosing what the prosecutor knows and even plans to read from in his case.… But looking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell defense counsel something about what the prosecution can produce.

*Id*. at 389.

The Court next turned to the prejudice inquiry, which it again addressed *de novo* because the Pennsylvania courts never reached it.  Had counsel inspected the files on Rompilla's prior conviction, they would have discovered "a range of leads that no other source had opened up." *Id*. at 390.  Additionally, the information would have dislodged the incomplete and/or inaccurate information provided by Rompilla and his family:

> The accumulated entries would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts.  With this information, counsel would have become skeptical of the impression given by the five family members and would unquestionably have gone further to build a mitigation case.  Further effort would presumably have unearthed much of the material postconviction counsel found, including testimony from several members of Rompilla's family, whom trial counsel did not interview.

*Id*. at 391.  Counsel would have learned that

> Rompilla's parents were both severe alcoholics who drank constantly.  His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems.  His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her.  His parents fought violently, and on at least one occasion his mother stabbed his father.  He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks.  All of the children lived in terror.  There were no expressions of parental love, affection or approval.  Instead, he was subjected to yelling and verbal abuse.  His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled.  He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone.  They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags.

*Id*. at 391-92 (quoting 355 F.3d at 279 (Sloviter, J., dissenting)).

Further, the Court noted that trial counsel's mental health experts were deprived of this information, but the experts assisting post-conviction counsel had it and

> found plenty of "'red flags'" pointing up a need to test further.  355 F.3d, at 279 (Sloviter, J., dissenting).  When they tested, they found that Rompilla "suffers from organic brain damage, an extreme mental disturbance significantly impairing

several of his cognitive functions."   *Ibid*.   They also said that "Rompilla's problems relate back to his childhood, and were likely caused by fetal alcohol syndrome [and that] Rompilla's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense."   *Id*., at 280 (Sloviter, J., dissenting).

*Rompilla*, 545 U.S. at 392.   Thus, counsel's failure to investigate and provide the available information to their mental health experts derailed the effectiveness of the experts as well.

Rompilla was plainly harmed by counsel's failure to take the simple step of reviewing available documents that would have led to a compelling case in mitigation:

> This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test.   It goes without saying that the undiscovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's] culpability," *Wiggins v. Smith*, 539 U.S., at 538, 123 S.Ct. 2527 (quoting *Williams v. Taylor*, 529 U.S., at 398, 120 S.Ct. 1495), and the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing, *Strickland*, 466 U.S., at 694, 104 S.Ct. 2052.

*Rompilla*, 545 U.S. at 393.   And for the third time in a relatively brief span, the Supreme Court reversed a death sentence because trial counsel failed to provide effective representation while preparing for sentencing, and found the state court decision to the contrary unreasonable.

These cases have clarified considerably the "clearly established law" applicable to capital cases adjudicated in state court after *Strickland*.   The following principles are inherent in *Strickland* and its progeny:

**Performance:**

- Capital defense is sufficiently specialized and regulated to have a national standard, reflected both in the 8th Amendment and the ABA Guidelines. *Rompilla*, 545 U.S.at 387; *Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 397.

- While there is no set of per se rules or checklist for capital representation, defense counsel must–in every case–engage in a thorough social history investigation. The ABA Guidelines reflect the "well-defined norms" of the national standard for

mitigation investigation, and thus the floor below which local practices may not descend. *Wiggins*, 539 U.S. at 524-25; *Rompilla*, 545 U.S. at 380.

• Termination of mitigation investigation is only appropriate in the context of an informed decision, after a thorough investigation. *Rompilla*, 545 U.S. at 395; *Wiggins*, 539 U.S. at 527-28.

• The fact that counsel performed some, or even extensive investigation, does not preclude a finding of deficient performance with respect to further investigation they reasonably should have done under the circumstances. *Rompilla*, 545 U.S. at 388-89; *Wiggins*, 539 U.S. at 527, 534.

• Federal courts, even under the deferential scheme of the AEDPA, should scrutinize claims of strategy in light of a close reading of the record and a state court finding of strategic purpose for an omission should be disregarded if it cannot withstand such scrutiny. *Wiggins*, 539 U.S. at 526-27.

• The duty to investigate and prepare for the punishment phase also includes rebutting the prosecution's case in aggravation. Counsel must, at a minimum, secure the information in possession of law enforcement. *Rompilla*, 545 U.S. at 385-87.

**Prejudice:**

• Prejudice ensues whenever the totality of the mitigating evidence "might well have influenced the jury's appraisal" of the defendant's moral culpability. *Rompilla*, 545 U.S. at 393; *Wiggins*, 539 U.S. at 538; *Williams*, 529 U.S. at 398.

• The operative question is whether there's a reasonable probability that one juror would have voted differently. *Wiggins*, 539 U.S. at 537.

• When assessing prejudice from counsel's error or omissions, reviewing courts must look at all of the evidence in the aggregate, including the evidence adduced at trial and the evidence adduced in post-conviction proceedings. *Wiggins*, 539 U.S. at 536; *Williams*, 529 U.S. at 397-98.

• Courts should not focus on trial counsel's post-trial statements regarding whether they would have used the mitigating evidence adduced in post-conviction proceedings; the relevant inquiry is whether a competent attorney would have introduced it. *Wiggins*, 539 U.S. at 535.

• The failure to discover mitigation undermines the outcome even in highly aggravated cases. The failure to provide any context or explanation for an aggravated case may render the proceeding unreliable. The idea that considerable aggravation is a *per se* bar to finding prejudice is no longer viable after *Williams* and *Rompilla*, both of which were highly aggravated cases.

- Prejudice inures even if the omitted evidence does not rebut the State's case for death eligibility. *Williams*, 529 U.S. at 398.

- Courts must look at all consequences that would have flowed from competent performance, including the impact on the work of expert witnesses. *Rompilla*, 545 U.S. at 592-93.

- When assessing prejudice, federal courts need not make the state-law evidentiary findings that would have been at issue at sentencing; courts merely evaluate the totality of the evidence adduced at trial and in the habeas proceedings. Thus, a petitioner can use reliable hearsay to prove prejudice. *Wiggins*, 539 U.S. at 536.

Proper application of these principles to a capital case arising from Texas is demonstrated by the Fifth Circuit's decision in *Walbey v. Quarterman*, 309 Fed.Appx. 795 (5th Cir. 2009) (unpublished). Tried in Texas in 1994, Gaylon Walbey murdered Marionette Beyah by breaking into her home and strangling, beating, and stabbing her to death with an extension cord, fire extinguisher and several different knives. *Walbey v. State*, 926 S.W.2d 307, 308-09 (Tex. Crim. App. 1996). When police arrived at the scene, they discovered a barbecue fork and a butcher knife still protruding from the victim's back. *Id*. at 309. In preparation for the punishment phase of the case, trial counsel had obtained and reviewed documents relating to Walbey's background. *Walbey*, 309 Fed.Appx. at 796. Trial counsel had also retained and presented the testimony of two psychologists during sentencing. *Id*. Counsel, however, did not begin his sentencing investigation or retain his primary expert until a week before trial, and did not thoroughly review the documents he had obtained. *Id*. at 796, 801.

At sentencing, Walbey's trial counsel presented evidence of Walbey's "tumultuous childhood and background of abuse, as well as expert testimony that Walbey would not be a future danger to society." Brief of Respondent-Appellee, at 12-21. This evidence included testimony from Walbey's maternal grandmother that Walbey had been kidnapped by his father when he was five years old and that his mother only discovered him six years later in an

orphanage in Corpus Christi, after which Walbey was no longer the same child. *Id*. The evidence also included testimony that Walbey had often run away from his father, hiding in abandoned houses, to escape frequent physical beatings by his father, and that after his discovery in the orphanage, Walbey had been placed by his mother in a mental institution in Florida. *Id*. When Walbey was 14 years old, his mother concluded she could no longer care for him and gave him up for foster care. *Id*. Trial counsel also presented the testimony of two foster parents with whom Walbey had lived for two years. *Id*. They testified that Walbey's placement with them indicated he had a history of severe abuse and neglect, but that Walbey never caused problems either at school or at home during his stay with them. *Id*.

After his conviction and death sentence, post-conviction counsel for Walbey discovered a plethora of mitigating evidence that "describe[d] a nightmarish hell of cruelty and neglect." *Walbey*, 309 Fed.Appx. at 797. The evidence indicated, *inter alia*, that Walbey was made to drink beer and smoke "joints" by ages two and a half to three and was left alone with unexplained marks on his body during the same time; was found wandering alone along a highway service road at age five; was kidnapped by his father—who abused his mother and had a drug and alcohol addiction—and hidden from his mother from ages five to ten; was repeatedly physically and mentally abused by his father and paternal grandmother, including a beating with a doubled over belt that lasted for forty-five minutes and broke the buckle; was forced to eat garbage while living in abandoned houses when he was locked out by (or ran away from) his father during the period of his kidnapping; was reunited with his mother after being discovered in an orphanage; took to petty theft; was hospitalized with a possible diagnosis of schizophrenia at age twelve, but did not receive the recommended follow-up care for that diagnosis because his mother "did not have the time"; and was abused by his mother when she drank. *Id*. The

evidence also indicated that Walbey had known the victim through a foster parent program. *Id*. at 798. After initially accepting Walbey, the victim had returned him to the youth center several months later with the explanation that she was going on vacation; she never returned for him, and Walbey was told that she did not want him back. *Id*.

The Fifth Circuit first held that there was "little room for debate" that trial counsel's mitigation investigation was deficient, calling it "severely limited." *Id*. at 800. In light of the "case law that firmly establishes a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history," the *Walbey* court faulted trial counsel because he did not (1) interview Walbey's mother or people who worked with him as a youth, (2) hire a mitigation expert, (3) reach an independent conclusion about the viability of a mitigation defense, instead delegating that task to an expert, who understood his role as limited to assessing only future dangerousness and spent two hours preparing the case, *or* (4) investigate the history of Walbey's relationship with the victim. *Id*. at 800, 801. Despite counsel's investigation into, and presentation of, Walbey's maternal grandmother, two former foster parents, and two psychological experts, "[t]here was essentially no effective investigation of the mitigation issue." *Id*. at 801. Moreover,

> [g]iven the Texas law establishing that the facts of Walbey's crime are themselves legally sufficient to support a finding of future dangerousness, the virtually impossible battle that Ezell faced on future dangerousness makes all the more unreasonable Ezell's failure to investigate a mitigation defense thoroughly. … Neither can there be any contention that the facts of Walbey's childhood were hidden or difficult to find; in fact, many were contained in a box delivered to Ezell by the district attorney that Ezell elected only to skim. Ezell's mere possession of "some information with respect to petitioner's background ... [did not put him] in a position to make a tactical choice not to present a mitigation defense."

*Id.* (quoting *Wiggins*, 539 U.S. at 527). The Court further held that the Texas Court of Criminal Appeals's conclusion that counsel did not perform deficiently was an objectively unreasonable application of *Williams*. *Id.*

As to prejudice, the district court had held that there was none because Walbey's trial counsel had "outlined the same mitigating factors for the jury as Walbey now contends should have been presented." *Id.* at 802. Despite counsel's presentation of a substantial part of Walbey's abusive and neglectful childhood, however, the Fifth Circuit disagreed. The *Walbey* Court again relied on *Williams*, characterizing the decision as "stand[ing] for the proposition that counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented and even if there is psychiatric testimony." *Id.*

> The fact that the presentation of some mitigation evidence does not necessarily defeat a prejudice showing is also clear from the test that *Williams* establishes. There, the Court held that it is an unreasonable application of Supreme Court precedents for a state court not to "evaluate the totality of the available mitigation evidence-both that adduced at trial, and the evidence adduced in the habeas proceeding." This standard clearly contemplates that even when *some* mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete.

*Id.* (emphasis in original).

Finally, the *Walbey* Court rebuffed two additional arguments made by Texas in support of the district court's determination that Walbey was not prejudiced. First, it rejected "the State's stereotypical fall-back argument" that the heinous and egregious nature of the crime itself would have ensured assessment of the death penalty even absent the deficiency. *Id.* at 804 (quoting *Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001)). That argument "eviscerat[es] the Supreme Court-approved Texas 'special issues' scheme" and "would be to return to the days of inflicting capital punishment based on emotion and revenge, supplanting altogether the questions

43

of deliberateness and future dangerousness which make the Texas scheme constitutional."[14]  *Id.*

Moreover,

> [a]lmost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief...would virtually never be available, so testing for it would amount to a hollow judicial act.

*Id.*

Second, the *Walbey* Court noted that Texas's argument that prejudice could not be shown because the mitigating evidence contained both helpful and aggravating was foreclosed by *Williams*.   Ultimately, the mitigating evidence Walbey's trial counsel's deficient investigation failed to discover was "sufficient to create a reasonable probability that one juror would have voted for life in prison rather than death," and "[i]t was unreasonable under *Williams* for the TCCA to conclude otherwise."  *Id.* at 806.

### c.   Trial   Counsel's   Performance   Fell   Below   Prevailing Professional Norms.

The defense of Edward Lee Busby, Jr. during the sentencing phase of his capital murder trial was hastily thrown together at the eleventh hour.   Mr. Busby's lead trial counsel was appointed on February 23, 2004.   C.R. Vol. 1: 17.[15]   Despite professional norms that clearly mandate capital defense counsel immediately begin assembling his or her defense team and

---

[14] Additionally, jurors are allowed to take into consideration the facts of the crime under the theory that the evidence is relevant to the future dangerousness special issue.  *Muniz v. State*, 573 S.W.2d 792, 795 (Tex. Crim. App. 1978).   However, as explained *supra*, the future dangerousness special issue and mitigation special issue are ***entirely distinct*** questions. Aggravation and mitigation are not weighed by a Texas capital sentencing jury.   Consequently, the question of aggravation is not a legally relevant consideration to the prejudice component of an IAC claim for failing to conduct a reasonable mitigation investigation.

[15] The Clerk's Record will be cited as C.R. Vol. __: __.

initiate investigation of the sentencing phase, Mr. Strickland failed to hire a mitigation investigator until September 24, 2005, a full *19 months* after his appointment and just five days before trial proceedings began, and failed to hire a mental health expert until October 11, 2005. During this time period, pre-trial proceedings took place in which defense counsel were attempting to challenge the voluntariness of Mr. Busby's custodial statements—an inquiry to which Mr. Busby's mental health and cognitive functioning were clearly relevant.[16]   C.R. Vol. 1: 154; S.F. Vol. 3. [17]

Individual voir dire began on October 4, 2005 and ended on November 7, 2005.  S.F. Vol. 6-27.  On October 11, 2005, Dr. Timothy Proctor was retained as the mental health expert for the defense.  Dr. Proctor met with Mr. Busby for the first time on October 14, 2005 and again met with him on November 4, 2005.  The trial on the merits began immediately thereafter.  S.F. Vol. 30.  The sentencing phase of the trial began on November 14, 2005 and ended on November 17, 2005.  S.F. Vol. 33-36.

From the time Mr. Strickland was appointed to represent Mr. Busby in February 2004 through the conclusion of Mr. Busby's trial, Mr. Strickland represented clients in at least 39 other active cases in both state and federal court.  Exhibit 4 (Graph of Jack Strickland's Caseload from February 2004 to November 2005).  At least seven of those cases were capital.  Mr. Strickland's heavy caseload during this period rendered him unable to meet his professional obligations in other cases, culminating, most notably, in the late filing of a state habeas application in the case of Quintin Phillippe Jones.  Exhibit 5 (Findings of Fact from *Ex Parte*

---

[16] During those nineteen months, Mr. Strickland's professional obligations were undoubtedly too burdensome to allow for proper preparation for Mr. Busby's capital murder trial.

[17] The Statement of Facts will be cited as S.F. Vol. __: at __.

*Quintin Phillippe Jones*).[18]   The state court in Jones subsequently found that Mr. Strickland's onerous caseload was directly responsible for the missed deadline.   *Id.*

Lead defense counsel's heavy caseload throughout 2004 and 2005 likely contributed to the violation of his duties to immediately assemble his defense team and begin investigation in this case; however, the failure to maintain one's caseload at, or reduce one's caseload to, a level at which representation in accordance with prevailing professional norms as articulated by the ABA and SBOT can be provided is itself a violation of the standard of professional care required in capital cases.   *See* ABA Guideline 10.3; ABA Guideline 10.3 cmt.; SBOT Guideline 9.3(A); SBOT Guideline 9.3(B).

As a result, defense counsel failed to retain a mitigation investigator until September 26, 2005, a full 19 months after having been appointed.   No reasonable mitigation investigation could have taken place between the retention of the mitigation specialist, Linda Sanders, on September 26, 2005 and the day the sentencing phase of the case began seven weeks later.   *See* Exhibit 2 at 5 ("No one mitigation specialist, or even a team of six or seven mitigation specialists, working full time on Mr. Busby's case could have completed the mitigation investigation and analysis of information in seven weeks.").

And, indeed, no reasonable sentencing investigation did take place.   The mitigation specialist's invoices reflect 96.5 total hours of work.   *See* Exhibit 6 (Invoices of Linda Sanders). Of those 96.5 hours, 60 hours were expended just before, and during, the sentencing proceeding and were not investigative hours.   *Id.*   The invoice reflects just four meetings with trial counsel between Ms. Sanders's appointment on September 26, 2005 and when the sentencing proceeding

---

[18] Notably, none of the court documents counsel have located, in which Mr. Strickland described his case load and professional responsibilities throughout 2004 and 2005, mentioned the investigation of, or preparation for, Mr. Busby's impending capital murder trial.

began on November 14, 2005.  The first of these meetings did not take place until October 25, 2005, almost a full month after retention and just three weeks before trial.  *Id.*  (The three other meetings occurred on October 31, November 4, and November 8, 2005.)  Fewer than 10 hours were spent in consultation with defense counsel before the sentencing phase of Mr. Busby's trial began.  *Id.*  In total, the mitigation specialist interviewed 12 people, 8 of whom were interviewed in a single, 7-hour day.  *Id.*

One of the difficulties of conducting a mitigation investigation in such a short time span is the inability of the investigator to establish relationships with, conduct in-depth interviews of, and, as is almost always necessary, re-interview, important life-history witnesses who possesses significant but sensitive (and sometimes embarrassing) information.  ABA Guideline 4.1(A)(1) cmt.  For example, while the trial mitigation specialist briefly interviewed Mr. Busby's mother and two sisters, she did not have sufficient time to develop from these life-history witnesses substantial and critical information about physical abuse and trauma inflicted on Mr. Busby, or abuse and trauma that existed within the family more generally, dating back generations.  The failure to develop this crucial information was caused by the needless—and deficient—delay by trial counsel in securing investigative assistance.  *See* Exhibit 7 (Affidavit of Linda Sanders) ("I attempted to gather as many records and interview as many people possible in such a short time, but it is impossible to do a thorough mitigation investigation and plan for the punishment phase of a trial in the time span of a month.").

As a result of this failure, no biopsychosocial history was ever created.  As detailed *supra*, the social history contains invaluable information for the attorneys, who, in conjunction with the mitigation specialist, can craft mitigation themes that tell the client's story to the sentencer.  A biopsychosocial history is critical to counsel, as it allows for the identification and

47

selection of appropriate mental health experts, who, in turn, use the information provided by the mitigation investigation to develop an appropriate plan for forensic testing or evaluation. *See* Exhibit 3 at 4.

Defense psychologist Timothy Proctor was hired on October 11, 2005, during individual voir dire. He did not complete the interview and testing of Mr. Busby until days before trial on the merits began, a mere ***10 days*** before the sentencing phase of Mr. Busby's capital murder trial began. At the time of his first evaluation of Mr. Busby, the mitigation investigation had just begun. As a result, Dr. Proctor's diagnoses rested on an incomplete and haphazard investigation into Mr. Busby's life, and no proper investigation into mental health issues (e.g. PTSD and trauma, schizophrenia, bipolar disorder), drug addiction, or mental retardation was ever conducted, nor were any further mental health professionals, qualified in these areas, hired to consult or to testify. Mr. Strickland's delay in retaining a mitigation specialist and mental health expert to assist in the preparation of trial violated his duties to assemble a defense team as soon as possible upon appointment and to immediately begin sentencing phase investigation.

### 2. Trial Counsel Failed to Seek and Obtain Admittance of Co-defendant Kathleen Latimer's Statements Relevant to Mr. Busby's Moral Culpability.

Additionally, trial counsel failed to adequately prepare and seek admittance of critical mitigating evidence in their possession favorable to Mr. Busby. Shortly before Mr. Busby's trial, the prosecution explored the possibility of negotiating an agreement with Kathleen Latimer, Mr. Busby's co-defendant, in exchange for her testimony against Mr. Busby. In pursuit of that, Latimer was administered a polygraph exam by Eric Holden at the behest of the Tarrant County District Attorney's Office. During the initial interview, Latimer explained her participation in the crime, including that it was she who filled out the check, endorsed it, and placed it in the

chute at Wells Fargo.  Defense Exhibit 2.  Latimer was then administered a series of questions as

part of the polygraph examination, and questions that focused primarily on the extent of her

participation and involvement in the binding of the complainant.  She was deemed to have given

deceptive answers to the questions asked during the polygraph.  In a post-exam interview,

Latimer admitted to lying in previous written and oral statements[19] and corroborated parts of Mr.

Busby's written and oral statements, including that Latimer had indeed instructed Mr. Busby,

twice, to bind the complainant because she was making too much noise in the trunk and that she

instructed him to find them a ride:

> I told him to tie her up.  I told him to make -- that she needed to stop kickin'.  I
> told him that….I told him to tie her up.  I told him to.  A couple times….I told
> him, I said, you can turn the music up sky blast but it's still not gonna stop
> anybody from hearin' her bang around in the trunk 'cause you can still hear it --
> the music's in the car, it's not outside the car….when I realized that everybody
> could hear the bangin' without the music and I told him, I said you need to do
> something to stop her.
>
> ….
>
> I told him.  I told him it was his fault that I was where I was at, because I didn't
> know where the hell I was at.  I still don't know where the hell that Tom Thumb
> was.  I told him I was gonna find a ride.  And um, he couldn't come with me.
> And he s-- he said, well I'm a find a ride.  I said well then you find us a ride.

 Defense  Exhibit  2;  *see also*  Exhibit  30  (Report  of  Eric  Holden).    Latimer's  admissions

corroborated Mr. Busby's admitted statements that (1) he lacked intent to cause the death of the

complainant, only tying her up because Latimer insisted he do so, after resisting Latimer's first

directive; and (2) suggested Latimer played a much greater role in the abduction and murder than

Latimer's prior statements had indicated, which was relevant to the jury's determination of Mr.

Busby's moral culpability.

---

[19] Those prior statements were sought to be admitted as Defense Exhibits 1 and 3.

At the guilt-innocence phase of Mr. Busby's trial, counsel for Mr. Busby sought to introduce Latimer's admission. S.F. Vol. 31: 3-4. It was anticipated by trial counsel that Latimer would invoke her Fifth Amendment privilege against self-incrimination. *Id*. at 4. This anticipation proved correct; when trial counsel attempted to call Latimer to the witness stand, she invoked her privilege, rendering her unavailable. *Id*. at 168. The State objected to the admission of Latimer's prior written statement on the ground, *inter alia*, that the statement was inadmissible hearsay. Trial counsel responded to the objection by arguing (1) that Latimer's statement was the statement of a co-conspirator admissible pursuant to TEX. R. EVID. 801(e)(2)(E); and (2) that her statement was one against interest admissible pursuant to TEX. R. EVID. 803(24). S.F. Vol. 31: 6. The trial court ruled the evidence inadmissible, finding it did not meet a hearsay exception.[20] *Id*. at 10.

Trial counsel did not prepare for and seek admittance of Latimer's prior written statements in the guilt phase pursuant to Mr. Busby's constitutional right to present a defense. That failure was a deficient omission for which no possible strategic motive could exist. In the sentencing phase, trial counsel failed to move at all to admit Defense Exhibit 2, although the evidence was admissible pursuant to Mr. Busby's right to have mitigating evidence relevant to the circumstances of the offense placed before the jury under the Eighth and Fourteenth Amendments. Had Latimer's statement been admitted at either stage of the trial under either

---

[20] The trial court's ruling that Latimer's statement was inadmissible pursuant to TEX. R. EVID. 803(24) was error. Direct appeal counsel's failure to raise the denial of admittance of these exhibits under Texas evidentiary law is a separate claim for relief. Subsequent to Latimer's invocation of her Fifth Amendment privilege, Mr. Strickland again attempted to introduce the statements and argued that denial would deprive Mr. Busby of the effective assistance of counsel and violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. S.F. Vol. 31: 176. He did not, however, argue that the statements required admittance to satisfy Mr. Busby's right to present a defense, and his objections were too general to preserve error. *Reyna v. State*, 168 S.W.3d 173, 176-79 (Tex. Crim. App. 2005).

rationale, Mr. Busby's jury would have been able to consider these circumstances of the offense as mitigating evidence.[21]

### a. Latimer's Statement was Admissible at Guilt-Innocence Pursuant to Mr. Busby's Right to Present a Defense.

The United States Supreme recently unanimously reaffirmed that "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotation omitted). The Court reversed a conviction where the trial court had relied on state evidentiary law to preclude admission of evidence that someone else had committed the rape/robbery/murder for which petitioner stood trial. *Id*. at 331.

The opinion reviewed the Supreme Court's long history of upholding the right to present a defense. *Holmes*, 547 U.S. at 324-29 (citing *Rock v. Arkansas*, 483 U.S. 44 (1987); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (finding violation of right to present defense where the defendant was prevented from introducing evidence to show at trial that his confession was unreliable, and neither the state court nor the prosecution "advanced any rational justification"); *Chambers v. Mississippi*, 410 U.S. 284 (1973) (finding violation of right to present defense, in part, because court precluded statement against penal interest inculpating an alternative perpetrator); *Washington v. Texas*, 388 U.S. 14 (1967) (noting that the "right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to

---

[21] Latimer's statement was also admissible under Texas law as a statement against interest. Counsel did seek admission on that basis, but the trial court erroneously sustained the State's objection. Although trial counsel preserved the error that the admission was not a statement against interest, counsel inexplicably did not raise the error as a ground of appeal. Counsel's failure to raise this error on direct appeal is the basis of a claim that Mr. Busby was deprived of the effective assistance of counsel on appeal.

present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury *so it may decide where the truth lies*") (emphasis added)).  The Court reversed despite substantial forensic evidence that the petitioner was guilty, including DNA evidence, palm print and fiber evidence. *Holmes*, 547 U.S. at 1730.

> **b.**  **Latimer's Statement was Admissible at Sentencing Pursuant to Mr. Busby's Eighth and Fourteenth Amendment Rights to Individualized Sentencing and Due Process.**

The exclusion of mitigating evidence highly relevant to a critical issue in the punishment phase of the trial violates due process, notwithstanding whether the evidence is hearsay.  *Green v. Georgia*, 442 U.S. 95, 97 (1979) (per curiam); *see also Skipper v. South Carolina*, 476 U.S. 1 (1986) (exclusion of mitigating evidence violates right to individualized sentencing under *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982)).  "[T]he hearsay rule may not be applied mechanistically to defeat the ends of justice."  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *see also Green*, 442 U.S. at 96 (holding that exclusion of otherwise inadmissible hearsay statement that co-defendant admitted role in murder violated due process); *Paxton v. Ward*, 199 F.3d 1197, 1211-16 (10th Cir. 1999) (trial court's refusal to admit otherwise inadmissible court order stating that Mr. Paxton had been cleared in murder by a polygraph examination violated due process and right to individualized sentencing); *Rupe v. Wood*, 93 F.3d 1434, 1439-41 (9th Cir. 1996) (trial court's refusal to admit otherwise inadmissible polygraph evidence at sentencing hearing violated the accused's due process rights to have relevant, mitigating evidence concerning the circumstances of the crime presented to the jury deciding between a penalty of life or death); *Dutton v. Brown*, 812 F.2d 593, 601 (10th Cir. 1987) (trial court's exclusion of otherwise inadmissible testimony about such mitigating factors as family background, medical history and education violated due process); *Garcia v. State*, 816

So. 2d 554, 567 (Fla. 1998) (exclusion of otherwise inadmissible prior testimony of co-defendant who invoked Fifth Amendment that he and not the accused was responsible for the offense violated due process); *State v. Phillips*, 940 S.W.2d 512, 517-18 (Mo. 1997) (third person's otherwise inadmissible hearsay statement that he participated in killing with accused was relevant and would be admissible in sentencing proceeding under due process clause).

### 3.   A Reasonable Probability Exists the Jury Would Have Answered the Second Special Issue Differently or Not at All, Resulting in a Life Sentence, Had Trial Counsel Conducted a Reasonable Sentencing Investigation and Admitted Kathleen Latimer's Statements.

#### a.   The Sentencing Case Presented at Trial

Trial counsel presented five lay witnesses, a psychologist, and a videotape during the sentencing phase of Mr. Busby's capital murder trial.[22]  S.F. Vol. 35-36.  The first two witnesses were teachers from Pampa, Texas, and had never met Mr. Busby.   S.F. Vol. 35: 12-21; S.F. Vol. 35: 22-33.  They testified about his school records and their content.  The third, special education teacher Jeanette Miller, testified that she taught Mr. Busby job skills, that he was a follower, and that he once called her to tell her he intended to kill himself.  S.F. Vol. 35: 33-49.

Mr. Busby's two sisters, Kimiko Coleman and Tarsharn Busby testified briefly.   Kim testified that Junior's father had a different personality when he drank, that he once stole from her, and that she was surprised that he would ever hurt a woman.  S.F. Vol. 35: 50-70.  Tarsharn testified that Junior's father was an alcoholic, that Kim generally cared for them as they were growing up, and that Junior was protective of his sisters.  S.F. Vol. 35: 71-83.

The final witness presented to the jury by trial counsel, purportedly on Mr. Busby's behalf, was Dr. Timothy Proctor, a psychologist.  S.F. Vol. 36: 7-9.  Based on his review of Mr. Busby's records, his personal evaluation and review of test results, Dr. Proctor stated that Mr.

---

[22] The videotape contained silent images of two Texas Department of Criminal Justice facilities in Palestine, Texas, Tennyson Colony and the Michael Unit.  S.F. Vol 35: 6.

Busby had a severe anti-social disorder, presented a "high risk" of violence, and represented a future danger to society.  S.F. Vol. 36: 34, 39, 62, 82.  Indeed, he testified he "would not be very comfortable running into Mr. Busby on a parking lot of a supermarket store."  *Id*. at 78.  Dr. Proctor further testified that Mr. Busby's IQ was approximately 77.  S.F. Vol. 36: 52-53.  Dr. Proctor also found documented evidence of Mr. Busby's chronic alcohol and illegal street drug abuse stemming back to his teenage years and briefly mentioned prior suicide attempts by Mr. Busby.[23]  S.F. Vol. 36: 57-58.

> **b.    The Sentencing Case That Would Have Been Presented Had Trial Counsel Rendered Effective Assistance.**

Had trial counsel conducted a reasonable sentencing investigation, counsel would have discovered and presented a wealth of mitigating evidence relevant to Mr. Busby's background, character and the circumstances of the offense.    Additionally, a reasonable sentencing investigation would have better informed counsel's selection and use of a mental health expert in presenting his sentencing case to the jury.  A mental health expert who was provided the fruit of a thorough and reasonable sentencing investigation would have given expert testimony elucidating Mr. Busby's complex and severe mental health problems, enabling the jury to understand how a person like Mr. Busby wound up on trial for capital murder.

> **1.    The mitigating evidence a reasonable sentencing investigation would have uncovered.**

Edward Lee Busby, Jr. was born July 25, 1972 to Lavern Coleman Busby and Edward Lee Busby, Sr.  Edward Lee Busby, Jr. ("Junior") was Lavern's third child.  *See* Exhibit 8

---

[23] However, as explained *supra*, Dr. Proctor was hired in the middle of individual voir dire.  At the time of his meetings with Mr. Busby, the mitigation investigation was still ongoing.  As a result, no proper investigation into mental health issues (e.g. PTSD and trauma, schizophrenia, bipolar disorder), drug addiction, or mental retardation was conducted, nor were any further mental health professionals, qualified in these areas, hired to consult or to testify.

(Declaration of Alma Lagarda).   Junior's two older sisters, Kimiko Coleman ("Kim") and Tarsharn Busby, were nine and two years older, respectively.  *Id.*  All three children were born to different biological fathers.[24]  *Id.*

Lavern Busby was unaware she was pregnant with Junior until her sixth month.  *Id.*  As a result, she obtained no prenatal healthcare for her unborn child.  *Id.*   Junior was her fifth pregnancy, but only her third live birth.  Lavern had two miscarriages prior to Junior's birth.  *Id.*

## Edward Lee Busby, Jr. Was Abandoned by His Mother
## for the First Two Years of His Life

Lavern Busby did not assume care of Junior after his birth.  *See* Exhibit 8 at 1.  Instead, for the first two years of his life, Alma Coleman, Lavern Busby's mother, was Junior's primary caregiver, and Junior was incredibly close with her.  *Id.*  Every Sunday Junior's grandmother would take the children to church and Sunday school.  Junior sat in her lap during the whole sermon.  *Id.*  She fulfilled the maternal role in his life.  *Id.*

Alma passed away when Junior was just two years old.  *Id.*  At that time, Junior's sister Kim assumed primary caregiving responsibilities for Junior.  *See* Exhibit 10 at 5-6 (Declaration of Kimiko Coleman).  After Alma's death, Junior cried constantly and was unable to bond with his mother, keeping to himself.  *Id.* at 4.  He had frequent nightmares and would wake up wide-eyed and terrified.  *Id.*

Edward Busby, Jr.'s mom was never there for her children.  *See* Exhibit 11 at 1 (Declaration of Merlyn Rogers); *see also* Exhibit 9 at 1.  Junior frequently asked his mother for help but she brushed him off.  Lavern would tell Junior that he was the man of the family and that he needed to solve the family's problems.  *See* Exhibit 11 at 1.  As he grew older, if the

---

[24] It was only as an adult that Tarsharn Busby discovered that her father was not Edward Lee Busby, Sr.  *See* Exhibit 9 at 1 (Declaration of Tarsharn Busby).

family needed money, Lavern Busby expected her son to get it, even though he had trouble maintaining steady employment. *Id.*

### Edward Lee Busby, Jr. Was Beaten, Abused, and Abandoned by His Biological Father.

Edward Busby Sr. was a severe alcoholic whose drinking inevitably led to relentless physical abuse of the children. When he was sober, Edward Busby, Sr. was at best uninvolved in the rearing of the three children. *See* Exhibit 10 at 2. However, during his frequent binges of beer and liquor, Edward Busby, Sr. would become irate, turning his anger towards the three children. *Id.* Kimiko, the eldest of the three, described him as Dr. Jekyll and Mr. Hyde. *Id.*

Edward Busby, Sr. once tried to "discipline" Tarsharn, just two years older than Junior, by striking her in the face with a belt buckle. *Id.* Kim grabbed her two younger siblings and ran out of the house with them, escaping to the safety of a cousin's house down the street. *Id.* From their cousin's house, Kim called Lavern, who came home immediately, picked up a knife and stabbed Edward Busby, Sr. several times. The knife penetrated his hand, which he was using to shield his chest. *See* Exhibit 8 at 2.

As the children got older, Kim began trying to take her two younger siblings out of the house whenever she saw Edward Busby, Sr. begin to drink alcohol. *See* Exhibit 10 at 2.

The girls were not the only ones to suffer Edward Busby, Sr.'s wrath. Junior was a small child when his biological father lived with their family, but his size did not shield him from his father's hand. Junior's father would hit him with anything around, most often with his closed fist. *Id.* He would punch Junior in the face and in the head with his fist, wherever he could strike a blow. *Id.*

Consequently, the children grew up with a man who was a threat, shattering their childhood innocence and placing them in perpetual fear. *Id.* Rather than turning to him for

advice, love and protection, the children literally ran from Edward Busby, Sr. and the physical abuse he would perpetrate upon them.  *Id.*  They spent their days in the household in unrelenting dread of what was to come next from the man who was meant to watch over them.  *Id.*

Junior's father had sexual relationships with lots of women in the community.  Junior, his sisters, and his mother were aware of Edward Sr.'s infidelities.  *Id.*  Lavern turned a blind eye, so long as her husband was able to provide income to the family.  *Id.*  Edward Busby, Sr. finally left Lavern Busby and her three children when Junior was still a small child.  *Id.*

**Edward Busby, Jr. Suffered Abuse at the
Hands of His Biological Mother**

Edward Busby, Jr.'s relationship with his mother was plagued by abandonment, physical abuse, verbal assaults, and neglect.

The abuse of Edward Busby, Jr. at the hands of his mother, Lavern Busby, began in childhood.  Lavern routinely beat Junior and his two sisters with extension cords, water hoses, 2x4 boards, switches, belts, slippers, shoes, hangers, and whatever else was lying around.  *See* Exhibit 10 at 4; Exhibit 9 at 2.  They would be subject to physical beatings for even the smallest things, like forgetting to do their chores or disobeying an order.  *Id.*  Lavern Busby always kept a gun in the house, as well as a knife.  *See* Exhibit 10 at 4.   She also owned a pair of brass knuckles.  *Id.*  The children were scared of their mother.  *See* Exhibit 9 at 2.

Lavern beat her children regardless of where they were, whether at school, in church, or at the store.  *See* Exhibit 10 at 4.   The beatings frequently left welts and bruises, some resulting in scars that lasted years.  *Id.*  Junior's sister Kim has a scar to this day, from ankle to knee, from a beating her mother gave her with an extension cord.  *Id.*   The whipping took place because her cousin told her mother that she went to the park, when she was supposed to be grounded.  *Id.*  Kim actually had gone to her aunt's house to retrieve something, but was never given an

57

opportunity to explain.  *Id.*  When she returned home from her aunt's home, she was beaten extensively with the extension cord.  *Id.*

One of the worst beatings Tarsharn Busby ever received was for coming home late one Fourth of July.  *See* Exhibit 9 at 2.  Lavern made Tarsharn strip down naked.  *Id.*  She then beat Tarsharn with an extension cord from head to toe.  *Id.*  The beating caused bleeding and left welts and bruises on Tarsharn's body that took ages to heal.  *Id.*

Although Junior often tried to run from the beatings as a child, he did not escape.  *See* Exhibit 10 at 4; Exhibit 9 at 2.  As he got larger, Lavern began using different objects, although she knew he would never fight back.  *See* Exhibit 10 at 4.  On one occasion, she had brass knuckles on one hand and a gun in the other.  She swung her fist at his face, slamming the brass knuckles into his temple.  *Id.*

As a teenager, Junior tried to avoid coming home.  Exhibit 9 at 2.  He stayed away from the house as much as possible.  *Id.*  When Junior was 15, he came home after a time spent away. *Id.*  Tarsharn remembers seeing Junior run out of the back of the house, straight towards the neighbor's fence, Lavern chasing after him with a gun.  *Id.*  As he tried to escape over the fence, she shot twice, barely missing.  *Id.*  He did not return home again until several days later.  *Id.*

The children were also subject to verbal abuse from Lavern.  Lavern frequently said malicious things to Tarsharn and Junior.  *Id.*  She told Tarsharn that having her was "a mistake." *Id.*  When Tarsharn sought help from her mother with anything, her mother would tell her, "You know I don't have love for you like that."  *Id.*  Lavern told Junior that he was "just like [his] sorry-ass daddy."  *Id.*  Junior grew up internalizing the things Lavern said to him. *Id.*

Lavern Busby's violent behavior mirrored that of her father; she learned how to "discipline" her children from her parents.  Exhibit 8 at 2.  Lavern's mother, Alma Coleman, was

40 years old when she had Lavern.  *Id.*  Lavern was 16 years younger than her brother Virgil.  *Id.*  Her parents separated when she was about two years old.  *Id.*  As a girl, Lavern's father beat her severely.  *Id.*  She described her father as "a mean man…a really mean man."  *Id.*  He hit the children and Lavern's mother, though he was particularly aggressive with their mother.  *Id.*  His physical abuse was part of the reason they separated. *Id.*

Lavern's older brother Virgil was meek and mild and cried when their father beat him.  *Id.*  But Lavern quickly learned to defend herself.  *Id.*  When her father hit Lavern with his walking cane, she hit back.  *Id.*  Even when Lavern's father was an elderly man, she saw him as a threat and felt a need to protect herself.  *Id.*  She once went over to his house to give him a bath so she could take him to the doctor.  *Id.*  Her father threatened her and she grabbed him by the arm and slammed him into the bathtub.  *Id.*  She said, "You don't do that to me."  *Id.*

### Edward Busby, Jr. Grew Up in a House Filled With Violence

In addition to the abuse Junior and his sisters suffered at the hands of their mother and Junior's biological father, the children witnessed traumatizing household violence between their mother and the men in the household.

Lavern's assaults on the men in her house were common.  Kim, the eldest sister, once witnessed her mother beating Edward Lee Busby, Sr. with the spike of a high heel.  *See* Exhibit 10 at 3.  Lavern had cornered Edward Sr. in the closet, striking multiple blows with the spike of the high heel.  *Id.*  Lavern's mother attempted to pull her away, but was unable to stop the assault.  *Id.*  Blood gushed from Edward Sr.'s face.  *Id.*  On another occasion, Edward Busby, Sr. attempted to hit Lavern. *Id.*  She grabbed a butcher knife and lunged at him over and over again.  *Id.*  He stood there, attempting to defend himself, throwing up his hands for protection.  Lavern stabbed him multiple times in the hand.  *Id.*

When Junior was small, he and his sisters witnessed another brutal assault on Junior's father involving a knife.  The children were all in her car, and Edward Busby, Sr. was outside. Lavern got out of the driver's seat, approached him, and started stabbing him.  Exhibit 9 at 3. Junior's sister Tarsharn thought her mother was trying to kill him; Lavern went straight for the heart.  *Id.*  Edward Busby, Sr. again put his hands up and the knife sliced his hands.  *Id.*  The children's aunt, who lived nearby, ran out of her house to try to stop the assault.  *Id.*  Junior and Tarsharn were in the back seat of the car crying.  *Id.*

All three children were in the car with their mother, returning home one day when Junior was in elementary school.  Exhibit 10 at 3.  As they began to pull into the driveway, Lavern stopped the car and Junior's father, who was living with them at the time, yelled something to Lavern from the lawn.  *Id.*  Lavern, angry, slammed her foot on the gas and aimed straight for him in the driveway, but he jumped out of the way.  *Id.*  She reversed the car and again attempted to run him over.  *Id.*  The car skidded to a halt just short of the house.  *Id.*  Junior witnessed the assault from the back seat of the family car.  *Id.*

When Junior was in elementary school, Lavern Busby began a relationship with a man named Jerome Bradshaw.  Jerome Bradshaw, much like Edward Busby, Sr., was an alcoholic. Exhibit 10 at 3; Exhibit 9 at 3.  Yet when Jerome Bradshaw drank, he was neither violent nor abusive.  The children generally liked him and he never raised a hand towards them.  *Id.* Nonetheless, Lavern Busby's violent behavior found a target in her live-in boyfriend.  *Id.*

Jerome and Lavern got into a fight about Lavern's use of his money to pay for his own Christmas present.  Exhibit 9 at 3.  Lavern grabbed a baseball bat and struck him with it.  Jerome ran out of the house, with his arms up for protection.  *Id.*  The children's cousin was outside, and Jerome begged her to intervene.  *Id.*

Jerome Bradshaw worked as a roofer, and would bring his paycheck to Lavern.  Exhibit 10 at 3; Exhibit 9 at 3.  Lavern, in turn, would give Jerome $20 for alcohol and cigarettes.  *Id.* After drinking on one occasion, Jerome Bradshaw tried to find money in the household.  Lavern later discovered she had no money left.  Angered, Lavern chased Jerome, and when she caught up with him, she flipped him up on the car and put a knife to his throat, threatening to cut him if he did not return the money.

Lavern once came home to find that Jerome was not there.  Exhibit 9 at 4.  She put Tarsharn in the car and drove to a club, where they found Jerome outside.  *Id.*  Lavern exited the car, grabbed Jerome by the collar and began stabbing him with a knife.  *Id.*  Tarsharn yelled at her mother to stop.  *Id.*  Blood began to soak Jerome's shirt.  *Id.*  Jerome finally pried himself away from Lavern, and ran.  *Id.*  Jerome did not return to the house for several days after the incident.  *Id.*

The physical violence between Lavern and Jerome culminated in a fight that ended their relationship.  Exhibit 10 at 3; Exhibit 9 at 3.  The incident occurred when Lavern attacked Jerome with a large crystal ashtray, which she used to repeatedly bash him in the head.  *Id.* The attack left a lump on Jerome's head.  *Id.*  Shortly after the incident, Jerome left Lavern.  *Id.* Despite his flaws, Jerome had tried to support and encourage the children, but he left after suffering too much violence at the hands of Lavern.

The violence the children experienced was not only at the hands of the adults within the home.  When Tarsharn was 11 years old and Junior nine, their 30-year-old cousin tried to rape Tarsharn.  Exhibit 9 at 7.  Junior was in the house and heard Tarsharn screaming from her bedroom.  *Id.*  He busted down the door, confronted the cousin, and yelled at him to leave.  *Id.* The children's cousin left, and went into hiding.  *Id.*  Shortly after the attempted rape, Tarsharn

and her mother, brother and another cousin were out walking when they saw the cousin who had tried to rape her. *Id.* The cousin with whom they were walking beat Tarsharn's attacker almost to death; he hit the man on his face, chest, and back, and he kicked the man while he was on the ground. *Id.* When he was done, the cousin who had assaulted Tarsharn could no longer move. *Id.* Junior, still a child, witnessed the vicious attack. *Id.*

The brutality spilled outside the four walls of the Busby home. When Tarsharn was around 14 or 15 years old, she had gotten into a fight with a neighbor's daughter. *Id.* As he always did, Junior, who was then age 12 or 13, tried to come to his sister's rescue, which resulted in his getting into a fight with the girl's brother. *Id.* Later that day, when Lavern and Tarsharn returned home from the store, they found Junior barricaded inside the home. *Id.* He had pushed the couch against the door and surrounded himself with kitchen knives. *Id.* He was terrified. *Id.* He told his mother and sister that the children's neighbor, and other family members, had come over while Lavern and Tarsharn were gone, threatening to hurt Junior. *Id.* He had barricaded himself inside the house to protect himself from the group outside. *Id.* Lavern retrieved her gun and walked her two children to the neighbor's house. *Id.* She barged into the home. *Id.* Gun in hand, Lavern questioned the woman about the threats she had made towards Junior. *Id.* The woman begged and pleaded for Lavern not to shoot her. *Id.*

## Edward Lee Busby, Jr. Faced Racism and Bigotry in the Small, Segregated Town of His Youth

During the time Edward Lee Busby, Jr. was growing up in Pampa, Texas, the town was still segregated, as it largely is today. *See* Exhibit 12 at 2 (Declaration of Pamela Harris). In Pampa, the black folks in the community lived on one side of the town and the white folks on another. *See* Exhibit 13 at 1 (Declaration of James Bybee) ("Junior lived in the area over the tracks, which was considered to be the bad part of town. It was predominantly black. I

62

remember that white high school kids would go over to that area...but black kids almost never came into the predominantly white neighborhoods.").

Junior faced overt and cruel taunts based on his dark skin and large size. He was called "nigger" often. He was nicknamed "monkey," "black monkey," "baboon," and "Black Junior." *See* Exhibit 10 at 1. The schools were integrated and Junior had friends of many racial and ethnic backgrounds, yet he constantly faced racially-infused taunts from his schoolmates.[25] *Id.*

On one occasion, Kim took her younger siblings to a new mall in Pampa shortly after it opened. *Id.* Kim and Tarsharn, Junior's two sisters, noticed that Junior had wandered off. *Id.* They found him in a fight with three white boys. *Id.* Tarsharn tried to intervene, but was dragged into the fight as well. *Id.* Kim finally went over and broke the fight up. *Id.* The fight started because one of the boys had called Junior a "nigger." *Id.*

Although Junior was larger than the other children, he was never a bully. *See* Exhibit 9 at 6. Instead, he found himself the object of bullying. Exhibit 10 at 1. But whenever he was picked on, Junior would not react right away. *Id.* He would take the taunting and the racist comments until he could not take it anymore, and then he would blow up. *Id.* His classmates knew that Junior would take it, so they tormented him relentlessly. *Id.*

As one teacher explained, "The fact that Junior was Black didn't make it any easier [for him]. Had Junior been white, he would have stood a better chance in [the Pampa] community." Exhibit 12 at 2.

### Edward Lee Busby, Jr. Grew Up in Poverty

Lavern Busby always worked at least two jobs to try to pay for food and shelter for her three children. *See* Exhibit 10 at 5; Exhibit 9 at 1. She worked primarily at hospitals and nursing

---

[25] When Lavern Busby attended high school in Pampa, Texas, the schools were still segregated. They were not fully integrated until 1964.

homes.  *Id.*  As a result of her work, she was rarely at home, and left young Kim to take care of her two younger siblings.    *Id.*  When she came home from work late at night, Lavern went straight to bed.  Exhibit 9 at 1-2.

Kim, as the eldest sibling, was Junior and Tarsharn's caretaker.  *See* Exhibit 10 at 5; Exhibit 9 at 1.  She was 12 years old when she learned to cook for the family.  *See* Exhibit 10 at 5.  When there was food available, she made the kids sandwiches and spaghetti.  *Id.*  Sometimes Kim cooked pinto beans and corn bread.  *Id.*  But there were times when there was not any food to cook.  *Id.*  During those times the children lived off of tuna fish and crackers.  *Id.*  When, as sometimes happened, even the tuna fish and crackers ran dry, the family resorted to a food pantry, procuring canned meat.  *Id.*  When food was scarce, the children ate "pancakes," which they made themselves by mixing flour and water.  *See* Exhibit 10 at 5; Exhibit 9 at 5.  The children sometimes ate these "pancakes" morning, noon and night.  *Id.*

Because Lavern had two jobs, she was turned away from United Way.  *See* Exhibit 10 at 5.  Lavern was a proud woman, and resisted asking for help from family members or anybody else.  *Id.*  When Lavern was too proud to ask for help, the family just did without.  *Id.*  They often found themselves without electricity or gas.  Exhibit 9 at 5.

One time, during a particularly rough patch, the water in the house was turned off for a week.  Exhibit 10 at 5.  Lavern and her three kids went to the well in the neighborhood park to get water.  *Id.*  They took jugs, pales and buckets to transport the water home.  *Id.*  They had to get water every time they needed to wash dishes, cook, flush the toilet and wash themselves.  *Id.*  They would warm the water on the stove and bathe from head to toe in the sink.  *Id.*

The family's poverty manifested itself in other ways.  Junior never had a coat, even in the harsh Pampa winter. *See* Exhibit 14 at 1 (Declaration of Steve Porter).  The clothes he did have

were too small, and looked to others as if he got them from the Salvation Army. *Id.*; *see also* Exhibit 13 at 1 ("I remember that Junior's family were very poor...he didn't dress well.  His clothes often had holes in them and they were dirty.").  Junior smelled as if he hadn't bathed in several days.  Exhibit 14 at 1.  He would wear the clothes for two or three days straight, sometimes longer, so even if he eventually showered, his clothes would still smell. *Id.*  Junior's football coach at Pampa Jr. High School remembered that he would shower in the locker room whenever he got them chance, as it seemed to be his only access to a shower. *Id.*; *see also* Exhibit 13 at 1.

When Kim left the house at age 18, the younger children were devastated.  Tarsharn, then 12 years old, was left to look after Junior, 10, take care of the household, and generally fill the hole left by Kim's absence. *See* Exhibit 9 at 1.  Tarsharn cleaned the house, helped Junior with his school work, and tried to do her own. *Id.*

### Edward Lee Busby, Jr.'s Mental Illness Surfaced Early in His Life

Edward Lee Busby, Jr. has a lengthy history of severe mental illness.  As an adolescent, Junior often seemed depressed and frustrated. *See* Exhibit 12 at 1.  His moods changed from one day to the other. *Id.*  He often cried, for no apparent reason. *See* Exhibit 11 at 2; Exhibit 13 at 1.

Junior's special education teachers noticed his constant shifts in mood and his frustration in class, and told school officials that Junior had untreated emotional problems. Exhibit 12 at 1-2.  Yet Junior's mental health problems were never adequately addressed or treated by the school district or the larger society. *Id.*  Although Junior exhibited clear signs of mental health problems, there were few resources for kids with mental health issues in Pampa. *Id.* at 2.  Mental Health/Mental Retardation intervention was unavailable to schoolchildren in Pampa. *Id.*  In fact, Pampa school officials openly discouraged teachers from making recommendations for children

outside of the Pampa Independent School District (ISD) because the school would have to pay for the recommended treatment. *Id.* The lack of adequate mental health services led to Junior's first documented suicide attempt, which occurred when he was 15. After an altercation with a football coach, in which the coach pushed him into the lockers, Junior told his mother "Mama, you can't protect me from them." Exhibit 8 at 2; *see also* Exhibit 10 at 4. Shortly thereafter, Tarsharn came home to find that Junior had overdosed on muscle relaxants in an effort to end his life; she shook him but could not wake him. *See* Exhibit 9 at 5.

An ambulance was called and rushed Junior to the emergency room at Coronado Hospital. *Id.* At the hospital, doctors treated Junior for self-induced poisoning by parasympatholytics and diagnosed him with anxiety and neurotic depression.[26] *See* Exhibit 15 at 10271, 10273 (Coronado Hospital Records). A nasogastric tube was inserted and his stomach was irrigated. *Id.* at 10275. Junior was taken to the Intensive Care Unit and was discharged three days later. *Id.* at 10273.

Tarsharn found a suicide note next to the bed. *See* Exhibit 9 at 5. The note said that Junior longed for his mother's attention and felt as though his mother did not love him. *Id.* Tarsharn showed the note to the paramedics and to her aunt, who told Lavern that she needed to make more of an effort with her children. *Id.*

At the age of 27, now living in Arlington, Edward Busby, Jr. again tried to end his life. In the early morning hours, local police officers transported Junior to John Peter Smith Hospital, after finding him walking along the yellow stripe in the street, on his way to the bridge at I-35 and Cooper Street, where he intended to jump off the bridge and end his life. *See* Exhibit 16 at

---

[26] Hospital records show a diagnosis reference to "300.4." The Diagnostic and Statistical Manual of Mental Disorders (DSM) currently lists 300.4 as a diagnosis of dysthymic disorder.

7286 (John Peter Smith Hospital Records).[27]  He expressed his hope that a car would hit him on his way.  *Id.*  When approached by the officers, he begged them, "Please just kill me!" "Please just let me die!"  *Id.*  He pleaded with them over 50 times to just let him end his life.  *Id.*

Hospital staff noted that Mr. Busby was "severely depressed" and "guarded," showing a lack of insight and judgment.  Exhibit 16 at 7296.  Medical professionals observed slowed speech and limited comprehension.  *Id.*  They held Mr. Busby for observation until just before noon, had him sign a sheet of paper, agreeing to call a hotline if he felt suicidal again, and discharged him.  *Id.* at 7281, 7289.

Three years later, Mr. Busby was again taken to John Peter Smith Medical after a third suicide attempt.  EMS workers "dropped [Mr. Busby] off with little information."  *Id.* at 7179, 7258.  Junior was found after having run his car into a lamp post at 35 miles per hour, in an attempt to end his life.  *Id.* at 7258.  When confronted by EMS workers, he stated he intended to take 80 muscle relaxers when he returned home to end his life.  *Id.* at 7179.  At the hospital, Mr. Busby cried, repeating that he was tired of living.[28]  *Id.*  Mr. Busby was discharged later the same day with only a bus pass and an information sheet about depression and cocaine abuse.  *Id.* at 7273-74.

Three months later, and four days before the crime, Mr. Busby was again admitted for his fourth attempted suicide.  *See* Exhibit 16 at 7232.  He had threatened to jump off the Riverside Bridge.  *Id.*  When approached by officers, Mr. Busby asked them to shoot him, to end his life.

---

[27] Neither the Coronado Hospital records nor the John Peter Smith Hospital records were introduced into evidence, leaving the jury with only a passing mention of Mr. Busby's multiple, and without the salient—indeed, heart wrenching—details of Mr. Busby's attempts at his own life.

[28] Mr. Busy informed the staff that he had a history of cocaine, marijuana and alcohol addiction.  Exhibit 16 at 7193, 7194.  Cocaine was detected in Mr. Busby's system. *Id.* at 7170.

*Id.* Mr. Busby reported to hospital personnel that he had been using crack cocaine, marijuana and alcohol, in order to sleep and make him "happy." *Id.* at 7227.[29] He reported auditory and visual hallucinations that he had been experiencing for "a long time." *Id.* at 7226. His psychiatric assessment showed paranoia and that he believed death was "after him." *Id.* He told the medical staff, "Death don't like to sleep. He keeps me up until I can't stay awake no more." *Id.* at 7228. Mr. Busby reported that the voices told him to get "offers to hurt [him]" and instructed him to "take a gun to [himself]." *Id.* at 7229.

A psychiatric assessment determined Mr. Busby was suffering from substance-induced psychosis. *See* Exhibit 16 at 7228. He was found to be "guarded" and "tense," suffering from "severe depression" and anxiety. *Id.* He was prescribed Zyprexa, an anti-psychotic, and discharged with referrals to shelters and substance abuse treatment programs the following day. *Id.* at 7229, 7214-15.

Following his arrest, Mr. Busby was under the care of Tarrant County MHMR. He was diagnosed with Depression, Not Otherwise Specified (NOS). Exhibit 17 at 19 (Tarrant County MHMR Records). Throughout his confinement in the Tarrant County Jail, Mr. Busby received psychopharmaceutical treatment, including a prescription for the anti-psychotic, Seroquel.[30] *Id.*

Mr. Busby's mental illness runs in his family. Tarsharn Busby always believed her mother was "a little off." She would have rapid changes in mood and would act "crazy." Exhibit 9 at 4. Tarsharn's son Tyson, "reminds [her] a lot of Junior." *Id.* at 8. Tyson, has been diagnosed schizophrenia, bipolar disorder, and ADHD. *Id.* He also has a mood disorder, and

---

[29] Cocaine and cannabinoids were found in his system. Exhibit 16 at 7151.

[30] Seroquel is used to treat schizophrenia and bipolar disorder—or manic depression—in adults. Seroquel can be used in combination with other antidepressants to manage major depressive disorder in adults.

has terrible mood swings.  *Id.*  Paralleling Mr. Busby's own history, Tyson was hospitalized as a teenager after begging a security guard for his gun so that he could shoot himself.  *Id.*  Tarsharn contacted the police and Tyson was admitted to the hospital.[31]  *Id.*

### Edward Lee Busby, Jr. Lost the Only Positive Male Role Models in His Life

Derrick Ryan was Edward Lee Busby, Jr.'s cousin.  Derrick was slightly older than Junior and was one of the only positive role models in Mr. Busby's life.  *See* Exhibit 10 at 5.  They were close from early childhood.  When Derrick was around, Junior stayed out of trouble.  *Id.*  Derrick did a lot for Junior, and generally looked out for him.  *Id.*  For example, knowing that Junior could not pass a driver's exam on his own, Derrick took the test for him.

Derrick Ryan eventually left home, and consequently Mr. Busby, to attend college.  After coming home for vacation, Derrick and his girlfriend left to drive back to college.  On the way home, they were involved in a car accident, in which Derrick was killed.  *See* Exhibit 10 at 5; Exhibit 9 at 7.  Junior never recovered from the loss.  *Id.*  It was after Derrick's tragic death that Junior began spending more time with his "street family."

---

[31]  Mr. Busby's friends noticed his depression and mood swings: "Sometimes [Junior] would get depressed, and say things like, 'I'm tired of living this life and I want to do.'  He would talk about how he didn't want to live…very often."  Exhibit 18 at 2 (Declaration of Willard Farr).  "[Junior] cried a lot.  Not every day, but close to it….Sometimes he would start crying with a room full of people when we were just hanging out."  Exhibit 19 (Declaration of Eddy Pouncy).

They also saw evidence that he was experiencing auditory and visual hallucinations: "Sometimes, if you were watching TV with him…he would look over…and ask, 'What did you say?' when I didn't say anything."  *Id.*  "A lot of the time it seemed like his mind wasn't all there.  He would say that he heard voices, or he saw someone come to the door when I knew there was no one there…[Mr. Busby] said he heard voices or saw things that weren't there even before his drug habit.  Sometimes we would be together in a room and he would look over at me and ask what I said to him, when I hadn't said anything, or he would act like he was responding to noises that weren't there.  He said he heard the voices of demons in his head and that they were talking to him."  Exhibit 18 at 2.

The other positive male role model in Junior's life was Lavern's older brother, Virgil Coleman.  Virgil owned a barber shop.  *Id.*  Virgil was a great uncle to the children whom they called "Uncle Coley."  *Id.*  He passed away when Junior was in elementary school.  *Id.*  The loss was hard on the entire family, but especially hard on Junior, as he looked up to his uncle and wanted to be a barber like he was.  *Id.*  The loss was also hard on Lavern, who, burying herself deeply into work, absented herself from the family even more.  *See* Exhibit 9 at 5.

### Edward Lee Busby, Jr. Was Consistently Manipulated by the Women Upon Whom He Was Dependant

Edward Lee Busby, Jr. was a protector of women even in early childhood.  He would do everything his two sisters and his mother asked of him.   They took advantage of him, manipulated his naïveté to their advantage, and used his size to shield them.  *See* Exhibit 10 at 7.

At two or three years old, Junior was already trying to protect his sisters.  *Id.*  When boys harassed his sister Tarsharn, she would run to get away from them and call out for Junior to help.  *Id.*  Young Junior would run outside and get in fights with the older boys, no matter their size, to protect his sister.  *Id.*  When Junior was about 18 years old, Kim, who was eight years older, told him that a boy had been harassing her and that she wanted him beat up.  *Id.*  The boy had not been harassing her, but Kim wanted to see if Junior would beat the boy up.  *Id.*  Junior believed her and did as her sister predicted: he acted as her protector.  *Id.*

Save a few long-term relationships, including a short marriage, Junior's "romantic" relationships lasted for only brief periods of time.[32]   What Mr. Busby thought of as "romantic" relationships were in fact based on a callow understanding of love.  *See* Exhibit 10 at 7 ("[Junior] would fall for anyone who gave him the time of day….He never said, 'That woman isn't good

---

[32] When Junior was 17, he began a romantic relationship with Merlyn Rogers.  They had a daughter together, Raven Simone Rogers.  *See* Exhibit 11 at 1.  After his relationship with Merlyn ended, he was married to Glenda McLaren.  They divorced a short time later.

for me.  If you showed the tiniest bit of interest, a kiss on the cheek, he was in love.'").  If a woman expressed any affection, he would do whatever they asked of him.  *Id.*  ( "all [the women] would have to do is say they loved him."); Exhibit 18 at 1 ("[Mr. Busby] was very easily manipulated by women…He would do anything…[they] told him.").

Family and friends describe his susceptibility to manipulation as being borne, at least in part, of his need to be cared for, both practically and emotionally—Junior needed to fill not only the emotional void caused by the abuse and neglect on the part of his mother, but also practical support, in the form bill-paying, laundry, and driving.[33]

Junior was entirely dependant on the women in his life.  He was unable to function without their help.  Exhibit 18.  "Women did everything for Junior.  They would wash his clothes and cook for him.  Junior never had his own apartment.  He always lived with the women he was dating."  Exhibit 10 at 8; *see also* Exhibit 18 at 1 ("[His girlfriends] would do a lot to help him, like cook and pay his bills.").  When he was living with Merlyn Rogers, she performed all of the daily tasks.  *See* Exhibit 11 at 2.  She did them because she knew he could not do them on his own, and she did not want him to be embarrassed or taken advantage of.  *Id.*  When they were together, Merlyn tried to explain errands as they did them, so, she hoped, he would learn how to do them on his own.  *Id.*  Yet no matter how many times she explained, he could not competently complete basic daily tasks.  *Id.*

Mr. Busby often got lost driving and would ask for directions, even when around his own neighborhood.  *Id.*  Merlyn Rogers tried to give him directions using street names, but realized

---

[33] Friends describe Junior's inability to be alone not as a preference, but as a necessity. *See* Exhibit 19 at 1 ("[H]e really couldn't be alone.  [When he was alone] it was like there was a hole there.  He didn't really know what to do with himself when he was alone."); Exhibit 18 at 1 ("If [Mr. Busby] didn't have a girlfriend he would get really depressed…When he didn't have a girlfriend, he seemed confused.").

that he was unable to read the signs. *Id.* Even when she gave him directions using landmarks, he still arrived late because he had been lost.[34] *Id.*

Mr. Busby's reliance upon women was particularly acute with Kathleen "Kitty" Latimer, Mr. Busby's co-defendant in the crime that led to his capital murder trial. Kathleen Latimer was more of a mother figure to Mr. Busby than a girlfriend. *See* Exhibit 20 (Declaration of Renee Boyd); *see also* Exhibit 18 at 1 ("Although [Kathleen Latimer] was his girlfriend, she had a very mother-like role in their relationship and she would take care of him. Kathleen used to say things like 'I love him more than his mama.'"). She, like the others upon whom Junior was dependant, would help him with the daily tasks his was unable to perform. *Id.*

Kitty preyed upon this dependence and exercised complete control over their relationship. *See* Exhibit 21 at 2 (Declaration of Raquel Farr); Exhibit 18. "She would tell [Mr. Busby] what to do and lead him around." Exhibit 20. "[She] could talk him into doing just about anything…[Junior] did whatever she told him." Exhibit 18 at 1.[35]

"Kitty yelled and screamed at [Junior] a lot. She treated him really badly and would talk to him really mean. This wasn't just when they were fighting, it was the way she would talk at him all the time, just to tell him to do simple things every day." Exhibit 19 at 2. "Kitty would always boss [Junior] around. She would tell him what to do. She would cuss and yell at him in an abusive way." Exhibit 21 at 2.

---

[34] An inability to get around was a common theme in Mr. Busby's life. He was unable to get from place to place without the aid of friends and family. Exhibit 19 at 1 ("[Junior] never really had to worry about getting places either—we would always drive him where he needed to go.").

[35] Those who knew Mr. Busby believe he could not have planned or executed a crime on his own. "When I heard about what happened on the news, I knew Kathleen was behind it and that [Junior] was just going along with her…he always did what she told him." Exhibit 18 at 2.

This exploitation culminated in Edward Busby's participation in the crime for which he was sentenced to death; participation that was solely, and completely, at the direction of Kathleen Latimer.

### Edward Lee Busby, Jr. Suffered from a Debilitating Addiction to Crack, Marijuana and Alcohol.

Mr. Busby has suffered from a lifetime addiction to crack cocaine, marijuana and alcohol. Junior was exposed to substance abuse early in life. Mr. Busby's father, Edward Busby Sr. was an alcoholic and violent drunk. *See* Exhibit 10 at 2; Exhibit 9 at 3. Jerome Bradshaw, the boyfriend of Mr. Busby's mother and a frequent presence in their home, was also an alcoholic. Exhibit 10 at 3. Junior, influenced by a much older cousin, first began smoking marijuana in his early teenage years. In Pampa, Texas, at the age of 15, Mr. Busby attempted suicide by overdosing on muscle relaxants. *See generally* Exhibit 15.

Exposed to crack cocaine during his teenage years by older men in his neighborhood, Mr. Busby's substance abuse—an effort at self-medication for his untreated mental illness—took hold when he moved to the Fort Worth area. Mr. Busby's cocaine abuse escalated further once he became involved with Kathleen Latimer. *See* Exhibit 18 at 1. An inordinate amount of his time was dedicating to finding, and using, drugs. *Id.* In the weeks leading up to the crime, Mr. Busby drank and smoked crack cocaine and marijuana daily. Exhibit 17 at 52. Mr. Busby drank at least two bottles of wine daily. *Id.* Mr. Busby's only period of sobriety was during the two years he spent in prison. *Id.* at 64.

Mr. Busby frequently tested positive for cocaine and marijuana. Exhibit 16 at 7151. Junior suffered from delirium tremens—shaking caused by acute alcohol withdrawal—if he did not drink. *Id.* The extent of Mr. Busby's substance abuse was so severe that he was diagnosed with substance-induced psychosis on at least two separate occasions. *Id.* at 7221, 7229.

**2.    The mental health evidence that could have been presented had the results of a reasonable sentencing investigation been provided to an appropriate mental health expert timely retained according to prevailing professional norms.**

Mr. Busby has a complex mental health history, including childhood and adolescent behavior consistent with post-traumatic stress disorder ("PTSD").  Mr. Busby suffers from Bipolar Disorder with psychotic features, Anxiety Disorder, and has a lengthy history polysubstance dependence.  "It is clear that Mr. Busby's exposure to repeated, severe and chronic stressors, trauma, abuse and neglect over the course of his childhood and adolescence, impacted his functioning significantly and negatively across multiple emotional, behavioral and cognitive domains."  Exhibit 22 at 16 (Declaration of Dr. Bekh Bradley-Davino, Ph.D.).  Mr. Busby's attachment-related problems, compounded by his mental illness and substance abuse and dependence, directly lead to his participation in the abduction and death of Laura Lee Crane.

<u>Rampant Childhood Abuse and Exposure to Adverse and Traumatic Events in Childhood and Adolescence Negatively Affected Edward Lee Busby, Jr.'s Development</u>

While some individuals who experience abuse and neglect in childhood and adolescence go on to lead lives relatively unmarked by the trauma of their youth, a number of risk factors placed Mr. Busby at much greater risk of developing problems in adulthood.  First, the sheer number of traumatic events to which Mr. Busby was exposed placed him at greater risk of developing "cognitive (thought), emotional (feeling) and behavioral problems" in adulthood.  Exhibit 22 at 16.  This is due to what is termed the "dose-response relationship. *Id.*  At its most basic, this model explains what is intuitive: the higher "dose" of trauma you are exposed to, based on the frequency and persistence over time, the increased your risk of "negative outcomes." *Id.*  This is particularly true where severe childhood abuse and neglect occurs "over the course of key developmental periods":

Over the course of childhood and adolescence our neurobiological and psychological development progresses in predictable stages. Over the course of these stages we develop important capabilities and skills related to our thoughts, emotions and behaviors. These abilities include (but are not limited to):

- Increased capacity for logical and cause-and-effect thinking
- The development of more mature and effective problem-solving skills
- Increased capacity for abstract reasoning
- Improved ability to monitor and interpret information in the world around us
- Improved ability to learn from, and adapt to, the information we gather from the world around us
- Increased ability to more accurately identify our own emotions and the emotions of others
- Increased ability to appropriately and effectively regulate the strength and intensity of our emotional responses
- Increased ability to effectively and appropriately respond to the emotions of others
- Improved ability to plan and initiate goal oriented actions
- Improved ability to inhibit impulses

Childhood abuse and other traumatic and stressful life events that take place during this development process disrupt the formation of these key abilities and skills. As a result, children, such as Mr. Busby, exposed to trauma and abuse during the course of their development, are more likely to have problems in these areas.

*Id.* at 17. Mr. Busby's severe cognitive and adaptive deficits would similarly have contributed to

delay or impairment in the acquisition of these same skills. *Id.*

Another significant risk factor for Mr. Busby was that the abuse he experienced was at

the hands of his primary caregivers—most notably, his mother.

Relationships with parents or other caregivers, as well as the predictability and stability of our early environments, is the foundation upon which people develop their core beliefs about themselves, others and relationships. Strong and secure attachment relationships and stable early environments are the foundation for the development of the ability to control emotions and emotional responses particularly in the face of threat or danger later in life. As a result, the lack of a secure attachment to his mother or other caregiver as a young child would have placed Mr. Busby at increased risk for psychological and behavioral problems.

*Id.*

75

Another significant risk factor for Mr. Busby is his family history of substance abuse and dependence. "Understanding [Mr. Busby's] family history is important because having family members with substance-use-related problems increases an individual's risk for developing these same types of problems. This occurs through increased genetic risk and through increased risk related to being raised by and exposed to family members with these types of problems." *Id.*

### Edward Lee Busby, Jr. Has Problematic Patterns of Attachment

"When children and adolescents are exposed to abuse, chaos and instability in their homes and to other traumatic events, they develop patterns of thinking, behaving and feeling (coping strategies) and patterns in interpersonal relationships in response to these environments." *Id.* at 17. These coping strategies, while often effective at "buffering" the individual against the abuse, trauma and stress they immediately face, are often ineffective in responding to stimuli in the world at large, and indeed often lead to serious psychological and behavior difficulties in adulthood. *Id.* One such response to a traumatic childhood environment—particularly one plagued by violence at the hand of one's caregiver—is the development of problematic attachment-related behavior patterns:

> These problematic patterns occur because relationships with caregivers in childhood provide the environment in which children develop beliefs about themselves, beliefs and expectations of others, and beliefs about their relationships with others. This relationship with a primary caregiver is referred to as the attachment relationship. This attachment relationship is central to young children's ability to appropriately develop important cognitive, emotional and behavioral skills. Attachment-related problems often become particularly severe when caregivers are not only unavailable or absent but are also threatening or abusive, as was the case for Mr. Busby.

*Id.* The fact that Mr. Busby suffered severe verbal and physical abuse at the hands of his mother damaged his sense of self, rendering him unable to participate in healthy relationships. This was

particularly true with regards to Mr. Busby's romantic relationships, in particular in his relationship with Kathleen Latimer:

> When people have attachment problems that include a damaged sense of self, they often develop a "dependent" and/or "preoccupied" style in relationships with others in which they may seem "desperate" for attention from others regardless of the quality of that attention. People with this style may also rely on this other person to meet their needs and they may not be able to psychologically tolerate separation or not being in a relationship. This interpersonal pattern is often marked by a strong fear of abandonment and efforts to avoid ending the relationship. It appears that Mr. Busby had this pattern in his romantic relationships with women, and specifically in his relationship with Kathleen Latimer.

*Id.*

### Edward Lee Busby, Jr. Suffers from Bipolar Disorder with Psychotic Features

"Across the course of his adult life, and potentially beginning in adolescence, Mr. Busby began demonstrating symptoms associated with a diagnosis of Bipolar Disorder NOS with psychotic features." Exhibit 22 at 12. Mr. Busby has long suffered from sleeplessness, sometimes going two or three days without sleep, even while not on drugs. *Id.* He suffers from mood swings, alternating between depression and irritability, unable to determine the cause of a shift. And, as discussed at length *supra*, Mr. Busby has a long history of suicidality, including serious attempts at his own life. While the psychotic features of Mr. Busby's mood disorder have in the past been classified as "substance-induced," he has presented—and now currently presents—with paranoia unrelated to substance abuse or dependence. *See, e.g.*, Exhibit 22 (describing at length Mr. Busby's paranoia about his food and mail). In fact, it is likely that Mr. Busby's substance dependence and mood disorder with psychotic features have been "co-morbid" or have co-existed for most of his adult life:

> It is likely that over the course of his adult life Mr. Busby was affected by co-morbid (occurring at the same time) substance dependence and a mood disorder with psychotic features. This type of clinical presentation is not atypical.

> Substance use disorders are quite common in people who have bipolar mood disorders, with some studies finding that as many as 40% of those patients with bipolar disorder also have met diagnostic criteria for a substance use disorder at some point in their lifetimes. Consistent with Mr. Busby's clinical presentation the most commonly used substance in these instances are alcohol and marijuana followed by cocaine.

Exhibit 22 at 15.

"When bipolar disorders are co-morbid with substance use disorders, as in the case of Mr. Busby, the symptoms of the bipolar disorder are more frequent, there is decreased likelihood of engaging in treatment, and an increased risk for suicidal behavior." *Id.*

### Edward Lee Busby, Jr. Is a Person with Mental Retardation

A reasonable sentencing investigation that resulted in a comprehensive social history would have triggered reasonable counsel to conduct a targeted investigation into whether Mr. Busby was a person with mental retardation, which would have required retaining a mental health professional with expertise in mental retardation. Although the psychologist retained by trial counsel did conduct intelligence testing as part of his broad, scattershot evaluation of Mr. Busby, no specific inquiry into mental retardation was ever made. An appropriately retained expert in mental retardation who was provided Mr. Busby's comprehensive social history and results of intelligence tests administered at the time would have opined that Mr. Busby is a person with mental retardation.[36] Mr. Busby's IQ, as reflected in the results of IQ tests administered to him, is significantly subaverage; he has significant limitations in his adaptive functioning; and he exhibited these diagnostic features before the age of eighteen.[37]

---

[36] Mr. Busby will separately seek funding from this Court to retain an appropriate mental retardation expert to support these factual allegations.

[37] Mr. Busby's contention that he is a person with mental retardation within the protection of the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), is raised separately below.

**Significant Limitations in Intellectual Functioning.**

On February 11, 2010, Dr. Gilbert Martinez, a psychologist, administered the Wechsler Adult Intelligence Scales—Fourth Edition ("WAIS-IV") to Mr. Busby. The WAIS-IV is the most recent, and therefore most reliable, iteration of the respected Wechsler Adult Intelligent Scales.[38] According to Dr. Martinez's report, Mr. Busby obtained a full scale IQ score of 74, which reflects significant subaverage intellectual functioning and is within the range at which a diagnosis of mental retardation may be made. *See* Exhibit 23 (Report of Dr. Gilbert Martinez). Because it was obtained using a reliable and respected test and was administered closest of any other known IQ tests to the date of its norming, this score is the most accurate known measurement of Mr. Busby's IQ.[39]

At the time of Mr. Busby's trial, however, the WAIS-IV was not yet released. Consequently, on October 14, 2005 and as trial proceedings were ongoing, defense psychologist Dr. Timothy Proctor administered the WAIS-III—a prior iteration of the Wechsler Adult Intelligence Scales—to Mr. Busby. S.F. Vol. 36: 53. He obtained a full scale IQ score of 77. *Id.*

---

[38] The Wechsler scales are comprehensive, cover both verbal and non-verbal domains, and are the "standard instrument in the U.S. for assessing intellectual functioning." *Moore v. Quarterman*, 491 F.3d 213, 232 n.7 (5th Cir. 2007) (Dennis, J., dissenting); *see also Howell v. State*, 151 S.W.3d 450, 469 (Tenn. 2004) (Drowota III, J., concurring and dissenting) (referring to Wechsler scales as "gold standard").

[39] As part of the testing, Dr. Martinez administered validity testing—specifically, a standardized measure called the Test of Memory Malingering ("TOMM")—"to explore potential problems with response bias or intentional efforts to misrepresent cognitive symptomatology." Exhibit 23 at 1. Use of the TOMM is intended to determine whether the person being examined is putting forth full effort. The results of the validity testing were "consistent with very good effort on cognitive testing"—the same results as when an expert for the defense administered similar testing at trial. *See* S.F. Vol. 36: 45 (defense expert did not detect any malingering). According to Dr. Martinez, "There was no evidence for misrepresentation of cognitive or intellectual functioning." Exhibit 23 at 1.

The WAIS-III was normed in 1995, approximately ten years before Dr. Proctor administered the test. Taking into account, as a mental retardation expert would, the accepted scientific phenomenon known as the "Flynn effect"—in which the population, as a whole, is observed to perform better on intelligence tests over time—Mr. Busby's WAIS-III score reflects intellectual functioning approximately two standard deviations below the mean at the time his test was administered—Mr. Busby's score of 77 on the WAIS-III in 2005 is equivalent to his having scored, rounding up, a 74 (77 − 3.3 = 73.7) where the mean is 100.[40] This places Mr.

---

[40] Flynn's empirical research has demonstrated that the average obtained by any given group on the Wechsler scales has historically increased by approximately 0.33 points per year. AAIDD USER'S GUIDE at 20-21; *Moore v. Quarterman*, 491 F.3d 213, 232 n.7 (5th. Cir. 2007) (Dennis, J., dissenting). Thus, if a standardization sample took the WAIS-III in 2005, that group would have scored an average that was 3.3 points higher than the average scored by the standardization sample that was administered the WAIS-III in 1995 (10 years x 0.33 points = 3.3 points). Because the average score, from which standard deviations are measured, was set for this particular test at 100 in 1995, this means the average score of a standardization sample in 2005 would have been 103.3. Two standard deviations (30 points) below the 2005 average, *i.e.*, the approximate AAMR cut-off for mental retardation would be 73.3.

Rather than expressing the Flynn effect by adjusting the mean *upward* and then recounting standard deviations to determine the mental retardation range, the Flynn effect may also be mathematically expressed simply by holding the mean steady and adjusting an individual score *downward* by the corresponding number of points. Flynn, James R., *The WAIS-III and WAIS-IV: Daubert Motions Favor the Certainly False over the Approximately True*, 16 Applied Neuropsychology 98 ("Adjusting the IQ of an individual is no less or more accurate than adjusting the mean IQ of a group. How could it be? You use the same rate of obsolescence for both: you deduct 0.3 points for every year between the time of norming and the time of testing. If the rate is accurate, both adjustments are accurate."). This has the effect of maintaining the mean at the arbitrary but familiar number 100, while still accurately expressing how many standard deviations below the current mean the individual scored, which is the relevant inquiry for intellectual functioning in the mental retardation context. Mr. Busby will use this latter method of expressing the Flynn effect so as to maintain the familiar 75 as the approximate IQ score cut-off for mental retardation. *See Briseno*, 135 S.W.3d at 5-8, 14, *Modden*, 147 at 298; 2002 AAMR Manual at 58-59.

The AAIDD, formerly the AAMR and the organization whose mental retardation criteria the Texas Court of Criminal Appeals has ruled should be followed, has issued guidelines recommending that the Flynn effect be taken into account when undertaking retrospective

Busby within the intellectual functioning range at which a diagnosis of mental retardation may be made, provided he also possesses significant limitations in adaptive functioning that manifested before age 18.

Dr. Proctor also administered a nonverbal intelligence test, the Beta III, to Mr. Busby on November 4, 2005, just days before trial on the merits began.  Mr. Busby was estimated to have obtained a full scale IQ of 81 on this test.  S.F. Vol. 36: 53.  A mental retardation expert would opine, however, that the Beta IQ test, because of its less comprehensive nature, is widely acknowledged  to inflate IQ scores generally, to be subject to a higher Flynn Effect rate than the Wechsler scales, and to be less reliable overall than the Wechsler Scales.[41]  Additionally, Mr.

---

analyses.  In a section entitled "Retrospective Diagnosis," The AAIDD User's Guide to the 2002 AAMR Manual states:

> The following guidelines for clinicians are important in retrospective diagnoses and complement those guidelines presented in the next section regarding situations in which formal assessment is less than optimal: … 4. **Recognize the "Flynn Effect."**  … In cases where a test with aging norms is used, a correction for the age of the norms is warranted.  For example, if the Wechsler Adult Intelligence Scale (WAIS-III; 1997) was used to assess an individual's IQ in July 2005, the population mean on the WAIS-III was set at 100 when it was originally normed in 1995 (published in 1997).  However, based on Flynn's data, the population mean on the Full-Scale IQ raises roughly 0.33 points per year; thus the population mean on the WAIS-III Full-Scale IQ corrected for the Flynn effect would be 103 in 2005 (9 years x 0.33 = 2.9).  Hence, using the AAMR 2002 System, significant deficits in intellectual functioning of "at least two standard deviations below the mean" (Luckasson et al., 2002) the approximate Full-Scale IQ cutoff would be approximately 73 (plus or minus the standard error of measurement).

AAIDD USER'S GUIDE at 20-21.

[41]  Because mentally retarded persons—particularly those with mild retardation—are generally more impaired in their language than in their non-language domains, non-verbal intelligence tests such as the Beta are likely to result in inflated IQ scores and are therefore considered an inappropriate instrument for the assessment of intelligence in a mental retardation inquiry.  *See* George S. Baroff, MENTAL RETARDATION: NATURE, CAUSE, AND MANAGEMENT 31 (3d ed.) Philadelphia Brunner/Mazel, (1999); George S. Baroff, *Establishing Mental Retardation*

Busby had been administered at least one other intelligence test within just a few weeks time, making this score subject to the practice effect, further inflating it.[42]

**Significant Limitations in Adaptive Behavior.**

A mental retardation expert also would have opined at trial that Mr. Busby possesses significant limitations in adaptive behavior in his conceptual, social, and practical skills.

### *Conceptual Skills*

Relevant to Mr. Busby's language, reading and writing, and money, time, and number concepts, Pampa Independent School Department (ISD) records reflect that Mr. Busby received failing marks during his first grade year:[43]

---

*in Capital Cases: A Potential Matter of Life and Death*, Mental Retardation, Vol. 29, No. 6, 1991, at 346-47.

Moreover, Flynn has found that population IQ gains over time are *largest* for nonverbal intelligence tests.  *See* James R. Flynn, *IQ Gains over Time, in* ENCYCLOPEDIA OF HUMAN INTELLIGENCE 617 (Robert J. Stenberg ed., 1994).[41]  The available data showed that there was not a single country "in which verbal gains match[ed] the gains on culture-reduced, or performance, or nonverbal tests and *often the ratios run against verbal gains by two or three to one*."  *Id*. at 618 (emphasis supplied).

Indeed, for this reason, federal courts in Texas have granted, and the Fifth Circuit has upheld, *Atkins* relief to petitioners with Beta IQ scores as high as 92.  *See Rivera v. Quarterman*, 505 F.3d 349, 362 (5th Cir. 2007).  The State of Texas has itself conceded the unreliability of the Beta intelligence test vis-a-vis the Wechsler scales.  *See id.* ("The latter three scores [of 85, 92, and 80] resulted from screening tests used in the prison system, and the score of 70 was mentioned in Rivera's school records. *Texas concedes that the two Beta-II scores, 85 and 92, correlate only moderately with the Wechsler tests*.")

[42] Additionally, an unidentified test, administered by an unknown individual under unknown testing conditions rendered an IQ score of 96.  S.F. Vol. 36: 49.  The score was considered unreliable by both the defense and State, and was disregarded at trial.  S.F. Vol. 36: 64 (noting that there was "probably...something wrong with the results").

[43] Lalinda Grant, of Pampa ISD, indicated that "S" most likely stood for "satisfactory." The only classes in which Junior received a "satisfactory" mark were music, art and physical education.

| COURSE | 1 | 2 | 3 |
|---|---|---|---|
| Arithmetic | D | D | F |
| Reading | D | F | F |
| Spelling | | F | F |
| Handwriting | D | D | D |
| Music | S | S | S |
| Art | | | S |
| P.E. & Health | S | S | S |

After receiving these failing grades during his first grade year, Junior was made to repeat the first grade the following year. Exhibit 24 at 1 (Pampa ISD Records).[44]

Pampa Jr. High School placed Junior in special education, where he remained in high school. *Id.* The special education classes he attended were "prevocational," consisting of special education academics, as well as living skills like cooking and keeping a checkbook. *Id.* The grading scale in special academics had little to do with performance. *Id.* The teachers in special education rarely failed students, or kept them back. *Id.* So long as they placed their name on their work, they were usually passed. *Id.*

---

[44] Mr. Busby still received poor marks during his second attempt at his first grade year:

| COURSE | 1 | 2 | 3 |
|---|---|---|---|
| Arithmetic | C+ | B- | C- |
| Reading | C | C-* | C-* |
| Spelling | A | F | |
| Handwriting | C | C- | D |
| Music | S | S | S |
| Art | | | |
| P.E. & Health | S | S | S |

There is no indication on Mr. Busby's report card explaining the significance of the asterisks. Mr. Busby and his family moved to Amarillo the following year. Amarillo ISD no longer has Mr. Busby's school records. During the trial, the State elicited testimony about Mr. Busby's low "conduct" grades. Deborah Robertson, the Special Education Director of Pampa ISD explained that low conduct grades of students with limited cognitive functioning or learning disabilities is often borne of frustration. S.F. Vol. 35: 30-31 ("Oftentimes if children are frustrated in the learning, they act out in behavioral ways.").

Junior was "exempt" from the standardized tests mandated by state law.  Exhibit 24 at 3. "All children are expected to take them unless they were exempt. And he was exempt on the TEAMS test in ninth grade… nor did he take it in the eleventh grade."  S.F. Vol. 35: 27. Children were found to be "exempt" from TEAMS testing if a committee—consisting of administrators, general and special education teachers, and/or a nurse or counselor—determined that the child would be unable to complete the test. S.F. Vol. 35: 28.  If a child was found to be exempt, the school district would make accommodations for the classes they were in, *i.e.* measure the child's performance in various classes with "modifications."  S.F. Vol. 35: 29.

Pampa ISD records reflect that Mr. Busby received the following marks during his 10th grade year in special education:

| COURSE | | S | 1 | 2 |
|---|---|---|---|---|
| English Language Arts | CORR LA1 | S | | 55 |
| | FOM-R | S | 64 | |
| Mathematics | FOM | S | | 50 |
| | FOM-R | S | 61 | |
| Health | HLTH ED | | | 50 |
| Physical Education | PE EQUIV | | 77 | 79 |
| Fine Arts | ART 2 | | 67 | |
| Vocational Educat'n | OCCP INV | S | 66 | 64 |
| Other Electives | FOM-R | S | 68 | 58 |

After receiving these poor marks, Junior was made to repeat the 10th grade the following year.  *See* Exhibit 24 at 4.

Special education students in Pampa were not mainstreamed into regular academic classes.  *See* Exhibit 12 at 1.  The only time the special education students were with their other schoolmates was during physical education.  *Id.*  The special education teachers requested that their students be given a chance at sports if they seemed to have any talent at all.  *Id.*  For many of the special education kids, athletics might have been their only shot at any kind of success.  *Id.*

Tragically, unlike those special education students who had some resources to draw from to compensate for their cognitive impairments, Junior didn't have a single strength to help him get by.  *Id.*  As one teacher said, Junior "had the perfect storm of deficits that made it nearly impossible for him.  *Id.*  He had some sort of auditory or visual deficit, a low IQ, and a severe mental illness…that didn't leave [him] any areas to draw from."  *Id.*

In his late teenage years, Mr. Busby's deficits increasingly affected his life.  Even at the age of 17, Mr. Busby could not read or write.  *See* Exhibit 11 at 1.  His live-in girlfriend, Merlyn Rogers, once found him at home, staring at a job application on the table.  *Id.*  Mr. Busby looked confused.  *Id.*  After some time, he wrote his name on it, though he clearly did not understand the questions.  *Id.*  His girlfriend later found the application in the trash.  *Id.* Despite repetitive attempts to read the same biblical passage, Mr. Busby would be unable to understand the text. Exhibit 20.  "He would have to read a sentence four of five times to comprehend it, and even after that he would ask me for help."  *Id.*

Relevant to Mr. Busby's conceptual skills with money, time and numbers, Mr. Busby's ex-girlfriend, Merlyn Rogers, once asked Junior to tell her how much she owed on a bill.  *See* Exhibit 11 at 1.  He was holding the bill in his hand.  *Id.*  The amount owed was clearly printed on the bill, but Mr. Busby stared at the bill and asked her how to figure out the amount.  *Id.*  Mr. Busby's girlfriend had to show him where the amount was located on the bill, as he could not understand the numbers.  *Id.*

Mr. Busby had significant problems dealing with money.  Merlyn Rogers and Junior once drove to Burger King, where Junior went in to order for them both.  *Id.*  Merlyn was usually the one who went in to place the orders, but on this occasion she was not feeling well.  *Id.*  When Junior went into the restaurant he had a $10 bill.  *Id.*  The couple usually ordered inexpensive

food, like $1 burgers.  *Id.*  Junior came back out to the car and told Merlyn that he needed more money for their order.  *Id.*  Merlyn realized that Junior could not read the menu or add up the cost of the food.  *Id.*

Junior often relied on others to help him count and manage money.  Mr. Busby's ex-wife, Glenda McLaren, managed the household.  Junior could not have managed the money, paid the bills, or taken care of himself; he was entirely reliant on his wife.  When they went out, which was rare, she ordered and paid for the food.

Renee Boyd, a friend of Mr. Busby's in Ft. Worth, explained: "When we bought cigarettes, he would hold his change out in his hand and ask me, 'Is that right?'  He would ask me to help him buy things because he couldn't do it alone and he knew I wouldn't take advantage of him…"  Exhibit 20.  Others recount similar stories: "[JB] couldn't count very well….If JB had money, he would give it to Kathleen to count."  Exhibit 18 at 1.  "[JB] would say, 'Aunt Raquel' or 'Mama' come and help me count my change.  I would go down and help him count his change." Exhibit 21 at 1; *see also* Exhibit 19.

In his youth, Junior loved to play football.  *See* Exhibit 14 at 1.  But he often got frustrated.  *Id.*  It was not his physical ability or his size that held him back; the problem was that Junior could not understand some of the more complex plays.  *Id.*  He never quite understood what the coaches wanted him to do.  *Id.*  Junior found himself confused over whom he was being asked to block, which route he was supposed to run, and which direction the play required him to turn.  *Id.*  These plays were simple for his teammates.  *See* Exhibit 13 at 1.  His former high school teammate explained that the plays were uncomplicated and nontechnical, especially the plays Junior was required to understand as a defensive player.  *Id.*

### *Social Skills*

Mr. Busby is uniformly described by those who knew him as a "follower."  S.F. Vol. 35: 37; Exhibit 11 at 2.  Relevant to Mr. Busby's interpersonal skills, Junior stayed to himself growing up.  In his developmental years, he was a "loner."  Exhibit 13 at 1.  "I don't remember him having any close friends at school and he didn't hang out with any of the black kids at the school."  *Id.*; *see also* Exhibit 11 at 2 ("Junior didn't have any close friends that I knew of.").

Without his mother's affection, Junior looked outwards for a family.  *See* Exhibit 11 at 2-3.  He desperately wanted to be a part of something, to be accepted.  *Id.*  He strove for attention from anywhere he could find it, and he ended up with the wrong crowd.  *Id.*  They became the family he never had at home.  *Id.*  But the people who claimed to be his friends used him.  As Merlyn Rogers explained, "[Mr. Busby's friends] would come around when they needed money, or a ride somewhere, but when Junior was out of money, or gas, they were nowhere to be found.  Everyone saw this except Junior."  *Id.*

Junior wanted so badly to be accepted that if anyone even feigned interest in a friendship, he would follow them, even if it led him into a bad situation.  The people whom Junior believed were his friends in Pampa used him as a "front man."  *Id.*  They would have Junior do things for them, because he was big, and because he was slow.  *Id.*  If there were a fight, he would be encouraged to fight, protecting his friends, even if the fight had nothing to do with him.  *Id.*

He was easily manipulated, and gullible, from an early age.  As described *supra*, this was especially true when it came to women.  Exhibit 10 at 7.  He would do everything his two sisters and his mother asked of him.  *Id.*  They took advantage of him, used his naïveté to their advantage, and used his size to shield them, as did the women with whom he was romantically involved.  *Id.*

Family and friends describe his susceptibility to manipulation as being borne, at least in part, of his need to be cared for, both practically and emotionally—Junior needed to fill not only the emotional void caused by the abuse and neglect on the part of his mother, but also practical support, in the form bill-paying, laundry, and driving.

Mr. Busby was an easy mark and was constantly victimized, particularly by women: "I had to help [Junior] look out for himself. He would get taken advantage of all the time. I had to help him get his I.D. back from people who had stolen his wallet twice. A lot of times he would go to a motel room with a girl, and they would steal his wallet after he passed out." Exhibit 20; *see also* Exhibit 19 at 1-2 ("[The girls Junior was with] would take his money from him all the time because they knew he couldn't count very well.").

As explicated more thoroughly *supra*, Mr. Busby's reliance upon women was particularly acute when it came to Kathleen Latimer. Kathleen was more of a mother figure to Mr. Busby than a girlfriend. *See* Exhibit 20; *see also* Exhibit 18 at 1. She, like the others upon whom Junior was dependant, would help him with the daily tasks his was unable to perform. *Id.*

Kitty preyed upon this dependence and exercised complete control over their relationship. *See* Exhibit 21 at 2; Exhibit 18. "She would tell [Mr. Busby] what to do and lead him around." Exhibit 20. "[She] could talk him into doing just about anything…[Junior] did whatever she told him." Exhibit 18 at 1.

### *Practical Skills*

Relevant to Mr. Busby's activities of daily living, he was neither neat nor hygienic. Junior's hygiene was remarkably bad. *See* Exhibit 9 at 6. He never liked to bathe. *Id.* The women in the house had to remind him to bathe constantly, and he sometimes went days without bathing. *Id.*; *see also* Exhibit 14 at 1. He had difficulty with brushing his teeth, and he never

88

washed his clothes.  *See* Exhibit 9 at 6.  His sister Tarsharn believed he did not even know how. *Id.*  Mr. Busby wore the same clothes for days at a time.  *Id.*; *see also* Exhibit 14 at 1.  He would wear the clothes for two or three days straight, sometimes longer, so even if he eventually showered, his clothes would still smell.  *Id.*

Mr. Busby also lacked the ability to keep things neat.  Growing up, Junior was responsible for keeping his room clean.  *See* Exhibit 10 at 6; Exhibit 9 at 5.  When it was time to clean, Mr. Busby pushed everything under the bed and threw his dirty clothes in the closet. Exhibit 9 at 5.  If Junior had to sweep, it would take him a long time to complete the task, as he would do some, and then sit down, and then try again.  *Id.* at 6.  When Junior did the dishes, they never got clean.  *Id.*  Tarsharn would have to reclean them.  *Id.*

Junior was supposed to rake the yard, but he never completed it.  Exhibit 10 at 6.  He raked the leaves, and then ruined the job, spreading the leaves out again.  *Id.*  The Busbys' yard never looked good.  *Id.*

Relevant to Mr. Busby's instrumental activities of daily living, Mr. Busby was entirely dependant on the women in his life.  He was unable to function without their help.  *See* Exhibit 18.  Growing up, Kim, and later Tarsharn, did all of the cooking and chores.  *See generally* Exhibit 9; Exhibit 10.  "Women did everything for Junior.  They would wash his clothes and cook for him.  Junior never had his own apartment.  He always lived with the women he was dating."  Exhibit 10 at 8; *see also* Exhibit 18 at 1 ("[His girlfriends] would do a lot to help him, like cook and pay his bills.").

When he was living with Merlyn Rogers, she performed all of the daily tasks.  *See* Exhibit 11 at 2.  She did them because she knew he could not do them on his own, and she did not want him to be embarrassed or taken advantage of.  *Id.*  For example, he could not figure out

how to light the furnace or open the car hood.  *Id.*  When they were together, Merlyn tried to

explain errands as they did them, so, she hoped, he would learn how to do them on his own.  *Id.*

Yet no matter how many times she explained, he could not competently complete basic daily

tasks.  *Id.*

As explained, *supra*, Mr. Busby's inability to complete basic tasks increasingly affected

his life.  Junior's live-in girlfriend, Merlyn Rogers, once found him at home, staring at a job

application on the table.  *See* Exhibit 11 at 1.  Mr. Busby looked confused.  *Id.*  After some time,

he wrote his name on it, though he clearly did not understand the questions.  *Id.*  His girlfriend

later found the application in the trash.  *Id.*

Junior was unable to get from place to place without the aid of friends and family.

Exhibit 19 at 1 ("[Junior] never really had to worry about getting places either—we would

always drive him where he needed to go.").  Junior often got lost driving and would ask for

directions, even when around his own neighborhood.  *See* Exhibit 11 at 2.  Merlyn Rogers would

try to give him directions using street names, but realized that he was unable to read the signs.

*Id.*  Even when she gave him directions using landmarks, he still arrived late because he had

been lost.  *Id.*

Relevant to Mr. Busby's ability to maintain safe environments, records reflect that Mr.

Busby made at least four attempts to commit suicide, once by attempting to overdose on muscle

relaxants.  An ambulance was called and rushed Junior to the emergency room at Coronado

Hospital.  *See* Exhibit 9 at 5.  At the hospital, doctors treated Junior for self-induced poisoning

by parasympatholytics and diagnosed him with anxiety and neurotic depression.[45]

---

[45] Hospital records show a diagnosis reference to "300.4."  The Diagnostic and Statistical
Manual of Mental Disorders (DSM) currently lists 300.4 as a diagnosis of dysthymic disorder.

90

At the age of 27, Edward Busby, Jr. again tried to end his life.  Police transported Junior to John Peter Smith Hospital, after finding him walking along the yellow stripe in the street, on his way to the bridge at I-35 and Cooper Street, where he intended to jump off the bridge and end his life.  Exhibit 16 at 7286.  He expressed his hope that a car would hit him on his way.  *Id.*  When approached by the officers, he begged them, "Please just kill me!" "Please just let me die!"  *Id.*  He pleaded with them over 50 times to just let him end his life.  *Id.*

Hospital staff noted that Mr. Busby was "severely depressed" and "guarded," showing a lack of insight and judgment.  Medical professionals observed slowed speech and limited comprehension.  *Id.* at 7296.  They held Mr. Busby for observation until just before noon, had him sign a sheet of paper, agreeing to call a hotline if he felt suicidal again, and discharged him.  *Id.* at 7281, 7289.

Three years later, Mr. Busby was again taken to John Peter Smith Medical after a third suicide attempt.  EMS workers "dropped [Mr. Busby] off with little information."  *Id.* at 7179.  Junior was found after having run his car into a lamp post, in an attempt to end his life.  *Id.*  When confronted by EMS workers, he stated he intended to take 80 muscle relaxers when he returned home to end his life.  *Id.*  At the hospital, Mr. Busby cried, repeating that he was tired of living.  *Id.*  Mr. Busby was discharged later the same day with only a bus pass and an information sheet about depression and cocaine abuse.  *Id.* at 7273-74.

Three months later, and four days before the crime, Mr. Busby was again admitted for his fourth attempted suicide.  *Id.* at 7232.  He had threatened to jump off the Riverside Bridge.  *Id.*  When approached by officers, Mr. Busby asked them to shoot him, to end his life.  *Id.*  Mr. Busby reported to hospital personnel that he had been using crack cocaine, marijuana and

alcohol, in order to sleep and make him "happy."   *Id.* at 7227.[46]   He reported auditory and visual

hallucinations that he had been experiencing for "a long time."   *Id.* at 7226.   His psychiatric

assessment showed paranoia and that he believed death was "after him."   *Id.*   He told the medical

staff, "Death don't like to sleep.  He keeps me up until I can't stay awake no more."   *Id.* at 7228.

Mr. Busby reported that the voices told him to get "offers to hurt [him]" and instructed him to

"take a gun to [himself]."[47]   Exhibit 16 at 7229.

### 3.     The circumstances of the offense that would have been presented had trial counsel admitted Kathleen Latimer's statement.

As discussed *supra*, Mr. Busby's co-defendant, Kathleen Latimer, was deemed to have

given deceptive answers to questions posed to her during the polygraph she was administered in

the weeks leading up to Mr. Busby's trial.  In an interview following that polygraph examination,

Latimer admitted to lying in her previous written and oral statements and corroborated parts of

Mr. Busby's written and oral statements, including that she had indeed instructed Mr. Busby—

not once, but twice—to bind the complainant because she was making too much noise in the

trunk and that she instructed him to find them a ride:

> I told him to tie her up.  I told him to make -- that she needed to stop kickin'.  I
> told him that….I told him to tie her up.  I told him to.  A couple times….I told
> him, I said, you can turn the music up sky blast but it's still not gonna stop
> anybody from hearin' her bang around in the trunk 'cause you can still hear it --
> the music's in the car, it's not outside the car….when I realized that everybody
> could hear the bangin' without the music and I told him, I said you need to do
> something to stop her.

Defense Exhibit 2; *see also* Exhibit 30 (Report of Eric Holden).   Latimer's statements

corroborate Mr. Busby's account that it was she who told Mr. Busby to find her a car, leading

---

[46] Cocaine and cannabinoids were found in his system.  Exhibit 16 at 7151.

[47] The 2002 AAMR Manual states that depression is prevalent in 6-30% of mentally retarded persons.  2002 AAMR Manual at 174.

Mr. Busby to steal the complainant's car in an effort to please Latimer and setting into motion the subsequent events of that tragic day:

> I told him.  I told him it was his fault that I was where I was at, because I didn't know where the hell I was at.  I still don't know where the hell that Tom Thumb was.  I told him I was gonna find a ride.  And um, he couldn't come with me.  And he s-- he said, well I'm a find a ride.  I said well then you find us a ride.

Defense Exhibit 2.

Latimer's statements make clear that she was the individual in charge, giving direction to Mr. Busby.  When Mr. Busby responded to the noise the complainant made in the trunk by turning up the music to drown it out, Latimer insisted that she be bound or tied down to silence her.  That Mr. Busby had no intention to bind the complainant and did it only at Latimer's insistence—after resisting her first command—reflects his lack of intent to cause the complainant's death, and reduces his moral culpability.  Mr. Busby may have performed acts that led to the complainant's death, but those acts were willed and orchestrated by Kathleen Latimer.

### 4. A Reasonable Probability Exists the Jury Would Have Been Given and Answered a Mental Retardation Special Issue Affirmatively, Resulting in a Life Sentence, Had Trial Counsel Conducted a Reasonable Sentencing Investigation.

A jury charge should be given "'if there is some evidence to support it, even if that evidence is weak, impeached, contradicted, or unbelievable."  *Trevino v. State*, 100 S.W.3d 232 (Tex. Crim. App. 2003) (discussing the issuance of a "sudden passion" charge).  "That standard is familiar not only to issues involving lesser included offenses, but is typically used to determine the propriety of adding requested defensive issues to the jury charge."  *Green v. State*, 2009 Tex. App. LEXIS 2416 (Tex. App. Beaumont Apr. 1, 2009) (citations omitted).  As discussed *supra*, in the absence of legislation since *Atkins*, Texas courts have enforced the *Atkins* prohibition

against execution of the mentally retarded by submitting a third special issue to the jury.  An example of the jury instructions and special issue in another case is attached as Exhibit 1.

The evidence of Mr. Busby's mental retardation, readily-available to defense counsel at trial, was persuasive and would have entitled Mr. Busby to have his jury receive a mental retardation special issue.  Mr. Busby had a history of academic underachievement, including placement in special education after being made to repeat the first grade.  Exhibit 24 at 1.  Mr. Busby's IQ, discussed in detail *infra*, is significantly subaverage; he has significant limitations in his adaptive functioning; and he exhibited these diagnostic features before the age of eighteen.  A reasonable sentencing investigation would have revealed this information.  Had trial counsel obtained, and utilized, the fruits of a reasonable sentencing investigation, Mr. Busby would have been entitled to a jury instruction on mental retardation and a reasonable probability exists that the jury would have answered a mental retardation special issue affirmatively, resulting in a life sentence.

    **5.**    **The Sentencing Case The Jury Would Have Heard Absent Counsel's Errors Places the Entire Case in Such a Different Light as to Undermine Confidence in the Verdict.**

> *I am going to tell you in this Charge, it doesn't say,*
> *"some mitigation."  It says, "sufficient mitigation."*
> S.F. Vol. 36: 151

The Supreme Court in *Strickland* noted that "Some errors [by trial counsel] will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture…" *Strickland*, 466 U.S. at 695-96.  This is such a case.  As the foregoing demonstrates, the picture of Mr. Busby and his moral culpability for the crime that would have emerged had a reasonable sentencing investigation been undertaken by counsel is a drastically different one from the barebones presentation counsel presented to Mr. Busby's sentencing jury at trial.  *See*

*Kyles v. Whitley*, 514 U.S. 419, 435 (materiality under *Brady*, which is equivalent to prejudice under *Strickland*, is demonstrated when "the [omitted evidence] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict").

With respect to the critical element of the mitigating special issue, the jury heard next to nothing at trial, and the evidence it did hear was insubstantial. Much like the evidence in *Rompilla*, it consisted of "relatively brief testimony of his family members beseech[ing] the jury for mercy, saying they believed [applicant] was a good man." *Rompilla*, 545 U.S. at 377. Trial counsel's unreasonable investigation is perplexing given counsel's avowed strategy of conceding the first special issue with respect to future dangerousness and presenting an expert uninformed by adequate sentencing investigation to opine that Mr. Busby would constitute a future danger. Having done so, trial counsel had but one statutorily-mandated special issue upon which to save Mr. Busby's life: the mitigation special issue, which asks jurors "[w]hether, taking into consideration all of the evidence, including *the circumstances of the offense*, the defendant's *character and background*, and *the personal moral culpability of the defendant*, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." Acts 1991, 72nd Leg., ch. 838, § 1 (1991) (amended 2005) (emphasis added).

Trial counsel presented extremely brief, isolated and uncontextualized evidence of Mr. Busby's low cognitive functioning and his past drug use and suicide attempts. As the prosecutor summarized trial counsel's sentencing case during closing argument:

> I think this whole thing boils down to Special Issue Number Two. … And I think we have to look at the whole thing. And it all boils down to the way I kind of listen to this, the Defense has come with really two – two concepts here in terms of mitigation. First of all, they have said he is slow. They have said he has an IQ that is below that of most of the people in the world. And secondly, they have said he has had a chronic drug problem.

S.F. Vol. 36: 121-22.  The prosecutor later reiterated to the jury:

> So what they have brought you in terms of mitigation? Well, not much. ***First of
> all, I'm not sure they brought you anything.*** But that's in your collective wisdom
> to decide whether it is sufficient mitigation. They brought you an IQ score, 77, 79,
> 81. I don't care. Pick one. It doesn't make any difference. Pick the lowest one.
> Pick 77 and run with it. I don't care. Here is -- here is the legal – because that's all
> they have really got in this case. Really when you shake it out and look at it, that
> is all they have got. … Well, he now finds himself in a legal box or a legal trunk,
> if you will. And what -- what they're hoping is, one of you -- and that is really all
> they are hoping for, is one of you will say, well, he has got this 77 IQ and,
> therefore, I'm going to make that the key that unlocks his box or unlocks his trunk
> to avoid a death penalty. ***That's really what they have got. That's really what
> they have got. And that is all they have got.***

*Id*. at 151-52 (emphasis added).  The State's argument, of course, presumes that trial counsel

adhered to norms of professional conduct, a misimpression that both the State and the jury were

under when they sentenced Mr. Busby to death.

A reasonable sentencing investigation—an investigation that, at minimum, would have

begun immediately after Mr. Strickland's appointment and over a year before trial—would have

placed the entire sentencing phase in a different light in several ways.  First, the mitigating

evidence regarding Mr. Busby's tragic childhood background—his abandonment by his mother

and biological father and the death of his grandmother, the severe physical and emotional abuse

he suffered from his biological father and mother, the violence that pervaded both his childhood

home and wider environment and from which he could not escape, the poverty in which he was

raised, the racism and bigotry he faced growing up black in a small, segregated town, the loss of

his only adult male role model and his best friend and influence, his extensive and debilitating

mental illness, and his mental retardation—would have been discovered and presented to the

jury.  Trial counsel's unreasonable investigation rendered the jury's life-and-death assessment of

Mr. Busby's background a partial and inaccurate one.

Second, the failure to conduct a reasonable sentencing investigation fatally infected trial counsel's attempt to develop mental health evidence. Counsel's last-minute mental health inquiry and selection of a mental health expert simply were not informed by reasonable sentencing investigation. Because counsel failed to conduct a reasonable investigation, the mental health expert, effectively chosen at random, was not provided the tools necessary to make the focused and reliable assessment of Mr. Busby's mental health that present counsel have made. For example, the mental health expert at trial was never provided the details or descriptions of abuse that would have resulted from a reasonable sentencing investigation:

> In order to evaluate the impact of [repeated, severe and chronic stressors, trauma, abuse and neglect over the course of one's childhood and adolescence], a comprehensive psycho-social background evaluation in combination with a comprehensive, psychological evaluation is necessary. It is also critical that a psychological evaluation of the impact of exposure to trauma and abuse include gathering detailed accounts of these experiences. ***The details in the descriptions of the abuse are often important in understanding later reactions and behaviors***. For example, in the case of Mr. Busby, in order to understand the way he behaved in his relationships with women as an adult, it is critical to understand in detail the nature of the physical and emotional abuse he experience from his mother, as well as the violence between his mother and other adults that he observed across the course of his childhood and adolescence. Trauma and abuse need to be evaluated with respect to multiple factors, including age at which they occurred, psychological and biological development processes related to the age(s) of occurrence, frequency of occurrence, severity level, chronicity, relationship to people who are agents of the trauma and abuse, reaction of other caregivers, internal resources (e.g., intellectual and mental abilities) of the person experiencing the trauma and abuse, and external resources (community, school, etc) available to person experiencing the trauma and abuse.

Exhibit 22 at 16 (emphasis added).

Additionally, trial counsel informed by a reasonable sentencing investigation would have sought a mental health professional with expertise in mental retardation to specifically evaluate whether Mr. Busby is a person with mental retardation. *See* Exhibit 25 (Affidavit of Gilda Kessner). The expert retained by counsel, although purporting to rule out mental

retardation, never in fact conducted an evaluation that would have allowed him to do so, as no assessment or evaluation of Mr. Busby's adaptive functioning was ever investigated by trial counsel. Trial counsel informed by reasonable investigation also would have retained a mental health professional to inquire specifically into whether Mr. Busby had bipolar disorder or post-traumatic stress disorder, as present counsel did. This would have resulted in testimony before the jury that Mr. Busby has bipolar disorder and childhood and adolescent behavior consistent with PTSD. It also would have illuminated for the jury the mental health factors contributing to Mr. Busby's willingness to take orders from Kathleen Latimer to acquire a car, and, subsequently, to bind the complainant with tape.

Third, trial counsel informed by reasonable sentencing investigation would have discovered the evidence of Mr. Busby's mental retardation and presented it to Mr. Busby's sentencing jury. While trial counsel presented evidence of Mr. Busby's low cognitive functioning, this is a far cry from presenting evidence, supported by expert testimony, that Mr. Busby is a person with mental retardation with its associated significant deficits in adaptive behavior. Not only would this evidence have been mitigating, trial counsel armed with such evidence would have requested a third special issue asking the jury to determine whether Mr. Busby is a person with mental retardation.[48] The potential that a jury could have found Mr. Busby at trial to be a person with mental retardation but were deprived of the opportunity to consider the substantial evidence that he is due to counsel's failure to conduct a reasonable sentencing investigation must alone undermine the Court's confidence in the outcome.

---

[48] In Texas, mental retardation in capital cases is determined by giving the jury a third special issue specifically inquiring whether the defendant is a person with mental retardation whenever raised by the evidence and requested by defense counsel. *See, e.g.*, Exhibit 1.

Fourth, a reasonable sentencing investigation would have revealed mitigating evidence that would have placed Mr. Busby's commission of the crime in the context of his untreated mental illness, his mental retardation, his dependency upon and manipulation by the women in his life, and his self-medication through narcotics and attendant substance addiction.

Mr. Busby is a significantly cognitively impaired and mentally ill individual who lacked adequate support services and who turned to drugs and alcohol to self-medicate. His relationship with Kathleen Latimer, as with all the women in his life, was a dysfunctional one borne of his abusive childhood. His dependence on Kathleen, and fear of abandonment by her, directly led to his kidnapping of the complainant at her direction (get me a car) and, eventually, to his binding her with tape, also at Kathleen Latimer's insistence. Mr. Busby was honest and forthright in his statements when he denied ever intending to kill the complainant and, had the jury been able to see Kathleen's statements, along with all the evidence a reasonable sentencing investigation would have uncovered, at least one of its members would have voted yes on the mitigation special issue, or, at the very least, refrained from voting no.

Had trial counsel rendered assistance according to prevailing professional norms, the picture they would have been able to paint for the jury would have shown an entirely different Edward Lee Busby, Jr. than the one painted by the State in its closing argument, when it told the jury, "You cannot draw up a more egregious, cold, calculating, deprived, hard set of facts that you have heard in this case." S.F. Vol. 36: 156.

Finally, had trial counsel admitted Kathleen Latimer's statements from her polygraph interview, the jury would have seen that she was the individual in charge. The jury would have heard that while Mr. Busby responded to the noise the complainant made in the trunk by turning up the music to drown it out, it was Kathleen Latimer who insisted that she be bound or tied

down and that it was Kathleen Latimer who used the ATM and credit cards and that it was Kathleen Latimer who endorsed and cashed the complainant's check at Wells Fargo.

Had counsel rendered assistance according to professional norms, the State would have been unable to claim, as it did in its closing argument at sentencing, that "[Mr. Busby] is smart enough to go through the drive-through at Wells Fargo and cash [the complainant's] check. Smart enough to forge the check, run through the drive-through, send it in with the driver's license and the credit cards.  Smart enough to use her credit cards at ATMs all up and down Interstate 35."  S.F. Vol. 36: 126.

While the facts of the offense, and of Ms. Crane's death, are undeniably tragic, the full story of Mr. Busby's personal moral culpability for his participation in the offense was never told.  Indeed, trial counsel's investigation did not even scratch the surface.  Not only were statements of his co-defendant admitting a leadership role in Ms. Crane's death unconstitutionally excluded from the jurors,[49] but the compelling evidence that explained how a mentally ill and mentally retarded man was manipulated by his girlfriend to participate in such a crime was never told.  The jury was deprived of evidence highly relevant to its assessment of Mr. Busby's moral culpability under the mitigation special issue.

At the end of its closing argument, the prosecutor told the jury, "How much more do we need to know about Edward Busby? Have we left something out about Edward Busby? I don't think so."  S.F. Vol. 36: 148.  Unfortunately, due to trial counsel's omissions at trial, omissions that rendered their assistance ineffective and well below professional norms, there was a wealth of relevant evidence about Edward Lee Busby, Jr. that the jury was unable to consider in its

---

[49] A claim of ineffective assistance that covers both the guilt-innocence and sentencing phases related to the exclusion of this evidence is presented, *infra*.

determination of whether he was a person worthy of living or so unsalvageable that he should be put to death.

## II.    MR. BUSBY'S DEATH SENTENCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE HE IS A MENTALLY RETARDED PERSON.

### A.    The Mental Retardation Standard.

The execution of a mentally retarded person violates the Eighth Amendment's proscription against cruel and unusual punishment. *Atkins v. Virgina*, 536 U.S. 304, 321 (2002).

The Texas Legislature has not provided a statutory definition of mental retardation. In the absence of such a statutory definition, it is appropriate for this Court in assessing whether a *prima facie* case has been made to rely on the definitions set out by the American Association of Mental Retardation ("AAMR") and the American Psychiatric Association ("APA").[50] *Ex parte Briseno*, 135 S.W.3d 1, 5-8, 14 (Tex. Crim. App. 2004). Each authoritative organization recognizes that mental retardation is a disability characterized by (1) "significantly subaverage" (APA) or "significant limitations" in (AAMR) intellectual functioning, (2) accompanied by "significant limitations" in adaptive behavior, (3) the onset of which occurs prior to the age of 18. *See* AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (10th ed. 2002) ("2002 AAMR Manual"); APA, *Diagnostic and Statistical Manual of Mental Disorders* 41 (Text Revision, 4th ed. 2000) ("DSM-IV"); *Briseno*, 135 S.W.3d, at 7.

Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below, or approximately two standard deviations below the mean. *Briseno*, 135 S.W.3d, at 7

---

[50] The AAMR is now called the American Association on Intellectual and Developmental Disabilities ("AAIDD"). Mr. Busby will use AAMR to refer to the manual published under that name, but will use AAIDD to refer to the organization itself and publications published under the new name. Mental Retardation is now referred to by the AAIDD as Intellectual Disability ("ID"). Mr. Busby will use the term Mental Retardation, which was the terminology in use at the time of trial.

n.24 (citing DSM-IV at 39).   However, both the AAMR Manual and the DSM-IV take into account the standard error of measurement in assessing IQ (approximately 5 points),  which, in effect, "expands the operational definition of mental retardation to 75."  2002 AAMR Manual at 58-59; DSM-IV-TR at 41-42.  *See also Atkins*, 536 U.S., at 309 n.5 (score of 75 is typically considered the cutoff IQ score for the intellectual functioning prong of the mental retardation definition); *Ex parte Modden*, 147 S.W.3d 293, 298 (Tex. Crim. App. 2004) (70-75 IQ score "generally indicates subaverage general intellectual functioning").   Additionally, the AAIIDD User's Guide to the 2002 AAMR Manual recommends that clinicians take the Flynn effect, discussed *infra*, into account when interpreting IQ scores and assessing intellectual functioning. *See* AAIDD, USER'S GUIDE: MENTAL RETARDATION, DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS—10TH EDITION 20-21 (2007) ("AAIDD User's Guide") (excerpt attached as Exhibit 26).

The AAMR Manual requires that there be "significant limitations…in adaptive behavior as expressed in conceptual, social, and practical skills."   2002 AAMR Manual at 1. "Significance" can be established by the limitations in one of the three domains.  *Id*. at 74, 77-78. The AAMR Manual provides examples of "representative skills" in each of the three domains. Representative **conceptual skills** are "language, reading and writing, money concepts, and self-direction."  *Id*. at 82.  Representative **social skills** are "interpersonal, responsibility, self-esteem, gullibility, naiveté, follows rules, obeys laws, avoids victimization."  *Id*.  Representative **practical skills** are "activities of daily living, instrumental activities of daily living, occupational skills, and maintains safe environments."  *Id*.  The APA definition requires that there be "significant limitations" in at least two of the following eleven domains:

- communication
- self-care

- home living
- social/interpersonal skills
- use of community resources
- self-direction
- health
- safety
- functional academics
- leisure
- work

DSM-IV-TR, at 41.[51]

---

[51] The AAIDD and APA adaptive behavior domains are consistent with each other. Prior to the 2002 AAMR Manual, the 1992 AAMR Manual (9th ed.1992) utilized a description of adaptive behavior domains similar to the description of the eleven domains still utilized by the APA in the DSM-IV. The only differences were the APA domain "social/interpersonal skills" was called "social skills" in the 1992 AAMR Manual; the APA domain "use of community resources" was called "community use" in the 1992 AAMR Manual; and the two APA domains, "health" and "safety" were combined into a single "health and safety" domain in the 1992 AAMR Manual. *See* AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (9th ed. 1992) ("1992 AAMR Manual"). Although the 2002 AAMR Manual shifted from a focus upon ten domains to three broader domains of adaptive behavior, each of the ten 1992 skill areas fits neatly within at least one 2002 AAMR Manual domain:

### Relationships of 1992 and 2002 Adaptive Behavior Skills

| Adaptive Behavior Skill Areas in 2002 Definition | Representative Skills in 2002 Definition | Skill Areas Listed in 1992 Definition |
|---|---|---|
| Conceptual | Language<br>Reading and Writing<br>Money concepts<br>Self-direction | Communication<br>Functional academics<br>Self-direction<br>Academics |
| Social | Interpersonal<br>Responsibility<br>Self-esteem<br>Gullibility<br>Naiveté<br>Follows rules<br>Obeys laws<br>Avoid victimization | Social skills<br>Leisure |

**B.     The Stereotype, Stigma, and Reality of Mild Mental Retardation.**

Many popular conceptions the mentally retarded exist, but they are often inaccurate representation of mental retardation, at least for the approximately 85-89% of all mentally retarded persons who suffer from "mild" mental retardation.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 443 n.9 (1985) ("Mentally retarded individuals fall into four distinct categories. The vast majority—approximately 89%—are classified as 'mildly' retarded, meaning that their IQ is between 50 and 70.   Approximately 6% are 'moderately' retarded, with IQs between 35 and 50.  The remaining two categories are 'severe' (IQs of 20 to 35) and 'profound' (IQs below 20).");  DSM-IV at 41 (85% of those officially categorized as mentally retarded are classified as mild).  Many lay persons labor under a profound misconception of the capabilities of persons with mental retardation, especially mild mental retardation.  This conception fails to take into account "the wide variation in the abilities…of the retarded," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 445 (1985), and is, ultimately, based on a stereotype— including the "false stereotype that all [are] ineducable," *Id.* at 463 (Marshall, J., dissenting)— that, if acted on by courts of law, would arbitrarily exclude from *Atkins's* protection the great majority of persons who are categorically mentally retarded.

As *City of Cleburne* Court noted, although it "is undeniable … that those who are mentally retarded have a reduced ability to cope with and function in the everyday world," the mentally retarded nonetheless "range from those whose disability is not immediately evident to

| Practical | Activities of daily living<br>Instrumental activities of<br>daily living<br>Occupational skills<br>Maintains safe environments | Self-care<br>Home living<br>Community use<br>Health and safety<br>Work |
|---|---|---|

2002 AAMR Manual, Table 5.2.   Thus, the current AAMR and APA domains are likewise compatible.

those who must be constantly cared for."  473 U.S. at 442.  The class of mildly mentally retarded

are most likely to contain those mentally retarded persons "whose disability is not immediately

evident."  With respect to the class of mildly mentally retarded persons, the DSM-IV states,

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." … As a group, people with this level of Mental Retardation typically develop *social and communication skills* during the preschool years (ages 0-5 years), have *minimal impairment in sensorimotor areas*, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level.  During their adult years, they usually achieve *social and vocational skills adequate for minimum self-support*, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress.  With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

DSM-IV at 43.  The *Manual of Diagnosis and Professional Practice in Mental Retardation*,

prepared by the American Psychiatric Association, describes this class of the mentally retarded

in more detail:

> People classified with mild MR evidence small delays in the preschool years but often are not identified until after school entry, when assessment is undertaken following academic failure or emergence of behavior problems.  Modest expressive language delays are evident during early primary school years, with the use of 2- to 3- word sentences common.  During the later primary school years, these children develop *considerable* expressive speaking skills, *engage with peers in spontaneous interactive play*, and can be guided into play with larger groups.  During middle school, they develop *complex* sentence structure, and their speech is *clearly intelligible*.  The ability to use simple number concepts is also present, but practical understanding of the use of money may be limited.  By adolescence, *normal language fluency* may be evident.  Reading and number skills will range from 1st- to 6th-grade level, and social interests, community activities, and self-direction will be typical of peers, albeit as affected by pragmatic academic skill attainments.  Baroff (1986) ascribed a mental age range of 8 to 11 years to adults in this group.  This designation implies variation in academic skills, and for a large proportion of these adults, persistent low academic skill attainment limits their vocational opportunities.  However, *these people are generally able to fulfill all expected adult roles*. Consequently, their involvement in adult services and participation in therapeutic activities following completion of education preparation is relatively uncommon, is often time-limited

or periodic, and may be associated with issues of adjustment or disability conditions not closely related to MR.[52]

---

[52] By way of contrast, the DSM-IV characterizes moderate, severe, and profound mental retardation as follows:

**Moderate** Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "trainable." This outdated term should not be used because it wrongly implies that people with Moderate Mental Retardation cannot benefit from educational programs. This group constitutes about 10% of the entire population of people with Mental Retardation. Most of the individuals with this level of Mental Retardation acquire communication skills during early childhood years. They profit from vocational training and, with moderate supervision, can attend to their personal care. They can also benefit from training in social and occupational skills but are unlikely to progress beyond the second-grade level in academic subjects. They may learn to travel independently in familiar places. During adolescence, their difficulties in recognizing social conventions may interfere with peer relationships. In their adult years, the majority are able to perform unskilled or semiskilled work under supervision in sheltered workshops or in the general workforce. They adapt well to life in the community, usually in supervised settings.

The group with **Severe** Mental Retardation constitutes 3%-4% of individuals with Mental Retardation. During the early childhood years, they acquire little or no communicative speech. During the school-age period, they may learn to talk and can be trained in elementary self-care skills. They profit to only a limited extent from instruction in pre-academic subjects, such as familiarity with the alphabet and simple counting, but can master skills such as learning sight reading of some "survival" words. In their adult years, they may be able to perform simple tasks in closely supervised settings. Most adapt well to life in the community, in group homes or with their families, unless they have an associated handicap that requires specialized nursing or other care.

The group with **Profound** Mental Retardation constitutes approximately 1%-2% of people with Mental Retardation. Most individuals with this diagnosis have an identified neurological condition that accounts for their Mental Retardation. During the early childhood years, they display considerable impairments in sensorimotor functioning. Optimal development may occur in a highly structured environment with constant aid and supervision and an individualized relationship with a caregiver. Motor development and self-care and communication skills may improve if appropriate training is provided. Some can perform simple tasks in closely supervised and sheltered settings.

DSM-IV at 43-45 (emphasis added).

American Psychological Association, *Manual of Diagnosis and Professional Practice in Mental Retardation* 17-18 (John W. Jacobson and James A. Mulick eds., 1996) (emphasis added) ("APA Manual").

People with mild mental retardation are capable of living remarkably meaningful and fulfilling lives, including the capacity to live independently, to work, and to marry and have families.  One recent British study that surveyed persons with intellectual functioning in the mild mental retardation range found that, "[a]lthough the mild intellectual impairment group were less likely to attain the following social outcomes than people with normal intellectual functioning, 67% had jobs, 73% were married, 62% had children and 54% owned their own homes.  12% participated in adult education."  I. Hall, *et. al.*, *Social Outcomes in Adulthood of Children with Intellectual Impairment: Evidence from a Birth Cohort*, 49 J. INTELL. DISABILITY RES. 171 (2005).

With respect to employment, mildly mentally retarded people often have adaptive deficits related to their occupational skills, but many are nevertheless able to seek, obtain, and even maintain work.  Indeed, employment is the norm among mildly mentally retarded persons. While members of this class typically hold lower-level, manual, and lesser-paying jobs than non-mentally retarded persons, the jobs that they perform are nonetheless varied.  A handbook regarding "job placement of mentally retarded adults who are preparing for independent living and competitive employment" lists many kinds of employment that mentally retarded persons satisfactorily perform, including:

- Library Assistant;
- Typist;
- Waiter/Waitress;
- Landscaping Worker;
- Painting and Maintenance Worker;
- Sewing Machine Operator;

- Forklift Operator; and
- Factory Equipment Cleaner

Angeline M. Jacobs, *et. al.*, HANDBOOK FOR JOB PLACEMENT OF MENTALLY RETARDED WORKERS: TRAINING, OPPORTUNITIES, AND CAREER AREAS (Eileen M. Oullette ed., Garland STPM Press 3d ed. 1979) (excerpts attached as Exhibit 27).

In his seminal book, *The Cloak of Competence*, first published in 1967, Dr. Robert Edgerton collected detailed data and information on 48 persons who had been diagnosed with mental retardation and who had been released without restriction from an institution.   The original group of 110 persons identified as having been released from the hospital had a mean IQ of 64, thirteen of which, despite having been diagnosed as mentally retarded, had IQs measuring higher than 70.  Robert B. Edgerton, THE CLOAK OF COMPETENCE 8-11 (Univ. of Cal. Press Rev. Updated 1993).  Dr. Edgerton discussed some of the individuals in the study in detail, including "Fred," about whom Dr. Edgerton wrote:

> Before beginning his present job Fred had a varied and moderately successful work career.  After leaving [the hospital], he held a number of jobs in sanitariums, involving the usual kitchen and janitorial work.  He also scrubbed and waxed floors, something which he says he did well.  He held one of these jobs for close to six years and was a reasonably adequate worker on the others.  As Fred puts it: "Well, sometimes you get tired of the same thing and you want to get something else.  You quit, or you keep looking until you find a place you like.  My problem has been quitting jobs.  They don't fire me.  You can see my record.  I got a good record behind me."  In general, what Fred says is true: he quits jobs; he is not fired.  He has also worked as a dishwasher in several downtown slum-area or skid-row restaurants.   But for the two years prior to his present job, Fred's employment consisted only of odd jobs for persons who had befriended him.
>
> One friend whom Fred describes as a "big shot with a great big house" offered him occasional jobs of gardening, as did his former social worker, who has kept in touch with him throughout the years.  Every weekend Fred would get on a bus downtown and ride to the homes of these "friends" in the suburbs.  His former social worker would pay his bus fare and give him five dollars for an afternoon's work of painting, cleaning up, or gardening.

*Id.* at 42-43 ("Fred's" complete profile is attached as Exhibit 28). Of all the 48 persons Dr. Edgerton was able to make contact with, he found that "relatively few of the ex-patients are unemployed," although most were "highly marginal economic earners."[53] *Id.* at 102.

With respect to marriage and parenting, while mentally retarded persons, as a group, marry less frequently than non-mentally retarded persons, they do indeed fall in love and marry, often to persons who do not themselves have mental retardation; moreover, "the marriages of almost half the mildly retarded young women appeared to be working out well," and "retarded

---

[53] The AAIDD position statement on employment states:

All of our constituents should be prepared for careers and have the opportunity for jobs alongside non-disabled workers based upon their preferences, interests, and strengths.

Employment Opportunities Should Include:

- Ongoing career planning, job advancement, and retirement planning.
- Flexible and comprehensive individualized supports to ensure the person's employment success.
- Wages and benefits that are fair and reasonable.
- Micro-enterprises or small businesses.

Employment Preparation Should Include:

- Instruction regarding principles of career development and social skill development, starting in the early grades and continuing through graduation.
- General and specific job skill training and actual paid work experiences in the community.
- A comprehensive plan for transition to adult life.
- Training in how to travel in the community so they can get to different jobs and enhance their independence.

In addition, employed individuals must have the opportunity for continued education or specialized training to enhance their marketability and to help them advance in careers or chosen areas of interest.

AAIDD/ARC Position Statements, Employment, available at:
http://www.aaidd.org/content_148.cfm (last visited February 22, 2010).

young men were not significantly different from nonretarded comparisons." H. Koller, *et. al., Marriage in a Young Adult Mentally Retarded Population*, 32 J. MENTAL DEFICIENCY RES. 93 (1988); s*ee also id.* at 97 (89% of the married mildly mentally retarded persons in study married a person who was *not* mentally retarded); B. Maughan, *et. al.*, *Mild Mental Retardation: Psychosocial Functioning in Adulthood*, 29 PSYCHOL. MED. 351, 359 (reflecting that 79.5% of mildly mentally retarded adult men reported having been "in a stable cohabitation" by age 33); Edgerton at 104 (finding that 71% of the 48-person cohort he studied were or had been married at the time the interviews were conducted, and 53% of those to people who were not themselves mentally retarded) (excerpt attached as Exhibit 28). However, as can be expected, "marriages in which **both** partners were retarded had many problems." H. Koller at 93 (emphasis added). With respect to child-rearing, "Mental retardation does not by itself establish the inability to parent." Douglas S. Diekema, *Involuntary Sterilization of Persons with Mental Retardation: An Ethical Analysis*, 9 MENTAL RETARDATION & DEV. DISABILITIES RES. REVS. 21, 24 (2003). Indeed, because involuntary sterilization of the mentally retarded came into disrepute several decades ago, many mentally retarded persons have children, and it has become common enough that it has generated significant scientific study, particularly with respect to improving the quality of care mentally retarded persons can give their children. As one review of the scientific literature on parenting by the mentally retarded discovered, many studies concluded that, despite problems, "the majority of parents labeled mentally retarded were providing adequate care."[54]

---

[54] In line with this understanding of the true capacities of mentally retarded persons, the AAIDD position statement regarding sexuality holds:

> Every person has the right to exercise choices regarding sexual expression and social relationships. The presence of mental retardation and related developmental disabilities, regardless of severity, does not, in itself, justify loss of rights related to sexuality.

Maurice A. Feldman, *Research on Parenting by Mentally Retarded Persons*, 9 Psych. Clinics of North America 777, 782 (1986); *see also* Maughan, at 359 (reflecting that 63.4% of mildly mentally retarded adult men had at least one child by age 33).

Finally, it is exceedingly important to understand the great stigma that is associated with a diagnosis of mental retardation, a stigma that, despite their impaired intellectual and social functioning, mentally retarded people can and do feel very deeply:

---

All people have the right within interpersonal relationships to:

- Develop friendships and emotional relationships where they can love and be loved and start and stop the relationships as they choose.
- Dignity and respect.
- Privacy, confidentiality, and freedom of association.

With respect to sexuality, individuals have a right to:

- Sexual expression, reflective of age, social development, cultural and moral values, and social responsibility.
- Information to allow informed decisions, including sex education about such issues as safe sexual practices, sexual orientation, sexual abuse, and sexually transmitted diseases.
- Protection from sexual harassment as well as from physical, sexual, and emotional abuse and sexual relationships with paid staff.
- Have sexual relationships, including marriage, with individuals of their choice. …

With respect to the potential for having and raising children, they have the right to:

- Choices related to birth control, including the decision to have and raise children, with supports if necessary; to accept personal responsibility for these decisions; and to have control over their own bodies.
- Have, on an individual basis, access to the proper supports to assist them in raising their children within their own home.
- Choose for themselves whether or not to be sterilized, regardless of the severity of their mental retardation."

AAIDD/ARC Position Statements, Sexuality, available at:
http://www.aaidd.org/content_154.cfm (last visited February 22, 2010).

To find oneself regarded as a mental retardate is to be burdened by a shattering stigma.  Indeed, for the former patient [of a hospital for the mentally retarded], to be labeled as a mental retardate is the ultimate horror.  They reject it with all their will.  Their own words best indicate how the stigma weighs upon them.

> (A woman) When I got out of that place it was horrible.  I knew everybody was looking at me and thinking that it was true what they thought I was.  I couldn't stand for people to think that about me.  That's a terrible thing for people to think.  Nobody could stand to have people thinking about them like that.  That's why I started to take dope (heroin).  I used to cry all the time because of what people were thinking about me, so my friend gave me this dope and said it would make me feel better.  It did, too.  I didn't worry about nothing while I was on.  But that's the reason I started taking it—nobody could stand what those people were thinking.

***

Words to the same effect were uttered by all but a few of the former patients in this study.  For all of these persons, an admission of mental retardation is unacceptable—totally and without exception.…They employ almost any other excuse, from epilepsy to "craziness"—excuses that are themselves highly stigmatizing.  Never is mental retardation admitted.

Edgerton, *supra*, at 182-83 (excerpt attached as Exhibit 28).  To help cope with this stigma, persons with mental retardation often assume a "cloak of competence," *i.e.*, an adoption of mannerisms and means of bluffing their way through the world to give an appearance of normalcy. One federal district court described this cloak of competency as the "powerful tendency of mildly mentally retarded people to mask or compensate for their deficits," as by making claims to having done and being able to do things they in fact have not and cannot competently do. *See United States v. Davis*, 611 F.Supp.2d 472, 494 (D. Md. 2009).

The evidence Mr. Busby describes below, and that he can produce at an evidentiary hearing, proves by a preponderance of the evidence that he has mild mental retardation. The evidence, viewed holistically, paints a vivid picture of the tribulations of a person with mild mental retardation, particularly one who, having never been properly assessed and diagnosed as a

child, fell through the cracks of our social safety net and thus lacked any social support for his disability.

### C.      Edward Lee Busby, Jr. is Mentally Retarded.

Mr. Busby is mentally retarded.  The evidence shows that: (1) his IQ, as reflected in the results of IQ tests administered to him, is significantly subaverage; (2) he has significant limitations in his adaptive functioning; and (3) he exhibited these diagnostic features before the age of eighteen.

### 1.      Evidence of Impairments in Intellectual Functioning.

### a.      WAIS-IV (February 11, 2010).

On February 11, 2010, Dr. Gilbert Martinez, a psychologist, administered the Wechsler Adult Intelligence Scales—Fourth Edition ("WAIS-IV") to Mr. Busby.  The WAIS-IV is the most recent, and therefore most reliable, iteration of the respected Wechsler Adult Intelligent Scales.[55] According to Dr. Martinez's report, Mr. Busby obtained a full scale IQ score of 74, reflecting significant subaverage intellectual functioning, which is well within the range at which a diagnosis of mental retardation may be made.  *See* Exhibit 23 (Report of Dr. Gilbert Martinez). Because it was obtained using a reliable and respected test and was administered closest to the date of its norming, this score is the most accurate known measurement of Mr. Busby's IQ.[56]

---

[55] The Wechsler scales are comprehensive, cover both verbal and non-verbal domains, and are the "standard instrument in the U.S. for assessing intellectual functioning."  *Moore v. Quarterman*, 491 F.3d 213, 232 n.7 (5th Cir. 2007) (Dennis, J., dissenting); *see also Howell v. State*, 151 S.W.3d 450, 469 (Tenn. 2004) (Drowota III, J., concurring and dissenting) (referring to Wechsler scales as "gold standard").

[56] Although scores are consistent in Mr. Busby's case, Flynn recommends that WAIS-III scores be set aside entirely and that practitioners rely on the WAIS-IV or Stanford-Binet V.  J.R. Flynn, *The WAIS-III and WAIS-IV: Daubert motions favor the certainly false over the approximately true*. Appl Neuropsychol. 2009;16(2):89-90.

As part of the testing, Dr. Martinez administered validity testing—specifically, a standardized measure called the Test of Memory Malingering ("TOMM")—"to explore potential problems with response bias or intentional efforts to misrepresent cognitive symptomatology." Exhibit 23 at 1.  Use of the TOMM is intended to determine whether the person being examined is putting forth full effort.  The results of the validity testing were "consistent with very good effort on cognitive testing"—the same results as when an expert for the defense administered similar testing at trial.  *See* S.F. Vol. 36: 45 (defense expert did not detect any malingering).  According to Dr. Martinez, "There was no evidence for misrepresentation of cognitive or intellectual functioning."  Exhibit 23 at 1.

### b.    WAIS-III (2005).

Just weeks after the Wechsler Adult Intelligence Scales—Third Edition ("WAIS-III") had been administered to Mr. Busby by defense psychologist Dr. Timothy Proctor, Mr. Busby was tested with the WAIS-III by the State's psychologist, Dr. Sven Helge.  S.F. Vol. 36: 61.  Although never admitted into evidence, it appears from the transcript of the trial that the State's expert, Dr. Helge, obtained a full scale IQ score of 79.  S.F. Vol. 36: 77.

The WAIS-III was normed in 1995, approximately ten years before Dr. Helge administered the test.  Taking into account the accepted scientific phenomenon known as the "Flynn effect"—in which people are observed to perform better on intelligence tests over time as norms age—Mr. Busby's WAIS-III score reflects intellectual functioning that below the mean.[57]

---

[57] The AAIDD, formerly the AAMR and the organization whose mental retardation criteria the Texas Court of Criminal Appeals has ruled should be followed, has issued guidelines recommending that the Flynn effect be taken into account when undertaking retrospective analyses.  In a section entitled "Retrospective Diagnosis," The AAIDD User's Guide to the 2002 AAMR Manual states:

Flynn's empirical research has demonstrated that the average obtained by any given group on the Wechsler scales has historically increased by approximately 0.33 points per year.  AAIDD USER'S GUIDE at 20-21; *Moore v. Quarterman*, 491 F.3d 213, 232 n.7 (5th. Cir. 2007) (Dennis, J., dissenting).  Thus, if a standardization sample took the WAIS-III in 2005, that group would have scored an average that was 3.3 points higher than the average scored by the standardization sample that was administered the WAIS-III in 1995  (10 years x 0.33 points = 3.3 points).  Because the average score, from which standard deviations are measured, was set for this particular test at 100 in 1995, this means the average score of a standardization sample in 2005 would have been 103.3.  Two standard deviations (30 points) below the 2005 average, *i.e.*, the approximate AAMR cut-off for mental retardation would be 73.3.

Rather than expressing the Flynn effect by adjusting the mean *upward* and then recounting standard deviations to determine the mental retardation range, the Flynn effect may also be mathematically expressed simply by holding the mean steady and adjusting an individual score *downward* by the corresponding number of points.  Flynn, James R., *The WAIS-III and WAIS-IV: Daubert Motions Favor the Certainly False over the Approximately True*, 16 Applied

---

The following guidelines for clinicians are important in retrospective diagnoses and complement those guidelines presented in the next section regarding situations in which formal assessment is less than optimal: … 4. **Recognize the "Flynn Effect."** … In cases where a test with aging norms is used, a correction for the age of the norms is warranted.  For example, if the Wechsler Adult Intelligence Scale (WAIS-III; 1997) was used to assess an individual's IQ in July 2005, the population mean on the WAIS-III was set at 100 when it was originally normed in 1995 (published in 1997).  However, based on Flynn's data, the population mean on the Full-Scale IQ raises roughly 0.33 points per year; thus the population mean on the WAIS-III Full-Scale IQ corrected for the Flynn effect would be 103 in 2005 (9 years x 0.33 = 2.9).  Hence, using the AAMR 2002 System, significant deficits in intellectual functioning of "at least two standard deviations below the mean" (Luckasson et al., 2002) the approximate Full-Scale IQ cutoff would be approximately 73 (plus or minus the standard error of measurement).
AAIDD USER'S GUIDE at 20-21.

Neuropsychology 98 ("Adjusting the IQ of an individual is no less or more accurate than

adjusting the mean IQ of a group.  How could it be?  You use the same rate of obsolescence for

both:  you deduct 0.3 points for every year between the time of norming and the time of testing.

If the rate is accurate, both adjustments are accurate.").  This has the effect of maintaining the

mean at the arbitrary but familiar number 100, while still accurately expressing how many

standard deviations below the current mean the individual scored, which is the relevant inquiry

for intellectual functioning in the mental retardation context.  Mr. Busby will use this latter

method of expressing the Flynn effect so as to maintain the familiar 75 as the approximate IQ

score cut-off for mental retardation.[58]  *See Briseno*, 135 S.W.3d at 5-8, 14, *Modden*, 147 at 298;

2002 AAMR Manual at 58-59.

---

[58] Many courts have relied upon and applied the Flynn effect in their assessments of intellectual functioning.  *See, e.g., Walker v. True*, 399 F.3d 315, 322-23 (4th Cir. 2005) (reversing district court for, *inter alia*, failure to consider Flynn effect); *Davis*, 611 F.Supp.2d at 488 ("[T]he Court finds the defendant's Flynn effect evidence both relevant and persuasive, and will, as it should, consider the Flynn-adjusted scores in its evaluation of the defendant's intellectual functioning."); Order Granting Defendant's Motion for Pretrial Determination of Mental Retardation, at 25, *United States v. Shields*, No. 2:04-cr-20254-BBD (W.D. Tenn. May 11, 2009) (Docket Entry 557) ("The Flynn effect, which all the experts agreed does actually exist, refers to the observation that IQ scores are rising over time. … The Court concludes that the Flynn effect must be considered…"); *Thomas v. Allen*, 614 F. Supp. 2d 1257, 1277-78 (N.D. Ala. 2009) ("The steady rise in IQ scores from year to year is a statistically proven fact. … It also is undisputed that Professor Flynn's recommendation—i.e., 'deduct 0.30 IQ points per year (3 points per decade) to cover the period between the year the test was normed and the year in which the subject took the test'—is a generally accepted adjustment.") (footnote omitted); *id*. at 1280 ("Contrary to respondent's argument that there is no diagnostic or legal basis by which this court may properly adjust petitioner's raw IQ scores in answering the question of whether he suffers from significantly subaverage intellectual functioning, the adjustments to raw IQ scores mandated by the 'standard error of measurement' and the 'Flynn effect' are well-supported by the accumulation of empirical data over many years.") (footnote omitted); *United States v. Parker*, 65 M.J. 626, 629-30 (N.M. Ct. Crim. App. 2007) ("In determining whether an offender meets [the AAMR] definition [of mental retardation], standardized IQ scores scaled by the SEM and the Flynn effect will be considered, along with evidence of the offender's adaptive functioning ability, and onset of the mental retardation before the age of 18."); *Green v. Johnson*, No. 2:05-cv-340, 2007 WL 951686, at *12, 2007 U.S. Dist. LEXIS 21711, at *41 (E.D. Va. Mar. 26, 2007) (Magistrate Judge properly took Flynn effect into account during analysis of

Expressed in this way, Mr. Busby's score of 79 on the WAIS-III in 2005 is equivalent to his having scored, rounding up, a 76 (79 – 3.3 = 75.7) where the mean is 100. This adjusted IQ score does not account for practice effect, which will be significant given the closeness in time (weeks) in which Dr. Helge administered the exact test administered by Dr. Proctor. When the Flynn effect, the practice effect, and the non-verbal nature of this test are taken into consideration, this score represents significantly subaverage intellectual functioning and is within the range at which a diagnosis of mental retardation may be made.[59]

### c.    Beta-III (November 4, 2005)

On November 4, 2005, days before trial on the merits began, defense psychologist Dr. Timothy Proctor administered the Beta III. Dr. Proctor estimated that, based on this test, Mr. Busby's FSIQ was approximately 81. S.F. Vol. 36: 53. The Beta-III was normed in 1998, 7 years before the test was administered. Thus, keeping the mean at 100 and adjusting Mr. Busby's estimated score of 81 downward by 2.3 (7 years x 0.33 points = 2.3 points) yields an adjusted score of 78.7 (81 – 2.3 = 78.7).

Much like the WAIS-III, this score does not account for the non-verbal nature of the test—which Flynn found to have much higher rates of increase over time—or for the practice effect. In other words, the Beta-III significantly overestimates IQ. When the Flynn effect, the practice effect, and the non-verbal nature of this test are taken into consideration, this score

---

intellectual functioning); *People v. Superior Court*, 155 P.3d 259, 855-56 (Cal. 2007) (state trial court applied Flynn effect).

[59] Dr. Proctor noted in his testimony that due to the practice effect, the WAIS-III score obtained by Dr. Helge is "basically identical" to the 77 Dr. Proctor obtained weeks earlier. S.F. Vol 36: 77. In other words, because of the practice effect, the 77 obtained by Dr. Proctor on the WAIS-III was more likely to reflect an accurate IQ score, though without the necessary adjustments for the Flynn Effect and the non-verbal nature of the test.

represents significantly subaverage intellectual functioning and is within the range at which a diagnosis of mental retardation may be made

### d.  WAIS-III (October 14, 2005)

On October 14, 2005, defense psychologist Dr. Timothy Proctor administered the WAIS-III to Mr. Busby.  S.F. Vol. 36: 53.  He obtained a FSIQ of 77.  *Id.*  As detailed, *supra*, the WAIS-III was normed in 1995, 10 years before the test was administered.  Thus, Mr. Busby's score of 77 on the WAIS-III in 2005 is equivalent to his having scored, rounding up, a 74 (77 – 3.3 = 73.7) where the mean is 100.

When the Flynn effect is properly taken into account, this score represents significant subaverage intellectual functioning and is within the range at which a diagnosis of mental retardation may be made.

### e.  Unknown Test (January 1, 2001)

The record reflects that an unidentified test, administered by an unknown individual, in uncertain testing conditions rendered an IQ score of 96.  S.F. Vol. 36: 49.  The score was considered unreliable by State, and was disregarded.  S.F. Vol. 36: 64 (noting that there was "probably...something wrong with the results").  Because neither the type of test nor the testing conditions—including whether Mr. Busby was even the individual who took the test—are unknown, the score should similarly be disregarded here.

### 2.  Evidence of Significant Limitations in Adaptive Behavior.

Mr. Busby also meets the second prong of the definition of mental retardation: he possesses significant limitations in adaptive behavior.  Mr. Busby possesses significant limitations in his conceptual, social, and practical skills.

### a.  Conceptual Skills.

Relevant to Mr. Busby's language, reading and writing, and money, time, and number concepts, Pampa Independent School Department (ISD) records reflect that Mr. Busby received failing marks during his first grade year:[60]

| COURSE | 1 | 2 | 3 |
|--------|---|---|---|
| Arithmetic | D | D | F |
| Reading | D | F | F |
| Spelling | | F | F |
| Handwriting | D | D | D |
| Music | S | S | S |
| Art | | | S |
| P.E. & Health | S | S | S |

After receiving these failing grades during his first grade year, Junior was made to repeat the first grade the following year. Exhibit 24 at 1.[61]

Pampa Jr. High School placed him in special education, where he remained in high school. *Id.* Students were placed in special education if the school believed their IQs were

---

[60] Lalinda Grant, of Pampa ISD, indicated that "S" most likely stood for "satisfactory." The only classes in which Junior received a "satisfactory" mark were music, art and physical education. Exhibit 24.

[61] Mr. Busby still received poor marks during his second attempt at his first grade year:

| COURSE | 1 | 2 | 3 |
|--------|---|---|---|
| Arithmetic | C+ | B- | C- |
| Reading | C | C-* | C-* |
| Spelling | | A | F |
| Handwriting | C | C- | D |
| Music | S | S | S |
| Art | | | |
| P.E. & Health | S | S | S |

Mr. Busby and his family moved to Amarillo the following year. Amarillo ISD no longer has Mr. Busby's school records.

During the trial, the State elicited testimony about Mr. Busby's low "conduct" grades. Deborah Robertson, the Special Education Director of Pampa ISD explained that low conduct grades of students with limited cognitive functioning or learning disabilities is often borne of frustration. S.F. Vol. 35: 30-31 ("Oftentimes if children are frustrated in the learning, they act out in behavioral ways.").

between 70 and 82.  Exhibit 12 at 1.  The special education classes Junior attended were "prevocational," consisting of special education academics, as well as living skills like cooking and keeping a checkbook.  *Id.*  The grading scale in special academics had little to do with performance.  *Id.*  The teachers in special education rarely failed students, or kept them back.  *Id.* So long as they placed their name on their work, they were usually passed.  *Id.*

Records indicate that Junior was "exempt" from the standardized tests mandated by state law.  Exhibit 24 at 3.  "All children are expected to take them unless they were exempt. And he was exempt on the TEAMS test in ninth grade… nor did he take it in the eleventh grade."  S.F. Vol. 35: 27.  Children were found to be "exempt" from TEAMS testing if a committee— consisting of administrators, general and special education teachers, and/or a nurse or counselor—determined that the child would be unable to complete the test.  S.F. Vol. 35: 28.  If a child was found to be exempt, the school district would make accommodations for the classes they were in, *i.e.* measure the child's performance in various classes with "modifications."  S.F. Vol. 35: 29.

Pampa ISD records reflect that Mr. Busby received the following marks during his 10th grade year in special education:

| COURSE | | S | 1 | 2 |
|---|---|---|---|---|
| English Language Arts | CORR LA1 | S | | 55 |
| | FOM-R | S | 64 | |
| Mathematics | FOM | S | | 50 |
| | FOM-R | S | 61 | |
| Health | HLTH ED | | | 50 |
| Physical Education | PE EQUIV | | 77 | 79 |
| Fine Arts | ART 2 | | 67 | |
| Vocational Educat'n | OCCP INV | S | 66 | 64 |
| Other Electives | FOM-R | S | 68 | 58 |

After receiving these poor marks, Junior was made to repeat the 10th grade the following year.  Exhibit 24 at 1.

Special education students in Pampa were not mainstreamed into regular academic classes. *See* Exhibit 12 at 1. The only time the special education students were with their other schoolmates was during physical education. *Id.* The special education teachers requested that their students be given a chance at sports if they seemed to have any talent at all. *Id.* For many of the special education kids, athletics might have been their only shot at any kind of success. *Id.*

Tragically, unlike those special education students who had some resources to draw from to compensate for their cognitive impairments, Junior didn't have a single strength to help him get by. *Id.* As one teacher said, Junior "had the perfect storm of deficits that made it nearly impossible for him. *Id.* He had some sort of auditory or visual deficit, a low IQ, and a severe mental illness…that didn't leave [him] any areas to draw from." *Id.*

In his late teenage years, Mr. Busby's deficits increasingly affected his life. Even at the age of 17, Mr. Busby could not read or write. *See* Exhibit 11 at 1. His live-in girlfriend, Merlyn Rogers, once found him at home, staring at a job application on the table. *Id.* Mr. Busby looked confused. *Id.* After some time, he wrote his name on it, though he clearly did not understand the questions. *Id.* His girlfriend later found the application in the trash. *Id.*

Despite repetitive attempts to read the same biblical passage, Mr. Busby would be unable to understand the text. Exhibit 20. "He would have to read a sentence four of five times to comprehend it, and even after that he would ask me for help." *Id.*

Relevant to Mr. Busby's conceptual skills with money, time and numbers, Mr. Busby's ex-girlfriend, Merlyn Rogers, once asked Junior to tell her how much she owed on a bill. *See* Exhibit 11 at 1. He was holding the bill in his hand. *Id.* The amount owed was clearly printed on the bill, but Mr. Busby stared at the bill and asked her how to figure out the amount. *Id.* Mr.

Busby's girlfriend had to show him where the amount was located on the bill, as he could not understand the numbers. *Id.*

Mr. Busby had significant problems dealing with money. Merlyn Rogers and Junior once drove to Burger King, where Junior went in to order for them both. *Id.* Merlyn was usually the one who went in to place the orders, but she wasn't feeling well. *Id.* When Junior went into the restaurant he had a $10 bill. *Id.* The couple usually ordered inexpensive food, like $1 burgers. *Id.* Junior came back out to the car and told Merlyn that he needed more money for their order. *Id.* He couldn't read the menu or add up the cost of the food. *Id.*

Junior often relied on others to help him count and manage money. Mr. Busby's ex-wife, Glenda McLaren, managed the household. Junior could not have managed the money, paid the bills, or taken care of himself; he was entirely reliant on his wife. When they went out, which was rare, she ordered and paid for the food.

Renee Boyd, a friend of Mr. Busby's in Ft. Worth, explained: "When we bought cigarettes, he would hold his change out in his hand and ask me, 'Is that right?' He would ask me to help him buy things because he couldn't do it alone and he knew I wouldn't take advantage of him…" Exhibit 20. Others recount similar stories: "[JB] couldn't count very well….If JB had money, he would give it to Kathleen to count." Exhibit 18 at 1. "[JB] would say, 'Aunt Raquel' or 'Mama' come and help me count my change. I would go down and help him count his change." Exhibit 21 at 1; *see also* Exhibit 19.

In his youth, Junior loved to play football. Exhibit 14 at 1. But he often got frustrated. *Id.* It was not his physical ability or his size that held him back; the problem was that Junior could not understand some of the more complex plays. *Id.* He never quite understood what the coaches wanted him to do. *Id.* Junior found himself confused over whom he was being asked to

block, which route he was supposed to run, and which direction the play required him to turn. *Id.*  These plays were simple for his teammates.  *See* Exhibit 13 at 1.  His former high school teammate explained that the plays were uncomplicated and nontechnical, especially the plays Junior was required to understand as a defensive player.  *Id.*

### b.    Social Skills.

Mr. Busby is uniformly described by those who knew him as a "follower."  S.F. Vol. 35: 37; Exhibit 11 at 2.  Relevant to Mr. Busby's interpersonal skills, Junior stayed to himself growing up.  In his developmental years, he was a "loner."  Exhibit 13 at 1.  "I don't remember him having any close friends at school and he didn't hang out with any of the black kids at the school."  *Id.*; *see also* Exhibit 11 at 2 ("Junior didn't have any close friends that I knew of.").

Without his mother's affection, Junior looked outwards for a family.  *See* Exhibit 11 at 2-3.  He desperately wanted to be a part of something, to be accepted.  *Id.*  He strove for attention from anywhere he could find it, and he ended up with the wrong crowd.  *Id.*  They became the family he never had at home.  *Id.*  But the people who claimed to be his friends used him.  As Merlyn Rogers explained, "[Mr. Busby's friends] would come around when they needed money, or a ride somewhere, but when Junior was out of money, or gas, they were nowhere to be found. Everyone saw this except Junior."  *Id.*

Junior wanted so badly to be accepted that if anyone even feigned interest in a friendship, he would follow them, even if it led him into a bad situation.  The people whom Junior believed were his friends in Pampa used him as a "front man."  *Id.*  They would have Junior do things for them, because he was big, and because he was slow.  *Id.*  If there were a fight, he would be encouraged to fight, protecting his friends, even if the fight had nothing to do with him.  *Id.*

He was easily manipulated, and gullible, from an early age.  As described *supra*, this was especially true when it came to women.  *See* Exhibit 10 at 7.  He would do everything his two sisters and his mother asked of him.  *Id.*  They took advantage of him, and used his naïveté to their advantage, and used his size to shield them, as did the women with whom he was romantically involved.  *Id.*

Family and friends describe his susceptibility to manipulation as being borne, at least in part, of his need to be cared for, both practically and emotionally—Junior needed to fill not only the emotional void caused by the abuse and neglect on the part of his mother, but also practical support, in the form bill-paying, laundry, and driving

Mr. Busby was an easy mark and was constantly victimized, particularly by women:  "I had to help [Junior] look out for himself.  He would get taken advantage of all the time.  I had to help him get his I.D. back from people who had stolen his wallet twice.  A lot of times he would go to a motel room with a girl, and they would steal his wallet after he passed out."  Exhibit 20; *see also* Exhibit 19 at 1-2 ("[The girls Junior was with] would take his money from him all the time because they knew he couldn't count very well.").

As explicated more thoroughly *supra*, Mr. Busby's reliance upon women was particularly acute with Kathleen "Kitty" Latimer, Mr. Busby's co-defendant in the crime that led to his capital murder trial.  Kathleen Latimer was more of a mother figure to Mr. Busby than a girlfriend.  *See* Exhibit 20; *see also* Exhibit 18 at 1 ("Although [Kathleen Latimer] was his girlfriend, she had a very mother-like role in their relationship and she would take care of him.  Kathleen used to say things like 'I love him more than his mama.'").  She, like the others upon whom Junior was dependant, would help him with the daily tasks his was unable to perform.  *Id.*

Kitty preyed upon this dependence and exercised complete control over their relationship. *See* Exhibit 21 at 2; Exhibit 18. "She would tell [Mr. Busby] what to do and lead him around." Exhibit 20. "[She] could talk him into doing just about anything…[Junior] did whatever she told him." Exhibit 18 at 1.

### c.    Practical Skills.

Relevant to Mr. Busby's activities of daily living, he was neither neat nor hygienic. Junior's hygiene was remarkably bad. *See* Exhibit 9 at 6. He never liked to bathe. *Id.* The women in the house had to remind him to bathe constantly, and he sometimes went days without bathing. *Id.*; *see also* Exhibit 14 at 1. He had difficulty with brushing his teeth, and he never washed his clothes. *See* Exhibit 9 at 6. His sister Tarsharn believed he did not even know how. *Id.* Mr. Busby wore the same clothes for days at a time. *Id.*; *see also* Exhibit 14 at 1. He would wear the clothes for two or three days straight, sometimes longer, so even if he eventually showered, his clothes would still smell. *Id.*

Mr. Busby also lacked the ability to keep things neat.  Growing up, Junior was responsible for keeping his room clean. *See* Exhibit 10 at 6; Exhibit 9 at 5. When it was time to clean, Mr. Busby pushed everything under the bed and threw his dirty clothes in the closet. Exhibit 9 at 5. If Junior had to sweep, it would take him a long time to complete the task, as he would do some, and then sit down, and then try again. *Id.* at 6. When Junior did the dishes, they never got clean. *Id.* Tarsharn would have to reclean them. *Id.*

Junior was supposed to rake the yard, but he never completed it. Exhibit 10 at 6. He raked the leaves, and then ruined the job, spreading the leaves out again. *Id.* The Busbys' yard never looked good. *Id.*

Relevant to Mr. Busby's instrumental activities of daily living, Mr. Busby was entirely dependant on the women in his life.  He was unable to function without their help.  *See* Exhibit 18.  Growing up, Kim, and later Tarsharn, did all of the cooking and chores.  *See generally* Exhibit 9; Exhibit 10.  "Women did everything for Junior.  They would wash his clothes and cook for him.  Junior never had his own apartment.  He always lived with the women he was dating."  Exhibit 10 at 8; *see also* Exhibit 18 at 1 ("[His girlfriends] would do a lot to help him, like cook and pay his bills.").

When he was living with Merlyn Rogers, she performed all of the daily tasks.  *See* Exhibit 11 at 2.  She did them because she knew he could not do them on his own, and she did not want him to be embarrassed or taken advantage of.  *Id.*  For example, he could not figure out how to light the furnace or open the car hood.  *Id.*  When they were together, Merlyn tried to explain errands as they did them, so, she hoped, he would learn how to do them on his own.  *Id.*  Yet no matter how many times she explained, he could not competently complete basic daily tasks.  *Id.*

As explained, *supra*, Mr. Busby's inability to complete basic tasks increasingly affected his life.  Junior's live-in girlfriend, Merlyn Rogers, once found him at home, staring at a job application on the table.  *See* Exhibit 11 at 1.  Mr. Busby looked confused.  *Id.*  After some time, he wrote his name on it, though he clearly did not understand the questions.  *Id.*  His girlfriend later found the application in the trash.  *Id.*

Junior was unable to get from place to place without the aid of friends and family.  Exhibit 19 at 1 ("[Junior] never really had to worry about getting places either—we would always drive him where he needed to go.").  Junior often got lost driving and would ask for directions, even when around his own neighborhood.  *See* Exhibit 11 at 2.  Merlyn Rogers would

try to give him directions using street names, but realized that he was unable to read the signs. *Id.* Even when she gave him directions using landmarks, he still arrived late because he had been lost. *Id.*

Relevant to Mr. Busby's ability to maintain safe environments, records reflect that Mr. Busby made at least four attempts to commit suicide, once by attempting to overdose on muscle relaxants. An ambulance was called and rushed Junior to the emergency room at Coronado Hospital. *See* Exhibit 9 at 5. At the hospital, doctors treated Junior for self-induced poisoning by parasympatholytics and diagnosed him with anxiety and neurotic depression.[62]

At the age of 27, Edward Busby, Jr. again tried to end his life. Police transported Junior to John Peter Smith Hospital, after finding him walking along the yellow stripe in the street, on his way to the bridge at I-35 and Cooper Street, where he intended to jump off the bridge and end his life. Exhibit 16 at 7286. He expressed his hope that a car would hit him on his way. *Id.* When approached by the officers, he begged them, "Please just kill me!" "Please just let me die!" *Id.* He pleaded with them over 50 times to just let him end his life. *Id.*

Hospital staff noted that Mr. Busby was "severely depressed" and "guarded," showing a lack of insight and judgment. Medical professionals observed slowed speech and limited comprehension. *Id.* at 7296. They held Mr. Busby for observation until just before noon, had him sign a sheet of paper, agreeing to call a hotline if he felt suicidal again, and discharged him. *Id.* at 7281, 7289.

Three years later, Mr. Busby was again taken to John Peter Smith Medical after a third suicide attempt. EMS workers "dropped [Mr. Busby] off with little information." *Id.* at 7179. Junior was found after having run his car into a lamp post, in an attempt to end his life. *Id.*

---

[62] Hospital records show a diagnosis reference to "300.4." The Diagnostic and Statistical Manual of Mental Disorders (DSM) currently lists 300.4 as a diagnosis of dysthymic disorder.

When confronted by EMS workers, he stated he intended to take 80 muscle relaxers when he returned home to end his life.  *Id.*  At the hospital, Mr. Busby cried, repeating that he was tired of living.  *Id.*  Mr. Busby was discharged later the same day with only a bus pass and an information sheet about depression and cocaine abuse.  *Id.* at 7273-74.

Three months later, and four days before the crime, Mr. Busby was again admitted for his fourth attempted suicide.  *Id.* at 7232.  He had threatened to jump off the Riverside Bridge.  *Id.* When approached by officers, Mr. Busby asked them to shoot him, to end his life.  *Id.*  Mr. Busby reported to hospital personnel that he had been using crack cocaine, marijuana and alcohol, in order to sleep and make him "happy."  *Id.* at 7227.[63]  He reported auditory and visual hallucinations that he had been experiencing for "a long time."  *Id.* at 7226.  His psychiatric assessment showed paranoia and that he believed death was "after him."  *Id.*  He told the medical staff, "Death don't like to sleep.  He keeps me up until I can't stay awake no more."  *Id.* at 7228. Mr. Busby reported that the voices told him to get "offers to hurt [him]" and instructed him to "take a gun to [himself]."[64]  Exhibit 16 at 7229.

### D. The Presence of Risk Factors and Other Indicia of Reliability Confirm That Mr. Busby Is a Person with Mental Retardation.

The 2002 AAMR Manual describes four categories of risk factors that may interact to cause mental retardation.  The four categories of risk factors are: (1) biomedical: factors that relate to biologic processes, such as genetic disorders or nutrition; (2) social: factors that relate to social and family interaction, such as stimulation and adult responsiveness; (3) behavioral: factors that relate to potentially causal behaviors, such as dangerous (injurious) activities or

---

[63] Cocaine and cannabinoids were found in his system.  Exhibit 16 at 7151.

[64] The 2002 AAMR Manual states that depression is prevalent in 6-30% of mentally retarded persons.  2002 AAMR Manual at 174.

maternal substance abuse; and (4) educational: factors that relate to the availability of

educational supports that promote mental development and the development of adaptive skills.

2002 AAMR Manual at 126 (excerpt attached as Exhibit 29).   The 2002 AAMR Manual

conceptualizes etiology of mental retardation as

> a multifactorial construct composed of four categories of risk factors (biomedical, social, behavioral, and educational) that interact across time, including across the lie of the individual and across generations from parent to child. This construct replaced prior historical approaches that had divided the etiology of mental retardation into two broad types: mental retardation of biological origin and mental retardation due to psychosocial disadvantage (Grossman, 1983).   McLaren and Bryson (1987) had noted in their review of epidemiological studies of mental retardation that as much as 50% of the population of individuals with mental retardation have more than one causal risk factor.     Furthermore, mental retardation often reflects the cumulative or interactive effects of more than one risk factor.

2002 AAMR Manual, at 125.   As reflected by the testimony during the trial in the state court,

declarations from family members, and the documentary record, Mr. Busby has been exposed to

several risk factors that serve to confirm that Mr. Busby is a person with mental retardation.

Prenatal poverty, prenatal domestic violence, postnatal family poverty, and the lack of

adequate stimulation are social risk factors for mental retardation.   *See* Exhibit 29.   As reflected

by the declarations and testimony of family members, *supra*, Mr. Busby was born into and grew

up in an unstable, poverty-stricken, and physically abusive environment, where his primary

caregiver was his 12-year-old sister.

As detailed *supra*, Edward Lee Busby, Jr. was born to Lavern Coleman Busby and

Edward Lee Busby, Sr.   Junior was Lavern's third child.   Junior's two older sisters, Kim

Coleman and Tarsharn Busby, were nine and two years older, respectively.   All three children

were born to different biological fathers.

Lavern Busby was unaware she was pregnant with Junior until her sixth month.  *See* Exhibit 8 at 1.  As a result, she obtained no prenatal healthcare for her unborn child.  *Id.*   Junior was her fifth pregnancy, but only her third live birth.  Lavern had two miscarriages prior to Junior's birth.  *Id.*  Edward Busby, Sr., Mr. Busby's biological father, drank alcohol excessively.

When Mr. Busby was growing up, domestic violence between Lavern Busby and Edward Busby, Sr., and later Jerome Bradshaw, occurred regularly, as did the abuse by both Lavern and Edward Busby of the children.

Lavern would use extension cords, water hoses, 2x4 boards, switches, belts, slippers, shoes, hangers, and whatever else was lying around.  The beatings were so severe that they left welts and scars on the children.

Mr. Busby's family confronted poverty and, at times, malnutrition.  When there was food available, Kim made the kids sandwiches and spaghetti.  Sometimes she cooked pinto beans and corn bread.  But there were times when there was not any food to cook.  When, as sometimes happened, even the tuna fish and crackers ran dry, the family resorted to a food pantry, procuring canned meat.  When food was scarce, the children ate "pancakes," which they made themselves by mixing flour and water.  When Lavern was too proud to ask for help, the family just did without.  They sometimes found themselves without water, electricity or gas.

The presence of so many risk factors in Mr. Busby's life is likely a contributing cause to his mental retardation.

### III.   MR. BUSBY WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO SEEK AND OBTAIN ADMITTANCE OF KATHLEEN LATIMER'S STATEMENTS PURSUANT TO MR. BUSBY'S CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE.

Trial counsel failed to adequately prepare and seek admittance of critical evidence favorable to Mr. Busby pursuant to Mr. Busby's federal constitutional right to present a defense.

A. **Trial Counsel's Failure to Seek and Obtain Admittance of Kathleen Latimer's Statements Pursuant to Mr. Busby's Constitutional Right to Present a Defense Was Deficient.**

The United States Supreme recently unanimously reaffirmed that "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotation omitted). The Court reversed a conviction where the trial court had relied on state evidentiary law to preclude admission of evidence that someone else had committed the rape/robbery/murder for which petitioner stood trial. *Id.* at 331.

The opinion reviewed the Supreme Court's long history of upholding the right to present a defense. *Holmes*, 547 U.S. at 324-29 (citing *Rock v. Arkansas*, 483 U.S. 44 (1987); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (finding violation of right to present defense where the defendant was prevented from introducing evidence to show at trial that his confession was unreliable, and neither the state court nor the prosecution "advanced any rational justification"); *Chambers v. Mississippi*, 410 U.S. 284 (1973) (finding violation of right to present defense, in part, because court precluded statement against penal interest inculpating an alternative perpetrator); *Washington v. Texas*, 388 U.S. 14 (1967) (noting that the "right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury *so it may decide where the truth lies*") (emphasis added)). The Court reversed despite substantial forensic evidence that the petitioner was guilty, including DNA evidence, palm print and fiber evidence. *Holmes*, 547 U.S. at 1730.

At the guilt-innocence phase of Mr. Busby's trial, counsel for Mr. Busby sought to introduce statements of Mr. Busby's codefendant, Kathleen Latimer.  S.F. Vol. 31: 4.  Defense Exhibit 3 was a video recording of an interview between Latimer and Eric Holden, a polygraph expert and member of the prosecution team, that occurred on September 19, 2005, shortly before Mr. Busby's trial began.  In that interview, Latimer, who had just been deemed to have been deceptive on a polygraph exam, admitted to lying in previous oral and written statements[65] and corroborated parts of Mr. Busby's written statements, including that Latimer had indeed instructed Mr. Busby, twice, to tie up the complainant because she was making too much noise in the trunk.  *See* Exhibit 30 (Report of Eric Holden).  Latimer's statement corroborated Mr. Busby's admitted statements that (1) he lacked intent to cause the death of the complainant, only tying her up because Latimer insisted he do so and initially resisting Latimer's first directive; and (2) suggested Latimer played a much greater role in the abduction and murder than Latimer's prior statements had indicated, which was relevant to the jury's determination of moral culpability.

It was anticipated by trial counsel that Latimer would invoke her Fifth Amendment privilege against self-incrimination.  *Id.*  This anticipation proved correct, as when trial counsel attempted to call Latimer to the witness stand, she invoked her privilege, rendering her unavailable.  *Id.* at 168.  The State objected to the admission of Latimer's prior written statement on the ground, *inter alia*, that the statement was inadmissible hearsay.  Trial counsel responded to the objection by arguing (1) that Latimer's statement was the statement of a co-conspirator admissible pursuant to Tex. R. Evid. 801(e)(2)(E); and (2) that her statement was one against

---

[65] Those prior statements were sought to be admitted as Defense Exhibits 1 and 2.

interest admissible pursuant to TEX. R. EVID. 803(24).  S.F. Vol. 31: 6.  The trial court ruled the evidence inadmissible, finding it did not meet a hearsay exception.[66]  *Id*. at 10.

Trial counsel did not prepare for and seek admittance of Latimer's prior written statements pursuant to Mr. Busby's constitutional right to present a defense.  That failure was a deficient omission for which no possible strategic motive could exist.  Trial counsel's failure to admit the records pursuant to Mr. Busby's due process right prejudiced Mr. Busby.  Had the records been admitted, there is a reasonable probability of a different outcome as to guilt-innocence.  Moreover, trial counsel failed to object to prosecutorial misconduct in making false and misleading statements to the jury in closing argument during the guilt-innocence phase that Latimer's statement would have shown untrue.

## B.     Trial Counsel's Omission Prejudiced Mr. Busby.

Trial counsel's omissions undermine confidence in the guilt-innocence verdict.  Mr. Busby's trial counsel did not attempt to prove at trial that Mr. Busby was not involved in the death of the complainant.  Instead, the defense team attempted to show that Mr. Busby lacked the intent to commit capital murder and, in accordance with Mr. Busby's own statements admitted at trial, that his codefendant, Kitty Latimer, played an instrumental and coercive role in the kidnapping of the complainant that eventually led to her death.

At closing argument, trial counsel Gordon told the jury,

---

[66] The trial court's ruling that Latimer's statement was inadmissible pursuant to TEX. R. EVID. 803(24) was error.  Direct appeal counsel's failure to raise the denial of admittance of these exhibits under Texas evidentiary law is a separate claim for relief.  Subsequent to Latimer's invocation of her Fifth Amendment privilege, Mr. Strickland again attempted to introduce the statements and argued that denial would deprive Mr. Busby of the effective assistance of counsel and violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  S.F. Vol. 31: 176.  He did not, however, argue that the statements required admittance to satisfy Mr. Busby's right to present a defense, and his objections were too general to preserve error.  *Reyna v. State*, 168 S.W.3d 173, 176-79 (Tex. Crim. App. 2005).

As we sit here in this courtroom with many exhibits, photographs, evidence that has been presented by the State, statements given by the Defendant when he was in custody, the seminal point, the most important thing that you have to remember is, that the State has to prove beyond a reasonable doubt that this man intentionally committed a capital murder.

S.F. Vol. 32: 43.  To support his argument, counsel Gordon pointed to Mr. Busby's statements in which he cried and said he did not intend for the complainant to die:

No one is going to disagree that the way Mrs. Crane met her end was anything other than tragic.  But if you recall Mr. Busby's recorded statement where he talked about what he believed was going to happen when he and Mrs. Latimer ended up in Oklahoma, he was crying. He was upset.  He was explaining to the officers that I didn't intend for this to happen. I didn't want her to die. …

The second statement that you heard – or actually you didn't hear it, which makes a bit of a difference, doesn't it? Someone reading someone else's words versus an actual recording at the time, giving a sense of what the person is speaking of, what their tenor is, what their emotion is at the time. The second statement emphasized again that the intent wasn't there.

*Id*. at 43-44.  Counsel Strickland, during his portion of closing argument, stressed to the jury that intent was "the lynchpin" of the guilt-innocence phase:

At the risk of being redundant, I, too, am going to talk to you about intent, not because of a lack of things to talk to you about to fill up the time, but because intent is the lynchpin in this case; the very thing that we talked about with each of you as we went through the tedious and long-winded process of selecting a jury. Intent has indeed come down to be the lynchpin in the case. And so it's worthy of me spending some time speaking with you about that issue today as you embark upon your very difficult task of deliberating the case which ultimately may determine whether another person lives or dies. …

There is no question about what caused the death of Laura Crane. There is no question about venue. There is no question about the date. There is no question about the manner and means. And there is no question, I'll submit to you, about the involvement of Edward Lee Busby, Jr. The question comes down to the single word that -- although a single word embodies a huge, a huge concept, an allusive concept of intent, and that's what I'm going to submit to you this case turns upon.

*Id*. at 45-46.  Counsel Strickland, like Gordon, could point only to the two statements made by Mr. Busby admitted into evidence by the State in his effort to persuade the jury that Mr. Busby lacked intent to cause the death of the complainant.  *Id*. at 48-49.  Because the only evidence that

Mr. Busby lacked intent to commit murder that was admitted were his own statements, counsel

Strickland had to go to great lengths to try to explain to the jury why they should believe them

and not discount them as self-serving manipulation. *See id*. at 53-54.

In its closing, the State agreed the case came down to a question of intent. Taking

improper advantage of its exclusion of Latimer's written statement,[67] the State told the jury,

> when you boil it all down, [the defense] want[s] you to take [Mr. Busby's] word
> for it. ***There's absolutely no other evidence in the case as to lack of intent***, as to
> -- other than what Mr. Busby told the police officers on the side of the road up
> there on Interstate 35, or what he told Detective Johnson in the statement of
> February the 20th. I didn't mean to kill her. And so they want you to buy that,
> lock, stock and barrel.

S.F. Vol. 32: 55-56.   The State prodded the jury not to consider the blubbering of "one

individual" as reliable evidence of his intent. *Id*. at 56.   The State then used Mr. Busby's various

---

[67] The State's knowingly false statement before the jury violated due process. *Giglio v. United States*, 405 U.S. 150 (1970).   An attorney for the government is a "representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935), *overruled on other grounds, Stirone v. United States*, 361 U.S. 212 (1960).   "[T]he basic [tenet] of *Giglio* does not depend on whether misleading information was given to the jury in the form of a closing argument by a prosecutor rather than through the testimony of a witness." *Armour v. Salisbury*, 492 F.2d 1032, 1037 (6th Cir. 1974).

> It is not improper to urge the jury to evaluate the plausibility of the justification
> defense in light of the other evidence (and the lack thereof), but it is plainly
> improper for a prosecutor to imply reliance on knowledge or evidence not
> available to the jury.   It is all the more improper to imply reliance on a fact that
> the prosecutor knows to be untrue, or to question the existence of someone who is
> known by the prosecution to exist.

*United States v. Udechukwu*, 11 F.3d 1101, 1106 (1st Cir. 1993) (internal quotations and brackets omitted); *see also United States v. Valentine*, 820 F.2d 565, 566 (2d Cir. 1987) (finding prejudicial misconduct where "the prosecutor misrepresented, at least implicitly, the substance of the testimony of several grand jury witnesses"); *United States v. Ringwalt*, 213 F. Supp. 2d 499, 519, 521-22 (E.D. Pa. 2002) (using *Brady's* materiality standard to analyze claim alleging that prosecutor made improper closing argument to jury, where prosecutor allegedly argued contrary to police interview notes).   The violation is particularly egregious in this case because the State itself sought and secured exclusion of the relevant facts.

statements, characterizing them as a "web of lies," to impeach Mr. Busby's statement that he did not intend for the complainant to die. *Id*. at 56-59.

Had defense counsel properly secured the admittance of Latimer's statement, closing arguments in the case would have been much different. Defense counsel could have pointed to a witness statement besides Mr. Busby's—the only other eyewitness besides Mr. Busby himself— as evidence that he lacked intent. Counsel would not have needed to depend exclusively upon the worst evidence in the case for lack of intent—the defendant's own potentially self-serving statement—to rebut the State's case. Moreover, if Latimer's statement had been introduced, the State could not have argued that Mr. Busby's own statements were the only evidence in the case and that they should not be believed in view of the "web of lies." By returning with a guilty verdict, the jury clearly accepted the State's argument that Mr. Busby's own statements were not to be believed. There is a reasonable probability that would not have happened had there been evidence in the record other than Mr. Busby's own statements corroborating them.

## IV. MR. BUSBY WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL BY COUNSEL'S FAILURE TO RAISE AS A GROUND OF ERROR THE DENIAL OF THE ADMISSIBILITY OF KATHLEEN LATIMER'S STATEMENTS PURSUANT TO TEX. R. EVID. 803(24).

Direct appeal counsel for Mr. Busby, Jack Strickland, failed to raise as a ground for relief on appeal that the trial court's exclusion of Kathleen Latimer's statement was error. The facts underlying this claim are recited in claim III, *supra*. In short, trial counsel—also Mr. Strickland—moved for the admission of important statements by Kathleen Latimer that corroborated Mr. Busby's statements about Latimer's primary role in the offense, including that she was the person who conceived the idea and demanded that the complainant be bound and taped to silence her. Trial counsel invoked Texas Rule of Evidence 803(24), which provides an

exception to hearsay where the statement made is against interest.[68]   The trial court erroneously denied admittance of the evidence.   Although trial counsel preserved the error, sought multiple times to gain admittance of the evidence, and gained the admittance of the evidence for record purposes only, direct appeal counsel nevertheless inexplicably failed to raise the ground as error on appeal.

Latimer's statements—made to prosecution team member Eric Holden after she was told her polygraph result indicated deception—that she directed Mr. Busby to bind and tie the complainant to keep her quiet implicated Latimer, at a bare minimum, as a party to capital murder, which exposed her to a punishment of death in Texas.   *See* Tex. Penal Code § 7.02(a)(2); *id*. § 7.02(b) ("If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.").   This was, unquestionably, a statement against interest under Texas law.

In order for a declaration against interest to be admissible under Rule 803(24) of the Texas Rules of Evidence, the statement must be self-inculpatory with corroborating circumstances to indicate the trustworthiness of the statements.   *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999).   It is not necessary for the declarant to be unavailable as a

---

[68] Texas Rule of Evidence 803(24) provides: "A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in declarant's position would not have made the statement unless believing it to be true. In criminal cases, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

witness.  *Id.*  Texas's highest criminal court has already squarely held in similar circumstances that statements against interest made in the aftermath of a deceptive polygraph examination are admissible as statements against interest.  *See Shiflet v. State*, 732 S.W.2d 622 (Tex. Crim. App. 1985).  Had direct appeal raised this claim on direct appeal, a reasonable probability exists that the Court of Criminal Appeals would have found error and reversed.

## V.   MR. BUSBY WAS DEPRIVED OF COUNSEL AT A CRITICAL STAGE OF PROCEEDINGS.

Mr. Busby was arrested by Officer Jeffrey Padgett of the Oklahoma City Police Department in the just after one o'clock in the morning on February 1, 2004.  S.F. Vol. 5: 15. The arrest followed a traffic stop for an improper right-hand turn.  S.F. Vol. 5: 19.  The traffic stop quickly turned into a homicide investigation based upon information from Fort Worth Police, who were then looking into the disappearance of Laura Crane. S.F. Vol. 5: 20-23.

Following his arrest, Mr. Busby was kept in continuous custody until he was initially interviewed by Detective Roland Garrett, a homicide investigator for the Oklahoma City police. S.F. Vol. 5: 39.  Later that same day Mr. Busby was interrogated by Special Agents Anderson and Collodi of the Federal Bureau of Investigation (FBI).  S.F. Vol. 5: 73.

As Mr. Busby was being interrogated by both state and federal law enforcement, yet another team of investigators was heading from Fort Worth to Oklahoma City.  S.F. Vol. 5: 84. Fort Worth Police Department detective Cheryl Johnson, Mike Carroll and Shawn McCoy were dispatched to interrogate Mr. Busby, arriving in Oklahoma City about midnight, February 1, 2004.  *Id.*  By the time Detective Johnson and her fellow Fort Worth officers left to travel to Oklahoma City, they were aware of evidence linking Mr. Busby to the disappearance of Ms. Crane—namely, that Mr. Busby had been pulled over in Ms. Crane's car, the trunk of which contained a woman's shoe and several hairs.  S.F. Vol. 5: 98.  Thus, when Fort Worth officers set

about interrogating Mr. Busby in three distinct sessions—occurring at 5:59 p.m. on February 2, at 9:45 a.m. on February 3, and at 1:33 p.m. on February 3—they believed that the evidence implicated him in the offense.  *Id.*  At no time during any one of these five separate police interrogations over the course of three days was Mr. Busby, an indigent, mentally retarded, African-American male provided counsel.

On February 6, 2004, the Tarrant County District Attorney's Office filed a felony criminal complaint against Mr. Busby for capital murder, C.R. Vol. 1: 11, at which time Mr. Busby's right to counsel attached.  *See Rothgery v. Gillespie County*, ___ U.S. ___, 128 S. Ct. 2578 (2008) ("We have, for purposes of the right to counsel, pegged commencement to 'the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'") (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984) and *Kirby v. Illinois*, 406 U.S. 682, 689 (1972)); *Barnhill v. State*, 657 S.W.2d 131, 132 (Tex. Crim. App. 1983) (comencement of adversary proceedings begins with filing of felony criminal complaint).  Nevertheless, Mr. Busby still was not provided counsel.

Nineteen days after his arrest, and thirteen days after his right to counsel attached, Mr. Busby was finally transported back to Tarrant County by Forth Worth police officers.  S.F. Vol. 5: 98.  Mr. Busby was brought before a magistrate on February 19, 2004, at which time he made a formal and affirmative written request for counsel.  C.R. Vol. 1: 15 ("I have been advised by the court of my right to representation by counsel in the trial of the charge pending against me.  I certify that I am without means to employ counsel of my own choosing and I hereby request the court to appoint counsel for me.").  The Court found that Mr. Busby was indigent the same day.  *Id*. at 16.  Still, Mr. Busby was not appointed counsel.

The next day, on February 20, 2004, Mr. Busby was approached by Fort Worth police, without the assistance of counsel. S.F. Vol. 5: 92. The ostensible purpose of the contact was to execute a search warrant for biological evidence. Despite that the search warrant indisputably could have been easily executed at the jail, Fort Worth police offers inexplicably removed Mr. Busby from the jail and transported him to the homicide section of the Fort Worth Police Department to execute the warrant. S.F. Vol. 31: 88. There, Mr. Busby, mentally retarded and never having had the opportunity to consult with counsel, waived his right to counsel and made yet more inculpatory statements. Following that interrogation, and still without the assistance and advice of any counsel, Mr. Busby held what can best be described as an ill-conceived press conference, presided over by the Sheriff of Tarrant County, Texas. It was not until February 23, 2004—after several inculpatory evidence and statements had been obtained from Mr. Busby, 22 days after his arrest, 17 days after his right to counsel attached, and four days after he requested counsel—that he was finally appointed counsel by the State of Texas. C.R. Vol. 1: 17.

The failure to appoint counsel for Mr. Busby immediately after the criminal complaint was filed on February 6, 2004, and even immediately after his affirmative, in-court request for counsel on February 19, 2004, violated Mr. Busby's Sixth Amendment right to counsel, and prejudiced his ability to defend himself. Mr. Busby is mentally retarded. *See* argument and authorities cited, *supra*. The services and advice of counsel were therefore critical to his ability to fairly defend himself against the criminal prosecutorial machinery of the State of Texas and in a proceeding in which his very life was on the line. As a result of this failure to appoint counsel, Mr. Busby made an uncounseled waiver of his right to counsel when Forth Worth police—

ostensibly executing a search warrant—took him from the jail to the police station.[69]   He subsequently made uncounseled public statements to the media in a proceeding overseen by the Tarrant County Sheriff's Office.  These statements were then used against him, both to convict him and to persuade a jury that he should die.

Texas law entitled Mr. Busby to suppression of any evidence obtained in violation of rights contained in the federal constitution, whatever their source.  Tex. Code Crim. Proc. art. 38.23 ("No evidence obtained by an officer or other person in violation of *any* provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." (emphasis added)).  Because the obtaining by Forth Worth police of Mr. Busby's February 20, 2004 statement was caused by the State's failure to appoint counsel (i.e., its deprivation of Mr. Busby's Sixth Amendment right to counsel during a critical proceeding) to advise Mr. Busby

---

[69] In *Montejo v. Louisiana*, ___ U.S. ___, 129 S. Ct. 2079 (2009), the Supreme Court overruled the holding in *Michigan v. Jackson*, 475 U.S. 625 (1986), that a waiver of the right to counsel where police initiated contact and following an accused's invocation of his right to counsel was presumptively invalid.  In that case, although the accused's right to counsel had attached, the accused had not made any affirmative request for counsel.  Moreover, because the police initiated contact with Montejo on the same day as his right to counsel attached, the State had yet to violate Montejo's Sixth Amendment right by simply abstaining from appointing counsel.  Here, the circumstances are quite different.  The State waited 17 days after Mr. Busby's right to counsel attached and four days after he made an affirmative request for counsel to the court to finally appoint counsel.  The police initiated contact with Mr. Busby, a mentally retarded man, one full day after Mr. Busby's affirmative request.  Mr. Busby does not, therefore, allege that his waiver of counsel was invalid under the now-overruled *Jackson* rule.  Instead, he contends that the State directly violated his Sixth Amendment right to counsel by failing to appoint counsel in a timely manner, and that his waiver and statements reflect the prejudice from the violation.  In short, *Montejo* does not control whether Mr. Busby's conviction was obtained in violation of Mr. Busby's Sixth Amendment right to counsel.

about the legal ramifications of any waivers or statements, the statement required suppression under state law.[70]

## VI.   MR. BUSBY WAS DEPRIVED OF HIS FIFTH AMENDMENT RIGHT TO REMAIN SILENT.

During the State's closing guilt/innocence stage argument, prosecutor Joe Shannon made three separate, distinct, and direct comments upon Mr. Busby's silence at trial. For ease of identification, those comments will be designated by Mr. Busby as improper comments one, two, and three. Mr. Busby contends that each separate comment violated his right to remain silent. Mr. Busby further contends, however, that the swelling effect of these three comments require finding that his conviction and death sentence were obtained in violation of the federal constitution.

Each comment was objected to in a proper and timely fashion, and in each instance, Mr. Busby's objection was inexplicably overruled. Consequently, the jury was left free to assign whatever weight and significance it wished to the prosecutor's comments. This effectively rendered meaningless the court's written instruction which Mr. Busby had requested and which was included in the jury charge regarding Mr. Busby's failure to testify.

### A.   Legal Standard.

An accused's right to remain silent is well-established and a prosecutor's comment on an accused's failure to testify violates the Fifth Amendment to the United States Constitutions. Comments regarding an accused's failure to testify can be characterized as either "direct" or 'indirect."   Direct comments are straightforward references and do not require much

---

[70] The state court held that Mr. Busby's Sixth Amendment right to counsel was not violated, and therefore held Mr. Busby's statements admissible.   If Mr. Busby's Sixth Amendment right were found to be violated, as he contends, suppression under Texas state law would have occurred.

interpretation.  Indirect references more difficult to analyze and may require that the remark be examined in the context of the entirety of the evidence. To constitute an impermissible comment, indirect references must be manifestly intended as a comment or of such character that the jury would naturally and necessarily take it to be a comment of the failure of the accused to testify. *See Griffin v. California*, 380 U.S. 609 (1965); *Davis v. United States*, 357 F.2d 438, 441 (5th Cir. 1966).

### B.    The State Commented On Mr. Busby's Failure to Testify.

In the case at bar, Mr. Busby invoked his right to remain silent and not testify in his own behalf. S.F. Vol. 32: 3-11.  In accordance with that decision, and at the request of Mr. Busby, the court instructed the jury as follows:

> Our law provides that a Defendant may testify in his own behalf if he elects to do so. This, however, is a privilege accorded to a defendant, and in the event he elects not to testify, that fact cannot be taken as a circumstance against him. In this case the Defendant has elected not to testify and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against him.

C.R. Vol. 2: 340-41.

Thereafter, the State of Texas, through its criminal district attorney for Tarrant County, made the following comment during its closing final argument at the guilt-innocence stage:

> MR. SHANNON: They arrest him, do all of the things that you have heard about. Is he telling the truth? No. Did he tell Detective Johnson on the side of the road that he hadn't told him the whole story? No. He says, well, I haven't told you the whole story.  Now, on February the 20th, he again says, well, I still haven't told you the whole story.  And, folks, I submit to you that it's a pretty logical deduction that he still hasn't told the whole story.

> MR. STRICKLAND: Objection. We object to that. That is a comment upon the Defendant's right to remain silent.

> THE COURT: That is overruled. The jury will recall the testimony.

S.F. Vol. 32: 57-58.

This is a direct comment on Mr. Busby's refraining from testifying.  The prosecutor's manifest intention does not need to be considered by this Court. The comment about which Mr. Busby complains in this point of error clearly and unequivocally referred to Mr. Busby's failure *at that time*—i.e, during the trial—to tell "the whole story."

By way of introduction to this impropriety, the prosecutor referenced Mr. Busby and then argued that the police had arrested him; rhetorically asked whether he was telling the truth, and whether he told the detective that he hadn't told the whole story; noted that he said I haven't told the whole story; that he later again said I haven't told the whole story.  Each time the prosecutor used the word "he" and "him" and "I" he is referring specifically to the accused.  And then the prosecutor made the comment that "he *still* hasn't told the whole story."  That is not an indirect comment, it is as direct a comment as one may make.  It is no different from if the State had argued, "Mr. Busby still hasn't told you the whole story."

The most significant word in the prosecutor's comment is the word "still."  "Still" is defined as "to this time; till now; yet."  Webster's New Twentieth Century Dictionary of the English Language. 1950.  By using the word "still," the prosecutor focused the jury's attention on Mr. Busby's failure to tell "the whole story" right up to the time of the argument, an argument which was delivered for the jury's consideration after both sides had rested and closed their cases on the issue of guilt-innocence. By pointing out Mr. Busby's failure up to and including the present time, the prosecutor made a direct and constitutionally impermissible argument.

Moments after making the first comment, the State again ventured into forbidden waters with the second direct comment regarding Mr. Busby's exercise of his right to remain silent:

MR. SHANNON: Now, ladies and gentlemen, this business of Kitty made me to it, that is not a defense, that is an excuse. It is high time that Mr. Busby took some responsibility for his own conduct instead of blaming it on everybody else.

MR. STRICKLAND: Your Honor, excuse me. We object to that. That is a comment on the Defendant's failure to testify in this case, a direct comment that he should in some manner take responsibility.

THE COURT: I'll overrule.

S.F. Vol. 32: 61-62.

This argument likewise constituted a direct comment upon his failure to testify. The unequivocal phrasing of the argument makes it clear that the prosecutor was referring to the present time, not some nebulous time in the past: "It is high time that Mr. Busby took some responsibility for his own conduct instead of blaming it on everybody else." *Id*. at 61.

The post-arrest statements made by Appellant and introduced into evidence before the jury shifted responsibility to and focused blame on his co-defendant, Kathleen Latimer. S.F. Vol. 37: SX-63; SX-99. Having initially tried to divert blame from himself, the only avenue which was then open to Mr. Busby should he wish to "take responsibility' would have been to testify. The prosecutor's argument was a clear and direct comment on his failure to do so.

Finally, the prosecutor offered yet another comment upon Mr. Busby's failure to testify in guilt-innocence closing argument:

MR. SHANNON: It's time he takes responsibility in these statements to the police. He doesn't do it. He doesn't avail himself-

MR. STRICKLAND: Excuse me, Mr. Shannon. Objection, Your Honor. Comment on the Defendant's failure to testify. Number three, we object.

THE COURT: All right. That is overruled.

S.F. Vol. 32: 65.

Mr. Busby contends that this argument also constitutes a direct comment upon his failure to testify. The unequivocal phrasing of the argument makes it clear that the prosecutor was referring to the present time, not some nebulous time in the past: "It's time he takes responsibility in these statements to the police. He doesn't do it.  He doesn't avail himself." The words clearly and directly refer to the here and now.  If the prosecutor had been referring to some time in the past, he would have used the past tense of those words: "it was time; he did not do it."

Mr. Busby's jury necessarily would have interpreted these three statements as comments on the silence of the accused at trial.  Consequently, the comments on Mr. Busby's failure to testify violated his right to remain silent, requiring relief from his unconstitutionally obtained conviction.

## VII.   MR. BUSBY'S RIGHT TO DUE PROCESS WAS VIOLATED WHEN THE STATE FAILED TO DISCLOSE FAVORABLE EVIDENCE MATERIAL TO THE GUILT AND SENTENCING PHASES OF HIS CAPITAL MURDER TRIAL.

### A.    Legal Standard.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.  It has long been the rule that *Brady* is violated even if the prosecutor is unaware of favorable evidence in the possession of another arm of the state which aids in the investigation or prosecution of the offense.  *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (lack of knowledge of witness's criminal record was no excuse for *Brady* violation); *Martinez v. Wainwright*, 621 F.2d 184 (5th Cir. 1980) (*Brady* violation found although prosecutor was unaware of the deceased's criminal history, which was in possession of

the medical examiner); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973) (for *Brady*

purposes, prosecution was in constructive possession of information in the files of the United

States Postal Service), *overruled on other grounds*, *United States v. Henry*, 749 F.2d 203 (5th

Cir. 1984).

The broad scope and affirmative nature of the State's obligation under *Brady* was made

clear in *Kyles v. Whitley*, 514 U.S. 419 (1995). *Kyles* held that, aside from the duty merely to

provide the defense with known favorable evidence in its possession, the prosecutor is also under

an affirmative duty to seek out and learn of favorable evidence in the possession of those acting

on the government's behalf. The *Kyles* Court wrote:

> [T]he prosecution, which alone can know what is undisclosed, must be assigned
> the consequent responsibility to gauge the likely net effect of all such evidence
> and make disclosure when the point of "reasonable probability" is reached. This
> in turn means that the individual prosecutor has a duty to learn of any favorable
> evidence known to the others acting on the government's behalf in the case,
> including the police.

*Id.*, at 437; *see also United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001) (citing *Kyles* for

proposition that "the Government should actively seek *Brady* material in its files and in the files

of related agencies reasonably expected to have possession of such information"); *United States*

*v. Miranne*, 688 F.2d 980, 988 (5th Cir. 1982) (noting that "the basic import of *Brady* is that

there is an obligation on the part of the prosecution to produce certain evidence actually or

constructively in its possession or accessible to it in the interests of inherent fairness," and

"[t]here is little question that there are occasions where the prosecution has an affirmative duty to

seek out evidence to which it has access and which may be beneficial to the defense").

The Supreme Court has rejected any distinction between impeachment and exculpatory

evidence for purposes of *Brady* analysis. *Giglio v. United States*, 405 U.S. 150, 154 (1972).

Under *Brady* and its progeny, a proceeding is rendered fundamentally unfair if: (1) the

prosecution failed to disclose favorable evidence; and, (2) the evidence was material to either guilt or punishment. *See Banks v. Dretke*, 540 U.S. 668 (2004); *Kyles*, 514 U.S. at 432; *United States v. Bagley*, 473 U.S. 667, 683 (1985); *Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006); *Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir. 1994).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles*, 519 U.S. at 432; *Bagley*, 473 U.S., at 682. The *Kyles* decision clarifies four significant aspects of materiality analysis under *Brady*. First, one is not required to demonstrate that the favorable evidence, if known to the defense, would have ultimately resulted in an acquittal or a life sentence. *Kyles*, 514 U.S. at 434. The inquiry is more properly whether the suppressed evidence undermines confidence in the jury's decision. *Id.* at 1566. Second, materiality analysis "is not a sufficiency of the evidence test." *Id..* "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35. Third, harmless error analysis is not applicable to *Brady* violations. *Id.* at 435. The *Kyles* Court stated, "Once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless error review." *Id.* Finally, materiality must be assessed "in terms of the suppressed evidence considered collectively, not item by item." *Id.* at 436.

> **B.      The State Failed to Disclose Favorable Evidence Material to Guilt-Innocence and to Sentencing.**

Counsel for Mr. Busby have reason to believe that the State failed to disclose favorable evidence material to his defense at guilt-innocence and sentencing, including, but not limited to, statements made to FBI agents by Kathleen "Kitty" Latimer, Mr. Busby's co-defendant in his capital murder prosecution. *See* Exhibit 31 (FBI Records).

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Mr. Busby prays that this Court:

1.      Issue a writ of habeas corpus to have him brought before it, to the end that he may be relieved of his unconstitutional sentence of death;

2.      If necessary to resolve disputed factual issues, schedule an evidentiary hearing during which Mr. Busby may present evidence in support of his claims;

2.      Grant such other relief as law and justice requires.


Respectfully submitted,


s/ David R. Dow
_____
David R. Dow
Texas Bar No. 06064900

Katherine C. Black
Texas Bar. No. 24064907

TEXAS DEFENDER SERVICE
1927 Blodgett Street
Houston, Texas 77004
Tel. (713) 222-7788
Fax (713) 222-0260

*Counsel to Edward Lee Busby, Petitioner–Appellant*


## VERIFICATION

I, David R. Dow, attorney for Petitioner in the above-entitled action, state that to the best of my knowledge and belief, the facts set for in this Petition are true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on Monday, May 24, 2010.

s/ David R. Dow
_____
David R. Dow

149

## CERTIFICATE OF SERVICE

I certify that on Monday, May 24, 2010, a copy of the foregoing pleading was electronically served on counsel for the Respondent by filing the document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.

Jeremy C. Greenwell
Office of the Texas Attorney General
Post Office Box 12548
Austin , TX 78711
jeremy.greenwell@oag.state.tx.us

s/ David R. Dow

_____

David R. Dow