**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **EDWARD LEE BUSBY,** §<br>§<br>     **Petitioner,** §<br>§<br>**V.** §<br>§<br>**WILLIAM STEPHENS, Director,** §<br>**Texas Department of Criminal Jus-** §<br>**tice, Correctional Institutions** §<br>**Division,** §<br>§<br>     **Respondent.** §<br>§ | **Civil Action No. 4:09-CV-160-O**<br>**(death-penalty case)** |

## <u>MEMORANDUM OPINION AND ORDER</u>

Edward Lee Busby ("Busby") petitions the Court for a writ of habeas corpus, contending that his conviction and death sentence are unconstitutional because (1) he was denied effective assistance of counsel at trial; (2) he is mentally retarded; (3) he was denied effective assistance of counsel on direct appeal; (4) he was deprived of his Sixth Amendment right to counsel at a critical stage of the proceedings after his arrest; (5) he was deprived of his Fifth Amendment right to remain silent; (6) he was deprived of his right to due process as a result of the State's *Brady* violation; and (7) he is severely mentally ill. Having reviewed the record, the briefs, and the exhibits tendered by the parties, the Court concludes that Busby is not entitled to relief under the standards prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), **DENIES** the petition, and **DISMISSES this action with prejudice**.

## I.       BACKGROUND

In November 2005, Busby was convicted and sentenced to death for the 2004 kidnapping,

robbery, and murder of an elderly woman, Laura Lee Crane, in Tarrant County, Texas. *State v. Busby*,

Cause No. 0920589A (Crim. Dist. Ct. No. 2, Tarrant Co., Tex. Sept. 17, 2005).   The Texas Court

of Criminal Appeals affirmed the conviction in a published opinion on direct appeal. *Busby v. State*,

253 S.W.3d 661 (Tex. Crim. App. 2008).   The Court takes the following recitation of facts from that

opinion:

> The evidence shows that on or about January 30, 2004, [Busby] and a female accomplice ("Kitty") abducted a seventy-eight-year-old woman in Fort Worth, then robbed and murdered her. The elderly victim suffocated from having multiple layers of duct tape wrapped tightly over her entire face that covered her nose and mouth. According to the medical examiner's testimony, approximately 23.1 feet of duct tape was wrapped around the victim's face with such force that her nose deviated from its natural position.
>
> On February 1, 2004, an Oklahoma City police officer (Padgett) arrested [Busby] in Oklahoma City after stopping him for committing several traffic violations while driving the victim's car. [Busby] made various statements to the FBI, Oklahoma police, and Fort Worth detectives between February 1st and February 3rd. [Busby] initially claimed that he and Kitty obtained the victim's car in Fort Worth from someone named "JD" with the victim's body in the trunk and that [Busby] and Kitty merely disposed of the victim's body in Oklahoma. On February 3rd, [Busby] led the police to the location of the victim's body in Oklahoma. At that location, [Busby] made a tape-recorded statement to the police in which [Busby] abandoned the "JD" story and admitted that he and Kitty abducted, robbed, and killed the victim. On February 20th, [Busby] gave a written statement to the police and again admitted that he and Kitty abducted, robbed, and killed the victim. [Busby's] February 3rd tape-recorded statement and his February 20th written statement portrayed Kitty as the leader of their criminal enterprise, with [Busby] following her instructions. However, [Busby] admitted in both of these statements that he wrapped the duct tape over the victim's face while also stating several times that he did not mean to kill her.

*Id*. at 663-64. Busby subsequently petitioned the United States Supreme Court for writ of

certiorari, which was denied. *See Busby v. Texas*, 129 S. Ct. 625 (2008).   While the appeal was pending,

Busby's habeas counsel petitioned the convicting court for a writ of habeas corpus.   Based on the

convicting court's findings and conclusions and its own review of the record, the Court of Criminal Appeals denied relief in 2009. *Ex parte Busby, Jr.*, No. 70,747-01 (Tex. Crim. App. Feb. 25, 2009).

The Court appointed federal counsel, and Busby filed a petition for writ of habeas corpus and supporting brief on February 25, 2010. Following a stay of the proceedings so that Busby could exhaust his claims in state court, Busby filed a second amended petition for writ of habeas corpus on March 27, 2014. Respondent filed its amended answer on May 12, 2014, and Busby filed a reply on June 13, 2014.

On February 14, 2015, the Court set an evidentiary hearing and ordered Busby's presence to address, among other things, whether Busby met the exception to procedural bar in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 133 S. Ct.1911 (2013). Order, Jan. 12, 2015, ECF No. 91. In a later order, the Court clarified that this would be the parties' only opportunity to present live witness testimony. Order, Jan.14, 2015, ECF No. 94. The Court held the hearing on February 27, 2015, and, although both parties were in attendance, neither party called any witnesses. This matter is ripe for determination.

## II.      ASSISTANCE OF COUNSEL (CLAIMS 1, 3, & 4)

Busby asserts that his trial counsel, Jack Strickland ("Strickland" or "trial counsel"), rendered ineffective assistance by limiting the investigation into Busby's mental health and overlooking mitigating circumstances of his life. 2d Am. Pet. 10-13, ECF No. 79. He further contends that Strickland failed to seek and obtain admittance of co-defendant Kathleen "Kitty" Latimer's ("Latimer") statements in both the guilt and sentencing phases of trial. *Id*. at 49-53, 137-40. Finally, Busby asserts that, as his state appellate counsel, Strickland was ineffective on direct appeal because he failed to challenge on appeal the trial court's exclusion of Latimer's statements. *Id*. at 143-45.

3

### A.      Applicable Law

The clearly established federal law governing claims of ineffective assistance of trial counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). *See Williams v. Taylor*, 529 U.S. 362, 398-99 (2000). Under *Strickland*, Busby must first demonstrate that counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. The objective standard of reasonable representation is defined by prevailing professional norms and is necessarily a general standard. *See Bobby v. Van Hook*, 558 U.S. 4, 7 (2009).

Restatements of professional standards, such as the American Bar Association guidelines, are "only guides" to what is reasonable and are properly considered only to the extent they describe the prevailing professional norms and standard practice, and the restatements are not so detailed that they "interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id*. at 8-9 n.1. The Constitution imposes "one general requirement: that counsel make objectively reasonable choices." *Id*. at 9. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Strickland*, 466 U.S. at 690)). This standard not only gives trial counsel the benefit of the doubt, but affirmatively entertains the range of possible reasons counsel may have had for proceeding as they did. *Id.* at 1407. Regarding counsel's duty to investigate, strategic decisions made by counsel following a thorough investigation are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. "[S]trategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 691.

Next, Busby must demonstrate that there is a reasonable probability that prejudice, sufficient to undermine confidence in the trial outcome, resulted from counsel's deficiency. *See Strickland*, 466 U.S. at 694. A "reasonable probability" of prejudice requires a substantial, not just a conceivable, likelihood of a different outcome. *Pinholster*, 131 S. Ct. at 1403. For claims that challenge counsel's sentencing investigation, the reviewing court reconsiders the evidence in aggravation against the totality of available mitigating evidence and determines whether there is a probability, sufficient to undermine confidence in the outcome, that the jury would have assessed a life sentence. *See Wiggins*, 539 U.S. at 534.

**B.**      **Procedural Bar**

Generally, a federal court will not review the merits of a claim that a state court declined to hear as a result of the petitioner's failure to abide by state procedural rules. *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012). This general rule is "designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." *Id*. An exception exists to the general rule, however, if the petitioner can establish a showing of cause and prejudice. *Id*. Here, Busby concedes that his first, third, and fourth claims are all procedurally barred, unless he meets the exception set forth in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), which would allow the Court to address the ineffective assistance of counsel claims on the merits.

Under *Trevino*, a petitioner who procedurally defaults a complaint of ineffective assistance of trial counsel "must show that (1) his underlying claims of ineffective assistance of trial counsel are substantial, meaning that he must demonstrate that the claim[s] ha[ve] some merit, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas

5

application." *Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013) (citing *Martinez*, 132 S. Ct. at 1318; *Trevino*, 133 S. Ct. at 1921). To establish ineffective assistance of his initial state habeas counsel, the petitioner must establish "both that habeas counsel's performance—in failing to present the ineffective assistance of trial counsel claims in the first state habeas application—was deficient and that he was prejudiced by the deficient performance—that is, that there is a reasonable probability that he would have been granted state habeas relief had the claims been presented in the first state habeas application." *Id*. However, even if the petitioner "establishes that ineffective assistance of his initial state habeas counsel constitutes cause for the default of his ineffective assistance of trial counsel claims, '[a] finding of cause and prejudice does not entitle [him] to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted.'" *Id*. at 422 (quoting *Martinez*, 132 S. Ct. at 1320).

### C.   Counsel's Representation

Busby maintains that Strickland provided ineffective assistance at the sentencing phase of trial in two ways: (1) he failed to conduct a timely and reasonable sentencing-phase investigation; and (2) he failed to admit Latimer's statements, which Busby contends she made against her interest. 2d Am. Pet. 11, ECF No. 79. Busby additionally contends that Strickland provided ineffective assistance at the guilt phase by failing to obtain admittance of Latimer's statements. *Id*. at 52. In response, Respondent contends that Strickland's performance was not deficient, Busby was not prejudiced by the allegedly deficient performance, and, in the alternative, any error was harmless. Am. Answer 46-74, ECF No. 86. The Court first turns to Busby's claim regarding the sentencing investigation.

### 1.   Sentencing Investigation

6

Trial counsel's failure to reasonably investigate and present mitigating evidence to a sentencing jury, when such evidence would have been discovered by a reasonably competent defense attorney, amounts to ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). To prove his claim, Busby must show that he suffered prejudice as a result of his trial counsel's failure to investigate and present mitigating evidence. *Id*. To establish prejudice, Busby must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the [sentencing] proceeding would have been different." *Id*. "In determining whether a petitioner suffered prejudice, [the court] compare[s] the evidence actually presented at sentencing with any additional mitigating evidence presented in the habeas proceeding." *Kunkle v. Dretke*, 352 F.3d 980, 991 (5th Cir. 2003). After reviewing all of the evidence, the court must ultimately "decide whether the additional mitigating evidence was so compelling that there was a reasonable probability that at least one juror could have determined that because of the defendant's reduced moral culpability, death was not an appropriate sentence."[1] *Id*. (internal quotation marks omitted).

> a.   *The Aggravating Evidence Presented*

---

[1] In his Reply brief, Busby contends that *Ex parte Gonzales* "authoritatively construed the special issues in capital sentencing proceedings to be independent from each other." Reply 10 n.6, ECF No. 89; 204 S.W.3d 391 (Tex. Crim. App. 2006). He further states that "[u]nlike the future danger special issue, the mitigation special issue does not require the jury's consideration of aggravating evidence; the special issues are distinct inquiries." *Id*. As a result, he contends that the Court's review is limited to "[l]ooking at the evidence in Mr. Busby's petition in comparison to the mitigating evidence presented at trial relevant to the second special issue." *Id*. at 10. The Court finds such an interpretation of *Ex parte Gonzales* unavailing, as the case does not limit the reviewing court's analysis of the prejudice prong to the mitigating evidence. Indeed, the court in *Ex parte Gonzales* noted that it reached its conclusion after weighing *all* of the evidence. *Id*. at 399. Further, the mitigation special issue asks the jury, "Whether, taking into consideration *all* of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal, moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." *See* Trial Tr. (vol. 36) at 113:8-14 (emphasis added); Tex. Code Crim. Proc. Ann. art. 37.071, § 2(e)(1). The Court is permitted to "evaluate the evidence in aggravation and the available mitigating evidence, in order to determine how a jury might reasonably answer the mitigation special issue." *Ex parte Gonzales*, 204 S.W.3d at 398.

During the punishment phase of trial, two roommates, Darwin Willis and David Coburn, testified that on one occasion, at three o'clock in the morning, Busby came to their home and demanded that Willis give Busby money. *Id.* at 13:1-13, 29:16-17. After Willis gave Busby a small sum, Busby then left. *Id.* at 13:22-25, 14:1-2. The jury learned that on this occasion, Busby was "invited" to Willis's home by a prostitute. *Id.* at 20:13-14. Busby later came to Willis's home at five o'clock in the morning, this time kicking down the front door to gain entry. *Id.* at 15:2-6, 31:4-5. Busby again demanded money and attempted to attack Willis with a box cutter. *Id.* at 15:10-24, 31:15-18. Coburn noted that when Willis emerged from his room, Willis was "bloody from the waist up." *Id.* at 32:17. Ultimately, Busby took Willis's truck and some of Willis's CDs. *Id.* at 16:11. Busby forced Coburn to take the stolen CDs to Willis's truck and then forced Coburn to help him sell CDs. *Id.* at 33:21-23, 35:1-3. Busby also attempted to force Coburn to cash his paycheck to give to Busby. *Id.* For this, Busby pleaded guilty and was sentenced to two years in prison for robbery causing bodily injury. *Id.* at 191:2-6.

Next, the Director of Operations for the Salvation Army testified that Busby came to the Salvation Army parking lot one morning and stole several bicycles from a box truck that were "donated by the community to be distributed to those less fortunate." *Id.* at 72: 19-25. The Salvation Army intended to give the bicycles to children on December 22nd and 23rd for Christmas gifts. *Id.* The witness and another individual followed Busby as he drove away with the bicycles, and they were able to stop Busby. *Id.* at 74:3-22. The witness eventually flagged down an officer and Busby was apprehended. *Id.* This officer who apprehended Busby testified that as she transported him to the jail, "[h]e was laying down, eating sunflower seeds, spitting the shells all over the back seat of [her]

car." *Id.* at 80:10-14.  For this, Busby was convicted of burglary of a vehicle and was sentenced to forty-five days in jail.  *Id.* at 192:10-22.

The jury next heard from several detention officers from the Tarrant County Sheriff's Department.  First, a detention officer, Vickie Hart, testified.  She noted that while Busby was incarcerated and awaiting trial, she patrolled the correctional facility.  *Id.* at 86:20-23, 87:15-18.  While Busby was watching TV one morning, he turned the volume too high.  *Id.* at 87:13-21.  When the officer asked that Busby turn the volume down, Busby "started getting upset" and began to use abusive language against the officer.  *Id.* at 88:15-21.  He then noted that "he was going to get the death chair [and the officer] couldn't do anything to him."  *Id.* at 91:16-18.  The officer later testified that she was afraid of Busby on that occasion.  *Id.* at 103:1-3.  A deputy from the Tarrant County Sheriff's office additionally testified the Busby admitted to him that Busby was an inactive member of the "Rolling 60s Crip gang."  *Id.* at 137:17-24.

Next, Terrance Savior, a jailer, took the witness stand.  He noted that one morning, while he and another officer were conducting jail cell searches, Busby left the officer's presence, climbed a flight of stairs, then punched another inmate twice in the face.  *Id.* at 142:1-21.  The officer noted that Busby did not comply on a regular basis with the rules and regulations for the inmates.  *Id.* at 144:15-17, 145:1.  The officer additionally stated that Busby was "assaultive" while he was confined.  *Id.* at 145:2-4.

Then, Daniel Evans, a detention officer, testified to a separate incident where Busby fought another inmate.  *Id.* at 148:20-24.  During this altercation, the jury learned that Busby "slammed him into the door . . . [and] he was manhandling him."  *Id.*  When the officer attempted to break up the fight, Busby forced past the officer.  *Id.* at 149:10-12.  With regard to Busby's attitude with the other

9

correctional officers, Evans noted that "[a]s long as he is getting – what he feels is his way, he is very polite to try and get his way.  If he is not getting his way, he becomes aggressive and begins yelling and carrying on."  *Id*. at 150:12-18.  Evans stated that Busby threatened other detention officers.  *Id*. at 150:19-21.

The jury also heard from Sergeant Randy Cundiff who described another situation in which Busby refused to return to his cell when Sergeant Cundiff ordered him to do so.  *Id*. at 154:13-23. Instead, Busby "made abrupt – ruckus in the pod yelling at me and refused to go back to his cell after [he] told him several times."  *Id*. at 155:1-2.  Busby made several threats towards the sergeant.  *Id*. at 155:12-14.  Additionally, the witness testified that Busby attempted to establish himself as a "tank boss."  *Id*. at 158:18-24.  In defining a tank boss, the sergeant noted that "[a] tank boss is what – normally what the inmates consider to be an inmate that runs the TV, that preys on weaker inmates. He would threaten a weaker inmate for his breakfast tray so he could have two trays instead of one. If they are gambling in the pod, he might get a cut of the gambling debts."  *Id*. at 157:16-21.

Next, Ronda Samson, a detention officer, testified regarding another incident in which Busby was in a physical altercation with an inmate.  *Id*. at 164:22-25.  Despite repeated requests from the detention officer to stop fighting, Busby ignored the orders and continued to fight.  *Id*. at 165:10-20. Even after the inmates were separated, Busby refused to stop fighting.  *Id*. at 166:16-20.  Only after several orders that he return to his cell did Busby comply and return.  *Id*. at 167:6-11.  Finally, the officer testified that she believed that Busby was assaultive and failed to follow the rules of the Tarrant County Sheriff's Department on a regular basis.  *Id*. at 168:5-10.

Further, Dwight Franklin, a correction officer, stated that he worked on Level 56, where Busby was housed.  *Id*. at 174:3-4.  The officer noted that "[t]he inmates that are housed in 56 are those that

are pretty much violent inmates, high profile inmates and inmates that are escape risks." *Id*. at 174:10-12.   He then related an incident where Busby, when speaking with a female correction officer, "got upset at [the officer] during the conversation.  And he stated that, if you want to see how fast I can get back in this red suit, you come into this day room."[2] *Id*. at 176:15-18.  After the incident, the female officer told Busby to return to his cell and wrote an official report.  *Id*. at 178:1-7.

Next, JoAnn Cooper testified.  She stated that both she and Latimer worked as prostitutes for Busby in exchange for drugs.  *Id*. at 13:8-13.  She noted that one evening, while she was outside on the street talking to Latimer, Busby "was yelling something and came running up the street and he hit me and took my purse and she started screaming.  He went after her.  And the next thing I heard, he broke her arm.  She said, you broke my arm." *Id*. at 6:9-12.  Cooper noted that Busby hit her in the mouth with his closed fist.  *Id*. at 6:14-16.  She stated that after Busby attacked Cooper, Busby then attacked Latimer with his fists and feet.  *Id*. at 7:15-17.  As Busby was attacking Latimer, he was asking her about money.  *Id*. at 7:12-17.  Cooper noted that Busby had also assaulted her both before and after that incident.  *Id*. at 11:15-25, 12:1.

Two officers from the Amarillo Police Department testified that they pulled  Busby over for committing a traffic violation early in the morning.  *Id*. at 21:14-19, 29:4-6.  As a result of the stop, the officers recovered a Raven .25-caliber semi-automatic pistol and a simulated illegal substance from Busby's vehicle.  *Id*. at 24:1-7, 29:14-15, 30:2-4.  Busby was taken to jail as a result of this traffic stop.  *Id*.

---

[2] Franklin noted the significance of an inmate's wearing a red suit: "If inmate is wearing a red suit, he has been classified as assaultive or escape risk."  *Id*. at 174:15-16.

The jury then heard from Ray Barbosa, who previously worked as a loss control prevention manager for the Kmart stores.  Barbosa related that on one occasion, he witnessed Busby take batteries from the store and place them into his baseball cap.  *Id*. at 35:11-22.  When Barbosa confronted Busby about the incident, Busby became "belligerent."  *Id*. at 37:9-11.  Busby then threatened to "pop [Barbosa] and his family."  *Id*. at 38:2.

Next, an officer working undercover in Amarillo, Texas, related an incident where Busby sold her and another officer what Busby claimed to be three rocks of cocaine.  *Id*. at 49:6-20.  After the transaction was completed, the officers identified themselves and attempted to arrest Busby, but he fled on foot.  *Id*. at 50:1-17.  After a short pursuit, Busby was apprehended.  *Id*. at 51:18-22, 60:2-17.

Sergeant Walter Ward then testified.  He noted that Busby admitted to Ward that he was a member of the Rolling 60s Crips.  *Id*. at 120:2-3.  He further stated that he recovered two Crip-related drawings from Busby's cell during a search.  *Id*. at 120:8-9.  Additionally, the officer testified that he confiscated a letter that Busby authored to another inmate.  *Id*. at 124:21-25.  Within the letter, he noted that there was gang-related symbolism.  *Id*. at 125:1-10.  The State then admitted gang-related graffiti drawn by Busby on the wall of his holding cell during the trial.[3]  *Id*. at 127:15-22.  Moreover,

---

[3] The officer described the drawing as follows:
> At the very top the R-S-C stands for Rolling 60s Crip.  The W with a slash mark would probably stand for west side.  Directly below that you have J-B.  That is his nickname I think . . . And, of course, you can see the letter K inside the letter B.  That would stand for blood killer.  Off to the left you have the numbers 2, 11.  That stands for blood killer as it corresponds with the assigned numbers to the alphabet . . . [With respect to the numbers and letters off to the right,] the 187, what it represents is – Crips use that – originally out of California they use 187 because that was the penal code number for murder in California.  Below that, you have the PK, that stands for Piru killer.  Again, Piru and Blood are essentially the same thing.  Below that than [sic] again you have the 60s representing the Rolling 60s . . . [below that were the words] jury trial, 11-2005, [then] Rolling for Life . . . Again, that makes references to the Rolling 60s. And then 'Crip or Die.'  That means that they are to remain a Crip or they will die.

*Id*. at 129:1-25, 130:1-7, 131:1-6.

the officer testified as to Busby's gang-related tattoos on his body.  *Id*. at 133:5-25, 134:1-24.

Next, a patrol officer testified that she stopped Busby for a traffic violation.  She noted that when she searched Busby, he had a pocketknife containing a Buck knife and box cutter. *Id*. at 156:4-7. In addition, she found a clear glass tube she believed to be a crack pipe.  *Id*. at 156:3-5.  She noted that Busby also had a black and white bandana that was folded and pressed protruding from his back pocket.  *Id*. at 157:1-2.  She later learned that "the bandana meant that he was a high ranking Crip member, gang member, and that he was considered an O-O-G which is an old, original gang member." *Id*. at 158:2-5.  In addition, Busby admitted to the officer that he was addicted to crack.  *Id*. at 158:9-11.

b.      *The Mitigation Case Presented*

 Busby maintains that although his trial counsel was appointed on February 23, 2004, he did not begin his mitigation investigation for the sentencing phase until nineteen months later on September 24, 2005, when counsel hired a mitigation expert.  2d Am. Pet. 46, ECF No. 79.  He further maintains that counsel did not hire a mental health expert until October 11, 2005.  *Id*.  Individual voir dire began on October 4, 2005, and it lasted through November 7, 2005.  *Id*.  The trial on the merits ultimately began on November 4, 2005, and the sentencing phase commenced on November 14, 2005.  *Id*.

During the sentencing phase, Busby's counsel presented five lay witnesses (his two sisters and three teachers from Busby's school in Pampa, Texas), Dr. Timothy Proctor (a psychologist), and a videotape containing silent images of two Texas Department of Criminal Justice facilities.  *Id*. at 54.  The jury first heard from the Pampa Independent School District records custodian.  Trial Tr. (vol. 35) at 12.  She testified that Busby obtained "average and above" grades in junior high, "average" grades his freshman year, "below average" grades his sophomore year, and Cs and Ds in his elementary

school conduct grades.  *Id*. at 17:19-23, 19:23-25, 20:1-8.  Busby was enrolled in LLD[4] Math and

Reading courses during his junior high year.  *Id*. at 18:3-5.  She noted that Busby was required to repeat

his tenth grade courses, and that he was homebound during the second semester of his eighth grade

year.  *Id*. at 16:15-18, 17:15-18.  Further, she stated that Busby had 17 absences during his ninth grade

year; 46 during his tenth grade year; and 57 during the following year when he repeated the tenth grade

courses.  *Id*. at 16:19-25.

The jury next heard from the Executive Director of Special Populations.  *Id*. at 22:13-16.  She

testified that Busby did not pass his first grade year and was retained.  *Id*. at 24:14-19.  During his

successive year in first grade, his records indicated that he was working below the first grade level

in the subject of Reading.  *Id*.  She also noted that Busby, beginning in his seventh grade year, was

in LLD classes for Reading, Math, and English.  *Id*. at 25:6-12.  The witness further stated that Busby

was exempted from the state-standardized testing in the ninth and eleventh grades.[5]  *Id*.

The jury next heard from one of Busby's former special education school teachers.  *Id*. at 33:19,

34:2-4.  She testified that she taught vocational adjustment classes, which were designed to prepare

the students to go into the workforce rather than college.  *Id*. at 35:1-8.  She noted that her experiences

with Busby were "trying": "[H]e didn't mind.  He didn't want to do what I asked him to do. He didn't

like any authority . . . he didn't like school.  He didn't like to be there.  He didn't want to do any of

---

[4] The "LLD" notation was later explained to mean that the student had "a learning disability in a core subject area, in reading, math, writing, language arts, and they would be attending classes where they are taught the deficits to try to bring them up to the academic grade level of that particular grade."  *Id*. at 27:13-20.

[5] The witness explained that in order to be exempted from such testing, a meeting called the "Arrested Committee Admission Review and Dismissal" would convene.  Trial Tr. at 28:5-7.  This committee, consisting of an administrator, a general education teacher, a special education teacher, a parent, and sometimes a nurse and counselor, would meet to determine whether the student "was not able academically to take the test and be successful."  *Id*. at 28:8-13, 19-22.

his work." *Id*. at 35:15-19. She further explained that he did not have much support from home, that his mother would often blame the teaching staff for Busby's problems, that Busby was a follower, and that he lived in a segregated part of town. *Id*. 36:8-21, 37:1-3.

Next, the Defense called Kimiko Coleman, Busby's oldest sister. *Id*. at 51:7-8. Coleman testified that Busby had a good relationship with his father, when his father was sober. *Id*. at 53:18-22. She noted that Pampa was a "small country town" that was "prejudiced" and that the African Americans typically lived on the south side of town. *Id*. at 54:4-8. In describing her neighborhood, she testified that it was "poor to middle class." *Id*. at 55:3. Regarding Busby's characteristics, Coleman stated that he was always big for his age. *Id*. at 55:14-15. Busby was often protective of his sisters, and he was often easily influenced by women. *Id*. at 55:20-24, 56:2-4. She noted that although she would not have been surprised if she was told that her brother killed another man, she was very surprised to learn that he killed the female victim in the instant case. *Id*. at 60:21-25, 61:1-4 ("[I]f they'd came to me and they would have said, well, Ms. Coleman, your brother has been accused of killing a man. I – we would have blown that off. Yeah that sounds like him . . . But to come to us and tell us that he killed a woman, no, that is not him. Not a woman."). She additionally testified that she knew Busby used drugs, that he had stolen from her in the past, and that they once had a physical fight requiring police intervention. *Id*. at 59:6-19, 62:25, 63:1-24.

Next, Busby's middle sister, Tarsharn Busby, was called to the stand. *Id*. at 71:13. She testified that the children's relationship with Busby's father was not always good due to Busby's father's alcoholism. *Id*. at 71:15-18. After Busby's parents divorced, Busby's father no longer played much of a part in the children's lives. *Id*. at 71:20-22. She noted that she always tried to keep Busby interested in school and that he was a good athlete in middle school. *Id*. at 76:4-17. Although he was "[m]ore

15

of a leader-type person in some ways," when it came to women with whom he had romantic relationships, they could "lead him astray." *Id*. at 78:12-18.  With regard to their neighborhood, Tarsharn testified that "it wasn't a bad neighborhood . . . everybody pretty much got along." *Id*. at 77:5-13.  When she learned that Busby was accused of the crime, she noted that she was surprised. *Id*. at 78:2-9.

Finally, Dr. Timothy Proctor, Busby's court-appointed psychologist testified.  Trial Tr. (vol. 36) at 9:16-19.  Dr. Proctor testified that he reviewed multiple records during his investigation of Busby's history.  Specifically, he reviewed Busby's records from the Pampa, Amarillo, and Tarrant County Police Departments regarding his previous arrest, criminal, and court history, photographs of the crime scene, audio and visual statements Busby made to the media, Busby's Tarrant County Jail records, the State's Rule 404 and Article 37.07 notices, Pampa Regional Medical Center records spanning from birth, Windham School records,[6] John Peter Smith Hospital records, Mental Health Mental Retardation mental health services records from the Tarrant County Jail, Latimer's recorded interview with Eric Holden, mitigation expert Linda Sanders' work product, and investigator Fred Pendergraf's work product.  *Id*. at 18:1-25, 19:1-23, 20:4-7.

In addition, Dr. Proctor met with Busby on several occasions, where he administered several tests and rated Busby using various instruments.  He first rated Busby using the Hare Psychopathy Checklist, which "looks at the extent to which antisocial personality features are present." *Id*. at 29:8-25. Under the Checklist, the jury learned that Busby obtained a score of 34 out of 40.  *Id*. at 34:16-17. According to Dr. Proctor, this indicated a presence of "psychopathy," which "would be consistent

---

[6] The Windham School is an educational program provided to individuals incarcerated within a Texas state penitentiary or jail.  Trial Tr. (vol. 36) at 19:18-20.

with a severe antisocial personality disorder." *Id*. at 34:16-21.  He also used the HCR-20,[7] which "is a list of 20 factors in the research that have been shown to be predictive of future violence." *Id*. Under the HCR-20, Busby received a score of 32 out of 40, which Dr. Proctor defined as a "high risk conclusion." *Id*. at 70:4-7.  Further, he rated Busby with the Violence Risk Appraisal Guide, which, similar to the HCR-20, is a list of several variables that research has established are predictive of future acts of violence. *Id*. at 29:23-25, 30:1.  Under the Violence Risk Appraisal Guide, Busby received a score of 7 out of 10, which was "in the high range." *Id*. at 70:8-13.  As a result of these three instruments, Dr. Proctor concluded that Busby suffered from a severe antisocial personality disorder, and considered him to be a high risk of future violence to society.[8] *Id*. at 70:14-17, 78:6-11.

Dr. Proctor also administered tests to determine Busby's IQ level.  He first administered the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III"), which he termed the "gold standard of IQ tests, intelligence tests." *Id*. at 40:22-25.  He further administered the Beta-III test, which was a "shorter version of an IQ test." *Id*. at 41:1-2.  Finally, he administered the Wide Range Achievement Test, Third Edition ("WRAT-3"), which measured Busby's educational abilities in Reading, Spelling, and Math. *Id*. at 41:3-5.  On the WAIS-III and Beta-III tests, Busby obtained scores of 77 and 81, respectively. *Id*. at 53:11-16.  These scores placed Busby in the lower sixth to tenth percentiles. *Id*. at 54:16-20, 56:2.  With regard to the WRAT-3 test, Busby tested at the fourth-grade level in Reading; third-grade level in Spelling; and sixth-grade level in Math. *Id*. at 51:17-25, 52:1.  To ensure confidence in the scores Busby received, Dr. Proctor also administered the Test of Memory Malingering, to

---

[7] In the "HCR" acronym, Dr. Proctor testified that "HCR stands for H, historical; C, clinical; R, risk management."  Trial Tr. (vol. 36) at 29:13-14.

[8] Notably, when he was asked "how comfortable would [he] feel running into [Busby] on a parking lot of a supermarket store," Dr. Proctor responded, "[n]ot comfortable." *Id*. at 78:12-17.

determine whether Busby was exerting his best efforts.  *Id*. at 41:6-10, 42:2-6.  Busby obtained a perfect

score on the test, "indicating he was putting forth full effort on the testing."  *Id*. at 45:15-20.

Finally, Dr. Proctor testified about Busby's mental health.  He noted that Busby attempted

suicide four times prior to committing the instant crime.  *Id*. at 58:4-10.  Two of the incidents involved

serious attempts requiring medical treatment, while the other two incidents involved threats of self-harm

requiring hospitalization.  *Id*. at 58:17-20.  Dr. Proctor also noted the existence of documented evidence

establishing Busby's long-standing chronic illicit drug and alcohol abuse.  *Id*. at 58:14-23.

> c.      *The "Undiscovered" Mitigating Information*

Busby maintains that "[h]ad trial counsel conducted a reasonable sentencing investigation,

counsel would have discovered and presented a wealth of mitigating evidence relevant to Mr. Busby's

background, character and the circumstances of the offense." 2d Am. Pet. 55, ECF No. 79.  Specifically,

counsel would have discovered that (1) for the first two years of his life, Busby was "abandoned"

by his mother and was under the primary care of his grandmother; (2) his biological father, an alcoholic,

was often physically abusive towards Busby and his sisters and left the family when Busby was a small

child; (3) Busby's mother was also often physically abusive towards the children and would commit

acts of domestic violence against the men she courted in front of the children; (4) Busby suffered racial

slurs and taunts from his classmates as a child in his Pampa, Texas school; (5) he grew up in poverty

and often had to go without adequate food, clothing, and plumbing; and (6) he lost the only positive

male role models in his life, his cousin and his uncle, at a young age.  *Id*. at 55-66, 70-71.  He supports

these assertions with the unsworn declarations of Kimiko Coleman, Tarsharn Busby, Richard H. Burr,

Alma Lagarda, Merlyn Rogers, Pamela Harris, James Bybee, Steve Porter, Willard Farr, Eddy Pouncy,

Renee Boyd, and Raquel Farr.  None of the declarants were called to testify at the hearing before this

Court. Some of the declarations are undated–specifically, the declarations of Kimiko Coleman and Tarsharn Busby–but were presumably made after their mother's death. *See* App. Supp. 2d Am. Pet. (Lagarda Decl.), ECF No. 80-5 (noting that Busby's mother passed away "just weeks after" her interview with Kimiko Coleman on February 9, 2010).

Busby further states that he has a lengthy history of severe mental illness. *Id*. at 66. Busby made several attempts at suicide, including an attempt four days before he committed the instant crime where he threatened police that he would jump off the edge of a bridge. *Id*. at 68. In addition, he maintains that a reasonable investigation would have established that, from a young age, he was entirely dependent on the women in his life and was easily manipulated. *Id*. at 71-74. As the "protector of women," Busby contends they "took advantage of him, manipulated his naivete to their advantage, and used his size to shield them." *Id*. at 71.

Finally, he states that he suffered from mental retardation and a "lifetime addiction to crack cocaine, marijuana and alcohol." *Id.* at 74. From an early age, he was exposed to his father's alcohol abuse. *Id*. He also began using marijuana and crack cocaine in his early teenage years at the influence of his older cousin and other older men in his neighborhood. *Id*. Further, he maintains that he was diagnosed with "substance-induced psychosis on at least two separate occasions." *Id*. He supports these assertions with reports from psychologists Dr. Gilbert Martinez and Dr. Bekh Bradley-Davino.

## 2.   Latimer's Statements

Busby maintains that trial counsel failed to "adequately prepare and seek admittance of critical mitigating evidence in their possession favorable to Mr. Busby." 2d Am. Pet. 49, ECF No. 79. Specifically, Busby references a statement Latimer made to polygraph examiner Eric Holden ("Holden") following a polygraph test Holden administered to Latimer. *Id*. at 49-50. Busby contends that in her

initial interview with Holden, Latimer "explained her participation in the crime, including that it was she who filled out the check, endorsed it, and placed it in the chute at Wells Fargo," but that she had not convinced Busby to tie up the victim. *Id*.; App. Supp. 2d Am. Pet. (Holden Letter), ECF No. 83-14. Latimer was then asked a series of questions for the polygraph examination, which focused primarily on her involvement in binding the victim. 2d Am. Pet. 50, ECF No. 79.  Holden determined that Latimer gave deceptive answers during the polygraph examination. Holden Letter, ECF No. 83-14.  In the post-examination interview, Latimer admitted that she lied in her previous written and oral statements.

*Id*.  According to Holden:

> Following the examination, Ms. Latimer was advised of the deceptive nature of her responses to the above noted relevant questions.  She was asked for an explanation at which time she maintained that she did lie to me about encouraging or instructing Mr. Busby to tape up Ms. Crane.  She stated that at one of the first stops where they got gas she could continue to hear Ms. Crane banging in the trunk and she stated she realized the music was not going to stop the noise from being heard.  She stated she told [Busby] "You are going to have to tie her up or tape her down because she is making too much noise."  She stated at the next truck stop where they stopped, she told him again "we need to do something."  She stated she told him "I said you need to tie her up or do something because she is making too much noise."  During the final portion of the post-test interview, she continued to deny that she actually saw Ms. Crane taped up in the trunk and denied Mr. Busby's allegations that she helped or participated in tying up Ms. Crane in any way.

*Id*.  Busby contends that Latimer's statements corroborated his admitted statements that "(1) he lacked intent to cause the death of the complainant, only tying her up because Latimer insisted he do so, after resisting Latimer's first directive; and (2) suggested Latimer played a much greater role in the abduction and murder than Latimer's prior statements had indicated, which was relevant to the jury's determination of Mr. Busby's moral culpability." 2d Am. Pet. 50, ECF No. 79.  Busby concludes that counsel was therefore ineffective in failing to get the post-polygraph statement admitted at both phases of the trial.

3.    <u>Analysis</u>

20

a.      Is the Claim "Substantial"?

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.  As a result, the Court pretermits its inquiry into trial counsel's performance and determines whether Busby was prejudiced by trial counsel's alleged deficiencies.[9]  *See Amador v. Quarterman*, 458 F.3d 397, 412 (5th Cir. 2006); *United States v. Pierce*, 959 F.2d 1297, 1302 (5th Cir. 1992) ("An insufficient showing of prejudice pretermits addressing the adequacy prong.").  Comparing the mitigating and aggravating evidence, the Court finds that there is no "reasonable probability that, absent the error, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Sonnier v. Quarterman*, 476 F.3d 349, 356-57 (5th Cir. 2007) (citing *Strickland*, 466 U.S. at 695).

Busby offers the declarations of multiple individuals, all of whom Busby maintains have mitigating evidence that should have been discovered and presented by trial counsel.  The weight of these declarations is weakened because they are untested, unsworn, and in some cases, undated.  Busby's sisters' declarations are doubly suspect because they were made post-conviction with the knowledge that their testimony at trial was unsuccessful.

Generally speaking, complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and allegations

---

[9] Although the Court omits its review into Strickland's allegedly deficient performance, the Court notes that Strickland, at the time of Busby's trial, was a seasoned criminal defense attorney who had experience in several previous capital murder trials. Clerk's R. vol. 1 (Strickland Aff.) ("I . . . have tried seventeen capital cases to verdict and pursued at least an equal number of capital direct appeals and 11.071 writs."). Further, Strickland maintains that Linda Sanders, the mitigation expert, was not the only member of Busby's defense team to conduct a mitigation investigation: Strickland, co-counsel Steve Gordon, and investigator Fred Pendergraf also interviewed witnesses with potentially mitigating evidence. *Id*.

of what a witness would have stated are largely speculative.  *See Gregory v. Thaler*, 601 F.3d 347,

352 (5th Cir. 2010); *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).  To prevail on this

type of claim, the petitioner must name the witness, demonstrate that he was available to testify and

would have done so, set out the content of the proposed testimony, and show that the testimony would

have been favorable to a particular defense.  *Id*.  This showing is required for claims regarding uncalled

lay and expert witnesses alike.  *See, e.g., Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002).

Busby states that Strickland should have discovered and presented Pamela Harris, a teacher,

James Bybee, a peer from Busby's high school, Steve Porter, Busby's 8th grade football coach, Willard

Farr and Raquel Farr, Busby's former neighbors, Eddie Pouncy, Busby's nephew, and Renee Boyd,

an acquaintance.  *See* App. Supp. 2d Am. Pet. (Harris Decl.), ECF No. 80-9; App. Supp. 2d Am. Pet.

(Bybee Decl.), ECF No. 80-10; App. Supp. 2d Am. Pet. (Porter Decl.), ECF No. 80-11; App. Supp.

2d Am. Pet. (Farr Decl.), ECF No. 83-2; App. Supp. 2d Am. Pet. (Pouncy Decl.), ECF No. 83-3, App.

Supp. 2d Am. Pet. (Boyd Decl.), ECF No. 83-4; App. Supp. 2d Am. Pet. (Farr Decl.), ECF No. 83-5.

In each of the declarations, the individuals noted that Busby was "slow," was dependent on the women

he spent time with, cried often, was suicidal, and was addicted to illicit drugs.  *Id*.  This testimony

is largely cumulative of the evidence adduced at trial.  The jury heard from several individuals from

the Pampa school that Busby's grades were low and that he was enrolled in classes for learning disabled

children.  Busby's sisters further noted that Busby was dependent upon women and that Busby had

a drug addiction.  Finally, Dr. Proctor testified about Busby's multiple suicide attempts.  As a result,

Busby failed to make the requisite showing that the additional mitigation evidence would have been

favorable to a particular defense.  *See Gregory*, 601 F.3d at 352; *Alexander*, 775 F.2d at 602.  Courts

must be "particularly wary of arguments that essentially come down to a matter of degrees.  Did counsel

investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009).

Finally, whatever mitigating impact the additional information may have had on the jury would have been overwhelmed by the State's aggravating evidence. The jury learned that while he was incarcerated in the time leading up to trial, he fought with several inmates and used abusive language towards the corrections officer. Busby attempted to intimidate other inmates to become the "tank boss," and even scrawled gang-related graffiti on the wall of the holding cell at the courthouse. Additionally, the jury learned of Busby's lengthy criminal history involving the theft of Christmas bicycles from the Salvation Army, a robbery and kidnapping causing bodily injury, and the multiple drug violations. Multiple witnesses testified that Busby attacked them for money. Further, any additional testimony regarding Busby's susceptibility to being manipulated by women would surely have been tempered by the testimony that Busby broke Latimer's arm six months before the murder, punched another prostitute in the mouth, and attempted to intimidate multiple female guards at the jail. The mitigation impact would have also been diluted by the fact that Busby's sisters were raised in the same allegedly abusive environment but managed to make different choices. *See Guevara v. Stephens*, No. 13-7003, 2014 WL 3894303, at *5 (5th Cir. Aug. 11, 2014) (per curiam) (holding that any information about Guevara's difficult life in El Salvador would have been undermined by, among other things, his brother's clean record despite their shared childhood). Additionally, the impact the mitigating evidence may have had on the jury would have been overshadowed by the brutal facts of the murder. Here, Busby terrorized an elderly woman by transporting her, bound in the trunk of her car, for more than a day and then duct-taped her head with 23.1 feet of duct tape, so tightly that it

dislodged her nose from its normal position, until she suffocated.  *See Jones v. Johnson*, 171 F.3d 270, 277 (5th Cir. 1999).

Furthermore, Busby has failed to establish how trial counsel's failure to obtain admittance of Latimer's statements at the guilt and sentencing phases prejudiced his defense.  First, and perhaps most obviously, it is not a defense to murder that someone told the defendant to do it.  Moreover, Latimer's statement is not inconsistent with Busby's guilt; it inculpates both of them.  In any event, trial counsel tried twice unsuccessfully to admit Latimer's statement.  Busby maintains that Latimer's statement was admissible pursuant to Busby's right to present a defense, which trial counsel did not offer as a basis for admission.  2d Am. Pet. 52, ECF No. 79 (citing *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)).  However, this right is tempered by the rules of procedure and evidence.  *See Chambers v. Mississippi*, 410 U.S. 284, 298 (1973) ("The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact.").  Latimer's statements are undeniably hearsay.

Busby has further failed to establish how trial counsel's failure to seek admittance of Latimer's statements at sentencing prejudiced him.  Although Busby contends that Latimer's statements would have established that Busby lacked the requisite intent to kill the victim and diminished his moral blameworthiness, a review of the statements suggests otherwise.  Latimer maintained only that she told Busby to tie up the victim to keep her quiet, not kill her.  The physical evidence establishing that Busby, while alone with the victim, wrapped her face and mouth with 23.1 feet of duct tape

demonstrates intent irrespective of Latimer's statements.[10] Further, the medical examiner's testimony that the duct tape was wrapped so tightly that it caused the victim's nose to deviate from its original position and that she likely only lived "[p]ossibly less than a minute" after Busby applied the tape belies any assertion that he did not intend to kill or harm the victim.  Trial Tr. (vol. 31) at 106-07. Finally, the admission of Latimer's final statement would have likely opened the door to the admission her first two statements, which placed Busby in the primary role during the offense.  Trial Tr. (vol. 38) Def.'s Ex. 3.

In sum, considering all of this evidence in its totality, the Court's confidence in the verdict is not undermined.  *Cf. Wiggins*, 539 U.S. at 535 (reciting "powerful" overlooked mitigation evidence of severe privation and abuse while in care of an alcoholic, absentee mother; physical torment, sexual molestation, and repeated rape while in foster care; periods of homelessness; and diminished mental capacities).  Accordingly, the claim against Strickland has "no merit."  While this conclusion  alone is sufficient to deny Busby's claims, in an abundance of caution, the Court turns to the second prong of the *Martinez* inquiry to determine whether state habeas counsel was ineffective.  *See Martinez*, 132 S. Ct. at 1318; *see also Trevino*, 133 S. Ct. at 1921.

### b.    Was Initial State Habeas Counsel Ineffective?

In its Amended Stay and Abeyance Order, this Court has previously noted the following:

In the state habeas court, Busby's counsel argued that there were disputed questions of material fact as to whether Busby's trial counsel rendered ineffective assistance due to the late timing of the mitigation investigation. (1 SHR 40, 42). State habeas counsel [David Richards] asserted that the convicting court's $3,000 funding cap was

---

[10] There is no question that Busby was the individual who taped the victim and ultimately caused her death. His fingerprint was lifted from the duct tape. Trial Tr. (vol. 31) at 157.  In his February 20 statement, Busby admits he taped the victim while he was alone with her at Walmart and Latimer was at the LaQuinta hotel.  Trial Tr. (vol. 31) at 73, 11; State's Ex. 99.

inadequate to uncover what additional mitigation evidence could have been discovered had the mitigation investigation begun earlier. (1 SHR 77). On state habeas counsel's subsequent motion, the convicting court granted an additional $1,000, for a total of $4,000, to complete the investigation. (1 SHR 201-03). Approximately six months later, state habeas counsel wrote a letter to the Texas Court of Criminal Appeals ("CCA") withdrawing the IAC claim as well as the related complaints about inadequate post-conviction funding. (Supp. SHR 4). Counsel stated that the additional funds proved to be adequate and he was convinced no significant additional mitigating evidence would have been discovered had trial counsel obtained the services of a mitigation expert at an earlier date. (Supp. SHR 4). The convicting court entered supplemental findings that state habeas counsel's withdrawal of the claims was in keeping with the highest standards of ethical conduct. (Supp. SHR 3). These findings were adopted by the CCA. *Ex parte Busby*, No. WR-70,741-01, 2009 WL 483096 (Tex. Crim. App. Feb. 25, 2009)(per curiam).

Am. Stay & Abeyance Order, Aug. 17, 2012, ECF No. 62. Busby included the unexhausted ineffective assistance claim in his original habeas petition in this Court, alleging that Richards withdrew the claim due to a conflict of interest based on his personal and professional relationship with Strickland.[11] *See* Pet., ECF No. 23. This Court stayed the case in 2012 and sent it back to state court so that Busby could exhaust the ineffective assistance claim, and any other claim, and so that the state trial court could revisit the circumstances surrounding state habeas counsel's withdrawal of the claim against Strickland. *See* Am. Stay Abeyance Order, Aug. 17, 2012, ECF No. 62.

Through federal counsel David Dow ("Dow" or "federal habeas counsel"), Busby filed a subsequent application in state court, raising the claim against Strickland. The State, in response, moved to hold federal habeas counsel in contempt. The Texas Court of Criminal Appeals dismissed the subsequent petition as an abuse of the writ, but sent the contempt motion back to the state court to resolve factual issues material to the merits. In his motion to reopen these proceedings, Dow advised

---

[11] At the hearing on this matter, Busby expressly withdrew this conflict-of-interest allegation.

the Court that no ruling was made on the contempt motion, as the parties reached an agreement that resulted in the motion being withdrawn. Mot. Reopen, ECF No. 69.

Busby failed to adduce sufficient evidence to establish that David Richards did not make reasonable, diligent efforts to discover new mitigation witnesses before withdrawing the ineffective assistance of counsel claim. Further, given the state court's findings and conclusions to the contrary, federal habeas counsel's allegations that he has discovered new and substantial mitigating evidence is unpersuasive. *Ex Parte Busby*, No. WR-70,747-01, at 2 (adopting the trial judge's supplemental findings and conclusions); 1st Supp. Clerk's R. at 3 ¶ 1 (finding that state habeas counsel's withdrawal of the claims was "in keeping with the highest standards of ethical conduct"); *see also* 1st Supp. Clerk's R. Ex. C (Richards Letter) at 4; 28 U.S.C. § 2254(e)(1) (The state court findings are presumed correct absent clear and convincing evidence.).

As previously stated, complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and allegations of what a witness would have stated are largely speculative. *See Gregory*, 601 F.3d at 352; *Alexander*, 775 F.2d at 602. This rule must apply equally to state habeas counsel who is alleged to have overlooked witnesses during his investigation. Busby has failed to establish that the declarants he presents were available for *Richards* to interview and that they would have provided their statements to *Richards*. The Court cannot conclude on the record that Richards *did not* meet with those named declarants or know the substance of their statements. Again, Busby did not call any of the declarants at the February 27 evidentiary hearing. Although each of the declarations provided by Busby maintain that they were available to meet with *trial counsel* and would have testified *at trial* if they had been asked, the declarations do not mention their availability to *Richards* or whether they in fact met with Richards.

27

*See generally* Harris Decl., ECF No. 80-9; Bybee Decl., ECF No. 80-10; Porter Decl., ECF No. 80-11;

Farr Decl., ECF No. 83-2; Pouncy Decl., ECF No. 83-3, Boyd Decl., ECF No. 83-4; Farr Decl., ECF

No. 83-5.

As a result, the Court finds that Busby has failed to establish that Richards provided deficient

performance.  Thus, the ineffective assistance of trial counsel claim against Strickland is procedurally

barred.  *See Martinez*, 132 S. Ct. at 1318; *see also Trevino*, 133 S. Ct. at 1921.  The Court now turns

to Busby's ineffective assistance of appellate counsel claim.

### D.      Ineffective Assistance on Appeal

Busby next contends that state appellate counsel, Strickland, was ineffective because Strickland

failed to raise as an issue on direct appeal the trial court's determination that Latimer's statements

were inadmissible.  2d Am. Pet. 143, ECF No. 79.  Respondent maintains that Strickland's performance

did not fall below the level required in *Strickland* or unduly prejudice Busby.  Am. Answer 75, ECF

No. 86.

During argument before the Court, Busby asked the Court to extend the holding in *Trevino*

and *Martinez* to excuse his procedural default of the ineffective assistance of appellate counsel claim

against Strickland.  The precedent in the Fifth Circuit does not permit the ineffective assistance of

state habeas counsel to excuse the procedural default of ineffective-assistance-of-appellate-counsel

claims.  While it may be a logical extension of *Martinez* to do so because ineffective assistance of

appellate counsel claims can only be raised for the first time in collateral proceedings, neither the

Supreme Court nor the Fifth Circuit has expanded *Martinez* to include this scenario.  *See, e.g.*, *Reed

v. Stephens*, 739 F.3d 753, 778 n.16 (5th Cir. 2014) (declining to consider petitioner's ineffective

assistance of appellate counsel claim under *Martinez*).  Thus, the ineffective assistance of appellate

counsel claim is procedurally barred, and *Martinez* does not provide an avenue for excusing the procedural default. Assuming, however, that *Martinez* does apply to ineffective assistance of appellate counsel claims, the Court will proceed to address the claim under the *Martinez* standard.

### 1.    The Statement

Trial counsel moved for the admission of three statements made by Latimer discussed in section III.C.2. above.  *See supra* Part III.C.2.   There is no question that the jury knew Latimer, like Busby, faced criminal charges for the murder.  Busby contends that  Latimer's final statement "would have corroborated Mr. Busby's statements about Latimer's primary role in the offense, including that she was the person who conceived the idea and demanded that the complainant be bound and taped to silence her." 2d Am. Pet. 143, ECF No. 79.  After Latimer invoked her Fifth Amendment right not to testify, trial counsel sought admission of the statement.  Trial counsel utilized a hearsay exception under Texas Rule of Evidence 803(24) in attempting to admit Latimer's statement.  *Id.*  The trial court excluded the statement.  *Id.*

Busby contends that had counsel raised this issue on direct appeal, "a reasonable probability exists that the Court of Criminal Appeals would have found error and reversed."  *Id.* at 145.  Busby concedes that this claim is procedurally barred, unless he meets the exception set forth in *Trevino*.  As discussed above, the Court begins its analysis under the *Trevino* test.  *See supra* Part II.D.

### 2.    Analysis

#### a.    Is the Claim Substantial?

In reviewing an ineffective assistance of appellate counsel claim, a court must determine (1) whether appellate counsel's performance was deficient, and (2) whether appellate counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.  To establish deficient performance,

29

a petitioner must show that "counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them." *Smith v. Robbins*, 528 U.S. 259, 287 (2000).  To show prejudice, the petitioner must establish "a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal." *Id*.  "Counsel need not raise every nonfrivolous ground of appeal, but should instead present '[s]olid, meritorious arguments based on directly controlling precedent.'" *Schaetzle v. Cockrell*, 343 F.3d 440, 445 (5th Cir. 2003) (citing *United States v. Williamson*, 183 F.3d 458, 463 (5th Cir. 1999)).

Texas Rule of Evidence 803(24) provides a hearsay exception for statements made against the declarant's interest.  The Rule states "[i]n criminal cases, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."  Tex. R. Evid. 803(24).  Here, Busby contends that Latimer's statement "was, unquestionably, a statement against interest under Texas law" because it "exposed her to a punishment of death in Texas."  2d Am. Pet. 144, ECF No. 79.  Busby further argues that because the statement was made "in the aftermath of a deceptive polygraph examination," it is admissible. *Id*. at 145.  In support, Busby cites to *Shiflet v. State*, 732 S.W.2d 622 (Tex. Crim. App. 1985), where he states the Texas Court of Criminal Appeals "squarely held" that statements against interest made after a failed polygraph examination are admissible as statements against interest. *Id*. However, the court's holding in *Shiflet* centered around whether the declarant was in custody, not whether it was made after a failed polygraph examination. *Shiflet*, 732 S.W.2d at 623-24 ("If we find that at the time appellant made his oral admission to the officers he was not in custody, and also find that his oral admission was given freely, voluntarily and without compulsion or persuasion, then we will hold that it was admissible, and not inadmissible, evidence.").  In determining that the declarant's

30

statement was given voluntarily while he was not in custody, the Court of Criminal Appeals held that the statements were admissible. *Id.* at 631 ("Given the unusual and peculiar circumstances of this case, we hold that the appellant was not in custody when he made his oral admission against interest to [the officers]. Appellant's oral statement was admissible evidence pursuant to Art. 38.22.").

*Shiftlet* is distinguishable from the facts here because Latimer was in custody when she made the statement against her interest. Trial Tr. (vol. 31) at 3:20-25 ("The second item which we would intend to offer . . . is a videotape of an interview conducted between Kathleen Latimer and Eric Holden while she was in custody at the behest of the District Attorney's Office."). Busby has failed to establish what corroborating circumstances existed to ensure the trustworthiness of Latimer's statement as required by Rule 803(24). *See generally* 2d Am. Pet. 143-45, ECF No. 79. As a result, the Court finds that Busby has failed to establish that the ground of error was a solid, meritorious argument based on directly controlling precedent that appellate counsel should have raised on appeal. *See Schaetzle*, 343 F.3d at 445. The Court further finds that Busby has failed to establish that Busby's claim against appellate counsel is substantial. *Cf. id.*, 343 F.3d at 445 ("[F]ailure to raise a discrete, purely legal issue, where the precedent could not be more pellucid or applicable, denies adequate representation.") (citing *Williamson*, 183 F.3d at 463 n.7). While this finding alone is sufficient to deny Busby's claims as a result of the procedural bar, in an abundance of caution, the Court turns to the second prong of the inquiry to determine whether state habeas counsel was ineffective. *See Martinez*, 132 S. Ct. at 1318; *see also Trevino*, 133 S. Ct. at 1921.

### b.   Was Initial State Habeas Counsel Ineffective?

Busby argues that state habeas counsel was deficient in failing to raise this claim. Reply 32, ECF No. 89. However, for similar reasons discussed above, the Court finds that Richards' performance

was not deficient in failing to raise the claim. As previously stated, Busby has failed to establish that the ground of error was a solid, meritorious argument based on directly controlling precedent that should have been raised. *See Schaetzle*, 343 F.3d at 445; *see also supra* Part III.D.2.a. As a result, the Court finds that Busby has failed to establish that Richards provided ineffective assistance of counsel. Thus, this Court is prevented from considering the ineffective assistance of appellate counsel claim against Strickland on the merits because the claim is procedurally defaulted. *See Martinez*, 132 S. Ct. at 1318; *see also Trevino*, 133 S. Ct. at 1921.

## III.  EIGHTH AMENDMENT - MENTAL RETARDATION[12] & MENTAL ILLNESS (CLAIMS 2 & 8)

Busby contends that his death sentence violates the Eighth Amendment to the United States Constitution because he suffers from mental retardation and severe mental illness. *See* 2d Am. Pet. 106, 167, ECF No. 79. In response, Respondent maintains that the claims are procedurally barred because the Court of Criminal Appeals "found that the allegations failed to satisfy the requirements for filing a subsequent application and dismissed the application as an abuse of the writ." Am. Answer 15, ECF No. 86. In the alternative, Respondent argues that Busby has failed to establish that he suffers from mental retardation or severe mental illness. *Id*. at 24-39, 103-08. Respondent also argues that Busby's alleged mental illness does not prohibit his sentence of death under *Atkins*, and that the claim is limitations-barred. *Id*. at 103-08. The Court addresses each issue in turn.

### A.  Applicable Law

---

[12] The briefing in this case refers to allegations of Busby's "mental retardation." *See generally* 2d Am. Pet., ECF No. 79; Am. Answer, ECF No. 86; Reply, ECF No. 89. While previous opinions referred to the term "mental retardation," the Court notes that the current preferred terminology is "intellectual disability." *See Guevara*, 577 F. App'x at 366 n.1. However, for the sake of consistency with the parties' briefing, the Court refers to the term "mental retardation" throughout this order.

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Supreme Court has held that the Eighth Amendment bars the execution of offenders suffering from mental retardation. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). In so holding, the Supreme Court left it to the states to define mental retardation. *Bobby v. Bies*, 556 U.S. 825, 831 (2009) ("Our opinion did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation 'will be so impaired as to fall [within Atkins' compass].' We 'le[ft] to the States the task of developing appropriate ways to enforce the constitutional restriction.'") (citing *Atkins*, 536 U.S. at 317). Texas law provides that "mental retardation is a disability characterized by: (1) significantly subaverage general intellectual functioning," defined as an IQ of about 70 or below; "(2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." Tex. Health & Safety Code Ann. § 591.003(13) (2013); *Blue v. Thaler*, 665 F.2d 647, 657-58 (5th Cir. 2011); *Guevara v. Stephens*, 577. F. App'x 364, 372 (5th Cir. 2014) (internal quotation marks and citation omitted). A petitioner's failure to establish any one of the elements is fatal to his claim. *Id*. at 658.

### B.    Procedural Bar

Respondent contends that Busby's Eighth Amendment claims are procedurally barred because the Texas Court of Criminal Appeals previously dismissed them on the basis that they failed to satisfy Article 11.071 § 5(a) of the Code of Criminal Procedure. Am. Answer 19, ECF No. 86. Generally, a federal court may not entertain a prisoner's habeas petition where "(1) a state court [has] declined to address [those] claims because the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." *Maples v. Thomas*,

33

132 S. Ct. 912, 922 (2012) (internal citation and quotation marks omitted). "The bar to federal review may be lifted, however, if the prisoner can demonstrate cause for the [procedural] default [in state court] and actual prejudice as a result of the alleged violation of federal law." *Id.* (internal quotation marks omitted). With respect to Article 11.071, the Fifth Circuit has determined that it is such an "'adequate and independent' procedural ground on which to base a procedural default ruling." *Aguilar v. Dretke*, 428 F.3d 526, 533 (5th Cir. 2005).

Busby contends that the Court of Criminal Appeals' dismissal constituted a ruling on the merits, rather than on a procedural defect. Reply 33, ECF No. 89. Alternatively, Busby argues that should this Court find that the procedural bar exists, "any procedural default should be excused because the execution of Mr. Busby, if he is a person with mental retardation, would constitute a miscarriage of justice." *Id.* at 34. Under the "miscarriage of justice" or "actual innocence" exception, the Supreme Court "require[s] the petitioner to show, based on the evidence proffered plus all record evidence, a fair probability that a rational trier of fact would have entertained a reasonable doubt as to the existence of those facts which are prerequisites under state or federal law for the imposition of the death penalty." *Sawyer v. Whitley*, 505 U.S. 333, 346 (1992). Here, in dismissing Busby's subsequent state habeas application, the Court of Criminal Appeals wrote: "We have reviewed this subsequent application and find that the allegations fail to satisfy the requirements of Article 11.071, § 5(a). Accordingly, we dismiss the application as an abuse of the writ *without considering the merits of the claims*. Art. 11.071, § 5(c)." *Ex parte Busby*, No. WR-70,747-02 (Tex. Crim. App. Mar. 6, 2013) (emphasis added). Accordingly, the Court finds that the Court of Criminal Appeals dismissed Busby's subsequent habeas application due to a procedural defect. With this in mind, the Court first turns to Busby's claim that he suffers from mental retardation and thus is innocent of the death penalty.

34

### C.      Mental Retardation

Busby contends that his proffered evidence establishes that: "(1) Mr. Busby's IQ, as reflected in the results of IQ tests administered to him, is significantly subaverage; (2) he has significant limitations in his adaptive functioning; and (3) he exhibited these diagnostic features before the age of eighteen." Reply 35, ECF No. 89.  The Court addresses each issue separately.

#### 1.      Facts

##### a.      *Subaverage Intellectual Functioning*

Busby first contends that his IQ is significantly subaverage as evidenced by several IQ tests administered between 2001 and 2010.  2d Am. Pet. 118-23, ECF No. 79.  Specifically, Busby was first administered an "unknown" IQ test on January 1, 2001.  *Id*. at 123.  The results of that test established that Busby obtained an IQ score of 96.  *Id*.  However, Busby maintains that the test should be disregarded, just as it was by the State, as unreliable.  *Id*. (citing S.F. vol. 36:64).

Busby next references the WAIS-III test administered by Dr. Proctor on October 14, 2005. *Id*. Busby then obtained a full-scale IQ score of 77.  *Id*.  Busby maintains that the "Flynn Effect" applies to adjust his score downward to 74.  *Id*.  Busby states that the American Association on Intellectual and Developmental Disabilities User's Guide to the 2002 American Association of Mental Retardation Manual recommends that clinicians consider the Flynn Effect when interpreting IQ scores.  *Id*. at 107. The Flynn Effect takes "into account the accepted scientific phenomenon . . . in which people are observed to perform better on intelligence tests over time as norms age." *Id*. at 119-20.  As a result, because the WAIS-III was given in 2005, ten years after it was normed in 1995, Busby's score should be lowered by 3.3 points.  *Id*. at 120 (arriving at 3.3 points where Busby maintains the average score on the WAIS-III scale improved by 0.33 points per year).

35

Busby also was administered the WAIS-III by state psychologist Dr. Sven Helge. *Id.* at 119. Busby received a full-scale score of 79. *Id.* at 119. Busby argues that, as a result of the Flynn Effect, Busby's score should be adjusted downward to 76. *Id.* at 122. Busby further contends that this score does not account for the practice effect, which artificially increases the score because he took the same test just weeks earlier. *Id.*

Additionally, on November 4, 2005, Dr. Procter administered the Beta-III test. *Id.* at 122. Busby obtained a full-scale IQ score of 81. *Id.* Busby maintains the score should be adjusted to 78.7 as a result of the Flynn Effect because the test was normed in 1998, seven years before it was administered. *Id.* (arriving at 2.3 points where Busby maintains the average score on the Beta-III scale improved by 0.33 points per year).

Finally, on February 11, 2010, while this federal challenge to his conviction and sentence was pending, Busby was administered the WAIS-IV test by Dr. Gilbert Martinez and obtained a full-scale score of 74. *Id.* at 118. Busby maintains that this score is the most reliable of the scores he received because it is the most recent. *Id.* Busby also notes that Dr. Martinez administered validity testing, known as Test of Memory Malingering ("TOMM"), which "explore[s] potential problems with response bias or intentional efforts to misrepresent cognitive symptomatology." *Id.* at 119. Busby contends that the defense expert did not detect any malingering, thus this score is the most instructive of his actual IQ or general intellectual functioning. *Id.*

  2. Analysis

With respect to the first prong, the Court finds that Busby has failed to establish that his general intellectual functioning, as reflected in the multiple results of the IQ tests administered to him, is significantly subaverage. At the outset, the Fifth Circuit has not accepted the Flynn Effect as

scientifically valid. *See In re Mathis*, 486 F.3d 395, 398 n.1 (2007) (citing *In re Salazar*, 443 F.3d 430, 433 n.1 (5th Cir. 2006)); *see also Thomas v. Quarterman*, 335 F. App'x 386, 391 (5th Cir. 2009) (agreeing with district court's findings that state court's "determination that the Flynn Effect should not be applied was not unreasonable"); *Moore v. Quarterman*, 342 F. App'x 65, 82 n.29 (5th Cir. 2009) ("The Flynn Effect has not been accepted in this Circuit as scientifically valid. More importantly for our purposes, it is not evident whether Texas courts would permit consideration of the Flynn Effect.") (internal citation and quotation marks omitted). This Court similarly declines to accept the Flynn Effect as scientifically valid. Accordingly, the Court considers the test scores actually obtained without adjustment for the Flynn Effect.

At Busby's trial, Dr. Proctor testified that the WAIS-III test that he administered to Busby was the "gold standard" for assessing intellectual abilities. Trial Tr. (vol. 36) at 40:22-25. Accounting for the standard measurement error on the WAIS-III, Dr. Proctor and the state's expert scores represent an IQ in the range of 72-82 and 74-84, respectively, well above the 70 required for mental retardation. Only the score achieved by Dr. Martinez for purposes of this federal litigation, 74, is within range of 70, when the standard measurement error is considered. But while Busby assumes that his score of 74 is actually a 69 due to the standard error of measurement, it is also possible, and given all the evidence indeed likely, that the actual score is closer to 79. An actual IQ in the 70s is consistent with the scores achieved on the earlier tests. Under these circumstances, Busby has not shown by clear and convincing evidence that he is mentally retarded. *See Sawyer*, 505 U.S. at 336 (requiring a petitioner to establish actual innocence through clear and convincing evidence). Because Busby has failed to establish the first prong of the mental retardation inquiry, the Court finds that he has failed to show that the "miscarriage of justice" or "actual innocence" exception applies. That is, Busby has

failed to show "a fair probability that a rational trier of fact would have entertained a reasonable doubt as to the existence of those facts which are prerequisites under state or federal law for the imposition of the death penalty." *Id.* at 346. Accordingly, the Court denies this claim because it is procedurally barred. *See id.*

### D. Mental Illness

#### 1. Facts

Busby contends that he suffers from "Bipolar Disorder with psychotic features, Anxiety Disorder, and a lengthy history of polysubstance dependence." 2d Am. Pet. 163, ECF No. 79. In support, Busby cites to the declaration of Dr. Bekh Bradley-Davino, who opines that "[i]t is clear that Mr. Busby's exposure to repeated, severe and chronic stressors, trauma, abuse and neglect over the course of his childhood and adolescence, impacted his functioning significantly and negatively across multiple emotional, behavioral and cognitive domains." App. Supp. 2d Am. Pet. (Bradley-Davino Decl.) 16, ECF No. 83-6.

#### 2. Analysis

Respondent contends that Busby's claim is time barred by the one-year statute of limitations period under the AEDPA. Am. Answer 104, ECF No. 86. According to Respondent, "[i]n Busby's case, the limitations period began to run on February 25, 2009, 'the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.'" *Id.* (citing 28 U.S.C. § 2244(d)(1)(A)). In reply, Busby argues that Federal Rule of Civil Procedure 15 allows the amendment of a pleading to relate back to the date of the original pleading, as long as the amendment asserts a claim or defense that arises out of the conduct, transaction, or occurrence set forth in the original pleading. Reply 45, ECF No. 89. Busby maintains that because his "claim is

38

tied to the same core of operative facts as his claim raised pursuant to *Wiggins*," the claim is timely. *Id.* This argument is unavailing. The Court finds that Busby's mental illness claim does not stem from the common core of facts supporting his *Wiggins* claim. *See, e.g., United States v. Gonzalez*, 592 F.3d 675, 680 (5th Cir. 2009) ("New claims of ineffective assistance of counsel do not automatically relate back to prior ineffective assistance claims simply because they violate the same constitutional provision."). As a result, this claim is time barred. However, even if the claim were not time barred, the Court still would find that it would be without merit.

The Supreme Court has never held that the Eighth Amendment bars the execution of mentally ill defendants. Rather, Busby argues that the Supreme Court's reasoning for barring the execution of defendants under age eighteen and defendants who are intellectually disabled should apply with equal force to the mentally ill. *See generally* 2d Am. Pet. at 156-63; *see also Atkins*, 536 U.S. at 304; *Roper v. Simmons*, 543 U.S. 551 (2005). The Fifth Circuit has clearly rejected the argument that *Atkins* and *Roper* apply to defendants with mental illness. *Turner v. Epps*, 460 F. App'x 322, 328 (5th Cir. 2012); *ShisInday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007); *In re Neville*, 440 F.3d 220 (2006). Accordingly, the Court denies this claim on the merits. *See* 28 U.S.C. § 2254(b)(2).

## IV.     SIXTH AMENDMENT - RIGHT TO COUNSEL (CLAIM 5)

In his fifth claim, Busby complains that he was deprived of counsel at a critical stage of the proceedings, which led him to make inculpatory statements to officers. 2d Am. Pet. 145, ECF No. 79. This claim was raised in state court and denied on the merits on direct appeal. Respondent contends that Busby has failed to establish that the state court's adjudication of this matter was either contrary to or involved an unreasonable application of clearly established federal law, thus this claim for relief should be denied. Am. Answer 80, ECF No. 86.

## A.    Standard of Review

This petition is subject to the AEDPA.  *See* 28 U.S.C. § 2254. The Court will address the AEDPA standards of review where applicable to the issues raised.  When a federal habeas petitioner challenges a prior state court adjudication on the merits, the AEDPA bars relitigation of the claim in federal court unless it (1) is "contrary to" federal law then clearly established in the holdings of the Supreme Court or "involved an unreasonable application of" such law, or (2) "is based on an unreasonable determination of the facts" in light of the record before the state court.  *See* § 2254(d); *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).  This determination is limited to the record that was before the state court that adjudicated the claim on the merits.  § 2254(d)(2); *Pinholster*, 131 S. Ct. at 1398.  These conditions are meant to be difficult to meet and stop short of imposing a complete bar on the relitigation of claims already rejected in state proceedings.  *Richter*, 131 S. Ct. at 786.

A state court's decision is "contrary to" Supreme Court precedent if the state court applies a rule that contradicts governing law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an different result.  *Coleman v. Thaler*, 716 F.3d 895, 901 (5th Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).  A state court's application of law is "unreasonable" when the state court identifies the correct governing legal principle but applies it unreasonably to the facts of a particular case.  *Id*. at 901-02.  The petitioner must show that the state court ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, 131 S. Ct. at 786-87; *see also White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) .  Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 131 S. Ct. at 786; *Woodall*, 134. S. Ct. at 1702 (stating a "merely wrong" holding or "clear error" will not suffice).

Factual determinations in a state court's decision are presumed correct, and a petitioner bears the burden of rebutting them by clear and convincing evidence. § 2254(e)(1); *see Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). A "decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." § 2254(d)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Titlow*, 134 S. Ct. at 15 (citing *Wood v. Allen*, 558 U.S. 290, 301 (2010)). The presumption of correctness attaches to explicit findings of fact as well as "unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Pippin v. Dretke*, 434 F.3d 782, 788 (5th Cir. 2005) (quoting *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003)). With this framework in mind, the Court turns to Busby's claims.

## B.      Applicable Law

The Sixth Amendment to the United States Constitution states, in relevant part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Under the Sixth Amendment, the right of the accused to assistance of counsel does not attach until a prosecution is commenced. *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 198 (2008). The Supreme Court has defined commencement as "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* (internal quotation marks omitted). "The rule is not mere formalism, but a recognition of the point at which the government has committed itself to prosecute, the adverse positions of government and defendant have solidified, and the accused finds himself faced with the prosecutorial

41

forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Id*. (internal quotation marks and citation omitted).

### C.   Analysis

Here, the undisputed facts, as recounted by the Court of Criminal Appeals, establish the following:

> Officer Padgett testified at the suppression hearing that, after he arrested [Busby] in Oklahoma City on February 1st, Oklahoma state charges were filed against [Busby] for unauthorized use of a motor vehicle, improper right turn, and driving with a suspended license. Padgett also testified at the suppression hearing that "within 48 hours," a "judge initial[ed] off [that] there was probable cause to make the arrest." . . .
> After being informed of and waiving his rights, [Busby] voluntarily made the February 1st through February 3rd custodial statements in Oklahoma City. On February 6th, a warrant was issued by a district judge in Fort Worth for [Busby's] arrest based on a capital-murder complaint filed that day by the Tarrant County District Attorney's Office. On Thursday, February 19th, Fort Worth detectives brought [Busby] from Oklahoma City to Fort Worth. That same day, [Busby] appeared before a Texas magistrate and requested appointment of counsel after being informed of his rights. [Busby] made the February 20th written statement, after initiating contact with Fort Worth detectives by repeatedly asking to speak to them. [Busby] also held a press conference on February 20th during which he repeated the claim that he did not mean to kill the victim when he wrapped duct tape around her face. [Busby] was appointed counsel on Monday, February 23rd. He was indicted on March 31st.

*Busby*, 253 S.W.3d at 667-68.  The court, assuming that Busby's Sixth Amendment right to counsel attached on February 19 after the magistrate hearing, held that suppression of Busby's statements on February 20 was not required "because [Busby] initiated contact with the authorities and voluntarily waived any Sixth Amendment right to counsel he may have had at the time." *Id*. at 669.  The court further noted that the February 20 statement "did not violate any statutory right to counsel because appellant freely and voluntarily made this statement only one day after his request for appointment of counsel at the Texas magistrate hearing." *Id*.

42

The state court determined that no adversary proceedings had commenced between February 1 and February 3, thus no Sixth Amendment or statutory right to counsel existed when Busby voluntarily spoke to the authorities. *Busby*, 253 S.W.3d at 669. The court further opined that even if the right attached on February 19, when he appeared before the magistrate, suppression of his statements on February 20 was inappropriate as Busby initiated the contact with the authorities, voluntarily waived his right to counsel, and the statement was made freely and voluntarily only one day after his request for appointment of counsel at the hearing. *Id*. Busby argues that the right to counsel attached when the complaint was filed, rather than when he appeared before the magistrate. Other than re-arguing the facts in his favor, however, he presents no clearly established federal authority that the right attached upon the filing of the complaint. The Court finds that the holding reached by the Court of Criminal Appeals was not "contrary to" federal law and was not "based on an unreasonable determination of the facts" in light of the record before it. *See* 28 U.S.C. § 2254(d); *Harrington*, 131 S. Ct. at 785. Accordingly, this claim for relief is denied.

## V.      FIFTH AMENDMENT - RIGHT TO REMAIN SILENT (CLAIM 6)

Busby next maintains that he was deprived of his right to remain silent when, during closing arguments at trial, the State's prosecutor made three impermissible comments on Busby's failure to testify. The state court denied the claim on direct appeal. In response, Respondent maintains that habeas relief should be denied because Busby failed to carry his burden to establish that the state court's previous rejection of this claim was either contrary to or involved an unreasonable application of clearly established federal law. Am. Answer 87, ECF No. 86.

### A.      Applicable Law

43

The Fifth Amendment to the United States Constitution states, in relevant part, that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As a result, a prosecutor is prohibited from commenting on a defendant's exercise of his Fifth Amendment rights. *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996). In determining whether a prosecutor has made such an impermissible comment, a court applies a two-tiered test: (1) the court first determines whether the remarks were constitutionally impermissible, and (2) if the court finds them to be impermissible, the court must consider whether the comment was harmless beyond a reasonable doubt. *Id.* "The test for determining whether the prosecutor's remarks were constitutionally impermissible is: (1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." *Id.* (internal citation and quotation marks omitted). In conducting this inquiry, the Court reviews the comments in context. *Id.*

## B.      The Comments

Busby complains of three of the prosecutor's statements made during closing arguments, emphasized below.

> [State] And I'll mention a few things that I think are particularly interesting, but with regard to some things that [defense counsel] said, when you boil it all down, they want you to take his word for it. There's absolutely no other evidence in the case as to the lack of intent, as to—other than what Mr. Busby told the police officers on the side of the road up there on Interstate 35, or what he told Detective Johnson in the statement of February the 20th. I didn't mean to kill her. And so they want you to buy that, lock, stock and barrel.
> . . .
> And the most interesting thing is that he gets himself really trapped in a web of lies with all of these statements he has given. Remember at the beginning of State's Exhibit 62, the tape-recorded statement, Detective Johnson says now, you really haven't told us the whole story, have you, Mr. Busby? And he said, no, I haven't. He admits to lying right there on the spot. Remember when Officer Padgett stopped him on the street?

44

He said where did you get this car? He said, well, my Aunt Geneva Coleman gave it to me. Well, do you know Laura Crane? No, I don't know her. This is the man they want you to take his word for. And he is lying to cops right there on the street. And when it comes to find out, they figure out, hey, this car is a car that he don't belong to be in, they take him in. They arrest him, do all of these things that you have heard about. Is he telling the truth? No. Did he tell Detective Johnson on the side of the road that he hadn't told him the whole story? No. He says, well, I haven't told you the whole story. *Now, on February the 20th, he again says, well, I still haven't told you the whole story. And, folks, I submit to you that it's a pretty logical deduction that he still hasn't told the whole story.*

[Defense] Objection. We object to that. That is a comment upon the Defendant's right to remain silent.

[State] I didn't get to finish my statement. He didn't tell the whole story to the police.

[Defense] He didn't —

[Court] That is overruled. The jury will recall the testimony . . . This is argument, not evidence.
. . .

[State] Oh yeah, he wants you to take his word for it that Kitty made him do it. Kitty made me do this. Kitty made me do that. I couldn't resist Kitty. Well, now he can't even keep his story straight, because in the statement that he first gave on the side of the road, they asked him why did you take her car? Well, Kitty told her [sic] that if I loved her, I would take somebody's car for her.

And then he comes along later, and why did you tape her up? I was afraid of Kitty. I was afraid Kitty was going to turn me into the police and tell everybody I did it all by myself. He can't keep it straight as to why he did it in the first place.
. . .
The most interesting thing is he keeps saying Kitty made me do it. Kitty made me do it. Well, you know, ladies and gentlemen, well, I love Kitty. I had to do all of these things because I love Kitty. I had to steal this poor woman's car who had just gone to the grocery store in the middle of the daytime two blocks from her house, but I had to because I love Miss Kitty. Well, I guess if you are married and you have got a husband or wife who gets mad at the neighbor because they make too much noise when they are having a party and you tell your spouse to go over and kill them because they are making too much noise, if you love them, I guess that would be okay with Mr. Busby; or go steal their car, that would be okay with Mr. Busby. *Now, ladies and gentlemen, this business of Kitty made me do it, that is not a defense, that is an excuse. It is high time that Mr. Busby took some responsibility for his own conduct instead of blaming it on everybody else.*

45

[Defense] Your Honor, excuse me. We object to that. That is a comment on the Defendant's failure to testify in this case, a direct comment that he should in some manner take responsibility.

[Court] I'll overrule.

. . .

[State] Remember this, Miss Kitty made him do it. But he taped her up when he was away from Miss Kitty. Here is statement 99. Did Miss Kitty make him do it? *It's time he takes responsibility in these statements to the police. He doesn't do it. He doesn't avail himself* . . .

[Defense] Excuse me, Mr. Shannon. Objection, Your Honor. Comment on the Defendant's failure to testify. Number three, we object.

[Court] All right. That is overruled.

Trial Tr. (vol. 32) at 55-65 (emphasis added).

## C. Analysis

The Texas Court of Criminal Appeals ultimately determined that "the emphasized portions of the State's jury arguments were not manifestly intended, or of such a character that the jury would have necessarily and naturally taken them, as comments on [Busby's] failure to testify." *Busby*, 253 S.W.3d at 666. In reaching this conclusion, the Court of Criminal Appeals opined that "[t]he State's closing arguments referred to inconsistencies between statements given to authorities by [Busby] and referred to specific statements made by [Busby] such as, 'I still haven't told you the whole story.' It was reasonable and proper for the prosecutor to comment on the shifting nature of [Busby's] custodial statements that were admitted into evidence." *Id.* (citing *Cruz v. State*, 225 S.W.3d 546, 549-50 (Tex. Crim. App. 2007) (noting record clearly showed that prosecutor's closing jury arguments referred to defendant's own written statement which had been admitted into evidence and was, therefore, not a comment on defendant's failure to testify); *Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004) (When a defendant makes a statement which is admitted into evidence, the State's references

46

to the statement and comparison between the statement and the other evidence collected is not a comment on the defendant's failure to testify or his right to remain silent.)).  The Court of Criminal Appeals further noted that although the State used present tense verbs, that language was not a comment on Busby's silence, but rather "the emphasized portions of its arguments referred to specific statements [Busby] had made well before trial."  *Id.* at 667 (citing *Cruz*, 225 S.W.3d at 549 ("There is, however, no particular 'trigger' word or phrase that makes any jury argument automatically improper. Rather, any objectionable argument should be evaluated on a case-by-case basis for what it would 'necessarily and naturally' mean to a jury when taken in full context of its utterance.")).  The Court finds that the holding reached by the Court of Criminal Appeals was not "contrary to" federal law and was not "based on an unreasonable determination of the facts" in light of the record before it.  *See* 28 U.S.C. § 2254(d); *Harrington*, 131 S. Ct. at 785.  Accordingly, this claim for relief is denied.

## VI.   *BRADY* VIOLATION (CLAIM 7)

Busby contends that the State committed a *Brady* violation by failing to disclose favorable evidence material to his defense at trial. 2d Am. Pet. 155, ECF No. 79.  Specifically, Busby maintains that the State failed to turn over a statement allegedly made by Latimer to the FBI.  *Id.*  Busby raised this claim in his initial petition,[13] and although the Court's abeyance order strongly encouraged him to exhaust all potential issues, he inexplicably did not raise the claim during state-exhaustion proceedings.  Respondent maintains that Busby's claim is therefore unexhausted, procedurally barred, inadequately briefed, and entirely speculative; thus, he is not entitled to relief.  Am. Answer 16, 101, ECF No. 86.

### A.   Procedural Bar

---

[13] He also moved for discovery, which the Court denied. Order, Sept. 19, 2011, ECF No. 50.

Unexhausted claims are procedurally barred from federal review unless the petitioner can establish either cause or prejudice for the failure to raise the unexhausted claim in state court, or that the failure to consider the claims on the merits would result in a fundamental miscarriage of justice. *See Coleman v. Thompson,* 501 U.S. 722 n.1 (1991); *Cantu v. Thaler*, 632 F.3d 157, 166 (5th Cir. 2011). Citing a dissenting opinion in the Ninth Circuit, Busby argues that the claim is procedurally viable under *Martinez* and *Trevino*. Reply, 44-45, ECF No. 89. The Court has found no binding authority expanding the *Martinez* exception to *Brady* claims, however. Accordingly, the claim is procedurally barred. Alternatively, the claim lacks merit.

### B.   Applicable Law

It is well established that the government violates a defendant's due process rights when it withholds evidence that is favorable to the defendant and material either to guilt or punishment, regardless of the good or bad faith of the prosecutor. *Brady*, 373 U.S. at 88. To prove a *Brady* violation, the defendant "must show that '(1) the prosecution did not disclose the evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material.'" *United States v. Davis*, 609 F.3d 663, 696 (5th Cir. 2010) (quoting *United States v. Fernandez*, 559 F.3d 303, 319 (5th Cir. 2009), *cert. denied*, 556 U.S. 1283 (2009)). "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *United States v. Severns*, 559 F.3d 274, 278 (5th Cir. 2009)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Severns*, 559 F.3d at 278).

*Giglio* extended the *Brady* rule to evidence bearing on the credibility of a witness when the reliability of that witness "may well be determinative of guilt or innocence." *See Giglio v. United*

*States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 269); *see also Davis*, 609 F.3d at 696.

A prosecutor violates *Giglio* if he denies the existence of or misrepresents the substance of a plea

agreement. *United States v. Williams*, 343 F.3d 423, 439 (5th Cir. 2003) (citing *Armour v. Salisbury*,

492 F.2d 1032, 1037 (6th Cir. 1974)).

### C.    Analysis

Busby's argument, as set forth in his second amended petition, is as follows: "Counsel for

Mr. Busby have reason to believe that the State failed to disclose favorable evidence material to his

defense at guilt-innocence and sentencing, including, but not limited to, statements made to FBI agents

by Kathleen 'Kitty' Latimer, Mr. Busby's co-defendant in his capital murder prosecution." 2d Am.

Pet. 155, ECF No. 79.  Busby further references a heavily redacted statement of a white female given

to the FBI on February 2, 2004, in Oklahoma City, Oklahoma.  App. Supp. 2d Am. Pet. (FBI Aff.),

ECF No. 83-15.

Respondent maintains that Busby's factually devoid assertion that the State withheld favorable

material evidence is insufficient to warrant consideration from the Court.  Am. Answer 102, ECF

No. 86.  In his reply, Busby again reasserts that the redacted statement given to the FBI was given

by Latimer.  Reply 44, ECF No. 89.  Busby further states, "[a]s explained in the petition, the available

information gives counsel reason to believe that the State may have failed to disclose favorable evidence

material to his defense at guilt/innocence and sentencing, including, but not limited to, statements

made to FBI agents by Kathleen Latimer."  *Id*.  During argument before the Court, however, Busby

did not dispute that a statement by the prosecutor in the trial record indicates that trial counsel knew

of the existence of the FBI statement.  Trial Tr. (vol. 31) at  8-9.  Trial counsel himself offered into

evidence a statement by Latimer that referenced her FBI statement.  Trial Tr. (vol. 38) Ex. 3.  In light

of this, Busby then changed his argument to assert that it was the *content* of the statement, not its *existence*, that was suppressed by the State.   Ultimately, Busby admitted that the claim was based on the fact that the FBI statement was simply not found in the attorneys' files.

Given that the record indicates trial counsel knew of Latimer's FBI statement, the fact that the statement was not found in counsel's files does not establish a *Brady* violation.   Further, Busby has not provided any theory under which the Court could conclude the statement would be exculpatory or material.   Indeed, all of Latimer's other statements to the authorities implicated Busby as the murderer, she did not testify as a witness, and she was an admitted liar.   *See, e.g.*, Trial Tr. (vol. 38) Exs. 1-3; 31 RR 14-42; 31 RR 41-42.   As a result, the Court finds that Busby has failed to carry his burden to establish the State withheld material, exculpatory evidence in violation of Brady.   *See Pippin v. Dretke*, 434 F.3d 782, 789 n.7 (5th Cir. 2005) ("A claim that is largely speculative with respect to the effect of the allegedly exculpatory evidence on the jury's ultimate determination of guilt or innocence cannot support a Brady violation.").

## VII.   CONCLUSION

Based on the foregoing, the Court **DENIES** Busby's petition for a writ of habeas corpus. In accordance with Federal Rule of Appellate Procedure 22(b) and 28 U.S.C. § 2253(c), and after considering the record in this case, the Court denies Busby a certificate of appealability because he has failed to make a substantial showing of the denial of a constitutional right.   *See Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); 28 U.S.C. § 2253(c)(2). If Busby files a notice of appeal, he may proceed in forma pauperis on appeal.   18 U.S.C. § 3006A(7).

**SO ORDERED** on this **10th day** of **March, 2015**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

50