IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **EDWARD LEE BUSBY,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 4:09-cv-00160-O |
| | § | |
| | § | *CAPITAL CASE* |
| | § | |
| **ERIC GUERRERO**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

## MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO RULE 60 OF THE FEDERAL RULES OF CIVIL PROCEDURE

_____

| | |
|---|---|
| David R. Dow | Jeffrey R. Newberry |
| Texas Bar No. 06064900 | Texas Bar No. 24060966 |
| University of Houston Law Center | University of Houston Law Center |
| 4170 Martin Luther King Blvd. | 4170 Martin Luther King Blvd. |
| Houston, TX 77204-6060 | Houston, TX 77204-6060 |
| Tel. (713) 743-2171 | Tel. (713) 743-6843 |
| Fax (832) 842-4671 | Fax (832) 842-4671 |
| Email ddow@central.uh.edu | Email jrnewber@central.uh.edu |

*Counsel for Edward Lee Busby*

**Table of Contents**

Index of Authorities…………………….............................................................

Table of Exhibits………………….....................................................................

I.     Introduction…………………….. ........................................................... 1

II.    Relevant factual and procedural background ........................................5

III.   Pursuant to *Ayestas*, this court's 2011 decision denying Busby
       the funds needed to obtain an expert report was wrong. .....................11

IV.    Rule 60(b)(6) is an appropriate vehicle through which Busby
       can seek redress…………………........................................................ 12

V.     Extraordinary circumstances necessitate the reopening of
       Busby's federal habeas proceeding. .................................................... 14

VI.    When the Report obtained through the funds this Court
       previously (and incorrectly) withheld is considered, it is clear
       that Busby is ineligible for execution because of intellectual
       disability…………………….. .............................................................. 19

       A.    The intellectual disability standard........................................... 19

       B.    Busby is intellectually disabled. ............................................... 21

             1.     Busby possesses significantly subaverage
                    intellectual functioning................................................. 22

                    a.     WAIS-IV (2010 and 2022) .................................. 23

                    b.     Unknown test (2001)........................................... 24

                    c.     WAIS-III (2005)................................................... 25

          d.     Beta-III (2005)........................................................ 25

          e.     WAIS-III (2005)..................................................... 26

     2.     Evidence of significant limitations in adaptive
behavior…………… ..................................................... 27

VII.   Conclusion and Prayer for Relief ......................................................... 34

CERTIFICATE OF SERVICE…………..................................................... 36

# Index of Authorities

## Cases

*Atkins v. Virginia*,
536 U.S. 304 (2002) ............................................................. 19

*Ayestas v. Davis*,
584 U.S. 28 (2018) ...................................................3-4, 11-12

*Buck v. Davis*,
580 U.S. 100 (2017) ....................................................16-18

*Busby v. Davis*,
589 U.S. 1141 (2020) ........................................................ 10

*Busby v. Davis*,
925 F.3d 699 (5th Cir. 2019) ....................................... 3, 9-10

*Busby v. Davis*,
677 F. App'x 884 (5th Cir. 2017) .........................................9

*Busby v. State*,
253 S.W.3d 661 (Tex. Crim. App. 2008) .............................5

*Crutsinger v. Davis*,
936 F.3d 265 (5th Cir. 2019) ............................................ 15

*Crutsinger v. Davis*,
929 F.3d 259 (5th Cir. 2019) ......................................13-14

*Ex parte Busby*,
No. WR-70,747-01, 2009 WL 483096 (Tex. Crim. App. Feb. 25, 2009) .............................................................................5

iv

*Ex parte Busby*,
No. WR-70,747-02, 2013 WL 831550 (Tex. Crim. App. Mar. 6, 2013)…….. ....................................................................................8

*Ex parte Busby*,
No. WR-70,747-06, 2021 WL 369737 (Tex. Crim. App. Feb. 3, (2021) ................................................................................ 2, 10

*Ex parte Cathey*,
451 S.W.3d 1 (Tex. Crim. App. 2014) ................................................22

*Gonzalez v. Crosby*,
545 U.S. 524 (2005) ............................................... 12-13, 14-15

*Hall v. Florida*,
572 U.S. 701 (2014) ........................................................................20

*In re Busby*,
No. WR-70,747-03, 2020 WL 2029306 (Tex. Crim. App. Apr. 27, 2020) ...................................................................................... 10

*In re Tex. Dep't Crim. Just.*,
710 S.W.3d 731 (Tex. Crim. App. 2025) ..............................................8

*Moore v. Texas*,
581 U.S. 1 (2017) ............................................................................19-21

*Saldano v. Texas*,
530 U.S. 1212 (2000) ........................................................ 17

## Other authority

AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports (11th ed. 2010) ........................................................19-21

APA, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013)…………......................................................................................19-21

# Table of Exhibits

Exhibit 1          Dr. Gilbert Martinez's July 11, 2022, Report

Exhibit 2          Dr. Antoinette McGarrahan's April 21, 2023, Report

Exhibit 3          State's Proposed Findings of Fact and Conclusions of
                   Law

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **EDWARD LEE BUSBY,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL NO. 4:09-cv-00160-O |
| | § | |
| | § | *CAPITAL CASE* |
| | § | |
| **ERIC GUERRERO**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

_____

**MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO
RULE 60 OF THE FEDERAL RULES OF CIVIL PROCEDURE**
_____

## I.    Introduction

Pursuant to Federal Rule of Civil Procedure 60(b)(6), Petitioner

Edward Lee Busby, Jr.--who is currently scheduled to be executed on

Thursday, May 14, 2026, after 6 o'clock p.m. --requests relief from this

Court's March 10, 2015, Memorandum Opinion and Order and Final

1

Judgment denying him relief on his petition for writ of habeas corpus. *See* Final J., ECF No. 101; Mem. Op. & Order, ECF No. 100.

Previously, Busby was scheduled to be executed on February 10, 2021. The Texas Court of Criminal Appeals ("CCA") stayed Busby's execution in 2021 because it believed that he had made a threshold showing that he is intellectually disabled and therefore ineligible for execution. *Ex parte Busby*, No. WR-70,747-06, 2021 WL 369737, at *1 (Tex. Crim. App. Feb. 3, 2021). Pursuant to the resulting state-court remand proceeding (and pursuant to the state trial court's granting the request for funding this Court had previously denied), experts for both Busby and the State found that Busby is, in fact, intellectually disabled.[1] These are the only experts who have formed an opinion about whether Busby is intellectually disabled since his 2005 capital murder trial.

This Court previously found Busby's claim that he is ineligible for execution due to intellectual disability to be both procedurally defaulted and without merit, largely because Busby could not produce any report from any

---

[1] These reports, which include Dr. Gilbert Martinez's July 11, 2022, Report and Dr. Antoinette McGarrahan's April 21, 2023, Report are both discussed thoroughly below and are both attached as Exhibits 1 and 2, respectively, of this Motion. As Dr. McGarrahan's Report makes clear, she was retained by Counsel for the State. Exhibit 2 at 1.

expert opining that he is intellectually disabled. Mem. Op. & Order 33-34, 36-38, ECF No. 100. While the United States Court of Appeals for the Fifth Circuit disagreed with this Court regarding whether Busby's claim was exhausted, it agreed that the lack of a report from an expert was fatal to Busby's claim for relief. *Busby v. Davis*, 925 F.3d 699, 710, 716-20 (5th Cir. 2019).

The reason the record before this Court did not previously contain at least one report like the two generated during the recent state court remand proceeding (which are attached as Exhibits of this Motion) is that this Court denied Counsel's multiple requests for the funds that were reasonably necessary to obtain such a report. *See, e.g.*, Order Den. Appl. Funds, ECF No. 55. The Court denied funding in adherence to the then-controlling rule of the Court of Appeals that to be entitled to funds to develop a claim, a petitioner must demonstrate, *inter alia*, that his claim is procedurally viable. *Id.* at 1-2 (*quoting Woodward v. Epps*, 580 F.3d 318, 334 (5th Cir. 2009)).

The Supreme Court has since expressly held that requested funds are reasonably necessary even if there is only a credible chance the claim which a petitioner is attempting to develop is procedurally viable. *Ayestas v. Davis*,

3

584 U.S. 28, 45-46 (2018). Under *Ayestas*, this Court's 2011 decision denying Busby the funds necessary to obtain an expert report opining that he is intellectually disabled was incorrect because it was based on this Court's belief that Busby could not conclusively demonstrate that the funds he requested would lead to a procedurally viable claim. ECF No. 55 at 1-2.

While a change in decisional law--like *Ayestas*--does not always constitute the extraordinary circumstances required to reopen a federal habeas proceeding pursuant to Rule 60(b)(6), this Court should find, for two reasons, that, in the present context, *Ayestas* does represent an extraordinary circumstance. First, as a general matter, *Ayestas* constitutes an extraordinary circumstance because its issuance has made clear that an eligibility claim was previously improperly reviewed (even if the Court of Appeals has found differently with respect to non-eligibility claims). Second, in this particular case, *Ayestas* represents an extraordinary circumstance because the State of Texas seeks to execute Busby even though every expert--i.e., experts for both Busby and the State--who has evaluated him since 2005 believes he is ineligible for execution. Indeed, the very office that asked the trial court to schedule Busby's execution also asked the trial court less than three years

ago to find Busby to be ineligible for execution because he is intellectual disabled.[2]

## II.     Relevant factual and procedural background

Busby was convicted in November 2005 of a capital murder committed in January 2004. *Busby v.* State, 253 S.W.3d 661, 663 (Tex. Crim. App. 2008). He was sentenced to death by the trial court in 2005. *Id.* The CCA affirmed his conviction and sentence on direct appeal in 2008. *Id.* at 673. Busby then filed an application post-conviction writ of habeas corpus in the state habeas court, and the Court of Criminal Appeals denied him relief in February 2009. *Ex parte Busby*, No. WR-70,747-01, 2009 WL 483096, at *1 (Tex. Crim. App. Feb. 25, 2009).

On April 13, 2009, this Court appointed undersigned Counsel Dow to represent Busby in this federal habeas proceeding. Order Appointing Counsel 1, ECF No. 3. Busby filed a Petition for Writ of Habeas Corpus in this Court on February 25, 2010, and an amended petition on May 24, 2010. Pet. Writ Habeas Corpus, ECF No. 23; Am. Pet. Writ Habeas Corpus, ECF No. 25. Busby raised several issues in his Amended Petition, including that

---

[2] A copy of the State's Proposed Findings of Fact and Conclusions of Law filed in the state habeas trial court on July 25, 2023, is attached to this Motion as Exhibit 3.

his death sentence violates the Eighth and Fourteenth Amendments pursuant to the Supreme Court's opinion issued in *Atkins v. Virginia*, 536 U.S. 304 (2002), because he is intellectually disabled. ECF No. 25 at 114-43.

Counsel employed Gilbert Martinez in 2010 at Counsel's own expense to administer an intelligence test to Busby, believing Busby likely to be intellectually disabled. *See* Pet'r's Appl. Authorization Funds Pursuant § 3599 at 3-4, ECF No. 49. Dr. Martinez administered the WAIS-IV to Busby on Feb. 11, 2010, and found that Busby possesses a full-scale IQ score of 74. *Id.* On September 9, 2011, Busby filed a motion requesting this Court authorize funds to obtain the reasonably necessary services from a mental disability expert, pursuant to 18 U.S.C. § 3599. ECF No. 49. Busby sought the funds so that an expert, specifically, Dr. Stephen Greenspan, could determine whether Busby is intellectually, given that Dr. Martinez had found him to possess a full-scale IQ score indicative of significantly subaverage intellectual functioning. *Id.* at 20. This Court denied the requested funds, believing Busby could not show the funds were reasonably necessary because he could not conclusively demonstrate the claim he sought to develop was procedurally viable. ECF 55 at 2-3. The Court then opined that even if the

6

claim Busby sought to develop was not procedurally defaulted, the requested funds were not reasonably necessary because Busby could not show he possessed significantly subaverage intellectual functioning. *Id*. at 8.

The Court then ordered this proceeding be stayed and held in abeyance so that Busby could attempt to exhaust his claim in the state court. Am. Stay & Abeyance Order 1, ECF 62. The same day, the Court ordered Undersigned Counsel Dow to seek funding from the state court for his legal services, writing § 3599 was not intended to supplant any state procedure for appointing and paying attorneys. Order Directing Counsel Seek State Funding 1, ECF 61. Both to adhere to this Court's instruction to seek payment from the state court and to seek from the state court funds necessary to develop Busby's claim, which this Court had previously denied, Busby filed a motion in the state trial court that asked that court to appoint Undersigned Counsel to represent him in his subsequent state habeas proceeding. Ex Parte Mot. Appointment Counsel, *Ex parte Busby*, Cause No. 0920589A (Tarrant Cnty. Crim. Ct. No. 2, Aug. 17, 2012). On September 7, 2012, the trial court denied the motion for appointment of counsel because it lacked jurisdiction to rule on the motion. Order, *Ex parte Busby*, Cause No.

0920589A (Tarrant Cnty. Crim. Ct. No. 2, Sept. 7, 2012). A trial court cannot act on a subsequent application for writ of habeas corpus until after the Texas Court of Criminal Appeals authorizes it to do so. *Id.*; *see also* Tex. Code Crim. Proc. art 11.07, § 5(a). A trial court is similarly without authority to rule on related motions such as a motion to appoint counsel, or to authorize funds reasonably necessary to develop meritorious claims. *See In re Tex. Dep't Crim. Just.*, 710 S.W.3d 731, 737-38 (Tex. Crim. App. 2025).

Pursuant to this Court's Order, Busby filed a subsequent application for habeas corpus in the state habeas trial court in October 2012. Because neither this Court nor the state court had granted the funds necessary to obtain a report from an expert opining that Busby is intellectually disabled, his then-*Atkins* claim was supported only by the full-scale IQ score Dr. Martinez obtained in 2010 and was identical, in all relevant respects, to the claim contained in his amended petition filed in this Court. Months later, the CCA dismissed Busby's habeas application because it found that the claim failed to satisfy the dictates of section 5, purporting to do so without considering the merits of Busby's *Atkins* claim. *Ex parte Busby*, No. WR-70, 747-02, 2013 WL 831550, at *1 (Tex. Crim. App. Mar. 6, 2013).

8

After subsequently returning to this Court, Busby filed a Second Amended Petition for a Writ of Habeas Corpus on March 27, 2014. Second Amended Petition for a Writ of Habeas Corpus, ECF 79. On March 10, 2015, this Court entered its order denying Busby relief (the order from which he now seeks relief). ECF No. 100. As mentioned above, with respect to Busby's *Atkins* claim, this Court found that the claim was procedurally defaulted because Busby could not demonstrate it would be a miscarriage of justice to execute him because the Court believed that an individual must have an IQ of 70 or below to be intellectually disabled and the Court furthered believed Busby's actual IQ score to likely be "in the 70s." ECF No. 100 at 37.

On appeal, the Fifth Circuit granted a certificate of appealability, finding that reasonable jurists would debate both whether Busby possesses significantly subaverage intellectual functioning and whether his claim was procedurally defaulted. *Busby v. Davis*, 677 F. App'x 884, 888-89 (5th Cir. 2017). On May 20, 2019, the Fifth Circuit issued its opinion affirming this Court's decision denying Busby relief on his *Atkins* claim. *Busby v. Davis*, 925 F.3d 699, 702. In its opinion, the Court of Appeals noted that "no expert

has ever opined that Busby is intellectually disabled." *Id.* at 706. The Supreme Court denied certiorari on January 13, 2020. *Busby v. Davis*, 589 U.S. 1141 (2020).

Busby was initially scheduled to be executed in May 2020, but that execution was stayed due to the global pandemic. *In re Busby*, No. WR-70,747-03, 2020 WL 2029306, at *1 (Tex. Crim. App. Apr. 27, 2020). After executions resumed following the pandemic-related pause, Busby was again scheduled to be executed on February 10, 2021. Ahead of that planned execution, Counsel presented Busby's *Atkins* claim to the CCA again, and the Court found that Busby's claim made a threshold showing that he is intellectually disabled pursuant to the Supreme Court's opinion issued in *Moore v. Texas*, 581 U.S. 1 (2017), and remanded the claim to the state habeas trial court for further proceedings. *Ex parte Busby*, No. WR-70,747-06, 2021 WL 369737, at *1 (Tex. Crim. App. Feb. 3, 2021).

Following the remand, the state trial court at last granted Busby the funds necessary to obtain an opinion from an expert regarding whether Busby is intellectually disabled (funds Counsel had been seeking since 2009). Counsel utilized those funds to employ Dr. Gilbert Martinez. Dr. Martinez's

10

opinion, announced in his July 11, 2022, Report (attached as Exhibit 1) is that Busby is intellectually disabled.

### III. Pursuant to *Ayestas*, this Court's 2011 decision denying Busby the funds needed to obtain an expert report was wrong.

This Court denied the funds which were necessary to obtain a report from an expert opining on whether Busby is intellectually disabled because it believed Busby could not show the *Atkins* claim he sought to develop was procedurally viable. ECF 55 at 2-3. This Court held, in the alternative, that even if the claim Busby sought to develop was not procedurally defaulted, the requested funds were not reasonably necessary because Busby could not show he possesses significantly subaverage intellectual functioning. *Id.* at 8. This Court's ruling was predicated on then-authoritative Fifth Circuit precedent.

However, in *Ayestas v. Davis*, 584 U.S. 28 (2018), the Supreme Court held that "the United States Court of Appeals for the Fifth Circuit's interpretation of § 3599(f) is not a permissible reading of the statute"; the Court struck down the Fifth Circuit's heightened "substantial need" standard. *Ayestas*, 584 U.S. at 48 (i.e., the standard this Court had relied upon). The Court ruled that the proper interpretation of the reasonably

necessary statutory standard does not require a petitioner to demonstrate a substantial need or to present a viable constitutional claim that is not procedurally barred. *Id.* at 45-46. Moreover, in cases where funding has a credible chance of enabling a petitioner to overcome procedural default, it may be an error for courts to refuse funding on the grounds that the request is not reasonably necessary. *See id.* at 46. The Court clarified that, when assessing funding requests, district courts should consider factors such as the potential merits of the claims, the likelihood that the services will generate useful evidence, and the relevance of any procedural hurdles to the merit determination. *Id.* at 46-47.

*Ayestas* makes clear this Court erred in denying Busby the funds necessary to obtain an expert report. But for this error, the record previously before the Court would have contained a report similar to Dr. Martinez's July 11, 2022, Report.

## IV.   Rule 60(b)(6) is an appropriate vehicle through which Busby can seek redress.

Federal Rule of Civil Procedure 60(b) allows a party seeking relief from a final judgment to request the reopening of their proceeding under a limited set of circumstances. *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005). A

Rule 60(b)(6) motion is not a successive habeas petition when it addresses a defect in the integrity of an initial federal habeas proceeding, and not the legality of the petitioner's confinement or the district court's earlier resolution of his claims. In *Gonzalez v. Crosby*, the Supreme Court found that the petitioner's Rule 60(b)(6) motion was not a successive habeas petition, because it did not assert or reassert claims for relief from the petitioner's sentence, but rather only challenged the district court's ruling regarding whether AEDPA's statute of limitations barred him from obtaining federal habeas relief. *Gonzalez*, 545 U.S. at 535-36, 538. As the Court explained, when a Rule 60(b) Motion attacks a *defect in the integrity* of a federal habeas proceeding, rather than the substance of the federal court's resolution of a claim, the motion is not considered a successive habeas petition, and the district courts are thereby not procedurally barred from deciding the merits of any argument properly raised in the motion. *Id.* at 532.

Following the Supreme Court's decision in *Ayestas*, Counsel for Billy Jack Crutsinger filed a Rule 60(b)(6) motion, asking the federal district court to reopen his federal proceeding on the basis that there was a defect in the integrity of his initial proceeding because the district court had misapplied

13

the law when evaluating his request for funds under § 3599. *Crutsinger v. Davis*, 929 F.3d 259, 263-64 (5th Cir. 2019). The district court concluded that Crutsinger's Rule 60(b)(6) motion was a successive petition for habeas relief and therefore believed it lacked jurisdiction to issue a ruling on the merits of the motion. *Id.* at 268. The Fifth Circuit disagreed, holding that Crutsinger's Rule 60 motion was not a successive petition because it addressed a defect in the integrity of his initial federal habeas proceeding -- specifically the wrongful denial of funds pursuant to § 3599. *Id.* at 268. Because the Rule 60 motion was confined to challenging the district court's denial of funding in his first habeas proceeding, the court reasoned that Crutsinger's motion was analogous to the one presented in *Gonzalez*. *Id.* at 265-66.

The Court of Appeals' decision in *Crutsinger* dictates a finding by this Court that Busby's Motion does not constitute a successive habeas petition and can therefore proceed in a motion file pursuant to Rule 60.

## V. Extraordinary circumstances necessitate the reopening of Busby's federal habeas proceeding.

To demonstrate "any other reason justifying relief" under Rule 60(b)(6)'s catch-all provision, a petitioner must demonstrate that

14

extraordinary circumstances exist to reopen the district court's final judgment. *Gonzalez*, 545 U.S. at 535. The Supreme Court has explained that extraordinary circumstances are rare in the habeas context and that a change in decisional law after entry of judgment alone does not justify relief from a final judgment. *Id.* at 535-36.

In the case of Billy Jack Crutsinger, mentioned above, the Court of Appeals found that the change in decisional law announced in *Ayestas* did not constitute the extraordinary circumstances necessary to reopen his federal habeas proceeding. *Crutsinger v. Davis*, 936 F.3d 265, 270-71 (5th Cir. 2019). This Court should find Busby's Motion is different from Crutsinger's Motion for at least two reasons.

First, Busby's motion alleges an error that affected this Court's resolution of a claim that asked this Court to determine whether he is eligible for a death sentence. The funding request at issue in *Crutsinger* sought to develop a claim that trial counsel provided Crutsinger ineffective assistance. *Crutsinger v. Davis*, No. 4:07-cv-00703-Y, 2019 WL 3749530, at *2 (N.D. Tex. Aug. 8, 2019). That Busby's funding motion sought to develop a claim that he is intellectually disabled--and thus constitutionally ineligible for

15

execution--makes his Motion fundamentally different from Crutsinger's. Moreover, we now know that the funds could have yielded (and have since yielded) precisely the item both this Court and the Court of Appeals faulted Busby for not previously possessing: an opinion from an expert opining that he is intellectually disabled.

Of course, now not one, but two, experts have now opined that Busby is intellectually disabled: both the expert Counsel employed, and the expert employed by Counsel for the State. This fact makes Busby's motion similar in at least one respect to the Rule 60(b) motion filed by Duane Buck.

In its opinion issued in *Buck v. Davis*, 580 U.S. 100 (2017), the Supreme Court found that Duane Buck's Rule 60(b)(6) motion satisfied *Gonzalez*'s extraordinary circumstances requirement. *Buck*, 580 U.S. at 124. A jury had convicted Buck of capital murder and sentenced him to death after affirmatively finding him to be a future danger, based on Dr. Walter Quijano's expert testimony that Buck's race was a pertinent factor in predicting future dangerousness. *Id.* at 104. Buck filed a Rule 60(b)(6) motion asking the federal district court to reopen his proceedings, grounded primarily in the extraordinary circumstances surrounding Dr. Quijano's

testimony, though he also cited a change in decisional law. *Id.* at 114 -15. The district court denied Buck's Rule 60(b)(6) motion, finding that Buck had failed to demonstrate extraordinary circumstances. *Id.* at 114. Agreeing with the district court, the Fifth Circuit denied his COA on the claim. *Id.* at 114-15. However, the Supreme Court reversed the Fifth Circuit's judgment, holding that Buck was entitled to relief under Rule 60(b)(6) and that the district court abused its discretion in denying his motion. *Id.* at 123, 128. The Court reasoned it is highly likely that Buck was sentenced to death in part because of his race, and relying on race in any way to impose a criminal sanction is a fundamental constitutional violation and poisons public confidence in the judicial process. *Id.* at 119, 123-24.

Moreover, "[t]he extraordinary nature of [Buck's] case is further confirmed by what the State did in response to Dr. Quijano's testimony." *Id.* at 124. In a prior case in which Dr. Quijano similarly testified that the petitioner's race weighed in favor of a finding of future dangerousness, the State confessed error in the introduction of race as a sentencing factor and consented to resentencing before the Supreme Court. *Id.* at 109, 124; *see also* *Saldano v. Texas*, 530 U.S. 1212 (2000). Additionally, the Texas Attorney

17

General issued a public statement addressing the cases in which Dr. Quijano testified, affirming that "it is inappropriate to allow race to be considered as a factor in our criminal justice system," and identifying six similar cases in which Dr. Quijano's testimony injected race into capital sentencing proceedings. *Buck*, 580 U.S. at 109, 124 (reflecting the Attorney General's identification of Buck as one of the six defendants). The Court highlighted how remarkable the State's response of consenting to resentencing was, because "[i]t is not every day that a State seeks to vacate the sentence of five defendants found guilty of capital murder." *Id.* at 125. However, while Buck was initially identified by the Attorney General as one of the defendants whose capital sentencing was improperly affected by Dr. Quijano's testimony, the State refused to confess error and resentence Buck. *Id.* at 109-10, 125.

Dr. Antoinette McGarrahan was employed by Counsel for the State to determine whether Busby is intellectually disabled. She agreed with Dr. Martinez's opinion. *See* Exhibit 2. Accordingly, with its own expert agreeing that Busby is ineligible for execution, Counsel for the State filed Proposed Findings of Fact and Conclusions of Law, urging the state habeas trial court

to find that Busby is ineligible for execution because of intellectual disability. That the same office would seek to execute an offender it has acknowledged to be ineligible for execution is extraordinary in precisely the same way it was for the Attorney General's Office to concede error in Duane Buck's case but then refuse to retry him.

**VI.    When the Report obtained through the funds this Court previously (and incorrectly) withheld is considered, it is clear that Busby is ineligible for execution because of intellectual disability.**

### A.    The intellectual disability standard

The execution of an intellectually disabled person violates the Eighth Amendment's proscription against cruel and unusual punishment. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). Intellectual disability is characterized by (1) significantly subaverage intellectual functioning, (2) accompanied by significant limitations in adaptive behavior, (3) the onset of which occurs prior to the age of 18. *See* AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports 27 (11th ed. 2010) ("2010 AAIDD Manual"); APA, Diagnostic and Statistical Manual of Mental Disorders 37 (5th ed. 2013) ("DSM-V"); *see also Moore*, 581 U.S. at 7.

19

Significantly subaverage intellectual functioning is defined as an IQ score that is approximately two standard deviations below the mean, adjusted for the standard error of measurement. 2010 AAIDD Manual at 27; DSM-V at 37. For IQ tests that have a standard deviation of 15 points, such as the Weschler Scales, an IQ score of 70 is two standard deviations below the mean, and the standard error of measurement is approximately 5 points. DSM-V at 37.

A court must account for an IQ test's standard error of measurement when assessing an *Atkins* claim, as is advanced by the APA and AAIDD. *Moore*, 581 U.S. at 13. For that reason, the Supreme Court has invalidated statutes that have a strict IQ test score cutoff. *Hall v. Florida*, 572 U.S. 701, 722 (2014). Furthermore, the AAIIDD recommends that clinicians take the Flynn Effect (discussed in greater detail below) into account when interpreting IQ scores and assessing intellectual functioning. *See* 2010 AAIDD Manual at 37.

The AAIDD Manual requires that there be "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical skills." 2010 AAIDD Manual at 5. "Significance" can be established if an

individual's adaptive skills fall two or more standard deviations below the mean in at least one of the three domains. *Id.* at 43; *see also Moore*, 581 U.S. at 15-16.

The AAIDD Manual provides examples of "representative skills" in each of the three domains. Representative conceptual skills are "language; reading and writing; and money, time, and number concepts." 2010 AAIDD at 44. Representative social skills are "interpersonal skills, social responsibility, self-esteem, gullibility, naiveté (i.e., wariness), follows rules/obeys laws, avoids being victimized, and social problem solving." *Id.* Representative practical skills are "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone." *Id.*

### B.    Busby is intellectually disabled.

Busby is intellectually disabled. The evidence shows that: (1) he possesses significantly subaverage intellectual functioning; (2) he has significant limitations in his adaptive functioning; and (3) he exhibited these diagnostic features before the age of eighteen.

### 1.   Busby possesses significantly subaverage intellectual functioning.

When assessing an individual's level of intellectual functioning based on an IQ score, the accepted scientific phenomenon known as the "Flynn Effect"—in which the general population's average IQ score is observed to perform better on intelligence tests over time—should be taken into account. *See* 2010 AAIDD Manual at 37. Flynn's empirical research has demonstrated that the average IQ score obtained by any given group on the Wechsler scale has historically increased by approximately 0.33 points per year. *Id.*

In *Ex parte Cathey*, 451 S.W.3d 1 (Tex. Crim. App. 2014), the CCA noted that the preferred solution to account for the Flynn Effect is to retest individuals with a recently normed version of an IQ test rather than adjusting an individual's score for the Flynn Effect. *Ex parte Cathey*, 451 S.W.3d 1, 16 (Tex. Crim. App. 2014). However, if it is not possible to retest an applicant with a recently normed test, the impact of the Flynn Effect on an individual's IQ score can be considered. *Id.* at 17. As more recently normed IQ tests are more reliable, Busby's IQ scores obtained from the WAIS-IV will be discussed first. The IQ scores Mr. Busby received from other IQ tests will be subsequently discussed in chronological order.

### a.    WAIS-IV (2010 and 2022)

As noted above, on February 11, 2010, Dr. Gilbert Martinez administered the Wechsler Adult Intelligence Scales—Fourth Edition ("WAIS-IV") to Mr. Busby. Exhibit 1 at 2-3. Busby obtained a full-scale IQ score of 74. Exhibit 1 at 2. Given the standard error of measurement, this means Busby's IQ was between 70 and 79. *Id.*

As part of the 2010 administration, Dr. Martinez administered validity testing—specifically, a standardized measure called the Test of memory malingering ("TOMM")—to determine whether Busby was performing to the best of his abilities. Exhibit 1 at 2. The results of the validity testing were "consistent with good effort" on Busby's part, meaning there is no reason to believe Busby malingered during the cognitive testing. *Id.*

On February 25, 2022, Dr. Martinez again administered the WAIS-IV to Busby. Exhibit 1 at 7. Busby obtained a full-scale IQ score of 81. *Id.* The report notes the seven-point increase was likely caused by both the Flynn Effect and the practice effect. Exhibit 1 at 25-26. Because the WAIS-IV was published in 2008 (fourteen years before the 2022 administration), Dr. Martinez believes that, to account for the Flynn Effect, Busby's 2022 score

23

should be adjusted by four points. *Id.* Accounting for this adjustment,

Busby's Flynn-adjusted score is 77. *Id.*

Dr. Martinez believes the practice effect also had an impact on

Busby's 2022 score. Exhibit 1 at 25-26. "Practice effects refer to gains in

standardized test scores that result from a person being tested a second time

using the same instrument." Exhibit 1 at 25; *see also* 2010 AAIDD Manual at

38. Despite a lack of universal agreement on quantitative score adjustments,

the practice effect has shown increases of 2.5 points in verbal IQ and up to

eight points in performance IQ. Exhibit 1 at 25.

Dr. Martinez believes that when both the Flynn and practice effects

are taken into account, Busby's 2022 score of 81 is consistent with his 2010

score of 74. Exhibit 1 at 25-26.

### b.   Unknown test (2001)

The record reflects that an unidentified test administered by an

unknown individual in uncertain testing conditions rendered an IQ score of

96. 36 R.R. 49.[3] The score was considered unreliable by the State  at trial and

was disregarded. 36 R.R. 64 (noting that there was "probably . . . something

---

[3] The Reporter's Record of Busby's 2005 capital murder trial is cited herein as [volume number] R.R. [page number].

wrong with the results"). Because neither the type of test nor the testing conditions—including whether Busby was even the individual who took the test—are known, the score should similarly be disregarded now.

### c.     WAIS-III (2005)

On October 14, 2005, psychologist Dr. Timothy Proctor administered the WAIS-III to Mr. Busby. 36 R.R 53. He obtained a FSIQ of 77. *Id.* The WAIS-III was normed in 1995, 10 years before the test was administered. *Id.* Thus, Busby's score of 77 on the WAIS-III in 2005 is equivalent to his having scored, rounding up, a 74 (77–3.3 = 73.7), where the mean is 100 after adjusting for the Flynn Effect. When the Flynn Effect is considered, Busby's performance on this test was identical to what he obtained on the WAIS-IV in 2010 and represents significantly sub-average intellectual functioning and is within the range at which a diagnosis of intellectual disability may be made.

### d.     Beta-III (2005)

On November 4, 2005, days before the trial on the merits began, psychologist Dr. Timothy Proctor administered the Beta-III to Busby. Dr. Proctor estimated that, based on this test, Busby's FSIQ was approximately 81. 36 R.R. 53. Despite their similarities, the Weschler Scales and the Beta-

III test differ greatly in their reliability. In Dr. Proctor's words, the Weschler Scales are the "gold standard of IQ tests," while the Beta-III is a "quick and dirty kind of intelligence test." 36 R.R. 40, 48. Accordingly, Busby's score on the Beta-III should not be regarded to be as reliable a score as the IQ score from the WAIS-IV, or even the WAIS-III.

### e.    WAIS-III (2005)

Just weeks after the Wechsler Adult Intelligence Scales—Third Edition ("WAIS-III") was administered to Busby by psychologist Dr. Timothy Proctor, Busby was tested with the WAIS-III by the State's psychologist, Dr. Sven Helge. 36 R.R. 61. Although never admitted into evidence, it appears from the transcript of the trial that the State's expert, Dr. Helge, obtained a full-scale IQ score of 79. 36 R.R. 77. The WAIS-III was normed in 1995, approximately ten years before Dr. Helge administered the test. Taking the Flynn Effect into account, Busby's WAIS-III score could be considered to be 76. Exhibit 2 at 3. Moreover, because Dr. Helge administered this test to Busby only weeks after Dr. Proctor administered the same measure, it is appropriate to take the practice effect into account when considering this test. On the Weschler Scales, there is a reported IQ

26

score increase between 2.0 and 3.2 points when individuals are retested at three- and six-month intervals. Michael R. Basso, et al., *Practice Effects on the WAIS-III Across 3-and 6-Month Intervals*, 16 Clinical Neuropsychologist 57, 58 (2002).

When the Flynn and practice effects are taken into account, Busby's score on this test is consistent with both the score he obtained on the WAIS-III administered by Dr. Proctor in 2005 and the score he obtained on the WAIS-IV administered by Dr. Martinez in 2010.

### 2. Evidence of significant limitations in adaptive behavior

Busby also meets the second prong of the definition of intellectual disability: he possesses significant limitations in adaptive behavior. Busby possesses significant limitations in his conceptual, social, and practical skills.

Dr. Gilbert Martinez conducted interviews and standardized tests to assess Busby's adaptive behavior. Dr. Martinez evaluated Busby's conceptual skills (literacy, self-direction, and the concepts of money, numbers, and time), practical skills (personal care, money, occupational skills, maintaining a schedule/routine, use of a telephone, and

transportation), and social skills (interpersonal skills, social responsibility, self-esteem, naivety, obeying laws, and following rules). Exhibit 1 at 24-25.

Dr. Martinez conducted in-depth interviews of Busby's sisters, Kimiko Coleman and Tarsharn Busby, who provided an account of his adaptive behaviors as a child and an adult. Exhibit 1 at 8-12. During her interview, Tarsharn Busby expressed that Busby had difficulty communicating. Exhibit 1 at 8. Ms. Busby recalled that Busby did not learn to count or how to perform basic mathematical tasks until the third grade. Exhibit 1 at 9. She also explained that while he eventually could read the numbers on an analog clock, he failed to comprehend their meaning in relation to time. *Id.* His inability to understand time impacted his ability to maintain a routine or schedule. *Id.*

Ms. Busby expressed that Busby lacked impulse control and the understanding of the consequences of his actions. Exhibit 1 at 9. Busby was dependent on others to help make decisions for him. *Id.* Ms. Busby remembered that, as a child, Busby did not engage in creative or imaginative play. Exhibit 1 at 9. According to Ms. Busby, Busby was an affectionate child but did not like to share. *Id.* As a child, Busby was bullied by other children

28

because he was in special education classes. *Id.* Ms. Busby reported that Busby did not help with chores around at home and had a limited understanding of what needed to be done around the house. Exhibit 1 at 9.

Ms. Busby recounted that Busby had difficulty managing his finances and making medical appointments. Exhibit 1 at 10. He did not understand budgeting and would make impulsive and unnecessary purchases if left alone to decide what to do with any money he had. *Id.*

Ms. Busby shared that Busby engaged in concerning behavior when he was younger, such as bringing snakes into the family home and overdosing on medication. Exhibit 1 at 10. Ms. Busby recalled that Busby held only one job in his lifetime, as a dishwasher at a steakhouse. *Id.* Although he did tell her why he was fired, she understood that he missed many shifts due to his inability to follow a schedule. *Id.*

Busby's other sister, Kimiko Coleman, provided similar insights into Busby's childhood and adaptive behavior. Ms. Coleman expressed that her brother's communication skills were below average: he slurred his speech and their mother tried to enroll him in speech therapy at his school when he

was eight. Exhibit 1 at 10. Ms. Coleman stated that Busby was in special education classes at school. Exhibit 1 at 11.

Ms. Coleman said that Busby had "zero" self-control. Exhibit 1 at 11. He started throwing tantrums from a young age and, throughout his life, his reactions and choices largely depended on his mood. *Id.* Ms. Coleman explained that while Busby could initiate tasks, he was not motivated to, and usually did not, complete them. Exhibit 1 at 11. She stated that Busby was unable to sit through an entire movie because of his limited attention span. *Id.* He was prone to quit or cheat during games because he did not understand the rules. *Id.*

Ms. Coleman described Busby as immature for his age and unable to express a normal range of emotions. Exhibit 1 at 11. Busby tended to emotionally respond in extremes; either very happy or very angry. *Id.* He did not seem interested in others' emotions or in helping others. Exhibit 1 at 11-12. Ms. Coleman indicated that Busby participated in unhealthy behaviors. At age 10, he stole from a pharmacy. Exhibit 1 at 12. At age 16, he attempted suicide by overdosing on a medication. *Id.*

Ms. Coleman explained that Busby was dependent on women to take care of him, by having them do tasks such as paying his bills, buying his clothes, making his appointments, cooking, cleaning, and making his travel plans. Exhibit 1 at 12.

Dr. Martinez reviewed the affidavits of eight other people who knew Busby across various stages of his life. From these affidavits, Dr. Martinez learned that:

- Busby was often the victim of bullying and manipulation. Exhibit 1 at 13-14.

- During school, Busby was in prevocational classes for students with IQs between 70 and 82. Exhibit 1 at 14. These classes taught basic life skills. *Id.*

- Busby could not read, write, or count money. He could not fill out a job application or read Bible verses. He was not able to understand complex instructions and football plays. Exhibit 1 at 14-15.

- Busby was afraid to be alone. Busby was considered a sad loner who desperately craved the attention and affection of women.

31

Even though Busby always had woman around that he claimed were prostitutes, people who knew him believed he lacked the organizational and accounting skills to be a pimp. Conversely, it was reported that women often manipulated Busby, stealing from him, and taking advantage of his gullibility. Exhibit 1 at 15-16.

- Multiple people recollected that Busby's hygiene was always lacking. He always wore dirty clothes that were in poor condition. Busby reportedly did not bathe for days and did not maintain proper dental hygiene. Exhibit 1 at 18.

Busby's sisters each independently completed an ABAS-3 standardized questionnaire, designed to quantify Busby's adaptive functioning. Exhibit 1 at 19. Busby's scores from the ABAS-3 indicate he is on the extremely low range of adaptive functioning. Tarsharn Busby reported the following scores for Busby's adaptive domains:

- General Adaptive Composite (which summarizes performance across all skills areas): 53, indicating Busby is in the extremely low range (lowest 0.1%) of overall adaptive functioning.

- Conceptual: 54, indicating the extremely low range (lowest 0.1%) of adaptive skills in communication, self-direction, and functional academics.

- Social: 58, indicating the extremely low range (lowest 0.3%) of leisure and social skills.

- Practical: 54, indicating the extremely low range (lowest 0.1%) of adaptive performance in community use, home living, health and safety, self-care, and work.

Exhibit 1 at 19-21.

Kimiko Coleman reported the following scores for Busby's adaptive domains:

- General Adaptive Composite (GAC): 52, indicating Busby is in the extremely low range (lowest 0.1%) of overall adaptive functioning.

- Conceptual: 54, indicating the extremely low range (lowest 0.1%) of adaptive skills in communication, self-direction, and functional academics.

- Social: 56, indicating the extremely low range (lowest 0.2%) of leisure and social skills.

- Practical: 54, indicating the extremely low range (lowest 0.1%) of adaptive performance in community use, home living, health and safety, self-care, and work.

Exhibit 1 at 22-24.

## VII.   Conclusion and Prayer for Relief

Only two experts have opined on whether Petitioner Edward Lee Busby is intellectually disabled since before his 2005 trial. Both experts--i.e., Busby's expert and the State's expert--agree Busby is intellectually disabled. This Court previously denied Busby relief on his *Atkins* claim largely because it did not then contain a report from any expert opining that Busby is intellectually disabled. The Record lacked such a report only because this Court previously adhered to the Fifth Circuit now-defunct standard for addressing § 3599 requests for funds. But for this defect in the integrity of Busby's federal habeas proceeding, the record then before the Court would have contained a report similar to the July 11, 2022, Report from Dr. Gilbert

34

Martinez, which establishes conclusively that Busby is intellectually disabled.

For the foregoing reasons, Petitioner Edward Busby requests that the Court grant his motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(6).

Respectfully submitted,

s/ David R. Dow                              /s/ Jeffrey R. Newberry

David R. Dow                                Jeffrey R. Newberry
Texas Bar No. 06064900                      Texas Bar No. 24060966
University of Houston Law Center            University of Houston Law Center
4170 Martin Luther King Blvd.               4170 Martin Luther King Blvd.
Houston, TX 77204-6060                      Houston, TX 77204-6060
Tel. (713) 743-2171                         Tel. (713) 743-6843
Fax (832) 842-4671                          Fax (832) 842-4671
Email ddow@central.uh.edu                   Email jrnewber@central.uh.edu

*Counsel for Edward Lee Busby*

35

## CERTIFICATE OF SERVICE

On April 2, 2026, I served an electronic copy of this pleading on counsel for Respondent by filing the foregoing document with the Clerk of the Court for the U.S. District Court, Northern Division of Texas, using the electronic case filing system of the Court.

Jefferson Clendenin
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, TX  78711
jay.clendenin@oag.texas.gov

/s/ David R. Dow

_____

David R. Dow