W011911

FILED
TARRANT COUNTY
7/25/2023 10:44 AM
THOMAS A. WILDER
DISTRICT CLERK

## WRIT NO. 70,747-06
## TRIAL COURT CAUSE NO. CDC2-W011911-00

| | | |
|---|---|---|
| EX PARTE | § | IN THE CRIMINAL DISTRICT |
| | § | |
| | § | COURT NO. 2 |
| | § | |
| EDWARD LEE BUSBY, JR. | § | TARRANT COUNTY, TEXAS |

## STATE'S PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

This Court, having considered Applicant's Subsequent Application for Writ of Habeas Corpus and its exhibits, the reports of Drs. Gilbert Martinez and Antoinette McGarrahan, the Texas Court of Criminal Appeals' (CCA) order dated February 3, 2021, and official court documents and records, makes the following Findings of Facts and Conclusions of law.

## I.   PROCEDURAL HISTORY

### A.   Trial and Direct Appeal

1. On March 31, 2004, Applicant was indicted for the offense of capital murder in Tarrant County Criminal District Court Number 2 in Cause Number 0920589D. SHCR-01 at 405.[1]

2. The indictment charged that on January 30, 2004, Applicant caused the death of Laura Crane in the course of committing or attempting to commit kidnaping or robbery. SHCR-01 at 405.

---

[1]   "SHCR-01" refers to the Clerk's Record filed with Applicant's first application for state habeas relief.

3.  On November 11, 2005, a Tarrant County jury found Applicant guilty of the capital murder of Laura Crane. SHCR-01 at 406.

4.  On November 17, 2005, the jury answered the special issues set forth in Texas Code of Criminal Procedure Article 37.071 in a manner that required a death sentence. SHCR-01 at 406–07.

5.  Direct appeal to the CCA was automatic. The judgment was affirmed, and the Supreme Court denied certiorari review. *Busby v. State*, 253 S.W.3d 661 (Tex. Crim. App. 2008), *cert. denied*, 555 U.S. 1050 (2008).

## B. Initial State Habeas Proceedings

6.  On July 28, 2008, while his direct appeal was pending, Applicant filed an initial application for post-conviction writ of habeas corpus raising 12 claims, but he did not include a claim that he was ineligible for the death penalty because he is intellectually disabled. *Ex parte Busby*, Cause No. C-2-008387-0920589-A (WR-70,747-01); *see* Tex. Code Crim. Proc. art. 11.071.

7.  The trial court entered findings of fact and conclusions of law, including supplemental findings and conclusions, and recommended that relief be denied. SHCR-01 at 386–404. The CCA denied Applicant's first writ on February 25, 2009. *Ex parte Busby*, No. WR-70,747-01.

## C.  Initial Federal Habeas Proceedings

8.  Applicant filed a federal petition for writ of habeas corpus, which the United States District Court for the Northern District of Texas stayed to permit exhaustion of claims that had not previously been presented to the state court. *Busby v. Thaler*, No. 4:09-CV-160-Y (N.D. Tex. August 17, 2012) (unpublished order).

## D.  First Subsequent State Habeas Proceedings

10. Applicant returned to state court and filed a subsequent application for writ of habeas corpus, in which he raised three claims, including a claim that his death sentence violates the Eighth and Fourteenth Amendments because

he is intellectually disabled. *Ex parte Busby*, Cause No. C-2-009761-0920589-B (WR-70,747-02).

11.    The CCA dismissed Applicant's first subsequent application as an abuse of the writ. *Ex parte Busby*, No. WR-70,747-02 (Tex. Crim. App. March 6, 2013) (per curiam) (unpublished order).

### E.    Subsequent Federal Habeas Proceedings

12.    Applicant filed a second amended petition in the federal district court, which was denied on March 10, 2015. Among the claims raised was a claim that he is intellectually disabled. *Busby v. Stephens*, No. 4:09-CV-160-O, 2015 WL 1037460 (N.D. Tex.) (unpublished).

13.    The United States Court of Appeals for the Fifth Circuit granted Applicant's application for a certificate of appealability on January 27, 2017, in part, as to his claim that he is intellectually disabled. *Busby v. Davis*, 677 Fed. App'x 884 (5th Cir.) (per curiam) (unpublished). Ultimately, the Fifth Circuit affirmed the district court's judgment, and the Supreme court denied certiorari review. *Busby v. Davis*, 925 F.3d 699 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 897 (2020).

### F.    Third through Sixth Subsequent State Habeas Proceedings

14.    At the conclusion of the subsequent federal habeas proceedings, an execution date was set for May 6, 2020. The CCA stayed the execution in light of the COVID-19 pandemic. *Ex parte Busby*, WR-70,747-03 (April 7, 2020).

15.    On January 29, 2021, Applicant filed his sixth subsequent state habeas application, in which he asserted that he was intellectually disabled. The CCA remanded the application so that this Court could review the merits of that claim. *Ex parte Busby*, WR-70,747-06 (Tex. Crim. App. Feb. 3, 2021).[2]

---

[2]    Applicant's third and fourth subsequent state habeas applications were denied without written order this same day. *See Ex parte Busby*, Nos. WR-70,747-04, 05.

## II.    FINDINGS OF FACT

1.    In *Moore v. Texas*, the Supreme Court held that legal determinations of intellectual disability "must be 'informed by the medical community's diagnostic framework.'" 137 S. Ct. 1039, 1048 (2017) (*Moore I*) (quoting *Hall v. Florida*, 572 U.S. 701, 721 (2014); *see id.* at 1053 ("Reflecting improved understanding over time . . . current manuals offer the best available description of how mental disorders are expressed and can be recognized by trained clinicians.") (internal quotation marks and citation omitted).

2.    As recognized in *Moore I*, the two main diagnostic authorities in the field of intellectual disability are the American Psychiatric Association (APA), which has most recently set forth its definition of intellectual disability in *The Diagnostic and Statistical Manual of Mental Disorders* 33 (Am. Psychiatric Ass'n, 5th ed. 2013) (DSM-5), and the American Association on Intellectual & Developmental Disabilities' *Intellectual Disability: Definition, Classification, and System of Supports* 10 (11th ed. 2010) (AAIDD Manual). 137 S. Ct. at 1048. The standards in the DMS-5 and the AAIDD Manual "are largely the same", with the AAIDD Manual examining "the issue of intellectual disability in greater detail." *See Ex parte Moore*, 548 S.W.3d 552, 560 n.50 (Tex. Crim. App. 2018) (*Ex parte Moore II*), *overruled by Moore v. Texas*, 139 S. Ct. 666 (2019) (*Moore II*).

3.    In *Ex parte Moore II*, the CCA "adopt[ed] the framework set forth in the DSM-5" for adjudicating claims on intellectual disability. 548 S.W.3d at 555. The CCA has since reaffirmed that Texas courts should rely on the DSM-5 in assessing intellectual disability claims, reasing that "the approach taken by the DSM-5 hews closer to the original justification set out by the Supreme Court than the AAIDD-11." *Petetan v. State*, 622 S.W.3d 321, 332 (Tex. Crim. App. 2021). The CCA also clarified, however, that it was not "prohibiting considering of or reliance upon the AAIDD-11." *Id.; see Ex parte Moore II*, 548 S.W.3d at 560 n.50 (allowing reliance on AAIDD Manual to the extent that it amplifies or clarifies standards contained in the DSM-5; but if there is a conflict, the DSM-5 controls).

4.    The DSM-5's diagnostic standards are controlling in assessing Applicant's claim of intellectual disability, but the AAIDD Manual's standards may also be relied on to the extent they are not inconsistent with the DSM-5.

5.    Under both the DSM-5 and the AAIDD Manual, the diagnostic criteria for intellectual disability are: (A) deficits in intellectual functioning (Criterion A); (B) deficits in adaptive functioning (Criterion B); and (C) onset of intellectual and adaptive deficits during the developmental period (Criterion C). DSM-5 at 33; AAIDD Manual at 4. A "diagnosis of intellectual disability should be made whenever Criteria A, B, and C are met." *Id.*

6.    As demonstrated in the record and set forth below, the preponderance of the evidence demonstrates that Applicant meets all three criteria. Therefore, he is intellectually disabled under the prevailing clinical standards set out in the DSM-5 and the AAIDD Manual.

7.    Two expert witnesses have evaluated whether Applicant displays deficits in intellectual and adaptive functioning, and if so, whether his deficits occurred during the developmental period as directed by the new *Moore* framework, including Dr. Antoinette McGarrahan, the State's expert, and Dr. Gilbert Martinez, Applicant's expert. Both experts concluded that Applicant is intellectually disabled. Exhibit A (McGarrahan Report); Exhibit B (Martinez Report).

**A.    Sub-average Intellectual Functioning (Criterion A)**

1.    Intellectual functioning includes reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding. *See* DSM-5 at 37. The typical method of assessing these functions is through individually administered and "psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence" (or IQ tests). *Id.* at 37. A score is indicative of intellectual disability if it is approximately two standard deviations or more below the population mean, including a margin for error (generally +/- 5 points). *Id.*

2.    Under the classification schemes outlined by both the DSM-5 and the AAIDD Manual, deficient intellectual functioning is defined as an IQ of

approximately 70 with a confidence interval of plus or minus 5 points, derived from the standard error of measurement. *Id.*; AAIDD Manual at 36. This range, which is two standard deviations below the mean gives experts a 95% probability that the obtained score is within the five-point confidence interval. *See* AAIDD Manual at 36. Therefore, scores of 75 and below fall within the range for intellectual disability under both the DSM-5 and the AAIDD Manual.

3.     From 2001 to the present, Applicant was administered six IQ tests, and he scored within the range for intellectual disability on four of them.

4.     The first test was administered to Applicant while he was incarcerated in the Texas Department of Criminal Justice (TDCJ). Exhibit A at 2, 3. Applicant scored a 96, but this score was considered unreliable and disregarded at the trial. 36 Reporter's Record (RR) 48–49, 64; *see also* Exhibit A at 2, 3. Dr. McGarrahan describes it as a "substantial outlier compared to multiple individually administered, well-regarded IQ measure." Exhibit A at 3.

5.     Dr. Tim Proctor, the expert hired by defense at trial, administered the Weschler Adult Intelligence Scale-Third Edition (WAIS-III). Exhibit A at 2, 3. Applicant obtained a full-scale IQ score of 77, 36 RR 53, 56, putting the confidence interval of 73–82 at the lower end and in the intellectual disability range. Exhibit at 3. Applying the Flynn Effect reduces Applicant's score to a 74. Exhibit A at 3.

6.     Dr. Proctor also administered the BETA-III to Applicant, on which he achieved a score of 81. 36 RR 53.

7.     The State's expert at trial, Dr. Steven Helge, also administered the WAIS-III to Applicant. Exhibit A at 2, 3. Applicant obtained a full-scale IQ score of 79, with a confidence interval of 75–83. Applying the Flynn Effect reduces Applicant's score to a 76. Exhibit A at 2, 3.

8. On February 11, 2010, Dr. Martinez administered the WAIS-IV to Applicant. Applicant obtained a full-scale IQ score of 74, with a confidence interval of 70–79. Exhibit A at 2, 3; Exhibit B at 2–3.

9. Dr. Martinez again administered the WAIS-IV to Applicant on February 25, 2022. Exhibit A at 4; Exhibit B at 7. Applicant obtained a full-scale IQ score of 81, with a confidence interval of 77–85. Exhibit A at 4; Exhibit B at 7. Applying the Flynn Effect reduces Applicant's score to 76.5. Exhibit A at 4.

10. Applicant's performance on neuropsychological tests and his academic performance support the finding that he has deficits in intellectual functioning. Both the DSM-5 and the AAIDD Manual emphasize the value of neuropsychological testing when determining whether deficits in intellectual functioning exist, explaining that "[i]ndividual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score." DSM-5 at 37. Likewise, "academic learning" is included as a component of intellectual functioning. DSM-5 at 33.

11. Having considered the results of these evaluations and reports, the Court finds that Drs. Martinez and McGarrahan are credible and persuasive on the issue of Applicant's significant deficits in intellectual functioning.

12. Having considered the testimony, comments, and conclusions of Drs. Martinez and McGarrahan, this Court finds that, based on a preponderance of the evidence, that Applicant has sub-average intellectual functioning indicated by an IQ score approximately two standard deviations below the mean.

## B. Significant Deficits in Adaptive Functioning (Criterion B)

### 1. The Diagnostic Standard

1. Criterion B of an intellectual disability diagnosis—deficits in adaptive functioning—refers to a person's ability to "cope, adjust, and appropriately respond to everyday demands of life." The DSM-5 defines adaptive functioning as "how well a person meets community standards of personal

independence and social responsibility in comparison to others of similar age and sociocultural background." At 37. The AAIDD Manual defines adaptive behavior as "the collection of conceptual, social, and practical skills that has been learned and are performed by people in their everyday lives." At 43. Both professional definitions further divide adaptive functioning into three areas: conceptual, social, and practical. DMS-5 at 37.

2.  According to the DSM-5, conceptual skills involve "competence in memory, language, reading, writing, math, reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others." At 37. The social skills involve "awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment among others." DSM-5 at 37. The practical skills involve "learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others." DSM-5 at 37.

3.  To qualify as intellectually disabled, the DSM-5 states that an individual must have deficits in at least one domain of adaptive functioning to the degree that "ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." At 37. Further, the DSM-5 requires that adaptive deficits be related to the deficits in intellectual functioning. At 38. Both the DSM-5 and the AAIDD Manual specify several parameters to be followed in the process of assessing adaptive behavior.

4.  First, the assessment should be comprehensive and broad-based, including date such as clinical interviews with third-party reporters and record review. DSM-5 at 38.

5.  Second, the diagnostician must employ "clinical judgment," which is defined as a "special type of judgment rooted in a high level of clinical expertise and experience and judgment that emerges directly from extensive training, experience with the person, and extensive date." AAIDD Manual at 217. When data is collected through informal interviews, "'significant

limitations' can be identified when the nature of the adaptive deficits has had a major impact on the subject's functioning that clearly deviates from the standards of personal independence and social responsibility expected of the subject's age and cultural group." AAIDD Manual at 46, 48.

6.    Third, as it is expected that strengths co-exist with weaknesses, analysis of adaptive behavior is based on the presence of weaknesses, not the absence of strengths. *See Moore I*, 137 S. Ct. at 1050 ("[T]he medical community focuses the adaptive-functioning inquiry on adaptive *deficits*.") (emphasis in original); *Petetan*, 622 S.W.3d at 358 ("[E]mphasizing Appellant's adaptive strengths to undermine reliance on an expert diagnosis repeats the problem identified by the Supreme Court in *Moore I* and *Moore II*.").

7.    Finally, it is critical to avoid the use of lay stereotypes in assessing adaptive functioning. *See Moore I*, 137 S. Ct. at 1052 ("the medical profession has endeavored to counter lay stereotypes of the intellectually disabled"); *Petetan*, 622 S.W.3d at 359 (factfinder must not "rely upon lay stereotypes regarding intellectual disabilities to reject a clinical diagnosis").

### 2.    Applicant displays significant deficits in adaptive functioning.

1.    Both Dr. Martinez and Dr. McGarrahan concluded that Applicant meets the second criterion of intellectual disability because he displays significant impairments or deficits in at least one domain of adaptive functioning.

### a.    The conceptual domain

2.    Conceptual skills involve "competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. DSM-5 at 37.

3.    Both Dr. Martinez and Dr. McGarrahan agree that Applicant suffers from adaptive deficits in the conceptual domain. Exhibit A at 4; Exhibit B at 26. Specifically, Dr. Martinez states that Applicant's "adaptive functioning assessment was indicative of significant deficiencies in communication and academic skills." Exhibit B at 26.

4.   On October 14, 2005, during the trial, Dr. Proctor administered the Wide Range Achievement Test-3 (WRAT-3), which assesses word reading, spelling, and arithmetic. Applicant obtained a Reading Standard Score of 67 (1st percentile; 4th grade equivalent), a Spelling Standard Score of 63 (1st percentile; 3rd grade equivalent), and an Arithmetic Standard Score of 84 (4th percentile; 6th grade equivalent). 36 RR 50. 51.

5.   On February 25, 2022, Dr. Martinez administered the Wide Range Achievement Test-5 (WRAT-5), the most recent version of this test. Exhibit A at 4; Exhibit B at 7. Applicant obtained a Word Reading Score of 66 (1st percentile; 3rd grade equivalent), a Sentence Comprehension Standard Score of 73 (4th percentile; 4th grade equivalent), a Reading Composite Standard Score of 69 (2nd percentile), a Spelling Standard Score of 84 (14th percentile; 5th grade equivalent), and a Math Computation Standard Score of 75 (5th percentile; 4th grade equivalent). Exhibit A at 4; Exhibit B at 7.

6.   Dr. McGarrahan concluded that the testing in 2005 and the testing in 2022 resulted in "highly consistent" scores. She also noted that these scores were also consistent with the testing done at TDCJ prior to the trial for the instant offense. Exhibit A at 4.

7.   School records from the Pampa School District establish that in the first grade, Applicant did not do well in such skills as reading, arithmetic, spelling, and handwriting, so much so that he had to repeat first grade. Applicant's Writ Exhibit 4, Exhibit 5.

8.   High school records establish that Applicant had been placed in special education classes and was ARD (Admission, Review, and Dismissal Committee) exempt from the state's standardized testing for promotion between grades. Applicant's Writ Exhibit 4, Exhibit 5; *see also* 35 RR 27–29.

9.   Mrs. Pamela Harris, one of Applicant's teachers, stated that Applicant was in "prevocational classes" for individuals with reduced intellectual functioning to help them develop basic living skills, such as cooking and

~ 10 ~

balancing a checkbook. Mrs. Harris said that grades did not a play a role in whether the student passed the class. Applicant's Writ Exhibit 5 at 1 (¶ 3).

10. One of Applicant's former girlfriends, Merlyn Rogers, stated that, at 17, Applicant could not read or write and had difficulty filling out job applications—she once found one in the trash can with only his name on it––and paying bills. Applicant's Writ Exhibit 6 at 1 (¶¶ 6–7).

11. Steve Porter, Applicant's junior high school football coach, said that Applicant's educational skills were more on par with that of a second grader even though he was in eighth grade. Applicant's Writ Exhibit 11 at 1 (¶ 8). He said further that Applicant could not grasp certain concepts and plays, even simple ones, and his confusion worsened with the complexity of the routes he was expected to learn and know. Applicant's Writ Exhibit 11 at 1 (¶ 9).

12. Renee Boyd, a friend, stated that Applicant had a difficult time reading and understanding *The Bible*. She said he would read the same sentence four or five times. Applicant's Writ Exhibit 7 at 1 (¶ 7). Raquel Farr, a neighbor, said that Applicant would ask her to count his change. Applicant's Writ Exhibit 9 at 1 (¶ 5).

13. Willard Farr, a neighbor, said that Applicant was not very good with numbers and counting—if Applicant had money, he would give it to someone else to count. Applicant's Writ Exhibit 8 at 1 (¶ 4). Applicant's nephew, Eddy Pouncy, also said Applicant could not count. Applicant's Writ Exhibit 10 at 1 (¶ 3).

14. James Bybee, a friend from high school, said that Applicant could not read very well. Applicant's Writ Exhibit 12 at 1 (¶ 7). And his sister, Tarsharn Busby, reported that she never saw her brother read; she tried to help him, but he could not "get it." Applicant's Writ Exhibit 14 at 6 (¶ 56).

### b.   The Social domain

1. Social skills involve "empathy, social judgment, interpersonal communication skills, the ability to make and retain friendships, and similar capacities. DSM-5 at 37.

2. Both Dr. Martinez and Dr. McGarrahan agree that Applicant suffers from adaptive deficits in the social domain. Exhibit A at 4; Exhibit B at 26. Specifically, Dr. Martinez states that Applicant's "adaptive functioning assessment was indicative of significant deficiencies in . . . leisure engagement and organization and social skills." Exhibit B at 26.

3. Mr. Pouncy described Applicant as a follower, saying that he did not make plans about "anything," including where to eat, but he said further that Applicant did not have to worry about these things like food or transportation because these things were taken care of by other people. Applicant's Writ Exhibit 10 at 1 (¶ 2). Mr. Farr echoed this sentiment, stating that Applicant always had girls around to make decisions for him. Applicant's Writ Exhibit 8 at 1 (¶ 8). Ms. Rogers concurred, stating that she organized and planned their outings. Applicant's Writ Exhibit 6 at 3 (¶ 18). Mr. Pouncy said the girls around Applicant, whom he believed to be prostitutes, were always in control and made all the decisions. Applicant's Writ Exhibit 10 at 1–2 (¶ 9).

4. Applicant's sister, Kimiko Coleman, reported that Applicant was easily distracted and would leave in the "middle of something," such as playing with his dog when he was supposed to cleaning the yard. Applicant's Writ Exhibit 13 at 6 (¶¶ 50–51).

5. Mr. Porter said that while Applicant appeared to really enjoy football, he could not understand the more complex plays; he looked confused as to whom to block, which route to run, or whether to go left or right. Applicant's Writ Exhibit 11 at 1 (¶ 9).

6.  Ms. Coleman and described Applicant as "gullible," stating that he would do whatever was asked of him and that he believed everything he was told without question. Applicant's Writ Exhibit 13 at 7 (¶¶ 58–59).

7.  Ms. Coleman and Mr. Pouncy both said that Applicant was the victim of bullying, but it took "a lot" for him to "blow up." Applicant's Writ Exhibit at 13 at 1 (¶ 6). Mr. Pouncy said that this happened when he was teased about being slow or when he felt he had to protect women. Applicant's Writ Exhibit 10 at 2 (¶¶ 11–12).

8.  Mr. Pouncy and Mr. Farr both stated that Applicant was taken advantage of as an adult. Specifically, Mr. Pouncy said that the girls around him would take money from him before he could finish counting it. Applicant's Writ Exhibit 10 at 1 (¶ 8). And Mr. Farr said that he was "very easily manipulated by women." Applicant's Writ Exhibit 8 at 1 (¶ 7).

9.  Finally, Applicant has demonstrated difficulty regulating sadness. Mr. Bybee said that Applicant always his heart on his shoulder and that he cried often. Applicant's Writ Exhibit 12 at 1 (¶ 3). Mr. Pouncy stated that Applicant cried more than others, often in a room full of people. Applicant's Writ Exhibit 10 at 2 (¶ 7). Ms. Harris noted that his two moods were "frustrated" and "depressed." Applicant's Writ Exhibit 5 at 1 (¶ 7). Both Mr. Pouncy and Mr. Farr reported that Applicant's depression and sadness stemmed from his low abilities and that he said he was tired of living "this life." Applicant's Writ Exhibit 8 at 2 (¶ 12), Exhibit 10 at 1 (¶ 5),

### c.  The practical domain

1.  Practical skills center on "self-management in areas such as personal care, job responsibilities, money management, recreation, and organizing school and work tasks." DSM-5 at 37.

2.  Both Dr. Martinez and Dr. McGarrahan agree that Applicant suffers from adaptive deficits in the practical domain. Exhibit A at 4; Exhibit B at 26. Specifically, Dr. Martinez states that Applicant's "adaptive functioning

assessment was indicative of significant deficiencies in . . . community/home skills, health and safety skills, and self-care." Exhibit B at 26.

3. Ms. Rogers said that Applicant would ask for directions when driving and this confused her because he had always lived in Pampa. Helping him by using street signs did not work because Applicant could not follow them, so she used landmarks and buildings. Applicant's Writ Exhibit 6 at 2 (¶ 11). Ms. Coleman reported that their cousin Derrick took Applicant's driver's test for him. Applicant's Writ Exhibit 13 at 5 (¶ 6).

4. Ms. Rogers ran errands for Applicant, and when he was with her, she tried to help him learn, but no matter how many times she showed him how to do something, Applicant "could not" figure out how to complete basic, daily tasks. Things like being unable to open the hood of a car made him frustrated. Applicant's Writ Exhibit 6 at 2 (¶¶ 10, 12).

5. Because of Applicant's inability to learn daily living tasks, Ms. Rogers and Applicant's other sisters took care of him; therefore, he never had to solve problems for himself. *See generally*, Applicant's Writ Exhibit 6, Exhibit 13 at 5 (¶ 39), Exhibit 14 at 6. Ms. Coleman reported that Applicant always lived the women he dated; he never leased his own apartment. Applicant's Writ Exhibit 13 at 8 (¶ 64). Mr. Farr reported that without his girlfriends, Applicant appeared confused. Applicant's Writ Exhibit 8 at 2 (¶ 9)

6. Both of his sisters stated that when Applicant "cleaned his room" by placing everything under the bed or in his closet. Applicant's Writ Exhibit 13 at 6 (¶ 48), Exhibit 14 at 5 (¶ 49). They also said that his chore was to mow the lawn, but Ms. Coleman never saw him do this, and after raking the leaves, he would spread them out across the lawn. Applicant's Writ Exhibit 13 at 6 (¶ 49). Tasks such as washing dishes or sweeping were not completed adequately. Applicant's Writ Exhibit 14 at 6 (¶ 51).

7. Applicant had difficulty managing money. Ms. Rogers mentioned a time when Applicant went to Burger King to buy food but then said he did not have enough money. She knew this not to be true, and she speculated that Applicant could not read the menu and add up the amount his choices

would have cost. Applicant's Writ Exhibit 6 at 1 (¶ 8). Ms. Rogers also said that he could not find the amount due on a paper bill. Applicant's Writ Exhibit 6 at 1 (¶ 7).

8.   At the same time, Ms. Busby reported that when he was young, she called him the "Candy Man" because he would spend all his money on candy or buy it when his mother sent him to buy something else. Applicant's Writ Exhibit 14 at 6 (¶ 59). She remembered a time when he spent all his Christmas money on a single outfit, while she was as able to purchase three or four outfits with the same amount of money. Applicant's Writ Exhibit 14 at 6 (¶ 60).

9.   Ms. Coleman reported that Applicant, at eight or nine years old, collected snakes and brought them home in a suitcase. He then let them loose in the house. Applicant's Exhibit 13 at 6 (¶ 54).

10.  Both Ms. Busby and Ms. Coleman reported that Applicant had difficulty with hygiene. There was always dirt underneath his fingernails, and when he showered, there was a ring of dirt around the tub. Applicant's Exhibit 13 at 6 (¶ 52). Indeed, he did not like to bathe—he would go days without doing so—and had to be reminded to do so. Applicant's Writ Exhibit 14 at 6 (¶ 52). Applicant also did not brush his teeth regularly. Applicant's Writ Exhibit 14 at 6 (¶ 53).  Both also reported that he did not changes his clothes. Applicant's Writ Exhibit 13 at 6 (¶ 52), Exhibit 14 at 6 (¶ 54).  Mr. Bybee and Mr. Porter said that his poor hygiene was noticed at school, with both stating that it appeared as if Applicant had not showered in days. Applicant's Writ Exhibit 11 at 1 (¶ 5), Exhibit 12 at 1 (¶ 5).

## III.   CONCLUSIONS OF LAW

1.   In *Atkins v. Virginia*, the United States Supreme Court held that the Eighth Amendment categorically bars the execution of intellectually disabled individuals. 536 U.S. 304, 321 (2002). The Court cited with approval the then-current editions of the DSM and AAIDD. *Id.* at 308 n.3, 317. Twelve years later, in *Hall v. Florida*, the Court made clear that assessments of intellectual disability must be "informed by the medical community's diagnostic

framework." 572 U.S. 701, 721–22 (2014) (striking down Florida's "rigid rule" prohibiting inquiry into adaptive functioning unless the IQ score was 70 or below as inconsistent with the consensus of medical and scientific authority). The Court reaffirmed this requirement in *Moore I*. 137 S. Ct. at 1051 (striking down Texas's framework for analyzing adaptive functioning, including its use of the *Briseño* factors, because it deviated from the prevailing clinical standards and created "an unacceptable risk that persons with intellectual disability will be executed").

2.    On remand following *Moore I*, the CCA adopted the framework set out in the DSM-5 for assessing claims of intellectual disability. *Ex parte Moore II*, 548 S.W.3d at 555, 559–60; *Petetan*, 622 S.W.3d at 325 ("we apply contemporary clinical standards—the framework set forth in the DSM-5— for assessing intellectual disability"). Texas courts adjudicating claims of intellectual disability may also rely on the AAIDD Manual to the extent it does not conflict with the DSM-5 and where its standards "amplify or clarify standards contained in the DSM-5." *Ex parte Moore II*, 548 S.W.3d at 560 n.50; *see also Petetan*, 622 S.W.3d at 332 (providing that courts may still consider and/or rely on the AAIDD Manual).

3.    In analyzing the evidence in support of Applicant's intellectual disability claim, this Court is bound by *Atkins*, *Hall*, *Moore I*, *Moore II*, the DSM-5, and the AAIDD Manual.

4.    Criterion A requires "intellectual-functioning deficits (indicated by an IQ score 'approximately two standard deviations below the mean'—i.e., a score of roughly 70—adjusted for the standard error of measurement[.]" *Moore I*, 137 S. Ct. at 1045 (quoting AAIDD Manual at 27); *see also Petetan*, 622 S.W.3d at 338; DSM-5 at 33 ("Deficits in intellectual functions" include "reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience.").

5.    This Court concludes that Applicant has established by a preponderance of the evidence that he has sufficient deficits in intellectual functioning. First, as described above, Applicant has scored within the range of subaverage intellectual functioning on multiple "psychometrically valid,

~ 16 ~

comprehensive, culturally appropriate tests of intelligence" (full-scale IQ tests). Second, he also scored in the impaired range on a series of additional tests designed to measure intellectual and neuropsychological functioning. Third, his history of poor academic performance also supports the conclusion that Applicant has deficits in intellectual functioning. Finally, psychologists for both Applicant and the State agree that the evidence is sufficient to conclude that Applicant has significantly sub-average intellectual functioning.

6.    Criterion B requires a showing of adaptive deficits, defined as "an evaluation of the individual's ability to function across a variety of dimensions." *Petetan*, 622 S.W.3d at 339. This criterion is met where there are "[d]eficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility." *Id.*; *see also Moore I*, 137 S. Ct. at 1045 (adaptive deficits are "the inability to learn basic skills and adjust behavior to changing circumstances"). This inquiry "involves three domains of adaptive reasoning: conceptual, social, and practical." *Petetan*, 622 S.W.3d at 339. And there must be a showing "that adaptive deficits are related to sub-average intellectual functioning." *Id.* at 332. However, "while the relational requirement found in the DSM-5 is currently a necessary legal requirement under *Atkins*, it is not a vehicle to undermine an otherwise clinical diagnosis through consideration of lay stereotypes, adaptive strengths, and alternative disorders." *Id.* at 333.

7.    Regarding this criterion, this Court concludes that Applicant has established by a preponderance of the evidence that he has significant adaptive deficits in all three domains of adaptive functioning. This conclusion is supports by the results of Applicant's neuropsychological testing, the nature of Applicant's adaptive impairments, and the reports of Dr. McGarrahan and Dr. Martinez, who each assessed evidence of Applicant's adaptive behavior using current diagnostic criteria and clinical judgment to evaluate testing, interviews, records, and lay-witness evidence.

8.    This Court further concludes that Applicant has established that his adaptive deficits are related to his intellectual impairments.

9. Criterion C requires onset of intellectual and adaptive deficits during the developmental period. *Moore I,* 137 S. Ct. at 1045; DSM-5 at 33. The Court concludes that Applicant has established that his intellectual and adaptive deficits began during the developmental period. This is supported by Applicant's school records, the absence of any intervening or post-developmental events that would explain his deficits and lay witness reports describing his impaired functioning from an early age.

10. In *Moore I,* the Supreme Court reiterated that as "instructed in *Hall,* adjudications of intellectual disability should be 'informed by the views of medical experts.'" 137 S. Ct. at 1044 (quoting *Hall,* 572 U.S. at 721). Here, medical experts for Applicant and the State concluded that he suffers from deficits in intellectual functioning. Additionally, these experts, who conducted or reviewed valid adaptive behavior assessments, found that Applicant suffers from significant deficits in adaptive functioning. Finally, both experts opined that both the intellectual deficits and the adaptive deficits were present during developmental period.

11. The Court concludes that Applicant has established by a preponderance of the evidence that he is a person with intellectual disability based on the legal criteria set out in *Atkins, Hall, Moore I,* and *Ex parte Moore II.*

12. Having reconsidered the case as directed by the CCA and considering the evidence presented at trial, the evidence presented in connection with Applicant's subsequent state habeas application, and Dr. McGarrahan's report, this Court concludes that Applicant is entitled to relief.

13. Accordingly, considering the foregoing findings of fact and conclusions of law, this Court recommends that Applicant's sentence of death be reformed to a sentence of life in prison.

WHEREFORE, the State prays that this Court adopt these Proposed Findings of Fact and Conclusions of Law and recommend that Applicant's sentence of death be reformed to a sentence of life in prison.

Respectfully submitted,

PHIL SORRELLS
Criminal District Attorney
Tarrant County, Texas

STEVEN W. CONDER
Assistant Criminal District Attorney
Chief, Post-Conviction

/s/ *Fredericka Sargent*
FREDERICKA SARGENT
Assistant Criminal District Attorney
State Bar No. 24027829
Tim Curry Criminal Justice Center
401 W. Belknap, 4th Floor
Fort Worth, Texas 76196-0201
(817) 884-3109
fsargent@tarrantcountytx.gov

## CERTIFICATE OF SERVICE

A true copy of the State's Proposed Findings of Fact and Conclusions of Law

has been e-served to counsel listed below on this, the 25th day of July 2023:

David R. Dow
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77204-6060
ddow@central.uh.edu

Jeffrey R. Newberry
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77024-6060
jrnewberry@central.uh.edu


/s/ *Fredericka Sargent*
FREDERICKA SARGENT

**WRIT NO. 70,747-06**
**CAUSE NO. CDC2-W011911-00**

| | | |
|---|---|---|
| EX PARTE | § | IN THE CRIMINAL DISTRICT |
| | § | |
| EDWARD LEE BUSBY, JR. | § | COURT NO. 2 |
| | § | |
| | § | TARRANT COUNTY, TEXAS |

## ORDER

The Court adopts the State's Proposed Findings of Fact and Conclusions of Law as its own and recommends that the relief Edward Lee Busby, Jr., requests should be **GRANTED** and that his sentence of death be reformed to a sentence of life in prison.

The Court further orders and directs the Clerk of this County to furnish a copy of the Court's findings to Applicant through his attorneys Jeffrey R. Newberry, jrnewberry@central.uh.edu , and David R. Dow, ddow@central.uh.edu, and to the Post Conviction Section of the Criminal District Attorney's Office at COAappellatealerts@tarrantcountytx.gov.

IT IS SO ORDERED.

SIGNED this _____ day of _____, 2023.


_____
Judge Wayne Salvant
Criminal District Court No. 2