70,747-06

**2nd SUPPLEMENTAL**

# CLERK'S RECORD

RECEIVED
COURT OF CRIMINAL APPEALS
10/13/2023
DEANA WILLIAMSON, CLERK

VOLUME **1** of **1**

Writ Number: **C-2-W011911-0920589-C**

Filed In the **CRIMINAL DISTRICT COURT TWO**
of Tarrant County, Texas
Hon. **WAYNE SALVANT**, Presiding Judge



**EX PARTE:  EDWARD LEE BUSBY JR**

vs.

THE STATE OF TEXAS

Appealed to the Court of Criminal Appeals
for the State Of Texas
at Capitol Station
AUSTIN, TEXAS

ATTORNEY FOR THE APPELLANT

**JEFFREY NEWBERRY, APPOINTED**
**UNIVERSITY OF HOUSTON LAW CENTER**
**4170 MARTIN LUTHER KING BLVD**
**HOUSTON, TEXAS 77204-6060**
**PHONE:**          713-743-6843
**FAX:**             832-842-4671
**SBOT:**            24060966
**Attorney for EDWARD LEE BUSBY JR, Appellant**

Delivered to the Court of Criminal Appeals for the State Of Texas At Capitol Station, AUSTIN, Texas, on the

__13th__ day of ____October____ , ___2023___

THOMAS A. WILDER, DISTRICT CLERK,
TARRANT COUNTY, FORT WORTH, TEXAS

/s/ *Richard Bryan Gardner*

**RICHARD BRYAN GARDNER**

Deputy District Clerk

(Court of CRIMINAL APPEALS)
Cause No. _____
Filed in the Court of Criminal Appeals for the State of Texas,
at Capitol Station, AUSTIN, Texas, this

_____ day of _____, _____

_____DEANA  WILLIAMSON_____,

Clerk

By _____, Deputy

1

# I N D E X

Clerk's Record Cover Page ...................................................................................................... 1

Index  ........................................................................................................................................ 2

Caption ..................................................................................................................................... 3

Order Appointing Counsel ....................................................................................................... 4

Advisory Regarding Intelligence Assessment ........................................................................ 8

Advisory Regarding Intelligence Assessment ...................................................................... 13

Joint Advisory Regarding Intelligence Assessment ............................................................. 18

State's Motion to Release Records ....................................................................................... 23

Order to Release Records – 08/17/2022 .............................................................................. 29

State's Proposed Findings of Facts and Conclusions of Law .............................................. 32

Applicant Busby's Proposed Findings of Fact and Conclusions of Law .............................. 91

State's Advisory ................................................................................................................... 165

Applicant Busby's Post Hearing Briefing – 09/08/2023 ...................................................... 168

Findings of Fact and Conclusions of Law on Second Subsequent Post-Conviction Habeas
Corpus Application and Order ............................................................................................. 178

Clerk's Certificate ................................................................................................................ 221

Back Cover Page ................................................................................................................. 222

**REPORTER'S RECORD OF SEPTEMBER 8, 2023 HEARING TRANSMITTED
SEPARATELY**

# *CAPTION*

THE STATE OF TEXAS                         §

COUNTY OF TARRANT                          §

At a term of the **CRIMINAL DISTRICT COURT TWO** of Tarrant County, Texas, the Honorable **WAYNE SALVANT** sitting as Judge of said court, the following proceedings were had, to-wit:

Writ Number: **C-2-W011911-0920589-C**

EX PARTE:

**EDWARD LEE BUSBY JR**

VS.

THE STATE OF TEXAS

3

FILED
TARRANT COUNTY
6/8/2021 11:16 am
THOMAS A. WILDER
DISTRICT CLERK

## IN THE CRIMINAL DISTRICT COURT NUMBER TWO, OF TARRANT COUNTY, TEXAS

Ex parte
Edward Lee Busby, Jr.,

Applicant

Cause No. CDC2-W011911-00

## ORDER APPOINTING COUNSEL

On February 3, 2021, this Court received notice that the Texas Court of Criminal Appeals found that the claim raised in Applicant's Application for a Post-Conviction writ of Habeas Corpus satisfied the criteria contained in section 5 of Article 11.071 of the Texas Code of Criminal Procedure. As directed by section 6(b-1) of Article 11.071, this Court hereby appoints the attorneys who represented Applicant in the proceedings under Section 5, David R. Dow and Jeffrey R. Newberry, to represent Applicant Edward Lee Busby, Jr. in further proceedings pursuant to the CCA's February 3 Order.

**SIGNED AND ENTERED** this ___8th___ day of June 2021.

Hon. Wayne Salvant
Judge Presiding
Criminal District Court No. 2

4

**5**

## IN THE CRIMINAL DISTRICT COURT NUMBER TWO, OF TARRANT COUNTY, TEXAS

|  |  |
|---|---|
| **Ex parte Edward Lee Busby, Jr.,**<br><br>**Applicant** | **Cause No. CDC2-W011911-00** |

## MOTION FOR THE APPOINTMENT OF COUNSEL

TO THE HONORABLE JUDGE WAYNE SALVANT:

Comes now, the indigent applicant, Edward Lee Busby, Jr., by and through undersigned Counsel and pursuant to sections 2 and 6(b-1) of Article 11.071 of the Texas Code of Criminal Procedure to move this Court to appoint the undersigned Counsel, David R. Dow and Jeffrey R. Newberry, to represent him in proceedings pursuant to the Court of Criminal Appeals' February 3, 2021 Order remanding Busby's claim that he is ineligible for execution because he is intellectually disabled this Court.

Busby is not represented by retained counsel and has not elected to proceed pro se. Undersigned counsel Dow represents Busby before the federal courts and has since 2009, when he was appointed to

represent Busby in his federal habeas proceeding by United States District Judge Terry Means. Newberry has worked with Dow on Busby's case since 2015. Both Dow and Newberry appear on the list of Approved Attorneys for 11.071 Appointment. Dow and Newberry represented Busby in his section 5 proceeding and seek appointment in this proceeding. As such, the Code recognizes they are the attorneys who should be appointed to represent Busby in this proceeding. Tex. Code Crim. Proc. art. 11.071, § 6(b-1)(1)

Accordingly, Counsel request the Court appoint them to represent Applicant Edward Lee Busby in this proceeding.

Respectfully submitted,

/s/ David R. Dow                          /s/ Jeffrey R. Newberry
_____                  _____
David R. Dow                              Jeffrey R. Newberry
Texas Bar Number 06064900                 Texas Bar Number 24060966
University of Houston Law                  University of Houston Law
Center                                    Center
4604 Calhoun Road                         4604 Calhoun Road
Houston, Texas 77204-6060                 Houston, Texas 77204-6060
Tel. (713) 743-2171                       Tel. (713) 743-6843
Fax (713) 743-2131                        Fax (713) 743-2131
Email ddow@central.uh.edu                 Email jrnewber@central.uh.edu

6

## Certificate of Service

I certify that a true and correct copy of this document was served

on Counsel for the State, Jeanette E. Walston Strange on June 7, 2021

via an email sent to JEStrange@tarrantcountytx.gov.

/s/ Jeffrey R. Newberry

_____

Jeffrey R. Newberry

CDC2-W011911-00

FILED
TARRANT COUNTY
7/29/2021 4:12 PM
THOMAS A. WILDER
DISTRICT CLERK

# IN THE CRIMINAL DISTRICT COURT NUMBER TWO,
## OF TARRANT COUNTY, TEXAS

**Ex parte
Edward Lee Busby, Jr.,**

**Applicant**

**Cause No. CDC2-W011911-00**

## ADVISORY REGARDING INTELLIGENCE ASSESSMENT

TO THE HONORABLE JUDGE WAYNE SALVANT:

As the Court is aware, neuropsychologist Dr. Gilbert Martinez was scheduled to interview Applicant Edward Busby at the Polunsky Unit on July 15 for the purpose of assessing whether Busby is intellectually disabled. Dr. Martinez was scheduled to begin his work at the unit at 8:00 am that day.

At 9:15 that morning, Dr. Martinez called undersigned attorney Newberry from the prison's parking lot[1] and informed him that the prison (specifically, Assistant Warden Billy Jackson) would not allow Busby to be uncuffed during the assessment unless this Court issued an

---

[1] Like all visitors to the unit, Martinez was not allowed to have his phone with him inside of the unit.

8

order specifying Busby should be uncuffed. Counsel knew that Busby would need to be uncuffed during the visit, but had not asked this Court to issue such an order because the prison had never required such. Newberry immediately called TDCJ's general counsel office seeking to resolve this issue, but that attorney was not in her office. Believing an order was not necessary (after all, Dr. Martinez had been approved for a contact visit with Busby) but wanting to do whatever he could to ensure Martinez could complete his work on July 15, Newberry drafted a proposed order, emailed the proposed order to this Court's coordinator at 9:57 am, and called the coordinator to explain why the order was needed.

Less than twenty minutes later, at 10:16 am, the court coordinator emailed to Newberry a copy of the order, signed by this Court. Newberry immediately attempted to fax the order to the unit, but the unit's fax machine was busy. Newberry called the Warden's office at the unit to ask for Warden Jackson's email address, and then emailed Jackson the order at 10:24. This did not, however, result in Martinez's being allowed to immediately return to the unit.

Warden Jackson believed he needed to confirm that this Court had, in fact, issued the order Newberry had emailed him. Not until 11:08 am did Jackson inform Newberry he was satisfied that this Court had, in fact, issued the order and that Martinez could return to the unit.

While waiting for Warden Jackson to do whatever he believed was necessary to confirm this Court had, in fact, issued the order, Newberry spoke to Dr. Martinez. Even at the beginning of this forty-four-minute delay, Martinez was concerned that there would not be sufficient time for him to complete the assessment of Busby before the prison would end the visit at 5:00 pm. Martinez explained to Newberry that having to end the assessment before completing it and then completing at a later time would be detrimental to the validity of the assessment.

When Newberry again spoke to Martinez at 11:19 (after leaving him a voice mail at 11:10), Martinez told Newberry that because it would be after noon before he would be able to begin the assessment,[2] he did not believe it could be completed that day.

---

[2] While Martinez was less than a ten-minute drive from the prison, it would have taken more than half an hour for him to clear security and be escorted to the visitation area. It would likely have taken even longer for the prison to escort Busby back to the visitation area.

10

At 12:59 pm, Newberry received an email from the unit's main warden, Daniel Dickerson, informing him that there was no new policy—i.e., that the order Assistant Warden Jackson had believed was required for Busby to be uncuffed during the interview was not, in fact, required.

Dr. Martinez does not have any availability to return to the unit before September. Undersigned counsel believe they should soon be able to schedule Martinez to return to the unit to complete the work he was prevented from doing on July 15 and will advise the Court once the visit is scheduled.[3]

Respectfully submitted,

| /s/ David R. Dow | /s/ Jeffrey R. Newberry |
|---|---|
| _____ | _____ |
| David R. Dow | Jeffrey R. Newberry |
| Texas Bar Number 06064900 | Texas Bar Number 24060966 |
| University of Houston Law Center | University of Houston Law Center |
| 4604 Calhoun Road | 4604 Calhoun Road |
| Houston, Texas 77204-6060 | Houston, Texas 77204-6060 |
| Tel. (713) 743-2171 | Tel. (713) 743-6843 |
| Fax (713) 743-2131 | Fax (713) 743-2131 |
| Email ddow@central.uh.edu | Email jrnewber@central.uh.edu |

---

[3] Because Martinez will have to return to the unit a second time, his travel expenses will be considerably more than he originally anticipated. Accordingly, Counsel will soon file an ex parte motion asking the Court to approve additional funds needed due to the warden's mistake as well as a voucher asking for the Court to pay Martinez for the expenses he has already incurred.

11

## Certificate of Service

I certify that a true and correct copy of this document was served on Counsel for the State, Jeanette E. Walston Strange on July 29, 2021 via an email sent to JEStrange@tarrantcountytx.gov.

/s/ Jeffrey R. Newberry

_____

Jeffrey R. Newberry

FILED
TARRANT COUNTY
3/23/2022 1:08 PM
THOMAS A. WILDER
DISTRICT CLERK

CDC2-W011911-00

# IN THE CRIMINAL DISTRICT COURT NUMBER TWO, OF TARRANT COUNTY, TEXAS

| | |
|---|---|
| **Ex parte**<br>**Edward Lee Busby, Jr.,**<br><br>**Applicant** | **Cause No. CDC2-W011911-00** |

## ADVISORY REGARDING INTELLIGENCE ASSESSMENT

TO THE HONORABLE JUDGE WAYNE SALVANT:

On February 3, 2021, the Texas Court of Criminal Appeals ("CCA") authorized Busby's claim that he is ineligible for execution because he is intellectually disabled and remanded the claim to this Court for a review of the claim's merits. *Ex parte Busby*, No. WR-70,747-06 (Tex. Crim. App. Feb. 3, 2021). Soon thereafter, the Court convened a hearing in which the parties agreed an expert should assess Busby's intelligence and subsequently provide an opinion regarding whether Busby is intellectually disabled.

As the Court is aware, Dr. Gilbert Martinez was originally scheduled to assess Busby's intelligence on July 15, 2021, but was not allowed to properly conduct his assessment that day because TDCJ's

13

officials at the Polunsky Unit would not allow Busby to be uncuffed during the assessment. After obtaining assurances from prison officials that Busby would be allowed to be uncuffed during a subsequently scheduled assessment by Dr. Martinez, Counsel conferred with Dr. Martinez and TDCJ employees at the Polunsky Unit and scheduled Dr. Martinez to return to the unit on February 25, 2022, to complete the assessment that would have been done in July had prison officials not interfered. On January 21, 2022, Counsel informed the Court of the date of the scheduled assessment through an email sent to the Court's coordinator.

Counsel writes now to inform the Court that Dr. Martinez conducted the assessment of Busby's intellectual functioning on February 25, 2022, as scheduled. Determining whether Busby is intellectually disabled pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), and its progeny requires Dr. Martinez to consider not only Busby's intellectual functioning but also the degree to which his subaverage intellectual functioning manifests itself through limitations to Busby's adaptive skills. *See Atkins*, 536 U.S. at 318; *see also Moore v. Texas*, 137 S. Ct. 1039, 1050 (2017). As Counsel informed the Court in

14

their funding motion filed on June 1, 2021, in order to determine the degree to which his subaverage intelligence has impacted Busby, in addition to considering his interactions with Busby during the assessment and the affidavits submitted with Busby's habeas application, Dr. Martinez needs to interview witnesses who have had an opportunity to observe Busby's adaptive deficits. Dr. Martinez has indicated he will be able to complete this portion of the evaluation in May and that he will be able to form an opinion as to whether Busby is intellectually disabled soon thereafter. Counsel will advise the Court once these interviews have been completed and Dr. Martinez has issued his report.

Respectfully submitted,

/s/ David R. Dow

_____

David R. Dow
Texas Bar Number 06064900
University of Houston Law
Center
4604 Calhoun Road
Houston, Texas 77204-6060
Tel. (713) 743-2171
Fax (713) 743-2131
Email ddow@central.uh.edu

/s/ Jeffrey R. Newberry

_____

Jeffrey R. Newberry
Texas Bar Number 24060966
University of Houston Law
Center
4604 Calhoun Road
Houston, Texas 77204-6060
Tel. (713) 743-6843
Fax (713) 743-2131
Email jrnewber@central.uh.edu

## Certificate of Service

I certify that a true and correct copy of this document was served on Counsel for the State, Fredericka Sargent on March 23, 2022 via an email sent to FSargent@tarrantcountytx.gov.

/s/ Jeffrey R. Newberry

_____

Jeffrey R. Newberry

16

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jeffrey Newberry
Bar No. 24060966
jrnewber@central.uh.edu
Envelope ID: 62878494
Status as of 3/23/2022 2:08 PM CST

Associated Case Party: EDWARDBUSBY JR.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jeffrey Newberry | 24060966 | jrnewber@central.uh.edu | 3/23/2022 1:08:39 PM | SENT |
| David R.Dow | | ddow@central.uh.edu | 3/23/2022 1:08:39 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Fredericka Searle Sargent | 24027829 | fsargent@tarrantcountytx.gov | 3/23/2022 1:08:39 PM | SENT |

17

FILED
TARRANT COUNTY
7/14/2022 10:36 AM
THOMAS A. WILDER
DISTRICT CLERK

**IN THE CRIMINAL DISTRICT COURT NUMBER TWO,
OF TARRANT COUNTY, TEXAS**

| | |
|---|---|
| **Ex parte<br>Edward Lee Busby, Jr.,**<br><br>**Applicant** | **Cause No. CDC2-W011911-00** |

**JOINT ADVISORY REGARDING
INTELLIGENCE ASSESSMENT**

TO THE HONORABLE JUDGE WAYNE SALVANT:

On February 3, 2021, the Texas Court of Criminal Appeals ("CCA") authorized Busby's claim that he is ineligible for execution because he is intellectually disabled and remanded the claim to this Court for a review of the claim's merits. *Ex parte Busby*, No. WR-70,747-06 (Tex. Crim. App. Feb. 3, 2021). Soon thereafter, the Court convened a hearing in which the parties agreed an expert should assess Busby's intelligence and subsequently provide an opinion regarding whether Busby is intellectually disabled.

As Counsel for Busby informed the Court on March 23, Dr. Martinez conducted the assessment of Busby's intellectual functioning on February 25, 2022. Dr. Martinez subsequently conducted the

18

interviews of witnesses who have had an opportunity to observe Busby's adaptive deficits on June 15 and issued his report on July 11. On July 13, Counsel for Busby provided a copy of Dr. Martinez's report to Counsel for the State.

Counsel for the State intends to meet with the State's expert in the coming days to discuss whether the State's expert should conduct a separate assessment of Busby's intelligence ahead of any hearing convened to determine whether Busby is ineligible for execution due to intellectual disability. Once Counsel for the State has reached a decision regarding whether she intends for the State's expert to conduct a separate assessment of Busby's intelligence, she will apprise the Court of that decision.

19

Respectfully submitted,

/s/ David R. Dow

_____

David R. Dow
Texas Bar Number 06064900
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77204-6060
Tel. (713) 743-2171
Fax (713) 743-2131
ddow@central.uh.edu

/s/ Jeffrey R. Newberry

_____

Jeffrey R. Newberry
Texas Bar Number 24060966
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77204-6060
Tel. (713) 743-6843
Fax (713) 743-2131
jrnewber@central.uh.edu

*Counsel for Edward Lee Busby, Jr.*

/s/ Fredericka Sargent

_____

Fredericka Sargent
Texas Bar Number 24027829
Assistant Criminal District
Attorney, Postconviction
Tarrant County Criminal District
Attorney's Office
Tim Curry Criminal Justice
Center, 4th Floor
401 West Belknap Street
Tel. (817) 884-3109
Fax (817) 884-2499
FSargent@tarrantcountytx.gov

*Counsel for the State*

20

## Certificate of Service

I certify that a true and correct copy of this document was served on Counsel for the State, Fredericka Sargent on July 14, 2022 via an email sent to FSargent@tarrantcountytx.gov.

/s/ Jeffrey R. Newberry

_____

Jeffrey R. Newberry

21

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jeffrey Newberry
Bar No. 24060966
jrnewber@central.uh.edu
Envelope ID: 66313690
Status as of 7/14/2022 11:05 AM CST

Associated Case Party: EDWARDBUSBY JR.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeffrey Newberry | 24060966 | jrnewber@central.uh.edu | 7/14/2022 10:36:49 AM | SENT |
| David R.Dow | | ddow@central.uh.edu | 7/14/2022 10:36:49 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Fredericka Searle Sargent | 24027829 | fsargent@tarrantcountytx.gov | 7/14/2022 10:36:49 AM | SENT |

22

CDC2-W011911-00

FILED
TARRANT COUNTY
7/19/2022 10:06 AM
THOMAS A. WILDER
DISTRICT CLERK

## CAUSE NO. CDC2-W011911-00

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE CRIMINAL DISTRICT** |
| | § | |
| **EDWARD LEE BUSBY, JR.** | § | **COURT NO. 2** |
| | § | |
| | § | **TARRANT COUNTY, TEXAS** |

## STATE'S MOTION TO RELEASE RECORDS

**To the Honorable Judge of said Court:**

On February 3, 2021, the Court of Criminal Appeals authorized Busby's claim that he is ineligible for execution because he is intellectually disabled and remanded the claim to this Court for a merits determination. *Ex parte Busby*, No. WR-70,747-06. A hearing was held, and the parties agreed that an expert should assess Busby's intelligence and provide an opinion on intellectual disability.

Defense expert Dr. Gilbert Martinez has concluded his assessment and provided his opinion. The State's expert, Dr. Antoinette McGarrahan, is going to review Dr. Martinez's opinion, together with the raw materials. Dr. McGarrahan has also requested access to Dr. Timothy Proctor's records regarding his assessment as provided during the punishment trial. Finally, she has requested the records regarding the opinion of the underlying expert, Dr. Sven Helge, Dr. Proctor relied on. Therefore, the State requests that this Court order Dr. Proctor to turn over the requested materials to Dr. Antoinette McGarrahan.

23

Undersigned counsel has conferred with opposing counsel, and they are not opposed to this motion.

**CONCLUSION**

The State of Texas respectfully requests that this Court order Dr. Proctor to release all requested materials, both his and those of Dr. Sven Helge, to Dr. Antoinette McGarrahan.

Respectfully submitted,

SHAREN WILSON
Criminal District Attorney
Tarrant County, Texas

JOSEPH W. SPENCE
Assistant Criminal District Attorney
Chief, Post-Conviction

/s/ *Fredericka Sargent*
FREDERICKA SARGENT
Assistant Criminal District Attorney
State Bar No. 24027829
Tim Curry Criminal Justice Center
401 W. Belknap, 4th Floor
Fort Worth, Texas 76196-0201
(817) 884-3109
fsargent@tarrantcountytx.gov

24

**CERTIFICATE OF SERVICE**

A true copy of the State's Motion to Release Records has been e-served to

counsel listed below on this, the 19th day of July 2022:

David R. Dow
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77204-6060
ddow@central.uh.edu

Jeffrey R. Newberry
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77024-6060
jrnewberry@central.uh.edu

/s/ *Fredericka Sargent*
FREDERICKA SARGENT

**CAUSE NO. CDC2-W011911-00**

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE CRIMINAL DISTRICT** |
| | § | |
| **EDWARD LEE BUSBY, JR.** | § | **COURT NO. 2** |
| | § | |
| | § | **TARRANT COUNTY, TEXAS** |

## ORDER TO RELEASE RECORDS

This Court orders Dr. Timothy Proctor to release any relevant materials regarding his examination of Edward Lee Busby, Jr., including those of the underlying expert, Dr. Sven Helge, to Dr. Antoinette McGarrahan.

IT IS SO ORDERED.

SIGNED this _____ day of _____, 2022.


_____

Judge Wayne Salvant
Criminal District Court No. 2

26

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Esther Castaneda on behalf of Fredericka Searle Sargent
Bar No. 24027829
ecastaneda@tarrantcountytx.gov
Envelope ID: 66443676
Status as of 7/19/2022 10:56 AM CST

Associated Case Party: EDWARDBUSBY JR.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeffrey Newberry | 24060966 | jrnewber@central.uh.edu | 7/19/2022 10:06:33 AM | SENT |
| David R.Dow | | ddow@central.uh.edu | 7/19/2022 10:06:33 AM | SENT |
| Benjamin Wolff | 24091608 | Benjamin.Wolff@ocfw.texas.gov | 7/19/2022 10:06:33 AM | SENT |
| Jay Clendenin | | Jay.Clendenin@oag.texas.gov | 7/19/2022 10:06:33 AM | SENT |

27

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Esther Castaneda on behalf of Fredericka Searle Sargent
Bar No. 24027829
ecastaneda@tarrantcountytx.gov
Envelope ID: 66443676
Status as of 7/19/2022 10:56 AM CST
Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jefferson Clendenin | 24059589 | Jay.Clendenin@oag.texas.gov | 7/19/2022 10:06:33 AM | SENT |
| Fredericka Searle Sargent | 24027829 | fsargent@tarrantcountytx.gov | 7/19/2022 10:06:33 AM | SENT |
| Sian Schilhab | 17745950 | sian.schilhab@txcourts.gov | 7/19/2022 10:06:33 AM | SENT |
| Jeanette Strange | 24079407 | jewstrange@gmail.com | 7/19/2022 10:06:33 AM | SENT |

CDC2-W011911-00

FILED
TARRANT COUNTY
8/17/2022 3:48 PM
THOMAS A. WILDER
DISTRICT CLERK

## CAUSE NO. CDC2-W011911-00

| | | |
|---|---|---|
| EX PARTE | § | IN THE CRIMINAL DISTRICT |
| | § | |
| EDWARD LEE BUSBY, JR. | § | COURT NO. 2 |
| | § | |
| | § | TARRANT COUNTY, TEXAS |

### ORDER TO RELEASE RECORDS

This Court orders Dr. Timothy Proctor to release any relevant materials regarding his examination of Edward Lee Busby, Jr., including those of the underlying expert, Dr. Sven Helge, to Dr. Antoinette McGarrahan.

IT IS SO ORDERED.

SIGNED this ___ day of ___ July, 2022.

_____
Judge Wayne Salvant
Criminal District Court No. 2

**29**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Esther Castaneda on behalf of Fredericka Searle Sargent
Bar No. 24027829
ecastaneda@tarrantcountytx.gov
Envelope ID: 67400046
Status as of 8/17/2022 3:53 PM CST
Associated Case Party: EDWARDBUSBY JR.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David R.Dow | | ddow@central.uh.edu | 8/17/2022 3:48:33 PM | SENT |

30

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Esther Castaneda on behalf of Fredericka Searle Sargent
Bar No. 24027829
ecastaneda@tarrantcountytx.gov
Envelope ID: 67400046
Status as of 8/17/2022 3:53 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| David R. Dow | 6064900 | ddow@uh.edu | 8/17/2022 3:48:33 PM | SENT |

31

W011911

FILED
TARRANT COUNTY
7/25/2023 10:44 AM
THOMAS A. WILDER
DISTRICT CLERK

## WRIT NO. 70,747-06
## TRIAL COURT CAUSE NO. CDC2-W011911-00

| | | |
|---|---|---|
| EX PARTE | § | IN THE CRIMINAL DISTRICT |
| | § | |
| | § | COURT NO. 2 |
| | § | |
| EDWARD LEE BUSBY, JR. | § | TARRANT COUNTY, TEXAS |

## STATE'S PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

This Court, having considered Applicant's Subsequent Application for Writ of Habeas Corpus and its exhibits, the reports of Drs. Gilbert Martinez and Antoinette McGarrahan, the Texas Court of Criminal Appeals' (CCA) order dated February 3, 2021, and official court documents and records, makes the following Findings of Facts and Conclusions of law.

## I.    PROCEDURAL HISTORY

### A.    Trial and Direct Appeal

1. On March 31, 2004, Applicant was indicted for the offense of capital murder in Tarrant County Criminal District Court Number 2 in Cause Number 0920589D. SHCR-01 at 405.[1]

2. The indictment charged that on January 30, 2004, Applicant caused the death of Laura Crane in the course of committing or attempting to commit kidnaping or robbery. SHCR-01 at 405.

---

[1]    "SHCR-01" refers to the Clerk's Record filed with Applicant's first application for state habeas relief.

32

3.    On November 11, 2005, a Tarrant County jury found Applicant guilty of the capital murder of Laura Crane. SHCR-01 at 406.

4.    On November 17, 2005, the jury answered the special issues set forth in Texas Code of Criminal Procedure Article 37.071 in a manner that required a death sentence. SHCR-01 at 406–07.

5.    Direct appeal to the CCA was automatic. The judgment was affirmed, and the Supreme Court denied certiorari review. *Busby v. State*, 253 S.W.3d 661 (Tex. Crim. App. 2008), *cert. denied*, 555 U.S. 1050 (2008).

**B.  Initial State Habeas Proceedings**

6.    On July 28, 2008, while his direct appeal was pending, Applicant filed an initial application for post-conviction writ of habeas corpus raising 12 claims, but he did not include a claim that he was ineligible for the death penalty because he is intellectually disabled. *Ex parte Busby*, Cause No. C-2-008387-0920589-A (WR-70,747-01); *see* Tex. Code Crim. Proc. art. 11.071.

7.    The trial court entered findings of fact and conclusions of law, including supplemental findings and conclusions, and recommended that relief be denied. SHCR-01 at 386–404. The CCA denied Applicant's first writ on February 25, 2009. *Ex parte Busby*, No. WR-70,747-01.

**C.    Initial Federal Habeas Proceedings**

8.    Applicant filed a federal petition for writ of habeas corpus, which the United States District Court for the Northern District of Texas stayed to permit exhaustion of claims that had not previously been presented to the state court. *Busby v. Thaler*, No. 4:09-CV-160-Y (N.D. Tex. August 17, 2012) (unpublished order).

**D.    First Subsequent State Habeas Proceedings**

10.   Applicant returned to state court and filed a subsequent application for writ of habeas corpus, in which he raised three claims, including a claim that his death sentence violates the Eighth and Fourteenth Amendments because

~ 2 ~

33

he is intellectually disabled. *Ex parte Busby*, Cause No. C-2-009761-0920589-B (WR-70,747-02).

11.   The CCA dismissed Applicant's first subsequent application as an abuse of the writ. *Ex parte Busby*, No. WR-70,747-02 (Tex. Crim. App. March 6, 2013) (per curiam) (unpublished order).

**E.   Subsequent Federal Habeas Proceedings**

12.   Applicant filed a second amended petition in the federal district court, which was denied on March 10, 2015. Among the claims raised was a claim that he is intellectually disabled. *Busby v. Stephens*, No. 4:09-CV-160-O, 2015 WL 1037460 (N.D. Tex.) (unpublished).

13.   The United States Court of Appeals for the Fifth Circuit granted Applicant's application for a certificate of appealability on January 27, 2017, in part, as to his claim that he is intellectually disabled. *Busby v. Davis*, 677 Fed. App'x 884 (5th Cir.) (per curiam) (unpublished). Ultimately, the Fifth Circuit affirmed the district court's judgment, and the Supreme court denied certiorari review. *Busby v. Davis*, 925 F.3d 699 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 897 (2020).

**F.   Third through Sixth Subsequent State Habeas Proceedings**

14.   At the conclusion of the subsequent federal habeas proceedings, an execution date was set for May 6, 2020. The CCA stayed the execution in light of the COVID-19 pandemic. *Ex parte Busby*, WR-70,747-03 (April 7, 2020).

15.   On January 29, 2021, Applicant filed his sixth subsequent state habeas application, in which he asserted that he was intellectually disabled. The CCA remanded the application so that this Court could review the merits of that claim. *Ex parte Busby*, WR-70,747-06 (Tex. Crim. App. Feb. 3, 2021).[2]

---

[2]   Applicant's third and fourth subsequent state habeas applications were denied without written order this same day. *See Ex parte Busby*, Nos. WR-70,747-04, 05.

~ 3 ~

**34**

## II.    FINDINGS OF FACT

1.    In *Moore v. Texas*, the Supreme Court held that legal determinations of intellectual disability "must be 'informed by the medical community's diagnostic framework.'" 137 S. Ct. 1039, 1048 (2017) (*Moore I*) (quoting *Hall v. Florida*, 572 U.S. 701, 721 (2014); *see id.* at 1053 ("Reflecting improved understanding over time . . . current manuals offer the best available description of how mental disorders are expressed and can be recognized by trained clinicians.") (internal quotation marks and citation omitted).

2.    As recognized in *Moore I*, the two main diagnostic authorities in the field of intellectual disability are the American Psychiatric Association (APA), which has most recently set forth its definition of intellectual disability in *The Diagnostic and Statistical Manual of Mental Disorders* 33 (Am. Psychiatric Ass'n, 5th ed. 2013) (DSM-5), and the American Association on Intellectual & Developmental Disabilities' *Intellectual Disability: Definition, Classification, and System of Supports* 10 (11th ed. 2010) (AAIDD Manual). 137 S. Ct. at 1048. The standards in the DMS-5 and the AAIDD Manual "are largely the same", with the AAIDD Manual examining "the issue of intellectual disability in greater detail." *See Ex parte Moore*, 548 S.W.3d 552, 560 n.50 (Tex. Crim. App. 2018) (*Ex parte Moore II*), *overruled by Moore v. Texas*, 139 S. Ct. 666 (2019) (*Moore II*).

3.    In *Ex parte Moore II*, the CCA "adopt[ed] the framework set forth in the DSM-5" for adjudicating claims on intellectual disability. 548 S.W.3d at 555. The CCA has since reaffirmed that Texas courts should rely on the DSM-5 in assessing intellectual disability claims, reasing that "the approach taken by the DSM-5 hews closer to the original justification set out by the Supreme Court than the AAIDD-11." *Petetan v. State*, 622 S.W.3d 321, 332 (Tex. Crim. App. 2021). The CCA also clarified, however, that it was not "prohibiting considering of or reliance upon the AAIDD-11." *Id.*; *see Ex parte Moore II*, 548 S.W.3d at 560 n.50 (allowing reliance on AAIDD Manual to the extent that it amplifies or clarifies standards contained in the DSM-5; but if there is a conflict, the DSM-5 controls).

~ 4 ~

**35**

4. The DSM-5's diagnostic standards are controlling in assessing Applicant's claim of intellectual disability, but the AAIDD Manual's standards may also be relied on to the extent they are not inconsistent with the DSM-5.

5. Under both the DSM-5 and the AAIDD Manual, the diagnostic criteria for intellectual disability are: (A) deficits in intellectual functioning (Criterion A); (B) deficits in adaptive functioning (Criterion B); and (C) onset of intellectual and adaptive deficits during the developmental period (Criterion C). DSM-5 at 33; AAIDD Manual at 4. A "diagnosis of intellectual disability should be made whenever Criteria A, B, and C are met." *Id.*

6. As demonstrated in the record and set forth below, the preponderance of the evidence demonstrates that Applicant meets all three criteria. Therefore, he is intellectually disabled under the prevailing clinical standards set out in the DSM-5 and the AAIDD Manual.

7. Two expert witnesses have evaluated whether Applicant displays deficits in intellectual and adaptive functioning, and if so, whether his deficits occurred during the developmental period as directed by the new *Moore* framework, including Dr. Antoinette McGarrahan, the State's expert, and Dr. Gilbert Martinez, Applicant's expert. Both experts concluded that Applicant is intellectually disabled. Exhibit A (McGarrahan Report); Exhibit B (Martinez Report).

### A. Sub-average Intellectual Functioning (Criterion A)

1. Intellectual functioning includes reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding. *See* DSM-5 at 37. The typical method of assessing these functions is through individually administered and "psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence" (or IQ tests). *Id.* at 37. A score is indicative of intellectual disability if it is approximately two standard deviations or more below the population mean, including a margin for error (generally +/- 5 points). *Id.*

2. Under the classification schemes outlined by both the DSM-5 and the AAIDD Manual, deficient intellectual functioning is defined as an IQ of

approximately 70 with a confidence interval of plus or minus 5 points, derived from the standard error of measurement. *Id.*; AAIDD Manual at 36. This range, which is two standard deviations below the mean gives experts a 95% probability that the obtained score is within the five-point confidence interval. *See* AAIDD Manual at 36. Therefore, scores of 75 and below fall within the range for intellectual disability under both the DSM-5 and the AAIDD Manual.

3.  From 2001 to the present, Applicant was administered six IQ tests, and he scored within the range for intellectual disability on four of them.

4.  The first test was administered to Applicant while he was incarcerated in the Texas Department of Criminal Justice (TDCJ). Exhibit A at 2, 3. Applicant scored a 96, but this score was considered unreliable and disregarded at the trial. 36 Reporter's Record (RR) 48–49, 64; *see also* Exhibit A at 2, 3. Dr. McGarrahan describes it as a "substantial outlier compared to multiple individually administered, well-regarded IQ measure." Exhibit A at 3.

5.  Dr. Tim Proctor, the expert hired by defense at trial, administered the Weschler Adult Intelligence Scale-Third Edition (WAIS-III). Exhibit A at 2, 3. Applicant obtained a full-scale IQ score of 77, 36 RR 53, 56, putting the confidence interval of 73–82 at the lower end and in the intellectual disability range. Exhibit at 3. Applying the Flynn Effect reduces Applicant's score to a 74. Exhibit A at 3.

6.  Dr. Proctor also administered the BETA-III to Applicant, on which he achieved a score of 81. 36 RR 53.

7.  The State's expert at trial, Dr. Steven Helge, also administered the WAIS-III to Applicant. Exhibit A at 2, 3. Applicant obtained a full-scale IQ score of 79, with a confidence interval of 75–83. Applying the Flynn Effect reduces Applicant's score to a 76. Exhibit A at 2, 3.

8.  On February 11, 2010, Dr. Martinez administered the WAIS-IV to Applicant. Applicant obtained a full-scale IQ score of 74, with a confidence interval of 70–79. Exhibit A at 2, 3; Exhibit B at 2–3.

9.  Dr. Martinez again administered the WAIS-IV to Applicant on February 25, 2022. Exhibit A at 4; Exhibit B at 7. Applicant obtained a full-scale IQ score of 81, with a confidence interval of 77–85. Exhibit A at 4; Exhibit B at 7. Applying the Flynn Effect reduces Applicant's score to 76.5. Exhibit A at 4.

10. Applicant's performance on neuropsychological tests and his academic performance support the finding that he has deficits in intellectual functioning. Both the DSM-5 and the AAIDD Manual emphasize the value of neuropsychological testing when determining whether deficits in intellectual functioning exist, explaining that "[i]ndividual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score." DSM-5 at 37. Likewise, "academic learning" is included as a component of intellectual functioning. DSM-5 at 33.

11. Having considered the results of these evaluations and reports, the Court finds that Drs. Martinez and McGarrahan are credible and persuasive on the issue of Applicant's significant deficits in intellectual functioning.

12. Having considered the testimony, comments, and conclusions of Drs. Martinez and McGarrahan, this Court finds that, based on a preponderance of the evidence, that Applicant has sub-average intellectual functioning indicated by an IQ score approximately two standard deviations below the mean.

**B.    Significant Deficits in Adaptive Functioning (Criterion B)**

### 1.    The Diagnostic Standard

1.  Criterion B of an intellectual disability diagnosis—deficits in adaptive functioning—refers to a person's ability to "cope, adjust, and appropriately respond to everyday demands of life." The DSM-5 defines adaptive functioning as "how well a person meets community standards of personal

~ 7 ~

38

independence and social responsibility in comparison to others of similar age and sociocultural background." At 37. The AAIDD Manual defines adaptive behavior as "the collection of conceptual, social, and practical skills that has been learned and are performed by people in their everyday lives." At 43. Both professional definitions further divide adaptive functioning into three areas: conceptual, social, and practical. DMS-5 at 37.

2. According to the DSM-5, conceptual skills involve "competence in memory, language, reading, writing, math, reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others." At 37. The social skills involve "awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment among others." DSM-5 at 37. The practical skills involve "learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others." DSM-5 at 37.

3. To qualify as intellectually disabled, the DSM-5 states that an individual must have deficits in at least one domain of adaptive functioning to the degree that "ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." At 37. Further, the DSM-5 requires that adaptive deficits be related to the deficits in intellectual functioning. At 38. Both the DSM-5 and the AAIDD Manual specify several parameters to be followed in the process of assessing adaptive behavior.

4. First, the assessment should be comprehensive and broad-based, including date such as clinical interviews with third-party reporters and record review. DSM-5 at 38.

5. Second, the diagnostician must employ "clinical judgment," which is defined as a "special type of judgment rooted in a high level of clinical expertise and experience and judgment that emerges directly from extensive training, experience with the person, and extensive date." AAIDD Manual at 217. When data is collected through informal interviews, "'significant

limitations' can be identified when the nature of the adaptive deficits has had a major impact on the subject's functioning that clearly deviates from the standards of personal independence and social responsibility expected of the subject's age and cultural group." AAIDD Manual at 46, 48.

6.    Third, as it is expected that strengths co-exist with weaknesses, analysis of adaptive behavior is based on the presence of weaknesses, not the absence of strengths. *See Moore I*, 137 S. Ct. at 1050 ("[T]he medical community focuses the adaptive-functioning inquiry on adaptive *deficits*.") (emphasis in original); *Petetan*, 622 S.W.3d at 358 ("[E]mphasizing Appellant's adaptive strengths to undermine reliance on an expert diagnosis repeats the problem identified by the Supreme Court in *Moore I* and *Moore II*.").

7.    Finally, it is critical to avoid the use of lay stereotypes in assessing adaptive functioning. *See Moore I*, 137 S. Ct. at 1052 ("the medical profession has endeavored to counter lay stereotypes of the intellectually disabled"); *Petetan*, 622 S.W.3d at 359 (factfinder must not "rely upon lay stereotypes regarding intellectual disabilities to reject a clinical diagnosis").

### 2.    Applicant displays significant deficits in adaptive functioning.

1.    Both Dr. Martinez and Dr. McGarrahan concluded that Applicant meets the second criterion of intellectual disability because he displays significant impairments or deficits in at least one domain of adaptive functioning.

#### a.    The conceptual domain

2.    Conceptual skills involve "competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. DSM-5 at 37.

3.    Both Dr. Martinez and Dr. McGarrahan agree that Applicant suffers from adaptive deficits in the conceptual domain. Exhibit A at 4; Exhibit B at 26. Specifically, Dr. Martinez states that Applicant's "adaptive functioning assessment was indicative of significant deficiencies in communication and academic skills." Exhibit B at 26.

4. On October 14, 2005, during the trial, Dr. Proctor administered the Wide Range Achievement Test-3 (WRAT-3), which assesses word reading, spelling, and arithmetic. Applicant obtained a Reading Standard Score of 67 (1st percentile; 4th grade equivalent), a Spelling Standard Score of 63 (1st percentile; 3rd grade equivalent), and an Arithmetic Standard Score of 84 (4th percentile; 6th grade equivalent). 36 RR 50. 51.

5. On February 25, 2022, Dr. Martinez administered the Wide Range Achievement Test-5 (WRAT-5), the most recent version of this test. Exhibit A at 4; Exhibit B at 7. Applicant obtained a Word Reading Score of 66 (1st percentile; 3rd grade equivalent), a Sentence Comprehension Standard Score of 73 (4th percentile; 4th grade equivalent), a Reading Composite Standard Score of 69 (2nd percentile), a Spelling Standard Score of 84 (14th percentile; 5th grade equivalent), and a Math Computation Standard Score of 75 (5th percentile; 4th grade equivalent). Exhibit A at 4; Exhibit B at 7.

6. Dr. McGarrahan concluded that the testing in 2005 and the testing in 2022 resulted in "highly consistent" scores. She also noted that these scores were also consistent with the testing done at TDCJ prior to the trial for the instant offense. Exhibit A at 4.

7. School records from the Pampa School District establish that in the first grade, Applicant did not do well in such skills as reading, arithmetic, spelling, and handwriting, so much so that he had to repeat first grade. Applicant's Writ Exhibit 4, Exhibit 5.

8. High school records establish that Applicant had been placed in special education classes and was ARD (Admission, Review, and Dismissal Committee) exempt from the state's standardized testing for promotion between grades. Applicant's Writ Exhibit 4, Exhibit 5; *see also* 35 RR 27–29.

9. Mrs. Pamela Harris, one of Applicant's teachers, stated that Applicant was in "prevocational classes" for individuals with reduced intellectual functioning to help them develop basic living skills, such as cooking and

balancing a checkbook. Mrs. Harris said that grades did not a play a role in whether the student passed the class. Applicant's Writ Exhibit 5 at 1 (¶ 3).

10. One of Applicant's former girlfriends, Merlyn Rogers, stated that, at 17, Applicant could not read or write and had difficulty filling out job applications—she once found one in the trash can with only his name on it––and paying bills. Applicant's Writ Exhibit 6 at 1 (¶¶ 6–7).

11. Steve Porter, Applicant's junior high school football coach, said that Applicant's educational skills were more on par with that of a second grader even though he was in eighth grade. Applicant's Writ Exhibit 11 at 1 (¶ 8). He said further that Applicant could not grasp certain concepts and plays, even simple ones, and his confusion worsened with the complexity of the routes he was expected to learn and know. Applicant's Writ Exhibit 11 at 1 (¶ 9).

12. Renee Boyd, a friend, stated that Applicant had a difficult time reading and understanding *The Bible*. She said he would read the same sentence four or five times. Applicant's Writ Exhibit 7 at 1 (¶ 7). Raquel Farr, a neighbor, said that Applicant would ask her to count his change. Applicant's Writ Exhibit 9 at 1 (¶ 5).

13. Willard Farr, a neighbor, said that Applicant was not very good with numbers and counting—if Applicant had money, he would give it to someone else to count. Applicant's Writ Exhibit 8 at 1 (¶ 4). Applicant's nephew, Eddy Pouncy, also said Applicant could not count. Applicant's Writ Exhibit 10 at 1 (¶ 3).

14. James Bybee, a friend from high school, said that Applicant could not read very well. Applicant's Writ Exhibit 12 at 1 (¶ 7). And his sister, Tarsharn Busby, reported that she never saw her brother read; she tried to help him, but he could not "get it." Applicant's Writ Exhibit 14 at 6 (¶ 56).

### b.    The Social domain

1.    Social skills involve "empathy, social judgment, interpersonal communication skills, the ability to make and retain friendships, and similar capacities. DSM-5 at 37.

2.    Both Dr. Martinez and Dr. McGarrahan agree that Applicant suffers from adaptive deficits in the social domain. Exhibit A at 4; Exhibit B at 26. Specifically, Dr. Martinez states that Applicant's "adaptive functioning assessment was indicative of significant deficiencies in . . . leisure engagement and organization and social skills." Exhibit B at 26.

3.    Mr. Pouncy described Applicant as a follower, saying that he did not make plans about "anything," including where to eat, but he said further that Applicant did not have to worry about these things like food or transportation because these things were taken care of by other people. Applicant's Writ Exhibit 10 at 1 (¶ 2). Mr. Farr echoed this sentiment, stating that Applicant always had girls around to make decisions for him. Applicant's Writ Exhibit 8 at 1 (¶ 8). Ms. Rogers concurred, stating that she organized and planned their outings. Applicant's Writ Exhibit 6 at 3 (¶ 18). Mr. Pouncy said the girls around Applicant, whom he believed to be prostitutes, were always in control and made all the decisions. Applicant's Writ Exhibit 10 at 1–2 (¶ 9).

4.    Applicant's sister, Kimiko Coleman, reported that Applicant was easily distracted and would leave in the "middle of something," such as playing with his dog when he was supposed to cleaning the yard. Applicant's Writ Exhibit 13 at 6 (¶¶ 50–51).

5.    Mr. Porter said that while Applicant appeared to really enjoy football, he could not understand the more complex plays; he looked confused as to whom to block, which route to run, or whether to go left or right. Applicant's Writ Exhibit 11 at 1 (¶ 9).

43

6.      Ms. Coleman and described Applicant as "gullible," stating that he would do whatever was asked of him and that he believed everything he was told without question. Applicant's Writ Exhibit 13 at 7 (¶¶ 58–59).

7.      Ms. Coleman and Mr. Pouncy both said that Applicant was the victim of bullying, but it took "a lot" for him to "blow up." Applicant's Writ Exhibit at 13 at 1 (¶ 6). Mr. Pouncy said that this happened when he was teased about being slow or when he felt he had to protect women. Applicant's Writ Exhibit 10 at 2 (¶¶ 11–12).

8.      Mr. Pouncy and Mr. Farr both stated that Applicant was taken advantage of as an adult. Specifically, Mr. Pouncy said that the girls around him would take money from him before he could finish counting it. Applicant's Writ Exhibit 10 at 1 (¶ 8). And Mr. Farr said that he was "very easily manipulated by women." Applicant's Writ Exhibit 8 at 1 (¶ 7).

9.      Finally, Applicant has demonstrated difficulty regulating sadness. Mr. Bybee said that Applicant always his heart on his shoulder and that he cried often. Applicant's Writ Exhibit 12 at 1 (¶ 3). Mr. Pouncy stated that Applicant cried more than others, often in a room full of people. Applicant's Writ Exhibit 10 at 2 (¶ 7). Ms. Harris noted that his two moods were "frustrated" and "depressed." Applicant's Writ Exhibit 5 at 1 (¶ 7). Both Mr. Pouncy and Mr. Farr reported that Applicant's depression and sadness stemmed from his low abilities and that he said he was tired of living "this life." Applicant's Writ Exhibit 8 at 2 (¶ 12), Exhibit 10 at 1 (¶ 5),

### c.      The practical domain

1.      Practical skills center on "self-management in areas such as personal care, job responsibilities, money management, recreation, and organizing school and work tasks." DSM-5 at 37.

2.      Both Dr. Martinez and Dr. McGarrahan agree that Applicant suffers from adaptive deficits in the practical domain. Exhibit A at 4; Exhibit B at 26. Specifically, Dr. Martinez states that Applicant's "adaptive functioning

assessment was indicative of significant deficiencies in . . . community/home skills, health and safety skills, and self-care." Exhibit B at 26.

3. Ms. Rogers said that Applicant would ask for directions when driving and this confused her because he had always lived in Pampa. Helping him by using street signs did not work because Applicant could not follow them, so she used landmarks and buildings. Applicant's Writ Exhibit 6 at 2 (¶ 11). Ms. Coleman reported that their cousin Derrick took Applicant's driver's test for him. Applicant's Writ Exhibit 13 at 5 (¶ 6).

4. Ms. Rogers ran errands for Applicant, and when he was with her, she tried to help him learn, but no matter how many times she showed him how to do something, Applicant "could not" figure out how to complete basic, daily tasks. Things like being unable to open the hood of a car made him frustrated. Applicant's Writ Exhibit 6 at 2 (¶¶ 10, 12).

5. Because of Applicant's inability to learn daily living tasks, Ms. Rogers and Applicant's other sisters took care of him; therefore, he never had to solve problems for himself. *See generally*, Applicant's Writ Exhibit 6, Exhibit 13 at 5 (¶ 39), Exhibit 14 at 6. Ms. Coleman reported that Applicant always lived the women he dated; he never leased his own apartment. Applicant's Writ Exhibit 13 at 8 (¶ 64). Mr. Farr reported that without his girlfriends, Applicant appeared confused. Applicant's Writ Exhibit 8 at 2 (¶ 9)

6. Both of his sisters stated that when Applicant "cleaned his room" by placing everything under the bed or in his closet. Applicant's Writ Exhibit 13 at 6 (¶ 48), Exhibit 14 at 5 (¶ 49). They also said that his chore was to mow the lawn, but Ms. Coleman never saw him do this, and after raking the leaves, he would spread them out across the lawn. Applicant's Writ Exhibit 13 at 6 (¶ 49). Tasks such as washing dishes or sweeping were not completed adequately. Applicant's Writ Exhibit 14 at 6 (¶ 51).

7. Applicant had difficulty managing money. Ms. Rogers mentioned a time when Applicant went to Burger King to buy food but then said he did not have enough money. She knew this not to be true, and she speculated that Applicant could not read the menu and add up the amount his choices

would have cost. Applicant's Writ Exhibit 6 at 1 (¶ 8). Ms. Rogers also said that he could not find the amount due on a paper bill. Applicant's Writ Exhibit 6 at 1 (¶ 7).

8. At the same time, Ms. Busby reported that when he was young, she called him the "Candy Man" because he would spend all his money on candy or buy it when his mother sent him to buy something else. Applicant's Writ Exhibit 14 at 6 (¶ 59). She remembered a time when he spent all his Christmas money on a single outfit, while she was as able to purchase three or four outfits with the same amount of money. Applicant's Writ Exhibit 14 at 6 (¶ 60).

9. Ms. Coleman reported that Applicant, at eight or nine years old, collected snakes and brought them home in a suitcase. He then let them loose in the house. Applicant's Exhibit 13 at 6 (¶ 54).

10. Both Ms. Busby and Ms. Coleman reported that Applicant had difficulty with hygiene. There was always dirt underneath his fingernails, and when he showered, there was a ring of dirt around the tub. Applicant's Exhibit 13 at 6 (¶ 52). Indeed, he did not like to bathe—he would go days without doing so—and had to be reminded to do so. Applicant's Writ Exhibit 14 at 6 (¶ 52). Applicant also did not brush his teeth regularly. Applicant's Writ Exhibit 14 at 6 (¶ 53). Both also reported that he did not changes his clothes. Applicant's Writ Exhibit 13 at 6 (¶ 52), Exhibit 14 at 6 (¶ 54). Mr. Bybee and Mr. Porter said that his poor hygiene was noticed at school, with both stating that it appeared as if Applicant had not showered in days. Applicant's Writ Exhibit 11 at 1 (¶ 5), Exhibit 12 at 1 (¶ 5).

## III.  CONCLUSIONS OF LAW

1. In *Atkins v. Virginia*, the United States Supreme Court held that the Eighth Amendment categorically bars the execution of intellectually disabled individuals. 536 U.S. 304, 321 (2002). The Court cited with approval the then-current editions of the DSM and AAIDD. *Id.* at 308 n.3, 317. Twelve years later, in *Hall v. Florida*, the Court made clear that assessments of intellectual disability must be "informed by the medical community's diagnostic

framework." 572 U.S. 701, 721–22 (2014) (striking down Florida's "rigid rule" prohibiting inquiry into adaptive functioning unless the IQ score was 70 or below as inconsistent with the consensus of medical and scientific authority). The Court reaffirmed this requirement in *Moore I*. 137 S. Ct. at 1051 (striking down Texas's framework for analyzing adaptive functioning, including its use of the *Briseño* factors, because it deviated from the prevailing clinical standards and created "an unacceptable risk that persons with intellectual disability will be executed").

2.   On remand following *Moore I*, the CCA adopted the framework set out in the DSM-5 for assessing claims of intellectual disability. *Ex parte Moore II*, 548 S.W.3d at 555, 559–60; *Petetan*, 622 S.W.3d at 325 ("we apply contemporary clinical standards—the framework set forth in the DSM-5— for assessing intellectual disability"). Texas courts adjudicating claims of intellectual disability may also rely on the AAIDD Manual to the extent it does not conflict with the DSM-5 and where its standards "amplify or clarify standards contained in the DSM-5." *Ex parte Moore II*, 548 S.W.3d at 560 n.50; *see also Petetan*, 622 S.W.3d at 332 (providing that courts may still consider and/or rely on the AAIDD Manual).

3.   In analyzing the evidence in support of Applicant's intellectual disability claim, this Court is bound by *Atkins*, *Hall*, *Moore I*, *Moore II*, the DSM-5, and the AAIDD Manual.

4.   Criterion A requires "intellectual-functioning deficits (indicated by an IQ score 'approximately two standard deviations below the mean'—i.e., a score of roughly 70—adjusted for the standard error of measurement[.]" *Moore I*, 137 S. Ct. at 1045 (quoting AAIDD Manual at 27); *see also Petetan*, 622 S.W.3d at 338; DSM-5 at 33 ("Deficits in intellectual functions" include "reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience.").

5.   This Court concludes that Applicant has established by a preponderance of the evidence that he has sufficient deficits in intellectual functioning. First, as described above, Applicant has scored within the range of subaverage intellectual functioning on multiple "psychometrically valid,

comprehensive, culturally appropriate tests of intelligence" (full-scale IQ tests). Second, he also scored in the impaired range on a series of additional tests designed to measure intellectual and neuropsychological functioning. Third, his history of poor academic performance also supports the conclusion that Applicant has deficits in intellectual functioning. Finally, psychologists for both Applicant and the State agree that the evidence is sufficient to conclude that Applicant has significantly sub-average intellectual functioning.

6.  Criterion B requires a showing of adaptive deficits, defined as "an evaluation of the individual's ability to function across a variety of dimensions." *Petetan*, 622 S.W.3d at 339. This criterion is met where there are "[d]eficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility." *Id.*; *see also Moore I*, 137 S. Ct. at 1045 (adaptive deficits are "the inability to learn basic skills and adjust behavior to changing circumstances"). This inquiry "involves three domains of adaptive reasoning: conceptual, social, and practical." *Petetan*, 622 S.W.3d at 339. And there must be a showing "that adaptive deficits are related to sub-average intellectual functioning." *Id.* at 332. However, "while the relational requirement found in the DSM-5 is currently a necessary legal requirement under *Atkins*, it is not a vehicle to undermine an otherwise clinical diagnosis through consideration of lay stereotypes, adaptive strengths, and alternative disorders." *Id.* at 333.

7.  Regarding this criterion, this Court concludes that Applicant has established by a preponderance of the evidence that he has significant adaptive deficits in all three domains of adaptive functioning. This conclusion is supports by the results of Applicant's neuropsychological testing, the nature of Applicant's adaptive impairments, and the reports of Dr. McGarrahan and Dr. Martinez, who each assessed evidence of Applicant's adaptive behavior using current diagnostic criteria and clinical judgment to evaluate testing, interviews, records, and lay-witness evidence.

8.  This Court further concludes that Applicant has established that his adaptive deficits are related to his intellectual impairments.

9. Criterion C requires onset of intellectual and adaptive deficits during the developmental period. *Moore I,* 137 S. Ct. at 1045; DSM-5 at 33. The Court concludes that Applicant has established that his intellectual and adaptive deficits began during the developmental period. This is supported by Applicant's school records, the absence of any intervening or post-developmental events that would explain his deficits and lay witness reports describing his impaired functioning from an early age.

10. In *Moore I,* the Supreme Court reiterated that as "instructed in *Hall,* adjudications of intellectual disability should be 'informed by the views of medical experts.'" 137 S. Ct. at 1044 (quoting *Hall,* 572 U.S. at 721). Here, medical experts for Applicant and the State concluded that he suffers from deficits in intellectual functioning. Additionally, these experts, who conducted or reviewed valid adaptive behavior assessments, found that Applicant suffers from significant deficits in adaptive functioning. Finally, both experts opined that both the intellectual deficits and the adaptive deficits were present during developmental period.

11. The Court concludes that Applicant has established by a preponderance of the evidence that he is a person with intellectual disability based on the legal criteria set out in *Atkins, Hall, Moore I,* and *Ex parte Moore II.*

12. Having reconsidered the case as directed by the CCA and considering the evidence presented at trial, the evidence presented in connection with Applicant's subsequent state habeas application, and Dr. McGarrahan's report, this Court concludes that Applicant is entitled to relief.

13. Accordingly, considering the foregoing findings of fact and conclusions of law, this Court recommends that Applicant's sentence of death be reformed to a sentence of life in prison.

WHEREFORE, the State prays that this Court adopt these Proposed Findings of Fact and Conclusions of Law and recommend that Applicant's sentence of death be reformed to a sentence of life in prison.

Respectfully submitted,

PHIL SORRELLS
Criminal District Attorney
Tarrant County, Texas

STEVEN W. CONDER
Assistant Criminal District Attorney
Chief, Post-Conviction

*/s/ Fredericka Sargent*
FREDERICKA SARGENT
Assistant Criminal District Attorney
State Bar No. 24027829
Tim Curry Criminal Justice Center
401 W. Belknap, 4th Floor
Fort Worth, Texas 76196-0201
(817) 884-3109
fsargent@tarrantcountytx.gov

## CERTIFICATE OF SERVICE

A true copy of the State's Proposed Findings of Fact and Conclusions of Law

has been e-served to counsel listed below on this, the 25th day of July 2023:

David R. Dow
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77204-6060
ddow@central.uh.edu

Jeffrey R. Newberry
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77024-6060
jrnewberry@central.uh.edu


/s/ *Fredericka Sargent*
FREDERICKA SARGENT

**WRIT NO. 70,747-06**
**CAUSE NO. CDC2-W011911-00**

| | | |
|---|---|---|
| EX PARTE | § | IN THE CRIMINAL DISTRICT |
| | § | |
| EDWARD LEE BUSBY, JR. | § | COURT NO. 2 |
| | § | |
| | § | TARRANT COUNTY, TEXAS |

## ORDER

The Court adopts the State's Proposed Findings of Fact and Conclusions of Law as its own and recommends that the relief Edward Lee Busby, Jr., requests should be **GRANTED** and that his sentence of death be reformed to a sentence of life in prison.

The Court further orders and directs the Clerk of this County to furnish a copy of the Court's findings to Applicant through his attorneys Jeffrey R. Newberry, jrnewberry@central.uh.edu , and David R. Dow, ddow@central.uh.edu, and to the Post Conviction Section of the Criminal District Attorney's Office at COAappellatealerts@tarrantcountytx.gov.

52

IT IS SO ORDERED.

SIGNED this _____ day of _____, 2023.


_____
Judge Wayne Salvant
Criminal District Court No. 2

53

54

# EXHIBIT A

54

# McGarrahan & Associates
*Forensic Psychology and Neuropsychology*

## Forensic Record Review and Intellectual Disability Analysis

### Examinee Identifying Information:

| | |
|---|---|
| Inmate Name: | Edward Lee Busby, Jr. |
| Date of Birth: | 7/25/1972 |
| Age: | 50 |
| TDCJ #: | 999506 |
| Trial Court Cause #: | C-2-009761-0920589-C |
| CCA Cause #: | WR-70, 747-06 |
| Style of Case: | Ex Parte Edward Lee Busby, Jr., Applicant |
| Date of Report: | 4/21/2023 |
| Referral Source: | Ms. Fredericka Sargent |
| | Assistant Criminal District Attorney, Postconviction |
| | Tarrant County Criminal District Attorney's Office |

### Reason for Referral and Legal Status:

Mr. Edward Busby, Jr. is a 50-year-old male who is currently on Texas' death row, having been convicted of capital murder in Tarrant County and sentenced to death on 11/17/2005. Mr. Busby, through his counsel, asserts that he is intellectually disabled and thus, per the Supreme Court of the United States, not eligible for execution. Counsel for the State, Ms. Fredericka Sargent, requested this examiner conduct a review of records in this matter and provide an opinion on whether Mr. Busby is intellectually disabled per current diagnostic standards and/or whether an in-person examination is necessary to determine such. It should be noted that this examiner did not conduct a face-to-face evaluation of Mr. Busby and, as such, the opinions provided herein may be limited as a result and could be different if one were to be performed.

### Sources of Information:

The following is a list of sources relied upon in gathering information for, and forming the opinions contained in, this report:

1. Raw psychological test data from a pre-trial psychological examination of Mr. Busby by Tim Proctor, Ph.D. on 10/14/2005 and 11/4/2005;
2. Affidavit of Gilda Kessner, Psy.D., dated 3/21/2008;
3. Report of Assessment of Effort and Test Results by Gilbert Martinez, Ph.D., dated 2/11/2010;
4. Report of Intellectual and Adaptive Functioning Assessment by Gilbert Martinez, Ph.D., dated 7/11/2022;
5. Declaration of Bekh Bradley-Davino, Ph.D., dated 5/19/2010, and Dr. Bradley-Davino's Curriculum Vitae;
6. TDCJ Windham School District educational records;
7. TDCJ I-60 Requests; and

Busby, Edward Lee, Jr.                                                                 Page 2
Trial Court Cause #: C-2-009761-0920589-C
CCA Cause #: WR-70, 747-06

8.  Subsequent Application for Post-Conviction Writ of Habeas Corpus and Exhibits 1-18, filed in Tarrant County on 1/29/2021.

**Intellectual Disability Criteria:**

The Diagnostic and Statistical Manual of Mental Disorders-5-Text Revision (DSM-5-TR) and the American Association on Intellectual Developmental Disabilities (AAIDD) are similar in their definition of intellectual developmental disorder/intellectual disability and list the following diagnostic criteria:

1.  Significant limitations in intellectual functioning, confirmed by both clinical assessment and individualized, standardized testing. Both the DSM-5-TR and the AAIDD define intellectual deficits as scores falling approximately two standard deviations below the mean, including a margin for measurement error (generally $\pm 5$ points). On tests with a mean of 100 and a standard deviation of 15, this would involve scores ranging from 65 to 75 (i.e., $70 \pm 5$). Practice effects (learning from repeated testing) and the "Flynn effect" (inflated scores due to out-of-date test norms) can affect test scores and should be considered when interpreting IQ scores;
2.  Deficits in adaptive behavior that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility; and
3.  Onset of intellectual and adaptive deficits during the developmental period, which is not specifically defined in the DSM-5-TR and states only that the condition is present "during childhood or adolescence." The AAIDD specifies the developmental period as occurring before the age of 22.

Each of the three criteria are considered for Mr. Busby below:

Intellectual Deficits: IQ Testing of Mr. Busby (in chronological order):

Mr. Busby has undergone several intelligence tests. The following is a summary of those assessments.

| Date & Examiner | Test Given & Year Normed | FSIQ | Percentile Rank | 95% Confidence Interval | Considering Flynn Effect (.3 points per year) |
|---|---|---|---|---|---|
| 1/1/2001 (Unknown examiner) | Unknown test in TDCJ | 96 | 39th | Approximately 91-101 | Unknown |
| 10/14/2005 (Dr. Tim Proctor) | WAIS-III (1995) | 77 | 6th | 73-82 | 74 (.3 x 10 = 3) |
| 11/4/2005 (Dr. Tim Proctor) | Beta-III (1997) | 81 | 10th | 72-90 | 78.6 (.3 x 8 = 2.4) |
| Unknown date but said was given "weeks" after Dr. Proctor's WAIS-III (Dr. Sven Helge) | WAIS-III (1995) | 79 | 8th | 75-83 | 76 (.3 x 10 = 3) |
| 2/11/2010 (Dr. Gilbert Martinez) | WAIS-IV (2007) | 74 | 4th | 70-79 | 73.1 (.3 x 3 = .9) |
| 2/25/2022 (Dr. Gilbert Martinez) | WAIS-IV (2007) | 81 | 10th | 77-85 | 76.5 (.3 x 15 = 4.5) |

**56**

Busby, Edward Lee, Jr.                                                                                Page 3
Trial Court Cause #: C-2-009761-0920589-C
CCA Cause #: WR-70, 747-06

The earliest available IQ test score in the file reviewed is a 96, administered by the Texas Department of Criminal Justice on 1/1/2001. The name of the test is not listed but from this examiner's experience with such testing, it is most likely a group (not individually) administered instrument. It is believed that this is the same IQ score referenced in the defense writ regarding "an unidentified IQ test" administered to Mr. Busby on 1/1/2001 by an unknown individual and under unknown conditions. This score was said to have been considered unreliable and disregarded at the trial level. It is also a substantial outlier compared to multiple individually administered, well-regarded IQ measures (described below).

On 10/14/2005, Dr. Tim Proctor, psychologist hired by the defense at trial, administered the Wechsler Adult Intelligence Scale-III (WAIS-III), which was normed in 1995, to Mr. Busby. He obtained a Full Scale IQ of 77 (6th percentile rank; 95% confidence interval = 73-82). The confidence interval, at the lower end, is in the intellectual disability range referenced above (generally 65-75), even without adjusting for or considering the Flynn effect, which would be 3 points (.3 per year x 10 years since being normed = 3). If applied, this would reduce the overall IQ score to 74. An embedded performance validity indicator was within normal limits, suggesting sufficient effort put forth by Mr. Busby, with no indication of malingering.

On 11/4/2005, Dr. Proctor administered another IQ test, the Beta-III, normed in the late 1990's, and obtained a Full Scale IQ of 81 (10th percentile rank; 95 % confidence interval = 72-90). Again, the confidence interval, at the lower end, is in the intellectual disability range referenced above (generally 65-75), even without adjusting for the Flynn effect. If a Flynn correction were to be applied or considered, the IQ score would be 2.4 points lower (i.e., 78.6). A stand-alone performance validity measure on this date was within normal limits and not indicative of faking or poor effort by Mr. Busby.

The State's psychological expert at trial, Dr. Sven Helge, also conducted an intellectual evaluation of Mr. Busby. Although Dr. Helge did not testify at trial, other trial testimony revealed that Dr. Helge administered the WAIS-III "just weeks" after Dr. Proctor's administration of the WAIS-III. This same testimony indicated that Dr. Helge's testing resulted in a Full Scale IQ score of 79 (8th percentile; 95% confidence interval = 75-83). Considering the Flynn effect, this Full Scale IQ would be 76. Attempts by this examiner to locate the raw data from Dr. Helge's IQ testing were unsuccessful.

After the conclusion of Mr. Busby's trial and sentencing, Dr. Gilda Kessner, psychologist, was asked by appellate counsel to review records and opine on the psychological mitigation evidence put forth by the defense in the punishment phase of trial. In a signed affidavit, dated 3/21/2008, Dr. Kessner concluded, among other things, that her review of materials demonstrated IQ scores in the "borderline" or "mentally retarded range" and that the documentation did "not rule out a diagnosis of mental retardation," particularly if the Flynn effect were to have been considered at the trial level. She recommended updated testing with the newest available instrument, which was set to be published later that same year.

Two years after the Wechsler Adult Intelligence Scale-IV (WAIS-IV) was published, Dr. Gilbert Martinez, neuropsychologist, administered it to Mr. Busby. Results from his 2/11/2010 assessment demonstrated that Mr. Busby's Full Scale IQ was 74 (4th percentile rank; 95% confidence interval = 70-79). Consideration of the Flynn effect would be less than 1 point since the test had recently been normed and published. Performance validity assessment, conducted on the same date as IQ testing, indicated that Mr. Busby gave sufficient effort such that the results were seen as a valid representation of his intellectual functioning at that time. Thus, there was no evidence of malingering or that Mr. Busby was attempting to present an inaccurate picture of his functioning. On 5/19/2010, Dr. Bradley-Davino, psychologist, per defense counsel request, outlined her findings from her extensive review of records and multi-hour interview with Mr. Busby, the latter of which occurred on 3/11/2010 and 3/12/2010. Among her many

57

conclusions, she opined that Mr. Busby had "significant limitations in intellectual functioning." Dr. Martinez repeated the WAIS-IV with Mr. Busby on 2/25/2022. Performance validity testing was again within normal ranges and indicative of good effort and no malingering. The WAIS-IV Full Scale IQ score was 81 (10th percentile rank; 95% confidence interval = 77-85). When considering the Flynn effect (15 years x .3 points per year = 4.5 point), the IQ score would be 76.5.

Deficits in Adaptive Functioning in One or More Area of Activities of Daily Living:

The earliest standardized achievement testing available in the file is in the TDCJ Windham School District records. While the name of the test is not indicated, Mr. Busby obtained 4th grade equivalent scores on measures of reading on two dates, 7/7/1998 and 4/18/2001 (ages 25 and 28, respectively).

On 10/14/2005, at the trial stage, Dr. Proctor administered the Wide Range Achievement Test -3 (WRAT-3), which assessed Mr. Busby's skills of word reading, spelling, and arithmetic. Mr. Busby obtained the following scores: Reading Standard Score of 67 (1st percentile rank; 4th grade equivalent); Spelling Standard Score of 63 (1st percentile rank; 3rd grade equivalent), and Arithmetic Standard Score of 84 (4th percentile rank; 6th grade equivalent).

On 2/25/2022, Dr. Martinez administered the Wide Range Achievement Test-5 (WRAT-5), the most recent reiteration of this test. Mr. Busby obtained the following scores: Word Reading Standard Score of 66 (1st percentile rank; 3rd grade equivalent), Sentence Comprehension Standard Score of 73 (4th percentile rank; 4th grade equivalent); Reading Composite Standard Score of 69 (2nd percentile rank); Spelling Standard Score of 84 (14th percentile rank; 5th grade equivalent), and Math Computation Standard Score of 75 (5th percentile rank; 4th grade equivalent). Dr. Martinez's scores are highly consistent with testing on the same instrument approximately 17 years earlier by Dr. Proctor and similar testing in TDCJ prior to trial for the instant offense.

Dr. Martinez also conducted the Adaptive Behavior Assessment System- Third Education (ABAS-3), a standardized questionnaire of adaptive functions completed by individuals who were familiar with the examinee during the developmental period. Results from Mr. Busby's sister demonstrated the following substantially low scores: Conceptual Domain Standard Score of 58 (<1st percentile rank), Social Domain Standard Score of 58 (<1st percentile rank), and Practical Domain Standard Score of 54 (<1st percentile rank), resulting in a General Adaptive Composite Standard Score of 53 (<1st percentile rank). Results from a former teacher were nearly identical to those of his sister, with the following scores: Conceptual Domain Standard Score of 54 (<1st percentile rank), Social Domain Standard Score of 56 (<1st percentile rank), and Practical Domain Standard Score of 54 (<1st percentile rank), resulting in a General Adaptive Composite Standard Score of 52 (<1st percentile rank). All of these scores, across multiple domains, are clearly within the range to be considered as substantially deficient.

Onset of Intellectual and Adaptive Deficits During the Developmental Period:

School records from the Pampa School District showed that, in the 1st grade, Mr. Busby did not do well in basic skills, such as reading, arithmetic, spelling and handwriting. These records also showed that he had to repeat the 1st grade, likely as a result of his poor marks. His high school records demonstrated that he was in special education and was ARD (Admission, Review, and Dismissal committee) exempt from the State of Texas standardized testing for promotion to subsequent grades. A 2/4/2020 declaration by Pamela Harris, a prior special education teacher of Mr. Busby in the Pampa School District, revealed that Mr. Busby was in "prevocational classes" for individuals with reduced intellectual functioning, in order to help him develop basic living skills. Consistent with this, a prior girlfriend of Mr. Busby indicated in her

2/5/2010 declaration that when she dated Mr. Busby, both were aged 17 at the time, he could not read or write and had difficulty carrying out basic tasks such as filling out a job application and paying bills. Mr. Busby's junior high school football coach described Mr. Busby as "physically like a grown man" but mentally lacking. He also noted that Mr. Busby demonstrated educational skills more on par with a 2nd grader even though he was in the 8th grade. He added that Mr. Busby could not grasp certain concepts and plays, even simple ones, and his confusion worsened with the complexity of player routes he was expected to learn and know. A former high school football team member reiterated the coach's sentiment regarding Mr. Busby's cognitive limitations and impairments.

Declarations of others who knew Mr. Busby in his early to mid 20's, such as his neighbors, indicated that he continued to struggle with the same basic tasks as those during his younger years. They used terms such as "slow" in describing Mr. Busby and all reported that he struggled to understand information. These declarations also showed that Mr. Busby had a lot of help from others to function and make decisions, both during his childhood and into his young adulthood. Further, these declarations revealed that he had significant mood dysregulation, poor personal hygiene, social deficits, lacked friends, and never really established independent living. Based on the declarations, administration of adaptive behavior questionnaires of a family member and teacher by Dr. Martinez, school records, achievement testing across his lifespan, and interviews by Dr. Martinez, it is apparent that Mr. Busby's intellectual and adaptive behavior deficits were present during the developmental period.

**Additional Testing:**

It is not believed that updated or additional intellectual and adaptive behavior testing is warranted in this matter. Mr. Busby has undergone numerous IQ assessments over many years, which were conducted by qualified individuals and using well-regarded and most recent measures available. There was no indication of faking or malingering during these examinations as indicated by the results of performance validity measures. The IQ scores obtained were valid and demonstrated a highly consistent pattern of results, with scores falling within the range considered to represent substantial intellectual deficits (generally 65 to 75). One IQ score, said to have been conducted in TDCJ in 2001 by an unknown individual, using an unknown instrument, and under unknown conditions appears to be an outlier and not seen as a valid indication of Mr. Busby's intellectual functioning. Thus, there is no further need for IQ testing. Similarly, achievement testing (aspects of adaptive behavior skills, such as mathematics, reading, comprehension, and spelling) during a prior period of incarceration (several years before trial), at the trial level, and post-trial has demonstrated highly consistent and substantially deficient scores over time. Further, the achievement assessment results have been commensurate with his school records, declarations from people involved in different aspects of his life (sports, relationships, academics), and Dr. Martinez's administration of standardized questionnaires to a family member and former teacher, all of which revealed significant deficits in these skills across his lifespan. As such, no further testing or assessment is needed in this area. Finally, the data available in the file are sufficient to document that the onset of Mr. Busby's intellectual and adaptive behavior deficits occurred during the developmental period, and there is no need for further exploration of the timing of the onset of his difficulties.

**Conclusions:**

Mr. Busby has consistently demonstrated substantially reduced intellectual abilities. He has also consistently demonstrated significant deficits in several areas of adaptative behavior. Finally, based on all of the material reviewed, it appears that the onset of his intellectual and adaptive deficits occurred during the developmental period.

Busby, Edward Lee, Jr.                                                                    Page 6
Trial Court Cause #: C-2-009761-0920589-C
CCA Cause #: WR-70, 747-06

## Opinion:

Considering in total Mr. Busby's IQ deficits, adaptive functioning impairments, and onset of these difficulties during the developmental period, this examiner cannot controvert the conclusion and opinion of Dr. Martinez that Mr. Busby meets the full diagnostic criteria for intellectual disability according to current standards (DSM-5-TR and AAIDD).

It should be noted that this examiner reserves the right to make changes to the above conclusions and opinions if new information becomes available that warrants such changes. Any such changes would be presented in the form of an addendum or supplement to this report.

If I can be of further assistance in this matter, please do not hesitate to contact me.

Antoinette R. McGarrahan, Ph.D.
Psychologist, Specializing in Forensic Psychology and Neuropsychology

60

EXHIBIT B

GILBERT MARTINEZ, PH.D., ABPP-CN
LICENSED PSYCHOLOGIST
BOARD CERTIFIED IN CLINICAL NEUROPSYCHOLOGY

16014 VIA SHAVANO
SAN ANTONIO. TX 78249
FAX (210) 615 – 6906
PH (210) 614 – 3011

## REPORT OF INTELLECTUAL
## AND ADAPTIVE FUNCTIONING ASSESSMENT

**Name:** Edward Busby
**Date of Birth:** 7/25/72
**Examiners:** Gilbert Martinez, Ph.D., ABPP-CN
Alisa Zinsmeyer Young, M.A., LPC
Verenice D'Santiago-Eastman, Ph.D., L.P

**Assessment Date(s):** 06/15/22
**Current Age:** 49 years, 11 months
**Report Date:** 7/11/22
**Referral Source:** Jeff R. Newberry
David R. Dow

**Re:** Cause No. CDC2-W011911-00 *Ex Parte Edward Lee Busby, Jr., Applicant.* In the Criminal District Court Number Two, of Tarrant County, Texas

**Disclosure Statement:** The information contained in this report is strictly confidential and protected. This information should generally only be interpreted the presence of a qualified psychologist. This report is not for release to the applicant or family and is intended for professional use only.

**Training/Experience:** I am a licensed psychologist and board-certified clinical neuropsychologist with a specialty in the evaluation and treatment of neurological and psychological conditions in adults and children, including brain injury, dementia, intellectual disability, depression, and posttraumatic stress. I am board certified in Clinical Neuropsychology by the American Board of Professional Psychology. A major portion of my training and experience has been in the area of psychological testing. I have more than 30 years of experience in conducting neuropsychological and psychological assessment and intervention with individuals suffering from a broad range of neurological, intellectual, behavioral, and emotional disorders, with a specialty in standardized test interpretation. In addition to my independent practice and staff and directorship appointments with several major hospital systems, I am also regularly appointed by courts in the field of clinical psychology and clinical neuropsychology in both civil and criminal matters. I am licensed in Texas and Louisiana and also serve as an examiner with the Texas State Board of Examiners of Psychologists, and have previously served as President of the Hispanic Neuropsychological Society. Please refer to my curriculum vitae for greater detail.

**Reason for Referral:** Attorneys representing Mr. Busby, Jeff R. Newberry, and Mr. David R. Dow, requested an evaluation of Mr. Edward Busby's intellectual and adaptive functioning to

assist in his legal proceedings. Mr. Busby has been convicted of capital murder and has been sentenced to death.

**Methodology:**   The following methodologies were employed in the current assessment to evaluate Mr. Busby's intellectual and adaptive functioning:

1. Administration of standardized intelligence testing with performance validity testing on February 11, 2010.

2. A clinical interview and the re-administration of standardized intelligence testing with performance validity testing on February 25, 2022.

3. A review of written affidavits by individuals who are familiar with Mr. Busby's development and functioning.

4. The administration of standardized assessment of adaptive functioning to Mr. Busby's sisters who are familiar with his development and functioning.

5. A review of available academic records.

Affidavits were previously collected by members of Mr. Busby's defense team, as well as academic records from his schooling. The information above was integrated in the following written report. This report is not meant to provide a comprehensive account of the statements gathered in the affidavits. Please refer to the affidavit exhibits for specific details.

## INTELLIGENCE TESTING ON FEBRUARY 11, 2010:

**Test Results:** Mr. Busby underwent standardized assessment of intellectual functioning using the Wechsler Adult Intelligence Scale-Fourth Edition on February 11, 2010. Testing was administered face-to-face and without obstructions under appropriate and controlled conditions in his detention facility. Mr. Busby was fully cooperative and an assessment was completed. During this assessment he was also administered the Test of Memory Malingering (TOMM) to establish the presence of optimal effort and motivation to perform to the best of one's abilities on standardized testing. Generally, scores above 45/50 on the TOMM are indicative of positive effort and credible responding. Mr. Busby's scores on the TOMM during this assessment were within the recommended cutoffs and consistent with good effort on cognitive testing (T1=50/50; T2=49/50). The administration and test results were determined to be a reliable estimate of Mr. Busby's abilities and functioning.

To evaluate his intellectual ability, Mr. Busby was also administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) during his assessment on February 11, 2010. He obtained a Full Scale IQ score of 74 (70-79 at 95% Confidence Interval), which falls within the Borderline range of intelligence.  His scores on the WAIS-IV were as follows:

2

**63**

*WAIS-IV Composite Score Summary (2010)*

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 15 | VCI | 72 | 3 | 67-79 | Borderline |
| Perceptual Reasoning | 20 | PRI | 81 | 10 | 76-88 | Low Average |
| Working Memory | 13 | WMI | 80 | 9 | 74-88 | Low Average |
| Processing Speed | 14 | PSI | 84 | 14 | 77-94 | Low Average |
| Full Scale | 62 | FSIQ | 74 | 4 | 70-79 | Borderline |

*Confidence Intervals are based on the Overall Average SEMs. Values reported in the SEM column are based on the examinee's age.*

## INTELLIGENCE TESTING ON FEBRUARY 25, 2022:

**Clinical Diagnostic Interview:** As part of the current assessment, Mr. Busby was interviewed to obtain information and his perspectives regarding his personal history. *It is important to note the information in this interview section is based solely on self-reporting by Mr. Busby and does not reflect the findings or opinions of the examiners.*

When asked about his birth history, Mr. Busby reported being born in Amarillo but noted his birth certificate says he was born in Pampa, Texas. He reported being unaware of any problems with his mother's gestation or his delivery. Mr. Busby reported his family "moved around quite a bit" but he was unsure why. He reported being raised by his mother and having occasional contact with his father, who never lived at home. His mother, Laverne Busby, was reportedly an LVN and died from complications of diabetes in 2012. When asked if he had a good relationship with his mother, Mr. Busby stated "somewhat". Mr. Busby also reported being raised in part from age 7 to 16 by a man he considers his stepfather, Jerome Bradshaw. Mr. Bradshaw and his mother were reportedly never legally married. When asked about his relationship with his stepfather, Mr. Busby stated "We got along some, he was in and out of the penitentiary." When asked if he was abused, Mr. Busby stated "We got major butt-whippings", mostly by his mother because his stepfather was usually working. He reported being emotionally abused "all the time," stating his mother would hit him often. Mr. Busby denied having a history of sexual abuse.

When asked if he had a happy childhood, Mr. Busby stated "sometimes happy, sometimes not." He reported he was hit more than his siblings because "I was a bad kid." Mr. Busby reported having two sisters and five adopted siblings. He reported having some contact with some of his sisters and indicated they were closer when they were growing up. Mr. Busby reported being married at age 19 for about eight months but was divorced because she reportedly cheated on him and was "unfaithful." He denied having any other marriages. When asked if he has any children, Mr. Busby stated "Five I know of and five possibilities." He denied having any regular contact with any of his children.

When asked about his educational history, Mr. Busby denied being aware of any educational or therapy services prior to his attending school. He reported attending the first and second grade in Amarillo, followed by grade school in Pampa up to the ninth grade. When asked why he left

3

school, Mr. Busby stated "Nobody was interested in teaching me to read or write. They just passed me because I played sports." Mr. Busby reported he never learned how to fully read or write, but indicated he is able to spell some words. He reported being enrolled in special education services in all subjects throughout his schooling. He denied ever being held back or repeating a grade. Mr. Busby recalled being embarrassed because he was unable to read or write, prompting him to leave school in the middle of the ninth grade. He denied earning a GED or attempting to earn a GED, and denied attending any other formal training or college coursework.

When asked about his occupational history, Mr. Busby reported he began working in unskilled jobs at an early age, mostly dishwashing at fast food restaurants. He then earned a lifeguard certificate and work as a lifeguard for one summer. When asked if he was ever terminated from unemployment, he reported he was fired from a Steak and Ale restaurant because he was unable to read the work schedule. He also reported being fired from a beef packing company after overdosing on drugs at age 19. He otherwise described a sporadic work history which included working for temp services.

When asked about his medical history, Mr. Busby reported being diagnosed with type II diabetes in March of last year, for which he takes metformin. He also reported being diagnosed with hypertension 18 years ago, but was unable to recall the name of his blood pressure medication, stating, "The pill looks like a little football." He denied currently taking any psychotropic medication but reported being prescribed medication in the past, stating "They sent me a white and tan pill. I saw a doctor and he said it was for depression. I told him I'm not depressed. I have anger issues." When asked about his psychiatric history, Mr. Busby reported being taken to a psychiatrist as a child by his mother for emotional problems but stated "I don't remember much about it." He also reported being in a "mental hospital" in Fort Worth several times at age 31 or 32. When asked about the reason for these hospitalizations, he stated "they say I attempted suicide several times." When asked to elaborate, he stated "I remember once I was trying to kill myself. I was walking down the street and was zoned out. They took me to the hospital." He also described an incident where he crashed a truck into a light pole, stating "I was trying to kill myself that day." He reported he was angry because someone owed him money. He reported being discharged several days later after he told his doctors "I was okay."

When asked about history of head trauma, Mr. Busby reported being injured in a bicycling accident at age 9 or 10. He reported losing consciousness for a brief period but was unable to recall the duration, other than remembering he woke up in his mother's arms. He reported being taken to a hospital at the time but does not recall any of his treatment or how long he was there. He denied having any awareness of any cognitive difficulty after this accident. Mr. Busby also reported being injured in a car accident in 2003, after which he "woke up in the hospital." He reported he believes he woke up in the hospital the same day of the accident and leaving against medical advice. He denied having other history of head trauma. However, Mr. Busby reported having a heart attack at age 19 after he mixed cocaine and alcohol. He reported being told he was having a heart attack and was hospitalized for 7 to 14 days, including 3 ½ days in ICU. He reported having a pacemaker put in at that time, and indicated he has had "three or four heart attacks" since his incarceration, for which he has been hospitalized twice. He reported believing he may have been having a heart attack three days ago because he was having pain in his arm and chest. He denied having other major medical problems or hospitalizations. When asked

4

65

about his substance use history, Mr. Busby reported having a history of using cocaine, marijuana, crack cocaine, and alcohol.

When asked about his daily activities, Mr. Busby reported being incarcerated in the current facility since his conviction for capital murder in 2005. When asked about his daily activities, he reported being in his cell "24-7", with the exception of one hour of recreation per day. He reported his activities in the cell include drawing, looking at comic books, and reading "graphic novels." He reported having several pen pals whom he corresponds with about 20 to 25 times per year. When asked about sleep, Mr. Busby reported having some difficulty sleeping due to being in the prison environment where there are "lots of noises." When asked about his appetite, he jokingly stated "I'm fat. I eat a lot." Mr. Busby denied having depression but reported having anxiety "constantly." He attributed his anxiety to being unable to move around and "being in the cell all the time." He described his belief that he has "bad claustrophobia."

**Behavioral Observations:** Mr. Busby was evaluated in a small contact room within the Polunsky Detention Center. He was escorted by prison guards and the room was locked from the outside. His handcuffs were removed and he wore ankle shackles during the assessment. He was evaluated as he sat in a chair and no one else was present in the room, although a guard positioned 3 feet outside of the room observed through a large window with bars. The evaluation was conducted face-to-face on a wooden table without obstructions. The room was well lit and otherwise relatively free from distracting noise or movement. Mr. Busby wore a face mask during the assessment in accordance with pandemic guidelines and facility requirements.

Mr. Busby ambulated independently, with no observable problems with gait or mobility upon casual inspection. Mr. Busby is African American and he appeared moderately overweight. He had several tattoos about the arms bilaterally, and a visible scar in the area of the left upper forehead. He wore a white prison jumpsuit and there were no observable problems with grooming or personal hygiene. He appeared his age, and his general physical presentation was otherwise unremarkable

Mr. Busby's vision and hearing appeared to be adequate for testing purposes upon casual inspection. He used his right hand for all writing and drawing tasks and his upper extremity motor speed and dexterity were grossly within normal limits bilaterally upon casual inspection, with no grossly observable problems with motor movement. The assessment was conducted in English, which was determined to be his primary language. Mr. Busby's speech was loud throughout the assessment. Intelligibility with adequate although there were occasional paraphasic errors, such as mispronouncing words are using word approximations. He was very inattentive during the assessment and required frequent redirection to maintain topic on task.

Mr. Busby's mood during the assessment was euthymic and his affect was broad. He laughed loudly several times during the interview and assessment. He was generally compliant and polite and appeared to put forth his best effort on all tasks presented to him. Insight and awareness regarding his test performance range from fair to poor. However, the following test results

5

66

appear to be an accurate assessment of Mr. Busby's ' current intellectual and academic functioning.

**Testing Tools and Techniques:**

Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV)
Advanced Clinical Solutions Word Choice/Effort
Wide Range Achievement Test-Fifth Edition (WRAT-5)
Test of Memory Malingering (TOMM)

**TEST RESULTS:**

**Performance Validity:** Mr. Busby was administered a standardized measure to evaluate his cognitive effort and motivation (TOMM). His score profile on the TOMM was within normal limits and indicative of positive effort on cognitive testing. Mr. Busby was also administered the Advanced Clinical Solutions Word Choice/Effort test to evaluate his effort on verbal recall tasks. His performance was within normal limits for the word choice task and imbedded measures of effort on intelligence tasks. The performance validity test profile was indicative of positive effort and motivation to perform to the best of one's abilities on cognitive testing.

*Test of Memory Malingering Score Summary*

|  | Raw Score | Clinical Cutoff | Qualitative Description |
|---|---|---|---|
| Trial 1 | 47 | <45 | Above Cutoff |
| Trial 2 | 50 | < 45 | Above Cutoff |
| Retention | 50 | < 45 | Above Cutoff |
| **Additional Measures** | **Raw Score** | **Clinical Cutoff** | **Qualitative Description** |
| Albany Consistency | 47 | < 45 | Above Cutoff |
| IFFI Sum | 50 | < 45 | Above Cutoff |
| Tomme Ten | 10 | < 10 | Above Cutoff |

*ACS Word Choice/Effort Score Summary*

| Subtest | Raw Score | Clinical Sample Base Rate |
|---|---|---|
| Word Choice | 49 | > 25% |
| Reliable Digit Span | 9 | > 25% |

**Academic Functioning:** Mr. Busby was also administered a screening measure of academic achievement, the Wide Range Achievement Test-Fifth Edition (WRAT-5). Mr. Busby's scores on a test of reading skills were in the extremely low range, within the third grade level. Mr.

6

Busby was able to read most single syllable words, but struggled with more complex multi-syllable words. Mr. Busby's sentence comprehension scores were in the very low range, within the fourth grade level. His reading composite score was 69, in the 2nd percentile. This places his overall reading ability within the extremely low range when compared to others his age in the general population. Spelling scores were in the very low range, within the fourth grade level. Mr. Busby was able to spell most single syllable words, but struggled with more complex multi-syllable words. Math computation abilities were in the low average range, within the fifth grade level. Mr. Busby was able to complete written arithmetic problems involving addition, subtraction, multiplication, and division, but struggled with problems involving fractions, decimals, and percentages.

*WRAT-5 Scores Summary*

| Subtest | Raw Score | Scaled Score | Percentile | Grade Equivalent | Qualitative Description |
|---|---|---|---|---|---|
| Word Reading | 34 | 66 | 1 | 3.0 | Extremely Low |
| Sentence Comprehension | 31 | 73 | 4 | 4.2 | Very Low |
| Spelling | 32 | 84 | 14 | 5.0 | Low Average |
| Math Computation | 24 | 75 | 5 | 4.5 | Very Low |
| Reading Composite | 141 | 69 | 2 | N/A | Extremely Low |

**Intellectual Functioning**: Mr. Busby was administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) as a measure of intelligence, information processing efficiency, and attention. Mr. Busby obtained the following scores on the Mr. Busby obtained the following scores on the recent administration (2022) of the Wechsler Intelligence Scales:

*WAIS Composite Score Summary*

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 20 | VCI | 81 | 10 | 76-87 | Low Average |
| Perceptual Reasoning | 23 | PRI | 86 | 18 | 80-93 | Low Average |
| Working Memory | 14 | WMI | 83 | 13 | 77-91 | Low Average |
| Processing Speed | 16 | PSI | 89 | 23 | 82-98 | Low Average |
| Full Scale | 73 | FSIQ | 81 | 10 | 77-85 | Low Average |

*\*Confidence Intervals are based on the Overall Average SEMs. Values reported in the SEM column are based on the examinee's age.*

7

## ADAPTIVE FUNCTIONING TESTING AND REVIEW:

**Available Records:**

Academic Report Card from Pampa Elementary and High School
Declaration of Ms. Busby Busby
Declaration of Kimiko Coleman
Declaration of James Bybee
Declaration of Steve Porter
Declaration of Eddy Pouncy
Declaration of Raquel Farr
Declaration of Pamela Harris
Declaration of Merlyn Rogers
Declaration of Renee Boyd
Declaration of William Farr

**Adaptive Functioning Interviews:** Ms. Tarsharn Busby and Kimiko Coleman were interviewed separately to provide an account of their perceptions of Mr. Busby's functional capacities. These findings should be interpreted within context as individuals' perceptions differ across functioning levels, cultural background, and expectations.

*Tarsharn Busby*
Ms. Busby was interviewed to provide a recollection of Mr. Busby's adaptive skills. She identified herself as the older sister of Mr. Busby, with a 2-year age difference, living in the same home as Mr. Busby in their youth. Ms. Busby indicated that she recalls bits and pieces of their childhood. She recalled that Mr. Busby left home at the age of 14 and her contact with him became limited. Ms. Busby reported that she completed the 10th grade and is currently a home health provider.

Ms. Busby was asked to comment on Mr. Busby's communication. She denied remembering when her brother first started speaking his first words or sentences. She gave an estimate that it was around the time he began elementary school. Ms. Busby reported that Mr. Busby's pronunciation was not "very good." She did not recall if he received speech services but did remember that Mr. Busby participated in a resource class. Ms. Busby indicated that her brother demonstrated difficulty expressing himself throughout his lifespan. She noted that his language deficits constrained his ability to "get his needs met." She denied observing her brother have a stuttering problem. With regard to receptive language, or the ability to understand language, Mr. Busby was reported to demonstrate a greater deficit in this area. He was reported to be able to understand simple sentences but needed clarification with more complex sentences and phrases. Similarly, when asked questions, Mr. Busby was often observed to appear confused. requiring the question being asked again or rephrased. She noted that his receptive language deficits were also observed until his adulthood. Furthermore, Ms. Busby reported that he did not like to carry conversations and kept to himself in middle and high school. When he did participate in a conversation, his responses were not appropriate. In addition to verbal language, nonverbal

8

**69**

language is critical to conveying and understanding a message. Ms. Busby indicated that Mr. Busby did not appear to understand non-verbal cues as both a child and an adult.

Basic skills are necessary to navigate one's environment. These include academic tasks such as reading and writing for independent functioning. Ms. Busby was unable to recall Mr. Busby's reading and writing ability. She did recall that he did not learn to count and perform basic mathematics tasks until the 3rd grade. By the 4th grade, he was reported to be able to tell time from an analog clock, however, he was unable to apply its meaning to real time. Thus, he was unable to complete a routine. She denied observing him draw shapes before Kindergarten and use units of measurement. Ms. Busby described her brother as an outdoors child.

Self-Direction skills are those that are needed for independence, responsibility, and self-control. Ms. Busby described Mr. Busby as a child who frequently was in "trouble" and did not apologize even when others were hurt. She noted that her brother appeared to experience behavioral issues more than others, and at times he was unable to understand the significance of his behavior choices. She indicated that he showed poor impulse control, which affected his ability to make good choices. She observed this tendency from childhood to adulthood and others helped him when making decisions. While he once persisted and taught himself to fix a radio, Ms. Busby recalled that her brother typically was prompted to initiate and complete tasks and needed individual guidance. Mr. Busby was reported to be unable to follow directions because of comprehension deficits, as well as due to his willingness.

With regard to leisure, Ms. Busby reported that Mr. Busby did not engage in creative or imaginative play. Mr. Busby reportedly did not like to share. Typically, his mother prompted playdates. However, at around the of 14, he began to socialize independently. She described her brother's ability to get along with others appropriate at times and other times he was verbal and physically aggressive. Mr. Busby was reported to play some football in the 9th grade before he dropped out of school. He appeared get along with other teammates.

In addition to relating with others, social skills include social responsiveness and reciprocity, as well as gullibility. Mr. Busby was described by his sister as affectionate at a young age (around the age of 6). He was reported to express his love for individuals and showed his affection through hugs. At the age of 9, other children bullied him for being slow, and participating in a resource class. Mr. Busby was reported to not have many friends in school and not show his emotions unless the emotion was of great intensity. He was observed to identify emotions in others since he was a child and into his adulthood. Ms. Busby described her brother's manners as okay and mostly applied them. When given feedback on improving his manners, Ms. Busby reported that her brother appeared confused. In middle school, Mr. Busby was reported to begin initiating outings with peers and walked to navigate to meet up locations or arranged transportation. Busby described her relationship with her little brother as good.

With regard to basic living skills, Ms. Busby reported that her brother rarely helped with chores in the home due to poor motivation. He was reported to have limited understanding of home maintenance. At school, he was never asked to help a teacher, according to Ms. Busby. She indicated that her mother and herself washed Mr. Busby's clothes. In fact, she indicated that her

9

brother also relied on women to take care of him when he was older. As an adult, he mostly walked to commute and Ms. Busby denied observing her brother take public transportation. At the of 16, he learned to drive and owned a car at the age of 20. Prior to that, he called individuals to provide him with transportation.

Mr. Busby was reported to demonstrate difficulty managing his own finances and Ms. Busby indicated that her mother generally managed his finances, including paying his bills, until she passed on. He did not make his own medical appointments, reportedly, as he demonstrated difficulty understanding the concept of time. He was able to shop for his groceries, but was reported to have a poor sense of budgeting and needed assistance. For example, she indicated that Mr. Busby would just make random unnecessary purchases when he was without the assistance of another adult.

Health and safety skills refers to one's ability to protect health by following safety rules. Ms. Busby reported that Mr. Busby indicated that in general, he did not play with dangerous objects, such as knives and sockets. When he was injured or hurt, he was reported to communicate to others but not if he was sick. On one occasion, at the age of 14, he was reported to overdose on medication. Ms. Busby also recalled that at the age of 7 or 8, Mr. Busby played with small rattle snakes and placed them inside their home.

With regard to motor skills, Ms. Busby did not have the opportunity to observe when her brother began to reach his infant motor milestones as she was younger. However, she reported that her brother began to grasp and eat independently at the age of 3. During that age, he began to walk, as well, reportedly.

Ms. Busby reported that Mr. Busby had one job in his lifetime as a dishwasher at a steakhouse. His career there was reported to end quickly and he did not share the reason why with her. She reported feeling uncertain if it was due to inability to complete tasks or his relationship with his supervisors. She recalled that he missed a lot of shifts due to his inability to follow a schedule.

*Kimiko Coleman*
Kimiko Coleman, sister of Mr. Busby, was also interviewed with specific regard to her brother's adaptive skills. She reported being 8 years older than him and lived with him until she moved to Dallas at the age of 18, after which they occasionally saw each other. She perceived her relationship with him to be "good." Ms. Coleman was cooperative but appeared to be somewhat reluctant to participate in the interview. However, she appeared to provide reliable information about his development.

Ms. Coleman recalled that her brother began to speak somewhat later than normal. While he was reported to not really babble, he began to speak in sentences. His words were "slurred" and she indicated that his mother attempted to enroll him in speech services at the age of 8. She denied witnessing other articulation problems. Ms. Coleman indicated that Mr. Busby understood language and nonverbal cues. however, she indicated that her brother's responses depended on his mood. These mood-based responses occurred both as a child and an adult. He reportedly

10

71

engaged in conversation more with women rather than men. With peers, she reported that he spoke "in code" to evade other's listening to their conversation. Ms. Coleman indicated that in general her brother's communication was below average with greater deficits in expressive and vocabulary.

With regard to academics, Ms. Coleman indicated that her brother was in special education classes. She does not recall the onset or duration of his participation of his educational assistance. She noticed that he was able to identify signs of restaurants, like McDonalds and Pizza Inn. She recalls that reading was challenging for him. In terms of writing, he began to draw in Kindergarten and she perceived him to identify letters and shapes. Ms. Coleman recalls him counting at the age of two and identifying the time on an analog clock in first grade. In general, she recalls him taking a longer time than his peers to learn.

While Mr. Busby desired to be independent, according to Ms. Coleman, he needed guidance from others. She indicated that Mr. Busby's ability to take responsibility for his actions was dependent on his mood. He often did not perceive that he did anything wrong when he misbehaved. She described his self-control as "zero." Ms. Coleman reported that starting at age two, he would have tantrums where he would appear upset, and "it was all over." Because of his temper, he engaged in altercations with boys but did avoid hitting women. His ability to make choices, reportedly, depended on his mood as well. Ms. Coleman reported that his bad choices were observed to escalate in middle and high school. While he was able to follow simple directions, it was challenging for him to follow complex instructions. Mr. Busby was able to initiate tasks, according to Ms. Coleman, however, it was difficult for him complete tasks. She noted that while he was able to complete chores, for examples, he was unmotivated to follow through.

With respect to leisure, Ms. Coleman recalled that her brother did not engage in creative play. She indicated that he played with others, with prompting, for a limited time. Because of his decreased attention span, Mr. Busby was unable to sit through a movie, even when he chose the film. She does not recall him asking permission to engage in activities, such as visiting a neighbor, and would just do it without notifying anyone. When he played board games, he cheated or quit because he did not understand the rules, according to Ms. Coleman. In high school, he was a wide receiver and perhaps a running back, according to Ms. Coleman. She recalled him playing well. In general, Ms. Coleman reported her perception that Mr. Busby's engagement and orientation in leisure activities was age appropriate.

Socially, Ms. Coleman recalls Mr. Busby being more immature than peers his age. She described him as childlike throughout his development. She recalls him having two friends, and spending time with one cousin. Ms. Coleman reported that he showed affection as a child, particularly to his sisters, mother, and his friend. Jokes were reported to be rare for Mr. Busby as he did not find them humorous. She described him as wanting to be "the protector" when he was young. After his friend passed away, showing affection became more difficult for him. Emotionally, Ms. Coleman reported that her brother rarely showed a normal variety of emotions, as he was either very happy or angry. She reported that she perceived Mr. Busby to be able to identify emotions

11

72

in other people but he did not appear to care for them. It was unlikely that he helped others, according to Ms. Coleman. Similarly, his manners depended on his mood.

Ms. Coleman indicated that Mr. Busby navigated his neighborhood adequately but that he never went too far from home. At the age 4 or 5, he was reportedly able to identify familiar places. She recalled that at the age of 10 years, he was caught stealing at a pharmacy store and his mother asked him to find his way home.

Ms. Coleman reported that Mr. Busby he did not initiate chores. She indicated she did not perceive this behavior as related to a skill deficit, but rather motivational, as he reportedly thought it was the role of women. This behavior was also reported by Ms. Coleman to be similar in the classroom. Personally, Ms. Coleman reported that he "somewhat" cared for personal items. Around middle school, he began to care for his appearance.

In terms of healthy safety, Ms. Coleman reported that Mr. Busby tended to avoid some danger as a child. For example, he knew not to place his hand in the electric socket. However, when he was dared, he rode his bike and engaged in stunts. Additionally, he collected snakes and brought them home in suitcase. He was reported to stay away from medications as a child. However, at the age of 16, he reportedly attempted suicide by consuming medication. At this same age of 16, Ms. Coleman indicated that Mr. Busby came home with new shoes and money during a time where he was accompanied by an older woman in her 30s. When asked, Mr. Busby indicated that he was her "gigolo," according to Ms. Coleman. He attempted to stay out of danger unless he was provoked, Ms. Coleman reported. She indicated that after his first child was born, he reverted to his old behaviors and relocated from Florida to Texas.

Motor abilities were reported to be within normal limits by Ms. Coleman. She shared that he played football in an organized team and basketball in the neighborhood. He played when he was 11-12 years old, and she indicated that she perceived he played adequately and sought after. He also reportedly taught himself to swim when he was 7 or 8 years old and he swam mostly solo, on occasion with others.

Ms. Coleman reported that the only job that he knows that her brother had was at the age of 17 or 18, where he was a lifeguard for three years. She indicated that he loved the job and that he was dependable because the hours were consistent, and his friend worked him and likely helped him. He walked to work most of the time.

When asked about Mr. Busby's ability to live independently, Ms. Coleman indicated that her brother was "smooth with women," and they "took care of him." Specifically, she indicated that they did not want him to work. She continued by saying that he did not need to work as they cooked, cleaned, and paid his bills. Ms. Coleman indicated that he did not have a bank account. Because he had difficulty with budgeting, he spent all the money he had with him that was less than $500 at once. When he needed food, he relied on others to place an order. Similarly, other people bought him his clothes. His wife, or others, were reported to make medical appointments and travel plans for him. Hygiene improved, reportedly, in high school and he began to care for his appearance. However, he reportedly took the longest to get ready in a home of girls.

12

73

**Summary of Affidavits:** Several individuals familiar with Mr. Busby completed affidavits. A summary of the affidavits is included below the respondent information. As noted earlier, this summary is not intended to provide a comprehensive account of the statements gathered in the affidavits. Please refer to the affidavit exhibits for specific details. The summary is organized by skill area and across respondents as follows:

Respondents

Pamela Harris was a special education teacher at Pampa Junior High School and Pampa High School and taught Mr. Busby three classes a day. Currently, she reported working for MH/MR and travels to numerous surrounding counties.

Merlyn Rogers met Mr. Busby at a club in 1988 and dated him for a year. She reported seeing him every day and living with him for a month. She indicated that they have a daughter together.

Renee Boyd reported meeting Mr. Busby in 2000 and seeing him often until his arrest in 2005.

William Farr indicated that he met Mr. Busby in 2000 and were neighbors until his arrest in 2005. He lived upstairs and Mr. Farr reported living downstairs in Forth Worth. He indicated that he would see him every day as Mr. Busby would come up to eat or socialize.

Raquel Farr knew Mr. Busby when he lived downstairs from their home in Forth Worth. She reported seeing him every day.

Eddy Pouncy indicated that Mr. Busby was his uncle and is related to him through his mother's brother, Donald Mason. He indicated that his uncles Mr. Mason and Mr. Busby raised him as a teenager.

Steve Porter stated his relationship with Mr. Busby as his football coach in the 8th grade at Pampa Junior High School.

James Bybee indicated that he attended high school with Mr. Busby. He reported that after high school, they did not have contact. He described their relationship as acquaintances who spoke at school every day.

Kimiko Coleman also provided an affidavit. She identified herself as the older sister of Mr. Busby by 8 years. She indicated that she moved out when she was 18 years old, and Mr. Busby was 10 years old.

Tarsharn Busby provided an affidavit in addition to participating in this interview. She reported that she was the older sister of Mr. Busby by two years. She indicated that she lived with Mr. Busby and took care of him when she became the "head of the household" at the age of 12 years and Mr. Busby was 10 years old.

13

**Summary Findings of Adaptive Functioning from Affidavits:**

*Communication is defined by the following skills, speech, language, and listening skills needed to communicate with others. Included in these communication skills is vocabulary, responding to questions, conversation skills, and nonverbal cues.*

A review of the affidavits noted a few specific examples of deficits in communication. Mrs. Farr reported that Mr. Busby took a minute to understand when he was spoken to. She described him as "slow" and reported that he could not always "immediately" understand what was going on around him. Mr. Farr similarly reported that Mr. Busby did not appear to understand what he was saying and perceived him to be "retarded." He reported that Mr. Busby would just sit out on the porch and stare out. Mr. Bybee, acquaintance from high school, reported that he felt like Mr. Busby understood what he was saying but was slow to comprehend.

*Functional Academics includes basic skills needed for reading, writing, and mathematics as for independent functioning. Additionally, counting, drawing, telling time, measuring, writing notes and letters construe this category.*

Problems in academic learning and schooling were noted across respondents. Mr. Busby's teacher, Mrs. Harris, reported that Mr. Busby was in prevocational classes, which was curriculum intended for "IQ's between 70 and 82." These classes, she continued, were intended to teach basic living skills, such as cooking and balancing a checkbook. She indicated that grades did not play a role in passing courses and that if students put their name on the class work, they would "pass." Mrs. Harris reported that that while most of her students possessed a talent to compensate for their deficits, Mr. Busby did not. She reported that he appeared to have an auditory or visual deficit, a low IQ, and mental health issues. His previous girlfriend, Ms. Rogers, reported that Mr. Busby could not read or write. She indicated that on one occasion, she observed Mr. Busby complete only his name on a job application and she perceived that he could not understand it- she later found the application in the trash can with only his name. She reported that she did not offer help because she did not want to embarrass him. Mr. Busby's neighbor reported that she helped him read the Bible and witnessed him have a difficult time reading and understanding the content. She reported that he would read the same sentence 4-5 times and ask for help. Mr. Farr indicated that Mr. Busby was not very good with numbers and could not count very well. He indicated that if he had money, he would give it to someone else to count. Mrs. Farr, similarly, reported that Mr. Busby would ask for her help to count his monetary change. Mr. Bybee indicated that Mr. Busby could not read very well. His sister, Mrs. Busby, reported that she never saw his brother read. She indicated that she tried to help him, but he could not "get it." She indicated that Mr. Busby he dropped out in 10th grade. Mr. Busby's nephew, Mr. Pouncy reported that his uncle could not count and he didn't perceive him to be able to read street signs. Hi previous football coach, Mr. Porter, shared that Mr. Busby appeared to have a lack of exposure, family direction, and education. He continued to say that Mr. Busby appeared that he had been denied any educational opportunity, including, special education. He noted that Mr. Busby's grades improved in the 8th grade after being admitted into special education. Mr. Porter stated that although he was in the 8th grade when he knew him, Mr. Busby appeared to have an education level closer to a 2nd grader.

14

*Self-Direction skills are those needed for independence, responsibility, and self-control. Examples include making choices, starting and completing tasks, following a routine and directions.*

Mr. Pouncy indicated that Mr. Busby was a follower, and he did not make plans about "anything," such as where to eat or daily plans. He reported that Mr. Busby did not have to worry about food or transportation as these things were taken care of by other people. Mr. Busby, according to Mr. Pouncy, "hated" being alone and when he was, he did not do "anything". While he said that it did not appear that his uncle was depressed, Mr. Porter reported that it was like there was a "hole" and that Mr. Busby did not appear to have self-orientation- he perceived his uncle to feel afraid of solitude. Mr. Porter stated that he did not think his uncle was capable of being "a pimp" as he did not have the organizational skills or the ability to count money. Others also saw Mr. Busby as having difficulty with independence. For example, Ms. Coleman indicated that their Derrick, a cousin, looked after Mr. Busby when he was alive, and Mr. Farr commented that the girls he had around him made decisions for him. Moreover, Mr. Busby demonstrated difficulty completing tasks. For example, Ms. Coleman reported that he was easily distracted and would leave in the "middle of something," such as playing with his dog when he was supposed to be cleaning the yard.

*Skills related to leisure include engaging and organizing recreational activities and hobbies, for example playing with others and toys, and following rules of games.*

Football was Mr. Busby's reported preferred leisure activity. His coach, Mr. Porter, reported that Mr. Busby appeared to really enjoy football and he had the impression that this was the first time Mr. Busby had really succeeded in any organized task. He was reported to sometimes seem frustrated while playing football, though. This frustration did not appear to be related to his physical abilities, rather his "intellect." Mr. Porter indicated that Mr. Busby could not understand the more complex plays. For example, he was reported to look confused as to whom to block, which route to run, or to go left or right. In comparison, his playmates were reported to find these plays simple and easy to follow.

*Social skills refers to interacting socially and getting along with other people, expressing affection, expressing and recognizing affection, having friends, helping others, and using manners.*

Mrs. Rogers also described Mr. Busby as a "follower." She indicated she organized and planned outings. Across most respondents, it was reported that his girlfriends "manipulated" him and took advantage of Mr. Busby. Inclusively, his sister Ms. Coleman and Mrs. Reed reported that he was "gullible". Ms. Coleman reported that he would do whatever was asked of him, and he believed everything that was told to him without questioning. He was reported to sit alone and be a victim of bullying. Ms. Coleman indicated that others teased him and called him names. Despite being victimized, Ms. Coleman reported that Mr. Busby did not immediately react, and it took "a lot" of teasing for him to "blow up." Similarly, Mr. Pouncy reported that Mr. Busby was calm in general, but would rise when others teased him about being slow, or when he felt he had to protect women. As an adult, individuals also reportedly took advantage of him. Mr. Pouncy,

15

Mr. and Mrs. Farr reported that his girlfriends took advantage of him and told him what to do. Mr. Pouncy reported that the girls around him would take money from him before he could finish counting it, as he was slow in counting. Additionally, he elaborated that the girls, whom he reported worked as prostitutes, were always in control of Mr. Busby and made decisions for him. Similarly, Mrs. Reed reported that in addition to being "easily intimidated," she would sometimes help him get his ID back from individuals or girls in a motel room who had stolen his wallet. She indicated that while it was not uncommon for individuals to have their wallet stolen in the streets, it occurred more with Mr. Busby.

With regard to friendships, Ms. Coleman and Mr. Porter, football coach, reported that Mr. Busby did not have any close friends. Mr. Porter and Mr. Bybee both described him as a "loner." Ms. Coleman reported that the friends that came around "used" him and their presence was conditional- Ms. Coleman reported that "everyone" observed this pattern but Mr. Busby. Despite her attempts to tell him, Mr. Busby did not perceive the manipulation, as he just wanted a "family so bad." Ms. Coleman reported that if others gave him attention, he followed them around despite placing himself in "harmful" situations. His friends were reported to use him as their "front man" to do all the "dirty" work. She speculated that perhaps it was because he was big but also because he was "slow." She provided an example of an incident when there was a fight, and he ended up being the only one fighting, "protecting" them. Likewise, Ms. Coleman described poor judgement in relationships. She reported that if a woman gave him attention, he immediately "fell in love." She described him as "butter" in a woman's hand. She indicated that by saying they loved him, Mr. Busby would do anything a girl requested. Ms. Coleman reported that her brother was not a talker and that he would feel very frustrated when many questions were asked of him.

Emotionally, Mr. Busby was reported to demonstrate difficulty regulating his sadness across most respondents. Specifically, Mr. Bybee reported that he remembered him to be an emotional guy, who always wore his heart on his shoulder, and cried. Mr. Busby's special education teacher also noted that his moods often appeared depressed and frustrated. Mr. Busby was reported to exhibit sadness related to his low abilities, based on reports. For example, Mr. Farr indicated that Mr. Busby would sometimes get depressed and say that he was tired of living "this life" and he wanted to die. Mr. Pouncy also observed Mr. Busby make these statements and he speculated that he said he was tired of living his lifestyle. Additionally, Mr. Pouncy, like Mrs. Rogers, reported that Mr. Busby cried often. Mr. Pouncy reported that he cried more than others, and at times, in a room full of people. Mrs. Rogers and Ms. Coleman both reported that they attempted to talk to him about his feelings, but Mr. Busby evaded.

*Community use refers to skills needed for functioning in neighborhood, such as navigating the area, participating in activities outside the home, and recognizing facilities.*

Mr. Busby's ability to navigate his environment was challenging for him based on reports collected from the affidavits. He would reportedly get lost when driving. Mrs. Rogers indicated that he would not drive alone often but he asked for directions to places in their small town, which confused her because he had lived his entire life in Pampa. She reported she attempted to give him directions using street signs but resorted to using landmarks and building as he was

16

unable to follow them. Mr. Busby was reported to be late when driving alone because he would get lost. His sister, Ms. Busby, shared that he totaled the first car she owned and told her that he had gone too fast over railroad tracks. Furthermore, Ms. Coleman stated that Derrick, their cousin, took Mr. Busby's driver license test for him.

*Home and school loving includes the skills to take basic care of one's home, school, or living space. This includes straightening out, cleaning, helping adults with household or classroom tasks and taking care of one's own possessions.*

Mrs. Rogers reported that Mr. Busby could not complete simple tasks that most people are able to do, such as turning on a furnace. To help him, she reported that she avoided putting him in situations where he looked "bad". She reported she completed errands for him and when Mr. Busby was with her, she pointed out tasks so that he could learn. However, Mrs. Rogers reported that regardless of how many times she showed him, Mr. Busby could not "figure out" how to complete basic, daily tasks. Emotionally, Mr. Busby was observed to become very frustrated when he could not complete simple tasks, such as opening the hood of the car. Mrs. Rogers and Mr. Farr both reported that this would happen frequently when he was attempting to complete simple and easy tasks. Because of his difficulty with daily living tasks, Mrs. Rogers reported that his sisters took care of him as they would with a child, providing him food, drink, and solving simple problems for him. She indicated that Mr. Busby did not have to figure out problems for himself. Likewise, girlfriends in his life were reported to cook and pay his bills because he needed their help. His sister, Ms. Coleman, indicated that Mr. Busby always lived in the homes of the women he dated and never leased his own apartment. Without his girlfriends, he was reported to appear confused by Mr. Farr. She labeled Mr. Busby's latest girlfriend as serving a "mother role." These issues appear to have developed when he was a child. Ms. Busby reported that she cooked and cleaned for them both. Both of his sisters indicated that that his room always looked "junky" and to clean up, he placed everything under the bed or all his dirty clothes in the closet. They shared that his chore was to maintain the lawn; however, Ms. Coleman indicated that she never saw him do it and that he would spread the leaves out again after raking them. When he did wash dishes or sweep, according to Ms. Busby, the tasks were not completed adequately.

Mr. Busby was reported to demonstrate difficulty managing his own money. Mr. Farr reported that Mr. Busby did not manage his own money. Mrs. Rogers indicated that on one occasion, Mr. Busby went into Burger King to buy food and said that he did not have enough money, although he did. Mrs. Rogers speculated that he could not read the menu and add up the amount. Similarly, he was unable to locate how much he owed on a paper bill when asked. Mrs. Boyd also reported that Mr. Busby asked her to count his money when buying cigarettes and purchase items of him. His sister, Ms. Busby, reported that he also had difficult managing his money when he was young. For example, she indicated that when he received money, he would spend it quickly. She recalled jokingly referring to him as the "candy man," because he would "blow" his money on candy or buy it when his mom sent him to buy something else. He also showed poor judgement with money. For example, when receiving money at Christmas, he spent it on a

17

single outfit, according to Ms. Busby, while she was able to purchase 3-4 outfits and perhaps a pair of shoes.

*Health and safety skills refers to following safety rules, using medicines, showing caution, and keeping out of danger.*

A specific instance included in the affidavits regarding safety behaviors was provided by Ms. Coleman. She reported that her brother, Mr. Busby, at the age of 8 or 9, collected snakes with a peer and brought them home in a picked-up suitcase. He proceeded to let them loose inside their home and placed one at the foot of his sister. She indicated that he did not know how dangerous that situation was. While other respondents did not provide information regarding health and safety, more instances of Mr. Busby's ability in this area are included in the interviews, as well as in the analysis of the completed questionnaires.

*Skills related to self-care include taking care of one's own hygiene, such as dressing, grooming, bathing, toileting, grooming, and hygiene.*

Mr. Busby's sisters observed his difficulty with hygiene as he was growing up. Ms. Coleman reported that Mr. Busby was "filthy" from playing and stayed in the same clothes as he would easily become dirty again. She reported that he always had dirt underneath his fingernails and when he showered there was a ring of dirt around the tub. His other sister reported that as a child, Mr. Busby did not like to bathe, needed reminders, would go days without bathing, and did not brush his teeth as needed. Like Ms. Coleman, Ms. Busby reported that he did not change his clothes and speculated that he did not know how to wash his clothes. At school, Mr. Busby's poor hygiene was also noticed. Both his previous acquaintance, Mr. Bybee, and his football coach, Mr. Porter, reported that Mr. Busby "always" appeared as if he had not showered in days. They both believed that Mr. Busby's family as poor due to the clothes he was wearing and their condition. Mrs. Harris reported also reported that his clothes did not appear washed.

*Adaptive functioning skills related to motor abilities includes fine and gross movements needed for manipulating the environment, and the development of more complex skills needed for sports.*

Issues with motor abilities were not reported by respondents. As noted above, Mr. Busby's coach indicated that it was Mr. Busby's intellect rather than physical abilities that created a barrier for him. Mr. Bybee reported that Mr. Busby played mostly defensive and thus, it was basic and straightforward.

*Lastly, work skills include completion of tasks, collaboration with supervisors, following schedules and routines with sufficiency to successfully function at the workplace.*

Reports related to Mr. Busby's skills at work were not addressed in the affidavits.

### Summary of Academic Records

Academic records from Pampa Public Schools were also available for review. Elementary school records indicate that Mr. Busby repeated first grade. During his first year of first grade he earned

D's and F's in core subjects and Satisfactory in electives (i.e., music, art, and physical education). During his second year of first grade, his grades varied by quarter, earning an A in spelling on one occasion and F the following quarter. In reading and mathematics, he earned mostly C-'s and one B-. He continued to earn Satisfactory his second year of first grade. Mr. Busby's attendance was poor the first year of first grade (i.e., 19 absences) and improved the second one (i.e., 6 absences). Mr. Busby's High School records were also provided. These records show that he completed 9th grade and repeated 10th grade. His second year of 10th grade he withdrew before the second semester grades were released. Attendance was poor, especially his two years of 10th grade, missing 46 and 57 days of school, respectively. Mr. Busby earned 60s and 70s in his core classes 9th grade and first year of 10th grade. The first semester of his second year of 10th grade he earned 50 in each class. Mr. Busby was exempted from taking standardized tests, per decision of his special education team. Students in special education are sometimes dismissed from taking these tests, like Mr. Busby, as the stress that it causes a student with learning disabilities exceeds the gains of taking a progress measure. An additional documentation from Mr. Busby's high school indicated that he was taking pre-vocational classes, instruction in special education rather than general education classes. However, the date on this document was illegible. In Ms. Busby's affidavits, she indicated that her family, including her brother, moved frequently from Pampa and Amarillo. Records from schooling in Amarillo were not available.

**Adaptive Behavior Assessment System-Third Edition (ABAS-3)**

Ms. Coleman and Ms. Busby both completed the ABAS-3 independently, a standard questionnaire designed to elicit and quantify information about a person's adaptive functioning. Listed below are tables of ABAS-3 results. The following *italicized* section also contains excerpts from a computer-generated report based on the results of the administration of the ABAS-3 (Harrison and Oakland, 2015):

**Rater: Mrs. Tarsharn Busby**

|  | Sum of Scaled Scores | Standard Score | Percentile Rank | Confidence Interval 95% |
|---|---|---|---|---|
| General Adaptive Composite (GAC) | 10 | 53 | 0.1 | 50-56 |
| Conceptual | 3 | 54 | 0.1 | 48-60 |
| Social | 3 | 58 | 0.3 | 53-63 |
| Practical | 4 | 54 | 0.1 | 49-59 |

*Interpretation of ABAS-3 Results Adaptive Behavior Standard Scores (Tarsharn Busby):*

*The General Adaptive Composite (GAC) summarizes performance across all skill areas. Mr. Busby obtained a GAC score of 53. His true score is likely to fall within the range of 50 - 56 at a 95% level of confidence. Mr. Busby's current overall level of adaptive behavior is in the Extremely Low range, as high as or higher than 0.1% of individuals of the same age. Because the GAC provides the most complete measure of adaptive behavior, it is likely to be the most reliable and accurate estimate of overall adaptive functioning. However, more detailed information about Mr. Busby's unique profile of adaptive functioning may be obtained by reviewing performance within adaptive domains and skill areas if significant differences exist between adaptive domain standard scores or skill area scaled scores.*

*The Conceptual domain standard score summarizes performance across the Communication, Functional Academics, and Self-Direction skill areas. Mr. Busby's Conceptual domain standard score of 54 (95% confidence interval of 48 - 60) is in the Extremely Low range, as high as or higher than 0.1% of individuals of the same age.*

*The Social domain standard score summarizes performance across the Leisure and Social skill areas. Mr. Busby's Social domain standard score of 58 (95% confidence interval of 53 - 63) is in the Extremely Low range, as high as or higher than 0.3% of individuals of the same age.*

*The Practical domain standard score summarizes performance across the Community Use, Home Living, Health and Safety, Self-Care, and Work skill areas. Mr. Busby's Practical domain standard score of 54 (95% confidence interval of 49 - 59) is in the Extremely Low range, as high as or higher than 0.1% of individuals of the same age.*

### Adaptive Domain Comparisons

*A comparison of performance between the adaptive behavior domains also provides useful information for interpretation. No significant differences were found between Mr. Busby's overall functioning in the areas of communication, academics, and self-direction (conceptual adaptive behavior), his general ability to participate in social and leisure activities (social adaptive behavior), and his community and home living, health and safety, and self-care skills (practical adaptive behavior).*

### Scatter in Adaptive Skill Area Scaled Scores

*An individual's adaptive skill area scaled scores may be relatively consistent or may show considerable variability. The scatter analysis allows you to determine whether the degree of scatter (i.e., the range between the person's highest and lowest scaled scores) warrants clinical attention. The degree of scatter in the GAC is neither statistically significant nor unusual (i.e., it has a high base rate). Thus, the GAC may be considered a robust measure of adaptive functioning for this individual.*

### Adaptive Skill Area Results

20

*Adaptive skill areas within the Conceptual domain provide a more detailed view of Mr. Busby's functioning. Mr. Busby's communication abilities, including speech, vocabulary, listening, conversation, and nonverbal communication skills, are in the Extremely Low range. He functions in the Extremely Low range when performing basic academic skills such as reading, writing, and mathematics, as well as functional skills such as taking measurements and telling time. His ability to make independent choices, exhibit self-control and take responsibility when appropriate is in the Extremely Low range.*

*A more in-depth look at Mr. Busby's specific skill sets within the Social domain may be obtained by examining the adaptive skill areas. The leisure skills needed for engaging in play and planning recreational activities are in the Extremely Low range for Mr. Busby. His ability to interact socially, initiate and maintain friendships, express and recognize emotions, and assist others when needed is in the Extremely Low range.*

*Adaptive skill areas within the Practical domain offer a more specific picture of Mr. Busby's capabilities. His ability to function and get around in the community, including shopping and using community resources, is in the Extremely Low range. Mr. Busby's level of functioning inside the home, including cleaning, food preparation, performing chores, and taking care of personal possessions, is in the Extremely Low range. Mr. Busby's ability to protect his physical well-being and prevent and respond to injuries, including following safety rules, showing caution, and using medicine when appropriate, is in the Extremely Low range. His ability to perform self-care activities such as eating, dressing, and taking care of personal hygiene is in the Extremely Low range.*

### Strengths and Weaknesses in Adaptive Skill Areas

*It is important to look at the relative strengths and areas for improvement within an individual's adaptive skills profile for the purposes of assessment, treatment and intervention planning, and progress monitoring. In order to determine the areas of personal strength and weakness within Mr. Busby's profile, each skill area scaled score was compared to his average scaled score across all adaptive skill areas to look for differences at the .05 level of statistical significance. In Mr. Busby's case, no skill area scaled score differences from his average across all skill areas were significant enough to be considered strengths or weaknesses within his profile.*

### Summary of ABAS-3 Results (Tarsharn Busby):

*Mr. Busby's overall adaptive behavior can be characterized as lower functioning than that of almost all individuals his age. Mr. Busby's conceptual adaptive behavior can be characterized as lower functioning than that of almost all individuals his age. Mr. Busby's social adaptive behavior can be characterized as lower functioning than that of almost all individuals his age. Mr. Busby's practical adaptive behavior can be characterized as lower functioning than that of almost all individuals his age.*

**Rater: Mrs. Kimiko Coleman**

| | Sum of Scaled Scores | Standard Score | Percentile Rank | Confidence Interval 95% |
|---|---|---|---|---|
| General Adaptive Composite (GAC) | 9 | 52 | 0.1 | 49-55 |
| Conceptual | 3 | 54 | 0.1 | 48-60 |
| Social | 2 | 56 | 0.2 | 51-61 |
| Practical | 4 | 54 | 0.1 | 49-59 |

### Interpretation of ABAS-3 Results (Kimiko Coleman):

#### Adaptive Behavior Standard Scores

*The General Adaptive Composite (GAC) summarizes performance across all skill areas. Mr. Busby obtained a GAC score of 52. His true score is likely to fall within the range of 49 - 55 at a 95% level of confidence. Mr. Busby's current overall level of adaptive behavior is in the Extremely Low range, as high as or higher than 0.1% of individuals of the same age. Because the GAC provides the most complete measure of adaptive behavior, it is likely to be the most reliable and accurate estimate of overall adaptive functioning. However, more detailed information about Mr. Busby's unique profile of adaptive functioning may be obtained by reviewing performance within adaptive domains and skill areas if significant differences exist between adaptive domain standard scores or skill area scaled scores.*

*The Conceptual domain standard score summarizes performance across the Communication, Functional Academics, and Self-Direction skill areas. Mr. Busby's Conceptual domain standard score of 54 (95% confidence interval of 48 - 60) is in the Extremely Low range, as high as or higher than 0.1% of individuals of the same age.*

*The Social domain standard score summarizes performance across the Leisure and Social skill areas. Mr. Busby's Social domain standard score of 56 (95% confidence interval of 51 - 61) is in the Extremely Low range, as high as or higher than 0.2% of individuals of the same age.*

*The Practical domain standard score summarizes performance across the Community Use, Home Living, Health and Safety, Self-Care, and Work skill areas. Mr. Busby's Practical domain standard score of 54 (95% confidence interval of 49 - 59) is in the Extremely Low range, as high as or higher than 0.1% of individuals of the same age.*

#### Adaptive Domain Comparisons

*A comparison of performance between the adaptive behavior domains also provides useful information for interpretation. No significant differences were found between Mr. Busby's overall functioning in the areas of communication, academics, and self-direction (conceptual*

22

83

adaptive behavior), his general ability to participate in social and leisure activities (social adaptive behavior), and his community and home living, health and safety, and self-care skills (practical adaptive behavior).

### Scatter in Adaptive Skill Area Scaled Scores

An individual's adaptive skill area scaled scores may be relatively consistent or may show considerable variability. The scatter analysis allows you to determine whether the degree of scatter (i.e., the range between the person's highest and lowest scaled scores) warrants clinical attention.

The degree of scatter in the GAC is neither statistically significant nor unusual (i.e., it has a high base rate). Thus, the GAC may be considered a robust measure of adaptive functioning for this individual.

### Adaptive Skill Area Results

Adaptive skill areas within the Conceptual domain provide a more detailed view of Mr. Busby's functioning. Mr. Busby's communication abilities, including speech, vocabulary, listening, conversation, and nonverbal communication skills, are in the Extremely Low range. He functions in the Extremely Low range when performing basic academic skills such as reading, writing, and mathematics, as well as functional skills such as taking measurements and telling time. His ability to make independent choices, exhibit self-control and take responsibility when appropriate is in the Extremely Low range.

A more in-depth look at Mr. Busby's specific skill sets within the Social domain may be obtained by examining the adaptive skill areas. The leisure skills needed for engaging in play and planning recreational activities are in the Extremely Low range for Mr. Busby. His ability to interact socially, initiate and maintain friendships, express and recognize emotions, and assist others when needed is in the Extremely Low range.

Adaptive skill areas within the Practical domain offer a more specific picture of Mr. Busby's capabilities. His ability to function and get around in the community, including shopping and using community resources, is in the Extremely Low range. Mr. Busby's level of functioning inside the home, including cleaning, food preparation, performing chores, and taking care of personal possessions, is in the Extremely Low range. Mr. Busby's ability to protect his physical well-being and prevent and respond to injuries, including following safety rules, showing caution, and using medicine when appropriate, is in the Extremely Low range. His ability to perform self-care activities such as eating, dressing, and taking care of personal hygiene is in the Extremely Low range.

### Strengths and Weaknesses in Adaptive Skill Areas

It is important to look at the relative strengths and areas for improvement within an individual's adaptive skills profile for the purposes of assessment, treatment and intervention planning, and progress monitoring. In order to determine the areas of personal strength and weakness within Mr. Busby's profile, each skill area scaled score was compared to his average scaled score

23

84

*across all adaptive skill areas to look for differences at the .05 level of statistical significance. In Mr. Busby's case, no skill area scaled score differences from his average across all skill areas were significant enough to be considered strengths or weaknesses within his profile.*

**Summary of ABAS-3 Results (Kimiko Coleman):**

*Mr. Busby's overall adaptive behavior can be characterized as lower functioning than that of almost all individuals his age. Mr. Busby's conceptual adaptive behavior can be characterized as lower functioning than that of almost all individuals his age. Mr. Busby's social adaptive behavior can be characterized as lower functioning than that of almost all individuals his age. Mr. Busby's practical adaptive behavior can be characterized as lower functioning than that of almost all individuals his age.*

**Definitions of Intellectual Disability:** The DSM-5 defines intellectual disabilities as neurodevelopmental disorders that begin in childhood and are characterized by intellectual difficulties as well as difficulties in conceptual, social, and practical areas of living. The American Association for Intellectual and Developmental Disability (AAIDD) and the International Classification of Diseases (10th Edition) embrace a similar definition. Specifically, the DSM-5 diagnosis of ID requires the satisfaction of three criteria:

1. Deficits in intellectual functioning—"reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience"—confirmed by clinical evaluation and individualized standard IQ testing (APA, 2013, p. 33);
2. Deficits in adaptive functioning that significantly hamper conforming to developmental and sociocultural standards for the individual's independence and ability to meet their social responsibility; and
3. The onset of these deficits during childhood.

Inclusively, the DSM-5 provides descriptors of the severity of the intellectual disability as mild, moderate, and severe. It is important to note that individuals with mild severity continue to have difficulty functioning in society; though their adaptation may appear adequate at the surface level (APA, 2013). Furthermore, it is critical to acknowledge that a diagnosis of ID and other mental health can not be considered independently as the intersectionality between them speaks to adaptive functioning of an individual.

**Definition of Adaptive Behavior:** Adaptive Behavior includes conceptual, social, and practical skills that are necessary to function in everyday life. These learned behaviors are specific to the environment and culture of the individual. Additionally, they are constantly changing. For example, making a phone call now is different than the skills necessary to make a phone call decades ago. Below are skill areas to define these three domains:

1. Conceptual skills: Literacy; self-direction; concepts of number, money and time
2. Social skills: interpersonal skills, social responsibility, self-esteem, gullibility, naivete, social problem solving, following rules, obeying laws, and avoid being victimized
3. Practical skills: activities of daily living (personal care), occupational skills, money,

24

85

safety, health care, travel/transportation, schedules/routines, and use of telephone

Tasse et al., 2009 developed behavioral indicators in each domain to assist in diagnosis of ID. These behavioral indicators are useful part to when appropriate standardized tests or professionals trained to administer such instruments are unavailable or limited. In these situations, a diagnosis of disorders of ID might be possible through the assessment of behavioral indicators to inform the professional's clinical judgement regarding the presence and severity of impairments in both intellectual functioning and adaptive behavior across conceptual, social and practical skills.

**Assessment Summary and Interpretation:** Mr. Busby obtained a Full Scale IQ score of 74 on the Wechsler Adult Intelligence Scale- Fourth Edition (WAIS-IV) in 2010, at the age of 37 years. The WAIS-IV was selected for re-administration due to the robust statistical properties and well-established validity and reliability profiles of this measure for estimating intelligence. The planned revision of this test (WAIS-V) was hampered by the effects of the COVID-19 pandemic on data collection studies (Pearson, Personal Communication, 2021), and as such, an updated version has not been made available.

During the more recent administration of the WAIS-IV in February, 2022, Mr. Busby obtained a Full Scale IQ score of 81, at the age of 49. Both scores were obtained with confirmation of optimal effort using standardized testing, and the score discrepancy between the two administrations (2010 and 2022) is likely due to the combined effects of several factors that are known to increase intelligence test scores over time, including the Flynn effect and "practice effects." The Flynn effect refers to the tendency for standardized intelligence test scores to increase over time, apparently due to changes in characteristics of the population (Flynn 1984, 1985, 1998). IQ test score increases have found to be generally continuous and approximately linear over time, with a proposed test score increase of .3 standard score points per year for most tests, or about one point every three years. Since the WAIS-IV was published in 2008, the application of the Flynn effect for an administration in 2022 (14 years) would result in a proposed score adjustment of approximately four points. This adjustment would result in a current Flynn adjusted IQ score of 77.

Practice effects refer to gains in standardized test scores that result from a person being tested a second time using the same instrument or similar methodology (Kaufman, 1994). This is believed to be due to several factors, including familiarity with test questions and stimuli, as well as gained experience with test taking in general. Although there is no universally agreed-upon quantitative score adjustment that can be applied to account for the increase in test scores due to practice effects in a particular case, there is an indication that there are initial gains of about 2.5 points in verbal IQ scores for adults age 16 to 54, and up to eight points in performance IQ scores for subjects and ages range from 16 to 54 (Kaufman and Lichtenberger, 2006). In analyzing the discrepancy in Mr. Busby's full scale IQ scores (74 in 2010; 81 in 2022), the potential influence of practice effects must be considered, likely contributing several points to the observed increase in IQ composite scores. Applying an adjustment for the Flynn effect and considering a possible increase of several Full Scale IQ points, the results of the more recent administration of the WAIS-IV (2022) are consistent with the prior first administration in 2010,

25

86

when Mr. Busby obtained a Full Scale IQ score of 74 (SEM = 70-79 at 95% confidence interval).

As part of his more recent assessment, Mr. Busby was also administered a measure of his academic skills, the Wide Range Achievement Test-Fifth Edition, as a supportive measure to evaluate his academic attainment and abilities. His scores on this measure were consistent with his low intelligence test scores and indicative of lifelong adaptive deficits in academic acquisition. His scores on reading tasks were in the Extremely Low range, while scores on a measure of sentence comprehension were in the Very Low range. Math computation skills were also Very Low, while spelling skills were Low Average.

With respect to adaptive functioning, information provided from multiple sources through affidavits, in-person interviews, and standardized assessment documents significant deficits in most functional areas beginning at an early age and persisting through adulthood. Mr. Busby's adaptive functioning assessment was indicative of significant deficiencies in communication, academic skills, self-direction, leisure engagement and organization, social skills, community/home skills, health and safety skills, and self-care. Gross motor skills were not reported as deficient by informants and test subjects. Information obtained through standardized testing (ABAS-3) completed by Mr. Busby's sisters regarding his adaptive functioning was consistent with that obtained through affidavits and interviewing, with low General Adaptive Composite scores reflecting adaptive deficits in all domains, including Conceptual, Social, and Practical skills. Mr. Busby's academic history was also indicative of difficulty with learning and acquisition, including repeating grades, exemptions from national standardized testing, and enrollment in special education services.

**Opinions:** The following opinions are based upon standardized testing, interviewing of Mr. Busby and his family members, and a review of pertinent records and documents. All opinions will be based on reasonable psychological and neuropsychological probability and are limited to my areas of expertise, and the referral question to examine Mr. Busby's intellectual functioning.

Based on information obtained through records, interviewing, and standardized testing, Mr. Busby has deficits in adaptive functioning that have been present throughout his development and meet AAIDD and DSM-5 diagnostic criteria for Intellectual Disability. His adjusted IQ scores also fall within the range of Intellectual Disability in the context of a documented history of adaptive deficits in multiple functional domains.

The opinions described in this report represent my conclusions based on information available to me as of July 11, 2022. I reserve the right to review or modify my opinions if other information becomes available. Thank you for allowing me to work with Mr. Busby. Please do not hesitate to contact me if I can be of further assistance.

Gilbert Martinez, PhD, ABPP-CN
Licensed Psychologist: *Texas 30743   Louisiana 1249*
Board Certified Clinical Neuropsychologist

26

87

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Esther Castaneda on behalf of Fredericka Searle Sargent
Bar No. 24027829
ecastaneda@tarrantcountytx.gov
Envelope ID: 77848745
Filing Code Description: Other Documents Not Listed
Filing Description: State's Proposed Findings of Facts and Conclusions of Law.
Status as of 7/25/2023 10:48 AM CST

Associated Case Party: EDWARDLEEBUSBY

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jeffrey Newberry | 24060966 | jrnewber@central.uh.edu | 7/25/2023 10:44:43 AM | SENT |
| David R.Dow | | ddow@central.uh.edu | 7/25/2023 10:44:43 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David R. Dow | 6064900 | ddow@uh.edu | 7/25/2023 10:44:43 AM | SENT |

88

## IN THE CRIMINAL DISTRICT COURT NUMBER TWO,
## OF TARRANT COUNTY, TEXAS

| | |
|---|---|
| **Ex parte** **Edward Lee Busby, Jr.,** **Applicant** | **Cause No. CDC2-W011911-00** |

## ORDER ADOPTING APPLICANT BUSBY'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
## AND FORWARDING THE CASE TO THE
## TEXAS COURT OF CRIMINAL APPEALS

The Court adopts and incorporates herein Applicant's proposed findings of fact and conclusions of law in this cause.

The Clerk is hereby ORDERED to prepare a transcript of all papers in Cause No. CDC2-W011911-00 and transmit the same to the Court of Criminal Appeals as provided by Article 11.071 of the Code of Criminal Procedure.

The Clerk is further ORDERED to send a copy of the Court's Findings of Fact and Conclusions of Law, including this Order, to Applicant's counsel and to counsel for the State.

89

ORDERED AND SIGNED on this ____ day of _____, 2023.


_____
Hon. Wayne Salvant
Presiding Judge
Criminal District Court Number Two

W011911

FILED
TARRANT COUNTY
7/25/2023 10:53 AM
THOMAS A. WILDER
DISTRICT CLERK

# IN THE CRIMINAL DISTRICT COURT NUMBER TWO,
## OF TARRANT COUNTY, TEXAS

|  |  |
|---|---|
| **Ex parte**<br>**Edward Lee Busby, Jr.,**<br><br>**Applicant** | **Cause No. CDC2-W011911-00** |

## APPLICANT BUSBY'S PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Capital Case

David R. Dow
Texas Bar No. 06064900
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77204-6060
Tel. (713) 743-2171
Fax (832) 842-4671
Email ddow@central.uh.edu

Jeffrey R. Newberry
Texas Bar No. 24060966
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77204-6060
Tel. (713) 743-6843
Fax (832) 842-4671
Email jrnewber@central.uh.edu

*Counsel for Edward Lee Busby, Jr.*

91

## Table of Contents

Table of Authorities ...............................................................................iv

Table of Exhibits.................................................................................vi

APPLICANT BUSBY'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW ..............................................................1

I.     Findings of fact pertaining to procedural history...........................1

       A.    Busby's 2005 trial ..................................................................2

       B.    Direct appeal and initial state habeas proceeding .................4

       C.    Federal habeas proceeding ....................................................5

       D.    Subsequent state habeas proceeding......................................7

II.    Findings of fact pertaining to Busby's claim that he is
       ineligible for execution because he is intellectually disabled........11

       A.    The intellectual disability standard ......................................11

       B.    Busby is intellectually disabled.............................................14

             1.    Busby possesses significantly subaverage
                   intellectual functioning..............................................14

                   a.    WAIS-IV (2010 and 2022)...................................15

                   b.    Unknown test (2001)...........................................18

                   c.    WAIS-III (2005) ..................................................18

                   d.    Beta-III (2005) ....................................................19

                   e.    WAIS-III (2005) ..................................................20

f.     Dr. McGarrahan's review (2023) ........................22

2.     Evidence of significant limitations in adaptive behavior ....................................................................22

3.     Evidence of onset before age eighteen ........................30

III.    Conclusions of law .....................................................................30

Certificate of Service............................................................................33

iii

93

## Table of Authorities

**Cases**

*Atkins v. Virginia,*
    536 U.S. 304 (2002).................................................................11

*Busby v. Davis,*
    925 F.3d 699 (5th Cir. May 20, 2019) ..............................................6

*Busby v. Davis,*
    140 S. Ct. 897 (2020)...................................................................6

*Busby v. State,*
    253 S.W.3d 661 (Tex. Crim. App. 2008)...........................................4

*Busby v. Stephens,*
    No. 4:09-cv-160-O, 2015 WL 1037460 (N.D. Tex. Mar. 10,
    2015).....................................................................................6

*Busby v. Texas,*
    555 U.S. 1050 (2008) ..................................................................4

*Ex parte Busby,*
    No. 70,747-01, 2009 WL 483096 (Tex. Crim. App. Feb. 25,
    2009).....................................................................................5

*Ex parte Busby,*
    No. WR-70,747-02 (Tex. Crim. App. Mar. 6, 2013)..........................6

*Ex parte Busby,*
    No. WR-70,747-06, 2021 WL 369737 (Tex. Crim. App. Feb. 3,
    2021).....................................................................................7

*Ex parte Cathey,*
    451 S.W.3d 1 (Tex. Crim. App. 2014)............................................15

*Hall v. Florida*,
    572 U.S. 701 (2014) ...................................................................13

*In re Busby*,
    No. WR-70,747-03, 2020 WL 2029306 (Tex. Crim. App. Apr.
    27, 2020) ...................................................................................7

*Moore v. Texas*,
    581 U.S. 1 (2017)..................................................................11-14

**Statutes**

Tex. Code Crim. Proc. art. 37.071........................................................3

**Other Authority**

AAIDD, Intellectual Disability: Definition, Classification, and
Systems of Supports (11th ed. 2010) ...............................................12-14

APA, Diagnostic and Statistical Manual of Mental Disorders (5th
ed. 2013)...............................................................................12-14

Michael R. Basso, et al., *Practice Effects on the WAIS-III Across 3-
and 6-Month Intervals*, 16 Clinical Neuropsychologist 57 (2002) ..........21

**Table of Exhibits**

Exhibit A       July 11, 2022, Report of Intellectual and Adaptive
                Functioning Assessment by Dr. Gilbert Martinez

Exhibit B       April 21, 2023, Forensic Record Review and
                Intellectual Disability Analysis by Dr. Antoinette
                McGarrahan

**IN THE CRIMINAL DISTRICT COURT NUMBER TWO,
OF TARRANT COUNTY, TEXAS**

| | |
|---|---|
| **Ex parte<br>Edward Lee Busby, Jr.,**<br><br>**Applicant** | **Cause No. CDC2-W011911-00** |

**APPLICANT BUSBY'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Applicant Edward Lee Busby, Jr., through his attorneys, David R. Dow and Jeffrey R. Newberry, files these Proposed Findings of Fact and Conclusions of Law.

This Court, having considered Edward Lee Busby, Jr.'s Subsequent Application for Post-Conviction Writ of Habeas Corpus, filed pursuant to Article 11.071 of the Texas Code of Criminal Procedure; the State's Response; the February 3, 2021, Order of the Texas Court of Criminal Appeals ("CCA") authorizing this Court to consider the merits of Busby's claim; all of the expert reports attached to the parties' proposed Findings of Fact and Conclusions of Law; and other briefing from both parties; makes the following Findings of Fact and Conclusions of Law, as directed by Article 11.071, Section 8.

1

97

## I.    Findings of fact pertaining to procedural history

### A.    Busby's 2005 trial

1. On March 31, 2004, Busby was indicted for the capital murder of Laura Crane. 1 C.R. 2.[1]

2. Busby pleaded not guilty to the charge, and the trial commenced on November 9, 2005. 30 R.R. 3-6.

3. On November 11, the jury found Busby guilty of capital murder. 32 R.R. 75.

4. The punishment phase began on November 14, 2005. 33 R.R. 3.

5. During the punishment phase, Busby's trial counsel presented testimony from five lay witnesses and a psychologist. 35 R.R. 12-83; 36 R.R. 5-98.

6. The first two witnesses were teachers from Pampa, who had never met Busby. 35 R.R 12-30. These witnesses testified about Busby's school records and their content.

7. The third lay witness, special education teacher Jeanette Miller, testified that she taught Busby job skills, that he was a follower,

---

[1] Citations to the Clerk's Record of Busby's 2005 trial appear herein [volume number] C.R. [page number]. Citations to the Reporter's Record appear as [volume number] R.R. [page number].

and that he once called her to tell her he intended to kill himself. 35 R.R. 33-45.

8. Busby's two sisters, Kimiko Coleman, and Tarsharn Busby, testified briefly. 35 R.R. 50-83.

9. The final witness presented to the jury by trial counsel was Dr. Timothy Proctor, a psychologist. 36 R.R. 6-7.

10. Dr. Proctor testified that Mr. Busby's IQ was approximately 77. *Id.* at 53-54.

11. At the conclusion of the punishment hearing, the jury answered "yes" to the first special issue, the so-called "future dangerousness" question,[2] and "no" to the second special issue, the mitigation issue.[3] 36 R.R. 158-59.

12. By operation of law, on November 17, 2005, this Court sentenced Busby to death. 36 R.R. 161-62.

---

[2] The "future dangerousness" question asks the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).

[3] The mitigation special issue asks the jury to determine "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).

**B.      Direct appeal and initial state habeas proceeding**

13. Busby's trial counsel represented him in his direct appeal proceeding and filed Busby's appellate brief on May 7, 2007. Relevant to these Findings of Fact and Conclusions of Law, the brief did not raise a claim pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002). *See* Appellant's Br. at 1-70, *Busby v. State*, 253 S.W.3d 661 (Tex. Crim. App. 2008) (No. AP-75300), 2007 WL 1920640.

14. Busby's conviction and sentence were affirmed by the CCA on May 14, 2008. *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008). The conviction became final on December 1, 2008, when the United States Supreme Court denied Mr. Busby's petition for writ of certiorari. *Busby v. Texas*, 555 U.S. 1050 (2008).

15. Busby's initial state habeas attorney filed Busby's initial application for writ of habeas corpus in this Court on March 24, 2008. 1 S.H.C.R. 2-79.[4] The application did not raise a claim pursuant to *Atkins*. *See id.*

16. This Court recommended that relief be denied, and the CCA agreed with the recommendation, denying Busby relief on February 25,

---

[4] Citations to the two-volume State Habeas Clerk's Record of Busby's initial state habeas proceeding appear herein as [volume number] S.H.C.R. [page number].

4

100

2009. 2 S.H.C.R. 403; *Ex parte Busby*, No. WR-70,747-01, 2009 WL 483096, at *1 (Tex. Crim. App. Feb. 25, 2009).

### C.    Federal habeas proceeding

17. Busby's lead attorney in this proceeding, David R. Dow, was appointed to represent Busby in his federal habeas proceeding on April 13, 2009. Order Appointing Counsel at 1-2, *Busby v. Quarterman*, No. 4:09-cv-160-Y (N.D. Tex. April 13, 2009), ECF No. 3.

18. Dow filed Busby's initial federal petition for writ of habeas corpus on February 25, 2010, and an amended petition on March 24, 2010, alleging seven grounds for relief from his conviction and death sentence, including a claim raised pursuant to *Atkins* that Busby is ineligible for execution because he is intellectually disabled. Am. Pet. Writ Habeas Corpus at 101-30, *Busby v. Thaler*, No. 4:09-cv-160-Y (N.D. Tex. May 24, 2010), ECF No. 25.

19. Because the petition contained unexhausted claims, on August 15, 2012, the federal proceeding was stayed to allow Busby to present his *Atkins* claim (and other unexhausted claims) to the state court. Stay and Abeyance Order at 11-12, *Busby v. Thaler*, No. 4:09-cv-160-Y (N.D. Tex. Aug. 15, 2012), ECF No. 60.

5

20. Counsel filed Busby's subsequent state application for writ of habeas corpus, raising, *inter alia*, the *Atkins* claim, in this Court on October 1, 2012. *Ex parte Busby*, No. WR-70,747-02 (Tex. Crim. App. Mar. 6, 2013).

21. After the application was transmitted to the CCA, that court found that the *Atkins* claim (as well as the other claims raised in the application) did not satisfy any of the criteria contained in section 5 of Article 11.071, section 5(a) and dismissed the application. *Id.*

22. On March 10, 2015, the federal district court entered an order denying Busby relief, which was affirmed by the United States Court of Appeals of the Fifth Circuit on May 20, 2019. *Busby v. Davis*, 925 F.3d 699, 727 (5th Cir. May 20, 2019); *Busby v. Stephens*, No. 4:09-cv-160-O, 2015 WL 1037460, at \*28 (N.D. Tex. Mar. 10, 2015).

23. The Supreme Court denied Busby's petition for a writ of certiorari on January 13, 2020. *Busby v. Davis*, 140 S. Ct. 897 (2020).

**D.    Subsequent state habeas proceeding**

6

102

24. Two weeks later, this Court entered an order scheduling Busby to be executed on May 6, 2020.

25. Arguing the pandemic made it impossible for them to do everything necessary to properly raise an *Atkins* claim for Busby at that time, Busby's attorneys filed a motion for stay of execution in the CCA on March 19, 2020. On April 27, 2020, the CCA granted the motion and entered an order staying Busby's execution for sixty days. *In re Busby*, No. WR-70,747-03, 2020 WL 2029306 (Tex. Crim. App. Apr. 27, 2020).

26. After the CCA's sixty-day stay had expired, on October 15, 2020, this Court scheduled Busby to be executed on February 10, 2021.

27. On January 28, 2021, Counsel for Busby filed a subsequent habeas application that raised an *Atkins* claim along with a motion that asked the CCA to stay Busby's execution.

28. On February 3, 2021, the CCA entered an order staying the execution and authorizing this Court to consider the merits of Busby's *Atkins* claim. *Ex parte Busby*, No. WR-70,747-06, 2021 WL 369737 (Tex. Crim. App. Feb. 3, 2021).

29. On February 10, 2021, this Court convened a status hearing during which the parties agreed Busby needed to be reevaluated.

30. Before March 15, 2021, it was not possible to have Busby reevaluated because there were no visits at any unit because TDCJ halted visitation upon the outbreak of the coronavirus pandemic.

31. By April 26, 2021, it was possible to schedule an expert contact visit. Busby's expert, Dr. Gilbert Martinez, was initially scheduled to have a contact visit with Busby on July 15, 2021.

32. TDCJ officials at the Polunsky Unit would not allow Busby to be uncuffed during the visit, and, according to Dr. Martinez, it is impossible to administer a WAIS-IV to an inmate in cuffs.

33. When this Court was notified TDCJ would not allow Busby to be uncuffed, the Court immediately ordered TDCJ officials to allow Busby to be uncuffed during the visit.

34. By the time TDCJ officials indicated they would comply with this Court's order, there was not enough time in the day remaining to complete the evaluation, so Busby was not evaluated as scheduled on July 15, 2021.

35. Dr. Martinez and his assistant were again approved for a contact visit with Busby on February 25, 2022, and this Court ordered

104

TDCJ officials at the Polunsky Unit to allow Busby to be uncuffed during the visit.

36. At last, Dr. Martinez was able to evaluate Busby on February 25, 2022. During this evaluation, Dr. Martinez conducted a clinical diagnostic interview of Busby. Exhibit A (July 11, 2022, Report of Intellectual and Adaptive Functioning Assessment by Dr. Gilbert Martinez) at 3-6.

37. Dr. Martinez administered the following testing tools and techniques:

>  a. Weschler Adult Intelligence Scale-Fourth Edition (WAIS-IV)
>
>  b. Advanced Clinical Solutions Word Choice/Effort
>
>  c. Wide Range Achievement Test-Fifth Edition (WRAT-5)
>
>  d. Test of Memory Malingering (TOMM).

Exhibit A at 6.

38. On June 15, 2022, Dr. Martinez interviewed Busby's sisters, Kimiko Coleman and Tarsharn Busby. Both of Busby's sisters reported that Mr. Busby was unable to care for himself and required other people, especially women, to do everything for him, including, but not

9

105

limited to, handling finances, basic household chores, and understanding driving directions. Exhibit A at 8-12.

39. On July 11, 2022, Dr. Martinez issued his report. Dr. Martinez found that Busby has deficits in adaptive functioning that have been present throughout his development and meet AAIDD and DSM-5 diagnostic criteria for Intellectual Disability. Martinez further found that Busby's IQ score falls within the range of Intellectual Disability in the context of a documented history of adaptive deficits in multiple functional domains. Exhibit A at 26.

40. On July 13, 2022, Counsel for Busby forwarded Dr. Martinez's report to Counsel for the State, so the State's expert, Dr. Antoinette McGarrahan, could review the report.

41. On April 21, 2023, Dr. McGarrahan issued her Forensic Record Review and Intellectual Disability Analysis, which is attached to these Findings of Fact and Conclusions of Law as Exhibit B.

42. Dr. McGarrahan assessed all the previous IQ tests performed on Busby and found that further testing was not necessary because previous testing "demonstrated a highly consistent pattern of results,

10

106

with scores falling within the range considered to represent substantial intellectual deficits." Exhibit B at 5.

43. Dr. McGarrahan further found that Busby has demonstrated significant deficits in several areas of adaptive behavior. *Id.*

44. Accordingly, Dr. McGarrahan, like Dr. Martinez, found that "Busby meets the full diagnostic criteria for intellectual disability according to current standards." Exhibit B at 6.

**II.     Findings of fact pertaining to Busby's claim that he is ineligible for execution because he is intellectually disabled**

**A.     The intellectual disability standard**

45. The execution of an intellectually disabled person violates the Eighth Amendment's proscription against cruel and unusual punishment. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

46. The Texas Legislature has not provided a statutory definition of intellectual disability. In the absence of such a statutory definition, it is appropriate for this Court to rely on the definitions set out by the American Association of Intellectual and Developmental Disabilities ("AAIDD") and the American Psychiatric Association ("APA") when assessing an *Atkins* claim. *See Moore v. Texas*, 581 U.S. 1, 7 (2017).

11

107

47. Intellectual disability is characterized by (1) significantly subaverage intellectual functioning, (2) accompanied by significant limitations in adaptive behavior, (3) the onset of which occurs prior to the age of 18. *See* AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports 27 (11th ed. 2010) ("2010 AAIDD Manual"); APA, Diagnostic and Statistical Manual of Mental Disorders 37 (5th ed. 2013) ("DSM-V"); *see also Moore*, 581 U.S. at 7.

48. Significantly subaverage intellectual functioning is defined as an IQ score that is approximately two standard deviations below the mean, adjusted for the standard error of measurement. 2010 AAIDD Manual at 27; DSM-V at 37.

49. For IQ tests that have a standard deviation of 15 points, such as the Weschler Scales, an IQ score of 70 is two standard deviations below the mean, and the standard error of measurement is approximately 5 points. DSM-V at 37.

50. A court must account for an IQ test's standard error of measurement when assessing an *Atkins* claim, as is advanced by the APA and AAIDD. *Moore*, 581 U.S. at 13.

12

108

51. For that reason, the Supreme Court has invalidated statutes that have a strict IQ test score cutoff. *Hall v. Florida*, 572 U.S. 701, 722 (2014). Furthermore, the AAIIDD recommends that clinicians take the Flynn Effect (discussed in greater detail below) into account when interpreting IQ scores and assessing intellectual functioning. *See* 2010 AAIDD Manual at 37.

52. The AAIDD Manual requires that there be "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical skills." 2010 AAIDD Manual at 5. "Significance" can be established if an individual's adaptive skills fall two or more standard deviations below the mean in at least one of the three domains. *Id.* at 43; *see also Moore*, 581 U.S. at 15-16.

53. The AAIDD Manual provides examples of "representative skills" in each of the three domains. Representative conceptual skills are "language; reading and writing; and money, time, and number concepts." 2010 AAIDD at 44. Representative social skills are "interpersonal skills, social responsibility, self-esteem, gullibility, naiveté (i.e., wariness), follows rules/obeys laws, avoids being victimized, and social problem solving." *Id.* Representative practical

13

109

skills are "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone." *Id.*

54. Prior to the Supreme Court's decision in *Moore*, the CCA also considered an applicant's adaptive strengths when assessing *Atkins* claims. *Moore*, 581 U.S. at 15-16. However, *Moore* established that a court's focus should not be on an applicant's adaptive strengths, but instead on his adaptive deficits. *Id.*

### B.   Busby is intellectually disabled.

55. Busby is intellectually disabled. The evidence shows that: (1) he possesses significantly subaverage intellectual functioning; (2) he has significant limitations in his adaptive functioning; and (3) he exhibited these diagnostic features before the age of eighteen.

### 1.   Busby possesses significantly subaverage intellectual functioning.

56. When assessing an individual's level of intellectual functioning based on an IQ score, the accepted scientific phenomenon known as the "Flynn Effect"—in which the general population's average IQ score is observed to perform better on intelligence tests over time—should be taken into account. *See* 2010 AAIDD Manual at 37.

57. Flynn's empirical research has demonstrated that the average IQ score obtained by any given group on the Wechsler scale has historically increased by approximately 0.33 points per year. *Id.*

58. In *Ex parte Cathey*, 451 S.W.3d 1 (Tex. Crim. App. 2014), the CCA noted that the preferred solution to account for the Flynn Effect is to retest individuals with a recently normed version of an IQ test rather than adjusting an individual's score for the Flynn Effect. *Ex parte Cathey*, 451 S.W.3d 1, 16 (Tex. Crim. App. 2014). However, if it is not possible to retest an applicant with a recently normed test, the impact of the Flynn Effect on an individual's IQ score can be considered. *Id.* at 17.

59. As more recently normed IQ tests are more reliable, Busby's IQ scores obtained from the WAIS-IV will be discussed first. The IQ scores Mr. Busby received from other IQ tests will be subsequently discussed in chronological order.

### a.    WAIS-IV (2010 and 2022)

60. On February 11, 2010, Dr. Gilbert Martinez, a psychologist, administered the Wechsler Adult Intelligence Scales—Fourth Edition

("WAIS-IV") to Mr. Busby. Exhibit A at 2-3. The WAIS-IV is the most recent iteration of the respected Wechsler Adult Intelligent Scales.

61. Busby obtained a full-scale IQ score of 74. Exhibit A at 2. Given the standard error of measurement, this means Busby's IQ was between 70 and 79. *Id.*

62. As part of the 2010 administration, Dr. Martinez administered validity testing—specifically, a standardized measure called the Test of memory malingering ("TOMM")—to determine whether Busby was performing to the best of his abilities. Exhibit A at 2. The results of the validity testing were "consistent with good effort" on Busby's part, meaning there is no reason to believe Busby malingered during the cognitive testing. *Id.*

63. On February 25, 2022, Dr. Martinez again administered the WAIS-IV to Busby. Exhibit A at 7. Busby obtained a full-scale IQ score of 81. *Id.*

64. The report notes the seven-point increase was likely caused by both the Flynn Effect and the practice effect. Exhibit A at 25-26. As explained in greater detail above, the Flynn Effect refers to the tendency for standardized test scores to increase over time due to

16

112

characteristic changes in the population. Because the WAIS-IV was published in 2008 (fourteen years before the 2022 administration), Dr. Martinez believes that, to account for the Flynn Effect, Busby's 2022 score should be adjusted by four points. *Id.* Accounting for this adjustment, Busby's Flynn-adjusted score is 77. *Id.*

65. Dr. Martinez believes the practice effect also had an impact on Busby's 2022 score. Exhibit A at 25-26. "Practice effects refer to gains in standardized test scores that result from a person being tested a second time using the same instrument." Exhibit A at 25; *see also* 2010 AAIDD Manual at 38. Despite a lack of universal agreement on quantitative score adjustments, the practice effect has shown increases of 2.5 points in verbal IQ and up to eight points in performance IQ. Exhibit A at 25.

66. Dr. Martinez believes that when both the Flynn and practice effects are taken into account, Busby's 2022 score of 81 is consistent with his 2010 score of 74. Exhibit A at 25-26.

67. As Dr. Martinez found, this Court finds that Busby's score on the WAIS-IV falls within the range of intellectual disability.

### b.    Unknown test (2001)

68. The record reflects that an unidentified test administered by an unknown individual in uncertain testing conditions rendered an IQ score of 96. 36 R.R. 49. The score was considered unreliable by the State and was disregarded. 36 R.R. 64 (noting that there was "probably . . . something wrong with the results"). Because neither the type of test nor the testing conditions—including whether Busby was even the individual who took the test—are known, the score should similarly be disregarded now.

69. The State's expert, Dr. McGarrahan, believes this was likely a group (not individually) administered instrument. Exhibit B at 3.

70. As Dr. McGarrahan observed, this Court agrees this test is "a substantial outlier compared to multiple individually administered, well-regarded IQ measures." Exhibit B at 3.

### c.    WAIS-III (2005)

71. On October 14, 2005, defense psychologist Dr. Timothy Proctor administered the WAIS-III to Mr. Busby. 36 R.R 53. He obtained a FSIQ of 77. *Id.* The WAIS-III was normed in 1995, 10 years before the test was administered. *Id.* Thus, Busby's score of 77 on the WAIS-III in

18

114

2005 is equivalent to his having scored, rounding up, a 74 (77–3.3 = 73.7), where the mean is 100 after adjusting for the Flynn Effect.

72. As Dr. McGarrahan observed, a symptom validity indicator within this test suggests that Busby was putting forth sufficient effort (and not malingering) when taking this test. Exhibit B at 3.

73. When the Flynn Effect is considered, Busby's performance on this test was identical to what he obtained on the WAIS-IV in 2010 and represents significantly sub-average intellectual functioning and is within the range at which a diagnosis of intellectual disability may be made.

### d.    Beta-III (2005)

74. On November 4, 2005, days before the trial on the merits began, defense psychologist Dr. Timothy Proctor administered the Beta-III to Busby. Dr. Proctor estimated that, based on this test, Busby's FSIQ was approximately 81. 36 R.R. 53.

75. Despite their similarities, the Weschler Scales and the Beta-III test differ greatly in their reliability. In Dr. Proctor's words, the Weschler Scales are the "gold standard of IQ tests," while the Beta-III is a "quick and dirty kind of intelligence test." 36 R.R. 40, 48. Accordingly,

19

115

this Court finds that Busby's score on the Beta-III should not be regarded to be as reliable a score as the IQ score from the WAIS-IV, or even the WAIS-III.

76. Dr. McGarrahan's report indicates that, given the standard error or measurement on the Beta-III, a score of 81 on the Beta-III indicates Busby's true score was likely between 72 and 90. Exhibit B at 2-3.

77. The Court finds that, given the standard error of measurement associated with the Beta-III, this score is consistent with the 74 Busby obtained on the WAIS-IV in 2010.

### e. WAIS-III (2005)

78. Just weeks after the Wechsler Adult Intelligence Scales— Third Edition ("WAIS-III") was administered to Busby by defense psychologist Dr. Timothy Proctor, Busby was tested with the WAIS-III by the State's psychologist, Dr. Sven Helge. 36 R.R. 61.

79. Although never admitted into evidence, it appears from the transcript of the trial that the State's expert, Dr. Helge, obtained a full-scale IQ score of 79. 36 R.R. 77.

116

80.    As Dr. McGarrahan observed, given the standard error of measurement, a score of 79 indicates Busby's score was likely between 75 and 83. Exhibit B at 2.

81.    As part of her review, Dr. McGarrahan attempted to obtain Dr. Helge's raw data but was unable to do so. Exhibit B at 3.

82. The WAIS-III was normed in 1995, approximately ten years before Dr. Helge administered the test. Were this Court to take the Flynn Effect into account, Busby's WAIS-III score could be considered to be 76. Exhibit B at 3.

83. Moreover, because Dr. Helge administered this test to Busby only weeks after Dr. Proctor administered the same measure, this Court finds that is is appropriate to take the practice effect into account when considering this test. On the Weschler Scales, there is a reported IQ score increase between 2.0 and 3.2 points when individuals are retested at three- and six-month intervals. Michael R. Basso, et al., *Practice Effects on the WAIS-III Across 3-and 6-Month Intervals*, 16 Clinical Neuropsychologist 57, 58 (2002).

84. The Court finds that when the Flynn and practice effects are taken into account, Busby's score on this test is consistent with both the

21

117

score he obtained on the WAIS-III administered by Dr. Proctor in 2005 and the score he obtained on the WAIS-IV administered by Dr. Martinez in 2010.

### f.      Dr. McGarrahan's review (2023)

85. Upon assessing all previous evaluations of Mr. Busby's intelligence and adaptive behaviors, the State's expert in this proceeding, Dr. Antoinette McGarrahan, decided there was no need to further test Mr. Busby for intellectual disability, because she found the scores Busby obtained in the past to "demonstrate[] a highly consistent pattern of results, with scores falling within the range considered to represent substantial intellectual deficits." Exhibit B at 5.

86.    This Court agrees with Dr. McGarrahan and finds that Busby's scores demonstrate a highly consistent pattern, with scores falling within the range considered to represent intellectual disability.

### 2.      Evidence of significant limitations in adaptive behavior

87. Busby also meets the second prong of the definition of intellectual disability: he possesses significant limitations in adaptive behavior. Busby possesses significant limitations in his conceptual, social, and practical skills.

88. Dr. Gilbert Martinez conducted interviews and standardized tests to assess Busby's adaptive behavior. Dr. Martinez evaluated Busby's conceptual skills (literacy, self-direction, and the concepts of money, numbers, and time), practical skills (personal care, money, occupational skills, maintaining a schedule/routine, use of a telephone, and transportation), and social skills (interpersonal skills, social responsibility, self-esteem, naivety, obeying laws, and following rules). Exhibit A at 24-25.

89. Dr. Martinez conducted in-depth interviews of Busby's sisters, Kimiko Coleman and Tarsharn Busby, who provided an account of his adaptive behaviors as a child and an adult. Exhibit A at 8-12.

90. During her interview, Tarsharn Busby expressed that Busby had difficulty communicating. Exhibit A at 8.

91. Ms. Busby recalled that Busby did not learn to count or how to perform basic mathematical tasks until the third grade. Exhibit A at 9. She also explained that while he eventually could read the numbers on an analog clock, he failed to comprehend their meaning in relation to time. *Id.* His inability to understand time impacted his ability to maintain a routine or schedule. *Id.*

92. Ms. Busby expressed that Busby lacked impulse control and the understanding of the consequences of his actions. Exhibit A at 9. Busby was dependent on others to help make decisions for him. *Id.*

93. Ms. Busby remembered that, as a child, Busby did not engage in creative or imaginative play. Exhibit A at 9.

94. According to Ms. Busby, Busby was an affectionate child but did not like to share. *Id.* As a child, Busby was bullied by other children because he was in special education classes. *Id.*

95. Ms. Busby reported that Busby did not help with chores around at home and had a limited understanding of what needed to be done around the house. Exhibit A at 9.

96. Ms. Busby recounted that Busby had difficulty managing his finances and making medical appointments. Exhibit A at 10. He did not understand budgeting and would make impulsive and unnecessary purchases if left alone to decide what to do with any money he had. *Id.*

97. Ms. Busby shared that Busby engaged in concerning behavior when he was younger, such as bringing snakes into the family home and overdosing on medication. Exhibit A at 10.

24

120

98. Ms. Busby recalled that Busby held only one job in his lifetime, as a dishwasher at a steakhouse. *Id.* Although he did tell her why he was fired, she understood that he missed many shifts due to his inability to follow a schedule. *Id.*

99. Busby's other sister, Kimiko Coleman, provided similar insights into Busby's childhood and adaptive behavior.

100. Ms. Coleman expressed that her brother's communication skills were below average: he slurred his speech and their mother tried to enroll him in speech therapy at his school when he was eight. Exhibit A at 10.

101. Ms. Coleman stated that Busby was in special education classes at school. Exhibit A at 11.

102. Ms. Coleman said that Busby had "zero" self-control. Exhibit A at 11. He started throwing tantrums from a young age and, throughout his life, his reactions and choices largely depended on his mood. *Id.*

103. Ms. Coleman explained that while Busby could initiate tasks, he was not motivated to, and usually did not, complete them. Exhibit A at 11. She stated that Busby was unable to sit through an entire movie

25

because of his limited attention span. *Id.* He was prone to quit or cheat during games because he did not understand the rules. *Id.*

104. Ms. Coleman described Busby as immature for his age and unable to express a normal range of emotions. Exhibit A at 11. Busby tended to emotionally respond in extremes; either very happy or very angry. *Id.* He did not seem interested in others' emotions or in helping others. Exhibit A at 11-12.

105. Ms. Coleman indicated that Busby participated in unhealthy behaviors. At age 10, he stole from a pharmacy. Exhibit A at 12. At age 16, he attempted suicide by overdosing on a medication. *Id.*

106. Ms. Coleman explained that Busby was dependent on women to take care of him, by having them do tasks such as paying his bills, buying his clothes, making his appointments, cooking, cleaning, and making his travel plans. Exhibit A at 12.

108. Dr. Martinez reviewed the affidavits of eight other people who knew Busby across various stages of his life. From these affidavits, Dr. Martinez learned that:

- Busby was often the victim of bullying and manipulation. Exhibit A at 13-14.

122

- During school, Busby was in prevocational classes for students with IQs between 70 and 82. Exhibit A at 14. These classes taught basic life skills. *Id.*

- Busby could not read, write, or count money. He could not fill out a job application or read Bible verses. He was not able to understand complex instructions and football plays. Exhibit A at 14-15.

- Busby was afraid to be alone. Busby was considered a sad loner who desperately craved the attention and affection of women. Even though Busby always had woman around that he claimed were prostitutes, people who knew him believed he lacked the organizational and accounting skills to be a pimp. Conversely, it was reported that women often manipulated Busby, stealing from him, and taking advantage of his gullibility. Exhibit A at 15-16.

- Multiple people recollected that Busby's hygiene was always lacking. He always wore dirty clothes that were in poor condition. Busby reportedly did not bathe for days and did not maintain proper dental hygiene. Exhibit A at 18.

27

123

109. Busby's sisters each independently completed an ABAS-3 standardized questionnaire, designed to quantify Busby's adaptive functioning. Exhibit A at 19.

110. Busby's scores from the ABAS-3 indicate he is on the extremely low range of adaptive functioning. Tarsharn Busby reported the following scores for Busby's adaptive domains:

- General Adaptive Composite (which summarizes performance across all skills areas): 53, indicating Busby is in the extremely low range (lowest 0.1%) of overall adaptive functioning.

- Conceptual: 54, indicating the extremely low range (lowest 0.1%) of adaptive skills in communication, self-direction, and functional academics.

- Social: 58, indicating the extremely low range (lowest 0.3%) of leisure and social skills.

- Practical: 54, indicating the extremely low range (lowest 0.1%) of adaptive performance in community use, home living, health and safety, self-care, and work.

Exhibit A at 19-21.

111. Kimiko Coleman reported the following scores for Busby's adaptive domains:

- General Adaptive Composite (GAC): 52, indicating Busby is in the extremely low range (lowest 0.1%) of overall adaptive functioning.

- Conceptual: 54, indicating the extremely low range (lowest 0.1%) of adaptive skills in communication, self-direction, and functional academics.

- Social: 56, indicating the extremely low range (lowest 0.2%) of leisure and social skills.

- Practical: 54, indicating the extremely low range (lowest 0.1%) of adaptive performance in community use, home living, health and safety, self-care, and work.

Exhibit A at 22-24.

112. In her review, Dr. McGarrahan concluded that Busby has significant adaptive deficits across multiple domains. Exhibit B at 4.

113. This Court finds that Busby significant limitations in his adaptive functioning across multiple domains.

29

### 3.    Evidence of onset before age eighteen

114. This Court finds that most of the affidavits Dr. Martinez reviewed (from which he was able to note evidence of Busby's subaverage intellectual functioning and limitations in adaptive functioning were from individuals who knew Busby before he turned eighteen.

115. In her report, Dr. McGarrahan enumerated the evidence of Busby's possessing both subaverage intellectual functioning and significant limitations in his adaptive functioning before he turned eighteen years old. Exhibit B at 4-5.

116. This Court finds the onset of both Busby's subaverage intellectual functioning and limitations in his adaptive functioning occurred before he was eighteen years old.

## III.    Conclusions of law

117. A person is ineligible for execution if he is intellectually disabled. That person satisfies the diagnostic criteria of intellectual disability if it is shown that he: (1) possesses significantly subaverage intellectual functioning; (2) has significant limitations in his adaptive

30

126

functioning; and (3) exhibited these diagnostic features before the age of eighteen.

118. The most accurate measure of his full-scale IQ score is the 74 he obtained on the WAIS-IV in 2010 (two years after the test was normed). Aside from the 2001 test, about which little is known, the scores obtained through the other intelligence tests known to this Court are consistent with this score.

119. Given the standard error of measurement, Busby's true IQ is likely between 70 and 79.

120. Busby possesses significantly subaverage intellectual functioning.

121. Busby possesses significant limitations in his adaptive functioning across multiple domains.

122. The onset of both Busby's significantly subaverage intellectual functioning and his significant limitations in adaptive functioning occurred during the developmental period, before Busby turned eighteen years old.

123. Busby satisfies the criteria for intellectual disability. He is, therefore, pursuant to *Atkins v. Virginia*, ineligible for execution.

Dated:      July 24, 2023

Respectfully submitted,

/s/ David R. Dow                                    /s/ Jeffrey R. Newberry

_____          _____
David R. Dow                                       Jeffrey R. Newberry
Texas Bar No. 06064900                    Texas Bar No. 24060966
University of Houston Law Center    University of Houston Law Center
4170 Martin Luther King Blvd.         4170 Martin Luther King Blvd.
Houston, TX  77204-6060               Houston, TX  77204-6060
Tel. (713) 743-2171                          Tex. (713) 743-6843
Fax (832) 842-4671                           Fax (832) 842-4671
Email ddow@central.uh.edu           Email jrnewber@central.uh.edu

*Counsel for Edward Lee Busby, Jr.*

32

128

## Certificate of Service

I certify that on July 24, 2023, a true and correct copy of the foregoing was provided to opposing counsel.

/s/ Jeffrey R. Newberry

_____

Jeffrey R. Newberry

# Exhibit A

GILBERT MARTINEZ, PH.D., ABPP-CN
LICENSED PSYCHOLOGIST
BOARD CERTIFIED IN CLINICAL NEUROPSYCHOLOGY

16014 VIA SHAVANO
SAN ANTONIO, TX 78249
FAX (210) 615 – 6906
PH (210) 614 – 3011

## REPORT OF INTELLECTUAL
## AND ADAPTIVE FUNCTIONING ASSESSMENT

**Name:** Edward Busby                      **Assessment Date(s):** 06/15/22
**Date of Birth:** 7/25/72                  **Current Age:** 49 years, 11 months
**Examiners:** Gilbert Martinez, Ph.D., ABPP-CN   **Report Date:** 7/11/22
     Alisa Zinsmeyer Young, M.A., LPC   **Referral Source:** Jeff R. Newberry
     Verenice D'Santiago-Eastman, Ph.D., L.P        David R. Dow

**Re:** Cause No. CDC2-W011911-00 *Ex Parte Edward Lee Busby, Jr., Applicant.* In the Criminal District Court Number Two, of Tarrant County, Texas

**Disclosure Statement:** The information contained in this report is strictly confidential and protected. This information should generally only be interpreted the presence of a qualified psychologist. This report is not for release to the applicant or family and is intended for professional use only.

**Training/Experience:** I am a licensed psychologist and board-certified clinical neuropsychologist with a specialty in the evaluation and treatment of neurological and psychological conditions in adults and children, including brain injury, dementia, intellectual disability, depression, and posttraumatic stress. I am board certified in Clinical Neuropsychology by the American Board of Professional Psychology. A major portion of my training and experience has been in the area of psychological testing. I have more than 30 years of experience in conducting neuropsychological and psychological assessment and intervention with individuals suffering from a broad range of neurological, intellectual, behavioral, and emotional disorders, with a specialty in standardized test interpretation. In addition to my independent practice and staff and directorship appointments with several major hospital systems, I am also regularly appointed by courts in the field of clinical psychology and clinical neuropsychology in both civil and criminal matters. I am licensed in Texas and Louisiana and also serve as an examiner with the Texas State Board of Examiners of Psychologists, and have previously served as President of the Hispanic Neuropsychological Society. Please refer to my curriculum vitae for greater detail.

**Reason for Referral:** Attorneys representing Mr. Busby, Jeff R. Newberry, and Mr. David R. Dow, requested an evaluation of Mr. Edward Busby's intellectual and adaptive functioning to

assist in his legal proceedings.  Mr. Busby has been convicted of capital murder and has been sentenced to death.

**Methodology:**   The following methodologies were employed in the current assessment to evaluate Mr. Busby's intellectual and adaptive functioning:

1.   Administration of standardized intelligence testing with performance validity testing on February 11, 2010.

2.   A clinical interview and the re-administration of standardized intelligence testing with performance validity testing on February 25, 2022.

3.   A review of written affidavits by individuals who are familiar with Mr. Busby's development and functioning.

4.   The administration of standardized assessment of adaptive functioning to Mr. Busby's sisters who are familiar with his development and functioning.

5.   A review of available academic records.

Affidavits were previously collected by members of Mr. Busby's defense team, as well as academic records from his schooling. The information above was integrated in the following written report. This report is not meant to provide a comprehensive account of the statements gathered in the affidavits. Please refer to the affidavit exhibits for specific details.

## INTELLIGENCE TESTING ON FEBRUARY 11, 2010:

**Test Results:**  Mr. Busby underwent standardized assessment of intellectual functioning using the Wechsler Adult Intelligence Scale-Fourth Edition on February 11, 2010.  Testing was administered face-to-face and without obstructions under appropriate and controlled conditions in his detention facility.  Mr. Busby was fully cooperative and an assessment was completed. During this assessment he was also administered the Test of Memory Malingering (TOMM) to establish the presence of optimal effort and motivation to perform to the best of one's abilities on standardized testing. Generally, scores above 45/50 on the TOMM are indicative of positive effort and credible responding. Mr. Busby's scores on the TOMM during this assessment were within the recommended cutoffs and consistent with good effort on cognitive testing (T1=50/50; T2=49/50).  The administration and test results were determined to be a reliable estimate of Mr. Busby's abilities and functioning.

To evaluate his intellectual ability, Mr. Busby was also administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) during his assessment on February 11, 2010.  He obtained a Full Scale IQ score of 74 (70-79 at 95% Confidence Interval), which falls within the Borderline range of intelligence.   His scores on the WAIS-IV were as follows:

132

*WAIS-IV Composite Score Summary (2010)*

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 15 | VCI | 72 | 3 | 67-79 | Borderline |
| Perceptual Reasoning | 20 | PRI | 81 | 10 | 76-88 | Low Average |
| Working Memory | 13 | WMI | 80 | 9 | 74-88 | Low Average |
| Processing Speed | 14 | PSI | 84 | 14 | 77-94 | Low Average |
| Full Scale | 62 | FSIQ | 74 | 4 | 70-79 | Borderline |

*\*Confidence Intervals are based on the Overall Average SEMs. Values reported in the SEM column are based on the examinee's age.*

## INTELLIGENCE TESTING ON FEBRUARY 25, 2022:

**Clinical Diagnostic Interview:**  As part of the current assessment, Mr. Busby was interviewed to obtain information and his perspectives regarding his personal history.  *It is important to note the information in this interview section is based solely on self-reporting by Mr. Busby and does not reflect the findings or opinions of the examiners.*

When asked about his birth history, Mr. Busby reported being born in Amarillo but noted his birth certificate says he was born in Pampa, Texas. He reported being unaware of any problems with his mother's gestation or his delivery. Mr. Busby reported his family "moved around quite a bit" but he was unsure why. He reported being raised by his mother and having occasional contact with his father, who never lived at home. His mother, Laverne Busby, was reportedly an LVN and died from complications of diabetes in 2012. When asked if he had a good relationship with his mother, Mr. Busby stated "somewhat". Mr. Busby also reported being raised in part from age 7 to 16 by a man he considers his stepfather, Jerome Bradshaw. Mr. Bradshaw and his mother were reportedly never legally married. When asked about his relationship with his stepfather, Mr. Busby stated "We got along some, he was in and out of the penitentiary." When asked if he was abused, Mr. Busby stated "We got major butt-whippings", mostly by his mother because his stepfather was usually working. He reported being emotionally abused "all the time," stating his mother would hit him often.  Mr. Busby denied having a history of sexual abuse.

When asked if he had a happy childhood, Mr. Busby stated "sometimes happy, sometimes not." He reported he was hit more than his siblings because "I was a bad kid." Mr. Busby reported having two sisters and five adopted siblings. He reported having some contact with some of his sisters and indicated they were closer when they were growing up. Mr. Busby reported being married at age 19 for about eight months but was divorced because she reportedly cheated on him and was "unfaithful." He denied having any other marriages.  When asked if he has any children, Mr. Busby stated "Five I know of and five possibilities." He denied having any regular contact with any of his children.

When asked about his educational history, Mr. Busby denied being aware of any educational or therapy services prior to his attending school. He reported attending the first and second grade in Amarillo, followed by grade school in Pampa up to the ninth grade. When asked why he left

3

school, Mr. Busby stated "Nobody was interested in teaching me to read or write. They just passed me because I played sports." Mr. Busby reported he never learned how to fully read or write, but indicated he is able to spell some words. He reported being enrolled in special education services in all subjects throughout his schooling. He denied ever being held back or repeating a grade. Mr. Busby recalled being embarrassed because he was unable to read or write, prompting him to leave school in the middle of the ninth grade. He denied earning a GED or attempting to earn a GED, and denied attending any other formal training or college coursework.

When asked about his occupational history, Mr. Busby reported he began working in unskilled jobs at an early age, mostly dishwashing at fast food restaurants. He then earned a lifeguard certificate and work as a lifeguard for one summer. When asked if he was ever terminated from unemployment, he reported he was fired from a Steak and Ale restaurant because he was unable to read the work schedule. He also reported being fired from a beef packing company after overdosing on drugs at age 19. He otherwise described a sporadic work history which included working for temp services.

When asked about his medical history, Mr. Busby reported being diagnosed with type II diabetes in March of last year, for which he takes metformin. He also reported being diagnosed with hypertension 18 years ago, but was unable to recall the name of his blood pressure medication, stating, "The pill looks like a little football." He denied currently taking any psychotropic medication but reported being prescribed medication in the past, stating "They sent me a white and tan pill. I saw a doctor and he said it was for depression. I told him I'm not depressed. I have anger issues." When asked about his psychiatric history, Mr. Busby reported being taken to a psychiatrist as a child by his mother for emotional problems but stated "I don't remember much about it." He also reported being in a "mental hospital" in Fort Worth several times at age 31 or 32. When asked about the reason for these hospitalizations, he stated "they say I attempted suicide several times." When asked to elaborate, he stated "I remember once I was trying to kill myself. I was walking down the street and was zoned out. They took me to the hospital." He also described an incident where he crashed a truck into a light pole, stating "I was trying to kill myself that day." He reported he was angry because someone owed him money. He reported being discharged several days later after he told his doctors "I was okay."

When asked about history of head trauma, Mr. Busby reported being injured in a bicycling accident at age 9 or 10. He reported losing consciousness for a brief period but was unable to recall the duration, other than remembering he woke up in his mother's arms. He reported being taken to a hospital at the time but does not recall any of his treatment or how long he was there. He denied having any awareness of any cognitive difficulty after this accident. Mr. Busby also reported being injured in a car accident in 2003, after which he "woke up in the hospital." He reported he believes he woke up in the hospital the same day of the accident and leaving against medical advice. He denied having other history of head trauma. However, Mr. Busby reported having a heart attack at age 19 after he mixed cocaine and alcohol. He reported being told he was having a heart attack and was hospitalized for 7 to 14 days, including 3 ½ days in ICU. He reported having a pacemaker put in at that time, and indicated he has had "three or four heart attacks" since his incarceration, for which he has been hospitalized twice. He reported believing he may have been having a heart attack three days ago because he was having pain in his arm and chest. He denied having other major medical problems or hospitalizations. When asked

4

134

about his substance use history, Mr. Busby reported having a history of using cocaine, marijuana, crack cocaine, and alcohol.

When asked about his daily activities, Mr. Busby reported being incarcerated in the current facility since his conviction for capital murder in 2005. When asked about his daily activities, he reported being in his cell "24-7", with the exception of one hour of recreation per day. He reported his activities in the cell include drawing, looking at comic books, and reading "graphic novels." He reported having several pen pals whom he corresponds with about 20 to 25 times per year. When asked about sleep, Mr. Busby reported having some difficulty sleeping due to being in the prison environment where there are "lots of noises." When asked about his appetite, he jokingly stated "I'm fat. I eat a lot." Mr. Busby denied having depression but reported having anxiety "constantly." He attributed his anxiety to being unable to move around and "being in the cell all the time." He described his belief that he has "bad claustrophobia."


**Behavioral Observations:** Mr. Busby was evaluated in a small contact room within the Polunsky Detention Center. He was escorted by prison guards and the room was locked from the outside. His handcuffs were removed and he wore ankle shackles during the assessment. He was evaluated as he sat in a chair and no one else was present in the room, although a guard positioned 3 feet outside of the room observed through a large window with bars. The evaluation was conducted face-to-face on a wooden table without obstructions. The room was well lit and otherwise relatively free from distracting noise or movement. Mr. Busby wore a face mask during the assessment in accordance with pandemic guidelines and facility requirements.

Mr. Busby ambulated independently, with no observable problems with gait or mobility upon casual inspection. Mr. Busby is African American and he appeared moderately overweight. He had several tattoos about the arms bilaterally, and a visible scar in the area of the left upper forehead. He wore a white prison jumpsuit and there were no observable problems with grooming or personal hygiene. He appeared his age, and his general physical presentation was otherwise unremarkable

Mr. Busby's vision and hearing appeared to be adequate for testing purposes upon casual inspection. He used his right hand for all writing and drawing tasks and his upper extremity motor speed and dexterity were grossly within normal limits bilaterally upon casual inspection, with no grossly observable problems with motor movement. The assessment was conducted in English, which was determined to be his primary language. Mr. Busby's speech was loud throughout the assessment. Intelligibility with adequate although there were occasional paraphasic errors, such as mispronouncing words are using word approximations. He was very inattentive during the assessment and required frequent redirection to maintain topic on task.

Mr. Busby's mood during the assessment was euthymic and his affect was broad. He laughed loudly several times during the interview and assessment. He was generally compliant and polite and appeared to put forth his best effort on all tasks presented to him. Insight and awareness regarding his test performance range from fair to poor. However, the following test results

5

135

appear to be an accurate assessment of Mr. Busby's ' current intellectual and academic functioning.

**Testing Tools and Techniques:**

Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV)
Advanced Clinical Solutions Word Choice/Effort
Wide Range Achievement Test-Fifth Edition (WRAT-5)
Test of Memory Malingering (TOMM)

**TEST RESULTS:**

**Performance Validity:** Mr. Busby was administered a standardized measure to evaluate his cognitive effort and motivation (TOMM). His score profile on the TOMM was within normal limits and indicative of positive effort on cognitive testing. Mr. Busby was also administered the Advanced Clinical Solutions Word Choice/Effort test to evaluate his effort on verbal recall tasks. His performance was within normal limits for the word choice task and imbedded measures of effort on intelligence tasks. The performance validity test profile was indicative of positive effort and motivation to perform to the best of one's abilities on cognitive testing.

*Test of Memory Malingering Score Summary*

|  | Raw Score | Clinical Cutoff | Qualitative Description |
|---|---|---|---|
| Trial 1 | 47 | <45 | Above Cutoff |
| Trial 2 | 50 | < 45 | Above Cutoff |
| Retention | 50 | < 45 | Above Cutoff |
| **Additional Measures** | **Raw Score** | **Clinical Cutoff** | **Qualitative Description** |
| Albany Consistency | 47 | < 45 | Above Cutoff |
| IFFI Sum | 50 | < 45 | Above Cutoff |
| Tomme Ten | 10 | < 10 | Above Cutoff |

*ACS Word Choice/Effort Score Summary*

| Subtest | Raw Score | Clinical Sample Base Rate |
|---|---|---|
| Word Choice | 49 | > 25% |
| Reliable Digit Span | 9 | > 25% |

**Academic Functioning:** Mr. Busby was also administered a screening measure of academic achievement, the Wide Range Achievement Test-Fifth Edition (WRAT-5). Mr. Busby's scores on a test of reading skills were in the extremely low range, within the third grade level. Mr.

6

Busby was able to read most single syllable words, but struggled with more complex multi-syllable words.  Mr. Busby's sentence comprehension scores were in the very low range, within the fourth grade level.  His reading composite score was 69, in the 2nd percentile.  This places his overall reading ability within the extremely low range when compared to others his age in the general population.  Spelling scores were in the very low range, within the fourth grade level.  Mr. Busby was able to spell most single syllable words, but struggled with more complex multi-syllable words.  Math computation abilities were in the low average range, within the fifth grade level.  Mr. Busby was able to complete written arithmetic problems involving addition, subtraction, multiplication, and division, but struggled with problems involving fractions, decimals, and percentages.

### *WRAT-5 Scores Summary*

| Subtest | Raw Score | Scaled Score | Percentile | Grade Equivalent | Qualitative Description |
|---|---|---|---|---|---|
| Word Reading | 34 | 66 | 1 | 3.0 | Extremely Low |
| Sentence Comprehension | 31 | 73 | 4 | 4.2 | Very Low |
| Spelling | 32 | 84 | 14 | 5.0 | Low Average |
| Math Computation | 24 | 75 | 5 | 4.5 | Very Low |
| Reading Composite | 141 | 69 | 2 | N/A | Extremely Low |

**Intellectual Functioning**: Mr. Busby was administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) as a measure of intelligence, information processing efficiency, and attention.  Mr. Busby obtained the following scores on the Mr. Busby obtained the following scores on the recent administration (2022) of the Wechsler Intelligence Scales:

### *WAIS Composite Score Summary*

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 20 | VCI | 81 | 10 | 76-87 | Low Average |
| Perceptual Reasoning | 23 | PRI | 86 | 18 | 80-93 | Low Average |
| Working Memory | 14 | WMI | 83 | 13 | 77-91 | Low Average |
| Processing Speed | 16 | PSI | 89 | 23 | 82-98 | Low Average |
| Full Scale | 73 | FSIQ | 81 | 10 | 77-85 | Low Average |

*Confidence Intervals are based on the Overall Average SEMs. Values reported in the SEM column are based on the examinee's age.*

## ADAPTIVE FUNCTIONING TESTING AND REVIEW:

**Available Records:**

Academic Report Card from Pampa Elementary and High School
Declaration of Ms. Busby Busby
Declaration of Kimiko Coleman
Declaration of James Bybee
Declaration of Steve Porter
Declaration of Eddy Pouncy
Declaration of Raquel Farr
Declaration of Pamela Harris
Declaration of Merlyn Rogers
Declaration of Renee Boyd
Declaration of William Farr

**Adaptive Functioning Interviews:** Ms. Tarsharn Busby and Kimiko Coleman were interviewed separately to provide an account of their perceptions of Mr. Busby's functional capacities. These findings should be interpreted within context as individuals' perceptions differ across functioning levels, cultural background, and expectations.

*Tarsharn Busby*
Ms. Busby was interviewed to provide a recollection of Mr. Busby's adaptive skills. She identified herself as the older sister of Mr. Busby, with a 2-year age difference, living in the same home as Mr. Busby in their youth. Ms. Busby indicated that she recalls bits and pieces of their childhood.  She recalled that Mr. Busby left home at the age of 14 and her contact with him became limited. Ms. Busby reported that she completed the 10th grade and is currently a home health provider.

Ms. Busby was asked to comment on Mr. Busby's communication. She denied remembering when her brother first started speaking his first words or sentences. She gave an estimate that it was around the time he began elementary school. Ms. Busby reported that Mr. Busby's pronunciation was not "very good." She did not recall if he received speech services but did remember that Mr. Busby participated in a resource class. Ms. Busby indicated that her brother demonstrated difficulty expressing himself throughout his lifespan. She noted that his language deficits constrained his ability to "get his needs met." She denied observing her brother have a stuttering problem. With regard to receptive language, or the ability to understand language, Mr. Busby was reported to demonstrate a greater deficit in this area. He was reported to be able to understand simple sentences but needed clarification with more complex sentences and phrases. Similarly, when asked questions, Mr. Busby was often observed to appear confused, requiring the question being asked again or rephrased. She noted that his receptive language deficits were also observed until his adulthood. Furthermore, Ms. Busby reported that he did not like to carry conversations and kept to himself in middle and high school. When he did participate in a conversation, his responses were not appropriate. In addition to verbal language, nonverbal

8

138

language is critical to conveying and understanding a message. Ms. Busby indicated that Mr. Busby did not appear to understand non-verbal cues as both a child and an adult.

Basic skills are necessary to navigate one's environment. These include academic tasks such as reading and writing for independent functioning. Ms. Busby was unable to recall Mr. Busby's reading and writing ability. She did recall that he did not learn to count and perform basic mathematics tasks until the 3rd grade. By the 4th grade, he was reported to be able to tell time from an analog clock, however, he was unable to apply its meaning to real time. Thus, he was unable to complete a routine. She denied observing him draw shapes before Kindergarten and use units of measurement. Ms. Busby described her brother as an outdoors child.

Self-Direction skills are those that are needed for independence, responsibility, and self-control. Ms. Busby described Mr. Busby as a child who frequently was in "trouble" and did not apologize even when others were hurt. She noted that her brother appeared to experience behavioral issues more than others, and at times he was unable to understand the significance of his behavior choices. She indicated that he showed poor impulse control, which affected his ability to make good choices. She observed this tendency from childhood to adulthood and others helped him when making decisions. While he once persisted and taught himself to fix a radio, Ms. Busby recalled that her brother typically was prompted to initiate and complete tasks and needed individual guidance. Mr. Busby was reported to be unable to follow directions because of comprehension deficits, as well as due to his willingness.

With regard to leisure, Ms. Busby reported that Mr. Busby did not engage in creative or imaginative play. Mr. Busby reportedly did not like to share. Typically, his mother prompted playdates. However, at around the of 14, he began to socialize independently. She described her brother's ability to get along with others appropriate at times and other times he was verbal and physically aggressive. Mr. Busby was reported to play some football in the 9th grade before he dropped out of school. He appeared get along with other teammates.

In addition to relating with others, social skills include social responsiveness and reciprocity, as well as gullibility. Mr. Busby was described by his sister as affectionate at a young age (around the age of 6). He was reported to express his love for individuals and showed his affection through hugs. At the age of 9, other children bullied him for being slow, and participating in a resource class. Mr. Busby was reported to not have many friends in school and not show his emotions unless the emotion was of great intensity. He was observed to identify emotions in others since he was a child and into his adulthood. Ms. Busby described her brother's manners as okay and mostly applied them. When given feedback on improving his manners, Ms. Busby reported that her brother appeared confused. In middle school, Mr. Busby was reported to begin initiating outings with peers and walked to navigate to meet up locations or arranged transportation. Busby described her relationship with her little brother as good.

With regard to basic living skills, Ms. Busby reported that her brother rarely helped with chores in the home due to poor motivation. He was reported to have limited understanding of home maintenance. At school, he was never asked to help a teacher, according to Ms. Busby. She indicated that her mother and herself washed Mr. Busby's clothes. In fact, she indicated that her

9

139

brother also relied on women to take care of him when he was older. As an adult, he mostly walked to commute and Ms. Busby denied observing her brother take public transportation. At the of 16, he learned to drive and owned a car at the age of 20. Prior to that, he called individuals to provide him with transportation.

Mr. Busby was reported to demonstrate difficulty managing his own finances and Ms. Busby indicated that her mother generally managed his finances, including paying his bills, until she passed on. He did not make his own medical appointments, reportedly, as he demonstrated difficulty understanding the concept of time. He was able to shop for his groceries, but was reported to have a poor sense of budgeting and needed assistance. For example, she indicated that Mr. Busby would just make random unnecessary purchases when he was without the assistance of another adult.

Health and safety skills refers to one's ability to protect health by following safety rules. Ms. Busby reported that Mr. Busby indicated that in general, he did not play with dangerous objects, such as knives and sockets. When he was injured or hurt, he was reported to communicate to others but not if he was sick. On one occasion, at the age of 14, he was reported to overdose on medication. Ms. Busby also recalled that at the age of 7 or 8, Mr. Busby played with small rattle snakes and placed them inside their home.

With regard to motor skills, Ms. Busby did not have the opportunity to observe when her brother began to reach his infant motor milestones as she was younger. However, she reported that her brother began to grasp and eat independently at the age of 3. During that age, he began to walk, as well, reportedly.

Ms. Busby reported that Mr. Busby had one job in his lifetime as a dishwasher at a steakhouse. His career there was reported to end quickly and he did not share the reason why with her. She reported feeling uncertain if it was due to inability to complete tasks or his relationship with his supervisors. She recalled that he missed a lot of shifts due to his inability to follow a schedule.

*Kimiko Coleman*

Kimiko Coleman, sister of Mr. Busby, was also interviewed with specific regard to her brother's adaptive skills. She reported being 8 years older than him and lived with him until she moved to Dallas at the age of 18, after which they occasionally saw each other. She perceived her relationship with him to be "good." Ms. Coleman was cooperative but appeared to be somewhat reluctant to participate in the interview. However, she appeared to provide reliable information about his development.

Ms. Coleman recalled that her brother began to speak somewhat later than normal. While he was reported to not really babble, he began to speak in sentences. His words were "slurred" and she indicated that his mother attempted to enroll him in speech services at the age of 8. She denied witnessing other articulation problems. Ms. Coleman indicated that Mr. Busby understood language and nonverbal cues, however, she indicated that her brother's responses depended on his mood. These mood-based responses occurred both as a child and an adult. He reportedly

10

140

engaged in conversation more with women rather than men. With peers, she reported that he spoke "in code" to evade other's listening to their conversation. Ms. Coleman indicated that in general her brother's communication was below average with greater deficits in expressive and vocabulary.

With regard to academics, Ms. Coleman indicated that her brother was in special education classes. She does not recall the onset or duration of his participation of his educational assistance. She noticed that he was able to identify signs of restaurants, like McDonalds and Pizza Inn. She recalls that reading was challenging for him. In terms of writing, he began to draw in Kindergarten and she perceived him to identify letters and shapes. Ms. Coleman recalls him counting at the age of two and identifying the time on an analog clock in first grade. In general, she recalls him taking a longer time than his peers to learn.

While Mr. Busby desired to be independent, according to Ms. Coleman, he needed guidance from others. She indicated that Mr. Busby's ability to take responsibility for his actions was dependent on his mood. He often did not perceive that he did anything wrong when he misbehaved. She described his self-control as "zero." Ms. Coleman reported that starting at age two, he would have tantrums where he would appear upset, and "it was all over." Because of his temper, he engaged in altercations with boys but did avoid hitting women. His ability to make choices, reportedly, depended on his mood as well. Ms. Coleman reported that his bad choices were observed to escalate in middle and high school. While he was able to follow simple directions, it was challenging for him to follow complex instructions. Mr. Busby was able to initiate tasks, according to Ms. Coleman, however, it was difficult for him complete tasks. She noted that while he was able to complete chores, for examples, he was unmotivated to follow through.

With respect to leisure, Ms. Coleman recalled that her brother did not engage in creative play. She indicated that he played with others, with prompting, for a limited time. Because of his decreased attention span, Mr. Busby was unable to sit through a movie, even when he chose the film. She does not recall him asking permission to engage in activities, such as visiting a neighbor, and would just do it without notifying anyone. When he played board games, he cheated or quit because he did not understand the rules, according to Ms. Coleman. In high school, he was a wide receiver and perhaps a running back, according to Ms. Coleman. She recalled him playing well. In general, Ms. Coleman reported her perception that Mr. Busby's engagement and orientation in leisure activities was age appropriate.

Socially, Ms. Coleman recalls Mr. Busby being more immature than peers his age. She described him as childlike throughout his development. She recalls him having two friends, and spending time with one cousin. Ms. Coleman reported that he showed affection as a child, particularly to his sisters, mother, and his friend. Jokes were reported to be rare for Mr. Busby as he did not find them humorous. She described him as wanting to be "the protector" when he was young. After his friend passed away, showing affection became more difficult for him. Emotionally, Ms. Coleman reported that her brother rarely showed a normal variety of emotions, as he was either very happy or angry. She reported that she perceived Mr. Busby to be able to identify emotions

11

141

in other people but he did not appear to care for them. It was unlikely that he helped others, according to Ms. Coleman. Similarly, his manners depended on his mood.

Ms. Coleman indicated that Mr. Busby navigated his neighborhood adequately but that he never went too far from home. At the age 4 or 5, he was reportedly able to identify familiar places. She recalled that at the age of 10 years, he was caught stealing at a pharmacy store and his mother asked him to find his way home.

Ms. Coleman reported that Mr. Busby he did not initiate chores. She indicated she did not perceive this behavior as related to a skill deficit, but rather motivational, as he reportedly thought it was the role of women. This behavior was also reported by Ms. Coleman to be similar in the classroom. Personally, Ms. Coleman reported that he "somewhat" cared for personal items. Around middle school, he began to care for his appearance.

In terms of healthy safety, Ms. Coleman reported that Mr. Busby tended to avoid some danger as a child. For example, he knew not to place his hand in the electric socket. However, when he was dared, he rode his bike and engaged in stunts. Additionally, he collected snakes and brought them home in suitcase. He was reported to stay away from medications as a child. However, at the age of 16, he reportedly attempted suicide by consuming medication. At this same age of 16, Ms. Coleman indicated that Mr. Busby came home with new shoes and money during a time where he was accompanied by an older woman in her 30s. When asked, Mr. Busby indicated that he was her "gigolo," according to Ms. Coleman. He attempted to stay out of danger unless he was provoked, Ms. Coleman reported. She indicated that after his first child was born, he reverted to his old behaviors and relocated from Florida to Texas.

Motor abilities were reported to be within normal limits by Ms. Coleman. She shared that he played football in an organized team and basketball in the neighborhood. He played when he was 11-12 years old, and she indicated that she perceived he played adequately and sought after. He also reportedly taught himself to swim when he was 7 or 8 years old and he swam mostly solo, on occasion with others.

Ms. Coleman reported that the only job that he knows that her brother had was at the age of 17 or 18, where he was a lifeguard for three years. She indicated that he loved the job and that he was dependable because the hours were consistent, and his friend worked him and likely helped him. He walked to work most of the time.

When asked about Mr. Busby's ability to live independently, Ms. Coleman indicated that her brother was "smooth with women," and they "took care of him." Specifically, she indicated that they did not want him to work. She continued by saying that he did not need to work as they cooked, cleaned, and paid his bills. Ms. Coleman indicated that he did not have a bank account. Because he had difficulty with budgeting, he spent all the money he had with him that was less than $500 at once. When he needed food, he relied on others to place an order. Similarly, other people bought him his clothes. His wife, or others, were reported to make medical appointments and travel plans for him. Hygiene improved, reportedly, in high school and he began to care for his appearance. However, he reportedly took the longest to get ready in a home of girls.

142

**Summary of Affidavits:** Several individuals familiar with Mr. Busby completed affidavits. A summary of the affidavits is included below the respondent information. As noted earlier, this summary is not intended to provide a comprehensive account of the statements gathered in the affidavits. Please refer to the affidavit exhibits for specific details. The summary is organized by skill area and across respondents as follows:

Respondents

Pamela Harris was a special education teacher at Pampa Junior High School and Pampa High School and taught Mr. Busby three classes a day. Currently, she reported working for MH/MR and travels to numerous surrounding counties.

Merlyn Rogers met Mr. Busby at a club in 1988 and dated him for a year. She reported seeing him every day and living with him for a month. She indicated that they have a daughter together.

Renee Boyd reported meeting Mr. Busby in 2000 and seeing him often until his arrest in 2005.

William Farr indicated that he met Mr. Busby in 2000 and were neighbors until his arrest in 2005. He lived upstairs and Mr. Farr reported living downstairs in Forth Worth. He indicated that he would see him every day as Mr. Busby would come up to eat or socialize.

Raquel Farr knew Mr. Busby when he lived downstairs from their home in Forth Worth. She reported seeing him every day.

Eddy Pouncy indicated that Mr. Busby was his uncle and is related to him through his mother's brother, Donald Mason. He indicated that his uncles Mr. Mason and Mr. Busby raised him as a teenager.

Steve Porter stated his relationship with Mr. Busby as his football coach in the 8th grade at Pampa Junior High School.

James Bybee indicated that he attended high school with Mr. Busby. He reported that after high school, they did not have contact. He described their relationship as acquaintances who spoke at school every day.

Kimiko Coleman also provided an affidavit. She identified herself as the older sister of Mr. Busby by 8 years. She indicated that she moved out when she was 18 years old, and Mr. Busby was 10 years old.

Tarsharn Busby provided an affidavit in addition to participating in this interview. She reported that she was the older sister of Mr. Busby by two years. She indicated that she lived with Mr. Busby and took care of him when she became the "head of the household" at the age of 12 years and Mr. Busby was 10 years old.

13

143

**Summary Findings of Adaptive Functioning from Affidavits:**

*Communication is defined by the following skills, speech, language, and listening skills needed to communicate with others. Included in these communication skills is vocabulary, responding to questions, conversation skills, and nonverbal cues.*

A review of the affidavits noted a few specific examples of deficits in communication. Mrs. Farr reported that Mr. Busby took a minute to understand when he was spoken to. She described him as "slow" and reported that he could not always "immediately" understand what was going on around him. Mr. Farr similarly reported that Mr. Busby did not appear to understand what he was saying and perceived him to be "retarded." He reported that Mr. Busby would just sit out on the porch and stare out. Mr. Bybee, acquaintance from high school, reported that he felt like Mr. Busby understood what he was saying but was slow to comprehend.

*Functional Academics includes basic skills needed for reading, writing, and mathematics as for independent functioning. Additionally, counting, drawing, telling time, measuring, writing notes and letters construe this category.*

Problems in academic learning and schooling were noted across respondents. Mr. Busby's teacher, Mrs. Harris, reported that Mr. Busby was in prevocational classes, which was curriculum intended for "IQ's between 70 and 82." These classes, she continued, were intended to teach basic living skills, such as cooking and balancing a checkbook. She indicated that grades did not play a role in passing courses and that if students put their name on the class work, they would "pass." Mrs. Harris reported that that while most of her students possessed a talent to compensate for their deficits, Mr. Busby did not. She reported that he appeared to have an auditory or visual deficit, a low IQ, and mental health issues. His previous girlfriend, Ms. Rogers, reported that Mr. Busby could not read or write. She indicated that on one occasion, she observed Mr. Busby complete only his name on a job application and she perceived that he could not understand it- she later found the application in the trash can with only his name. She reported that she did not offer help because she did not want to embarrass him. Mr. Busby's neighbor reported that she helped him read the Bible and witnessed him have a difficult time reading and understanding the content. She reported that he would read the same sentence 4-5 times and ask for help. Mr. Farr indicated that Mr. Busby was not very good with numbers and could not count very well. He indicated that if he had money, he would give it to someone else to count. Mrs. Farr, similarly, reported that Mr. Busby would ask for her help to count his monetary change. Mr. Bybee indicated that Mr. Busby could not read very well. His sister, Mrs. Busby, reported that she never saw his brother read. She indicated that she tried to help him, but he could not "get it." She indicated that Mr. Busby he dropped out in 10th grade. Mr. Busby's nephew, Mr. Pouncy reported that his uncle could not count and he didn't perceive him to be able to read street signs. Hi previous football coach, Mr. Porter, shared that Mr. Busby appeared to have a lack of exposure, family direction, and education. He continued to say that Mr. Busby appeared that he had been denied any educational opportunity, including, special education. He noted that Mr. Busby's grades improved in the 8th grade after being admitted into special education. Mr. Porter stated that although he was in the 8th grade when he knew him, Mr. Busby appeared to have an education level closer to a 2nd grader.

14

144

*Self-Direction skills are those needed for independence, responsibility, and self-control. Examples include making choices, starting and completing tasks, following a routine and directions.*

Mr. Pouncy indicated that Mr. Busby was a follower, and he did not make plans about "anything," such as where to eat or daily plans. He reported that Mr. Busby did not have to worry about food or transportation as these things were taken care of by other people. Mr. Busby, according to Mr. Pouncy, "hated" being alone and when he was, he did not do "anything". While he said that it did not appear that his uncle was depressed, Mr. Porter reported that it was like there was a "hole" and that Mr. Busby did not appear to have self-orientation- he perceived his uncle to feel afraid of solitude. Mr. Porter stated that he did not think his uncle was capable of being "a pimp" as he did not have the organizational skills or the ability to count money. Others also saw Mr. Busby as having difficulty with independence. For example, Ms. Coleman indicated that their Derrick, a cousin, looked after Mr. Busby when he was alive, and Mr. Farr commented that the girls he had around him made decisions for him. Moreover, Mr. Busby demonstrated difficulty completing tasks. For example, Ms. Coleman reported that he was easily distracted and would leave in the "middle of something," such as playing with his dog when he was supposed to be cleaning the yard.

*Skills related to leisure include engaging and organizing recreational activities and hobbies, for example playing with others and toys, and following rules of games.*

Football was Mr. Busby's reported preferred leisure activity. His coach, Mr. Porter, reported that Mr. Busby appeared to really enjoy football and he had the impression that this was the first time Mr. Busby had really succeeded in any organized task. He was reported to sometimes seem frustrated while playing football, though. This frustration did not appear to be related to his physical abilities, rather his "intellect." Mr. Porter indicated that Mr. Busby could not understand the more complex plays. For example, he was reported to look confused as to whom to block, which route to run, or to go left or right. In comparison, his playmates were reported to find these plays simple and easy to follow.

*Social skills refers to interacting socially and getting along with other people, expressing affection, expressing and recognizing affection, having friends, helping others, and using manners.*

Mrs. Rogers also described Mr. Busby as a "follower." She indicated she organized and planned outings. Across most respondents, it was reported that his girlfriends "manipulated" him and took advantage of Mr. Busby. Inclusively, his sister Ms. Coleman and Mrs. Reed reported that he was "gullible". Ms. Coleman reported that he would do whatever was asked of him, and he believed everything that was told to him without questioning. He was reported to sit alone and be a victim of bullying. Ms. Coleman indicated that others teased him and called him names. Despite being victimized, Ms. Coleman reported that Mr. Busby did not immediately react, and it took "a lot" of teasing for him to "blow up." Similarly, Mr. Pouncy reported that Mr. Busby was calm in general, but would rise when others teased him about being slow, or when he felt he had to protect women. As an adult, individuals also reportedly took advantage of him. Mr. Pouncy,

15

145

Mr. and Mrs. Farr reported that his girlfriends took advantage of him and told him what to do. Mr. Pouncy reported that the girls around him would take money from him before he could finish counting it, as he was slow in counting. Additionally, he elaborated that the girls, whom he reported worked as prostitutes, were always in control of Mr. Busby and made decisions for him. Similarly, Mrs. Reed reported that in addition to being "easily intimidated," she would sometimes help him get his ID back from individuals or girls in a motel room who had stolen his wallet. She indicated that while it was not uncommon for individuals to have their wallet stolen in the streets, it occurred more with Mr. Busby.

With regard to friendships, Ms. Coleman and Mr. Porter, football coach, reported that Mr. Busby did not have any close friends. Mr. Porter and Mr. Bybee both described him as a "loner." Ms. Coleman reported that the friends that came around "used" him and their presence was conditional- Ms. Coleman reported that "everyone" observed this pattern but Mr. Busby. Despite her attempts to tell him, Mr. Busby did not perceive the manipulation, as he just wanted a "family so bad." Ms. Coleman reported that if others gave him attention, he followed them around despite placing himself in "harmful" situations. His friends were reported to use him as their "front man" to do all the "dirty" work. She speculated that perhaps it was because he was big but also because he was "slow." She provided an example of an incident when there was a fight, and he ended up being the only one fighting, "protecting" them. Likewise, Ms. Coleman described poor judgement in relationships. She reported that if a woman gave him attention, he immediately "fell in love." She described him as "butter" in a woman's hand. She indicated that by saying they loved him, Mr. Busby would do anything a girl requested. Ms. Coleman reported that her brother was not a talker and that he would feel very frustrated when many questions were asked of him.

Emotionally, Mr. Busby was reported to demonstrate difficulty regulating his sadness across most respondents. Specifically, Mr. Bybee reported that he remembered him to be an emotional guy, who always wore his heart on his shoulder, and cried. Mr. Busby's special education teacher also noted that his moods often appeared depressed and frustrated. Mr. Busby was reported to exhibit sadness related to his low abilities, based on reports. For example, Mr. Farr indicated that Mr. Busby would sometimes get depressed and say that he was tired of living "this life" and he wanted to die. Mr. Pouncy also observed Mr. Busby make these statements and he speculated that he said he was tired of living his lifestyle. Additionally, Mr. Pouncy, like Mrs. Rogers, reported that Mr. Busby cried often. Mr. Pouncy reported that he cried more than others, and at times, in a room full of people. Mrs. Rogers and Ms. Coleman both reported that they attempted to talk to him about his feelings, but Mr. Busby evaded.

*Community use refers to skills needed for functioning in neighborhood, such as navigating the area, participating in activities outside the home, and recognizing facilities.*

Mr. Busby's ability to navigate his environment was challenging for him based on reports collected from the affidavits. He would reportedly get lost when driving. Mrs. Rogers indicated that he would not drive alone often but he asked for directions to places in their small town, which confused her because he had lived his entire life in Pampa. She reported she attempted to give him directions using street signs but resorted to using landmarks and building as he was

16

146

unable to follow them. Mr. Busby was reported to be late when driving alone because he would get lost. His sister, Ms. Busby, shared that he totaled the first car she owned and told her that he had gone too fast over railroad tracks. Furthermore, Ms. Coleman stated that Derrick, their cousin, took Mr. Busby's driver license test for him.

*Home and school loving includes the skills to take basic care of one's home, school, or living space. This includes straightening out, cleaning, helping adults with household or classroom tasks and taking care of one's own possessions.*

Mrs. Rogers reported that Mr. Busby could not complete simple tasks that most people are able to do, such as turning on a furnace. To help him, she reported that she avoided putting him in situations where he looked "bad". She reported she completed errands for him and when Mr. Busby was with her, she pointed out tasks so that he could learn. However, Mrs. Rogers reported that regardless of how many times she showed him, Mr. Busby could not "figure out" how to complete basic, daily tasks. Emotionally, Mr. Busby was observed to become very frustrated when he could not complete simple tasks, such as opening the hood of the car. Mrs. Rogers and Mr. Farr both reported that this would happen frequently when he was attempting to complete simple and easy tasks. Because of his difficulty with daily living tasks, Mrs. Rogers reported that his sisters took care of him as they would with a child, providing him food, drink, and solving simple problems for him. She indicated that Mr. Busby did not have to figure out problems for himself. Likewise, girlfriends in his life were reported to cook and pay his bills because he needed their help. His sister, Ms. Coleman, indicated that Mr. Busby always lived in the homes of the women he dated and never leased his own apartment. Without his girlfriends, he was reported to appear confused by Mr. Farr. She labeled Mr. Busby's latest girlfriend as serving a "mother role." These issues appear to have developed when he was a child. Ms. Busby reported that she cooked and cleaned for them both. Both of his sisters indicated that that his room always looked "junky" and to clean up, he placed everything under the bed or all his dirty clothes in the closet. They shared that his chore was to maintain the lawn; however, Ms. Coleman indicated that she never saw him do it and that he would spread the leaves out again after raking them. When he did wash dishes or sweep, according to Ms. Busby, the tasks were not completed adequately.

Mr. Busby was reported to demonstrate difficulty managing his own money. Mr. Farr reported that Mr. Busby did not manage his own money. Mrs. Rogers indicated that on one occasion, Mr. Busby went into Burger King to buy food and said that he did not have enough money, although he did. Mrs. Rogers speculated that he could not read the menu and add up the amount. Similarly, he was unable to locate how much he owed on a paper bill when asked. Mrs. Boyd also reported that Mr. Busby asked her to count his money when buying cigarettes and purchase items of him. His sister, Ms. Busby, reported that he also had difficult managing his money when he was young. For example, she indicated that when he received money, he would spend it quickly. She recalled jokingly referring to him as the "candy man," because he would "blow" his money on candy or buy it when his mom sent him to buy something else. He also showed poor judgement with money. For example, when receiving money at Christmas, he spent it on a

single outfit, according to Ms. Busby, while she was able to purchase 3-4 outfits and perhaps a pair of shoes.

*Health and safety skills refers to following safety rules, using medicines, showing caution, and keeping out of danger.*

A specific instance included in the affidavits regarding safety behaviors was provided by Ms. Coleman. She reported that her brother, Mr. Busby, at the age of 8 or 9, collected snakes with a peer and brought them home in a picked-up suitcase. He proceeded to let them loose inside their home and placed one at the foot of his sister. She indicated that he did not know how dangerous that situation was. While other respondents did not provide information regarding health and safety, more instances of Mr. Busby's ability in this area are included in the interviews, as well as in the analysis of the completed questionnaires.

*Skills related to self-care include taking care of one's own hygiene, such as dressing, grooming, bathing, toileting, grooming, and hygiene.*

Mr. Busby's sisters observed his difficulty with hygiene as he was growing up. Ms. Coleman reported that Mr. Busby was "filthy" from playing and stayed in the same clothes as he would easily become dirty again. She reported that he always had dirt underneath his fingernails and when he showered there was a ring of dirt around the tub. His other sister reported that as a child, Mr. Busby did not like to bathe, needed reminders, would go days without bathing, and did not brush his teeth as needed. Like Ms. Coleman, Ms. Busby reported that he did not change his clothes and speculated that he did not know how to wash his clothes. At school, Mr. Busby's poor hygiene was also noticed. Both his previous acquaintance, Mr. Bybee, and his football coach, Mr. Porter, reported that Mr. Busby "always" appeared as if he had not showered in days. They both believed that Mr. Busby's family as poor due to the clothes he was wearing and their condition. Mrs. Harris reported also reported that his clothes did not appear washed.

*Adaptive functioning skills related to motor abilities includes fine and gross movements needed for manipulating the environment, and the development of more complex skills needed for sports.*

Issues with motor abilities were not reported by respondents. As noted above, Mr. Busby's coach indicated that it was Mr. Busby's intellect rather than physical abilities that created a barrier for him. Mr. Bybee reported that Mr. Busby played mostly defensive and thus, it was basic and straightforward.

*Lastly, work skills include completion of tasks, collaboration with supervisors, following schedules and routines with sufficiency to successfully function at the workplace.*

Reports related to Mr. Busby's skills at work were not addressed in the affidavits.

**Summary of Academic Records**

Academic records from Pampa Public Schools were also available for review. Elementary school records indicate that Mr. Busby repeated first grade. During his first year of first grade he earned

D's and F's in core subjects and Satisfactory in electives (i.e., music, art, and physical education). During his second year of first grade, his grades varied by quarter, earning an A in spelling on one occasion and F the following quarter. In reading and mathematics, he earned mostly C-'s and one B-. He continued to earn Satisfactory his second year of first grade. Mr. Busby's attendance was poor the first year of first grade (i.e., 19 absences) and improved the second one (i.e., 6 absences). Mr. Busby's High School records were also provided. These records show that he completed 9th grade and repeated 10th grade. His second year of 10th grade he withdrew before the second semester grades were released. Attendance was poor, especially his two years of 10th grade, missing 46 and 57 days of school, respectively. Mr. Busby earned 60s and 70s in his core classes 9th grade and first year of 10th grade. The first semester of his second year of 10th grade he earned 50 in each class. Mr. Busby was exempted from taking standardized tests, per decision of his special education team. Students in special education are sometimes dismissed from taking these tests, like Mr. Busby, as the stress that it causes a student with learning disabilities exceeds the gains of taking a progress measure. An additional documentation from Mr. Busby's high school indicated that he was taking pre-vocational classes, instruction in special education rather than general education classes. However, the date on this document was illegible. In Ms. Busby's affidavits, she indicated that her family, including her brother, moved frequently from Pampa and Amarillo. Records from schooling in Amarillo were not available.

**Adaptive Behavior Assessment System-Third Edition (ABAS-3)**

Ms. Coleman and Ms. Busby both completed the ABAS-3 independently, a standard questionnaire designed to elicit and quantify information about a person's adaptive functioning. Listed below are tables of ABAS-3 results.  The following *italicized* section also contains excerpts from a computer-generated report based on the results of the administration of the ABAS-3 (Harrison and Oakland, 2015):

**Rater: Mrs. Tarsharn Busby**

| | Sum of Scaled Scores | Standard Score | Percentile Rank | Confidence Interval 95% |
|---|---|---|---|---|
| General Adaptive Composite (GAC) | 10 | 53 | 0.1 | 50-56 |
| Conceptual | 3 | 54 | 0.1 | 48-60 |
| Social | 3 | 58 | 0.3 | 53-63 |
| Practical | 4 | 54 | 0.1 | 49-59 |

149

*Interpretation of ABAS-3 Results Adaptive Behavior Standard Scores (Tarsharn Busby):*

*The General Adaptive Composite (GAC) summarizes performance across all skill areas. Mr. Busby obtained a GAC score of 53. His true score is likely to fall within the range of 50 - 56 at a 95% level of confidence. Mr. Busby's current overall level of adaptive behavior is in the Extremely Low range, as high as or higher than 0.1% of individuals of the same age. Because the GAC provides the most complete measure of adaptive behavior, it is likely to be the most reliable and accurate estimate of overall adaptive functioning. However, more detailed information about Mr. Busby's unique profile of adaptive functioning may be obtained by reviewing performance within adaptive domains and skill areas if significant differences exist between adaptive domain standard scores or skill area scaled scores.*

*The Conceptual domain standard score summarizes performance across the Communication, Functional Academics, and Self-Direction skill areas. Mr. Busby's Conceptual domain standard score of 54 (95% confidence interval of 48 - 60) is in the Extremely Low range, as high as or higher than 0.1% of individuals of the same age.*

*The Social domain standard score summarizes performance across the Leisure and Social skill areas. Mr. Busby's Social domain standard score of 58 (95% confidence interval of 53 - 63) is in the Extremely Low range, as high as or higher than 0.3% of individuals of the same age.*

*The Practical domain standard score summarizes performance across the Community Use, Home Living, Health and Safety, Self-Care, and Work skill areas. Mr. Busby's Practical domain standard score of 54 (95% confidence interval of 49 - 59) is in the Extremely Low range, as high as or higher than 0.1% of individuals of the same age.*

**Adaptive Domain Comparisons**

*A comparison of performance between the adaptive behavior domains also provides useful information for interpretation. No significant differences were found between Mr. Busby's overall functioning in the areas of communication, academics, and self-direction (conceptual adaptive behavior), his general ability to participate in social and leisure activities (social adaptive behavior), and his community and home living, health and safety, and self-care skills (practical adaptive behavior).*

**Scatter in Adaptive Skill Area Scaled Scores**

*An individual's adaptive skill area scaled scores may be relatively consistent or may show considerable variability. The scatter analysis allows you to determine whether the degree of scatter (i.e., the range between the person's highest and lowest scaled scores) warrants clinical attention. The degree of scatter in the GAC is neither statistically significant nor unusual (i.e., it has a high base rate). Thus, the GAC may be considered a robust measure of adaptive functioning for this individual.*

**Adaptive Skill Area Results**

20

150

*Adaptive skill areas within the Conceptual domain provide a more detailed view of Mr. Busby's functioning. Mr. Busby's communication abilities, including speech, vocabulary, listening, conversation, and nonverbal communication skills, are in the Extremely Low range. He functions in the Extremely Low range when performing basic academic skills such as reading, writing, and mathematics, as well as functional skills such as taking measurements and telling time. His ability to make independent choices, exhibit self-control and take responsibility when appropriate is in the Extremely Low range.*

*A more in-depth look at Mr. Busby's specific skill sets within the Social domain may be obtained by examining the adaptive skill areas. The leisure skills needed for engaging in play and planning recreational activities are in the Extremely Low range for Mr. Busby. His ability to interact socially, initiate and maintain friendships, express and recognize emotions, and assist others when needed is in the Extremely Low range.*

*Adaptive skill areas within the Practical domain offer a more specific picture of Mr. Busby's capabilities. His ability to function and get around in the community, including shopping and using community resources, is in the Extremely Low range. Mr. Busby's level of functioning inside the home, including cleaning, food preparation, performing chores, and taking care of personal possessions, is in the Extremely Low range. Mr. Busby's ability to protect his physical well-being and prevent and respond to injuries, including following safety rules, showing caution, and using medicine when appropriate, is in the Extremely Low range. His ability to perform self-care activities such as eating, dressing, and taking care of personal hygiene is in the Extremely Low range.*

### Strengths and Weaknesses in Adaptive Skill Areas

*It is important to look at the relative strengths and areas for improvement within an individual's adaptive skills profile for the purposes of assessment, treatment and intervention planning, and progress monitoring. In order to determine the areas of personal strength and weakness within Mr. Busby's profile, each skill area scaled score was compared to his average scaled score across all adaptive skill areas to look for differences at the .05 level of statistical significance. In Mr. Busby's case, no skill area scaled score differences from his average across all skill areas were significant enough to be considered strengths or weaknesses within his profile.*

### Summary of ABAS-3 Results (Tarsharn Busby):

*Mr. Busby's overall adaptive behavior can be characterized as lower functioning than that of almost all individuals his age. Mr. Busby's conceptual adaptive behavior can be characterized as lower functioning than that of almost all individuals his age. Mr. Busby's social adaptive behavior can be characterized as lower functioning than that of almost all individuals his age. Mr. Busby's practical adaptive behavior can be characterized as lower functioning than that of almost all individuals his age.*

21

151

**Rater: Mrs. Kimiko Coleman**

| | Sum of Scaled Scores | Standard Score | Percentile Rank | Confidence Interval 95% |
|---|---|---|---|---|
| General Adaptive Composite (GAC) | 9 | 52 | 0.1 | 49-55 |
| Conceptual | 3 | 54 | 0.1 | 48-60 |
| Social | 2 | 56 | 0.2 | 51-61 |
| Practical | 4 | 54 | 0.1 | 49-59 |

*Interpretation of ABAS-3 Results (Kimiko Coleman):*

*Adaptive Behavior Standard Scores*

*The General Adaptive Composite (GAC) summarizes performance across all skill areas. Mr. Busby obtained a GAC score of 52. His true score is likely to fall within the range of 49 - 55 at a 95% level of confidence. Mr. Busby's current overall level of adaptive behavior is in the Extremely Low range, as high as or higher than 0.1% of individuals of the same age. Because the GAC provides the most complete measure of adaptive behavior, it is likely to be the most reliable and accurate estimate of overall adaptive functioning. However, more detailed information about Mr. Busby's unique profile of adaptive functioning may be obtained by reviewing performance within adaptive domains and skill areas if significant differences exist between adaptive domain standard scores or skill area scaled scores.*

*The Conceptual domain standard score summarizes performance across the Communication, Functional Academics, and Self-Direction skill areas. Mr. Busby's Conceptual domain standard score of 54 (95% confidence interval of 48 - 60) is in the Extremely Low range, as high as or higher than 0.1% of individuals of the same age.*

*The Social domain standard score summarizes performance across the Leisure and Social skill areas. Mr. Busby's Social domain standard score of 56 (95% confidence interval of 51 - 61) is in the Extremely Low range, as high as or higher than 0.2% of individuals of the same age.*

*The Practical domain standard score summarizes performance across the Community Use, Home Living, Health and Safety, Self-Care, and Work skill areas. Mr. Busby's Practical domain standard score of 54 (95% confidence interval of 49 - 59) is in the Extremely Low range, as high as or higher than 0.1% of individuals of the same age.*

*Adaptive Domain Comparisons*

*A comparison of performance between the adaptive behavior domains also provides useful information for interpretation. No significant differences were found between Mr. Busby's overall functioning in the areas of communication, academics, and self-direction (conceptual*

22

152

*adaptive behavior), his general ability to participate in social and leisure activities (social adaptive behavior), and his community and home living, health and safety, and self-care skills (practical adaptive behavior).*

### Scatter in Adaptive Skill Area Scaled Scores

*An individual's adaptive skill area scaled scores may be relatively consistent or may show considerable variability. The scatter analysis allows you to determine whether the degree of scatter (i.e., the range between the person's highest and lowest scaled scores) warrants clinical attention.*

*The degree of scatter in the GAC is neither statistically significant nor unusual (i.e., it has a high base rate). Thus, the GAC may be considered a robust measure of adaptive functioning for this individual.*

### Adaptive Skill Area Results

*Adaptive skill areas within the Conceptual domain provide a more detailed view of Mr. Busby's functioning. Mr. Busby's communication abilities, including speech, vocabulary, listening, conversation, and nonverbal communication skills, are in the Extremely Low range. He functions in the Extremely Low range when performing basic academic skills such as reading, writing, and mathematics, as well as functional skills such as taking measurements and telling time. His ability to make independent choices, exhibit self-control and take responsibility when appropriate is in the Extremely Low range.*

*A more in-depth look at Mr. Busby's specific skill sets within the Social domain may be obtained by examining the adaptive skill areas. The leisure skills needed for engaging in play and planning recreational activities are in the Extremely Low range for Mr. Busby. His ability to interact socially, initiate and maintain friendships, express and recognize emotions, and assist others when needed is in the Extremely Low range.*

*Adaptive skill areas within the Practical domain offer a more specific picture of Mr. Busby's capabilities. His ability to function and get around in the community, including shopping and using community resources, is in the Extremely Low range. Mr. Busby's level of functioning inside the home, including cleaning, food preparation, performing chores, and taking care of personal possessions, is in the Extremely Low range. Mr. Busby's ability to protect his physical well-being and prevent and respond to injuries, including following safety rules, showing caution, and using medicine when appropriate, is in the Extremely Low range. His ability to perform self-care activities such as eating, dressing, and taking care of personal hygiene is in the Extremely Low range.*

### Strengths and Weaknesses in Adaptive Skill Areas

*It is important to look at the relative strengths and areas for improvement within an individual's adaptive skills profile for the purposes of assessment, treatment and intervention planning, and progress monitoring. In order to determine the areas of personal strength and weakness within Mr. Busby's profile, each skill area scaled score was compared to his average scaled score*

23

*across all adaptive skill areas to look for differences at the .05 level of statistical significance. In Mr. Busby's case, no skill area scaled score differences from his average across all skill areas were significant enough to be considered strengths or weaknesses within his profile.*

**Summary of ABAS-3 Results (Kimiko Coleman):**

*Mr. Busby's overall adaptive behavior can be characterized as lower functioning than that of almost all individuals his age. Mr. Busby's conceptual adaptive behavior can be characterized as lower functioning than that of almost all individuals his age. Mr. Busby's social adaptive behavior can be characterized as lower functioning than that of almost all individuals his age. Mr. Busby's practical adaptive behavior can be characterized as lower functioning than that of almost all individuals his age.*

**Definitions of Intellectual Disability:** The DSM-5 defines intellectual disabilities as neurodevelopmental disorders that begin in childhood and are characterized by intellectual difficulties as well as difficulties in conceptual, social, and practical areas of living. The American Association for Intellectual and Developmental Disability (AAIDD) and the International Classification of Diseases (10th Edition) embrace a similar definition. Specifically, the DSM-5 diagnosis of ID requires the satisfaction of three criteria:

1. Deficits in intellectual functioning—"reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience"—confirmed by clinical evaluation and individualized standard IQ testing (APA, 2013, p. 33);
2. Deficits in adaptive functioning that significantly hamper conforming to developmental and sociocultural standards for the individual's independence and ability to meet their social responsibility; and
3. The onset of these deficits during childhood.

Inclusively, the DSM-5 provides descriptors of the severity of the intellectual disability as mild, moderate, and severe. It is important to note that individuals with mild severity continue to have difficulty functioning in society; though their adaptation may appear adequate at the surface level (APA, 2013). Furthermore, it is critical to acknowledge that a diagnosis of ID and other mental health can not be considered independently as the intersectionality between them speaks to adaptive functioning of an individual.

**Definition of Adaptive Behavior:** Adaptive Behavior includes conceptual, social, and practical skills that are necessary to function in everyday life. These learned behaviors are specific to the environment and culture of the individual. Additionally, they are constantly changing. For example, making a phone call now is different than the skills necessary to make a phone call decades ago. Below are skill areas to define these three domains:

1. Conceptual skills: Literacy; self-direction; concepts of number, money and time
2. Social skills: interpersonal skills, social responsibility, self-esteem, gullibility, naivete, social problem solving, following rules, obeying laws, and avoid being victimized
3. Practical skills: activities of daily living (personal care), occupational skills, money,

24

154

safety, health care, travel/transportation, schedules/routines, and use of telephone

Tasse et al., 2009 developed behavioral indicators in each domain to assist in diagnosis of ID. These behavioral indicators are useful part to when appropriate standardized tests or professionals trained to administer such instruments are unavailable or limited. In these situations, a diagnosis of disorders of ID might be possible through the assessment of behavioral indicators to inform the professional's clinical judgement regarding the presence and severity of impairments in both intellectual functioning and adaptive behavior across conceptual, social and practical skills.

**Assessment Summary and Interpretation:** Mr. Busby obtained a Full Scale IQ score of 74 on the Wechsler Adult Intelligence Scale- Fourth Edition (WAIS-IV) in 2010, at the age of 37 years. The WAIS-IV was selected for re-administration due to the robust statistical properties and well-established validity and reliability profiles of this measure for estimating intelligence. The planned revision of this test (WAIS-V) was hampered by the effects of the COVID-19 pandemic on data collection studies (Pearson, Personal Communication, 2021), and as such, an updated version has not been made available.

During the more recent administration of the WAIS-IV in February, 2022, Mr. Busby obtained a Full Scale IQ score of 81, at the age of 49. Both scores were obtained with confirmation of optimal effort using standardized testing, and the score discrepancy between the two administrations (2010 and 2022) is likely due to the combined effects of several factors that are known to increase intelligence test scores over time, including the Flynn effect and "practice effects." The Flynn effect refers to the tendency for standardized intelligence test scores to increase over time, apparently due to changes in characteristics of the population (Flynn 1984, 1985, 1998). IQ test score increases have found to be generally continuous and approximately linear over time, with a proposed test score increase of .3 standard score points per year for most tests, or about one point every three years. Since the WAIS-IV was published in 2008, the application of the Flynn effect for an administration in 2022 (14 years) would result in a proposed score adjustment of approximately four points. This adjustment would result in a current Flynn adjusted IQ score of 77.

Practice effects refer to gains in standardized test scores that result from a person being tested a second time using the same instrument or similar methodology (Kaufman, 1994). This is believed to be due to several factors, including familiarity with test questions and stimuli, as well as gained experience with test taking in general. Although there is no universally agreed-upon quantitative score adjustment that can be applied to account for the increase in test scores due to practice effects in a particular case, there is an indication that there are initial gains of about 2.5 points in verbal IQ scores for adults age 16 to 54, and up to eight points in performance IQ scores for subjects and ages range from 16 to 54 (Kaufman and Lichtenberger, 2006). In analyzing the discrepancy in Mr. Busby's full scale IQ scores (74 in 2010; 81 in 2022), the potential influence of practice effects must be considered, likely contributing several points to the observed increase in IQ composite scores. Applying an adjustment for the Flynn effect and considering a possible increase of several Full Scale IQ points, the results of the more recent administration of the WAIS-IV (2022) are consistent with the prior first administration in 2010,

25

155

when Mr. Busby obtained a Full Scale IQ score of 74 (SEM = 70-79 at 95% confidence interval).

As part of his more recent assessment, Mr. Busby was also administered a measure of his academic skills, the Wide Range Achievement Test-Fifth Edition, as a supportive measure to evaluate his academic attainment and abilities. His scores on this measure were consistent with his low intelligence test scores and indicative of lifelong adaptive deficits in academic acquisition. His scores on reading tasks were in the Extremely Low range, while scores on a measure of sentence comprehension were in the Very Low range. Math computation skills were also Very Low, while spelling skills were Low Average.

With respect to adaptive functioning, information provided from multiple sources through affidavits, in-person interviews, and standardized assessment documents significant deficits in most functional areas beginning at an early age and persisting through adulthood. Mr. Busby's adaptive functioning assessment was indicative of significant deficiencies in communication, academic skills, self-direction, leisure engagement and organization, social skills, community/home skills, health and safety skills, and self-care. Gross motor skills were not reported as deficient by informants and test subjects. Information obtained through standardized testing (ABAS-3) completed by Mr. Busby's sisters regarding his adaptive functioning was consistent with that obtained through affidavits and interviewing, with low General Adaptive Composite scores reflecting adaptive deficits in all domains, including Conceptual, Social, and Practical skills. Mr. Busby's academic history was also indicative of difficulty with learning and acquisition, including repeating grades, exemptions from national standardized testing, and enrollment in special education services.

**Opinions:** The following opinions are based upon standardized testing, interviewing of Mr. Busby and his family members, and a review of pertinent records and documents. All opinions will be based on reasonable psychological and neuropsychological probability and are limited to my areas of expertise, and the referral question to examine Mr. Busby's intellectual functioning.

Based on information obtained through records, interviewing, and standardized testing, Mr. Busby has deficits in adaptive functioning that have been present throughout his development and meet AAIDD and DSM-5 diagnostic criteria for Intellectual Disability. His adjusted IQ scores also fall within the range of Intellectual Disability in the context of a documented history of adaptive deficits in multiple functional domains.

The opinions described in this report represent my conclusions based on information available to me as of July 11, 2022. I reserve the right to review or modify my opinions if other information becomes available. Thank you for allowing me to work with Mr. Busby. Please do not hesitate to contact me if I can be of further assistance.

Gilbert Martinez, PhD, ABPP-CN
Licensed Psychologist: *Texas 30743  Louisiana 1249*
Board Certified Clinical Neuropsychologist

26

156

# Exhibit B

# McGarrahan & Associates
*Forensic Psychology and Neuropsychology*

## Forensic Record Review and Intellectual Disability Analysis

### Examinee Identifying Information:

| | |
|---|---|
| Inmate Name: | Edward Lee Busby, Jr. |
| Date of Birth: | 7/25/1972 |
| Age: | 50 |
| TDCJ #: | 999506 |
| Trial Court Cause #: | C-2-009761-0920589-C |
| CCA Cause #: | WR-70, 747-06 |
| Style of Case: | Ex Parte Edward Lee Busby, Jr., Applicant |
| Date of Report: | 4/21/2023 |
| Referral Source: | Ms. Fredericka Sargent |
| | Assistant Criminal District Attorney, Postconviction |
| | Tarrant County Criminal District Attorney's Office |

### Reason for Referral and Legal Status:

Mr. Edward Busby, Jr. is a 50-year-old male who is currently on Texas' death row, having been convicted of capital murder in Tarrant County and sentenced to death on 11/17/2005. Mr. Busby, through his counsel, asserts that he is intellectually disabled and thus, per the Supreme Court of the United States, not eligible for execution. Counsel for the State, Ms. Fredericka Sargent, requested this examiner conduct a review of records in this matter and provide an opinion on whether Mr. Busby is intellectually disabled per current diagnostic standards and/or whether an in-person examination is necessary to determine such. It should be noted that this examiner did not conduct a face-to-face evaluation of Mr. Busby and, as such, the opinions provided herein may be limited as a result and could be different if one were to be performed.

### Sources of Information:

The following is a list of sources relied upon in gathering information for, and forming the opinions contained in, this report:

1. Raw psychological test data from a pre-trial psychological examination of Mr. Busby by Tim Proctor, Ph.D. on 10/14/2005 and 11/4/2005;
2. Affidavit of Gilda Kessner, Psy.D., dated 3/21/2008;
3. Report of Assessment of Effort and Test Results by Gilbert Martinez, Ph.D., dated 2/11/2010;
4. Report of Intellectual and Adaptive Functioning Assessment by Gilbert Martinez, Ph.D., dated 7/11/2022;
5. Declaration of Bekh Bradley-Davino, Ph.D., dated 5/19/2010, and Dr. Bradley-Davino's Curriculum Vitae;
6. TDCJ Windham School District educational records;
7. TDCJ I-60 Requests; and

158

8. Subsequent Application for Post-Conviction Writ of Habeas Corpus and Exhibits 1-18, filed in Tarrant County on 1/29/2021.

**Intellectual Disability Criteria:**

The Diagnostic and Statistical Manual of Mental Disorders-5-Text Revision (DSM-5-TR) and the American Association on Intellectual Developmental Disabilities (AAIDD) are similar in their definition of intellectual developmental disorder/intellectual disability and list the following diagnostic criteria:

1. Significant limitations in intellectual functioning, confirmed by both clinical assessment and individualized, standardized testing. Both the DSM-5-TR and the AAIDD define intellectual deficits as scores falling approximately two standard deviations below the mean, including a margin for measurement error (generally $\pm 5$ points). On tests with a mean of 100 and a standard deviation of 15, this would involve scores ranging from 65 to 75 (i.e., $70 \pm 5$). Practice effects (learning from repeated testing) and the "Flynn effect" (inflated scores due to out-of-date test norms) can affect test scores and should be considered when interpreting IQ scores;
2. Deficits in adaptive behavior that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility; and
3. Onset of intellectual and adaptive deficits during the developmental period, which is not specifically defined in the DSM-5-TR and states only that the condition is present "during childhood or adolescence." The AAIDD specifies the developmental period as occurring before the age of 22.

Each of the three criteria are considered for Mr. Busby below:

Intellectual Deficits: IQ Testing of Mr. Busby (in chronological order):

Mr. Busby has undergone several intelligence tests. The following is a summary of those assessments.

| Date & Examiner | Test Given & Year Normed | FSIQ | Percentile Rank | 95% Confidence Interval | Considering Flynn Effect (.3 points per year) |
|---|---|---|---|---|---|
| 1/1/2001 (Unknown examiner) | Unknown test in TDCJ | 96 | 39th | Approximately 91-101 | Unknown |
| 10/14/2005 (Dr. Tim Proctor) | WAIS-III (1995) | 77 | 6th | 73-82 | 74 (.3 x 10 = 3) |
| 11/4/2005 (Dr. Tim Proctor) | Beta-III (1997) | 81 | 10th | 72-90 | 78.6 (.3 x 8 = 2.4) |
| Unknown date but said was given "weeks" after Dr. Proctor's WAIS-III (Dr. Sven Helge) | WAIS-III (1995) | 79 | 8th | 75-83 | 76 (.3 x 10 = 3) |
| 2/11/2010 (Dr. Gilbert Martinez) | WAIS-IV (2007) | 74 | 4th | 70-79 | 73.1 (.3 x 3 = .9) |
| 2/25/2022 (Dr. Gilbert Martinez) | WAIS-IV (2007) | 81 | 10th | 77-85 | 76.5 (.3 x 15 = 4.5) |

159

The earliest available IQ test score in the file reviewed is a 96, administered by the Texas Department of Criminal Justice on 1/1/2001. The name of the test is not listed but from this examiner's experience with such testing, it is most likely a group (not individually) administered instrument. It is believed that this is the same IQ score referenced in the defense writ regarding "an unidentified IQ test" administered to Mr. Busby on 1/1/2001 by an unknown individual and under unknown conditions. This score was said to have been considered unreliable and disregarded at the trial level. It is also a substantial outlier compared to multiple individually administered, well-regarded IQ measures (described below).

On 10/14/2005, Dr. Tim Proctor, psychologist hired by the defense at trial, administered the Wechsler Adult Intelligence Scale-III (WAIS-III), which was normed in 1995, to Mr. Busby. He obtained a Full Scale IQ of 77 (6th percentile rank; 95% confidence interval = 73-82). The confidence interval, at the lower end, is in the intellectual disability range referenced above (generally 65-75), even without adjusting for or considering the Flynn effect, which would be 3 points (.3 per year x 10 years since being normed = 3). If applied, this would reduce the overall IQ score to 74. An embedded performance validity indicator was within normal limits, suggesting sufficient effort put forth by Mr. Busby, with no indication of malingering.

On 11/4/2005, Dr. Proctor administered another IQ test, the Beta-III, normed in the late 1990's, and obtained a Full Scale IQ of 81 (10th percentile rank; 95 % confidence interval = 72-90). Again, the confidence interval, at the lower end, is in the intellectual disability range referenced above (generally 65-75), even without adjusting for the Flynn effect. If a Flynn correction were to be applied or considered, the IQ score would be 2.4 points lower (i.e., 78.6). A stand-alone performance validity measure on this date was within normal limits and not indicative of faking or poor effort by Mr. Busby.

The State's psychological expert at trial, Dr. Sven Helge, also conducted an intellectual evaluation of Mr. Busby. Although Dr. Helge did not testify at trial, other trial testimony revealed that Dr. Helge administered the WAIS-III "just weeks" after Dr. Proctor's administration of the WAIS-III. This same testimony indicated that Dr. Helge's testing resulted in a Full Scale IQ score of 79 (8th percentile; 95% confidence interval = 75-83). Considering the Flynn effect, this Full Scale IQ would be 76. Attempts by this examiner to locate the raw data from Dr. Helge's IQ testing were unsuccessful.

After the conclusion of Mr. Busby's trial and sentencing, Dr. Gilda Kessner, psychologist, was asked by appellate counsel to review records and opine on the psychological mitigation evidence put forth by the defense in the punishment phase of trial. In a signed affidavit, dated 3/21/2008, Dr. Kessner concluded, among other things, that her review of materials demonstrated IQ scores in the "borderline" or "mentally retarded range" and that the documentation did "not rule out a diagnosis of mental retardation," particularly if the Flynn effect were to have been considered at the trial level. She recommended updated testing with the newest available instrument, which was set to be published later that same year.

Two years after the Wechsler Adult Intelligence Scale-IV (WAIS-IV) was published, Dr. Gilbert Martinez, neuropsychologist, administered it to Mr. Busby. Results from his 2/11/2010 assessment demonstrated that Mr. Busby's Full Scale IQ was 74 (4th percentile rank; 95% confidence interval = 70-79). Consideration of the Flynn effect would be less than 1 point since the test had recently been normed and published. Performance validity assessment, conducted on the same date as IQ testing, indicated that Mr. Busby gave sufficient effort such that the results were seen as a valid representation of his intellectual functioning at that time. Thus, there was no evidence of malingering or that Mr. Busby was attempting to present an inaccurate picture of his functioning. On 5/19/2010, Dr. Bradley-Davino, psychologist, per defense counsel request, outlined her findings from her extensive review of records and multi-hour interview with Mr. Busby, the latter of which occurred on 3/11/2010 and 3/12/2010. Among her many

160

conclusions, she opined that Mr. Busby had "significant limitations in intellectual functioning." Dr. Martinez repeated the WAIS-IV with Mr. Busby on 2/25/2022. Performance validity testing was again within normal ranges and indicative of good effort and no malingering. The WAIS-IV Full Scale IQ score was 81 (10th percentile rank; 95% confidence interval = 77-85). When considering the Flynn effect (15 years x .3 points per year = 4.5 point), the IQ score would be 76.5.

Deficits in Adaptive Functioning in One or More Area of Activities of Daily Living:

The earliest standardized achievement testing available in the file is in the TDCJ Windham School District records. While the name of the test is not indicated, Mr. Busby obtained 4th grade equivalent scores on measures of reading on two dates, 7/7/1998 and 4/18/2001 (ages 25 and 28, respectively).

On 10/14/2005, at the trial stage, Dr. Proctor administered the Wide Range Achievement Test -3 (WRAT-3), which assessed Mr. Busby's skills of word reading, spelling, and arithmetic. Mr. Busby obtained the following scores: Reading Standard Score of 67 (1st percentile rank; 4th grade equivalent); Spelling Standard Score of 63 (1st percentile rank; 3rd grade equivalent), and Arithmetic Standard Score of 84 (4th percentile rank; 6th grade equivalent).

On 2/25/2022, Dr. Martinez administered the Wide Range Achievement Test-5 (WRAT-5), the most recent reiteration of this test. Mr. Busby obtained the following scores: Word Reading Standard Score of 66 (1st percentile rank; 3rd grade equivalent), Sentence Comprehension Standard Score of 73 (4th percentile rank; 4th grade equivalent); Reading Composite Standard Score of 69 (2nd percentile rank); Spelling Standard Score of 84 (14th percentile rank; 5th grade equivalent), and Math Computation Standard Score of 75 (5th percentile rank; 4th grade equivalent). Dr. Martinez's scores are highly consistent with testing on the same instrument approximately 17 years earlier by Dr. Proctor and similar testing in TDCJ prior to trial for the instant offense.

Dr. Martinez also conducted the Adaptive Behavior Assessment System- Third Education (ABAS-3), a standardized questionnaire of adaptive functions completed by individuals who were familiar with the examinee during the developmental period. Results from Mr. Busby's sister demonstrated the following substantially low scores: Conceptual Domain Standard Score of 58 (<1st percentile rank), Social Domain Standard Score of 58 (<1st percentile rank), and Practical Domain Standard Score of 54 (<1st percentile rank), resulting in a General Adaptive Composite Standard Score of 53 (<1st percentile rank). Results from a former teacher were nearly identical to those of his sister, with the following scores: Conceptual Domain Standard Score of 54 (<1st percentile rank), Social Domain Standard Score of 56 (<1st percentile rank), and Practical Domain Standard Score of 54 (<1st percentile rank), resulting in a General Adaptive Composite Standard Score of 52 (<1st percentile rank). All of these scores, across multiple domains, are clearly within the range to be considered as substantially deficient.

Onset of Intellectual and Adaptive Deficits During the Developmental Period:

School records from the Pampa School District showed that, in the 1st grade, Mr. Busby did not do well in basic skills, such as reading, arithmetic, spelling and handwriting. These records also showed that he had to repeat the 1st grade, likely as a result of his poor marks. His high school records demonstrated that he was in special education and was ARD (Admission, Review, and Dismissal committee) exempt from the State of Texas standardized testing for promotion to subsequent grades. A 2/4/2020 declaration by Pamela Harris, a prior special education teacher of Mr. Busby in the Pampa School District, revealed that Mr. Busby was in "prevocational classes" for individuals with reduced intellectual functioning, in order to help him develop basic living skills. Consistent with this, a prior girlfriend of Mr. Busby indicated in her

161

Busby, Edward Lee, Jr.
Trial Court Cause #: C-2-009761-0920589-C
CCA Cause #: WR-70, 747-06
Page 5

2/5/2010 declaration that when she dated Mr. Busby, both were aged 17 at the time, he could not read or write and had difficulty carrying out basic tasks such as filling out a job application and paying bills. Mr. Busby's junior high school football coach described Mr. Busby as "physically like a grown man" but mentally lacking. He also noted that Mr. Busby demonstrated educational skills more on par with a 2nd grader even though he was in the 8th grade. He added that Mr. Busby could not grasp certain concepts and plays, even simple ones, and his confusion worsened with the complexity of player routes he was expected to learn and know. A former high school football team member reiterated the coach's sentiment regarding Mr. Busby's cognitive limitations and impairments.

Declarations of others who knew Mr. Busby in his early to mid 20's, such as his neighbors, indicated that he continued to struggle with the same basic tasks as those during his younger years. They used terms such as "slow" in describing Mr. Busby and all reported that he struggled to understand information. These declarations also showed that Mr. Busby had a lot of help from others to function and make decisions, both during his childhood and into his young adulthood. Further, these declarations revealed that he had significant mood dysregulation, poor personal hygiene, social deficits, lacked friends, and never really established independent living. Based on the declarations, administration of adaptive behavior questionnaires of a family member and teacher by Dr. Martinez, school records, achievement testing across his lifespan, and interviews by Dr. Martinez, it is apparent that Mr. Busby's intellectual and adaptive behavior deficits were present during the developmental period.

**Additional Testing:**

It is not believed that updated or additional intellectual and adaptive behavior testing is warranted in this matter. Mr. Busby has undergone numerous IQ assessments over many years, which were conducted by qualified individuals and using well-regarded and most recent measures available. There was no indication of faking or malingering during these examinations as indicated by the results of performance validity measures. The IQ scores obtained were valid and demonstrated a highly consistent pattern of results, with scores falling within the range considered to represent substantial intellectual deficits (generally 65 to 75). One IQ score, said to have been conducted in TDCJ in 2001 by an unknown individual, using an unknown instrument, and under unknown conditions appears to be an outlier and not seen as a valid indication of Mr. Busby's intellectual functioning. Thus, there is no further need for IQ testing. Similarly, achievement testing (aspects of adaptive behavior skills, such as mathematics, reading, comprehension, and spelling) during a prior period of incarceration (several years before trial), at the trial level, and post-trial has demonstrated highly consistent and substantially deficient scores over time. Further, the achievement assessment results have been commensurate with his school records, declarations from people involved in different aspects of his life (sports, relationships, academics), and Dr. Martinez's administration of standardized questionnaires to a family member and former teacher, all of which revealed significant deficits in these skills across his lifespan. As such, no further testing or assessment is needed in this area. Finally, the data available in the file are sufficient to document that the onset of Mr. Busby's intellectual and adaptive behavior deficits occurred during the developmental period, and there is no need for further exploration of the timing of the onset of his difficulties.

**Conclusions:**

Mr. Busby has consistently demonstrated substantially reduced intellectual abilities. He has also consistently demonstrated significant deficits in several areas of adaptative behavior. Finally, based on all of the material reviewed, it appears that the onset of his intellectual and adaptive deficits occurred during the developmental period.

162

Busby, Edward Lee, Jr.
Trial Court Cause #: C-2-009761-0920589-C
CCA Cause #: WR-70, 747-06

**Opinion:**

Considering in total Mr. Busby's IQ deficits, adaptive functioning impairments, and onset of these difficulties during the developmental period, this examiner cannot controvert the conclusion and opinion of Dr. Martinez that Mr. Busby meets the full diagnostic criteria for intellectual disability according to current standards (DSM-5-TR and AAIDD).

It should be noted that this examiner reserves the right to make changes to the above conclusions and opinions if new information becomes available that warrants such changes. Any such changes would be presented in the form of an addendum or supplement to this report.

If I can be of further assistance in this matter, please do not hesitate to contact me.

Antoinette R. McGarrahan, Ph.D.
Psychologist, Specializing in Forensic Psychology and Neuropsychology

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jeffrey Newberry
Bar No. 24060966
jrnewber@central.uh.edu
Envelope ID: 77849927
Filing Code Description: Other Documents Not Listed
Filing Description: Applicant Busby's Proposed Findings of Fact and Conclusions of Law
Status as of 7/25/2023 10:58 AM CST

Associated Case Party: EDWARDLEEBUSBY

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeffrey Newberry | 24060966 | jrnewber@central.uh.edu | 7/25/2023 10:53:33 AM | SENT |
| David R.Dow | | ddow@central.uh.edu | 7/25/2023 10:53:33 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Fredericka Searle Sargent | 24027829 | fsargent@tarrantcountytx.gov | 7/25/2023 10:53:33 AM | SENT |

164

W011911

FILED
TARRANT COUNTY
9/5/2023 2:18 PM
THOMAS A. WILDER
DISTRICT CLERK

**WRIT NO. 70,747-06**
**TRIAL COURT CAUSE NO. CDC2-W011911-00**

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE CRIMINAL DISTRICT** |
| | § | |
| | § | **COURT NO. 2** |
| | § | |
| **EDWARD LEE BUSBY, JR.** | § | **TARRANT COUNTY, TEXAS** |

**STATE'S ADVISORY**

This Court has scheduled a hearing in this matter for Friday, September 8, 2023, at 10:00 a.m. Although the Court has not told the parties that their experts should be present at the hearing, in an abundance of caution, the State did reach out to its expert, Dr. Antoinette McGarrahan. She will be out of town that day, and therefore, not available to testify should the Court want to hear from her.

Respectfully submitted,

PHIL SORRELLS
Criminal District Attorney
Tarrant County, Texas

STEVEN W. CONDER
Assistant Criminal District Attorney
Chief, Post-Conviction

165

/s/ *Fredericka Sargent*
FREDERICKA SARGENT
Assistant Criminal District Attorney
State Bar No. 24027829
Tim Curry Criminal Justice Center
401 W. Belknap, 4th Floor
Fort Worth, Texas 76196-0201
(817) 884-3109
fsargent@tarrantcountytx.gov

## CERTIFICATE OF SERVICE

A true copy of the State's Advisory has been e-served to counsel listed below

on this, the 5th day of September 2023:

David R. Dow
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77204-6060
ddow@central.uh.edu

Jeffrey R. Newberry
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77024-6060
jrnewberry@central.uh.edu

/s/ *Fredericka Sargent*
FREDERICKA SARGENT

166

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Esther Castaneda on behalf of Fredericka Searle Sargent
Bar No. 24027829
ecastaneda@tarrantcountytx.gov
Envelope ID: 79216827
Filing Code Description: Other Documents Not Listed
Filing Description: State's Advisory
Status as of 9/5/2023 2:26 PM CST

Associated Case Party: EDWARDLEEBUSBY

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jeffrey Newberry | 24060966 | jrnewber@central.uh.edu | 9/5/2023 2:18:18 PM | SENT |
| David R.Dow | | ddow@central.uh.edu | 9/5/2023 2:18:18 PM | SENT |

FILED
TARRANT COUNTY
9/8/2023 12:45 PM
THOMAS A. WILDER
DISTRICT CLERK

W011911

## IN THE CRIMINAL DISTRICT COURT NUMBER TWO, OF TARRANT COUNTY, TEXAS

**Ex parte
Edward Lee Busby, Jr.,**

**Applicant**

**Cause No. CDC2-W011911-00**

### APPLICANT BUSBY'S POST-HEARING BRIEFING

Applicant Edward Lee Busby, Jr., through his attorneys, David R. Dow and Jeffrey R. Newberry, files Post-Hearing Briefing following the conclusion of a hearing convened in this cause earlier today to clarify two points.

First, at today's hearing, undersigned Counsel referred the Court to the 2014 decision from the Texas Court of Criminal Appeals ("CCA") in *Ex parte Cathey*. In case Counsel misstated the opinion's location within the South Western Reporter, Counsel writes now to inform the Court the decision to which Counsel referred is located at 451 S.W.3d 1. It is this opinion which Counsel argued suggests the CCA would find that the WAIS-IV, which was administered in 2010 and normed in 2007, is the score that most accurately reflects Mr. Busby's intelligence; it is

1

168

that test which relied on the then most up-to-date norms. In addition, Counsel notes that the decision in *Cathey* also reflects that the CCA agrees that the standard error of measurement ("SEM") needs to be taken into account when determining whether an individual score reflects significantly subaverage intellectual functioning. *See Ex parte Cathey*, 451 S.W.3d, 1, 18 (Tex. Crim. App. 2014).

Second, the Court asked Counsel whether the APA and the AAIDD endorse taking the Flynn Effect into account. Counsel assured the Court both organizations do but could not cite for the court evidence of that claim off the top of his head. Therefore, Counsel has attached to this briefing as Exhibit A pages 37 and 38 of the DSM-5 (the citation he could not recall during the hearing). These pages reflect the APA's endorsement of considering both the Flynn Effect and practice effects when determining whether a score reflects significantly subaverage intellectual functioning. Counsel is also attaching, as Exhibit B, page 37 of the 2010 AAIDD manual, which makes clear that "[i]n cases where a test with aging norms is used, a correction for the age of the norms is warranted."

2

169

Dated:      September 8, 2023

Respectfully submitted,

/s/ David R. Dow                    /s/ Jeffrey R. Newberry

_____    _____
David R. Dow                        Jeffrey R. Newberry
Texas Bar No. 06064900              Texas Bar No. 24060966
University of Houston Law Center    University of Houston Law Center
4170 Martin Luther King Blvd.       4170 Martin Luther King Blvd.
Houston, TX  77204-6060             Houston, TX  77204-6060
Tel. (713) 743-2171                 Tex. (713) 743-6843
Fax (832) 842-4671                  Fax (832) 842-4671
Email ddow@central.uh.edu           Email jrnewber@central.uh.edu

*Counsel for Edward Lee Busby, Jr.*

3

170

## Certificate of Service

I certify that on September 8, 2023, a true and correct copy of the foregoing was provided to opposing counsel.

/s/ Jeffrey R. Newberry

_____

Jeffrey R. Newberry

172

# Exhibit A

172

...creational activities may involve, for example, enjoyment in listening to music, watching movies, going out for walks, or participating in water activities, all with the support of others. Co-occurring physical and sensory impairments are frequent barriers to participation (beyond watching) in home, recreational, and vocational activities. Maladaptive behavior is present in a significant minority.

...and responds to social interactions through gestural and emotional cues. Co-occurring sensory and physical impairments may prevent many social activities.

acteristics, may be acquired. However, co-occurring motor and sensory impairments may prevent functional use of objects.

## Diagnostic Features

The essential features of intellectual disability (intellectual developmental disorder) are deficits in general mental abilities (Criterion A) and impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioculturally matched peers (Criterion B). Onset is during the developmental period (Criterion C). The diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functions.

Criterion A refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding. Critical components include verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficacy. Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence. Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65–75 (70 ± 5). Clinical training and judgment are required to interpret test results and assess intellectual performance.

Factors that may affect test scores include practice effects and the "Flynn effect' (i.e., overly high scores due to out-of-date test norms). Invalid scores may result from the use of brief intelligence screening tests or group tests; highly discrepant individual subtest scores may make an overall IQ score invalid. Instruments must be normed for the individual's sociocultural background and native language. Co-occurring disorders that affect communication, language, and/or motor or sensory function may affect test scores. Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score. Such testing may identify areas of relative strengths and weaknesses, an assessment important for academic and vocational planning.

IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.

Deficits in adaptive functioning (Criterion B) refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical. The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others. Intellectual capacity, education, motivation, socialization, personality features, vocational opportunity, cultural experience, and coexisting general medical conditions or mental disorders influence adaptive functioning.

Adaptive functioning is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures. Standardized measures are used with knowledgeable informants (e.g., parent or other family member; teacher; counselor; care provider) and the individual to the extent possible. Additional sources of information include educational, developmental, medical, and mental health evaluations. Scores from standardized measures and interview sources must be interpreted using clinical judgment. When standardized testing is difficult or impossible, because of a variety of

factors (e.g., sensory impairment, severe problem behavior), the individual may be diagnosed with unspecified intellectual disability. Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained.

Criterion B is met when at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community. To meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A. Criterion C, onset during the developmental period, refers to recognition that intellectual and adaptive deficits are present during childhood or adolescence.

## Associated Features Supporting Diagnosis

Intellectual disability is a heterogeneous condition with multiple causes. There may be associated difficulties with social judgment; assessment of risk; self-management of behavior, emotions, or interpersonal relationships; or motivation in school or work environments. Lack of communication skills may predispose to disruptive and aggressive behaviors. Gullibility is often a feature, involving naiveté in social situations and a tendency for being easily led by others. Gullibility and lack of awareness of risk may result in exploitation by others and possible victimization, fraud, unintentional criminal involvement, false confessions, and risk for physical and sexual abuse. These associated features can be important in criminal cases, including Atkins-type hearings involving the death penalty.

Individuals with a diagnosis of intellectual disability with co-occurring mental disorders are at risk for suicide. They think about suicide, make suicide attempts, and may die from them. Thus, screening for suicidal thoughts is essential in the assessment process. Because of a lack of awareness of risk and danger, accidental injury rates may be increased.

## Prevalence

Intellectual disability has an overall general population prevalence of approximately 1%, and prevalence rates vary by age. Prevalence for severe intellectual disability is approximately 6 per 1,000.

## Development and Course

Onset of intellectual disability is in the developmental period. The age and characteristic features at onset depend on the etiology and severity of brain dysfunction. Delayed motor, language, and social milestones may be identifiable within the first 2 years of life among those with more severe intellectual disability, while mild levels may not be identifiable until school age when difficulty with academic learning becomes apparent. All criteria (including Criterion C) must be fulfilled by history or current presentation. Some children under age 5 years whose presentation will eventually meet criteria for intellectual disability have deficits that meet criteria for global developmental delay.

When intellectual disability is associated with a genetic syndrome, there may be a characteristic physical appearance (as in, e.g., Down syndrome). Some syndromes have a *behavioral phenotype*, which refers to specific behaviors that are characteristic of particular genetic disorder (e.g., Lesch-Nyhan syndrome). In acquired forms, the onset may be abrupt following an illness such as meningitis or encephalitis or head trauma occurring during the developmental period. When intellectual disability results from a loss of previously acquired cognitive skills, as in severe traumatic brain injury, the diagnoses of intellectual disability and of a neurocognitive disorder may both be assigned.

Although intellectual disability is generally nonprogressive, in certain genetic disorders (e.g., Rett syndrome) there are periods of worsening, followed by stabilization, and in

others (e.g., San
early childhood
over time. The c
co-occurring con
terventions may
some cases, thes
the diagnosis of
when assessing
til after an appro
the extent of sup
ing and improve
proved adaptive
case the diagnos
improvement is
which case the

## Risk and

Genetic and ph
quence variatio
disorders), inbo
placental diseas
gens). Perinatal
neonatal encep
brain injury, inf
severe and chro
(e.g., lead, merc

## Culture-R

Intellectual disa
are needed dur
ground, availab
cultural setting

## Gender-R

Overall, males
male:female rat
disability. How
tors and male v

## Diagnosti

A comprehensi
functioning; id
medical conditi
mental, emotio
basic pre- and p
ination, genetic
for specific gen

## Differenti

The diagnosis
met. A diagno

175

# Exhibit B

175

determining a cutoff score, evaluating the role that an IQ score plays in making a diagnosis, assessor credentials, and test selection.

## Measurement Error

The results of any psychometric assessment must be evaluated in terms of the accuracy of the instrument used and such is the case with the assessment of intelligence. An IQ score is subject to variability as a function of a number of potential sources of error, including variations in test performance, examiner's behavior, cooperation of test taker, and other personal and environmental factors. Thus, variation in scores may or may not represent the individual's actual or true level of intellectual functioning. The term *standard error of measurement*, which varies by test, subgroup, and age group, is used to quantify this variability and provide a stated statistical confidence interval within which the person's true score falls.

For well-standardized measures of general intellectual functioning, the standard error of measurement is approximately 3 to 5 points. As reported in the respective test's standardization manual, the test's standard error of measurement can be used to establish a statistical confidence interval around the obtained score. From the properties of the normal curve, a range of confidence can be established with parameters of at least one standard error of measurement (i.e., scores of about 66 to 74, 66% probability) or parameters of two standard error of measurement (i.e., scores of about 62 to 78, 95% probability).

Understanding and addressing the test's standard error of measurement is a critical consideration that must be part of any decision concerning a diagnosis of ID that is based, in part, on significant limitations in intellectual functioning. Both AAIDD and the American Psychiatric Association (2000) support the best practice of reporting an IQ score with an associated confidence interval. Both systems rely on the reported standard error of measurement that is derived from the standard deviation of the test and a measure of the test's reliability. Currently, the prevailing best practice standard in test construction, reporting, and interpretation is to use internal consistency measures of reliability (along with the test's standard deviation) to estimate a standard error of measurement. Reporting an IQ score with an associated confidence interval is a critical consideration underlying the appropriate use of intelligence tests and best practices; such reporting must be a part of any decision concerning the diagnosis of ID.

## Test Fairness

There are at least two areas in which test fairness may be of particular concern. The first is when tests requiring a verbal response are employed with individuals who have severely limited verbal abilities. In these situations, the test score may underestimate their level of intellectual functioning. The second area involves individuals of diverse ethnicity or culture, who may achieve markedly different results. Readers are referred to chapters 3 and 8 for a discussion of guidelines regarding test selection and test fairness.

## The Flynn Effect

Flynn's research (1984, 1987, 2006, 2007) as well as that of others (e.g., Kanaya, Scullin, & Ceci, 2003; Scullin, 2006) found that IQ scores have been increasing from one generation to the next in the United States as well as in all other developed countries for which IQ data are available. This increase in IQ scores over time was called the *Flynn Effect* by Hernstein and Murray (1994). The Flynn Effect refers to the observation (Flynn, 1984) that every restandardization sample for a major intelligence test (e.g., SBIS-4 and Wechsler) from 1932 through 1978 resulted in a mean IQ that tended to increase over time. Flynn (1987) reported that this effect was also observed in samples from other countries. Although the cause of this effect is unknown, Neisser et al. (1996) suggested that potential factors might well be improved nutrition, cultural changes, testing experience, changes in schooling, and changes in child-rearing practices.

The Flynn Effect raises potential challenges for the diagnosis of ID (Kanaya et al., 2003). Because Flynn (1984) reported that mean IQ increases about 0.33 points per year, some investigators (e.g., Flynn, 2006) have suggested that any obtained IQ score should be adjusted 0.33 points for each year the test was administered after the standardization was completed. For example, if the Wechsler Adult Intelligence Scale (WAIS-III; 1997) was used to assess an individual's IQ in July 2005, the population mean on the WAIS-III was set at 100 when it was originally normed in 1995 (published in 1997). However, based on Flynn's data, the population mean on the Full-Scale IQ raises roughly 0.33 points per year; thus the population mean on the WAIS-III Full-Scale IQ corrected for the Flynn Effect would be 103 in 2005 (9 years × 0.33 = 2.9). Hence, using the significant limitations of approximately two standard deviations below the mean, the Full-Scale IQ cutoff would be approximately 73 (plus or minus the standard error of measurement).

There are also data suggesting that the Flynn Effect may not be a purely linear function of time and that the impact of the effect may asymptote or even reverse. Teasdale and Owens (2005), for example, reported on a large sample of Danish males in which the Flynn Effect peaked and subsequently reversed. In a Norwegian sample, Sundet, Barlaug, and Torjussen (2004) reported a slowing and eventual cessation of the Flynn Effect over time. These data would seem to suggest that while the Flynn Effect is evident, how one corrects for it is still a challenging issue.

As discussed in the *User's Guide* (Schalock et al., 2007) that accompanies the 10th edition of this *Manual*, best practices require recognition of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score. As suggested in the *User's Guide* (Schalock et al., 2007, pp. 20, 21):

> The main recommendation resulting from this work [regarding the Flynn Effect] is that all intellectual assessment must use a reliable and appropriate individually administered intelligence test. In cases of tests with multiple versions, the most recent version with the most current norms should be used at all times. In cases where a test with aging norms is used, a correction for the age of the norms is warranted.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jeffrey Newberry
Bar No. 24060966
jrnewber@central.uh.edu
Envelope ID: 79353058
Filing Code Description: Other Documents Not Listed
Filing Description: Applicant Busby's Post-Hearing Briefing
Status as of 9/8/2023 12:59 PM CST

Associated Case Party: EDWARDLEEBUSBY

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jeffrey Newberry | 24060966 | jrnewber@central.uh.edu | 9/8/2023 12:45:32 PM | SENT |
| David R.Dow | | ddow@central.uh.edu | 9/8/2023 12:45:32 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Fredericka Searle Sargent | 24027829 | fsargent@tarrantcountytx.gov | 9/8/2023 12:45:32 PM | SENT |
| David R. Dow | 6064900 | ddow@uh.edu | 9/8/2023 12:45:32 PM | SENT |

177

FILED
THOMAS A. WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

OCT 12 2023

TIME___3:43 PM___
BY_____DEPUTY

Case No. W011911
(Court of Criminal Appeals No. WR-70,747-06)

| THE STATE OF TEXAS | § | IN CRIMINAL DISTRICT |
| | § | |
| V. | § | COURT NO. 2, |
| | § | |
| EDWARD LEE BUSBY | § | TARRANT COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON SECOND SUBSEQUENT POSTCONVICTION HABEAS CORPUS APPLICATION AND ORDER

As ordered by the Court of Criminal Appeals, this Court has reviewed applicant Edward Lee Busby's second subsequent postconviction habeas corpus application in which he asserts that his execution would violate the Eighth and Fourteenth Amendments because he is intellectually disabled. In entering the ordered findings of fact and conclusions of law, this Court has considered the reporter's and clerk's records from the underlying trial, the second subsequent application, the attorney representing the state's response to the second subsequent application, Busby's reply to the response, the proposed findings of fact and conclusions of law filed by the attorneys representing the state and Busby, the evidence submitted by the attorneys representing the state and Busby regarding the intellectual-disability issue, the arguments made at the Court's September 9, 2023 hearing on the application, Busby's post-hearing briefing, the Court's personal recollections and credibility determinations, and the applicable law.

1

**178**

## I. BUSBY'S TRIAL, DIRECT APPEAL, AND HABEAS CORPUS PROCEEDINGS

### A. THE OFFENSE, TRIAL, AND DIRECT APPEAL

1. Although not conclusively determinative of Busby's constitutional claim, the facts of the capital offense Busby was convicted of and his criminal history are at least informative of the issue. *See generally Ex parte Cathey*, 451 S.W.3d 1, 6–7, 27 (Tex. Crim. App. 2014) [hereinafter *Cathey I*] (considering facts of the offense and defendant's criminal history in determining intellectual disability), *cert. denied*, 576 U.S. 1037 (2015).

2. Busby was a self-described high-ranking member of the Rolling 60s Crips criminal street gang. [1 CR HC-06 393; 34 RR 12, 120][1] His tattoos are consistent with that claim; he would use gang slang and abbreviations,[2] and symbolic gang drawings were found in his cell. [34 RR 120-32] Busby is familiar with the criminal-justice system; he has been convicted of delivery of a simulated controlled substance, evading arrest, robbery causing bodily injury, and burglary of a vehicle, all occurring between 1998 and 2003. [1 CR HC-06 392-94] And his history of aggression and violence has been recounted in detail by a United States District Court. *See Busby v. Stephens*, No. 4:09-CV-

---

[1] Citations to "CR HC-06" refer to the clerk's record of the instant state habeas corpus proceeding, which was delivered to the Court of Criminal Appeals on February 1, 2021. Citations to "RR" refer to the reporter's record from Busby's capital-murder trial.

[2] While he was in this Court's holding cell during his trial, Busby wrote gang abbreviations and slang on the wall. [34 RR 127-31]

2

160-O, 2015 WL 1037460, at *4–7 (N.D. Tex. Mar. 10, 2015) [hereinafter *Busby II*], *aff'd*, *Busby v. Davis*, 925 F.3d 699 (5th Cir. 2019) [hereinafter *Busby III*] (op. on reh'g), *cert. denied*, 140 S. Ct. 897 (2020).

3. Busby was also a pimp. [34 RR 12-13] Two of the prostitutes who worked for him were Kathleen Latimer and JoAnn Cooper. [34 RR 12-13] Busby would supply Latimer and Cooper with drugs. [34 RR 13] On August 3, 2003, Busby assaulted Latimer and Cooper. Busby hit Cooper in the mouth and took her purse after she fell to the ground. [34 RR 6-7, 11] Busby screamed at Latimer about money then hit Latimer with his fists and feet, breaking her arm and kicking her after she fell to the ground. [34 RR 7-8, 15] This was not the first or the last time Busby was violent with Cooper. [34 RR 11-12]

4. On January 30, 2004, Busby and Latimer abducted 78-year-old Laura Crane from a grocery store parking lot in Texas and robbed her. Busby tightly wrapped 23 feet of duct tape around Crane's face, covering her entire mouth and nose and deviating her nose from its normal position. Busby and Latimer then put Crane in the trunk of her own car. Crane died of suffocation. Busby and Latimer disposed of Crane's body in Oklahoma. On February 1, police officers arrested Busby in Oklahoma City after stopping him for committing several traffic violations while driving Crane's car. *See Busby III*, 925 F.3d at 703; *Busby v. State*, 253 S.W.3d 661, 663–64 (Tex. Crim. App.) [hereinafter *Busby I*], *cert. denied*, 555 U.S. 1050 (2008).

3

**180**

5. Busby gave statements to the police on February 1 and 3. He initially claimed that "JD"[3] had given Crane's car to him and Latimer with Crane's body already in the trunk. [37 RR State Exs. 7–8] Busby asserted that he and Latimer merely disposed of the body. On February 3, Busby showed the police where Crane's body had been left. At the scene, Busby admitted that he and Latimer had abducted, robbed, and killed Crane. [37 RR State Ex. 9] Busby again admitted to his involvement on February 20 in a written statement after initiating contact with the authorities. [37 RR State Ex. 11] However, Busby consistently portrayed Latimer as the leader and himself as a follower of her instructions. [37 RR State Exs. 11–12] Busby did admit that he alone wrapped the duct tape around Crane's mouth and nose but stated that he had not intended to kill her. [37 RR State Ex. 11]

6. While Busby was in the Tarrant County Jail awaiting trial, Busby was assaultive, aggressive, and threatening, requiring jail staff to move him to a maximum-security area of the jail. He attempted to establish himself as a "tank boss," who would be a leader of his jail area and prey on weaker inmates. [1 CR HC-06 394-95] Further, he submitted cogent "request for services" forms to jail staff. [37 RR State Ex. 132]

7. During a prior incarceration in 2001, intricate, detailed drawings related to Busby's gang membership had been found in his cell.[4] [34 RR 120-21; 37 RR State Exs.

---

[3] Busby was known as "JB" as an adult. [1 CR HC-06 108]

[4] Busby posited at trial that there was no showing he had personally written the jail forms or created the drawings, perhaps having another inmate do so. [36 RR 81, 94-

4

170-80] Although not introduced at trial, the state proffered a four-page letter handwritten by Busby[5] to a similarly incarcerated friend, which also had been confiscated in 2001. [34 RR 92] While the letter contains gang slang, epithets, and expletives, it also contains pleas for the receiver to "just keep your cool and stay out of trouble" and anger at his situation—"these white people aint [sic] going to give you no good job, they want to see us get out and [expletive] up again so they can make more money off us by loccing [sic] us up, well not me no more." [37 RR State Ex. 119]

8. Before the November 2005 trial, Busby had been given three IQ tests.[6] Dr. Timothy Proctor, Busby's court-appointed psychologist, administered a Wechsler Adult Intelligence Scale-III test (WAIS-III) on October 14, 2005. Busby scored a 77. Busby scored an 81 on a second test, which was a Beta-III administered by Dr. Proctor on November 4, 2005. Shortly after that test, Dr. Sven Helge, the state's psychological trial expert, administered a WAIS-III. Busby scored a 79. *Busby II*, 2015 WL 1037460, at *10, *20.

---

95] While possibly true, there also was no showing that he had not drawn the pictures or written the letters.

[5] Again, Busby asserted there was no showing he had written the letter. [34 RR 107]

[6]A fourth test, given to Busby in 2001 under unknown circumstances, resulted in a score of 96. However, all courts to review the intellectual-disability issue have disregarded this test. *See, e.g., Busby III*, 925 F.3d at 716.

9. A jury found Busby guilty of capital murder.[7] *See* Tex. Penal Code Ann. § 19.03(a)(2). Proctor testified at punishment that although Busby has a learning disability, he is not intellectually disabled. *Busby III*, 925 F.3d at 706; *see also Busby II*, 2015 WL 1037460, at *10. [36 RR 51, 64] Proctor also testified that Helge had reached the same conclusion. [36 RR 64]

10. After other mitigating and aggravating punishment evidence (including Busby's school records, grade-level academic skills, pretrial IQ tests, and family history) was presented, the jury's answers to the statutory special issues required this Court to sentence Busby to death. Tex. Code Crim. Proc. Ann. art. 37.071, § 2(g); *see Busby I*, 253 S.W.3d at 663; *Busby II*, 2015 WL 1037460, at *4–10. [38 RR Def. Ex. 21; 35 RR 12-83; 36 RR 6-87] The Court of Criminal Appeals affirmed his conviction and sentence, and the United States Supreme Court denied certiorari. *Busby I*, 253 S.W.3d at 663.

## B. HABEAS CORPUS PROCEEDINGS

11. The Court of Criminal Appeals denied Busby's initial state habeas corpus application, which did not raise an intellectual-disability claim. *Ex parte Busby*, No. WR-70,747-01, 2009 WL 483096, at *1 (Tex. Crim. App. Feb. 25, 2009) (per curiam order) (not designated for publication).

---

[7]Latimer had pleaded guilty to the lesser-included offense of murder and was sentenced to life confinement. *Latimer v. Quarterman*, No. 4:08-CV-072-A, 2009 WL 1074802, at *2 (N.D. Tex. Apr. 17, 2009).

12. In 2010, Busby filed a federal habeas corpus petition, raising several claims, including his current constitutional, intellectual-disability claim. *Busby II*, 2015 WL 1037460, at *2, *18. The United States District Court stayed the petition to allow Busby to exhaust his state remedies in a subsequent state habeas corpus application raising the intellectual-disability issue. *Busby III*, 925 F.3d at 704. The Court of Criminal Appeals dismissed the subsequent application as an abuse of the writ. *Ex parte Busby*, No. WR-70,747-02, 2013 WL 831550, at *1 (Tex. Crim. App. Mar. 6, 2013) (per curiam order) (not designated for publication) (citing Tex. Code Crim. Proc. Ann. art. 11.071, § 5).

13. After the stay was lifted, the District Court denied the petition, concluding that Busby had failed to "establish that his general intellectual functioning, as reflected in the multiple results of the IQ tests administered to him, is significantly subaverage." *Busby II*, 2015 WL 1037460, at *21. But the District Court noted that because the United States Court of Appeals for the Fifth Circuit had not accepted the "Flynn Effect" as scientifically valid, the District Court had not considered a score adjustment based on the effect.[8] *Id.*

14. The Fifth Circuit then reviewed most of the IQ evidence now before this Court as well as the Supreme Court's relatively recent precedent on intellectual-functioning deficits: *Moore v. Texas*, 581 U.S. 1 (2017) [hereinafter *Moore I*] (6–3 decision) and *Hall v. Florida*, 572 U.S. 701 (2014) (5–4 decision). *See Busby III*, 925 F.3d at 715–

---

[8]The Flynn Effect adjusts scores that are a result of out-of-date test norms and will be more fully addressed later.

7

20. The Fifth Circuit affirmed the District Court's denial, noting that even though Busby had been evaluated by four mental-health experts during his trial and postconviction proceedings, none had concluded that he was intellectually disabled. *Id.* at 706, 726–27. The Supreme Court denied certiorari in 2020.

15. On January 29, 2021, Busby filed a second subsequent state habeas corpus application, arguing in a sole issue that his death sentence violated the Eighth and Fourteenth Amendments based on his intellectual disability. [1 CR HC-06 25] He also filed a motion to stay his February 10, 2021 execution date, which the Court of Criminal Appeals granted. The state responded to the application, arguing that Busby's intellectual-disability claim should be dismissed because his claim had previously been rejected by the Fifth Circuit under the prevailing review standard. [1 CR HC-06 399-400]

16. On February 3, 2021, the Court of Criminal Appeals determined that Busby's second subsequent application contained sufficient specific facts establishing that his claim had not been and could not have been presented previously because the factual or legal basis for the claim was unavailable on the date Busby had filed his prior applications. Tex. Code Crim. Proc. Ann. art. 11.071, § 5(a)(1). Thus, the Court remanded the issue to this Court to review the merits of Busby's claim. *Ex parte Busby*, No. WR-70,747-06, 2021 WL 369737, at *1 (Tex. Crim. App. Feb. 3, 2021) (per curiam order) (not designated for publication).

17. The parties agreed that an expert should assess Busby's disability, if any. That expert—Dr. Gilbert Martinez—filed a report, which was reviewed by another psychologist—Dr. Antoinette R. McGarrahan—at the state's request. Both Busby and the state filed proposed findings and conclusions. These proposed findings and conclusions tracked the opinions of Martinez and McGarrahan that Busby is intellectually disabled based on the governing criteria. The specifics of these reports and the other submitted evidence will be discussed below.

## II. INTELLECTUAL-DISABILITY FRAMEWORK

18. The execution of intellectually disabled criminals amounts to cruel and unusual punishment that is prohibited by the Eighth Amendment's evolving standards of decency, applicable to the states through the Fourteenth Amendment, because the criminal's diminished capacity lessens his moral culpability. *Atkins v. Virginia*, 536 U.S. 304, 306–07, 311–12 (2002) (6–3 decision). Intellectual disability encompasses not only subaverage intellectual functioning but also "significant limitations in adaptive skills such as communication, self-care, and self-direction" that manifest before 18. *Id.* at 318. However, not all those who claim intellectual disability will be so impaired to fall within the prohibition. *Id.* at 317.

19. In summary, intellectual disability consists of three core elements: (1) intellectual-functioning deficits, (2) adaptive deficits, (3) and the onset of these deficits while still a minor. *Id.* at 308 n.3; *see also Moore v. Texas*, 139 S. Ct. 666, 668 (2019)

9

**186**

[hereinafter *Moore II*] (per curiam) (6–3 decision); *Moore I*, 581 U.S. at 7; *Petetan v. State*, 622 S.W.3d 321, 333 (Tex. Crim. App. 2021) (op. on reh'g) (5–4 decision).

20. But medical experts' views based on the medical community's diagnostic framework do not dictate a court's intellectual-disability determination; they are merely informative. *Hall*, 572 U.S. at 721. Stated differently, while medical standards cannot be completely disregarded, they do not, on their own, conclusively determine intellectual disability. *Moore I*, 581 U.S. at 13.

21. Busby must establish all elements of intellectual disability by a preponderance of the evidence.[9] *Petetan*, 622 S.W.3d at 325 (citing *Franklin v. State*, 579 S.W.3d 382, 386 (Tex. Crim. App. 2019)); *Cathey I*, 451 S.W.3d at 5; *see also In re Salazar*, 443 F.3d 430, 432 (5th Cir. 2006) (citing *Hall v. State*, 160 S.W.3d 24, 36 (Tex. Crim. App. 2004)).

## A. INTELLECTUAL FUNCTIONING

22. Deficits in intellectual functioning refer to "intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding. Critical components include verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficacy." *Petetan*, 622 S.W.3d at 338 (quoting Am.

---

[9] This Court notes the recent criticism of the application of the preponderance standard at this stage of the proceedings. *See, e.g., Ex parte Jean*, 667 S.W.3d 768–69, 771–72 (Tex. Crim. App. 2023) (Yeary, J., dissenting); *Ex parte Segundo*, 663 S.W.3d 705, 707–08 (Tex. Crim. App. 2022) (Keller, P.J., dissenting). However, current precedent applies the preponderance standard, which this Court will follow.

Psychiatric Ass'n, *Diagnostic and Statistical Manual of Disorders* 37 (5th ed. 2013) [hereinafter DSM-5]). These functions are measured through IQ tests. *Id.*; *Moore II*, 139 S. Ct. at 668. A score falling approximately two standard deviations below the population mean, including a standard error of measurement (SEM) of "generally +5 points," indicates intellectual disability. *Petetan*, 622 S.W.3d at 338 (quoting DSM-5 at 37 and Am. Ass'n on Intell. & Dev. Disabilities, *Clinical Manual* 35 (11th ed. 2010) [hereinafter AAIDD-11]);[10] *see Hall*, 572 U.S. at 712–13 (holding SEM should be used to account for tests' inherent imprecision). But a strict IQ-test-score cutoff cannot be used. *Hall*, 572 U.S. at 704.

23. Practice effects and the "Flynn Effect" may affect test scores. *Petetan*, 622 S.W.3d at 338 (citing DSM-5 at 37). But those concepts should be considered "only in the way that they consider an IQ examiner's assessment of malingering, depression, lack of concentration, and so forth"—as a "generalized consideration that could detract from the over-all validity of the score obtained." *Cathey I*, 451 S.W.3d at 5. They do not operate to change an individual score. *Id.* at 18. In any event, if an IQ score is "close to" 70, a court must account for the test's SEM. *Moore I*, 581 U.S. at 13.

24. The Flynn Effect has been categorized as "a controversial theory" that does not address individualized scores, only IQ test score averages. *Dunn v. Reeves*, 141 S. Ct.

---

[10] The 12th edition of the AAIDD Manual was published in early 2021. Neither Busby nor the state assert that the 12th edition should apply or that its provisions would result in a different analysis.

11

188

2405, 2408 (2021) (per curiam) (6–3 decision); *Cathey I*, 451 S.W.3d at 12. Its application has been described as discretionary, "challenging," and inapplicable when the most recent version of a test with the most current norms is administered. *See Ex parte Cathey*, No. WR-55,161-02, 2021 WL 1653233, at *1 (Tex. Crim. App. Apr. 28, 2021) [hereinafter *Cathey II*] (per curiam) (not designated for publication) (rejecting argument that 77 score should be reduced by the Flynn Effect); *Cathey I*, 451 S.W.3d at 15, 18 & n.53 (refusing to apply Flynn Effect to reduce 77 score to 71.6); 43A George E. Dix & John M. Schmolesky, *Texas Practice: Criminal Practice and Procedure* § 49:35 (3d ed. 2022) (recognizing Flynn Effect may be "more of a description of historical changes in IQ tests than any difference among generations of intellectually challenged persons"). [Busby Post-Hearing Briefing Ex. B] Further, its existence regarding WAIS-III and WAIS-IV tests is questionable. *Cathey I*, 451 S.W.3d at 12. Indeed, Professor James Flynn, the author of the theory, "has admitted exaggerating the effect to save more people from the death penalty in light of *Atkins*." 43A Dix & Schmolesky, *supra*, at § 49:35 (citing *Cathey II*, 2021 WL 1653233 at *1); *see also Cathey I*, 451 S.W.3d at 15 n.42.

25. For these reasons and others, the Court of Criminal Appeals has held that the Flynn Effect and its impact on an IQ score may be considered when "it is impossible to retest using the most current IQ test available." *Cathey I*, 451 S.W.3d at 18. The *Cathey I* Court, citing the AAIDD manual, further concluded that there is insufficient evidence that clinical practitioners outside the criminal-justice system normally use and apply the Flynn Effect to IQ test results. *Id.* at 14. But even if the effect is considered, it is merely

12

189

a factor in the "interpretive narrative" and may not result in a change in a specific IQ test score. *Id.* at 14, 18.

26. Although states have flexibility in defining intellectual disability, current medical standards, such as the DSM-5 and the AAIDD-11, cannot be disregarded. *Moore I*, 581 U.S. at 20. But, again, they do not dictate the result. *Id.* at 13. If an individual's IQ score, adjusted for SEM, falls within the clinically established range for intellectual-functioning deficits—the lower end of the SEM range falls at or below 70— the inquiry continues to the remaining two elements of intellectual disability. *Id.* at 13– 15; *Hall*, 572 U.S. at 723. In other words, if the individual meets the first element of the intellectual-disability test, the second element must then be considered. *See Salazar*, 443 F.3d at 432 ("To state a successful claim, an applicant must satisfy all three prongs of this test.").

## B. ADAPTIVE DEFICITS

27. Adaptive deficits must be related to subaverage intellectual functioning, and not to other conditions such as a personality disorder, to satisfy the *Atkins* exception to the imposition of the death penalty. *Petetan*, 622 S.W.3d at 332–33 (relying on DSM-5 at 33).

28. These deficits require an evaluation of the individual's ability to function across a variety of dimensions—"how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." *Id.* at 339 (quoting DSM-5 at 37). This involves three

13

190

"domains" of adaptive reasoning: conceptual, social, and practical. *Id.* (quoting DSM-5 at 37). Adaptive deficits must be found in at least one domain to satisfy the adaptive-deficits element of intellectual disability. *Id.* (citing DSM-5 at 37–38).

29. The domains are measured through clinical evaluations and testing that use standardized measures "with knowledgeable informants and the individual to the extent possible." *Id.* Other sources are educational, developmental, medical, and mental-health evaluations—individualized measures. *Id.*; *Moore II*, 139 S. Ct. at 668. All information must be interpreted using clinical judgment. *Petetan*, 622 S.W.3d at 340 (quoting DSM-5 at 37). And this Court's review may not "overemphasize[ ]" the objective evidence of adaptive strengths. *Moore I*, 581 U.S. at 15, 18 n.9; *see also id.* at 30–31 (Roberts, C.J., dissenting) (discussing overemphasis prohibition in majority opinion).

30. The significance of any adaptive deficits is determined by looking at whether the individual's adaptive performance falls two or more standard deviations below the mean in any of the three adaptive domains. *Moore I*, 581 U.S. at 8 (majority opinion) (citing AAIDD-11 at 43). Standardized tests are not the sole measure of adaptive functioning but they may be helpful to the factfinder. *Ex parte Hearn*, 310 S.W.3d 424, 428 (Tex. Crim. App.) (relying on the fourth edition of the DSM), *cert. denied*, 562 U.S. 1006 (2010).

31. Conceptual skills involve "competence in memory, language, reading, writing, math, reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others." *Brownlow v. State*, No. AP-77,068, 2020 WL 718026, at

14

191

*11 (Tex. Crim. App. Feb. 12, 2020) (not designated for publication) (quoting DSM-5 at 37).

32. Social skills involve "awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment among others." *Id.*

33. Practical skills include skills related to language, reading, writing, money concepts, and self-direction. *Hearn*, 310 S.W.3d at 428. They also include skills related to interpersonal relationships, responsibility, gullibility, and following rules. *Id.* Practical skills are related to activities of daily living and include occupational skills and maintaining a safe environment. *Id.*

34. However, the Court of Criminal Appeals has cautioned that the inquiry is not whether a person is currently intellectually disabled and in need of special services. *Cathey I*, 451 S.W.3d at 19. Instead, the operative questions regarding adaptive deficits are:

1. Is this person capable of functioning adequately in his everyday world with intellectual understanding and moral appreciation of his behavior wherever he is?

2. Or is he so intellectually disabled that he falls within that class of intellectually disabled inmates who are exempt from the death penalty?

*Id.* at 26.

35. These ultimate questions are muddied by issues associated with retrospective assessments and the well-known effect of an intellectual-disability diagnosis on death-

15

192

penalty eligibility. *Id.* The retroactive assessment of adaptive deficits can be a subjective one. *Id.* at 22–23 & n.67. Thus, this Court cannot "become so entangled with the opinions of psychiatric experts as to lose sight of the basic factual nature of the *Atkins* inquiry." *Id.* at 26. And importantly, this Court cannot "turn a blind eye to the inmate's ability to use society and his environment to serve his own needs." *Id.*

### C. EARLY ONSET

36. The onset of the alleged subaverage intellectual functioning and adaptive deficits must have occurred while the individual was still a minor—during the developmental period. *Moore I*, 581 U.S. at 7.

### III. INTELLECTUAL-DISABILITY DETERMINATION

37. Although this Court held a hearing on Busby's application on September 8, 2023, neither the state nor Busby proffered witness testimony. [9/8/2023 RR] Interestingly, Busby also chose not to present evidence to the federal District Court that considered his intellectual-disability claim, similarly relying on declarations and other attachments. *Busby II*, 2015 WL 1037460, at *2, *10. As the District Court noted, some of Busby's proffered declarations are not sworn under penalty of perjury and some are undated. *Id.* at *10. [1 CR HC-06 102, 106, 108, 111, 114, 117, 120, 123, 132, 141, 369]

38. Accordingly, this Court has referred to the record from Busby's capital-murder trial, the exhibits attached to Busby's application and his proposed findings and conclusions, the exhibits attached to the state's proposed findings and conclusions, and

16

**193**

the exhibits attached to Busby's September 8, 2023 post-hearing briefing. Except for Martinez's 2022 report and testing and McGarrahan's reviewing report, this appears to be substantially the same evidence considered by the federal courts.

## A. INTELLECTUAL FUNCTIONING

### 1. Test Scores

#### a. 2001

39. Busby scored 96 on an unidentified IQ test in 2001. There is no further information on this test that would allow this Court to assay its reliability or the meaning of the score. Accordingly, this Court will not consider it further. *See, e.g., Busby II*, 2015 WL 1037460, at *20.

#### b. 2005

40. Proctor was Busby's court-appointed expert for trial. [36 RR 9] Both Busby and the state recognized that Proctor is an expert in the field of forensic psychology. [36 RR 11]

41. Proctor administered a WAIS-III test to Busby on October 14, 2005, at the Tarrant County Jail. [36 RR 26,42] Proctor testified that the WAIS-III was the "gold standard of IQ tests" because of its length with 13 subtests. [36 RR 40, 46] These subtests "tap[ ] several various areas of intelligence to give [an] overall global picture of a person's intelligence, their IQ." [36 RR 47] Other IQ tests, such as the Beta-III, are shorter versions of the WAIS-III. [36 RR 47-49]

17

194

42. Busby's full-scale score on the WAIS-III was 77, and there was no empirical evidence that he was malingering. *See Busby II*, 2015 WL 1037460, at *20. [36 RR 44-45, 53] This score placed Busby in the sixth percentile—94% of the population has a higher IQ. [36 RR 55-56] The SEM for the WAIS-III ("roughly plus or minus five") put Busby's score somewhere between 73 and 82, which placed him in the "borderline" range—"the low part of the low average range." [36 RR 56-57]

43. Proctor also administered a Beta-III test to Busby on November 4, 2005. [36 RR 28, 42] The Beta-III, which Proctor described as a "quick and dirty kind of intelligence test," is a shorter test meant to approximate the longer form WAIS-III. [36 RR 48] Busby scored an 81, which put him in the tenth percentile of the population— 90% of the population has a higher IQ. [36 RR 53-54]  This score was consistent with the 77 on the WAIS-III and again put Busby in the "borderline" range. [36 RR 55, 65]

44. Helge, the state's expert, also administered a WAIS-III to Busby shortly after Proctor's testing. Busby received a full-scale score of 79. *See id.* [36 RR 64] Proctor testified that this score was "almost the same" as the other full-scale IQ results and, thus, Proctor seemed to downplay the applicability of a practice effect to the score. [36 RR 61]

45. Proctor, who this Court finds credible, saw no evidence that Busby was intellectually disabled and neither did Helge. [36 RR 64]

46. In 2008, as part of Busby's first state habeas corpus application, Busby retained Dr. Gilda Kessner, a psychologist. She reviewed Busby's test scores and

18

195

Proctor's trial testimony. She recognized that the WAIS-III was the current test in 2005, that Busby had scored a 77, and that Proctor had concluded Busby was not intellectually disabled. *Busby III*, 925 F.3d at 718. Kessner believed Proctor should have considered the Flynn Effect, "which posits that there is a rise or gain in IQ scores over time and that '[r]esearch literature has suggested that this figure is .3 per year beginning the year after the test is normed.'" *Id.* [Busby Post-Hearing Briefing Ex. B] Kessner recommended that Busby be administered the WAIS-IV, which at the time was to be released in 2008, "so that the issue of the Flynn Effect and questions about the validity of the score can be avoided." *Id.* Kessner also recommended that Busby's adaptive history be investigated. *Id.* Busby has not proffered Kessner's report as part of the instant habeas corpus proceeding. [1 CR HC-06 17-18]

### c. 2010

47. In 2010 while Busby's federal habeas corpus petition was pending in the District Court, Dr. Gilbert Martinez administered a WAIS-IV test to Busby. His full-scale score was 74, which was qualitatively described as "borderline." *Busby III*, 925 F.3d at 717. [1 CR HC-06 90] The applied SEM for the WAIS-IV resulted in a range of 70 to 79. *Id.* [1 CR HC-06 90] There was no indication Busby was malingering. *See id.* [1 CR HC-06 89]

48. Martinez did not give an opinion as to whether Busby's score met the first element of intellectual disability. *See Busby III*, 925 F.4th at 718–19. [1 CR HC-06 89-94]

19

**196**

49. Busby hired a licensed clinical psychologist, Dr. Bekh Bradley-Davino, to opine on Busby's intellectual-disability claim. Although she did not expressly conclude that Busby was intellectually disabled, she concluded that the 2010 74 WAIS-IV score reflected "significant limitations in intellectual functioning" and that he had "significant problems in academic functioning beginning early." *Id.* at 719. Bradley-Davino recommended further evaluation. *Id.* Busby has not proffered Bradley-Davino's report in this proceeding. [1 CR HC-06 17-18]

### d. 2022

50. As part of Busby's second subsequent state habeas corpus proceeding, Martinez again administered a WAIS-IV test to Busby. His full-scale score was 81, resulting in a range of 77 to 85. [Busby Proposed FOF & COL at Ex. A, at 7] This score was qualitatively described as "low average." There was no indication of malingering. [*Id.* Ex. A, at 6]

51. Martinez noted that the difference between the 74 in 2010 and the 81 in 2022 was "likely due to the combined effects of several factors that are known to increase intelligence test scores over time," i.e., the Flynn Effect and the practice effect. [*Id.* Ex. A, at 25]

52. Martinez stated that because the WAIS-IV was published in 2008, a test taken in 2022 would result in a score adjustment of four points. [*Id.*] Thus, the Flynn Effect would lower Busby's full-scale score to 77. [*Id.*]

20

**197**

53. The practice effect refers to gains in standardized test scores that result from a person being tested a second time using the same instrument or similar methodology. [Busby Proposed FOF & COL Ex. A, at 25] "There is no universally agreed-upon quantitative score adjustment that can be applied to account for the increase in test scores in a particular case." [*Id.*] Nevertheless, Martinez opined that the practice effects must be considered, "likely contributing several points to the observed increase in IQ composite scores." [*Id.*] Martinez concluded, based on the four-point adjustment for the Flynn Effect and the unidentified adjustment for the practice effect, the 2022 81 score was consistent with the 2010 74 score on the WAIS-IV. [*Id.*] Thus, both WAIS-IV scores should be considered a full-scale score of 74 with an SEM range of 70 to 79 according to Martinez. [*Id.* Ex. A, at 25-26].

54. Martinez concluded that Busby's "adjusted" 2010 and 2022 WAIS-IV scores fell within the range of subaverage intellectual functioning—the first element of intellectual disability. [*Id.* Ex. A, at 2, 26]

### e. 2023 review of Martinez's report

55. McGarrahan, the state's proffered expert, did not conduct her own testing or interviews and merely reviewed most of what Martinez had reviewed as well as the 2005 IQ tests. [Busby's proposed FOF & COL Ex. B, at 1-2] According to McGarrahan, more testing was not warranted because Busby had already been given "numerous IQ assessments over many years, which were conducted by qualified individuals and using well-regarded and most recent measures available." [*Id.* Ex. B, at 5]

21

198

56. Although McGarrahan has been accepted as an expert in forensic psychology and neuropsychology in other Texas cases, neither she nor the state delineates her education or explains her qualifications to opine on Busby's intellectual condition. *See, e.g., Wells v. State*, 611 S.W.3d 396, 413 (Tex. Crim. App. 2020); *In re Commitment of Dyer*, No. 08-22-00221-CV, 2023 WL 4146288, at *1 (Tex. App.—El Paso June 23, 2023, no pet.). McGarrahan was not called as a witness at this Court's September 2023 hearing on Busby's writ application.

57. McGarrahan specifically applied the Flynn Effect to the WAIS-IV test scores, but not the practice effect. She merely mentioned that the practice effect "can affect test scores and should be considered when interpreting IQ scores." [*Id.* Ex. B, at 2] She opined that his 74 score on the 2010 test should be reduced to a 73.1 and that his 81 score on the 2022 test should be considered a 76.5 based on the Flynn Effect. [*Id.* Ex. B, at 2] However, she apparently applied a generalized SEM to the unadjusted, full-scale scores and not to the Flynn-adjusted scores.

58. McGarrahan also applied the Flynn Effect to the 2005 tests administered by Proctor and Helge. The Flynn Effect would modify those three scores as follows:

- The WAIS-III test administered by Proctor resulted in a full-scale score of 77 with an SEM range of 73 to 82.[11] The Flynn Effect would reduce Busby's score to 74.

---

[11] McGarrahan does not explain why the SEM for Proctor's WAIS-III subtracts 4 points but adds 5.

22

**199**

- The Beta-III test administered by Proctor resulted in a full-scale score of 81 with an SEM range of 72-90.[12] The Flynn Effect would reduce Busby's score to 78.6.

- The WAIS-III test administered by Helge resulted in a full-scale score of 79 with an SEM range of 75 to 83.[13] The Flynn Effect would reduce Busby's score to 76.

[*Id.* Ex. B, at 2-3]

59. McGarrahan further stated that on tests "with a mean of 100 and a standard deviation of 15," scores in a range of 65 to 75 would fit the DSM-5 and AAIDD definitions of intellectual disability. [*Id.* at 2-3]

60. McGarrahan could not "controvert the conclusion and opinion of Dr. Martinez" that Busby is intellectually disabled. [*Id.* at 6]

### 2. The Parties' Arguments

61. Busby argued in his application that his scores showed subaverage intellectual functioning sufficient to establish the first element of intellectual disability. He asserted that a 2005 WAIS-III score, adjusted for an SEM, would be considered two standard deviations below the mean (and, thus, subaverage intellectual functioning) if it fell within a range of 73.3 to 78.3. [1 CR HC-06 39-40]

---

[12] McGarrahan does not explain why her stated range for the Beta-III factors for a 9-point SEM. Perhaps McGarrahan applied the SEM after the score was reduced to 78.6 by the Flynn Effect, but nothing supports this guess.

[13] McGarrahan inexplicably applies a 4-point SEM to Helge's WAIS-III.

23

**200**

62. Busby recognized that the Flynn effect should be accounted for by more recent testing than those available in 2005. [1 CR HC-06 40] Indeed, Busby did not apply the Flynn Effect or the practice effect when discussing the 2010 WAIS-IV administered by Martinez. [1 CR HC-06 41-42] Nor did Busby discuss the SEM for Busby's 2010 WAIS-IV score. Busby states in his application that the 2010 WAIS-IV test, which is a "reliable and respected test" and was "administered closest to the date of its norming," is "the most accurate known measurement of Mr. Busby's IQ." [1 CR HC-06 41-42]

63. Busby did argue, however, that his 2005 WAIS-III 77 score "is equivalent to his having scored, rounding up, a 74." [1 CR HC-06 43] This "equivalent" score considered the Flynn Effect.

64. Regarding the 2005 Beta-III administered by Proctor, Busby argues that the Flynn Effect results in an adjusted score of 78.7. Busby continues that practice effects and the fact that the Beta-III is a more non-verbal test than the WAIS-III should be "taken into consideration," but he does not argue the practical application of these measures or how they would specifically affect the 78.7 Flynn-adjusted score. [1 CR HC-06 44-45]

65. The Helge-administered WAIS-III, according to Busby, should be adjusted from a 79 to a 76 to account for the Flynn Effect. The practice effect, which Busby asserts is "significant on this IQ test," again is urged to be "considered" with no specific adjustment attached. [1 CR HC-06 47] Busby does assert that Proctor's trial testimony

24

201

that the 79 was equivalent to Proctor's WAIS-III 77 should reduce the Beta-III score to 77, which would then be reduced further by the Flynn and practice effects. [1 CR HC-06 47 n.12].

66. Because Busby filed his subsequent application before the 2022 Martinez testing, the 2022 WAIS-IV test is not discussed. However, in his proposed findings and conclusions he notes that Martinez "believes that when both the Flynn and practice effects" are considered, Busby's 81 "is consistent with his 2010 score of 74" and, thus, meets the first element of intellectual disability. [Busby Proposed FOF & COL, at 17 & Ex. A, at 25-26]

67. The state responded to the instant subsequent habeas corpus application and argued that Busby failed to establish a prima facie case of intellectual disability, pointing to the fact that his claim had "already been considered and rejected under *Moore* [*I*]" in *Busby III*. [1 CR HC-06 396-97] But after Martinez's 2022 report and McGarrahan's concurring report, the state submitted proposed findings and conclusions that reversed course and urged this Court to conclude that Busby's IQ scores showed by a preponderance of the evidence that Busby has subaverage intellectual functioning. [State Proposed FOF & COL at 7]

### 3. Application of Law to Facts

68. Informed by the reasoning in *Cathey I*, this Court declines to apply the Flynn Effect to Busby's test scores. 451 S.W.3d at 14–18.

25

202

69. Although the discretionary Flynn Effect is recognized by the medical community, its genesis after *Atkins* and its creator's motives are questionable. And it is not normally and universally applied. *Id.* As was found in *Cathey I*, there is insufficient evidence that clinicians routinely subtract points from IQ scores to account for the Flynn Effect. *Id.* at 15. Martinez did not mention the Flynn Effect in either his 2010 testing results or his 2022 report. McGarrahan applied the effect to all of Busby's scores after a brief recognition that the DSM-5 and the AAIDD acknowledge that the Flynn Effect "can" affect test scores.

70. As Kessner recognized, the Flynn Effect as a concept should be factored into scoring by retesting with more recent tests. *Cathey I*, 451 S.W.3d at 16; *see Busby II*, 2015 WL 1037460, at *20. And its efficacy is questionable. *Cathey I*, 451 S.W.3d at 15-17. By all accounts, the WAIS-IV is the most reliable IQ test available. [Busby Proposed FOF & COL, at 15] Martinez stated that the WAIS-IV has "robust statistical properties and well-established validity and reliability profiles." [*Id.* Ex. A, at 25] The WAIS-IV has not been updated and is the latest version. [*Id.*] McGarrahan recognized that each test Busby has taken was conducted by qualified individuals and used the most recent testing measures. [*Id.* Ex. B, at 5]

71. The practice effect is on ever shakier ground. There is no evidence of the practical application of this effect.

72. For example, Martinez merely assumed that the practice effect would work in tandem with the Flynn Effect to lower Busby's 2022 WAIS-IV 81 score to a 74,

26

203

consistent with his 2010 result. Martinez benchmarked the presumed 74 result off Busby's 2010 WAIS-IV 74 score and then apparently subtracted from 81 the 4.5 points for the Flynn Effect—.3 X the number of years since the WAIS-IV had been published (15)—and subtracted an additional and arbitrary 2.5 points for the practice effect. But Martinez does not explain other than to conclude that the 2022 81 is a 74 based on the two effects and based on his 2010 74 score.

73. McGarrahan also did not quantify the practice effect, merely recognizing that "[p]ractice effects (learning from repeated testing) . . . can affect test scores and should be considered when interpreting IQ scores." [Busby Proposed FOF & COL Ex. B, at 2]

74. In this case, the practice effect has no guidelines, no quantitative measures, and no limits. It ostensibly has been applied to reach a desired result—lower Busby's 2005 and 2022 scores to comport with his 2010 score. However, an SEM already accounts for "practice from earlier tests." *Hall*, 572 U.S. at 713. The evidence of the practice effect, such as there is, is not credible, and the Court will not attempt to apply an unspecified practice-effect number to Busby's scores.

75. The SEM, however, should be applied. *Hall*, 572 U.S. at 713–14, 724; *see also Cathey I*, 451 S.W.3d at 18.

76. The specific SEMs for the WAIS-III, the WAIS-IV, and the Beta-III are, for the most part, unexplained in the evidence. Proctor testified at Busby's trial that the SEM for the WAIS-III was plus or minus five. [36 RR 57] McGarrahan states that the

27

**204**

SEM for "scores" is "generally ±5 points." [Busby Proposed FOF & COL Ex. B, at 2] However, she inconsistently and inexplicably applies differing SEMs to different scores and tests. Martinez states that his applied SEM ranges for the 2010 and 2022 WAIS-IV are "based on the Overall Average SEMs" and that the SEMs are "based on the examinee's age." [*Id.* at 3, 7] Busby, relying on the AAIDD-11 and the DSM-5, asserts that the SEM for the WAIS tests "is approximately 5 points." [1 CR HC-06 26, 39-40] The state agrees with Busby. [State Proposed FOF & COL 12]

77. However, a test's SEM is not an automatic plus or minus 5; it must be individually calculated for each test based on statistics as reflected in the DSM-5. *Ex parte Wood*, 568 S.W.3d 678, 680 n.9 (Tex. Crim. App. 2018); *see also Moore I*, 581 U.S. at 14 (recognizing SEM must be "test-specific"). The SEM evidence before this Court consists only of SEM generalizations and does not explain or mention the statistical calculation for each test. In short, the evidence of a specific SEM for each test is conclusory. In an abundance of caution, this Court will consider the SEM ranges for each test that are supported by at least some evidence or that were previously used by the federal habeas courts.

78. The evidence before this Court and that had been submitted to the federal habeas courts reveals the following score ranges based on the application of a generalized SEM to Busby's scores:

- 2005 Proctor WAIS-III: **73 to 82**. [36 RR 56-57; Busby Proposed FOF & COL Ex. B, at 2] *But see Busby III*, 925 F.3d at 716 (stating range as 72 to 82).

28

**205**

- 2005 Proctor Beta-III: **76 to 86**, assuming a similar SEM as the WAIS-III.[14] *Id.* at 717.

- 2005 Helge WAIS-III: **74 to 84**. *Busby II*, 2015 WL 1037460, at *21.

- 2010 Martinez WAIS-IV: **70 to 79**. *Busby III*, 925 F.3d at 719. [Busby Proposed FOF & COL Ex. A, at 2-3; 1 CR HC-06 90]

- 2022 Martinez WAIS-IV (not available to federal reviewing courts): **77 to 85**. [Busby Proposed FOF & COL Ex. A, at 7 & Ex. B at 2]

79. "[T]he analysis of multiple IQ scores jointly is a complicated endeavor." *Hall*, 572 U.S. at 714. Nevertheless, this Court cannot discount that of the five scores Busby received over the course of seventeen years, only one is low enough to include 70 in the generalized SEM range, and just barely. *See Moore I*, 581 U.S. at 34 n.1 (Roberts, C.J., dissenting) (noting majority opinion should not be read to question states that do not "treat a single IQ score as dispositive evidence where the prisoner presented additional higher scores"); *see, e.g., Ferguson v. Comm'r, Ala. Dep't of Corr.*, 69 F.4th 1243, 1255–56 (11th Cir. 2023). Subaverage intellectual functioning is established, requiring examination of adaptive deficits, if the lower end of the SEM range falls at or below 70. *Moore I*, 581 U.S. at 14 (majority opinion); *see also Green v. Lumpkin*, 860 F. App'x 930, 937–38 (5th Cir. 2021) (determining SEM would be impermissibly double counted if a lower-end SEM range up to 75 were sufficient to satisfy first element of intellectual

---

[14] This Court will not apply McGarrahan's unexplained, 9-point SEM range of 72 to 90. [Busby Proposed FOF & COL Ex. B, at 2]

29

disability), *cert. denied*, 142 S. Ct. 1234 (2022). The preponderance of Busby's intellectual-functioning evidence does not meet this test.

80. Accordingly, the preponderance of Busby's IQ scores shows that he does not satisfy the first element of intellectual disability. *See, e.g., Cathey I*, 451 S.W.3d at 18–19; *Wood*, 568 S.W.3d at 680. The federal courts that reviewed Busby's intellectual-disability claim and had Busby's 2010 WAIS-IV 74 score before them also concluded that Busby had failed to sufficiently establish subaverage intellectual functioning, albeit under different review standards than the one at issue here. *Busby III*, 925 F.3d at 718; *Busby II*, 2015 WL 1037460, at *21. Because Busby failed to meet the first element, his constitutional claim fails.

81. But to ensure the Court of Criminal Appeals has complete findings on the entirety of Busby's issue, this Court will consider the remaining two elements. *See Moore I*, 581 U.S. at 15 (holding courts must "continue the inquiry and consider other evidence of intellectual disability" if IQ score, adjusted for SEM, falls at or below 70); *Hall*, 572 U.S. at 723 (requiring analysis of other evidence of intellectual disability, including adaptive deficits, if IQ score falls within the test's "acknowledged and inherent margin of error"); *Cathey I*, 451 S.W.3d at 19 (addressing adaptive deficits after concluding first intellectual-disability element not proven by a preponderance of the evidence). *But see Salazar*, 443 F.3d at 432 ("To state a successful claim, an applicant must satisfy all three prongs of this test."); *Petetan*, 622 S.W.3d 332 (holding adaptive deficits must be related to subaverage intellectual functioning). Even so, this Court's intellectual-disability

30

207

conclusion ultimately rests on the determination that Busby has not shown by a preponderance of the evidence subaverage intellectual functioning.

## B. ADAPTIVE DEFICITS RELATED TO INTELLECTUAL DEFICIT

### 1. The Domains[15]

82. In elementary school, Busby had to repeat the first grade, and struggled with reading. *Busby II*, 2015 WL 1037460, at *8 [1 CR HC-06 96]

83. In junior high, he was placed in math and reading classes that would focus on ameliorating learning deficits in those areas. *Id.* [35 RR 24-25] He earned "average and above" grades in junior high. *Id.*

84. Busby's junior-high football coach, Steve Porter, stated in a 2010 affidavit that Busby's "intellect was lacking." [1 CR HC-06 119] He was unable to understand complex plays and would "get confused about who to block, or which route to run." [1 CR HC-06 119] Although he was in danger of not being able to pay football because of his grades, his grades improved after he was moved to appropriate classes, and he was able to continue playing. [1 CR HC-06 120]

85. Busby earned "average" grades as a high-school freshman, and "below average" grades as a high-school sophomore. *Id.* Busby was exempt from taking state

---

[15] The following evidence is not the entirety of the adaptive-deficit evidence that was proffered or that this Court considered. It is merely a summary of the overarching tenor of that evidence.

31

standardized tests his freshman year of high school.[16] *Id.* [1 CR HC-06 98; 35 RR 28-29] Although he was in special-education classes, those classes were targeted to those with IQs between 70 and 82, which would not have been considered in the "mentally retarded range." [35 RR 27; 1 CR HC-06 101; Busby Proposed FOF & COL Ex. A, at 14] Busby was described in one teacher's declaration as having had a "perfect storm of deficits." [1 CR HC-06 101] Busby dropped out of school after he was required to repeat his sophomore year. [35 RR 32; Busby Proposed FOF & COL Ex. A, at 19]

86. Busby's sister, Kimiko Coleman, testified at Busby's trial that Busby was "always trying to learn"; however, he had problems in school. [35 RR 57] Busby's other sister, Tarsharn Busby, also testified and agreed that school had been "something positive" for Busby until he "started having problems in high school . . . with the teachers." [35 RR 76]

87. Proctor administered a wide-range achievement test (WRAT) to Busby in 2005. [36 RR 42] That test showed his reading skill was at a fourth-grade level, spelling skill was at a third-grade level, and math skill was at a sixth-grade level. [36 RR 51-52] Martinez's 2022 WRAT had similar results. [Busby Proposed FOF & COL Ex. A, at 7] Proctor testified that although these results showed a learning disability, Busby is not intellectually disabled. [36 RR 51, 64] Martinez concluded the opposite. [Busby FOF & COL Ex. A, at 26]

---

[16] Busby also would have been exempt his junior year, but he was required to repeat his sophomore year.

88. Martinez interviewed Busby in 2022. [*Id.* Ex. A, at 3] Martinez noted that Busby was optimistic, compliant, and polite during the interview with a broad, loud affect. [*Id.* Ex. A, at 5] Busby stated that he was unable to "fully" read or write and was able to recount his educational history, stating that "nobody was interested in teaching [him] to read or write" because he played sports. [*Id.* Ex A, at 3-4] However, Busby reported to Martinez that he had "several pen pals," whom he writes to "about 20 to 25 times per year." [*Id.* Ex. A, at 5]  He recounted his "sometimes happy, sometimes not" childhood; sporadic work history; and his medical history (admitting that he has "anger issues" and a history of alcohol and drug abuse). [*Id.* Ex. A, at 3-5]

89. Several 2010 declarants described Busby as "slow." [1 CR HC-06 108, 110, 113, 116, 122, 130, 368] Several also noted that he was not good with numbers, even unable to count money or order fast food, which contradicts his WRAT score showing he performed at a sixth-grade math level. [1 CR HC-06 104, 108, 110, 113, 117] The mother of one of his children noted that he could not read or write, which again contradicts the WRAT results; other declarants noted his difficulty reading. [1 CR HC-06 104, 108, 116, 139] But there was also evidence that Busby never had to figure out how to do things for himself because either his sisters or other women, whom he was "smooth" with, did everything for him. *See* [1 CR HC-06 105; Busby Proposed FOF & COL Ex. A, at 14]

90. He was also described as a "follower" who could be easily manipulated by women, e.g., Latimer. *Busby I*, 253 S.W.3d at 664. [Busby Proposed FOF & COL Ex.

33

210

A, at 15; 1 CR HC-06 106, 110-11, 116, 131; 35 RR 37] However, his sister Tarsharn testified at his trial that he was "a leader-type person in some ways," but not with women. [35 RR 78] Coleman testified that Busby was not gullible with men. [35 RR 56] And he was a high-ranking gang member who had prostitutes working for him in exchange for drugs.

91. One of Busby's teachers testified at trial that Busby was able to regulate his behavior when his mother was present. [35 RR 42-43] He also was compliant if told to "sit down and be quiet for a while." [35 RR 42]

92. Busby had poor hygiene, but Coleman stated that improved in high school. [Busby Proposed FOF & COL Ex. A, at 12, 18; 1 CR HC-06 119, 122] Busby did not help with chores in the home; however, Coleman reported that this was not related to a deficit but was "motivational, as he reportedly thought it was the role of women." [Busby Proposed FOF & COL Ex. A, at 9, 12]

93. It was reported that Busby could not budget his money, had low self-control, and did not understand the consequences of his actions. [*Id.* Ex. A, at 9-10, 12, 17] Busby had little to no work history; however, the women who "took care of him," did not want him to work. [*Id.* Ex. A, at 12] According to Coleman, Busby "did not need to work as they [i.e., the women in his life] cooked, cleaned, and paid his bills." [*Id.*] Tarsharn testified that Busby was protective of women and that he did not "go for" violence toward women. [35 RR 78-79] Coleman testified however that Busby had hit her in the past, which was consistent with his behavior toward Cooper and Latimer. [35

34

RR 63] And as for his understanding of consequences, Busby sought a reprieve from the Board of Pardons and Paroles after this Court set his 2021 execution date to accommodate his request to have a spiritual adviser accompany him to the execution chamber.

94. Busby would speak in code to his friends to avoid "other's listening to their conversation." [*Id.* Ex. A, at 11] But there was also evidence that his communication skills were below average and he could not follow complex instructions. [*Id.* Ex. A, at 8-9, 11] His choices, communication, manners, and willingness to take responsibility for his actions reportedly were based on his "mood" at the time. [*Id.* Ex. A, at 10-12] There was little to no evidence that his "mood" was related to any adaptive deficits.

95. Busby's upbringing involved racial segregation, violence in the home, and poverty. [1 CR HC-06 125-26, 128-29, 135-37; 35 RR 40, 54] He had a history of mental illness and made several suicide attempts, the most recent of which occurred days before he murdered Crane. *Busby II*, 2015 WL 1037460, at *11. [36 RR 80] Busby also was diagnosed with severe antisocial personality disorder and was at high risk to commit future acts of violence. *Id.* [36 RR 34-39]

96. Martinez administered the third version of the Adaptative Behavior Assessment System questionnaire (ABAS-III) to Busby's sisters[17] and further

---

[17] McGarrahan represented in her reviewing report that the ABAS-III was given to one of Busby's sisters and a former teacher. [Busby Proposed FOF & COL Ex. B, at 4]

35

interviewed each separately regarding Busby's adaptive functioning. [Busby Proposed FOF & COL Ex. A, at 8, 19] It is unclear when these tests and interviews occurred or whether the interviews were conducted face-to-face. [*Id.*] The ABAS-III is "designed to elicit and quantify information about a person's adaptive functioning." [*Id.* Ex. A, at 19] These results, based on the sisters' answers about Busby, showed that Busby was substantially deficient in the adaptative-deficits domains. [Busby Proposed FOF & COL Ex. A, at 20, 26]

### 2. Application of Law to Facts

97. Although this Court may not overemphasize adaptive strengths, neither can this Court ignore them and uncritically focus on pointed out deficits. *Petetan*, 622 S.W.3d at 358; *Cathey I*, 451 S.W.3d at 19–22, 27.

98. Much of the adaptive-deficit evidence comes from anecdotal declarations and interviews that occurred when it was clear Busby was claiming an exemption from the death penalty based on his asserted intellectual disability. Some reveals Busby's ability to "use society and his environment to serve his own needs." *Cathey I*, 451 S.W.3d at 26.

99. And some evidence is internally inconsistent. For example, some evidence indicates Busby cannot read or write; but his achievement tests place him at a fourth-grade level around the time of the offense, he lodged written complaints while in the Tarrant County Jail, he was found with detailed drawings and a letter, and he admitted to having several pen pals. Another example: Busby was described as unable to count

36

213

money or even order food from a fast-food restaurant; however, the evidence also shows that he ran a prostitution ring, was a high-ranking member of a criminal street gang, and had women take care of him because he believed that is their role. Finally, the anecdotal evidence that Busby does not understand the consequences of his actions is contradicted by his request for a spiritual adviser to accompany him into the execution chamber, indicating his awareness of the consequences and gravity of his murder of Crane.

100. This Court is not impermissibly focusing on adaptive strengths but on conflicting evidence of the asserted deficits. *Petetan*, 622 S.W.3d at 349, 355; *see also Moore I*, 581 U.S. at 15; *Cathey I*, 451 S.W.3d at 27. Further, this Court cannot ignore Busby's demonstrated ability to serve his own needs by using society and his environment. *Cathey I*, 451 S.W.3d at 26.

101. The ABAS-III results initially appear convincing that Busby has sufficient adaptive deficits to meet the second element of intellectual disability, mainly because the results ostensibly are objective measures of adaptive deficits. But the Court of Criminal Appeals has noted that the second version of the ABAS was "not normed for retrospective assessments," and no evidence in this case shows that the ABAS-III has been so normed. *Petetan*, 622 S.W.3d at 356; *see also Cathey I*, 451 S.W.3d at 26 ("[C]ourts should not become so entangled with the opinions of psychiatric experts as to lose sight of the basic factual nature of the *Akins* inquiry . . . .").

102. Indeed, it is hard to justify giving conclusive effect to ABAS-III scores that rely on answers from relatives who had not seen Busby for approximately six years before his 2005 trial and who were asked to answer the questions as part of Busby's intellectual-disability claim. *Petetan*, 622 S.W.3d at 355 (noting family members who took the ABAS "had an obvious vested interest in the outcome of their interviews . . . : saving Appellant from a possible death penalty"); *Cathey I*, 451 S.W.3d at 20 (declining to credit expert conclusion of adaptive deficits because participants' responses conflicted with trial testimony, test was not designed to have retrospective application, and participants were "highly motivated to misremember" adaptive abilities). [35 RR 62, 77-78] This Court concludes that the preponderance of the adaptive-deficit evidence is, at best, conflicting and, at worst, suspect. Busby has not satisfied the second element by a preponderance.

103. Further, there is little evidence linking these asserted adaptive deficits to his intellectual deficit, which is required. *Petetan*, 622 S.W.3d at 332–34 (citing DSM-5 at 38). Busby's traumatic childhood experiences "count in the medical community as 'risk factors' *for* intellectual disability." *Moore I*, 581 U.S. at 16 (quoting AAIDD-11 at 59–60). However, such a factor merely leads to further investigation of the issue; it does not supply the required relatedness link. *See id.* ("Clinicians rely on such factors as cause to explore the prospect of intellectual disability further, not to counter the case for a disability determination.").

104. How to determine relatedness is not well defined, and neither the state nor Busby discuss the issue. Clearly, the former *Briseno*[18] factors, which were an attempt to standardize the adaptive-deficit determination, are disavowed and cannot be used to "restrict qualification of an individual as intellectually disabled." *Id.* at 17–19.

105. This Court has been given no guidance on the relatedness between Busby's asserted adaptive deficits and his asserted subaverage intellectual functioning. The parties treat the asserted deficits as *ipso facto* related to his subaverage intellectual functioning.[19] This Court cannot be so conclusory. *See, e.g., Petetan*, 622 S.W.3d at 332–33. Because Busby has not shown by a preponderance of the evidence that any adaptive deficits are related to his intellectual functioning, even if that functioning were subaverage, the second intellectual-disability element is not met. And, again, because Busby failed to show subaverage intellectual functioning by a preponderance, he necessarily has not shown that any adaptive deficits would be related. *Cathey I*, 451 S.W.3d at 25–26.

---

[18] *Ex parte Briseno*, 135 SW.3d 1, 6 (Tex. Crim. App. 2004), *invalidated by Moore I*, 581 U.S. at 20–21.

[19] This Court recognizes that some asserted adaptive deficits such as money handling and reading skill would generally be related to subaverage intellectual functioning; however, this evidence was contradicted. Other asserted adaptive deficits such as gullibility, self-control, and the like are not so obviously related.

106. In short, there is not a preponderance of the evidence that Busby is not capable of functioning adequately in his everyday world with intellectual understanding and moral appreciation of his behavior wherever he is. *Id.* at 26.

## C. EARLY ONSET

107. Busby must also show that the onset of his subaverage intellectual functioning and adaptive deficits occurred before he was 18. *Atkins*, 536 U.S. at 318; *Hall*, 572 U.S. at 710; *Petetan*, 622 SW.3d at 331. [1 CR HC-06 363] Much of the evidence presented to this Court shows that any intellectual-functioning or adaptive-deficit issue began before Busby was 18. [Busby Proposed FOF & COL Ex. A, at 26 & Ex. B, at 4-5]

108. Busby showed onset during the developmental period by a preponderance. But, of course, this finding presumes that Busby established the first two elements, which he did not. *Cathey I*, 541 S.W.3d at 28.

## IV. SUMMARY

109. Most of the evidence before this Court, including Busby's 2010 WAIS-IV IQ test that he posits is the "the most accurate known measurement" of his intellectual functioning, has been presented in federal habeas corpus proceedings and been found insufficient to show intellectual disability, although under different standards than are at issue today. *See Busby III*, 925 F.2d at 716–20;[20] *Busby II*, 2015 WL 1037460, at *18–

---

[20] This Court recognizes that the Fifth Circuit stated the need for "further evaluation" by an expert in intellectual disability, which has now occurred, as part of its

40

21. [1 CR HC-06 41-42] For the first time, Busby presents his 2022 WAIS-IV test, Martinez's 2022 report (which considers anecdotal and adaptive-testing evidence, at least some of which was available in Busby's federal habeas corpus proceedings), and McGarrahan's concurring report (which added nothing new to Martinez's report). The differences are that now (1) Martinez, contrary to his 2010 no-conclusion, expressly concludes that Busby is intellectually disabled; (2) McGarrahan concurs; and (3) Busby has a WAIS-IV full-scale score of 81, resulting in a generalized SEM range of 77 to 85, according to McGarrahan and Martinez.

110. Martinez and McGarrahan rely heavily on the 2010 WAIS-IV and discount the 2022 WAIS-IV, concluding that the 2010 WAIS-IV is the true measure of Busby's intellectual functioning. However, this Court's acceding to that view of the evidence would appear to be the same legal mistake that has been pointed out regarding adaptive deficits: This Court would be overemphasizing some evidence (e.g., the 2010 WAIS-IV result) and underemphasizing the other (e.g., the 2022 WAIS-IV result and the 2005 WAIS-III and Beta-III results). *Moore I*, 581 U.S. at 15, 18 n.9; *see also Moore II*, 139 S.

---

holding that a reasonable factfinder could have failed to conclude that Busby was intellectually disabled even though he had an asserted history of intellectual- and adaptive-functioning limits. *Busby III*, 925 F.3d at 719–20. However, the new evidence before this Court does not meet Busby's burden considering all the presented evidence unless this Court were to impermissibly accept Martinez's 2022 report and McGarrahan's concurring report whole-hog without any critical analysis and without reference to the other available evidence. *See Cathey I*, 451 S.W.3d at 26 (cautioning courts to "not become so entangled with the opinions of psychiatric experts as to lose sight of the basic factual nature of the *Atkins* inquiry").

41

Ct. at 673 (Thomas, J., dissenting) (discussing *Moore I*'s evidentiary review standard for adaptive deficits). This Court's review must be a holistic review, not a selective one. *See Hall*, 572 U.S. at 721 (recognizing experts' views do not dictate result but inform it); *Cathey I*, 451 S.W.3d at 24–25, 27 (considering "the entire body of evidence taken from the trial and the habeas hearing, including applicant's school records and the death-row cell exhibits of his pen-pal letters and . . . articles and poems," to conclude intellectual disability had not been shown by a preponderance).

111. Busby's four other IQ tests—2005 Proctor WAIS-III, 2005 Proctor Beta-III, 2005 Helge WAIS-III, and 2022 Martinez WAIS-IV—must be weighed as well. And the methods to adjust Busby's scores on those tests—the Flynn Effect and the practice effect—are either not well defined in the evidence, inconsistent, or are not credible under the facts of this case. The evidence of the test-specific SEMs is not much better, although the Court has used the generalized ±5 to the scores here. The preponderance of the evidence reveals that Busby's intellectual functioning is not so subaverage that he is exempt from the death penalty under the Eighth Amendment.

112. Although this Court addressed the adaptive-deficits element in an abundance of caution, it was not necessary based on the intellectual-functioning conclusion. In any event, Busby has failed to expressly show that any adaptive deficits are specifically related to his intellectual functioning by a preponderance. And the preponderance of the credible evidence, including evidence of his deficits, shows that

Busby is capable of functioning adequately in his everyday world with an intellectual understanding and moral appreciation of his behavior wherever he is.

113. Based on this Court's review of the law, the presented evidence, the parties' arguments, and this Court's own recollections and credibility determinations, this Court RECOMMENDS that relief be denied.

## V. ORDER

This Court ORDERS the clerk to (1) send a copy of these findings and conclusions to the attorneys of record and (2) transmit to the Court of Criminal Appeals in cause number WR-70,747-06 a second supplemental clerk's record containing all documents filed on or after June 8, 2021, including the court reporter's transcript of the September 8, 2023 hearing and these findings and conclusions. *See* Tex. Code Crim. Proc. Ann. art. 11.071, § 9(f).

SIGNED October 12ᵀᴴ, 2023.

_____

Honorable Wayne Salvant
Presiding Judge

43

**220**

Certified True Copy

THE STATE OF TEXAS                    §

COUNTY OF TARRANT                  §


I, Thomas A. Wilder, Clerk of the District Courts of Tarrant County, Texas, do hereby certify that the above and foregoing is a true and correct copy of ALL PROCEEDINGS HAD.


In Writ Number:   **C-2-W011911-0920589-C**


EX PARTE:  **EDWARD LEE BUSBY JR**
VS.
THE STATE OF TEXAS


as the same appears on the file and/or record in my said office.

GIVEN UNDER MY HAND and seal of Said Court at office in the City of Fort Worth, Tarrant County, Texas, this the  13th , day of    October    , A.D.  2023  .


THOMAS A. WILDER
CLERK, DISTRICT COURTS, TARRANT COUNTY, TEXAS

By _/s/_ _Richard Bryan Gardner_
Deputy

221

222