Busby - Vol 6

1

REPORTER'S RECORD

VOLUME 6 OF 38 VOLUMES

TRIAL COURT CAUSE NO. 0920589A

| THE STATE OF TEXAS | ) | IN THE CRIMINAL DISTRICT |
|---|---|---|
| vs. | ) | COURT NUMBER TWO |
| EDWARD LEE BUSBY, JR. | ) | TARRANT COUNTY, TEXAS |

RULING ON MOTION TO SUPPRESS

AND

JURY VOIR DIRE

On the 4th day of October, 2005, the following proceedings came on to be heard in the above-titled and numbered cause before the Honorable Wayne F. Salvant and Phillip Vick, Judges Presiding, held in Fort Worth, Texas, reported by machine shorthand utilizing computer-aided transcription.

Barbara Lynn Chapman, CSR
Official Court Reporter
Criminal District Court No. 2

@

2

Tarrant County, Texas
Page 1

Busby - Vol 6

APPEARANCES

HONORABLE JOE SHANNON, JR. - SBOT NO. 18107000
HONORABLE GREGORY T. MILLER - SBOT NO. 14073650
Assistant District Attorneys
401 W. Belknap Street
Fort Worth, Texas  76196
Telephone:  (817) 884-1400

                    Attorneys for The State of Texas.

HONORABLE JACK V. STRICKLAND - SBOT NO. 19397000
Attorney at Law
909 Throckmorton Street
Fort Worth, Texas  76102
Telephone: (817) 338-1000


HONORABLE STEPHEN GORDON - SBOT NO. 00785918
Attorney at Law
101 Summit Avenue, #610
Fort Worth, Texas  76102
Telephone: (817) 338-1877


                    Attorneys for The Defendant.

@                                                                          3



                    P R O C E E D I N G S

                              October 4, 2005
                              Tuesday, 8:32 a.m.
                    (Judge Wayne Salvant presiding)

                    (Defendant Present)

                    THE COURT:  Okay.  I'll hear any arguments
                              Page 2

Busby - Vol 6

from Counsel on the Motion to Suppress.

The State?

MR. MILLER:  Okay.  Well, it's our position, number one, that based on the testimony the Court has before it, that the traffic stop by Officer Jeff Padgett from the Oklahoma City Police Department, that was indeed valid.

He had two independent reasons for stopping the driver of the Nissan automobile.  Number one, the failure to signal a turn within 100 feet of the intersection, and the second one, making an improper turn under the -- as he testified, those are both violations of which he is entitled to stop the operator of a motor vehicle.

Second, as you will recall, as he was going up to the car -- and I think -- I think the testimony was he had actually asked for -- the Defendant for his driver's license.  He got the -- I think he called it a 10-48 NCIC hit, alerting him that the car was wanted out of Fort Worth and possibly an endangered person.

@                                                    4

The car was occupied by two individuals and the second one, who we ultimately knew as Kathleen Latimer, he did not know, in fact, who that was, and he got the information, the reported victim of the hit was a Laura Crane.  I think he said a 77-year-old woman.

The initial traffic stop is lawful.  He explained to the Court yesterday as to why he arrested the Defendant in this case.  It's the State's position that -- at least directing our attention to the car itself, the

Page 3

Busby - Vol 6

Defendant has no standing to complain about whatever was taken -- whatever was or wasn't taken in the car.

And I didn't bring that case with me, but it is Jackson v. State.  It is a capital murder case.  It's -- I don't remember the cite offhand.  It is about 1995, something like that, same type of fact situation.  Jackson, in that case, was arrested in a stolen car.  And the Court of Criminal Appeals held someone arrested in a stolen car has no standing to complain about what was taken out of that, although, that is our initial point on that.

Secondly, whatever was seized from the car was seized pursuant to a valid search warrant.  The Court looked at the search warrant from a District Judge in Oklahoma.  That should be dispositive of anything coming out of the car.

@                                                                    5

Concerning the motel room, it is our position that based on the information the officers had available to them, wanting to find out where Laura Crane was, that under the community caretaking exception of the Fourth Amendment of the United States Constitution, they were -- they acted properly in their initial concern about going to the motel room to see if Ms. Crane was, in fact, there.  It is reasonable under the community caretaking exception to the Fourth Amendment of the United States Constitution.

Officer Gabeau testified yesterday that nothing was removed.  They simply went in, made a cursory check to see if Ms. Crane was indeed inside the room.  She

Page 4

Busby - Vol 6

was not.  They left.  They testified they did not take anything.

As the Court knows, later on in the morning, they did go back to the room 111 of the Delux Motel armed with a search warrant that had been issued by a District Judge, Virgil Black, of Oklahoma County -- Oklahoma City.

Concerning the various statements, the first statement chronologically was the one between Detective Garrett and Detective Whitebird with the Defendant.

We would agree with Mr. Strickland's and

@                                                               6

Mr. Gordon's position yesterday, that if, in fact, we choose to use that statement -- if the Court rules it is admissible -- Mr. Shannon and myself would not -- repeat, would not -- play the parts prior to the advising of his constitutional rights.  However, from that point forward, we believe that statement is admissible -- the remainder of that statement is admissible in its entirety.

And as the Court knows, when you are dealing with statements that have been either video recorded or electronically recorded, the case law has been for many, many years in this state that the Court, yourself, can make a determination after looking at that whether the interviews and the statements were voluntary. I know the Court has looked at this.

That then moves us to the -- I guess chronologically speaking, the two statements provided to the two FBI agents later -- later on in the afternoon,

Busby - Vol 6

February 1st.

As the Court knows, statements to federal law enforcement officers, even oral statements to federal law enforcement officers, are admissible after they have been advised of their constitutional warnings.  The Rule, as the Court knows, is substantially different than it is in the State of Texas.

Agent Anderson testified, and the Court has

@                                                                            7

the documentation, that the Defendant was warned of his constitutional rights at the very beginning of the interview and then there was an interview and subsequently reduced to two written versions.

We believe that under the -- I guess it is the Federal Rules of Criminal Procedure -- that those statements are admissible and under 38.22, section -- I believe it is section (8), the law has changed in Texas, that if the statement is admissible in the jurisdiction under which it was taken, it is admissible under Texas state law.  So, therefore, we believe the two written statements from the FBI agents are admissible.

That gets us to the two tape-recorded interviews of the Defendant between Detective Cheryl Johnson and Detective Mike Carroll on February 3rd, I believe it was, of 2004.

The Court heard testimony from Detective Johnson yesterday afternoon.  In the interest of saving time, we only played in open court the parts of the recordings that do, in fact, show Mr. Busby being given his rights under 38.22.  We believe that those warnings

Busby - Vol 6

are sufficient.  In fact, again the Court was able to make a determination as to the voluntariness of the issue.

The first one -- the first recorded statement is admissible for those reasons.  The second one

@                                                                        8

is admissible for those reasons.  But there is an additional reason why the second one is admissible because it was Mr. Busby, as a result of that, that took the two detectives to the body location of where Mrs. Crane was found.  And that is exception 38.22 -- I think it's (3), but I can't -- you know which one I'm talking about, Judge.  The one that leads to the evidence of the -- fruits of the crime or whatnot.  I may be off on my subsection.  We believe that one is admissible also for all purposes.

That gets us to the statement on February 20th, 2004, which we believe is admissible based on -- I mean, the detective did it right.  She told them that she couldn't talk to them because he had requested a lawyer, or I think it was earlier in the day, if I remember correctly.  But he was the one that persisted in this and Detective Johnson did in fact take his statement. We believe that statement is admissible because that, as the Court has seen, has the required 38.22 warnings that are at the top of the statement.

We believe it is also admissible because, again, at the conclusion of that, Mr. Busby took Detectives Johnson and Carroll to the location off of Highway 121 over on King's Highway where the two crates were recovered that ultimately were discovered to have

Busby - Vol 6

@                                                                    9

come from the trunk of the Nissan.

So for all of those reasons, at least preliminarily, Mr. Shannon and I believe that all of the statements the Court heard yesterday are admissible.

And I presume you don't want me to go into the press conference, at least at this time?

THE COURT:  No.

Mr. Strickland?

MR. STRICKLAND:  Your Honor, I hardly know where to begin.

THE COURT:  Yes.

MR. STRICKLAND:  Your Honor, I have no -- no remarks to say concerning the initial stop itself or the initial search of the car itself.  The Court has heard the evidence and we would rely on the record in that case.

We have no -- we have no further complaint concerning the cursory search of the room under the community caretaking exception which Mr. Miller noted.

We do wish, however, to advise the Court that -- that as we consider the testimony of the people that appeared yesterday on behalf of the State and made further examination of the photographs, which are not yet before the Court, that additional concerns have arisen in the minds of Mr. Gordon and myself concerning the nature of that cursory search.

@                                                                   10

Even though officer -- and I think it was

Busby - Vol 6

Officer Gebeau from Oklahoma City, indicated to the best of his knowledge, and there was a cursory search of the room under the community caretaking exception.

I would tell the Court that there appears to be an inconsistency in some evidence that I anticipate that was brought to the Court that shows that the room has been -- is in a state of disorder.  In the police vernacular, "may have been tossed", that is, searched extensively.  We have yet -- and we can't in good faith say that was not the state of the room at the time the officers entered.  But it certainly gives rise to assume that the scope of that initial so-called cursory search maybe was much more detailed than we initially had been led to believe.  Not that Officer Gebeau would be misinforming us, he may just not be aware of the nature of the search, that cursory search.

Until we are able to determine whether or not, indeed, there was anything of an incriminating nature revealed, whether it was taken from the room or not taken from the room, but revealed during that initial search, we would ask the Court to withhold ruling on the legality of that initial search.

It may well be we are reading something into the photographs that is not there.  But until we have

@                                                                11

had an opportunity to further -- further examine the officers, to do some further investigation of this, I can't tell the Court that -- what our position is going to be on that.

In regard to statement number one, the

Busby - Vol 6

Oklahoma City officer, I think Mr. Miller has met our concerns about that for anything given prior to the time of the earlier warnings which appear on the tape.

With regards to the two FBI statements themselves -- excuse me -- the written statements, we have no further comments to offer.

In regard to the oral statements, Mr. Miller is certainly correct that the federal procedure does allow for the introduction of oral statements.  And I would agree with Mr. Miller that federal procedure would trump Texas procedure under these circumstances.

I think we part company when it is Mr. Miller's position that federal procedure trumps the Texas Constitution, which I think is the basis for the 38.22 exception disallowing oral statements.

So we would object to the introduction of any oral statements under the -- under the theory that although allowable under federal procedure, they are disallowed by virtue of Texas procedure, which in turn stems from the Texas Constitution requirements.

@                                                                    12

As to the -- as to the subsequent -- the first two Fort Worth Police Department statements taken up in Oklahoma City, we have no -- no further comments to address to those.

We do have a concern about -- about the last Fort Worth Police Department oral statement that led to the recovery of the crates.  I think they were described once -- once Mr. Busby was returned to Tarrant County.

Busby - Vol 6

The Court will recall that I believe that those statements were made to Detective Johnson, not only after his return, but actually on February the 20th, 2004. By that time Mr. Busby had been in custody for three weeks. And even though he had not been -- not been physically present in Tarrant County but for about 24 hours at that point, he had been held in Oklahoma City upon a Fort Worth warrant. The nature of the crime was well-known. The Court already has before it some of the publicity which at that time had tapered off, obviously considerably since then, but at that time was extensive publicity.

So the nature of the crime was understood. It likely involved if not a murder/robbery, certainly a murder/kidnapping.

And Mr. Busby -- it was pretty clear, once

@                                                                                                 13

he was apprehended and once the details of the crime began to be known, even prior to the time he was brought back to Tarrant County, was pretty well -- this was going to be charged, if not tried, as a death penalty offense.

Mr. Busby, however, was not appointed counsel. And I think the records of the Court will reflect that counsel was not appointed until actually after he was brought back, after he gave further oral statements to the police, after he gave the press conference, and then and only then, was he appointed counsel.

It would be our concern that by then -- although I know Mr. Busby appreciated being appointed

Busby - Vol 6

counsel, at that point the hole was already dug so deeply that counsel wasn't -- counsel wasn't able to proceed to prevent such things as the oral statement and the giving of the press conference.

So we would object to the last of the oral statements -- the last of the statements to the Fort Worth Police, that is, the oral statement of February 20th, 2004, under the theory that because of the tardiness of the appointment of counsel, Mr. Busby was effectively denied assistance of counsel under the Sixth, Eighth, Fourteenth Amendments of the United States Constitution, as well as Article 1, Section 10 of the Texas

@                                                                14

Constitution, not to mention the very stringent requirements of the Code of Criminal Procedure, which addresses the necessity of appointing counsel as expeditiously as possible, particularly for a case as serious as this one.

So we -- although we have no further comments about the first two written statements, we do vigorously object to the introduction of the oral statement and any fruits secured by virtue of 38.22 exception, that is, by -- as a result of the oral statement that he gave on February the 20th.

Having said all of that, if we could then make sort of a catch-all, if not objection, at least make the Court aware that we would like to specifically reserve the right as to all of these statements that come in, to object to specific -- specific portions if the need arises.

Busby - Vol 6

The statements, for example, may well make reference to -- and it is impossible to tell until we get the context of the other evidence -- may well make reference to the admission of extraneous offenses that we would seek to redact from the statement.  Even though the statement itself comes in, we don't wish to in any way waive our right to continue to object to the untimely introduction of the extraneous offenses.

@                                                                    15

I think that is all we have in regards to the statements, Your Honor.

THE COURT:  All right.

MR. STRICKLAND:  Although we would ask that the Court submit, at the Court's convenience, written Findings of Facts and Conclusions of Law.

THE COURT:  Thank you, Mr. Strickland.

The Court will address all of the issues that have been discussed by both Counsel and your arguments.

I'm not going to belabor on the traffic stop.  The Court also agrees that this was a valid traffic stop concerning the Defendant's improper turn signal and the improper turn.  It seems as if, I think, both sides agree on that.

The fact that the 10-48 NCIC hit that was made the basis of this stop itself to show that the car was a missing car out of Fort Worth and that the owner of the car was a 77-year-old white female, the officer did not see a 77-year-old white female, even though one was, in fact, in the car.

Busby - Vol 6

Likewise, the Court is going to rule that the -- there was a valid search warrant for the car and also that the motel room check of room 111 of the Delux Motel was valid under the community caretaking exception.

Likewise, there was a valid search warrant that was issued after that.

Concerning the statements that were made, the Defendant made approximately six different statements during this whole period of time. His first statement was made to the Oklahoma police officers Garrett and Whitebird. These statements were recorded and videoed. Likewise, they were placed in writing.

When a statement is made under 38.22, of course, it must be shown that the statement was made under the voluntary conditions that, not only were they voluntary, but that they were also freely made without any type of compulsion or persuasion. Also, that the Defendant knowingly, intelligently and voluntarily waived his rights set out in the warning.

I think from the video can be shown that Mr. Busby knowingly, intelligently and voluntarily waived the rights set out in the warrant.

Officer Garrett gave him a waiver and asked him, and read to him, the rights that he was going to be giving up by giving a statement or talking to them.

Mr. Busby, on the video and by discussing it with the officers, decided that he would give them a statement, and it can be shown that he signed it. At no time was it shown that this was done through compulsion or

Busby - Vol 6

persuasion or that he did not knowingly and intelligently understand what was going on.  He, in fact, did understand the warnings that were given and he waived these rights.

As such, the Court believes that this statement was freely and voluntarily made.  I did not see any type of persuasion or compulsion or threats made to Mr. Busby prior to him actually making that statement.

The second statement was, of course, made to FBI, who -- Mr. Busby again was advised of his rights and he voluntarily, freely, without compulsion or persuasion, decided that he would give a statement to the FBI.  And so the Court, likewise, is going to find that this was knowingly, intelligently and voluntarily made by Mr. Busby, without any fear of compulsion or persuasion or threats.  He was not denied food, water or anything of this nature.

The third statement that Mr. Busby made was to Fort Worth police officers Johnson and Carroll, followed by a fourth statement that took place while they were in the police automobile.  And Mr. Busby, likewise, advised both officers that he could take them to the location of the body of Ms. Crane and also discussed with them the possibility of finding Ms. Crane's credit cards along the highway that was close to where the body was located.

@ 18

They, in fact, did find Ms. Crane's body. And as such, Mr. Busby not only voluntarily and freely and

Busby - Vol 6

intelligently and knowingly made these statements, it seems as if he, remorsefully speaking, wanted to help the officers find the body of Ms. Crane.  And the Court believed that he did want the officers to find the body of Ms. Crane and that is why he took them to that location.

However, this also means that he knew, and intelligently understood his rights and waived his rights, in helping them actually find the body of Ms. Crane.

I'm going to find that -- that he was not under any type of compulsion or persuasion when he did this and it was a free statement made under voluntary conditions.

The next statement was made to Detective Johnson after Mr. Busby was brought back to Fort Worth and this concerned the crates that were thrown out of the vehicle here in Fort Worth.  Mr. Busby took the officers to the location to actually find these crates and have them recovered.  Once again, this was done freely and voluntarily by Mr. Busby.  And, once again, I think Mr. Busby was trying to assist and help the officers with the finding of evidence that concerned this case and was not forced to do this, was not compelled to do this.  He voluntarily agreed in this regard.

@                                                                            19

The Court, likewise, is going to find that that statement is admissible.

The final statement that was given was the press conference.  And although we did not get into a total discussion of saying -- other than your remarks, Mr. Strickland -- the Court has been very, very concerned

Page 16

Busby - Vol 6

about that conference.  Mr. Busby had been in custody in Oklahoma City and Mr. Busby was brought back to the jurisdiction of Tarrant County.  And without the appointment of counsel, Mr. Busby did decide that he wanted to make a statement or talk to the press.

The Court is concerned because no one notified the Court that Mr. Busby was even in Tarrant County.  And then the sheriff of this county decided to agree with Mr. Busby and have a press conference without notifying this Court.  And Mr. Busby, for whatever reason, without counsel, decided that he would, in fact, give a press conference.  And I'm concerned about that.

Even though Mr. Busby has given all of these statements before, he should have had someone there to advise him that he was not compelled to give this conference and probably advise him not to give the conference.

As a matter of fact, when the Court found out about it, I, in fact, brought Mr. Busby down and

@                                                                          20


admonished him quite severely that he was not to give any other statements or discussions whatsoever about this until after he was appointed counsel and counsel could advise him.

But be that as it may, I have reviewed both the video portion of the press conference and also the transcript of Mr. Busby's conference.  And, once again, even though I am extremely concerned about it, Mr. Busby seemed at the time to want to air and explain his participation in this event.  I don't see where Mr. Busby

Busby - Vol 6

was forced or compelled to give this press conference. And, quite frankly, I don't even know if anyone could have convinced him not to give the conference because it seems, from this Court, to be that Mr. Busby did want to explain his participation and how he felt about this whole case.

As such, the Court is going to find that all of these statements that were given were made under voluntary conditions; that Mr. Busby freely and voluntarily made the various statements without compulsion or persuasion or force by any of the law enforcement authorities; that Mr. Busby knowingly, intelligently and voluntarily waived his rights set out in the warrant; that when the video recordings were made of the statement, prior to these recordings, the Defendant was given a warning; he freely, knowingly, intelligently and

@                                                                    21

voluntarily waived this; that the recording device was capable of making accurate recordings and had not been altered; that the voices on the recording devices are properly identified, the folks who were there talking, including Mr. Busby; that the lawyers for the Defendant was -- were provided with true, complete and accurate copies of these recordings prior to appearing that was requested within 20 days.

And based upon all of this and above, the Court is going to deny at this time the motion for suppression. I am going allow you to reserve your rights, of course, to object to any of the extraneous offenses that might or might not come forward in the trial of the case.

Page 18

Busby - Vol 6

And that is going to be the Order of the Court.

MR. STRICKLAND:  Your Honor, just for point of clarification, I take it that the Court does not intend to cut off further -- further discussion or objections in regard specifically to the press conference, based on the representations of the State, they don't know if they want to use it or not.

THE COURT:  That is exactly right.

MR. STRICKLAND:  If a problem arises, well, I guess we can address it.

@                                                                    22

THE COURT:  All right.

MR. STRICKLAND:  Your Honor, we object to the Court's rulings for all of the reasons that were set forth in the motion without the necessity of restating those, if that is agreeable with the Court?

THE COURT:  That is so agreeable with the Court, Mr. Strickland.

MR. STRICKLAND:  Thank you.

THE COURT:  There was one other thing I want to take up before we bring in the prospective juror. And that is:  We had a prospective juror -- and I can't recall the number.

MR. MILLER:  23.

THE COURT:  Number 23.

MR. MILLER:  Mr. Maze (sic)?

THE COURT:  Yes.  Who appeared before the Court on crutches.  And I have since received a doctor's statement that he doesn't feel that he could serve as a

Busby - Vol 6

juror because of his medical condition.  I asked both sides to review the jury questionnaire to see if it could be agreed upon by the sides to excuse juror 23.

Did each side have an opportunity to do this?

MR. MILLER:  We don't have a problem with excusing Mr. Maze.

@                                                                    23

MR. STRICKLAND:  Could we perhaps reserve comment until, say, the first recess?  Steve and I have not talked about it.  I think we each reviewed his questionnaire.  We need to discuss it, both between ourselves and our client.

THE COURT:  Very well.  All right. Anything else we need to take up?

MR. STRICKLAND:  Yes, Your Honor, there are a couple of other matters.  One is:  This morning we have filed what we have designated as Defense Motion No. 31, which is a motion to select the death penalty, whereby means of exercising retroacting peremptory strikes.  We have been referring to that in shorthand, I think, as a mini-panel.  There have been discussions, both on and off the record, concerning when we would do this.

But the long and the short of it is, we have this morning filed this motion.  The motion has been signed by Mr. Busby, although it is not sworn to by Mr. Busby.  And I'm prepared to ask Mr. Busby, on the record in open court this morning, to affirm if he agrees with the motion and agrees with the relief that the motion seeks.

Busby - Vol 6

THE COURT:  Very well.

MR. STRICKLAND:  If I may do so.

24

EDWARD LEE BUSBY, JR.,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. STRICKLAND:

Q.   State your name for the Court, sir.

THE COURT:  And Mr. Busby you are still under oath.  I swore you in yesterday.

THE DEFENDANT:  Yes.

Q.   (By Mr. Strickland) State your name for the record, please, sir.

A.   Edward Lee Busby.

Q.   You are the same Edward Lee Busby, Jr. who is the Defendant in this cause of action; is that correct?

A.   Yes.

Q.   You have heard me just describe for the Court what we have filed this morning, what we are calling the mini-panel motion, which somewhat alters the manner in which we would go about selecting the jury in this case.

Do you understand that?

A.   Yes.

Q.   And Steve Gordon and I have spoken with you about there this morning; is that correct?

A.   Yes.

Q.   You understand that -- that we have a right to do it the other way, but as we have explained to you, it

25

Busby - Vol 6

is our opinion, based upon our experience, that this is a means by which it is likely that a better picture of the prospective juror can be gained and that certainly raises the possibility of selecting, for your benefit, a more favorable array.

Do you understand that?

A.   Yes, sir.

Q.   All right.  Do you agree with this motion?

A.   Yes, sir.

Q.   And are you asking this Court to grant this motion?

A.   Yes, sir.

THE COURT:  Very well.  All right.  Any objection from the State?

MR. MILLER:  No, sir.

THE COURT:  All right.  The Court will grant Defendant's motion to Select a Death Penalty Jury by Means of Exercising Retroactive Peremptory Strikes.

MR. STRICKLAND:  All right, Judge.  The second matter, Your Honor, is:  I think both sides have reviewed the jury questionnaires that have been submitted as of last Friday.  It has already become obvious that several jurors have neglected to sign the questionaire attesting to the truthfulness of the information.  That is probably inadvertent.  As the Court knows there is a

@                                                                    26

couple of weird cases out there.  One of the Fort Worth Court of Appeals says, well, it is unsworn, so any

Busby - Vol 6

misrepresentation doesn't mean anything, you can't rely on it. There is another equally strange case out of Court of Criminal Appeals. As I read it, says, well, even though they may be sworn motions, you know, it is really only an adjunct to the voir dire. So, I guess, in abundance of caution, you have to go through the jury questionnaire and ask every question over again, which doesn't make sense to me.

But in light of that, the Defense would ask that the Court individually swear, as they come up to be examined, each and every venireperson as to the truthfulness of the information that is set out in this, so we have as much basis to rely upon these jury questionnaires as possible.

We would further move then that each of the jury questionnaires be included in the record on this, as I know will make the court reporter infinitely happy, but there we have it.

THE COURT: All right. Well, I think one of the benefits of having this panel interviewed individually is that we can, in fact, swear them in and make sure that whatever information that they have given on the questionnaire form is accurate. And so we will

@                                                                27

swear them in individually and we also will keep all of the jury questionnaire forms as you requested.

All right. Anything else?

MR. STRICKLAND: No, I think the process is in place on the mini-panel for those people that qualify up. As I understand, there is going to be two Polaroid

Page 23

Busby - Vol 6

pictures taken.  The jurors' fears will be alayed that those will be kept confidential and destroyed at the conclusion of voir dire, but a Polaroid will be given to each side --

THE COURT:  Very well.

MR. STRICKLAND:  -- to allow us to exercise our strikes.

THE COURT:  That brings up one other thing, though.  There was some discussion yesterday about lesser included and I need to hear from you, both sides, on your positions.

MR. STRICKLAND:  I'm in favor of them, Judge.

MR. SHANNON:  May it please the Court, the State is of the opinion that -- and under the Indictment as framed -- that the standard murder as a lesser included offense of capital murder, which is pretty normally inquired about, would not be appropriate in this case for the reason that the State would represent to the Court

@                                                                          28

that all of the evidence, as developed by the State and which includes numerous statements made by Mr. Busby, indicate that Ms. Crane's death was caused in the State of Oklahoma.  And under the Rodriquez case, out of the Court of Criminal Appeals last October, approximately one year ago, under capital murder, if any one element occurs in Texas, then the entire charge of capital murder can be brought in the State of Texas.

And, of course, I don't think there is any dispute as to the fact that the kidnapping aspect or

Page 24

Busby - Vol 6

robbery aspect, as alleged in both counts of the Indictment, occurred here in Tarrant County and then the lady was transported to Oklahoma, where her death ensued. And it is our position that clearly Texas has the jurisdiction of the capital murder.

However, in the event for some reason that the Defendant were to be not found not guilty of capital murder, then a charge of lesser included of straight murder would not be appropriate because none of the elements of murder would have occurred in the State of Texas and so therefore, the courts of the State of Texas would have no jurisdiction over murder. And if he was to be charged with murder, he would have to be prosecuted in the State of Oklahoma or by federal authorities under the Lindbergh kidnapping law.

@                                                                    29

So what we submit to the Court that in the event the Court agrees that there is absolutely no jurisdictional hook for the courts of the State of Texas on a straight murder, then obviously a charge would not be submitted as a lesser included as you might normally expect.

So in the absence of a charge being submitted, there is no point of voir diring on a murder offense because that matter will not be presented to any of the jurors that are ultimately impaneled in this case.

As far as kidnapping and robbery is concerned, the State has alleged that the capital murder occurred during, one, the course of kidnapping and secondly, in the course of robbery, and both of those

Page 25

Busby - Vol 6

would be felony second degree as alleged.  And we do feel like that it would be a proper -- assuming that the facts develop in the case as we anticipate them to be -- that a charge on kidnapping and/or robbery could possibly be done.  And so in which case a voir dire on robbery and kidnapping range of punishment or the elements thereof, would certainly be appropriate to see if the juror has any bias or prejudice against that aspect of the law that might be submitted to them.

And so we submit that in the absence of some good faith submission by the Defense of any facts

@                                                                    30

that contravene the State's position that the homicide actually occurred in the State of Oklahoma, that murder would be out as a voir dire issue in the Charge, but kidnapping and robbery would be in.  That is the State's position.

THE COURT:  Very well.  Thank you, Mr. Shannon.

Mr. Strickland?

MR. STRICKLAND:  Your Honor, I think that makes for a better law school discourse than it does for a day-to-day discourse in the prosecution of a capital murder case.

I cannot make -- I cannot make a good faith representation, but I'm not sure -- I'm not sure the obligation rests upon me to make a good faith obligation. The burden rests upon the State.

I suspect it is possible.  Again, not making this as a representation, but based upon the facts

Busby - Vol 6

that have thus far been developed.  But I suspect it is possible that to be shown that the death occurred before ever leaving Tarrant County or that the death occurred somewhere in the transit between Tarrant County and the state line between here and Oklahoma.  We won't know for certain until -- until the evidence actually comes before the jury.

@                                                                          31

The difficulty -- the difficulty, frankly, may be as a practical matter, less academic and more practical.  Let's say that we, over our objection, are not allowed to discuss the lesser included offense of murder. We don't qualify this jury up, and let's say that five weeks, six weeks down the road from now that the jury, because of that evidence is developed, is charged on the lesser included offense of murder, it seems to me then what we have done is we have just wasted five or six weeks because we don't have the proper -- because we don't have the proper Charge to qualify the jury.  It would seem to me that discretion is the better part of valor and that we should, in fact, voir dire on that under the abundant precaution simply because the issue may raise its head.

I'm well aware, having done this from both sides, that it becomes a tar pit.  That when we get into lesser included offenses, from time to time, we lose -- we lose people who might otherwise be well qualified State's jurors to the Defendant.  It seems to me that is part of the burden that both sides have to undertake when we select a death penalty jury and we would be well advised to qualify people on the lesser included offenses for the

Busby - Vol 6

next month and a half.

I don't know how it is going to develop.

But then again in all fairness, neither does the State.

@                                                                        32

They know what they expect their evidence to show.  We know what we expect their evidence to show.  As the Court is well aware, what people actually say and how the jury is actually charged depends on factors that are absolutely unforeseen.  I think it would be a mistake.

THE COURT:  All right.  Thank you.

Mr. Shannon, anything further?

MR. SHANNON:  I would say one thing.  The Court has had the opportunity to review the statements of Mr. Busby.  And if the Court will recall -- and I can't recall exactly which statement it was -- but Mr. Busby, himself, stated when these people arrived in Ardmore, Oklahoma, Ms. Crane was still alive and making noise.  And then the next morning, after they had spent night in Ardmore, Oklahoma, he found her dead in the trunk of the car, by his own words proves that the homicide occurred in Oklahoma.

THE COURT:  Well, the only -- the only problem with that, though, is how do we know Mr. Busby is telling the truth?  If I go with that, then I'm going to have to believe everything that he is saying.

MR. SHANNON:  Not necessarily.

THE COURT:  I don't necessarily know whether I could believe everything he is saying through his statements.  A lot of times Defendants will say a lot

@                                                                        33

Busby - Vol 6

of things to make them look good in one respect and
actually it really doesn't make them look good.

MR. SHANNON:  But the point I make is that
by his own statements, he has demonstrated if -- true.
And if he is lying about that, then yes, I see where the
Court is coming from.  But certainly he would have to
recant that statement and alter it.  In which case, it is
conceivable, I guess, that some spin of the Defendant's
mouth could perhaps raise an issue of the lesser included
in the State of Texas.  So perhaps in abundance of caution
maybe we ought to go ahead and voir dire.

THE COURT:  I think we should.

MR. SHANNON:  We are trying to speed it up.

THE COURT:  Right.

MR. SHANNON:  If they insist on it, it is
not a big a deal.

THE COURT:   Right.  I would feel a lot
more comfortable if we had some type of autopsy report
saying how this lady actually died or when she actually
died, if we could get something like that, more so than
going with the Defendant's statement.  I don't think we
can hang our hats on that.

So I'm going to allow it.  In the abundance
of caution, I would rather err on caution.  So I'll allow
that.

@                                                              34

Okay.  Anything else?

MR. STRICKLAND:  Can we take about a
two-minute recess?

Busby - Vol 6

THE COURT:  Very well.  We are in recess.

(Recess from 9:33 a.m. to 9:54 a.m.)

(Judge Phillip Vick presiding)

THE COURT:  Mr. Busby, I need to introduce myself to you.  My name is Phillip Vick.  I'm a retired Judge.  I'm going to be presiding in this proceeding.

I'll call Cause No. 0920589A, the State of Texas versus Edward Lee Busby, Jr.

Is the State present and ready to proceed with the voir dire examination?

MR. MILLER:  We are ready, Your Honor.

THE COURT:  Is the Defense ready?

MR. STRICKLAND:  We are, Your Honor.

THE COURT:  Okay.  I believe we are ready for the first juror.

Everybody agrees that is Mr. Stair?

MR. STRICKLAND:  Yes, sir.

Judge, for purposes of the questionnaires, if we could -- the record could reflect this is Prospective Juror Number 21, who has switched places with Prospective Juror Number 1 who had some medical conditions.

@                                                      35

THE COURT:  Number 20, I think.

MR. STRICKLAND:  Number 20, I'm sorry, for Number One.

(Prospective Juror Enters)

THE COURT:  Come up, Mr. Stair.

If you will have a seat and raise your right hand.

Busby - Vol 6

(Prospective Juror Sworn)

THE COURT: If you will first state your name.

PROSPECTIVE JUROR: Daniel Keith Stair.

THE COURT: Mr. Stair, the first thing I want to ask you: Since I placed you under oath, you filled out a juror questionnaire?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Were those answers true and correct?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: I'll introduce myself. My name is Phillip Vick. I'm the Judge presiding at this proceeding. Judge Salvant will try the case when it proceeds to trial, we think sometime in the first week or so, November 7th, sometime around there. At some point he will be presiding in the trial of the case.

I'll introduce the attorneys. Representing

@                                                              36

the State: Mr. Joe Shannon, Jr., Mr. Greg Miller.

MR. MILLER: Morning, Mr. Stair.

THE COURT: Representing the Defendant is Mr. Jack Strickland.

MR. STRICKLAND: Good morning.

THE COURT: Mr. Steve Gordon.

MR. GORDON: Good morning.

THE COURT: I think they will probably all have some questions for you. We'll give you a chance first.

Is there anything do you think we all ought

Busby - Vol 6

to know about you before we get started?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Okay.  Thank you, sir.

I'll recognize the State.

DANIEL STAIR,

having been first duly sworn to make true answers to questions propounded concerning qualifications and service as a juror, testified as follows:

VOIR DIRE EXAMINATION

BY MR. MILLER:

Q.  Well, Mr. Stair, it has already been a long morning for you.  And I apologize for having you wait outside, but we had some legal issues that we had to take up before we started the hearing.  And you have the

@                                                                    37

dubious distinction of being the first individual that we are going to talk to this morning throughout this process. This is going to take about four or five weeks.

I have some questions that I want to ask you about.  I have some slides that I want to show you, and I'm sure Mr. Strickland and Mr. Gordon have some questions they will have of you.

And having done this a number of times, I'll probably stumble my way through this until I, later on in the week, get more comfortable and see how things shake out.

But let me just ask you this question initially, okay?  You came in, I guess, Thursday originally and came back on Friday and then you found out that this was a trial in which potentially the death

Busby - Vol 6

penalty could be assessed.

When you heard that information, what -- what went through your mind?

A.   It is very serious.

Q.   All right.

A.   So -- being as serious as it is, that everything needs to be done correctly and according to the law, not something to take lightly at all.

Q.   Is this the first time you have been called for jury duty?

@                                                                38

A.   Yes, sir.

Q.   So you sort of started out on the most serious case that you could possibly be called to serve.

A.   Yes, sir.

Q.   I'm going to -- as we go through this this morning, if I ask you something which you do not understand, which I guarantee you I probably will do that, by all means, please stop me, okay?  Because, you know, the questions that I'm asking you or the questions that the Defense lawyers are asking you aren't the important part of this.  The important part is how you feel about these issues, okay?

A.   Yes, sir.

Q.   I'm going to go through some general principles of law and there will be some PowerPoint slides up on the screen and then we are going to sort of shift gears dramatically and we are going to talk about the death penalty.  And believe it or not, I know it is difficult to have to fill out a 25-page questionnaire, but this is

Busby - Vol 6

really going to speed things up.

I guess the good thing for you is you only had to fill out one questionnaire and the bad thing for us is we have got to read them all.  So we'll go through some things here.

This is, of course, the State of Texas vs.

@                                                                    39

Edward Lee Busby.  Let me go through these real quickly.

This is the only time the lawyers can talk to you, okay?  If you get selected on the jury and you end up in the jury box such as this, the lawyers obviously can't talk to you and that is the way it should be.

I know you are probably a little -- I don't know, you might be a little apprehensive about all of this.  There are no right or wrong answers here.  The only thing that we want out of you is how you truly feel about these issues, okay?

If you have a question, ask.  We are going to talk a little bit about the law.  Obviously we are here in private.  You are not here with all of your fellow jury members.  And really the bottom line for the lawyers here in this process is, at the end of visiting with you, can you serve as a fair and impartial juror in this case?  And I think you understand that, okay?

Let's talk a little bit about the Indictment.

A lot of this is information that you already read or you heard Judge Salvant give you in the oral instructions and were also contained in the written instructions.

Busby - Vol 6

Did you have an opportunity to read the written instructions?

40

A.   Yes, sir.

Q.   Okay.  Good.  So most -- a lot of what I'm going to talk about here is stuff that is already in the written -- obviously the Indictment is not any evidence of guilt.  It is what I call the jumping off place in any criminal trial.  We are going to talk a little bit about the elements of the Indictment and that is the only thing that is not -- that we have to prove.  And we never -- and it doesn't make any difference whether it is this case or any type of criminal case that you may be familiar with, the State of Texas never has to prove motive or why a particular individual charged with a crime did what they did, okay?

Do you understand that?

A.   Yes, sir.

Q.   Do you have any problem with that?

A.   No, sir.

Q.   Okay.  Let's talk about what is murder.  Pretty straight forward definition:  Commits a murder if a person intentionally or knowingly causes the death of an individual.

A.   Yes, sir.

Q.   And let me ask you:  Can you see the screen okay from there?

A.   Yes, sir.

41

Busby - Vol 6

Q.   It's a first-degree felony.  What bumps it up to capital murder?  Well, I think if you will recall from Judge Salvant's instructions to you, you have got that same intentional killing, but there has to be an added factor or an added component and we sometimes refer to it as an aggravating factor.

In this case Mr. Shannon and I -- Mr. Shannon and I have alleged there is two aggravating factors; that this murder was committed during the course or continuing course of committing kidnapping or robbery, okay?  Kidnapping and robbery are -- although you probably know what they are anyway, there is a legal definition.

Kidnapping:  A person commits an offense if he intentionally or knowingly abducts another person. Probably sort of comports to what you thought it was before you came in here.

You understand that?

A.   Yes, sir.

Q.   Okay.  It's a felony -- normally it's a felony from two to ten years and a fine up to $10,000.

Robbery, on the other hand, a person commits an offense if, in the course of committing theft and with intent to obtain or maintain control of the property, he, one, intentionally, knowingly or recklessly causes bodily injury to another or, two, threatens or

@                                                                              42


places another in fear of imminent bodily injury or death.

A lot of legal words, but a common sense application.  Does that sort of comport to what robbery

Page 36

Busby - Vol 6

would be to you before --

A.   Yes, sir.

Q.   -- you walked in here?

A.   Yes, sir.

Q.   Okay.  Let's talk a little bit about venue in this case.  And venue is just a legal word which means, where can Judge Salvant or Judge Vick try the case, okay?  That is really what it boils down to.

In a capital murder case, there is two components.  There is obviously the murder part of the Indictment and then there is the aggravating factor which we talked a little bit about in this case.  It is either kidnapping or robbery, okay?

And our law tells us that a case may be prosecuted in the county where any part of the crime occurs.  So for -- in this situation for the Court to have jurisdiction over the case, some part of this capital murder has to have occurred in Tarrant County where, you know, you and I live.

Do you understand that?

A.   Yes, sir.

Q.   Does that make sense to you?

@                                                                    43

A.   Yes, sir.

Q.   And obviously, kidnapping and a robbery, you know, might start off at one location and during the continuing course of the robbery and the kidnapping, it may move out of Tarrant County.  It may move into, you know, counties north of here or wherever, and it can even go across state lines potentially.

Busby - Vol 6

Do you understand how that works?

A.   Yes, sir.

Q.   Do you have any problem with that?

A.   No, sir.

Q.   But we do have to show that some part of the offense, at least initially, happened in Tarrant County.

Are you okay with that?

A.   Yes, sir.

Q.   Okay.  Here's what we alleged in this Indictment:  That it at least started off in Tarrant County, Texas; on or about a certain date, and the date we have alleged here is back in January 30th, 2004; that the Defendant intentionally killed a lady by the name of Laura Crane.  And then we have to prove how he did it, or at least how we think he did it, by covering her mouth and nose with tape, while he was in the course of committing or attempting to commit kidnapping or robbery.

Do you remember those from the oral and

@                                                                    44

written instructions?

A.   Yes.

Q.   Does that make sense to you?

That is what an Indictment is.  And you will see from there, you don't see the word "motive", do you?  Or a sixth one that says "and furthermore we have to" -- and when I say "we", I'm talking about the Prosecutors.  We don't have to prove motive.

Are you okay with that?

A.   Yes, sir.

Q.   Now, oftentimes in a trial the jury will hear

Page 38

Busby - Vol 6

some evidence of motive, but you won't get charged on it, and it is not a burden that Mr. Shannon and I have in this case, okay?

"Presumption of innocence", you have heard of that before, okay?  A pretty important right, okay?  And I describe it as, that is where we start from in any criminal case, not just this one, but when you are charged, you go down to municipal court and fighting a traffic ticket, all the way up to capital murder, the presumption of innocence.  The Defendant is presumed to be innocent.  It is a legal presumption.  It doesn't necessarily mean he is factually innocent.

Do you see how that works?

A.    Yes.

@                                                                      45

Q.    And it is a rebuttable presumption.  What I mean by that is, Mr. Shannon and I will put on evidence in this case that we believe rebuts the presumption of innocence, that does, in fact, show the jury that the Defendant committed this crime, okay?

Do you see how that works?

A.    Yes.

Q.    We always have the burden.  And I'll tell you right now, in a capital -- not only a capital murder trial, but in any criminal trial, nobody over at that table, Mr. Strickland, Mr. Gordon and certainly the Defendant, have any burden whatsoever.  Well, I guess they do.  They have a burden to show up.  But beyond that, they don't have to bring evidence.  They don't have to put on witnesses.  They can do all of those things if they want,

Page 39

Busby - Vol 6

but you understand the burden squarely is at this table right here?

A.   Yes.

Q.   Do you have a problem with that?

A.   No.

Q.   Does that make sense to you?

A.   Yes, sir.

Q.   Okay.  "Beyond a reasonable doubt", you have heard that phrase before.  I will tell you initially that there is no legal definition, and we're going

@                                                                46

to -- especially when we get to special issues, if a word or phrase has a legal definition, then the Judge will instruct the jury as to what that legal definition is. And you are sort of bound by that.

And we have already looked at a couple of terms that have legal definitions.  For instance, kidnapping, robbery, they each have legal definitions. Then the jury would get those.

"Beyond a reasonable doubt", even though it is a term that most everyone is familiar with, it is not defined, okay?  And when it's not defined, then that means you get to attach whatever meaning you want to attach to it as an individual juror, okay?  You get to decide what it means, and not just beyond a reasonable doubt.

And we are going to talk a little bit later about some wording in the special issues that don't have legal definitions.  So any time we are talking about something that doesn't have a legal definition, that that means Daniel Stair gets to decide what it means, okay?

Page 40

Busby - Vol 6

Does that make sense to you?

A.    Yes, sir.

Q.    And of course, juries in this courthouse and throughout the State of Texas use beyond a reasonable doubt every day and are able to reach verdicts. Certainly, it is not an impossible burden.

@                                                                              47

For years this is pretty much how I have explained it to jurors and this may make sense to you, or you may have a different spin on it.

But I have always said it is a two-step approach.  The first one is:  Was a crime, in fact, committed?  Did the prosecutors in that case prove that a crime had been committed, okay?  That is the first inquiry.

And then the second inquiry really was, look, okay, they showed me that a crime was committed, but have they proved to me that the man or woman that they have got on trial for the crime, is that the person who did it, okay?

Does that make sense to you?

A.    Yes, sir.

Q.    Okay.  You may have a completely different way of approaching it.  That is just an example I have used over the years.

Let's talk a little bit about the Defendant:  Absolutely does not have to testify in any criminal case, the right to remain silent, the Fifth Amendment.  You have heard of all of that stuff before. He may testify if he wants to.  It is a personal right

Busby - Vol 6

afforded any -- any Defendant in a criminal case.

Now, quite frankly, it is usually made in

48

conjunction with the advice that his lawyers may give him on that issue, and that is what we want lawyers to do.

Do you see how that works?

A.   Yes, sir.

Q.   We don't know at this stage if he is going to testify, but if he does choose to testify, he is not presumed to be telling the truth.

Now, the presumption of innocence, as important as it is, does not presume him to be telling the truth.  You get to decide and weigh his testimony just like you would do any witness.

You can believe all of the testimony of a particular witness, you can believe some of the testimony of a particular witness, or you can believe absolutely none of the testimony of a particular witness, and that applies to a Defendant, too.

Because the jury -- the big thing that we ask juries to do is you become the judges of the credibility of witnesses, okay?

Do you see how that works?  Would you have any trouble doing that?

A.   No, sir.

Q.   And there might be reasons why a Defendant may not testify.  I mean, a lot of people don't like to talk in public.  He may have consulted with his lawyers.  He

49

Busby - Vol 6

could be guilty, you know.  And if the burden rests at this table, where it does, you know, the lawyers and the Defendant may say, well, you know, I'm going to make Miller and Shannon prove to me beyond a reasonable doubt, that, number one, a crime was committed, and that I'm the one that did it.  And you know what?  We have listened to the testimony and we don't think they have done that.

So in that case a Defendant in a criminal case may be very well served to say, look, I know I have got a right to testify, but I don't think they have met their burden, so I'm not going to do it.

Do you see how that might work?

A.   Yes, sir.

Q.   I mean, whether a Defendant testifies or not, you can't predict at this stage.  The only thing at this stage of the proceeding for you, the inquiry really becomes, would you hold it against a Defendant in a criminal case if he or she did not testify?  Would you do that?  Would you hold it against them?

A.   No, sir, I would not.

Q.   And you would be given that instruction.

There we go.  Let's talk quickly about intent.  "Intent" is one of those words that has a legal definition and there's the legal definition right there.  So just take a look at that for just a moment.

@                                                                    50

And basically, although there is a lot of words there, it comes down to this:  In a capital murder or a murder case, you would have to intend to cause the result, and the result in a murder case is, of course, the

Busby - Vol 6

death of the individual.

Does that make sense to you?

A.    Yes, sir.

Q.    You notice where it says "intent", you don't see the word "premeditation".  A lot of times in murder cases when jurors come in, they think, well, what about premeditation or anything like that.  The intent to kill can be formed very quickly.

Would you agree with that?

A.    Yes, sir.

Q.    I mean, if I am having a disagreement with Mr. Shannon over something and I somehow have gotten into the courthouse with a gun this morning, and I'm sitting here and I'm mad at him, for whatever reason, and I pull the gun out and I say, I'm going to shoot and kill him, and I do that, I can do that as soon as I can pull a gun out and pull the trigger and shoot him.

See how that works?  Any questions about that?

A.    No, sir.

Q.    Punishment options.  Capital murder conviction.

@                                                                         51

Now, this was in your instructions.  If, and only if, the jury finds a Defendant guilty of capital murder, then you proceed to the punishment stage of the trial.  And, of course, we are going to talk more about this later on, but right here at the jumping off point, there is only two options.  Based on how the jury answers the special issues, the Judge can only sentence a person to death by lethal injection or a life sentence.

Busby - Vol 6

And in a capital murder scheme, if it is a life sentence, the jury is allowed to be told that that life sentence equals 40 calendar years before the individual is eligible for parole, okay?

Do you see how that works?

A.   Yes, sir.

Q.   And a life sentence in a capital murder means 40 calendar years.  A life sentence on murder, or a life sentence on either kidnapping or robbery, does not mean 40 calendar years.  It means something else, okay?

Do you see how that works?

A.   Yes, sir.

Q.   And at this stage -- and I -- if I recall Judge Salvant's oral instructions correctly, one of the things that he impressed on the panel was at this stage, we are just looking for people who can keep an open mind about all of these issues that we are going to talk about here

@                                                                      52

today, okay?

In other words, we don't want people who already have a preconceived notion as to how the evidence should turn out or how the punishment would be or anything like that.

Would you agree with me that that is the kind of jurors that we are looking for in this case; people that can keep an open mind, listen to the facts and circumstances in evidence in this case and then and only then make decisions?

A.   Absolutely.

Q.   Does that sound fair to you?

Page 45

Busby - Vol 6

A.    Yes, sir.

Q.    Okay.  Is that the type of juror that -- that you would want on a case if, heaven forbid, you were charged with something or maybe a close friend or co-worker charged with something?

A.    Absolutely.

Q.    That makes fair sense, doesn't it?

A.    Yes, sir.

Q.    And going back to what you said, this is a very serious procedure.  I mean, let's -- I mean, let's make no mistake about it.  So we want people that are going to be fair.  It goes quite a long -- as you said at the very outset, this is very serious and indeed it is.

@                                                                        53

Any questions about these general areas of law?  And I'm sort of flying through these because we have kept you waiting so long out there.

A.    No, sir.

Q.    Any questions at all?

A.    No, sir.

Q.    Okay.  Well, now we are going to switch gears and talk about the death penalty, okay?  And you know from your instructions that -- that the jury just doesn't find somebody guilty and they go back and say, well, life or death.

We ask you as jurors to look at two special issues.  And I'm going to put up here on the screen -- and I think I have also put a piece of paper over there if you want to look at those closer up.

Let's talk about the first one.  Do you

Busby - Vol 6

find beyond a reasonable doubt that there is a probability that a Defendant would commit criminal acts of violence that would constitute a continuing threat to society, okay?

And you'll see that we've -- we subtitled that "future danger" and the reason we do that is the lawyers and the judges that hear these cases oftentimes refer to Special Issue Number One as the future danger question, okay?

@                                                                54

There is a variety of words in there.  We have already talked about "beyond a reasonable doubt", and you know that does not have a legal instruction.  But there is also some other words in there that, likewise, do not have legal definitions, okay?

The first one is "probability".  The second one would be "criminal acts of violence".  And the fourth one is the very last word in the instruction or the question, "society", okay?

Now, let's talk about probability just a little bit.  You are an engineer.  Work out at Lockheed. Even though "probability" is not defined for the jury, we do know that it means more than a mere possibility, okay? You and I -- for instance, maybe I work at Lockheed, too, and we go to some other Lockheed facility for a meeting and we're going to take a plane trip to get there.  And you and I go out to DFW Airport and we get on a plane.  I suppose it is possible that the plane could crash, okay?

Would you agree with that?

A.   Yes, sir.

Busby - Vol 6

Q.   But historically we know that the probability of that event happening is certainly going to be, you know, beyond or something more different than a possibility of a plane crash.

Do you see how that works?

55

A.   Yes, sir.

Q.   The State has to prove that there is a probability that a Defendant in a capital murder case is going to commit acts of violence in the future, is basically sort of a shorthand way of looking at it.

Does that make sense to you?

A.   Yes, sir.

Q.   Do you have any problem with that special issue?

A.   No, sir.

Q.   And let me tell you, as we are visiting here this morning, I'm certainly not going to -- and I don't think Mr. Strickland is going to ask you -- to give you a set of facts and say, okay, Mr. Stair, based on these facts, how are you going to answer Special Issue Number One?  We are not going to do that because that wouldn't be proper.  And it wouldn't be proper for a variety of reasons.  But the most compelling reasons that it wouldn't be proper is you haven't heard any facts or circumstances in this case, have you?

A.   That is correct.

Q.   Okay.  So at this point all the law requires of you is that you keep an open mind.  And again, it's on -- maybe this is -- here we go.  To answer this question, yes -- in other words, we do find that he is

Busby - Vol 6

going to be a future danger, all 12 jurors must agree

56

unanimously.  To answer it no, ten or more jurors must agree.

So at this stage of the proceeding, all that is required of you is to keep an open mind.  Although I won't give you a specific set of facts and neither will Mr.  Strickland, we are going to ask you -- and I'm going to ask you this right now:  Without telling us what a particular set of facts are in the mind of Daniel Stair, can you see that you might find yourself presented with a set of facts and circumstances that would allow you to answer this question either way, just yes or no?

A.    Yes.

Q.    The way the evidence shook out, you know, whether you knew that the punishment -- obviously this is in the punishment stage of a trial.  And although the law contemplates that when you get to the punishment stage of the trial, neither side has to offer any evidence -- in all of the years I have been doing this, that has never occurred.  Almost invariably in the punishment stage of the trial, the jurors are going to get some additional information.  You are going to know more about a Defendant's background, things of that nature.  Has the person been in trouble before?  Have they not been in trouble?  You name it.  In a death penalty case, just about any conceivable type of evidence the jury could

57

Busby - Vol 6

hear.  And that is important because we want the jury to have information as to be able to answer those questions.

Does that sound fair to you?

A.   Yes, sir.

Q.   Does that make sense?

A.   Yes, sir.

Q.   Are you comfortable with that?

A.   Yes, I am.

Q.   So I take it from your answers that you have an open mind to this question, that this question could be answered either way.  The Prosecution either proved it beyond a reasonable doubt to your satisfaction in the event that you would answer it, yes.  Or conversely, you might say, you know, I just don't think the Prosecution has met their burden and I'm going to answer the question, no.

Can you do that?

A.   Yes, sir.

Q.   Keep an open mind about it and just call it as you see it?  Let the chips fall where they may, one way or the other?

A.   Yes, sir.

Q.   And again, Mr. Shannon and I have the burden on that.  The question -- as this slide represents, no burden.  Just keep in your mind, no burden over there at

@                                                                    58


all, okay?

And that is the way it should be, don't you agree?

A.   Absolutely.

Busby - Vol 6

Q.    Any questions about Special Issue Number One?

A.    No, sir.

Q.    Do you understand what it is asking the jury to look at?

A.    Yes, sir.

Q.    Let's move on to number two.  And again, under the Special Issue Number Two, we used -- inserted the word "mitigation" and that is because the lawyers and the judges often refer to this as the mitigation question.

Now, I do need to back up.  If the jury finds that the answer to the Special Issue Number One is no, in other words, we don't find that he is potentially a future danger, that is it.  You stop.  You don't go on to Special Issue Number Two.  It is only if the jury answers Special Issue Number Two, yes, that you consider the second one.  Take a look at the second one just a second.

Do you think you understand what it is asking for here?

A.    Yes, sir.

Q.    Okay.  And over the years I have my own personal description of this question is:  That it's a fail-safe

@                                                                                      59

question.  That because if you have answered Special Issue Number One yes and you're going to Special Issue Number Two, and it gets answered no unanimously by a jury, that a death sentence is going to be imposed.

Do you see how that works?

A.    Yes, sir.

Q.    I think this question is asking the jury, before you answer this question -- because you know that the only

Page 51

Busby - Vol 6

two options are death by lethal injection or life sentence equals 40 calendar years. I think this question is saying to the jury, wait a minute, stop, let's go back and look at the evidence again and see if there is something in the evidence that tells you as an individual juror that, look, yes, this is a bad crime, obviously somebody got killed, usually under pretty bad circumstances. That is terrible. And as terrible as that is, I just don't think that the death penalty is appropriate here. I think that a life sentence is the more appropriate reasoned response to this crime, okay?

Do you see how that works?

A.   Yes, sir.

Q.   How do you feel about that? Does that make sense to you? That we ask the jury to go back and take a second look at everything?

A.   Yes, that makes sense.

@                                                                    60

Q.   Do you think it is the appropriate way to go about it in keeping with what you said at the very beginning, this is very serious?

A.   Yes, this is another fail-safe mechanism. Another look at it.

Q.   And again, I'm not going to ask you for a specific set of facts, but having looked at Special Issue Number Two, can you in your own mind conceive of a set of facts or open to the possibility that there could be a set of facts out there that would allow you to answer that question no, which would mean the death penalty would be imposed? Or conversely, there might be a set of facts and

Busby - Vol 6

circumstances out there that would allow you to answer the question yes, look, I do think there is something mitigating here about the Defendant or his background and I'm going to vote that he not receive the death penalty.

Could you do that?

A.    Yes, sir.

Q.    Are you open to both of those possibilities?

A.    Absolutely.

Q.    Can you promise us that you will be open to both of those possibilities?

A.    Yes, sir.

Q.    Does that sound fair to you?

A.    Yes, sir.

@                                                                                  61

Q.    I think that may be it.  Oh, again to answer no -- in other words, we find no mitigation or no sufficient mitigation, all 12 jurors must agree. Conversely, to answer the question yes, ten or more jurors disagree.

We talked a little bit about the burden of proof on number one.  Who has it on number two?  Neither side.  The law in the State of Texas says on Special Issue Number Two, neither side has the burden.  Now, having said that, having done this a number of times, generally what happens here, when we get to the mitigation part of the trial, is the State brings you the evidence, if they have it, that shows all sort of the bad stuff of the Defendant, so to speak.  And if they want to, the Defense can bring you the good part about a Defendant.

Do you see how that works?  It is just sort

Busby - Vol 6

of common sense.  Does that make sense to you?

A.    Yes, sir.

Q.    Do you have any questions about either of these special issues?

A.    No, sir.

Q.    Are you going to promise us here this morning that if you are selected -- ultimately selected as a juror in this case, that you will just wait, you don't have any preconceived notions as to whether the Defendant is

@                                                                                    62

guilty?  You don't have any preconceived notions there?

A.    No, sir.

Q.    And you don't certainly have any preconceived notions as to how the two special issues should be answered?

A.    Yes.

Q.    Have I stated that correctly?

A.    Yes, sir.

Q.    We talked a little about -- I just -- do you have any questions of me up to this point?  Anything you need clarified or --

A.    No, sir.

Q.    Okay.  There is a couple of things on your questionnaire that I want to ask you about.

When did you get out of the Air Force?

A.    1 September, 1997.  I retired from the Air Force on that date.

Q.    So you retired from the Air Force?

A.    Yes, sir.

Q.    Who is the pastor out at St. John's now?  Do you

Page 54

Busby - Vol 6

know?

A.   We are just new there because we switched over my children from St. Elizabeth, which was Father John.

Q.   Right.

A.   And so we just started our kids there at St.

63

John's.  I don't know his name off the top of my head.

Q.   Do they like that -- do they like going to that new school?

A.   They like it better -- they like it a little bit better than St. Elizabeth.  And financially, it is a little bit better on us.

Q.   Okay.  I think we probably cleared it up.  One of the -- one of the questions of the multitude of questions that we asked, asked you what would you like to know about the crime, and you said, how was the crime committed?  Was it premeditated and motive and stuff like that.  And believe me, we have gotten lots of answers similar to that.

The only thing I want to make sure is, now that we have gone through the discussion as to what the elements of the Indictment are, you understand that Mr. Shannon and I don't have that burden about proving premeditation or proving motive.  You understand -- well --

A.   Yes, sir, I do now.

Q.   -- proving premeditation, the intent to kill can be formed pretty quickly, and we don't have a burden to show what motive is.

A.   Yes, sir.

Page 55

Busby - Vol 6

Q.   Are you okay with that?

64

A.   Yes, sir.

Q.   I have gone through this pretty fast.  I probably didn't make a whole lot of sense along the way.

Do you have any questions or anything about this?

A.   No, sir.

Q.   Do you know anything about this case?  You indicated that you did not.

A.   I do not.

MR. MILLER:  Thank you.  Your Honor, I'll pass Mr. Stair.

THE COURT:  Thank you.  I will recognize the Defense.

MR. STRICKLAND:  Thank you.

VOIR DIRE EXAMINATION

BY MR. STRICKLAND:

Q.   Mr. Stair, my name is Jack Strickland.  Mr. Gordon and I are appointed in this case.

How are we doing so far?  You have been up there for about half an hour.  Do you need a break or any thing?

A.   No, sir.  I am fine.  Let's press on.

Q.   All right.  That is what we are going to do today for too long here before we get through this process.

65

Any questions up to this point?

Busby - Vol 6

A.   No, sir.

Q.   Thanks for filling out the questionnaire. Hopefully it will make this matter move a little more quickly if both sides can take about half an hour.  I think we are doing pretty well.

You got out of the Air Force in 1997 and began work at Lockheed Martin about 2002; is that correct?

A.   Actually, sir, I put down Lockheed Martin as my last job -- is the job I am currently working.  Prior to that I was -- when I got out of the Air Force, I worked for a company called S.A.I.C. working with intelligence systems.  That was in Florida.  That was just for a short time and then I got on with Bell Helicopter.  That is what brought me up here.  I was at Bell Helicopter for three years and now I'm doing the same job that I was doing at Bell Helicopter as a cost analyst, cost engineer at Lockheed Martin.

Q.   Okay.  And that was my question.  I needed to know what was going on.

You retired from the Air Force as a captain; is that correct?

A.   Yes, sir.

Q.   For about 20 years?

A.   Yes, sir, I started out enlisted.  You will see

@                                                                          66


there I had enlisted in the Coast Guard, enlisted in the Air Force as well.  And then I got a commission, went back in the Air Force and finished up as a captain.

Q.   I suspect -- I also suspect that you would agree with me, that the real gist of what we are talking about

Busby - Vol 6

here -- not that everything is not important -- but the real gist of what we are talking about, the thing that distinguishes a prosecution or a case such as this from what you might ordinarily be called upon to come up here and consider is the possibility of the death penalty.

Now, prior to the -- prior to the time that Judge Salvant asked you to consider this matter on last Friday, had you given some thought to your feelings about the death penalty?

A.   Yes, sir.  I've given it thought.  I have been in discussion with colleagues over it.  Sometimes you get into those kind of discussions.  I have given it thought over the years.

Q.   And what generally has been your thought processes about the death penalty?

A.   I have read that statistics show that it is a deterrent.  So in that way I would justify it.  I'm not real comfortable with taking a man's life.  But I think if it is law and it's the law in this state that that is a punishment in certain cases, in certain situations, and it

@                                                                    67

would be a deterrent, then I'm for it.

Q.   The military experience that you have had perhaps provides a good springboard for what I'm about to tell you and that is:  As you are aware, before you joined the military you could believe what you wanted to about -- about rules and regulations and UCMJ and how the military does things.  But once you raised your hand and took the oath, that all sort of went by the wayside.  You were obligated to follow the rules and regulations with the

Busby - Vol 6

Coast Guard and the Air Force.

You would agree with that?

A.   Yes, sir.

Q.   That is not similar to what you find in jury service.  Right now you are entitled to believe whatever you want to about anything in the law.  You believe they are good and bad and think that they ought to be strengthened, think that they ought to be thrown out, but once you take your oath to serve as a juror, if, in fact, you are selected to serve on this case, you have to be willing to set aside those personal feelings, those personal misgivings, if you will, about the law and say, well, that was then, this is now.  Now, I'm obligated to follow that because I am enlisted for the jury, for lack of a better term.

What this process is now is to make sure

@                                                                  68

that you don't have any feelings, either misgivings or strong feelings that would in some manner prevent you or inhibit you from being able to take such an oath and being able to discharge that responsibility.  I take it that makes -- that makes sense?

So we've just got to talk to you about these things and make some judgments as to what we think and hopefully you also make some judgments about what you think.

A.   Yes, sir.

Q.   All right.  Has your feeling about the death penalty in some manner evolved over the years or has it been pretty consistent?

Page 59

Busby - Vol 6

A.    No, I would say it has been consistent.  I haven't really flip-flopped through my life from right to left.  I mean, I have pretty much always been the way I am today.  I think the military of 20 years of that somewhat formed me in my values.  But on the same hand, prior to going into the military, I was raised, you know, a certain way as well.  And it was to follow rules, follow the law, whether it be from my parents or from law officials.  I always try to do the right thing.

So I would say that I have -- again I would reiterate that I haven't flip-flopped the way that I am, the way that I have presented myself in the questionnaire,

@                                                                69

is pretty much the way I have always been.

Q.    Can you recall -- and I'm not particularly interested in specific case names -- but can you recall over the years cases in which you felt that the system failed?  That is, the jury or a Court should have imposed the death penalty, but did not do so based on what you -- the question you gained from news accounts or discussions with other people?

A.    Well, the only thing that comes to mind, which I think I have indicated in the questionnaire, was the O.J. Simpson trial.  And we are at the hills of the tenth anniversary of that trial.  I don't follow trials, you know, every day, every week or monthly, but that particular one was on television every day.  You couldn't get away from it.

Q.    You couldn't get away from it, could you?

A.    And so I think that was one case an individual,

Page 60

Busby - Vol 6

O.J, was let go and I think that was a failure of the jury.

Q.    Well --

A.    But based on the way it was presented, based on what they heard -- I mean, that's -- you got to go by that and that's how it turned out.

Q.    Well, the good news is this ain't California. So the good news is whatever failings or evidence by that

@                                                                          70

trial, I would be the most surprised in the courtroom if those should be repeated here.

Conversely, as you think back on it, do you recall having -- having formed an opinion in which the death penalty was imposed on an individual where you thought, I'm not sure that that is exactly what should happen in this trial?

A.    Well, I have read -- not in great detail, but when I hear where the death penalty was imposed on an individual and then later on they got DNA evidence that proved that that person was not guilty and he was put to death.  I mean, that's disturbing.

Q.    I take it you would agree that the system, like any other human institution, is capable of making mistakes in both directions?

A.    Yes, sir.

Q.    Before it was explained, initially by Judge Salvant and now in greater detail by Mr. Miller here this morning, were you aware of what -- what the law calls the Texas capital murder scheme?  "Scheme" is not a bad word. I mean, that's the word that the courts use to describe

Busby - Vol 6

the procedure by which persons are charged with, tried for and may be sentenced to and ultimately executed for crimes in Texas. Did you know how that -- how that worked before?

@                                                                        71

A. I was somewhat familiar with it. I had civil law in college where we -- that has been over years ago. But we talked at length about individual rights and your right, like in the case like this, where the proof is on the State, just that whole concept that you're innocent until proven guilty. So I have had some courses in that or some training in that and so I haven't seen anything or read anything that is completely knew to me or I'm not familiar with.

Q. What do you think of this procedure whereby we don't ask jurors to impose life or death directly, but we do it in this sort of roundabout manner where we ask them to answer these questions. And depending how they answer the questions, the obligation now falls upon the Court to assess life or death?

How does that sound?

A. I think that is fair.

Q. Do you think that -- would you prefer to see a system where the jury actually -- actually recommends life or death or is this all right?

A. No, I think it is all right the way it is.

Q. Make no mistake about it, though, it would not be fair for us to tell you what your job is and not tell you what the consequences are. And the consequences are, as Mr. Miller indicated to you, if question number one is

Busby - Vol 6

@                                                                    72

answered, yes, unanimously and question number two is answered, no, unanimously, the Court has no choice but to impose the death penalty.  That is required by law.

A.   Yes.

Q.   You understand that?

A.   Yes.

Q.   In regard to some of the questions that the jury questionnaire asked you -- let me explore this a little bit.

You indicated in response to a question about the -- about the frequency of the death penalty or your view of the death penalty, that you believe it is generally appropriate with very few exceptions.

A.   I'm sorry.  Is that how I answered that question?

Q.   Yes.  You had a laundry list and by then you were on page 20 and you were probably starting -- your eyes were probably starting to glaze over on Oklahoma City at that point?

A.   May I recount that?

Q.   Sure.

A.   I mean, my view on questions like that -- I'm indifferent.  I don't have the facts in front of me to say whether the majority of the time it's -- I think it's kind of a question that pigeonholes you one way or another.

@                                                                    73

Q.   Oh, it does.  Absolutely.

Busby - Vol 6

A.   I'm not comfortable with that.  I don't like it. On some things -- I mean, I'm a black and white kind of person on many issues.  But without having data here in front of me that, yeah, this absolutely shows that most of the time it was appropriate and very few times it was not, I would have to answer that question -- I think there is an option there, indifferent, correct?  Am I correct on that?

Q.   Well, yeah, there is actually five choices where it ranges from the death penalty is always appropriate if somebody has been killed, all the way down to with varying degrees down to, it is never appropriate.  I would always be opposed to it in every single case.  Clearly the two extremes and gradations in between that.

A.   Well, I take the middle of the road on that.  I wouldn't want to.

Q.   Middle of the road would be -- it is appropriate in some cases and inappropriate in some cases.  Presumably depending on the facts and circumstances of not only the crime, but the person charged with the crime.

A.   Right.

Q.   Would you agree that that is --

A.   Yes.

Q.   -- it is appropriate to not only consider the

@                                                              74

facts of the crime, but also consider whatever facts, good or bad, may be presented to you concerning the Defendant himself?

A.   Yeah, I would want to hear all of that.  And that is why it is all -- is why these things take so long.

Busby - Vol 6

That will all come out.

Q. Well, you are presumably, like most engineers, you are fact-intensive. The more facts you have, the more you are going to like it.

A. Absolutely.

Q. You also -- you also made the comment -- let's talk about this a little bit. That as a general proposition you may -- you may believe the law is too lenient on criminals.

Can you elaborate on that for us?

A. I recall from courses that I had in college and from what I have seen over the years that there is, it's my perception that there is so much crime now and so few of courts, so few prisons, compared to what crimes are being committed that criminals often get off.

I remember discussions we had in some of my classes on plea bargaining. And it is driven by just the fact that there is just a litigation and being tied up in court and all of the things that are entailed in that, that I just feel if a crime has been committed and there

@                                                                    75

is a punishment for that crime, then that is the way it should go. Not get off on some plea bargain or something and then turn a criminal back out on the street because you didn't have time or you didn't have the facilities to -- or the system to accommodate or to properly handle that case.

Q. Let me --

A. And am I coming across? Do you understand what I'm saying? Do I need to --

Busby - Vol 6

Q.   Sure.  That is not an infrequent concern citizens have about crime and our courts and society.  Let me springboard from that to two -- two areas.

One of the things Mr. Miller told you that is absolutely true was that if a person is found guilty of capital murder, the only two possible penalties are a death sentence.  We know what that is.  Or life imprisonment whereby a person is eligible for parole after serving 40 calendar years.  That is not -- that doesn't mean 40 years, you know, special prison calculation.  That means 40, 365 day, years.  But the possibility exists clearly because a person is parole eligible after 40 years.

Given your feeling about leniency and concern that criminals will be turned back in society, would the possibility of parole after 40 years pre-dispose

@                                                                            76

you in some manner toward the death sentence in order -- in order to prevent the Defendant from being returned to society?

A.   You know, I would consider threat to society in 40 years.  If that individual could be released in 40 years and then -- and then pose a threat to society, then that would certainly be a consideration.

Q.   Any feeling on your part that that would, that that concern, a legitimate concern I might suggest, would impact you -- impact your thinking, your thought processes, in such a manner that you would answer the questions so that the death penalty would be imposed in order to -- in order to avoid that possibility?

Busby - Vol 6

A.   No, I would be able to assess the facts and make a determination and at that point -- and not -- what you're saying is just go ahead and go with the death penalty, that way it just wipes out any probability or possibility of that ever happening?

Q.   Sure.

A.   No, I don't think that would be -- that's not me.  I wouldn't make a decision like that.

Q.   The second question I want to ask you which stems from your concern about that is:  You again evidenced a common concern that perhaps putting somebody in the penitentiary for life for a long period of time

@                                                                    77

unnecessarily burdens the economy, the taxpayers, the social costs that are incumbent upon keeping somebody in that kind of facility for that period of time?

A.   Yeah, I know I put that on the questionnaire.  I thought about that.  I thought about a lot of these questions over the weekend.  And that answer is kind of -- it's not really a good -- I don't -- I'm not so sure I'm real comfortable with that.  Because again, we are talking about a person's life and that's not really even in accordance with the law.  There is nothing in law that says, well, you have got to consider the economic burden.  So that was reinforced with the -- what we were discussing here initially and with the thoughts I have had over -- just in the past couple of days over this.

Q.   We appreciate the fact that you have given us some thoughts over the last couple of days.

             What you are telling us, even though you

Busby - Vol 6

are the very first person we have talked to, all of us have done this on a number of occasions and spoken to a number of people similarly situated and a lot of times people put down what is on the top of their head on Friday and after they mull the seriousness of the matter of your life is over and figured out this is where the rubber meets the road and come back on Monday, they feel like, maybe I'm not so comfortable of saying that or feeling

@                                                                              78

that and I can set it aside if I'm being called upon to do so in a case as serious as this.

A.   Yes, sir.  That's not -- I think a person's way of doing it -- economic burden should have no bearing on it.  And probably if it was all said and done, I would have to see the facts on that as well.  But it probably costs as much to put a person to death as it does to keep them in jail.  So, you know, to make a statement like that without -- again, I wrote that down on the questionnaire, but in court I would want to see -- I need to see some data to back that up.  It's not -- it doesn't make sense.

Q.   And there might be such data presented in a case and it might -- you can't ever prejudge what the evidence would be.  But the data might be quite a shock to you.

We've been talking about -- about the death penalty and certainly that is what -- what this Defendant is charged with.  But as Mr. Miller has also indicated to you, capital murder is composed of, in effect, two offenses that take place within a single transaction.  And it's always possible that a jury might find that one of the offenses was committed and one of the offenses was

Page 68

Busby - Vol 6

not.  It might be possible -- I'm not speaking of this case, but in any case alleging capital murder where the jurors say, well, I'm finding that the person is guilty of the offense of murder -- bless you -- but I'm not -- but I

@                                                                                            79

am not convinced that the second aggravating offense took place, so the jury might well have an option in a capital murder case to find the Defendant guilty of a lesser included offense.  Lesser in that it is a less serious included in that as a constituent part of the offense charged.

Make sense?

A.    Yes, sir, absolutely.

Q.    That depends on the proof and on the instructions that the Court would give you.  But as Mr. Miller pointed out, since this is the only time we have got to talk to you, we have got to talk about it now before it comes to fruition.

A.    No, I completely realize that that's a possibility and that is something that needs to be considered and I don't have any problems with that at all.

Q.    The reason it is important we consider it is this:  Of course, if somebody is found guilty of a lesser included offense, all of these instructions and all this wording about the death penalty goes right out the window.  And then the jury has to consider, as the -- as the assessor of the punishment, what the appropriate penalty is for that offense.

The range of -- the range of punishment for the offense of murder, an intentional killing of another

@                                                                                            80

Page 69

Busby - Vol 6

human being, in Texas is from five to 99 years or life. It is a great, huge range of punishment from relatively -- relatively little to pretty severe. Not death, but still severe.

Do you believe that you are of such a mind, as you sit here now, without knowing any of the facts and circumstances of this case, that based upon -- based upon the law and based upon the facts that might develop, that you would be able to give fair consideration to the entire range of punishment, having found somebody guilty of intentionally killing another person, of as little as five years and as much as life?

A. I would be completely comfortable with that because that is in accordance with the law there.

Q. That is the key.

A. And that's -- that's -- that's what would drive my decisions, is how is it in alignment with what is the law.

Q. And that is exactly what we -- what we hope for. Not always what we get. But it's exactly what we hope for from someone in your position that they are able to -- they are able to keep an open mind. They are not one of these people that I know you have encountered over your lifetime that say, don't bother me with the facts, my mind is made up.

@                                                                          81

A. I don't operate that way.

Q. If the law should charge you -- if the Court

Busby - Vol 6

should charge you that it would be incumbent upon you to consider a range of punishment from five years, 25 years or whatever the minimum that the Court might tell you that the law is, all the way up to the maximum, I take it that you could -- you could do so with an open mind and then make your decision based upon the law and the facts of the case?

A.   Absolutely.  May I say this?

Q.   Yes, sir.

A.   I want to be able to look this man in the eye and tell him that I did my best to give him a fair deal in accordance with the law without bias in any way, shape or form.  It's that simple.

Q.   As you sit here now, do you believe that you have any bias or prejudices converse to this man?

A.   No, I have no bias.

Q.   Based --

A.   No prejudice.  No bias.

Q.   Nothing about the fact that he is charged with capital murder -- and I take it you don't know anything about the allegations of this case?

A.   I don't know anything about the case, no.  I haven't heard anything -- any of the facts.

@                                                                    82

Q.   Let me ask you a question which I have to ask you.  I don't mean to be -- to offend you when I ask you this question.  But does the fact that the client is an African-American cause you any concern, reservations, bias or prejudice in your ability to perform your duties as a fair and impartial juror?

Busby - Vol 6

A.   None whatsoever.  I have had many Black friends over the years.  I don't raise my children that way.  I have Black friends right now.  I mean, I don't see color. I don't.  When I see this man, I don't see color.

Q.   Do you have any concerns about any of the aspects of the law that primarily Judge Salvant or Mr. Miller have discussed with you?

A.   I'm sorry.  Say that again?

Q.   Any reservations or concerns about any aspects of the law that either the Judge or Mr. Miller have discussed with you that would impinge on your service as a fair and impartial juror?

A.   No, I have no reservations about the law or anything that we have discussed.

Q.   Any questions that you would like to ask of me?

A.   No, sir.

Q.   Good.  I have no further questions to ask.  You have been very patient.  We appreciate your candor.  Thank you.

@                                                                83

Pass the witness.

THE COURT:  Okay.  Mr. Stair, I get to talk to you now.  This won't take but a couple of hours.  I'm kidding you.

PROSPECTIVE JUROR:  They probably towed my truck away by now.  That is fine, sir.

THE COURT:  Okay.  Let me tell you what is happening:  You are not on the jury at this time, but you are on the panel that the jury is going to be selected from.  That panel will be brought back at some point, a

Busby - Vol 6

jury will be selected, and either you will be on the jury or an alternate on the jury or released at that time.

We are going to take two pictures of you and we do that because this thing is going to last about a month. And the attorneys will be able to look at the pictures and say, oh, yeah, I remember Mr. Stair. That is why we are doing that. They won't be used for any other purpose.

In the meantime, don't look up information. Don't go back to work and say, hey, what do you know about the case. Don't discuss it with anyone. There may be some publicly in this case in the newspaper or TV. In the meantime, don't watch it. When this is all over, you can do what you want to with it. In the meantime, don't watch it. Don't read it. Don't do anything to seek out

@                                                                  84

information on the case. If you accidentally do walk into somebody talking about it, walk away. I believe that is it.

We'll get a couple of pictures taken of you and let you go home until you are called back, okay? If you change your address or anything, let us know because you will be required to come back one more time to see if you are on the jury.

Thank you, sir.

(Off-the-record discussion)

(Prospective Juror retires)

THE COURT: Are we ready for the next person? Anything we need to change to anything we have done so far?

Busby - Vol 6

MR. SHANNON: We are ready.

THE COURT: Let's make sure we know who the next person is. Number 2, Thommie Pratt, bring him in.

(Prospective Juror enters)

THE COURT: Mr. Pratt, go ahead and have a seat, if you would. After you sit down, if you will raise your right hand.

PROSPECTIVE JUROR: After I sit down?

THE COURT: Yeah, you can.

(Prospective Juror sworn)

THE COURT: If you will state your name.

@                                                                85

PROSPECTIVE JUROR: Thommie Lee Pratt.

THE COURT: Mr. Pratt, let me first ask: You filled out a juror questionnaire the other day?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Were the answers you put on that questionnaire true and correct?

PROSPECTIVE JUROR: Yes.

THE COURT: My name is Phillip Vick. And I'm a retired judge sitting by assignment and I'll be presiding at this proceeding.

Judge Wayne Salvant will try the case and we think that it will start somewhere around November 7th. Somewhere in there.

I'll introduce the attorneys for you first. Representing the State is Mr. Joe Shannon and Mr. Greg Miller. Representing the Defendant is Mr. Jack Strickland and Mr. Steve Gordon.

Before we start, I'll ask if there is

Busby - Vol 6

anything you need to tell us or we should know about you before we do?

PROSPECTIVE JUROR:  I think it is all on the questionnaire.

THE COURT:  Okay.  Then I'll recognize the State.

MR. SHANNON:  Thank you, Your Honor.

@                                                                    86

THOMMIE PRATT,

having been first duly sworn to make true answers to questions touching upon service and qualifications as a juror, testified as follows:

VOIR DIRE EXAMINATION

BY MR. SHANNON:

Q.   Mr. Pratt, as the Court told you, my name is Joe Shannon and I'm an Assistant District Attorney and I work for the elected District Attorney, Tim Curry.  And I have been assigned to prosecute a case called the State of Texas versus Edward Busby.

I'm going to ask you a few questions.  And because of your background in law enforcement, I may go over some material that is somewhat familiar to you.  But I just want to make sure that, from the possibility of you being a prospective juror, that there is not any issues or questions in the law that might be called upon to be applied in this case that you might have any problem or heartburn with, okay?

A.   Okay.

Q.   Feel free to ask any questions.

You indicated, I think, that you have had

Busby - Vol 6

some prior jury service; is that right?

A. Yes, I have.

Q. And you sat, I think, on an assault case?

87

A. Yeah, I believe so.

Q. How long ago was that?

A. I don't know. I think it is -- I'm pretty sure over ten years.

Q. Was it here in Tarrant County?

A. Yes, it was.

Q. Well, you and I share a common experience that I sat on a murder case one time. And I was quite surprised that they picked me, as you might have been quite surprised that they picked you, being in law enforcement.

A. Yes.

Q. But nevertheless, you realize, do you not, that if taken as a juror in any case, what anybody expects is a juror to go into a jury box with his or her mind completely in neutral as to the facts without any preconceived notion.

Can you do that?

A. I can do that.

Q. Okay. It wouldn't cause you any problem? Because you are going to -- I guess it is kind of like on your job if you are called out to investigate some offense at DFW or wherever, you don't go out there with a preconceived notion as to who did it or who didn't?

A. No.

Q. You go out there to find out what the facts are

88

Busby - Vol 6

to see, one, was there a crime committed?  And secondly, see if you can ascertain perhaps who did it?

A.    Exactly.

Q.    And sometimes it is easier and sometimes it is a little more difficult.

Would you agree?

A.    Yes.

Q.    Okay.  Well, it's the same thing being a juror -- excuse me -- in view of the fact that you have had that experience, that is the main thing.

I want to go over a few -- a few concepts and there is no right or wrong answers.  Let me see if I can make my gizmo work here.  And I am putting some of these things up on the board that perhaps will be helpful.

And I'll mention just a couple here that -- as you are perhaps familiar and from your experience with the law enforcement community in the criminal justice system, that this is the only opportunity that lawyers have to talk to possible jurors.  And right now, if we don't find out something about you, we can't find it out later.  And, likewise, if something comes up in the course of this discussion that you feel like perhaps I ought to know or Mr. Strickland or Mr. Gordon ought to know, in the interest of fairness, feel free to tell us right here. Because it is not one of those things where there is any

@                                                                        89

right or wrong and we are certainly not giving a test, okay?

Busby - Vol 6

A.   Okay.

Q.   And by the way, we do appreciate your filling out a rather lengthy questionnaire. And, of course, the reason the questionnaire is so lengthy in this case is because this is the case in which the State is seeking the death penalty.

And would you agree with me that is probably the absolute most serious type of criminal offense in our whole system?

A.   Yes.

Q.   And obviously you see that we want to make sure everything was done as perfectly as we possibly could. So that whatever result is reached, that it will be fair and just for all concerned?

A.   Yes.

Q.   Would you agree with that?

Okay. Now --

MR. STRICKLAND:  Excuse me.

MR. SHANNON:  Oh, I'm sorry. Did you want to swear him on the questions on the questionnaires?

THE COURT:  I think I did.

MR. STRICKLAND:  Did he?

MR. SHANNON:  Jack is asleep.

@                                                          90

THE COURT:  I did. We all agree we did.

MR. SHANNON:  I was just getting on a roll there.

Q.   (By Mr. Shannon) Okay. Let me just mention a couple of things and I know these are some of the things you are familiar with.

Page 78

Busby - Vol 6

How long, by the way, have you been in law enforcement, by the way?

A.   19 years.

Q.   Okay.  You are about to get on permanent, aren't you?

A.   I'm sorry?

Q.   You are about to get on permanent.

How long do you have to go out at DFW before you are eligible for retirement?

A.   Six more. Six more years.

Q.   So it's a 25-year hitch?

A.   Yes.

Q.   An Indictment -- and this is something that everybody does not know, but obviously an Indictment is what brings a felony case to court.

And you are familiar with that?

A.   Yes.

Q.   And the main thing, I think, you know, we need to make sure that all jurors know, and I think you

@                                                                          91

probably do know it, is that an Indictment, in and of itself, is no evidence of the guilt of a Defendant.  You have to prove it by evidence in the Court and you can charge somebody with something and if there is not enough evidence, then they are not obviously going to be convicted, okay?

Likewise again, elements of a crime are the only things that have to be proved.

Have you ever had occasion at DFW to work a homicide investigation?

Busby - Vol 6

A.   I haven't worked one myself, no.

Q.   Okay.  They don't have very many out there, I think.

A.   No.

Q.   But there have been some on occasions.

A.   Yeah, we have had some.

Q.   where things have happened or perhaps somebody turned up deceased in an unusual condition or something like that.

A.   Yeah.

Q.   So it is not something you are particularly experienced at one way or another?

A.   I wasn't in the detective division at the time.

Q.   Well, obviously you don't have to be experienced in it to sit on a jury in a case.  You know that.

@                                                                    92

Now, the main thing I want to mention is that there is a thing in a murder case that the State is not required to prove and that is motive.

Now, you would agree with me, would you not, that as an investigating officer, motive is an element or a fact that you would want to inquire into in a homicide investigation.

Wouldn't you agree?

A.   Yes.

Q.   Who would have a motive to have somebody else killed or do somebody in?

But under the law of murder, murder is the intentional taking of another human life.  That doesn't say that it has to be motivated by certain things.

Page 80

Busby - Vol 6

And a lot of people -- and I don't think you have been subject to this as much, but a lot of people watch Law and Order on television and they think we can do this whole thing in an hour, you know, stuff like that. And they are always talking about motive.

But would you agree with me that there is no requirement, under the law of murder, that a person -- that the State be able to unearth the motive of a Defendant in committing a homicide.

Would you agree with that?

A.   I agree with that.

@                                                                        93

Q.   Okay.  You wouldn't require the State to prove something that the law didn't require, would you?

A.   No.

Q.   Murder:  I'm just going to go fast through these things because you have been waiting a good while.  You are familiar with that, I'm sure.  Intentionally and knowingly cause the death of an individual.  Pretty straightforward.  Not a complicated issue there.

Murder is a first-degree felony.  You are familiar with the felony range, third, first and second.

I'm going to -- capital murder now is a little different animal.  I don't know if that is something that you have ever had occasion in school or whatever, in your training to be familiar with.  But by and large, all it is a murder plus an aggravating factor. And in this particular case the aggravating factor has been alleged to be kidnapping or robbery.  Not necessarily both, but kidnapping or robbery.  So a murder committed in

Busby - Vol 6

the course of kidnapping or a murder committed in the course of a robbery would qualify as a capital murder.

Do you have any problem with that law at all?

A.   No, I don't.

Q.   Do you think it is a justifiable step up from a normal murder if done in certain things?  Or, for

@                                                                    94

instance, the killing of a police officer in the line of duty being capital?  Because police officers risk their lives, put themselves out on the front lines, they get an extra level of protection.  This last session of the Legislature included judges in that, too.  They haven't included prosecutors yet, but we are working on that.

Now, a kidnapping is pretty straightforward.  You commit an offense if you intentionally or knowingly abduct another person.  And a kidnapping -- the penalty for kidnapping is two to ten or a fine up to $10,000.

Robbery, not aggravated robbery, but straight robbery, is also a felony, second, two to ten.  And that is basically, if you are trying to commit theft and intended to take somebody's property, you intentionally, knowingly or recklessly caused bodily injury to another or you intentionally, knowingly or threatened or place another in fear of bodily injury or death.

You have worked with that stuff before, haven't you?

A.   Yes.

Page 82

Busby - Vol 6

Q.   Okay.  Venue:  Now this is something that is a little bit different in a capital case.  That is why I wanted to mention it.  Venue, obviously, is where the

95

crime is committed.  If you work at DFW, you will file cases, I am sure, in Tarrant County sometimes or then in Dallas County sometimes.  Because the airport does straggle the county line.

Now, in a capital murder there are two main parts.  There is murder and the aggravating factor and a case can be prosecuted in a county where any part of the crime occurs.  And, you know, the same is true like with theft, things like that.  Somebody steals property on the Tarrant County side, they run with it over to the Dallas County side, you can file it in any county.

You have run against that before, I guess?

A.   Yes.

Q.   Similar?

A.   Yeah.

Q.   Now, what have we alleged here -- and this is the first time you have indicated that you know exactly what the charge is.  But you did, I think, also perhaps indicate that you might have heard of this case through the media or something of that nature?

A.   The names involved sound vaguely familiar to me.

Q.   I would take it because you say "vaguely" that you have not heard anything that caused you to form an opinion in this matter?

A.   No.

96

Page 83

Busby - Vol 6

Q.   So you have no opinion as to the guilt of the Defendant in this particular case as you sit here today; is that true?

A.   No.

Q.   In this case what we have alleged is:  That in Tarrant County, Texas the Defendant, on or about January 30, 2004, intentionally killed a lady by the name of Laura Crane, and he did that by covering her mouth and nose with tape and we have alleged that he did it while in the course of committing or attempting to commit either kidnapping or robbery, either one qualifies.

You are not -- it doesn't cause you to recall or recollect anything specifically about the case --

A.   No.

Q.   -- now that I have told you what the Indictment says?

A.   No.

Q.   Okay.  Thank you.

Now I'm going to mention the presumption of innocence.  As you are aware, all Defendants are presumed to be innocent.  It doesn't mean that you are.  It is just that you start off with the presumption of innocence.

As a police officer, when you file a case with the prosecuting authorities, I'm sure by this time

@                                                                97

you have formed an opinion as to the guilt of the accused, wouldn't you say, or you wouldn't be filing a case?

A.   Yes.

Busby - Vol 6

Q.   In other words, you wouldn't file a case on somebody you didn't think was guilty and if you come to the conclusion, based on what you have found in your investigation that a person is guilty, that is your belief and you represent that to the prosecuting authorities and you give them the paperwork and the facts or whatever you have unearthed.

Now, would you agree with me that merely because a police officer might believe that somebody is guilty, that doesn't mean that when we get to court, we start off with the police officer's opinion.

Wouldn't you agree with that?

A.   I agree with that.

Q.   And we start off with the fact that there is a presumption, in fact, that the -- the contrary is true. That he or she is not guilty, okay?

A.   All right.

Q.   All right.  Now, while we are on the subject of police officers, it may well be that if you were taken as a juror in this case that there will be testimony from police officers.  And I can safely represent to you that there will be and not only from this area, but perhaps

@

98

from other areas.  And would you agree with me that if you were listening to the testimony of a police officer, that you would judge that person's testimony by the same standards as you would judge any other citizen's testimony:  Believe all of it, believe part of it, believe none of it, believe a little piece here, maybe discount a little piece there.

Busby - Vol 6

Would you agree that you could apply your investigative training and experience to weigh the credibility of what a police officer sees?

A.    That is correct.

Q.    Have you ever had occasion to go out in an investigation and perhaps the officer who made the initial report or something, you get out there and you find out it really wasn't quite like that?

A.    Yeah.

Q.    And it works a little differently?

A.    Yeah.

Q.    And not because of anybody's intent to do anything wrong, it is just that things don't always shake out the way they appear.

Would you agree?

A.    Yes.

Q.    And if you were taken as a juror in this case, would you be willing to listen to the testimony of a

@                                                                99

police officer and a citizen, a non -- a civilian, for a better word, and judge their testimony the same way based upon your background and experience in judging whether anybody is telling you the truth or whether the guy at the car lot is telling you that is the best price he can give you for the car?

A.    Yeah.

Q.    Would you agree -- you can judge that by basic experience?

Okay.  But any way, the Defendant is presumed to be innocent and that is a rebuttable

Page 86

Busby - Vol 6

presumption and it is a presumption that the State is obligated to overcome.  And it is overcome by the evidence that is presented in court, much of which has been perhaps brought to us by officers such as yourself, okay?

Now, when you sat as a juror in an assault case, did you make the State prove that the person was guilty of the assault?

A.   Yes.

Q.   And you don't have any hesitation about finding somebody guilty if the State proves it beyond a reasonable doubt?  Or you don't have any hesitation about proving -- finding somebody innocent if the State didn't prove it to your satisfaction beyond a reasonable doubt?

A.   No.

@                                                                100


Q.   You could go either way?

A.   Yeah.

Q.   Good.

"Beyond a reasonable doubt" is not a term that is defined in law.  We rely upon each individual citizen to use reasonable doubt in their own mind.  It is a concept that we use every day in our lives.  You make a lot of decisions every day, and so do I, based upon things that you know to be true beyond a reasonable doubt, although you might not personally have witnessed it.

If a guy walks in the back room back here with his raincoat on and water is dripping off of him and you are hearing some thunder while we are sitting here talking, you would probably conclude beyond a reasonable doubt it is raining outside, wouldn't you?

Page 87

Busby - Vol 6

A.   Yeah.

Q.   So would I.  And it is not a foreign term or concept, even though it is not defined.

Now, I'll kind of flip through these here real quickly.

And Mr. Miller likes this.  So I'm going to use it and make him feel good.

A two-step approach.  Was a crime committed?  And did the Defendant do it beyond a reasonable doubt?  Is that -- all of that concept work

@                                                                    101

well in your mind?

A.   That works well with me.

Q.   Okay.  Thank you.

Mr. Miller used to be a police officer, too, so he understands how all of that works.  I don't.

All right.  The Defendant -- you mentioned in there that you didn't have a problem with the law that requires a Defendant -- or does not require a Defendant to testify.  And that is okay with you.  And you do understand that he has got these rights under the Constitution, the Fifth Amendment, not to say anything.

A.   Yeah, that is right.

Q.   And the State has got the burden of proof.  Whether he talks or not -- as a matter of fact, when you arrest an individual, that is one of the things you tell them, they don't have to talk, right up front, right?

A.   Yes.

Q.   And you respect that.  If they choose not to do it, that is fine.

Page 88

Busby - Vol 6

He may testify if he wants to and obviously all jurors are expected to wait and judge what a Defendant says based upon their basic common experiences in judging his credibility.  What does he have to gain?  What does he have to lose?  How good an opportunity does a witness have to see anything?  That sort of thing.  So you judge the

@
102

Defendant by the same standards you do anybody else.  He gets no breaks, but he doesn't take a disadvantage if he does choose to testify.  You listen to him and you judge what he says.

And we don't know if he is going to testify or not.  We have no way of knowing it.  That that is his call.  And a lot of times, quite frankly, those calls are made by the lawyer and that is just the way our system works.

Now, there is no presumption that he is telling the truth just because he takes an oath.  And unfortunately, as you may know, there are people in our community out there that think that there is no lying goes on in the courthouse.  And you kind of smile because there is probably more lying goes on here than anywhere else in town.  And the lightening bolts don't come down and strike anybody if they are telling a falsehood.

Now, why a Defendant may not testify, that is his call.  He may be a person who is not very articulate and his lawyers feel like that he won't be able to say what it is he wants to say in a convincing manner, so they may advise him not to testify.  It might be that he doesn't want to have the State ask him any questions

Busby - Vol 6

because he can get cross-examined like any other witness. You see all of these reasons are fine.

@                                                                                    103

You don't have a problem with giving him the benefit and right not to decide, do you?

A.   No.

Q.   And you also have to agree to be a juror in a case, that you can't hold it against him if he doesn't testify.  That is not taken as any evidence of guilt.

Can you live with that?

A.   Yeah.

Q.   Good.  Okay.  Under our law of intent, you are familiar with this section of the Penal Code that basically to be intentional, you have to have the conscious result or conscious objective to engage.  In other words, intent is just a legal definition that we work with a lot.

Now, one thing I do want to mention in a homicide matter, that the intent to kill can be formed in an instant.  It doesn't have to be premeditated.  A lot of people, particularly lay people, say, well, was it a premeditated crime.

Now, a homicide can be premeditated, but it doesn't have to be.

Can you live with that?  Does that cause you any problem?

A.   I agree with that.

Q.   In other words, the intent to kill can be formed

@                                                                                    104

Busby - Vol 6

in a blink of an eye or as long as it takes you to pull a weapon, if that was your motive?

A.   Yeah.

Q.   Okay.  In our case here we have got certain options of punishment in a capital murder conviction and this is something that I kind of need to make sure that you feel comfortable with.

What happens is, there is two possible punishments if a person is convicted.  It is death by lethal injection or a life sentence, which indicates or means that a person must serve 40 calendar years before they are eligible for parole.  It doesn't mean they will be paroled in 40 years.  It just means that before the Board of Pardon and Paroles can consider them as such, that that will be -- they will have to do that much time in a capital case.

Now, the law requires that you consider all possible ranges of punishment.  I'm going to ask you about a couple more here in a minute.  But to be a fair and impartial juror in any case, a person has to be able to, at least, be willing to consider evidence which works for the low end of the scale or works for the high end of the scale.  And you are familiar with -- that is why we have large ranges of punishment in non-capital cases is because the facts may or may not justify a smaller sentence or the

@                                                                                        105

facts might justify a larger sentence.

Could you consider the full range of punishment, for instance, in -- let's say in a murder

Page 91

Busby - Vol 6

case, punishment for murder is five to 99 or life on felony one. Would you be willing to listen to the evidence and if you are called upon to ever assess punishment in a murder case, not a capital murder, but in a murder case, that you would be willing to listen to evidence that works for the low end? You would be willing to hear and listen to evidence that works towards the high end?

A. Yes.

Q. Could you do that?

A. Yes.

Q. Okay. Would you agree with me that that is the reason why we have a wide range of punishment because these things don't all happen alike and there is sometimes reasons why people do things that might not make them innocent or might make them not guilty, but it darn well kind of works in their favor.

Would you agree with that?

A. Yeah.

Q. Okay. Now, in a capital case the way the law is structured, let's suppose a jury finds a Defendant guilty of capital murder, then as you know, we have a punishment

@                                                                106

stage of the trial.

By the way, you indicated in your sheet that in that assault case you served, that a person was found guilty. Did you assess punishment in that matter or was that done by the Judge?

A. That was done by the Judge.

Q. Okay. So you didn't have to sit in a second

Busby - Vol 6

part of a trial?

A.   No.

Q.   All right.  In a capital case it always goes to the jury once a person is convicted of capital murder. And here is what we do:  We have two what are called special issue questions.  The first one we kind of call a future danger issue.  And here is the way that works:  The question is asking the jury -- and obviously you are to consider all of the evidence you have heard at the guilt phase and any other evidence that is put on at the punishment phase, everything you have heard.  The first question is:  Do you find beyond a reasonable doubt that there is a probability -- it doesn't mean a certainty -- but a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society, okay?

And, of course, society could be a prison society.  It could be a society of folks gathered in the

@                                                                107

park or any kind of a society.  That is the first question.

Now, in a capital punishment trial, in all probability, both sides will put on some evidence.  And in order for this question to be answered yes, all 12 jurors have to agree that a yes answer is appropriate under the evidence, okay?

Now, in order to answer no, there must be at least ten or more jurors saying the answer should be no.  That is the way our system works.

Does that sound okay to you so far?

Busby - Vol 6

A.    Yes.

Q.    All right.  That is not something that you are particularly unfamiliar with yet, is it?

A.    No.

Q.    Now, there is a second ---well, first of all, I mention this:  Who has the burden of proof on Special Issue Number One to prove there is a probability that the Defendant would commit future acts of violence?  The answer to that question is, just like everything else, the State of Texas has the burden to prove beyond a reasonable doubt that the answer is number one.  If you have a reasonable doubt of it, then obviously you would find the State had not met its burden of proof and the answer would be no.

@

108

Now, they have no burden at all.  They can sit -- they don't have to offer any evidence, just like in the guilt phase.  The Defendant never has to put on any evidence at all and that's just like everything else.

Now, we have another special issue or another question.  We call it our mitigation issue.  And the way this works, and it's pretty lengthy, so I'm going to put it up here on the board and let you look at it because sometimes you can pick it up better than listening to me.

Basically, Mr. Pratt, what that question asks the jury is:  When you consider all of the evidence, which includes the offense, any evidence you have heard about his background, his character, anything that anybody wants to tell you -- and in a capital case there is just

Page 94

Busby - Vol 6

almost all evidence comes in.  Because the reason for that is because the jury needs as much information as they possibly can get before they have to make a very serious decision, okay?  Would you agree with me that that -- that you would want --

A.   Yes.

Q.   -- as much evidence as possible before being called upon to vote, okay?

Now, what happens is -- it's really kind of a fail-safe position -- is after you have found a

@                                                                109

Defendant guilty of capital murder and after you have said that -- and by the way, you don't ever get to this second question.  If the answer to the first one is no, that there is not a probability that they commit future acts of violence, you don't get to number two.  But if you say yes -- and this is kind of a fail-safe, let's take one more look at this.  Is there anything that mitigates against a death sentence that basically says it would be more appropriate for a life sentence of 40 calendar years to be imposed.

Do you see what I'm saying?  That is how it works.  You look -- you take one last look at it.

Now, the way this one works is a little bit different.  If you say no, there are no mitigating factors, you have got to have 12 people again saying, no.  However, if you answer the question, yes, and you have got to have ten or more people to agree.

And what happens next is, if the first issue is answered yes, and the second mitigation issue is

Busby - Vol 6

answered no, all by a unanimous jury, then a death sentence is imposed.

Do you follow the scheme so far?

A.   Yes.

Q.   All right.  Is there any part of that that causes you any personal heartburn or concern if you were

@                                                                    110

taken as a juror to sit in a case and to sit in judgment upon a person that could mean a person's life could be taken by the State?  Could you do that?

A.   Yeah.  I could do that.

Q.   The burden of proof:  You might think the State has the burden on number two or the Defense does because it is mitigation, but the truth is neither side has a burden.  It is purely an issue that is submitted to the jury and nobody has to prove anything.  You weigh all of the facts in the principal one more time, okay?

Now, we have got a couple of other possibilities of punishment that might come out.  Let's suppose we are in a situation where the jury believes that maybe a murder was committed but, for instance, maybe there was not a kidnapping or maybe there was not a robbery, for whatever reason, then we get into an area called "lesser included offenses".

Have you ever had experience with lesser included offenses?

A.   Yes.

Q.   All right.  Well, murder is a lesser included offense of capital murder.  Because if you find that certain elements don't exist, then you drop down to the

Busby - Vol 6

next available charge which would be murder.

And I mentioned this to you briefly a while

111

ago, about murder being five to 99 or life, plus a $10,000 fine, and under certain circumstances, it's a possibility that maybe the penalty is 15 to 99 and a $10,000 fine or even maybe 25 to 99, depending on the evidence. Now, that is what we call a range of punishment.

Do you feel like if you were taken as a juror in a case and it ever came to the jury to decide a punishment for murder, not capital murder, but murder, do you feel like that you could keep an open mind and consider the full range of punishment until you have heard the evidence?

And that doesn't mean that you can't be forming opinions while the evidence comes in because obviously you will. Nobody could -- nobody could not do that. But at the end of everything you are still willing to say, all right, as I sit in the jury box and as I take my oath, I'm willing to consider the full range of punishment. Now, when I get to the end of this, I may decide, you know, this person needs life. I may decide this person needs 50 years. I may decide this person needs 25 or maybe five years depending on the facts of the case.

Could you do that?

A.   Yeah.

Q.   Okay. All right. Because of your -- your

112

Busby - Vol 6

background in law enforcement, there may be a perception among some that a person in law enforcement could not be a fair and impartial juror in a criminal case because of the natural tendency toward law enforcement.  Do you see what I'm saying?

And you probably know some police officers that you wouldn't take on a jury if you were on trial. Wouldn't you agree?

A.   I probably come across a few.

Q.   Sure.  And most of them are objective.  As a matter of fact, I noticed that you put down on your questionnaire that you believe that by and large police officers and people in the criminal justice system are honest and try to do a good job.

Now -- but is there anything in your background or your feelings or your belief, as you sit here now, that if you were on trial that you would not want a person such as you taken on the jury?  Anything you could tell us?

A.   Nothing in my background, no.

Q.   Or your feelings or in your heart?

A.   No.

Q.   So you can tell us all now that you could look the Defendant in the eye and call them like you see them. If it is a ball, it is a ball.  If it is a strike, it is a

@                                                             113

strike.  Fair enough?

A.   Yes.

Q.   Good.  Listen, Mr. Pratt, I appreciate you being so patient and taking your time to come up here and visit

Busby - Vol 6

with us.

At this time I'll pass the witness.

THE COURT:  I'll recognize the Defense.

MR. STRICKLAND:  Thank you, Judge.

VOIR DIRE EXAMINATION

BY MR. STRICKLAND

Q.  Mr. Pratt, let's just kind of pick up where Joe Shannon just left off.  This whole process -- and maybe they told you this the first time you served on a jury.  This whole process really depends upon you looking within yourself, sharing your thoughts, your feelings, reservations, if any, about your role in this whole process with us so that we can make some informed judgments as to whether or not we would be comfortable having you on the jury.  We don't get to make the decision ourselves.  The State gets to make the same decision on the case.  Because clearly both sides, even though they are adversaries in the process, we have different goals.  Both sides nonetheless are wetted to the proposition that we have got to have fair and impartial people serve on the jury.

@                                                              114

We can have you fill out questionnaires. We can read those questionnaires.  We can ask you questions.  But your common sense tells you that it all ultimately comes down to how candid you can be with us and how insightful you can be about yourself.  It is always important on a jury, I guess, over in a traffic ticket, a jury is important.  But as you can well imagine, all of us feel pretty heavily, pretty -- pretty seriously about the

Busby - Vol 6

responsibility that is imposed upon us in a death penalty case. Certainly, I know the State does.

A. Yeah.

Q. They have devoted a tremendous amount of time preparing for this. Steve Gordon and I feel like we also have a heavy responsibility. We have been appointed by the Court to help Mr. Busby to get the maximum extent we can under the law. So when I ask you these questions, it is not meant as any sort of attempt to argue with you, to talk you into something or out of something or to quibble with any decisions you might make. It is simply to enable us to do the same job that you would want us to do for anybody that you would care about charged with a crime.

Any concern about your career as a police officer and being called upon to serve on a jury such as this?

Here is the reason I ask you this: I think

@                                                                115

a great number, not all of them by any means, but the overwhelming majority of witnesses in this case, certainly in the first stage of this trial -- I don't know whether we'll get to the second stage -- but the first stage of the trial, the overwhelming majority, I think, are going to be police officers. There are going to be Oklahoma police officers, I would anticipate, Fort Worth police officers, FBI, medical examiners, folks -- people who have done some criminalistic testing, people who gathered the evidence. And most of them are going to be people who, if they don't do exactly what you do, are pretty darn close.

And you are going to be called upon to

Busby - Vol 6

listen to them and judge their credibility and maybe be called upon to say, well, I'm not quite certain I absolutely believe what the person is saying. Not necessarily that they are lying, but I don't think they are accurate or I don't think they did their job, whatever the case may be. I can't put full faith in them. And that may put you in somewhat of an awkward possession to go back to work with your fellow police officers.

If you find yourself in that position, what do you think about that?

A.  I don't necessarily believe that to be so. You know, I feel like I perform my job. We do that every day in every decision we make because, I mean, that is part of

@
116

what I feel our responsibility is, is to analyze every aspect of a crime, be it something traffic related to what you guys are doing capital murder wise. But, you know, the thing is you want to get the facts of the case out and you want to get them out in the most truest form you want. So you are going to analyze that information, regardless of where it comes from and how it is going to affect the case, the outcome, you know, and all of that.

Q.  Carrying that idea forward from the first stage to the second stage, it might well be in a case that even though the evidence of a person's guilt is proven beyond a reasonable doubt, the fact is it is overwhelming. The jury doesn't have the slightest problem finding somebody guilty.

At the second stage of the trial, you and your fellow jurors might feel that the evidence is not

Busby - Vol 6

supporting of the death penalty, for whatever reason.
Something that the State failed to prove or something that
just convinced you on that mitigation issue number two
that the death penalty was not an appropriate penalty.

            Do you believe if you were called to serve
as a juror in a case and, in fact, having found somebody
guilty of capital murder, but returned a sentence that
resulted in a verdict that resulted in a life sentence
rather than a death sentence, that would put you in any

@                                                      117

sort of awkward position with fellow officers when you
went back to your work?

    A.   You are asking me if that would?  No.  I feel
like I'm judged by -- I have been like -- that I'm judged
by a higher being and a higher plain.  That is where I go
to.  That doesn't bother me.

    Q.   Well, I think the Court would tell you, and I
suspect you will agree with this, although you may not
have thought of it in these terms, when you take an oath
to follow the law and render a true verdict, you are
following that oath and following the law when you find a
person not guilty, if that is what you find, as well as
guilty or if you sentence a person to life versus death,
if that is what you do.

            In other words, the oath doesn't require
that you just do one thing.  The oath requires that you do
whatever the facts and the law require you to do.

            Do you have any disagreement?

    A.   I understand that.  I agree with that.

    Q.   And you think you could do that?

Busby - Vol 6

A.    Yeah.

Q.    Irrespective of your job as a police officer?

A.    Yes.

Q.    Let's explore this issue of whether you know something about the case.  I don't want to give you a lot

@                                                                118

more facts to the point that if you didn't know something about it, then you do by the time I get finished.  But let me -- let me go a little bit further and you tell me if there is something that jogs your memory.  I think Mr. Shannon has gone over with you the allegations in the Indictment, what the State intends to prove in this case.

I think you expressed some concern that you might recognize the name Edward Lee Busby, Jr. or Laura Lee Crane; is that correct?

A.    That is correct.

Q.    If, in fact, the facts demonstrated, or at least the allegations made by the State, that Ms. Crane was an elderly lady who was abducted against her will, ultimately taken to Oklahoma where her body was ultimately found, anything about just that bare bones rendition that causes you to remember this case?

A.    That's what -- I remember that in the news and so forth.  Not like we talked about it on the job.  That is what I thought this case was about when I saw the names.

Q.    Do you recall any particular news accounts other than what I have just -- just recited for you?

A.    Seems like it -- from what I recall of this, if this is the one I'm thinking about, seems like there was a

Busby - Vol 6

female involved, also.

@
119

Q.   As a co-Defendant?

A.   Exactly.

Q.   Anything else?

A.   No.  What was in the news wasn't a whole lot.

Q.   Certainly you did not take part in the investigation of the case?

A.   No.

Q.   And to the best of your knowledge and belief, you do not know any of the officers that took part?

A.   I wouldn't have any idea whether I know them or not.  No, not at this point.

Q.   If it should develop during the course of the trial that an officer is called to the stand and you say, oh, my gosh, that is the Detective Johnson from the Fort Worth homicide and I do know her, would you be able to do two separate things:  Number one, will you be able to set aside that factor and just listen to that testimony and judge that witness just as you would any other witness that perhaps you did not know?

A.   Yes.

Q.   And number two, would you be able to -- would you be able to keep the fact to yourself and not go back to the jury room and say, oh, I know Detective Johnson, let me tell you, she is a good officer and you can take whatever she says to the bank?

@
120

Busby - Vol 6

A.   No, I wouldn't try to influence the jurors with -- if I have any hardship, of course, I know I can contact the Court.  I wouldn't do that.

Q.   Well, the reason for that provision, of course, all the sudden you would go from being a juror, in effect, to being a character witness for Detective Johnson if you were to tell the jury that and that would amount to unsworn testimony and not be appropriate.

So I take it that you could follow whatever the instructions the Court would give you in that regard should the occasion arise?

A.   That is correct.

Q.   Maybe the best thing to do would be to advise the Court, by whatever means the Court requires, by the way, Judge, I do know this person, and I'm quite confident the Court would give you instructions.

Could you follow that?

A.   Yeah.

Q.   Let's get right to the heart of the matter here and that is talking about the death penalty.  I think you indicated that on your jury question there -- that perhaps at one point in your life presumably -- I guess it would have to be when you are young?

A.   Getting older all the time.

Q.   You were younger yesterday, weren't you?

121

A.   Yeah.

Q.   Sometimes I feel like I'm older today than I will be tomorrow, but younger days I presume you had a different belief about the death penalty.  Tell me a

Busby - Vol 6

little bit about that.

A.   I think early on I did not believe in the death penalty at all, you know.  And I think over the time, I don't know if it is experience alone or other things, but, you know, I do believe that there is situations, for instance, where the death penalty is appropriate now.

Q.   Would you -- would you describe your earlier belief that perhaps the death penalty was -- you were not in favor of the death penalty being religious in nature or philosophical in nature or just because you were 20 years old and maybe felt differently about a lot of social issues?

A.   Probably some of all of that.

Q.   Any particular event that you can point to that perhaps triggered your change in belief?

A.   No.

Q.   As you think back over the years, can you think of a -- you don't have to share what that case would be with me unless you want to.  I guess any particular case in which you felt that perhaps somebody was tried, deserved the death penalty, but did not receive the death

@
122

penalty?  Should have been and that there was somewhat of a miscarriage by virtue of the fact that the death penalty was not imposed?

A.   I guess not.  I'm not coming up on anything offhand.  Nothing that just, you know, sticks in my mind, no.

Q.   What were your feelings when you heard -- who is this fellow up in this Ohio, this BTK fellow that had 20

Busby - Vol 6

years or so of killing and torturing people and it looks like he got out of it.

Do you have any feeling about that?

A.   Well, that's -- it was -- what was his rendering?  His sentencing?  I don't quite remember.

Q.   I think -- I think about as many life sentences stacked on one another as you could get, is my understanding of it.

A.   That is right.  It was.  You know, I guess so many cases that come about, I can't say that I had formulated an opinion one way or the other because, one, I wasn't serving on it and, two, I guess it wasn't up to me, you know, as far removed from where we were.  I guess, I have to search my inner being, you know, now to see whether or not the death penalty is something that I would say for sure, yeah, I think that is what he deserved.

Q.   I think you raised a good point by your answer

@                                                              123

and that is, although our gut reaction might be on a case, I have got a poster child for the death penalty, I have no idea what the basis was for him not receiving a decision clearly made by a judge and by prosecutors and by the people whom were conversant with the facts and so there may be all kinds of reasons that were justified or not justified.

Would you agree with that?

A.   Yeah.

Q.   Would you have somewhat similar feelings or answer about somebody that perhaps you heard about over the years that received the death penalty that you did not

Busby - Vol 6

think was justified, from what you knew, in receiving the death penalty?

A.   My answer is probably going to be the same as the other.  I mean, I guess -- one, I guess I don't -- far removed from it -- and, of course, I hear about cases and, you know, during training and so forth you read about different things and so forth.  It gives you a little more closeness to the case, I guess.  But when you are not involved, you know, you don't know all of the particulars and all of the circumstances around it.  I guess, you know, before I formulate my opinion at that particular time, there is nothing I will necessarily beat myself down about.  In this profession you see people get away with

@                                                                124

crimes all the time and you see people that are victims of things, maybe you would not have even tried, you know, no small circumstances.  So you go to where you want.  To be judge and jury of all of those things, this career is going to be real hard.  So I guess that is the reason why I am like I am.

Q.   Well, I bet you are like almost everybody in this courtroom and that is that probably none of us that even follow these cases with a lot of interest or watch these television shows, fictional or otherwise, with a lot of interest because frankly we see quite a enough of it at work.  We just as soon not be involved with it for entertainment or any other reason and be away from it.

A.   It's not like I go home and it is still heavy in my mind.

Q.   You indicated, I think, in regards to the

Busby - Vol 6

questions about the death penalty, that you think that it is appropriate in some cases and inappropriate in most cases. And when you say "most cases" -- perhaps we didn't ask the question very well.

Do you mean most cases of capital murder or just inappropriate in most cases, period?

A.  Probably inappropriate.  I would say inappropriate in the general sense of most cases, period. I wasn't thinking specifically in capital murder at the

@                                                                    125

time.

Q.  Because I tell you, every once in a while we talk to somebody up here that thinks that burglary ought to get the death penalty.  They are so much in favor of the death penalty that they think it is not being given nearly enough for crimes, not just capital murder, but 15-year-olds that steal a car.

A.  Yeah.

Q.  And I know you have come across people like that in your work, too, so you know what I'm talking about.

A.  Yeah.

Q.  Any feeling on your part that the offenses in which the death penalty should be or could be imposed, should be -- should be increased?  Should be added to it?

A.  Can you restate it again?

Q.  Sure.  Any thought in your mind that there ought to be more offenses for which you can receive the death penalty?  Mr. Shannon just told you a few minutes ago, that the Legislature in this last session broadened -- broadened death penalties to include killing of judges --

Page 109

Busby - Vol 6

A.   Yeah.

Q.   -- in the line of duty.  But like I said, there may be people that think it ought to be beyond that that all murders should be subject to the death penalty.

Any thought in your mind about that?

@
126

A.   Not necessarily any thought in my mind.  Nothing I have weighed, anything.  I know everything that has different sets of circumstances.  I think that is probably the reason I answered it in that form because, you know, I know there is, you know, good and bad people out there. But I have to think, you know, from -- you know, to try to get society any type of moral value, that most of society is probably not that way even though I know most crimes are not committed by most of the people in society.  They are committed by a small segment of that.  I have to somewhat believe in some of the good in man.

I mean, of course, I'm not one that is working the homicide cases all the time.  If I was one working the homicide cases all the time, I probably would have a different viewpoint of that.  It is not my background and stance, so therefore I decide I have to take the case on a case-by-case basis.  I don't go by painting with a broad brush, in other words.

Q.   I think that it -- that it is probably clear to you -- probably was clear to you before you ever started this process.  But certainly I would hope it is clear to you now based on the questions and comments that you have heard from the Court and the lawyers, that it is not an easy deal to give somebody the death penalty.

Page 110

Busby - Vol 6
There is a lot of hoops that the State has
127

to jump through.  The first thing they have got to do is they have got to prove someone did, in effect, two crimes. If they prove that beyond a reasonable doubt to the satisfaction of all 12 jurors, then they go to the second stage.  And they have got to prove beyond a reasonable doubt to all 12 jurors that that first question should be answered, yes.  It's still not over.  Then the jurors -- although no one has the burden of proof, then all 12 jurors have to have -- to be able to say, I have found a person having -- having answered the first question yes, that they do not believe that there is any -- any mitigation, any -- any circumstances, which would warrant imposing a life sentence rather than a death sentence.

So in effect what you have got, you have got 36 -- 36 votes, 12 and 12 and 12, that have to be rendered in favor of death before the death penalty can be imposed.

And that's a lot of hoops, would you agree?

A.    Yeah.

Q.    Any reservation about that or any argument with that?

A.    No, because I can only control three of those votes.  You know, which would be, of course, I know you have to deliberate and so forth in some form to come to a judgment.  But the thing is you have to stay true to what
128

it is you believe.

Busby - Vol 6

Q.   Well, that is a very -- that is a very good point.  Because you know better than most, particularly having served on a jury, that a jury verdict is not a majority vote.  11 people can be convinced of one thing and if one person doesn't -- does not agree then that person has not only the legal right, but I would suggest you have a moral right, to continue to vote your conscience based upon the evidence they have heard and based upon the law they have received.

Would you agree with that?

A.   I agree with that.

Q.   Do you think that you are a -- I think I know the answer to this.  Do you think you are a strong enough personality that you would be able to do that even if you found yourself in the distinct minority with the other members of the jury?

A.   Yes.

Q.   Going either way?

A.   Oh, yeah.  The answer to that is, yes.

Q.   The law builds in a little bit -- a little bit of a safeguard in addition to what we have discussed in that.  Although it takes all 12 jurors to vote unanimously on Special Issue Number One and Number Two, to impose the death penalty, it only takes ten of them to answer in such

@                                                            129

a manner that the death penalty will not be imposed.  So while unanimity is required to execute a person, lack of unanimity to the extent is ten out of 12 is all that is required to save that person's life.

Do you think that is an undue advantage for

Busby - Vol 6

a Defendant, who has a lot of other advantages in a criminal case?

A.    No, not necessarily.

Q.    Would you agree that maybe that that is yet just another -- another procedural safeguard that is built into the system to make sure that before we do anything as serious as sentencing a person to death, that there can't be any kind of reservations or qualms about it?

A.    No, I agree with that.  There should be safeguards.

Q.    How about some of the other aspects of the law that -- I keep looking at the clock -- because I'm not tired of talking to you.  Probably you are tired of hearing me.

A.    You got me for the day, so go ahead.

Q.    The whole day?

A.    Well, I'm sure you are not going to keep me up here all day.

Q.    What are you doing after lunch?

A.    I don't know.  You buying?

@                                                                130


(Laughter)

Q.    How about these other things we have been talking about:  The fact that the Defendant has the right to remain silent.

Do you have any reservation about that?

A.    No.

Q.    All right.  The "presumption of innocence," the burden of proof rests on the State.  All of those things you knew already.  All of those are okay and those are

Busby - Vol 6

laws you can follow?

A.   I have no problem with none of that.

Q.   Mr. Shannon broached the subject with you that is difficult to wrestle with.  That is the question of lesser included offenses.  And I don't think I need to further explain how we might reach a lesser included offense.  But suffice it to say that if a jury is given the option by the Court, based upon the law and based upon the evidence, they might find somebody who is guilty of murder, but not guilty of a kidnapping, guilty of a kidnapping, but not guilty of a murder.

Make sense?

A.   Yeah.

Q.   We can't say for certain and we can't even ask you what you would do because you haven't heard any of the evidence yet.  We can't ask you to prejudge that aspect of

@                                                                    131

the case, any aspect.  But if a jury found somebody guilty of a lesser included offense, that means that the death penalty is out the window.  That is the first thing, right?

And the second thing is:  Instead of dealing with the death penalty as a punishment, they would deal with -- the jury would deal with a set number of years that was prescribed by law for that offense, that is murder, kidnapping or robbery.  And each of them has different ranges of punishment, as you are well aware, because you know the difference between second and first-degree felonies from your work, right?

A.   Yes.

Busby - Vol 6

Q.   My question of you is this:  Do you believe that you are of such a mind that if you were to find somebody guilty of the lesser included offense of murder, that you would then be able to give fair consideration to the entire range of punishment, whatever that might be, that the law gives you for one adjudged guilty of that?

A.   Yes.

Q.   That might be in a given case as little as five years in the penalty for an intentional murder.  In that same case, it might be as much as life in the penitentiary for an intentional murder.  Once again, you know that because that is the range of punishment for a first-degree

@

132

felony, right?

A.   Yeah.

Q.   Do you believe that you would be able to give fair consideration to that punishment of as little as five years based upon the law and based upon the facts and circumstances of that case?

A.   Yes.

Q.   Contrary, do you believe you would be able to give fair consideration to the maximum punishment, life in the penitentiary, again based upon the law and the facts?

A.   Yes.

Q.   What that really boils down to is asking you:  Do you have a predisposition for the minimum and a predisposition for the maximum or can you keep an open mind and listen to the facts and abide by the law?

Can you do that?

A.   Yes, I can.

Busby - Vol 6

Q.   All right.  By the same token, I have to ask you, knowing all that you know now about the capital murder sentences, do you have a predisposition for the death penalty versus a predisposition for a life sentence?

A.   No, I don't.

Q.   The law probably -- probably because of the burden of proof -- the law probably says -- well, unless the State convinces you, you got to give the person -- you

@                                                                    133

have got to answer the questions in such a way that the person gets life.  But that's -- I'm not -- I'm not really asking that.  I'm asking you whether or not as you sit here right now, not knowing any more than you have told us about this case, you are inclined to give this Defendant a death sentence versus a life sentence?

A.   No, I don't know nothing about the case.

Q.   I take it that you don't know enough about the case that it would influence your service as a juror in this case?

A.   No.

Q.   What few facts you know aren't going to bear on anything, are they?

A.   No.

Q.   Just as you would have an obligation to kind of keep it to yourself if you knew some of the officers, if something jogged your memory about the facts of the case or something came up that you remembered about the case, I take it you would be able to keep that to yourself, not share it with your fellow jurors so that you wouldn't be given unsworn testimony.

Busby – Vol 6

Is that fair to say?

A.   That's fair.

Q.   Is there any reason you can think of, as you sit here right now, that you couldn't be as fair and impartial

@                                                                      134

to Mr. Busby as you would wish for a juror to be in a case that you cared about?  You or your son's case or anybody's case?  Any reason?

A.   No.

Q.   Any questions that you have of me or the Judge?

A.   No, sir.

Q.   Have we made this less complicated or more complicated?

A.   No, it is probably what I expected.

Q.   All right.  Except for the buying the lunch part, right?

A.   Yeah.  I eat off the expensive side of the menu for sure.

(Laughter)

Q.   All right.  Okay, sir, well, you have been very candid.  I appreciate it.  It is clear that you have given some thought about this before you came back here.  Made this job a lot easier.  I appreciate it.  Thank you for speaking with me.

THE COURT:  Okay.  Mr. Pratt, I have got to tell you a couple of things.

You are not on the jury yet, but you are on the panel that the jury is going to be selected from.  You will be brought back to court at some time.  I am not sure of the date or time yet.  It will be a while from now

Busby - Vol 6

@

135

since we just started this.  And you will either be selected for the jury and told you are on the jury or released, one of the two.

We are going to take two pictures of you before you leave here today.  And we are doing that only so the lawyers can look at your picture and remember who you are and what you look like.  They will be used for no other purpose but to refresh their memories.

In the meantime, don't look up anything on the case.  Don't go back to work and say, hey, by the way, do you know anything about this?  Don't talk to anybody about it.  There may be some publicity about the case on TV or the newspaper.  Don't read it or watch it.  If it comes on, walk out of the room.  You can look into it later if you are released.  Until then you are not allowed to find out anything at all about this case.  And with that -- and if you change address or anything or anything changes at all, let us know because you will be required to come back here one more time.

Okay.  Thank you, sir.

(Prospective Juror retired)

(Off-the-record discussion)

THE COURT:  We probably need to take a little break before we keep going.  First off, don't question -- also, we have got two people out there.  One

@

136

of them -- tell them to come back at 1:30.  We are going

Busby - Vol 6

to have to take a break for lunch.  So number four, let them go eat and come back at 1:30, okay?

Let's take a little break.  Then we'll take a little break for lunch.

(Recess from 12:08 p.m. to 12:17 p.m.)

THE COURT:  Are we ready for Ms. Headrick?

(Prospective Juror enters)

THE COURT:  Have a seat.

You need to sit there because the spotlight comes right down.

Okay.  If you will raise your right hand.

(Prospective Juror sworn)

THE COURT:  Okay.  If you will state your name.

PROSPECTIVE JUROR:  Melissa Headrick.

THE COURT:  Ms. Headrick, let me first ask you:  You filled out a juror questionnaire.  Are the answers you gave on that questionnaire true?

PROSPECTIVE JUROR:  Yes.

THE COURT:  My name is Phillip Vick and I'll be the Judge presiding in this proceeding.  You have already met Judge Wayne Salvant.  He will be the one trying the case and we think that it will start somewhere around November 7th.

@
137

I'll introduce the attorneys.  Representing the State in this case:  Mr. Joe Shannon and Mr. Greg Miller.

Representing the Defendant:  Mr. Jack Strickland and Mr. Steve Gordon.

Busby - Vol 6

MR. STRICKLAND:  Hi.

THE COURT:  Is there anything you think that we need to know about you before we start this proceeding?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  Then I will recognize the State.

MR. MILLER:  Thank you.

MELISSA HEADRICK, having been first duly sworn to make true answers to questions touching upon service and qualifications as a juror, testified as follows:

VOIR DIRE EXAMINATION

BY MR. MILLER:

Q.  Well, Ms. Headrick, you have been very patient with us.  Thank you.  This is our first day that we are starting this and we got a little sidetracked earlier because we had some legal matters to take up.

We sort of stumbled our way through this initially.  So I'm going to be visiting with you for about

@                                                                138

30 minutes and then one of the Defense lawyers will be visiting with you.

We have your questionnaire.  We have gone over it.  And we do appreciate you taking the time to fill that out.  We know that is a lengthy process, but believe me, it's going to speed everything up here.

Before we start talking about the law and everything, I just want to -- I want to ask you a question because it certainly appears to us that you may want to

Busby - Vol 6

serve on this jury, okay, based on what you said on the questionnaire. Do you remember that? It asked you, do you want to serve? Do you not want to serve?

Well, you know this is a death penalty case now. And you certainly knew that when you filled out this questionnaire.

When you found out that this was a death penalty from Judge Salvant, what went through your mind?

A.    At that moment, I guess, the importance of the decisions that you have to make on something like this and --

Q.    Obviously, and I don't recall if you have been on jury duty before, but this is a very serious case?

A.    Yes.

Q.    It is serious for not only the State of Texas and the victim's family, but it is certainly serious to

@                                                                              139

Edward Busby, the Defendant, in this case.

You understand that, do you not?

A.    Yes, sir.

Q.    And it looks like to me that you followed some criminal cases and you have indicated you were interested in -- I don't remember what it was exactly, but mysteries and detectives and trial lawyers and all of the C.S.I. stuff and all of that, okay?

A.    Yes, sir.

Q.    And you also indicated that a criminal case that you had followed was Cullen Davis?

A.    Cullen Davis.

Q.    How did you follow that case?

Page 121

Busby - Vol 6

A.   Just mostly, just the newspaper and the news, you know, just as far as just watching, reading up on it.

Q.   Did you think that was a pretty interesting case?  All of the facets of it?

A.   Yes, sir.

Q.   Well, let me -- let me perhaps peak your interest.  Because two of the prosecutors at the time that prosecuted Cullen Davis are right in this courtroom, Joe Shannon and later on, Jack Strickland.  And I had a little involvement in that case, too, because I did all the crime -- or most of the crime scene work on that case.  So you have got three people in this courtroom that were

@                                                          140

involved in a case that you followed.  That is pretty goofy, isn't it?

Okay.  You also indicated that you followed books -- or read books about trial lawyers.  Any particular -- any of those books that come to mind?

A.   I can't even think of the guy's name right now, but it was the one with the movie with the guy who tried -- it had Matthew McConaughey in it.

Q.   John Grisham's book?

A.   Yeah, John Grisham's.

Q.   Have you read a lot of those?

A.   I have read several of them, yes.

Q.   Well, I don't want to speak for any other lawyer in this room, but a lot of those are fictional and C.S.I and Law and Order stuff, they all get to do all of these things in an hour.

A.   Okay.

Busby - Vol 6

Q.    And, quite frankly, some of it is based on what we do, day in and day out, in this courtroom is pretty far-fetched, okay?

Can you promise me at the outset that if you are selected as a juror in this case that you will make your decisions based on what you hear from the witness stand and maybe documents and photographs and evidence that actually comes before the jury?  Can you do

@
141

that?

A.    Yes, sir.

Q.    Do you see why I might ask that?

A.    Yes.

Q.    Because TV -- they don't even really do it in an hour if you take out the commercial time.  The C.S.I. series, for example, you are really talking about 40 minutes max.  And I'm telling you they can't always do what they say in that show, okay?  Can you see why we might be concerned about that?

A.    Yeah, I know the difference between the drama and the real thing.

Q.    Because this is the real thing.

A.    I understand.

Q.    All right.  Let's talk about some things here. And I have a slide presentation which I assume you can see from up there.  Some of these are pretty self-evident. This is the only time that the lawyers in the case can talk to you.  If you are actually selected to sit in a jury box, such as this one on this case, the lawyers can't talk to you, so this is it for us.  Really it's for you.

Busby - Vol 6

It's the only way it is going to work.

There are no right or wrong answers here. The only thing that we ask is that you give us your answers and how you feel about these issues, okay?

142

Did you have a chance to review the written instructions that you left the Central Jury Room with before you came here today?

A.   Yes, sir.

Q.   Okay.  Good.  Great.  If you have a question as I go through this, or Mr. Gordon or Mr. Strickland goes through it, by all means ask us.

We are going to spend a little bit of time talking about the law.  But for us as the lawyers in the case, what this really boils down to this afternoon with you, we are going to spend about an hour with you and we have just got to figure out if you can serve on this jury. Or at least make it to the next step, okay?

And really what we are looking for is exactly what Judge Salvant said last Friday.  We are looking for people that can come in here and keep an open mind, not have any preconceived notions as to what should or shouldn't happen in this case and just tell us that they will listen to the facts and evidence in this case and, then and only then, make some decisions.

Does that sound fair?

A.   Yes, sir.

Q.   Is that the type of juror that you would want if, you know, you were in trouble or a friend of yours was in trouble or something like that?

143

Busby - Vol 6

A.   Yes, sir.

Q.   So you understand why we are here this afternoon?

A.   Yes.

Q.   Okay.  Let me see if I can work this thing.  Ah, the Indictment.  You have received some instructions.

MR. SHANNON:  Too much.

MR. MILLER:  No, I meant to go to the second one.

Q.   (By Mr. Miller) Okay.  You already know, if you have read the instructions, you know what is contained in the Indictment.  We'll talk about that in just a minute.

The Indictment is no evidence of guilt in any criminal case and certainly not this one.  Okay.  You understand that?

A.   Yes.

Q.   It is just a piece of paper that, quite frankly, starts everything off in a criminal case.

The elements of the Indictment are the only things that Mr. Shannon and I have to prove.  We'll talk about those momentarily.

We are never required to prove motive, okay?  Now, you read a lot of these crime books or novels or fictional accounts or whatever and I'm guessing that you see motive talked about a lot on those pages of those

@                                                                                      144

types of books.  Am I correct?

A.   Correct.

Busby - Vol 6

Q.   We don't have to prove motive and it doesn't make any difference whether we are talking about -- you are down in municipal court being prosecuted on a speeding ticket all the way up to capital murder where the State is seeking the death penalty, the Prosecutors never have to prove motive.  And there is a reason for that.  Because really the only person that knows why they did a particular crime is who?

A.   The person that did the crime.

Q.   The person that did it.  And they have got a lot of constitutional protections, don't they?

A.   Yes.

Q.   In other words, Mr. Shannon and I, in any criminal case we can't force somebody, a Defendant, to get on the stand and testify.  So that is at least one of the reasons why we never have to prove motive.

Are you okay with that?

A.   Yes, sir.

Q.   What is murder?  Pretty straightforward.  A person commits murder if that person intentionally and knowingly causes the death of an individual.

You don't have any problems with that, I assume?

@                                                          145


A.   No, sir.

Q.   You understand what that is?

A.   Yes, sir.

Q.   It is a first-degree felony.  We'll come back and talk about that a little later.

What makes it capital murder?  Well, there

Busby - Vol 6

has to be that same intentional killing that we just saw on the previous slide, but there has to be an additional, and we call it an aggravating factor, okay?  And in this case we have alleged that the aggravating factor is either kidnapping or robbery, okay?  Kidnapping and robbery have legal definitions -- this is what kidnapping is.

Does that sound pretty straightforward to you?

A.   Yes, sir.

Q.   Abducting someone against their will?

So too -- and that is a felony punishable of two to ten years and we don't really care about the fines.  They are not important.

Robbery has a legal definition:  Committing an offense in the course of committing theft in intent to obtain or maintain control of the property.  Did the person either intentionally or knowingly or recklessly cause bodily injury or places another in fear of imminent bodily injury, okay?  So that is a legal way of saying

@                                                                          146

what a robbery is.  Something you probably already knew about, okay?

A.   Yes.

Q.   You know what a robbery is?

A.   Yes.

Q.   You know what a kidnapping is?

A.   Yes.

Q.   "Venue" is just a legal phrase, is just where can the case be tried, what county can the case be tried.

And in capital murder, there are two parts

Busby - Vol 6

to the capital murder.  There is the murder itself, obviously, and then there is the aggravating factor which we have alleged in this case to be, either kidnapping or robbery, or it could be both kidnapping or robbery.

What the law tells us in capital murder cases is, that cases can be prosecuted in any county where part of the offense occurs.  So in this particular case a part of the offense is either the robbery part or the kidnapping part and as long as we show some part of the capital murder occurred or started off in Tarrant County, we can prosecute the case in Tarrant County as opposed over in Dallas County or wherever.

You understand how that goes?

A.    Yes.

Q.    And you might suspect, especially in a

147

kidnapping allegation, the continuing course of the kidnapping may take you outside of Tarrant County, may take you through other counties in the State of Texas, may take you across the state lines.  For capital murder purposes that is not a problem because it all started off in Tarrant County.

Do you have any problem with that?

A.    No, sir.

Q.    Does that make sense to you?

A.    Yes, sir.

Q.    Okay.  Now, these are the elements of the Indictment that we talked about a few minutes ago.  And these are the only things that Mr. Shannon and I have to prove to the jury beyond a reasonable doubt.  Nothing

Busby - Vol 6

else, okay?  Let's talk about them.

We have already talked about the first one, Tarrant County, Texas.  We have to allege a certain date or on or about a certain date.  In this case we are alleging January 30th of 2004.  And we are also alleging the Defendant intentionally killed a lady by the name of Laura Crane.  We have alleged how we believe the killing occurred, by covering her mouth and nose with tape.  And finally, you see those are the aggravating elements again, while he was in the course of committing or attempting to commit kidnapping or robbery.

@
                                                                148

Okay.  Do you see that?

A.    Yes.

Q.    And I believe that was on your oral instructions and the written instructions, okay?

A lot of legal language there, but basically that he caused the death while he was in the course of committing or attempting to commit either kidnapping or robbery.

Does that make sense to you?

A.    Yes, sir.

Q.    Do you -- do you understand now that the only things that Mr. Shannon and I have to prove are those five elements beyond a reasonable doubt?

A.    Yes, sir.

Q.    Okay.  You wouldn't require anything?

Would you require us to prove anything else beyond a reasonable doubt?

A.    No, sir.

Busby - Vol 6

Q.   Okay.  Any questions about the elements?

A.   No, sir.

Q.   The presumption of innocence:  You have heard of that before, have you not?

A.   Yes, sir.

Q.   And I sort of think of it as that is where we start at in any criminal case.  Not just this one, but any

@                                                                  149

one.  It is a legal presumption.  He is presumed innocent. It does not mean that he is factually innocent.  It is a legal presumption.

It is also a rebuttable presumption.  And what that means is that Mr. Shannon and I can put on evidence and will put on evidence that we believe rebuts the presumption.  And at some point when he and I believe we have put on enough evidence that we believe has rebutted that presumption of innocence, one of us, in the course of the trial, will stand up and say the State rests, okay?  And then the Defense, they can either -- they can rest right behind us.  They can put on a case. They can do a variety of things.

Do you think the fact that the Defendant is presumed innocent that that is fair?  Is that fair in a criminal case?

A.   That he is presumed --

Q.   That we give him or her a presumption of innocence?

A.   Yes, sir.

Q.   Any problem with that?

A.   No, sir.

Page 130

Busby - Vol 6

Q.   Have you heard about beyond a reasonable doubt before?

A.   Yes, sir.

@
150

Q.   I bet you have.  Okay.

And we have already talked about some words, you know, robbery and murder and kidnapping.  They have legal definitions.  Remember those?

A.   Yes, sir.

Q.   "Beyond a reasonable doubt" does not have a legal definition.  And we are going to talk about some other words here this afternoon that do not have legal definitions.

And what that means is:  When the Judge does not give you a legal definition for a word or a phrase, then you get to attach whatever meaning you wish to attach to the word or the phrase, okay?

Do you see how that works?

A.   Yes, sir.

Q.   Well -- excuse me -- beyond a reasonable doubt is one of them.  But there are some things we can say about reasonable doubt.  It's an individual standard.  You get to decide what it means for you.  Juries use it every day or are able to reach conclusions on criminal cases, either way.  Either the person is guilty or they are not guilty.  It is not an impossible burden.  And we know that because if it were an impossible burden, we wouldn't be able to get jury verdicts in this courthouse or any other courthouses in the State of Texas.

@
151

Busby - Vol 6

Do you see how that works?

A.    Yes.

Q.    Does that make sense?

A.    Yes.

Q.    I describe it as a two-step approach.  You may describe it in some other way.  Was a crime committed?  And, yes, indeed if we believe a crime was committed, is the person that is on trial, is that -- do we believe beyond a reasonable doubt that is the person that committed the crime, okay?  That is sort of my shorthand way of looking at it.  You may have a different way.  But does the material on beyond a reasonable doubt, does that make sense to you?

A.    Yes, sir.

Q.    Some things a Defendant may or may not want to do in a criminal trial.  Obviously, they do not have to testify.  You have heard of that, their Fifth Amendment right to remain silent and that is a very important right.

Conversely, he can -- any Defendant can testify in a criminal case, if they want to.  At this juncture, probably every one in this room has no idea whether he will or will not testify, but we have got to talk to you about it right now.

If he does choose to testify, while the presumption of innocence is very important, it doesn't

@                                                                    152

mean that he is presumed to be telling the truth when he testifies.  You treat him the same as you would treat any

Busby - Vol 6

witness that would sit in the witness box such as you are seated in right now. You can believe everything a witness tells you, you can believe absolutely nothing a witness tells you or somewhere in between, okay?

Do you see how that works?

A.  Yes, sir.

Q.  There may be many reasons why a Defendant may not testify: The person may be nervous, scared, may not do well in speaking in front of people. You know, usually we want -- well, usually the decision to testify is made in consultation with his lawyers. I mean, after all, that is why he has lawyers in criminal cases, to give him some advice. And oftentimes, you know, you want to follow the advice that the lawyer gives you. He may be guilty. He may have already said something through some other piece of evidence that he has gotten his version of what happened across, so he may not think that there is any need for me to get on the stand. There may be a multitude of reasons why a Defendant may not testify.

But the bottom line here on all of this is, if the Defendant chooses not to testify -- exercises his constitutional right not to testify -- you will be given an instruction from the Judge that says, you can't hold

@                                                                              153

that against the Defendant for any purpose whatsoever.

You have probably heard of that before, okay?

A.  Yes, sir.

Q.  Do you have a problem with that?

A.  No, sir.

Busby - Vol 6

Q.   The intent in a murder case and also in a capital murder case, that it has to be their conscious desire, objective or desire to engage in the conduct or cause the result.  Do you see that?  And obviously in a murder case the result that you are intending to cause is indeed the death of the individual.

Does that make sense to you?

A.   Yes, sir.

Q.   Now, intent to kill someone can be formed very quickly.  It does not have to be premeditation.  And I'll bet you, just my guess here, in some of the books that you might have read talk about premeditated murder or something like that.

Have they not?

A.   Yes, sir.

Q.   And that all makes it good for interesting ink on the pages of a book.  But in the real world, the Prosecution never has to prove premeditation, okay?

Are you okay with that?

@

154

A.   Yes, sir.

Q.   Let's talk about some punishment options here for a minute.  And I think you probably recall from your -- both the oral instructions and your written instructions -- if and only if the jury finds a Defendant guilty of capital murder, do you move on to the punishment stage of a capital murder trial.  And depending on how the jury answers a couple of special issues will determine what sentence the Judge has to impose.  And if you have been found guilty of capital murder, then the only two

Busby - Vol 6

possible sentences are -- I think you know this -- the first one is death by lethal injection.  The second one is a life sentence wherein under the capital murder scheme, a life sentence means that the individual has to serve 40 calendar years before they're even eligible for parole.

Do you see how those are the only two options?

A.   Yes, sir.

Q.   Now, you might see a life sentence in a different context, but it is only in a capital murder scenario that it equals 40 calendar years.  In other words, day for day.  A person would actually have to go to the penitentiary for 40 real years before they would be eligible for release or at least consideration on parole.  It doesn't mean they would get out.

@                                                                  155

At this stage of our inquiry with you all that we are looking for and the commitment that we are looking for from you at this stage, is that you would keep an open mind and be able to consider all of the ranges of punishment that might potentially come up in this case.

Can you do that?

A.   Yes, sir.

Q.   Do you have any problem with that?

A.   No, sir.

Q.   Given the fact that this is a death penalty case, do you have any preconceived notion that, well, if I find the guy guilty of capital murder, I'm going to vote for a death penalty automatically or anything like that?

A.   No, sir.

Busby - Vol 6

Q.   Good.  We want you to keep an open mind.

Will you promise all of us here this afternoon that -- that if you are selected on this jury panel, that you will continue to keep an open mind.

Can you do that?

A.   Yes, sir.

Q.   See why that is important?

A.   Yes.

Q.   It is important because, especially when we get to the special issues, we want to give you additional information.  It is sort of like me saying, hey,

@                                                              156

Ms. Headrick, who are you going to vote for the November, 2008 presidential election?  Tell me -- tell us today who are you going to vote for.  You know, I could ask that question, but it would be a silly question.  And why would it be silly?

A.   It is my personal business.

Q.   Yeah, but not only is it your personal beliefs, but what is missing?  If I asked you a question on -- what is today?  October 4th of 2005, who you are going to vote for in November of 2008, what is missing?

A.   Who is going to be running.

Q.   Yeah.  Information, facts, data, that you can, you know, run through your mind and then as you say, make your own personal decision.  And that is really what it is sort of like at this stage.  Because nobody in this room is going to give you a set of facts that we believe may or may not come into play in this case and say, okay, Ms. Headrick, we have told you these facts, now, first of

Busby - Vol 6

all, are you going to find him guilty of capital murder and if you find him guilty of capital murder and we are going to give you some more facts, are you going to assess the death penalty.  You see, that wouldn't be fair because that wouldn't be allowing you to be a fair and impartial juror, would it?

A.   No, sir.

@                                                                157

Q.   It would be trying to get you to take what I give you or Mr. Strickland or Mr. Gordon gives you and make a decision today.  And we can't do that because you haven't heard any evidence in this case, okay?

But what the law does allow us to ask is: Can you keep an open mind at this stage, okay?  Can you do that?

A.   Yes, sir.

Q.   Because after a jury -- a juror on any case -- it doesn't make any difference whether it is a capital murder or a burglary case -- once you have heard the facts and circumstances and you have information to digest, you get to make the decisions, not the lawyers, not the Judge, okay?

A.   Yes, sir.

Q.   Does that sound like a fair way about going about it?

A.   Yes, sir.

Q.   Do you have any problem with that?

A.   No, sir.

Q.   Okay.  Let's jump off into these special issues and actually there is a piece of paper up there on the

Busby - Vol 6

witness chair there on the stand that has the same issues.

The first one is what we sometimes refer to as the future danger issue, okay?  Take a look at it and

158

just read it to yourself for just a moment.

Okay.  Do you see where Special Issue Number One is sort of asking the individual jurors and jury as a whole to sort of look into the future and make some type of prediction?  Do you see where it is asking that?

A.   Yes, sir.

Q.   Do you understand -- do you think you have a pretty good grasp as to what that issue is asking you to consider?

A.   Yes, sir.

Q.   Okay.  Now, we have already talked about beyond a reasonable doubt doesn't have a word (sic), but there is some additional words in that special issue that likewise don't have legal definitions.  So if you will recall from a moment ago, when a word doesn't have a legal definition, you get to ascribe your own definition or legal interpretation or meaning to that word, okay?

Let me point out some words that don't have legal definitions.  The first being "probability," the second might be "criminal acts of violence" and the third one might be the very last word, "society," okay?  None of those words or phrases have legal definitions.  About the only thing that I can tell you about them is, even though probability doesn't have a legal definition, we know from

159

Busby - Vol 6

our case law in Texas on death penalty cases, that probability means something more than a possibility of something happening, okay?  You see how that would work, okay?

You work for Sprint, right?

A.   Yes, sir.

Q.   And it looks like you have done a variety of things for Sprint, okay?  And maybe this is a bad analogy but to illustrate the difference, I'll take a stab at this:  I suppose it is possible tomorrow when you go back to work at Sprint that virtually every computer system within the Sprint system would crash at the same time. That could be possible.  But the probability of every information computer system within the Sprint system throughout the United States of America -- the probability of that occurring is probably what?

A.   Not going to happen.

Q.   It's not going to happen.  It is pretty remote.

Do you see the distinction between the word possibility and probability?

A.   Yes, sir.

Q.   Now, to answer that question yes, all 12 jurors must agree, okay?  To answer it no, at least ten or more of the jurors must agree.

Now, who has the burden of proof on Special

@                                                                    160

Issue Number One?  Well, you remember it started out with the language, do you find beyond a reasonable doubt, and that's the same language you would have already found or

Busby - Vol 6

had seen in the first stage of the trial, do you find beyond a reasonable doubt that the Defendant is guilty of capital murder, okay?

Any time the juror sees those magic words, "beyond a reasonable doubt", it means one thing and one thing only.  That means that Mr. Shannon and I, the Prosecutors, have to prove to the jury to your satisfaction beyond a reasonable doubt that the answer to Special Issue Number One is indeed, yes.  In other words yes, we as a jury find beyond a reasonable doubt that we do believe that he is going to be a danger in the future to society and commit criminal acts of violence.

Do you see how that goes?

A.   Yes.

Q.   They have no burden whatsoever.  Throughout this entire process, whether you are in the guilt-innocence stage or the punishment stage, they have no burden, okay? The burdens are always right here at this table.

Do you have any problem with that?

A.   No, sir.

Q.   Do you think that is where the burden should be? Right here at this table?

@                                                           161


A.   Yes, sir.

Q.   Okay.  We already talked about that.  They have no burden.

The second special issue we sometimes refer to as the mitigation special issue and take a moment and just look at that.

Do you have -- do you think you have an

Busby - Vol 6

understanding of what is being asked for in this question?

It is a little complicated, but it's not the most artfully worded question around. But let's talk about it for just a minute.

You only get to this second question if, and only if, the jury has already answered Special Issue Number One yes unanimously, okay? If the jury doesn't answer the question unanimously yes, you don't go any further. You don't get to number two, okay?

Do you see how that works?

A.   Uh-huh.

Q.   What number two, the mitigation issue over the years, this is sort of how I have looked at it. I call it a fail-safe question, okay? Because I think what the issue is asking the individual juror to do and the jury as a whole to do, is stop one more time, step back, look at all of the evidence that the jury has before them -- and at this stage, you are going to have a lot of evidence, I

@                                                                           162

would suggest -- to digest the evidence -- excuse me -- and make an informed decision and inquiry and analysis that says look, as bad as this killing was -- and let's face it, most killings are pretty bad.

Would you agree with me on that?

A.   Yes, sir.

Q.   That as bad as this killing was, we are going to look at this evidence again and see if there is something, if there is a sufficient mitigating circumstance that tells us, either tells me as an individual juror or tells us as a collective jury that we just don't think the death

Busby - Vol 6

penalty is appropriate, okay?  As bad as the underlying murder was, the aggravating factors, we just don't think the death penalty is appropriate.

Does that clear that up a little bit for you maybe?

A.   Yes, sir.

Q.   Do you see -- do you see that it's really asking the jurors to really dig down deep within themselves and make a decision as to whether or not a death sentence is going to be imposed, okay?

Because let's be clear about this.  You know, the lawyers can sit here and say, well, we don't -- we don't ask you to say whether the Defendant is going to live or die, which technically is true.  But you see,

163

based on how the jury answers these questions, that's going to decide in no short order whether the Defendant is going to receive a death sentence or not.

Do you see how that goes?

A.   Yes.

Q.   Because you see, the Judge -- and Judge Vick has done these cases before.  Judge Vick can't take a verdict -- the answer to these special issues and the first one is yes, and the second one is no, and he says, yeah, I heard the same evidence that the jury heard and I know they have answered these questions in such a way that the death penalty is going to be assessed.  But you know what?  I'm not going to do that.  I'm going to give them a life sentence.  He can't do that.  His hands, just like any other judges in this state, are tied, so to speak, by

Busby - Vol 6

your decisions, okay?

Do you understand how that works?

A.   Yes, sir.

Q.   How do you feel about that?

A.   I feel --

Q.   I'm sorry?

A.   I think it puts a lot on the juror and they have got to weigh a lot --

Q.   Yeah.

A.   -- to get it correct.

@                                                                    164

Q.   We ask a lot -- have you been a jury before?  I can't remember.

A.   No.

Q.   We ask a lot of jurors on any case short of capital murder.  We ask a lot of them -- on those cases we ask of their time, their commitment, their attention and everything else that goes along with being a juror.  But when we get to a case like this, where the stakes for both sides of the lawsuit are incredibly high, they are the highest that -- we have all been doing this a gazillion years.  And no one in this room would debate or even come close to suggesting, this is not serious business because it is serious business.  And it's like -- and I'm not trying to pick on you or anything.  It's one thing to sit in a Central Jury Room with 249 other people and listen to a Judge give you some instructions and it is even one thing to fill out this, 20-whatever-page, 25-page questionnaire.  But it is another thing entirely when people actually come in and have to sit where you are

Busby - Vol 6

seated.

And even though you are the third person -- you are only the third person we talked to so far, the previous two individuals that we have talked to have told us, you know, I have been thinking about this. And I have a sneaking suspicion you have been thinking about this.

@                                                                    165

Am I right?

A.   Yes, sir.

Q.   All right. So how do you feel about all of this?

A.   Well, I have different emotions, I guess.

Q.   I'm sorry?

A.   Different emotions.

Q.   Okay. Well --

A.   I feel -- I ask myself, can I make that kind of decision. And I can't be making that kind of decision that goes through my mind.

Q.   Well, let me ask you this: Do you feel like you still want to serve on this jury?

A.   I can still serve on the jury.

Q.   Pardon me?

A.   Yes, sir.

Q.   Okay. Going -- taking both of these special issues and just taking them as a group, as a couple, as you sit here right now you don't know anything about -- well let me ask you.

Do you know anything about the facts and circumstances of this case?

A.   I didn't until I read the end of the

Busby - Vol 6

questionnaire.  When I saw a name at the end of the
questionnaire, then I remembered the case.  Yes, I did.  I

remember it in the media.

Q.    That was the name Kathleen Latimer?

A.    Kathleen Latimer.

Q.    What -- if you do know anything about Kathleen Latimer, tell us what you know.

A.    Kathleen Latimer is a name I knew -- I don't know.  I haven't seen her since she was eight years old.  Her sister and I were friends.  They lived up the street from us.  The Kathleen Latimer I knew moved away to Mississippi when she was about eight, I guess.  Moved with her father.  Her mother and her sister stayed there in Texas and her father and Kathleen went to Mississippi.

Q.    Okay.  Do you know how -- about how old a woman she would be now?

A.    I'm trying to think how old we were when she moved.  I don't know 30, in her late 30s.

Q.    Okay.  Well --

A.    And I guess that is what caught my eye when I saw the news story.

Q.    I can't give you a whole lot of facts, but I think I would be permitted in saying that I believe -- well, I don't believe.  I know that there is an individual in this case named Kathleen Latimer, okay?

Well, let me ask you this:  Other than the fact that you grew up or spent some time with someone

Busby - Vol 6

named Kathleen Latimer, let me ask this -- let me ask this you this first question.

Do you know anything about the facts in this case?

A.   Not the facts in this case.

Q.   Well, I don't know how to phrase this, I guess. I can't conceive, as I stand -- as I sit here today of any way that Kathleen Latimer would testify in this case, okay?  But maybe there is a scenario out there that I haven't thought of.  So let's talk about that eventuality.

If Kathleen Latimer were to testify in this case and it's the Kathleen Latimer that you know or knew of, okay?  Would you be able to just listen to whatever she had to say from the witness stand and judge her credibility just like all of the other witnesses on the case, sort of the same way, you believe every darn thing she says and nothing that she says or somewhere in the middle?

A.   Yes, sir.

Q.   Because I'm not sure that the Kathleen Latimer that you know is the Kathleen Latimer in this case?

A.   Right.

Q.   But short of doing some other things, which I can't do, I don't want to go down that road right now.

A.   Okay.

@                                                                168

Q.   But will you promise us that if it is the Kathleen Latimer that you know, that you will just judge her credibility as any other witness.

Busby - Vol 6
Can you promise us that?

A.    Yes, sir.

Q.    Absolutely promise us?

A.    Absolutely.

Q.    Okay.  Let's see, well getting back to these special issues.  We have talked about keeping an open mind, waiting to hear the evidence and all of that kind of stuff, which is exactly what we want jurors to do.  Okay.  That is the commitment we are looking for during this stage of the jury selection of the trial, okay?

And nobody here this afternoon is going to say, well, we are going to give you a set of facts or, Ms. Headrick, come up with a set of facts and tell us how you are going to vote.  We are not going to do that.  The law doesn't allow us to do that.

But what the law does allow us to ask in this part of the proceedings is, can you keep an open mind and give fair consideration that there could be a set of facts and circumstances that you might hear in a criminal case that would allow you to answer the special issues just the way you felt they should be answered?

In other words, you might hear a set of

169

facts and circumstances in a criminal case that would allow you to answer Special Issue Number One either yes or no.  Just sort of how the chips fall, okay?

Are you open to that possibility?

A.    Yes, sir.

Q.    You haven't -- you haven't -- you don't have a predisposition in this case that the answers to this --

Busby - Vol 6

like for instance the answer to Special Issue Number One is always going to be yes.

You don't have that predisposition, do you?

A.   Yes, sir.

Q.   Are you just going to listen to the testimony and let it shake out the way it shakes out, one way or the other?

A.   Yes, sir.

Q.   Can you do that?

A.   Yes, sir.

Q.   Can you promise us that you can do that?

A.   Yes, sir.

Q.   Special Issue Number Two, to answer it no, again all 12 jurors must agree.  To answer it yes, ten or more jurors must agree, okay?  Do you have any questions about the special issues up to this point?

A.   No, sir.

Q.   Do you think you have a pretty good grasp of how

@                                                                    170

the scheme -- that is the word we use -- works on whether or not someone is going to receive the death penalty or not?

A.   Yes, sir.

Q.   Because obviously it would have been very easy if the Legislature had said, look, if you do a capital murder, you are going to get the death penalty.  They didn't do that, okay?

There are two legally accepted punishment options in a death penalty capital murder case.  One, of course, would be the death penalty and the other one is

Busby - Vol 6

life imprisonment, 40 years.

Do you understand?

A.   Yes.

Q.   Can you give fair consideration to both of those?

A.   Yes, sir.

Q.   Nobody has the burden of proof on Special Issue Number Two, okay?  You don't -- unlike Special Issue Number One where it started off, do you find beyond a reasonable doubt, dot, dot, dot, you won't see that in Special Issue Number Two, okay?  So we don't have -- we don't have the burden to prove it beyond a reasonable doubt and the Defense has no burden at all in this journey.

@                                                                    171

Okay.  And I think Judge Salvant talked about this and I think it was even on the written instructions.  Because you are talking about a capital murder case, sometimes, not always, but sometimes, the jury may be asked to consider whether or not the person is nonetheless guilty of capital murder.  In other words, the jury -- let me start over.

If the jury believes that the Defendant committed a murder, but for whatever reason didn't feel like the prosecutors had proved either the robbery or the kidnapping -- with me so far?

A.   Uh-huh.

Q.   The jury would nonetheless be able to consider if the person was guilty of murder.  And if they found he was guilty of murder, then we would still have a second

Busby - Vol 6

phase of the trial, the punishment stage, but it would be a little different than the punishment stage of a death penalty trial.

But these are some punishment options that the jury might see and the key to all of this is the very last four lines that are underlined, "depending on -- upon the evidence," okay?  Do you see that?

Because again, you don't know what the evidence is.  And while the lawyers might have an idea what the evidence is, sometimes trials, you know, take

@                                                                                        172

twists and turns that, quite frankly, nobody anticipates, okay?

So really what we need to know at this stage with you is -- the bottom line is murder, in the most broadest range of punishment that you could consider as a juror, is from 5 to 99 years or life, okay?  There may be some variations on that, whether or not, you know, certain evidence comes into play during the punishment stage.  But for our purposes here this afternoon, let's just assume the entire range is 5 to 99.  That is a big range of punishment.  Would you agree?

A.    Yes, sir.

Q.    And I think there is that big range of punishment because the Legislature has realized and the courts have realized over the years that -- that not all murders are the same.  There could be a variety of relationships between the parties.  There could be no relationship between the parties.  This could be a, gosh, a stranger on stranger killing.  This could be a spouse

Page 150

Busby - Vol 6

that doesn't, you know, want to see their wife suffer through chemotherapy any more. I mean, it's the whole gamut of facts and emotions and relationships and that is why the facts might be 99 or life.

The only thing that we need from you is an assurance that this afternoon, that you could keep an open

@                                                                                     173

mind to the full range of punishment. In other words, there could very well be a fact and circumstances that you could hear that you would assess a low end range of punishment, 5, 10, 15 years or there might be a set of circumstances out there where you would assess 99 years or life, okay?

A. Yes, sir.

Q. Are you open to that possibility?

A. Yes, sir.

Q. Can you do that?

A. Yes, sir.

Q. Do you have any preconceived notions that, well, you know, if I found him guilty of murder, by golly, I'm going to give him the most the law allows under the law. Anything like that?

A. No, sir.

Q. Do you have any questions up to this point? I know it has been a long, long day for you and we certainly appreciate it. Any questions at all?

A. No, sir.

Q. Are you going to go home and read one of them lawyer books tonight?

A. No.

Busby - Vol 6

Q.   You checked that -- oh, there is one thing I want to talk about.

@
174

You talked quite -- not quite a bit. Several times in answering some of these questions about what is wrong with crime and society and all of that, you mentioned drugs, okay?  And I don't think anybody would necessarily disagree with you that drugs can be a problem as it relates to crime, okay?

And drugs -- drugs might be -- there isn't really anything that the Courts have said is mitigation, per se, but drugs might be mitigation.  Okay.  For instance, you might, in the punishment stage of a death penalty trial, you might hear about someone's problems with drugs over a protracted period of time.  And a juror is free to determine whether or not drugs could be mitigation evidence, okay?  Some jurors might say, well, you know, the guy had a bad drug problem and I think drugs played some role in this.  It doesn't excuse his behavior. It's not a legal defense or anything.  But, you know, I'm going to think about that in deciding whether or not I want to answer these special issues in such a way that somebody receives the death penalty, okay?

Other jurors may say, look, drugs?  Come on.  Lots of people have problem with drugs, but they don't kill people.

Do you see how there is give and take there.  As an individual juror you get to decide what it

@
175

Busby - Vol 6

is.  Because nobody -- the lawyers can't sit here and say, well, A, B and C are mitigation and D, E and F aren't, okay?  We can't do that.

Understand how that works?

A.   Yes, sir.

Q.   And you said in answering the question which describes your view of the death penalty, you checked right in the middle.  Smack dab in the middle.  It's appropriate in some cases, inappropriate in most cases. That is sort of statistically how it has shaken out on the death penalty.  Not everybody that is charged with capital murder gets a death penalty trial.  And you know that.

A.   Yes, sir.

Q.   Is that how you still feel after you have given some thoughts to this and you -- we have gone through the special issues and everything like that?

A.   Yes, sir.

Q.   What are you -- are you comfortable with how this process works?

A.   Yes, sir.

Q.   Does it make sense to you?

It asks as a follow-up, please explain your answer.  "If the person is guilty without doubt," do you remember writing that?  You probably don't, but that is what you wrote, "if the person is guilty without doubt."

@                                                              176


Let me visit with you for just a moment because I want to make sure that you understand that Mr. Shannon and I's burden is not to prove that the Defendant committed the capital murder without any doubt.

Busby - Vol 6

What is the standard that we have to prove?

A.    Without reasonable doubt.

Q.    Yeah, beyond a reasonable doubt.  Because, quite frankly, the only way that you, as an individual juror, would know that any Defendant committed a capital murder without any doubt whatsoever, is you would probably have had to have witnessed that murder yourself.  And if you witnessed a murder, can you sit over here in the jury box?

A.    No, sir.

Q.    No, you can't.  So I just want to make sure that you don't hold Mr. Shannon and I to a higher burden of proof than what the law demands that we do, okay?

A.    Okay.

Q.    Are we okay on that?

A.    Yes, sir.

Q.    You are not going to hold us to a higher burden, are you?

A.    No.

Q.    Hold us to our burden, but not a higher, okay?

A.    Yes, sir.

Q.    Can we have that agreement?

177

A.    Yes.

Q.    Do you have any questions?

A.    No, sir.

Q.    Ms. Headrick, thank you much.  I know it is been a very long day for you.  And I'll pass her at this time.

                THE COURT:  I will recognize the Defense.

                MR. STRICKLAND:  Thank you, Judge.

                    VOIR DIRE EXAMINATION
                        Page 154

Busby - Vol 6

BY MR. STRICKLAND

Q.   Are you okay?  Can we keep going here?

A.   Yes, sir.

Q.   Do you need a break?

A.   No, sir.

Q.   Look at it this way:  The sooner we get to it, the sooner you can get out of here.

Let me ask you some questions off your questionnaire and then we'll talk about some of the law. But hopefully, because of the very -- very thorough manner in which Mr. Miller has gone over it with you, perhaps we don't need to revisit all of those issues in quite the same depth.

You indicated that you are widow; is that correct?

A.   Yes.

Q.   What kind of work did your husband do before his

@                                                                         178

death?

A.   He was a computer engineer.

Q.   And may I inquire as to when he passed away?

A.   Cancer.

Q.   And when did he pass away?

A.   Oh, August 10th, this year.

Q.   This year, 2005?

A.   5.

Q.   That is very recent.  I'm sorry for your loss.

Of course, not knowing that it was as recent as that, let me ask you a question here that may or may not have occurred to you.

Busby - Vol 6

These are tough cases.  Under the best of circumstances, they are tough cases.  Simply by virtue of the fact that there is a murder of some variety alleged, there has been a loss and they are never easy for anybody to deal with, and particularly I would suggest to you not easy for someone to deal with if they themselves have suffered a loss or some recent trauma in their life.  And clearly in your case, some more recently than others.

I think I can speak for all of us when I say that regardless of which side of the table that we are on and regardless of what role we play, that -- that these cases are emotionally draining.  And I guess I just want to ask you whether or not you think that in light -- in

@
179

light of your recent loss and in light of the nature of this case, do you think this is something you are up to?

A.   Yes, sir.

Q.   By that, I don't mean to suggest that it would be easy and I'm sure you don't mean to suggest by your answer, but you believe you can fulfill your functions and go about it as dispassionately or at least impartially as I know you would want to.

A.   Yes, sir.

Q.   Mr. Miller pointed out to you, for better or for worse, that several of us in here have had some -- some association with the Davis case which you -- you mentioned as the case that you had followed with some interest.

What did you think about the outcome of that case?  I'll come right out and ask you.

A.   I wasn't happy with the verdict.  It should have

Page 156

Busby - Vol 6

went the other way.

Q.   You are not hurting our feelings because we all trying to put him in the penitentiary.

A.   Okay.  No, I was disappointed in the verdict.

Q.   Well, a lot of people weren't.  So when they say they are interested, I'm always kind of curious as to whether they think I was picking on him or whether or not they thought I was doing the right thing, same with Joe and Greg.  Greg was a police officer then.  He wasn't a

@                                                                              180

prosecutor.  But I'm sure I know where his feelings lie on that case.

Have there been other cases, and you don't need to tell me what they are, but other cases where you felt maybe the person that was charged kind of dodged the bullet and got off when they shouldn't have?

A.   Yeah, other cases, I think so.

Q.   Do you think -- do you think there have been also some cases out there that you may have seen and followed and been familiar with at least in passing where the person maybe did get convicted where you thought, I'm not sure that was right or they got the death penalty or a severe sentence, that is not the right punishment, from what you know in the case?

A.   Right.

Q.   That's a pretty common response, I suspect, most people have.  That some they agree with and some they don't.

Do you feel that pretty well describes you?

A.   Yes, sir.

Busby - Vol 6

Q.   You indicated at one point, I believe, in response to question 98 -- and I think you and Greg talked about it -- you and Mr. Miller talked about it -- that is maybe you would have some interest in serving as a juror in this case and you expressed the reasons.  And the

@                                                                      181

following questions was question number 98 and that question was, is there any reason why you would not want to serve as a juror in this case and you checked, yes.  It may well be that you misread the question or the spacing of the answer is not well done, but is that -- is there a reason you would not want to serve as a juror?

A.   No.

Q.   So is it okay if I change that answer?

A.   Yeah, you can change that answer.

Q.   All right.  Do you know anything about how Texas goes about trying -- trying people for and perhaps inflicting the death penalty before the time that you had this explanation?

A.   No, sir.

Q.   Having heard the explanation, how does it -- how does it strike you?

A.   I think I have a more clear understanding of what is imposed of me as a juror and what I have to -- the decision that I have to make pertaining to that.  I think I have a better understanding.  I don't know if I am explaining that right, but with all of the facts and without the reasonable doubt and all of the explanation.

Q.   Well, I think probably most -- most people who are not involved with it on a day-to-day basis are much

like you.  They have some vague notion as to how it works,

but until they actually get called up for jury service and have it explained in detail, they are probably not too conversant with the ins and outs of it.

Now that you had some further explanation of it, do you have an impression that it's a good scheme, it's a bad scheme, that it's too slanted in favor of the Prosecution or too slanted in favor of the Defense?  What are --

A.  I don't really look at it as a favor of either one, but I do look at it as the importance of the decision that you have to make as far as on the issues that, you know, the decision that you have to make individually.

Q.  Yeah.  Well, and each individual jurors -- of course, there is 12 of you.  Each individual juror has to make three individual questions.  I'm not that good in math, but 12 times three is 36.  That means in effect, 36 verdicts -- 36 decisions that have to be made by that jury before the death penalty can be imposed.  35 ain't going to do it.  It takes all 36.  A bit of a -- a bit of a safeguard is built into it because, while it takes 12 and 12 on those two special issues to inflict the death penalty, as you may recall seeing on the graph, it only takes ten to answer the questions in such a manner -- either of the questions in such a manner so the death penalty cannot be imposed.  So there is a little bit of a

Busby - Vol 6

fudge factor built in favor, if you will, slanted toward giving somebody life as opposed to taking life.

Does that seem all right to you?

A.   Yes, sir.

Q.   Does that in any manner seem at odds with the opinion that you expressed that you believe in the concept of an eye for an eye?

There may be somebody who is found guilty of capital murder that is intentionally causing the death of somebody in the course of a kidnapping and yet, by virtue of the requirements of the law or by virtue of the decisions of the jury, it is not an eye for an eye, but it's a life sentence for an eye?

A.   Right.

Q.   How does that sound?

A.   Well, the way things were presented today, I have some different thoughts on that.

Q.   Well, I mean, I think a lot of people, when they are asked to state arguments in favor of the death penalty, use that exact phrasing.  I think the Court would also tell you that if you had some -- if you had some religious or Biblical injunction, if you will, in favor of or in opposition of the death penalty or something such as that, that you have to be willing to set that aside to follow the law that the Judge gives you.

@                                                                184

As long as you can do so without doing violence to your personal belief or your own personal morality, then you would be qualified to serve as a juror.

Some people can't.  Some people say, look,

Busby - Vol 6

the Biblical teachings outstretch anything the Judge is going to tell me to do.  That person would not be qualified.

Q.  I take it you are not such a person?

A.  No.

Q.  You would be able to follow the law that is the law of the State of Texas?

A.  Yes, sir.

Q.  Do you find that at odds with, say, your personal beliefs or convictions?  If you are a juror, you have to be willing to set aside those personal convictions.

Do you think you can do that?

A.  Yes, sir.

Q.  Now, you don't have to do that today because you are not a juror yet.

A.  Okay.

Q.  And if you say, you know, I feel so strongly in this or I disagree so strongly with this aspect of the law that I can't in good conscience do that, you need to tell us.  You have got a perfect right to say, I don't believe

@
                                                                      185

in that.  That is contrary to my beliefs today.  If you take an oath to serve as a juror, then you no longer have that option.

Q.  Do you understand that?

A.  Yes, sir.

Q.  Anything that we have talked about thus far that seems to be at such odds with your personal beliefs or your personal conscience or your personal code of morality

Busby - Vol 6

that you think it would cause you to stress to have to follow the law of the State of Texas versus your own personal beliefs?

A.  No, sir.

Q.  Here is something that I want to explore with you a little bit in regard to the death penalty.  You know how -- you know how it works, so I'm not going to belabor that.

You indicated several times in your questions, though -- or in your answers, if a person is guilty without a doubt -- I take that to mean without a reasonable doubt with that further explanation -- and no remorse whatsoever, the death penalty is appropriate.

I know what you are saying, but here is what concerns me as a lawyer appointed by the Court to represent Mr. Busby -- frankly, trying to get keep the death penalty from being imposed in this case.

@                                                                    186

A Defendant has the right to remain silent and not present any evidence in his own behalf.  You know that?

A.  Yes, sir.

Q.  If you are of such a mind, however, that if a Defendant is guilty and doesn't express or doesn't demonstrate or show remorse in some manner, that you are going to be giving him the death penalty, do you see where that may be at odds were that right to remain silent?

A.  Oh, yes, sir.

Q.  Because the Defendant is not obligated to say anything or present any evidence at trial including

Busby - Vol 6

evidence of remorse.  And if a juror could only say -- could -- if a juror says, I could only not give him the death penalty if he expressed remorse, then your need to see remorse may be at loggerheads with his right to remain silent and not present evidence.

Am I making that clear?

A.    Yes, sir.

Q.    All right.  I don't know how to resolve that.  Tell me how we resolve this issue.

A.    Well, it -- maybe I feel like I don't answer it right now, now that you put it that way.

Q.    Well, and I'm not faulting you for putting it that way because I think -- I think, frankly, that is a

@
                                                                    187

normal, predictable reaction.  I mean, we would like to see people express remorse for misdeeds no matter how serious.  So I'm not faulting you, but -- but I -- neither am I comfortable saying, well, if the only way that -- that I can save a client's life is to have them express remorse when the law says they don't have to, it kind of puts me in a box.  And I need to know kind of where you stand on that with this further explanation, so I can figure out what to do.

A.    Of course, you put it in a different light then -- than the way I originally wrote that response.  Because in reading up, I read up different things on capital murder.  I mean, on the death penalty.  I did a speech paper a couple of years ago --

Q.    Oh, you did?

A.    -- on the death penalty.  So, I guess, when I

Busby - Vol 6

was reading pros and cons of, you know, weighing it out both ways, I guess I'm thinking that the person that committed the crime, it was so -- I don't know what the word is, other than so bad, that there is nothing there to indicate that he, I don't know, was even sorry for what he did.

But then on the other hand, the way you are putting it now today, it's like, it's his right not to do that. I never thought of it that way before so --

@                                                                  188

Q.   Do you believe that you are of such a mind, that if you found somebody guilty of capital murder, found that they intentionally caused someone's death in the course of a kidnapping -- you understand when we talk about finding someone guilty of capital murder, we are not saying that somebody acted by accident because then you wouldn't convict them of capital murder. We are not saying that they were insane. We are not saying that they acted in self-defense. We are saying they intentionally killed somebody. That is what you have to find before you could convict them of capital murder. That they had to intentionally take a life without legal justification or excuse. And further it has to be in the course of, in this case alleged to be the kidnapping or robbery, serious crimes in and of themselves.

If you found somebody guilty of that, then when you move to the second stage, can you imagine a circumstance in which you could vote on those special issues in such a manner as to impose a life sentence if the person did not express some kind of remorse? Some

Busby - Vol 6

kind of sorrow for what you had just convicted him of doing?

A.   So you are asking me if ---

Q.   Okay.

A.   If the person -- with the way it is presented to

@                                                                              189

me today, okay, I can now see where if the person didn't show remorse and based on everything that was shown to me, I wouldn't base my decision on that, because he wasn't showing remorse, if that is what you are asking.

Q.   So even though you might like to see somebody show remorse in the circumstances, you understand that the law says if they fail to do so --

A.   That's not a reason.

Q.   -- that would not be a reason to inflict the death penalty?

A.   No.

Q.   And there may be a circumstance in which the death penalty would be appropriate and there may be a circumstance in which it is not.

Would you agree with that?

A.   Yes, sir.

Q.   That Special Issue Number Two, that mitigation issue, I will tell you I think there is probably a limitless laundry list of things that you, as individual juror, consider as mitigation.  And if a person expressed remorse, you might consider that to be mitigation.  Your fellow jurors might not.  But the lack of remorse, I'm going to suggest to you, could not be -- would not be a proper consideration for lack of mitigation.

Busby - Vol 6
Does that make sense?

190

A.   Yes, sir.

Q.   One side of it would be helpful in showing mitigation and the other side would not be appropriate issue of concern or consideration by you?

A.   No.

Q.   Oh, a variety of other things might be considered mitigation, other things might not be.  Some people might consider age as being mitigation.  Well, they are awfully young and I'm going to consider that as mitigation.  But so old, if they go to prison for life, they will die there, so I consider that mitigation.  Some people might consider everything from intellectual functioning to good or bad family life, to good or bad upbringing, schooling, circumstances, all kinds of things can be considered mitigation.

If you want to consider mitigation, would you be willing to keep an open mind as to what is mitigation and what is not until you hear the evidence?

A.   Yes, sir.

Q.   And once you hear the evidence, you can say to yourself, well, that is a factor with me and that is not a factor.  Discuss that with your fellow jurors and making judgments about that Special Issue Number Two.

Would you be able to do that?

A.   Yes, sir.

191

Q.   Mitigation, as Mr. Miller, I think, described
Page 166

Busby - Vol 6

it, is kind of a fail-safe, for lack of a better term. That is the last opportunity that the jury has, although they found somebody guilty of intentionally committing murder, although they have found beyond a reasonable doubt unanimously that the person -- what they know of the person presents the probability of future acts of criminal acts of violence against the community and society.

That mitigation Special Issue Number One represents the last opportunity to say all that withstanding, we think there is sufficient reason not to execute this person and that's the purpose of that question. It's unlimited as to -- I'm going to suggest to you as to the scope of the evidence that you can consider and what that evidence means to you.

Do you think you can do that?

A.   Yes, sir.

Q.   All right.  As you sit here right now, I take it you don't have a closed mind about the nature of the evidence that you will hear?  You can listen to it and make your judgment after you hear it?

A.   Yes, sir.

Q.   Mr. Miller also discussed with you the concept of lesser included offense.

Do you understand how it is that we might

@
192

get to a lesser included offense in a case?  Because it's kind of complicated.

A.   I guess.

Q.   And let me explain it to you, because I'm not trying to put you on the spot.  Here is the deal:  Capital

Busby - Vol 6

murder is really two -- two offenses in a single incident, murder plus kidnapping plus robbery.

Well, it might be possible in a case that after the jury hears the evidence that the Court -- the Court says, well, I'm going to give the jury, for legal reasons, I'm going to give the jury the option to say, well, maybe he is guilty of capital murder, that is murder plus, or maybe he is just guilty of the murder, or maybe he is just guilty of the kidnapping.  It is lesser, but it is included in the concept of capital murder.

A.    Uh-huh.

Q.    All right.  If a jury were to find a Defendant guilty of a lesser offense -- let's say, murder, just to make it easy, then the death penalty is out the window, right?

A.    Uh-huh.

Q.    And only get convicted -- you only get the death penalty for capital murder and if you are not convicted of that, you don't have the death penalty.

Are you with me so far?

193

A.    Yes.

Q.    And then the jurors would have to look at the range of punishment for murder because that is against the law, too.  It's just not as serious as capital murder. And it has got a specific punishments under the law and the punishment, I would tell you, the ordinary first-degree punishment for murder, is from a low of five years to a maximum of life in the penitentiary.  It's the least and the most that the jury can impose.

Busby - Vol 6

Are you with me so far?

A.   Yes, sir.

Q.   So if the jury finds you guilty of murder, they have got to assess the punishment between five years and life.

Now, there is all kinds of murders and there is all kinds of Defendants, all kinds of circumstances and all kinds of facts that you might hear. And my question to you is this:  Do you believe you are of such a mind that if you were to find a Defendant guilty of murder, that is, the intentional killing of another person without legal justification or excuse, that you could then consider imposing a sentence of as little as five years if the law provided for it and the facts justified it?

A.   You are asking me if I can give somebody that murders someone five years?

@                                                              194

Q.   Well, close, not quite.  I'm asking you if you could consider that you could give fair consideration to giving them as little as five years.  I can't ask you if you would or not because you don't know the facts.

A.   No.

Q.   As you sit here right now, having found somebody guilty of an intentional murder, you could give fair consideration to giving them as little as five years?

A.   Yes, sir.

Q.   You have not closed your mind then as to that possibility?

A.   No, sir.

Q.   The opposite side of the coin is also

Busby - Vol 6

appropriate to ask you about.  And that is, could you give fair consideration to giving the maximum, that is, life in the penitentiary?

A.   Yes, sir.

Q.   Again, depending upon the facts and circumstances of the particular case?

A.   Right.  Yes, sir.

Q.   So if the law allowed for it and the facts justified it, you could give that consideration; is that correct?

A.   Yes, sir.

Q.   Or anything in between?

@                                                                    195

All right.  See the purpose of this inquiry is to make sure that as you sit here now, you are not saying, if I find somebody guilty of murder, I'm always going to give them life.  Because then you would have prejudged the case.

Just like saying, you come to court and you have been indicted, I'm always going to find you guilty. That wouldn't be fair either, would it?

A.   No, sir.

Q.   You have got to keep an open mind as to guilt. You have got to keep an open mind as to punishment. Whether it is death penalty punishment or years in the penitentiary punishment until you hear the facts of the case.

Do you think you can do that?

A.   Yes, sir.

Q.   Do you have any predisposition?  Any sort of

Busby - Vol 6

pre-inclination, I guess, toward finding somebody guilty just because they are charged?

A.   No, sir.

Q.   Do you have any pre-inclination, predisposition to giving somebody death --

A.   No.

Q.   -- just because you find them guilty of capital murder?

@                                                                    196

A.   No, sir.

Q.   Or giving them a maximum sentence, if you find them guilty of the lesser offense?  Could you just wait and reserve judgment until you hear everything?

A.   Yes, sir.

Q.   All right.  The other thing you need to know about the death penalty -- the death penalty process here is:  The only thing that is really automatic about it is, if you answer Special Issue Number One, yes, you and your fellow jurors, all 11 -- all 12 of them answer the first question, yes, and the second question, no, it is automatic that the Judge is going to impose the death penalty.  You have got no choice, no discretion, all right?  Other than that, everything else is up for grabs.

Here is what I mean by that:  Just as -- just because the State charges capital murder, you don't automatically find them guilty, right?

A.   Right.

Q.   Just because you find them guilty, you don't automatically answer Special Issue Number One, yes?

A.   Correct.

Busby - Vol 6

Q.   You weigh the evidence and maybe this is one of those cases where it is not -- just because you find them guilty and answer Special Issue Number One yes, you don't automatically answer Special Issue Number Two no.  Each of

@                                                                                      197

these is separate.  Not an independent because you get to consider all of the evidence on each of these.  But each of them is a separate -- separate set of decisions, guilt, Special Issue One, Special Issue Two, okay?

A.   Yes, sir.

Q.   And you start doing things automatically in this process, that's when we get in trouble.

I take it you would not do so?

A.   No, sir.  I wouldn't.

Q.   Are you still quite as enthusiastic about being a juror in this case?

A.   Yes.

Q.   Do you have any -- do you have any plans, any concerns about your obligations, your schedule that you think would impact on your ability to serve on this case?

None of us know for certain when testimony will start.  But let's say it starts about the first week of November, I suspect.  It will take another two weeks to try the case.  I think all of us have great hopes we would be finished before Thanksgiving.  We may be hard on Thanksgiving before we get out.

How does that fit with your schedule, your obligations, personal work, whatever?

A.   My schedule is pretty open.  I'm okay.

Q.   Any questions you want to ask us?

Page 172

@

198

A.   No.

Q.   Any questions you want to ask the Judge?

See, I'm volunteering him to answer questions.

THE COURT:  I'm going to object to that.

Q.   (By Mr. Strickland) Any reason you can think of that you would not be a fair and impartial juror?

A.   No.

Q.   You have got -- you have got -- you have got children?  You have got brothers and sisters?

A.   Yes, sir.

Q.   Mom, dad?

A.   Uh-huh.

Q.   If one of them were on trial for something, somebody came in with your mindset, your beliefs, your feelings and wanted to be a juror in their case, would you be comfortable having somebody like you on their case?

A.   Yes, sir.

Q.   Because that is kind of where it gets real personal when we start worrying about those we love.  As long as you are comfortable with someone like you serving on their jury.

Thank you for visiting with me.  I appreciate it.

THE COURT:  Okay.  Now, I get to talk to

@

199

you.

Busby - Vol 6

You are not on the jury yet, but you are on the panel that the jury is going to be selected from.

I am -- you'll be brought back to court at some point. We are not exactly sure when. The jury will be selected that day. You will be on the jury. You could be an alternate on the jury. I don't think you could be. You will either be on the jury or released at that time.

We are going to take two pictures of you before you leave. We'll do that. This could to go on for a month and we are going to be see lots of people. The lawyers will look at it and see your answers.

In the meantime, don't look up anything about the case. Don't seek out any information. Don't go back to work and say, hey, what do you know about it?

As the trial gets closer, there will probably be publicity in the case. Don't look at it on the TV, walk out of the room. You can save the papers and read it when you are released. And also if you change work or home phone numbers or addresses, you need to let us know. You will be coming back one more time.

And with that I'll call the bailiff and see if we can get pictures taken and let you go home.

THE BAILIFF: I have already called her, Judge.

@                                                    200

THE COURT: Good work. I guess she will come get you right at that door.

(Prospective Juror retires)

THE COURT: We are going to have to eat lunch. I have got to eat lunch.

Page 174

Busby - Vol 6

Can y'all be back in 30 minutes?

MR. STRICKLAND:  I cannot even go.

MR. MILLER:  I can.

THE COURT:  You can.  Is that too long?  I can be through faster than that.

THE COURT REPORTER:  We need 30.

MR. STRICKLAND:  30 minutes.

THE COURT:  Okay.  Oh, that is right. We'll make it back in 30 minutes.  If you will just tell both -- we have got two people out there?

THE BAILIFF:  Yes, Your Honor.

THE COURT:  Why don't you tell them both to be back in 30 minutes.

(Recess from 1:45 p.m. to 2:30 p.m.)

THE COURT:  We are ready for Greg Miller.

MR. SHANNON:  Yeah, Greg hop up there, please.

(Off-the-record discussion)

(Prospective Juror enters)

THE COURT:  Just have a seat and raise your

@                                                                201

right hand after you sit down.

(Prospective Juror sworn)

THE COURT:  If you will state your name?

PROSPECTIVE JUROR:  Gregory Blake Miller.

THE COURT:  And, Mr. Miller, I need to first ask you since you are under oath:  You filled out a questionnaire, were your answers true and correct on that questionnaire?

PROSPECTIVE JUROR:  Yes, sir.  I'm hard of

Page 175

Busby - Vol 6

hearing.

THE COURT: Okay. First off, I'll introduce myself. I'm Phillip Vick. I'm the Judge presiding at this proceeding. Judge Wayne Salvant will try the case. We think that it is going to start somewhere around November 7th.

The attorneys involved in the case representing the State: Mr. Joe Shannon and Mr. Gregory Miller. And representing the Defendant is Mr. Jack Strickland and Mr. Steve Gordon.

And I guess I will ask you: Is there anything we need to know about you that -- before we get started with this?

PROSPECTIVE JUROR: Pertaining to what?

THE COURT: Any reason you couldn't be a fair and impartial juror?

@                                                                202

PROSPECTIVE JUROR: Oh, no, sir.

THE COURT: Next off, we need to apologize to you. You have been kicked around. We got started an hour and a half late due to nobody's fault this morning. So we have been running late all day. We apologize to you for the way you had to go.

I'll recognize the State.

MR. SHANNON: Thank you, Your Honor.

GREGORY BLAKE MILLER,

having been first duly sworn to make true answers to questions touching upon service and qualifications as a juror, testified as follows:

VOIR DIRE EXAMINATION

Busby - Vol 6

BY MR. SHANNON:

Q.   Mr. Miller?  Your name is Gregory Miller; is that right?

A.   Yes.

Q.   You are not any kin to this Gregory Miller, are you?

A.   No, sir, I don't think so.

Q.   Okay.  Mr. Miller, you indicated that you had a little difficulty hearing perhaps or something?

A.   Yes, sir.

Q.   Is that in one ear, both ears or how is that?

A.   I can't hear out of this one.  I can hear out of

                                                     203

this one pretty good.

Q.   Okay.  So it really affects you on one side of your -- of your head; is that right?

A.   Uh-huh.

Q.   Okay.  Let me ask you this question, sir:  Of course, it's important that a juror be able to hear the evidence that is being presented and this courtroom here that we are in is a little bit smaller than the actual courtroom that we will be trying the case in and the jury box is a little further removed from the witness stand, not too much.

Do you think that in a normal conversational type tone without a lot of background noise, which I don't think there will be, do you think that your hearing situation would permit you to be sufficiently attentive and knowledgeable to hear all of the evidence, as long as -- people will be using a

Busby - Vol 6

microphone and things like that?

Do you think your hearing will be satisfactory to permit you to serve as a juror in a case of this kind of magnitude?

A.    Well, I would hope so.

Q.    Okay.  And I know that my hearing is not as good as it used to be and I do find sometimes that when there is background noise, it is a little bit more difficult for

@                                                                     204

me to hear than it was for me 10 or 15 years ago.

A.    I have been in construction all of my life with loud machinery, so --

Q.    Well, and that -- I know some people in the similar situation and it's one of those things, I guess, occupational hazards, so to speak.  But you think you could -- you could sit and if you have a problem here, you have a right to hold up your hand and ask somebody to speak up or whatever and the Judge will be attentive to that if you are selected as a juror.

A.    I just do the best I can do.

Q.    All right.  That is all we can ask you.

Now, let me ask you this question, sir:  I noticed on your questionnaire, you are in the trim business.  Trimming homes and stuff like that?

A.    Yes, sir.

Q.    When you say trim, you are talking about the interior.  Does that include cabinetry, things of this nature?

A.    I don't do the cabinetry, but I do everything but the cabinets.

Busby - Vol 6

Q.    Okay.  Do you work primarily for one home builder or several home builders?

A.    I have three.

Q.    Do you?  Okay.  It pretty well keeps you

205

full-time with those three?

A.    Pretty much.

Q.    Okay.  And I assume that since you are mostly working inside, that the weather is not as big a factor as it might be if you were a framer or something like that?

A.    No, sir.

Q.    Now, you indicated on your juror questionnaire that you were a little concerned that if you were tied up here a great length of time, that these home builders, needing to continue building their homes, I guess, would put those jobs to somebody else or some other company and you might lose business.  You indicated -- I think the way you said it, you might go under?

A.    Yes, sir.  If I ain't there to manage the job, they will just hire somebody else.  It is real hard to go kicking bushes and find another builder.  I mean, it is --

Q.    They are not -- they are not real sympathetic, is what you are saying.  They need to get their homes built --

A.    No, sir.  They want to get it up and get the old-mighty-dollar in their back pocket.

Q.    And they don't make anything until somebody closes on the house?

A.    Right.

Q.    All right.  Now, here is my question -- let me

206

Busby - Vol 6

tell you a little about what we anticipate the time consumed in this case will be and let you kind of -- because nobody at this point has given you that information that I know of.

The jury selection process takes probably a long time, but you are only involved today, okay?

Now, if you are selected as a juror, we anticipate that the trial of the case will start somewhere around the first part of November. And we anticipate that both the guilt and the punishment phase of the case will probably take approximately -- and there is no guarantees -- but approximately two weeks.

Would two weeks off of your job put you in a position to where you would suffer a tremendous financial hardship or would you have enough jobs kind of in the pipeline to have your crew doing it if you were up here for two weeks. Just during the days now. I don't anticipate you having to be up here in the evenings. That is about what the best guess I can make.

A.   It will be real difficult because I have something to do every day and finding good help that shows up every day is far and few between.

Q.   Okay.

A.   So if I'm not there -- sometimes I'm there by myself.

@

207

Q.   Oh, really. Okay.

A.   You know, I have got guys that show up two days

Busby - Vol 6

a week.  Some show up three days a week.  It is just hard to find good help out there.

Q.  All right.  So in other words, would you think a two-week delay would -- two-week absence from your frame -- from your trimming business would cause you such a irrevocable financial hardship that you would have a hard time concentrating on the case to the point to where you wouldn't really pay attention to the evidence; you would be more worried more about --

A.  I'm having that right now.

Q.  Okay.

A.  I have got kids in college and people at home.

Q.  All right.  Well, let me ask you one more thing, too.  I noticed on your questionnaire you have got a couple of kiddoes under ten?

A.  Yes.  I have got a 22-month and nine-year-old and 17-year-old and 19-year-old.

Q.  You got them spread out pretty good there?

A.  I don't know what happened.

Q.  I can imagine, but we won't go there.

Let me ask you this:  You have got custody of those children?  They are living in your home?

A.  Uh-huh.

@

208

Q.  You have right under the law, if you have custody of children under the age of ten, to claim an exemption from jury duty.

A.  Well, I tried that, sir and they --

Q.  They wouldn't let you?

A.  They didn't listen to me.

Busby - Vol 6

Q. You are kidding?

A. No, sir.

Q. Okay.

A. My wife is an alcoholic and she ran off and I told the lady on the phone. She acted like she didn't care and for me to be up here or they would send a warrant out for my arrest.

Q. Wow.

A. So that is why I have been here.

Q. You have got a 22-month-old baby?

A. I have no parents, no sisters.

Q. Do you want to claim that exemption right now?

A. If you would let me, sir.

MR. SHANNON: It is up to the Judge.

THE COURT: Any objections?

MR. STRICKLAND: No objections.

THE COURT: Okay. We are going to let you claim that.

PROSPECTIVE JUROR: I will be more than

@                                                                   209

happy to help you some other time.

MR. SHANNON: Okay. We appreciate it. We thank you for being patient --

THE COURT: We thank you. We appreciate it. I will let -- we'll consider you excused because you are claiming an exemption for the minor.

(Prospective Juror retires)

(Off-the-record discussion)

THE COURT: Are we ready for Eddy Lin?

(Prospective Juror enters)

Busby - Vol 6

THE COURT: If you will raise your right hand.

(Prospective Juror sworn)

THE COURT: Would you state your name first.

PROSPECTIVE JUROR: My name is Eddy Lin.

THE COURT: Mr. Lin, you filled out a juror questionnaire the other day?

PROSPECTIVE JUROR: Yes. Half of it, not completely.

THE COURT: Okay. You didn't make it through the whole thing or --

PROSPECTIVE JUROR: I did, but I didn't answer some.

THE COURT: The answers you gave, were they

@                                                                                    210

true and correct?

PROSPECTIVE JUROR: Yes.

THE COURT: My name is Phillip Vick. I'm the Judge presiding at this proceeding.

Judge Wayne Salvant, that you met last week, will try the case. We think that will start sometime around November 7th.

I will introduce the attorneys involved in the case. Representing the State: Mr. Joe Shannon and Gregory Miller. Representing the Defendant is Mr. Jack Strickland and Mr. Steve Gordon.

I'll first ask you: Is there anything we should know about you about some reason you couldn't be a fair and impartial juror in this case?

Page 183

Busby - Vol 6

PROSPECTIVE JUROR:  I don't know nothing about this case.

THE COURT:  Okay.  Then I'll recognize the State.

EDDY LIN,

having been first duly sworn to make true answers to questions touching upon service and qualifications as a juror, testified as follows:

VOIR DIRE EXAMINATION

BY MR. MILLER:

Q.   Good afternoon, Mr. Lin.  How are you today?

@                                                           211

A.   Fine, thank you.

Q.   I'm sorry we have had you waiting out in the hallway for a while.  We do appreciate you coming.

Before I get into the -- I guess, it's what we normally talk about here.

In looking over your jury questionnaire from last Friday, there seemed to have been a lot of the questions that you did not answer, okay?  Was there any particular reason for that?

A.   Sometime for reading --

Q.   I'm sorry?

A.   For reading, it is hard for me.

Q.   Okay.

A.   I not quite understand the question.  That's why I didn't write down answer.

Q.   How -- I'm sorry.  Go ahead.

A.   I do my best to try to answer that question.

Q.   Is it easier for you to understand English as

Busby - Vol 6

opposed to read English?

A. Yeah.

Q. Okay.

A. Not completely, but to tell the truth, I understand most of it, but not complete sometimes.

Q. Well, let's set aside the questionnaire for just a moment. When Judge Salvant was giving the jury panel

@
212

the instructions that he gave, do you remember that? When Judge Salvant was sitting at the bench? Were you able to follow along with his -- did you understand the instructions?

A. Most -- most of it, yes. But I don't know what I missing, but I answer.

Q. Did you read the written instructions that you were given by the jury room staff? It was like a four or five-page document?

A. Yeah, I go through it, but, yes.

Q. Did you read those?

A. Most of them, yes.

Q. Okay. All right. Of the ones that you read, did you understand them?

A. Yeah. Like I said, most of it I understand, but I don't know which one I not understand. But I just -- I read it, but --

Q. Okay. I don't --

A. -- I don't know how to answer it.

Q. Well, one of the things we are going to have to --

MR. MILLER: Oh, okay. I think we have a

Busby - Vol 6

motion, Your Honor.

THE COURT:  Okay.  Mr. Lin, I need to hear something right quick.  If you will step outside for just

213

a minute.

(Prospective Juror retires)

THE COURT:  Is there an agreement?

MR. MILLER:  Yes, we have an agreement.

MR. STRICKLAND:  Your Honor, there is an agreement.  We have spoken with Mr. Busby and Mr. Busby is in agreement with our agreement to excuse Mr. Lin from further service in this case; is that correct?

THE DEFENDANT:  Yes.

THE COURT:  Just because he couldn't speak and understand English?

MR. STRICKLAND:  Yes, sir.  Actually that may help us.  I don't know.

And, Judge, if we could --

THE COURT:  For the record, I will approve that agreement and we'll release Mr.  Lin.

Go ahead and tell Mr. Lin he is released.

MR. STRICKLAND:  If I could, for purposes of the record, Judge, the particular concern for us, on the written questionnaire, which I know will be included in the evidence in the record of this case, the gist of questions, beginning with question No. 78 which discusses the law, in particular the death penalty, and there is virtually, I think, maybe with only one exception, any of those questions that were answered.  And, of course, the

214

Busby - Vol 6

death penalty questions are central to our interest in this case.

And so for that reason we have decided to agree to excuse him.

THE COURT:  Okay.  Okay.  Are we ready for Teresa?

(Off-the-record discussion)

MR. STRICKLAND:  Judge, we have an agreement on No. 23.  Judge, we'll tell you afterwards.

(Prospective Juror enters)

THE COURT:  If you will raise your right hand.

(Prospective Juror sworn)

THE COURT:  First, if you will state your name.

PROSPECTIVE JUROR:  Teresa Thigpen.

THE COURT:  Ms. Thigpen, you filled out a juror questionnaire.  Were the answers on that questionnaire true and correct?

PROSPECTIVE JUROR:  Yes.

THE COURT:  My name is Phillip Vick.  I'm the Judge presiding in this proceeding.  Judge Wayne Salvant will try the case and we think it will start somewhere around November 7th.

I'll introduce the attorneys to you.

@                                                              215

Representing the State is Mr. Joe Shannon and Mr. Greg Miller.  Representing the Defendant is Jack Strickland and

Busby – Vol 6

Mr. Steve Gordon.

And before we start, I'll ask:  Is there anything we need to know about you, why your schedule is a problem or why you couldn't be a fair and impartial juror? Anything we need to know before we start?

PROSPECTIVE JUROR:  The only thing is I'm pregnant, five and a half months.  Other than that, no.

THE COURT:  Are you having any medical problems with it?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  I'll recognize the State.

MR. SHANNON:  Thank you, Your Honor.

TERESA LYNN THIGPEN,
having been first duly sworn to make true answers to questions touching upon service and qualifications as a juror, testified as follows:

VOIR DIRE EXAMINATION

BY MR. SHANNON:

Q.    Ms. Thigpen, I am Joe Shannon, one of the lawyers representing, along with Mr. Miller, the State in this case, the State versus Edward Busby.

And I was going to just kind of flush out a

@                                                                216

little bit, if I might, the issue of the pregnancy and how it might impact on your service.

By the way, we do appreciate you putting that note down there because there was no pregnancy question on there, but you gave us that information because certainly nobody in this group wants to put

Busby - Vol 6

anybody at risk or anything by doing the civic duty serving on the jury.

So let me ask you this:  You indicated to Judge Vick that you hadn't had any particular problems with this pregnancy?

A.   No, none at all.

Q.   Okay.  Is this your first?

A.   My second.

Q.   Second one, okay.  Then as far as you know -- and let me give you a rough timetable of what we are looking at.  We anticipate, cannot guarantee, but we do anticipate beginning testimony in approximately one month. The selection process, as you can see, takes a while. Now, that would mean in all likelihood, we anticipate the trial of the case, including both guilt and punishment, to take approximately two weeks.  So that would put you probably on the lip of the cuff of seven months?

A.   Correct.

Q.   Am I right?

@                                                                 217


A.   Correct.

Q.   Is there anything about that timetable or about your personal situation or anything that would in any way impact or cause you to be -- have a problem sitting as a juror in the case other than we might have to take a break from time to time as sometimes is the case with pregnant ladies and men as old as me, you see.

So would that pose any kind of problem?

A.   No, no problems.

Q.   Okay.  Good.  So you could sit as a juror if you

Busby - Vol 6

were selected?

A.    Yes.

Q.    And without regard to any health issues?

A.    Yes.

Q.    All right.  Thank you.

Now, let me ask you this -- I'm going to just kind of go over a few things.  I'll ask you a couple of specific questions, a little about yourself.

You have indicated you have been ten years with the Arlington I.S.D.?

A.    Yes.

Q.    And I gather from your -- from your questionnaire and some of the answers that you have given -- and by the way, your filling this out has helped all of us speed this process up a great deal.  I kind of

@                                                                    218

detect, just from reading everything, that you obviously have an abiding interest in young people?

A.    Yes, I do.

Q.    Okay.  And that is as it should be and as people in your profession should do.

And I noticed in talking a little bit about some of the causes of crime and criminal behavior and things of that nature, that you kind of indicated that you felt like there ought to be better ways of dealing with younger offenders?

A.    Correct.

Q.    And by -- you didn't say younger offenders and that is my word.  But in that area, what age group are you particularly most concerned about in terms of their

Busby - Vol 6

interaction with the criminal justice system?

A.   Under 18, high school students, teenagers.

Q.   Kids who screw up, make a mistake, ought to not necessarily be blemished for life because of their lack of judgment at that age?  Is that a fair characterization?

A.   Yes.

Q.   I know there is a ton of people that share that. But do you feel like, once people have made mistakes, maybe had a second or third chance that perhaps there comes a time of having to be accountable?

A.   Definitely, at any age.

219

Q.   Okay.  Thank you.

And I'm assuming that that probably works that way in your high school?

A.   Yes.

Q.   Okay.  And first offenders generally don't wind up getting the extreme punishment than those who finally continue to abuse the rules and regulations and that sort of thing ultimately do?

A.   Correct.

Q.   You don't see anything wrong with that system?

A.   No, not at all.

Q.   All right.  Let me go through a few things with you because -- do you ever watch Law and Order or anything like that?

A.   Occasionally, if I'm home.

Q.   Okay.  Well, your husband is a coach, too?

A.   Yes.

Q.   And he is coaching football?

Busby - Vol 6

A.    Yes.

Q.    So he is a little busy this time of year?

A.    Yes.

Q.    And he probably has long hours?

A.    Very long.

Q.    But when you have time, things like Law and
Order or C.S.I or some of those, I will represent to you

@                                                                    220

there is no way we are going to do this whole process in
an hour and have time to run out to Rikers and talk to
people in the middle.  Do you understand?

            Okay.  People sometimes get an idea of how
our criminal justice system works from their the
television experience and that sort of thing.  And I just
want to let you know that most of that is kind of
make-believe.  And quite truthfully, if a TV show would
try to film the process we are engaged in, there would be
no viewers at all.  You don't see a raft of people in this
courtroom.  And the same thing is true with the normal
trial.  It is slow moving, but it is slow for a very good
reason.  We are not trying to entertain.  We are trying to
be deliberate and trying to do it right and perfect.

            And as part of being a juror, you are
called upon from time to time to maybe be excused from the
room while we take care of legal issues that are not yet
ready to go in front of the jury and things like that.

            Would that sort of thing bother you if you
felt like what we were really trying to do is get it
right?

A.    No.

Busby - Vol 6

Q.  All right.  Have you had prior jury service before?  I don't recall your question.

A.  No, I got on a final panel of 30 on a DWI case,

@

221

but was cut from that.

Q.  Okay.  And I take it then that -- is there any particular reason why -- and I will tell you this before I get started here.  This is a case in which the State seeks the death penalty.  And it is a capital murder case.  And I'm going to explain those elements to you a little bit.

Does the mere fact that the State seeks the death penalty, does that in any way cause you a -- any reason why you could not serve on the jury?  Not whether you want to, but whether for some reason you could not serve?

A.  No, there is no reason.

Q.  Okay.  Good.

Okay.  Now -- and I think you would understand and agree that when the death penalty is on the table, so to speak, it is probably the most serious of all criminal trials that can be taking place?

A.  Yes.

Q.  A lot more serious than the DWI where incarceration is the maximum punishment, okay?

All right.  I'm going to go through a few things and I have got some slides up here that may kind of help us talk just a little bit.  I'm going to ask you a couple of things.  This is what we call the voir dire process.  And as number two says, this is the only time

@

222

Busby - Vol 6

the lawyers get to talk to a juror and ask you questions. And so consequently, you're really at our mercy now -- or excuse me -- I'm really at your mercy. I got it backwards. We are really at your mercy because of the answers that you give and everything are the only things that we can use to judge as to whether or not you could and would be a fair and impartial juror if taken in this kind of a case.

Now, later if you get in the box and everything, you are at the lawyers' mercy and you will think, well, we are over-masticating an issue or something too long, but unfortunately a juror doesn't have the power to control that.

Now, there is no right or wrong answers in this exercise. It is not like school. You know, some answers are right some days and wrong some other days. And that is probably why practicing law is an art instead of a science. But anyway, we are going to ask you a few questions about your background.

If you have a question while we are in the middle of this, please ask. There is no dumb questions, only dumb answers, okay?

And I am not sure we can answer your question, but we will try. And sometimes certain things we are limited in what we call the voir dire process which

@                                                                          223

is, I think, means to speak the truth. And we are limited in some way. Because like, for instance, things we cannot do. We cannot tell you the facts of case because that has

Page 194

Busby - Vol 6

to come out in the evidence.  Because what a lawyer says is not evidence.

Another thing we cannot do is to ask you in advance how you would vote if you were on a jury and a given set of circumstances because you have got to hear the evidence first.  It would not be fair to ask you in advance to tell us what you were going to do because how would you know.

You understand?

A.   Yes.

Q.   Now, is there any of those reasons or anything that you can think of why you could not serve as a juror --

A.   No.

Q.   -- in this matter?

We'll pursue it a little further.  A case is brought to court in a felony trial by virtue of what is called an Indictment.  I'm sure you have heard of that. And it merely is a formal pleading which is prepared and brought to court and it recites the charges that are being brought against the individual who is accused of the crime.

@
                                                            224

Now, it is the charging document and it is nothing more than that.  It is a piece of paper with a bunch of writing on it that says -- and gives notice to the people of what it is the State says you did.

Now, the most important thing is that the Indictment is not evidence of guilt.  An Indictment is nothing more than a piece of paper.  It does not prove or

Busby - Vol 6

disprove guilt or innocence or anything like that. And the Court will instruct you that merely because a person has been indicted, that cannot be taken as any evidence against them. It is merely a mechanism of bringing a case to court.

However, there are people who believe, for some reason, that if a person is indicted or charged with the crime, they must be guilty or they wouldn't have been indicted, you see, but that is not the law. That is merely an opinion of somebody, say a police officer or a Grand Jury or whoever. It is merely someone's opinion that this case ought to be tried, okay?

Can you abide by that instruction that an Indictment is no evidence of guilt? You have got to hear the proof.

A.    Correct.

Q.    That is not a problem for you? Okay.

And most of these things I ask you about

@                                                                 225

won't be a problem.

Now remember this: The only things that must be proved are the elements of the Indictment. And an element means what are the things that make up a crime. What are the component actions that constitute a crime, if you do them, okay?

Now, we are not required as the State to prove motive. Now, that's a misconception some people get from watching Law and Order or detective shows. And it is a legitimate inquiry for a policeman to say, okay, who would have a motive to want somebody harmed or want

Page 196

Busby - Vol 6

somebody dead?  But once it is determined that a case ought to be brought to court, then the State is not required to prove why somebody did something.

Now, if the State can prove it, then that may be helpful to you.  And as a juror you might want to know why somebody would want to do something because some things people do are so totally bizarre.  That is so farfetched from your imagination, you might wonder why would somebody do that?  Just like maybe some kids at your school.  You look around, why would you do that, you dummy.  You don't know why they did it.

Because would you agree with me, the only person who truly knows why somebody did something is the person who did it?

@
226

A.    That is right.

Q.    And in our law we can't make the Defendant testify and we can't open their head and look inside and say why they did it.  This is why the State does not have to prove motive.  Although on television, motive is a big deal.  It helps make a story.

Would you agree with me that you wouldn't require the State to prove motive even though you might want to know why?

A.    I agree with that.

Q.    Not a problem to you.  Good.  Okay.  We are going to talk about murder and capital murder here in a minute.  And so murder is a pretty straightforward definition.  You commit murder if you intentionally or knowingly cause the death of an individual.  And there is

Busby - Vol 6

justification and things that come into play.  But by and large, that is the CliffsNotes version of exactly what a murder is.

Murder is what we call a first-degree felony.  Now, I am going to talk a little more about punishments for murder towards the end of this.  But a first-degree felony is one that's punishable by a period of time in the penitentiary from five years to 99 years or life, okay?  It is a wide, wide range because there is a wide, wide range of reasons why people commit murder.  And

@                                                                    227

the Legislature has given the courts and juries the options to go anywhere in the range.  In other words, there is no automatics except when we get into capital and that is what I want to talk to you about.

What makes a murder capital from a regular murder?  You have got to have a killing, just like you would in murder, plus you have to have an aggravating factor.

Judge Salvant mentioned to you the other day a little bit about some of the aggravating factors.  He mentioned the murder of a police officer in the line of duty.  A murder committed in the course of committing another felony or crime.  In the case before us now, the aggravating factor is kidnapping or robbery.  Not necessarily both, but either one.

Now, so a murder committed in the course of a kidnapping is a capital murder or a murder committed in the course of a robbery.  Somebody robs a convenience store, shoots the attendant, capital murder, okay?  Or

Busby - Vol 6

somebody kidnaps somebody and kills them during the course of the kidnapping.

Now, what is kidnapping? That is pretty simple, straightforward, too. You knowingly abduct another person. That is not really anything that requires a great deal of explanation. But I wanted to go over it

@                                                                          228

with you because there might be people who would have a question about it. Like some people think if you are going to kidnap, you have got to ask for some ransom because that is the scenario you do hear on television. But not necessarily true. You may have all kinds of reasons, ransom being the last one. Now, kidnapping is a felony, two to ten years and up to $10,000.

Now, robbery, a lot of people say, you know, my house got robbed. What they are really saying is my house was burglarized. There is a distinction. Everybody understands what you mean.

But a person commits an offense if, in the course of committing theft and with intent to obtain or maintain control of property, he either, one, intentionally or knowingly or recklessly caused bodily injury to someone else or intentionally or knowingly threatened or placed another in fear of imminent bodily injury or death.

A guy goes in the convenience store. Got the gun, points the gun, give me your money. Robbery, okay? If he goes in the middle of the night, nobody is there and he steals the safe, burglary. See the difference?

Busby - Vol 6

A.   Yes.

Q.   Venue.  Venue just means what area is the case

229

tried in.  And I want to mention how venue works in a capital case so that if you have any questions about it, you can ask us.  That just means where is the crime committed.

Capital murder has two main parts, as I said, the murder and the aggravating factor.  Like the kidnapping or the robbery.

A case may be prosecuted in the county where any part of the crime occurred.  You can see why, for instance, in a kidnapping, if a person is kidnapped in one county and is taken into another county and murder results, you can prosecute in either county.  Or even across the state line, you can prosecute in either location.

None of that causes you any problem?

A.   No.

Q.   Now, here is what we have alleged in this particular case and this is probably the extent of the facts that I can mention to you because this is the allegations of the Indictment.  It is not evidence of anything.

But what the State has charged is that the Defendant, Mr. Busby, did in Tarrant County, Texas, on or about a certain date -- in this case January 30, 2004, did intentionally kill Laura Crane by covering her mouth and

230

Busby - Vol 6

nose with tape while he was in the course of committing or attempting to commit kidnapping or robbery, okay?  That is it.  That is what has been alleged.  And that charges the offense of capital murder because we have charged murder, we have charged the aggravating circumstance.  And you probably now know a whole lot more about capital murder than you ever really wanted to know.

Now, let's talk about the presumption of innocence.  And everybody -- a lot of people give lip service to the presumption of innocence.  But what we ask of jurors is that they really not just give lip service to it, but they take it to heart.  Because as we start this case, there has been no evidence presented in this courtroom against the Defendant.  And so when we start, we start somewhere and that means we start from the position of a presumption of innocence.  If the State didn't offer any evidence, then that presumption of innocence means he is acquitted.  If we offer a little bit of evidence, but not enough to prove it beyond a reasonable doubt, that means he is found not guilty.  That is the way it works.

Now, a presumption in this case is a rebuttable presumption.  By that, we mean it is a presumption the State can overcome by producing the general evidence to overcome the feeling of innocence that you start with.

@                                                                    231

Does that concept sound okay to you?

A.   Yes.

Q.   We have people who say, I can't believe somebody

Busby - Vol 6

is here who is presumed to be innocent, because they wouldn't be here if they weren't guilty.  And that does not happen to be the law.  And we can't have people on the jury who feel that way.  You see?

A.   Yes.

Q.   All right.  Not a problem.  All right. Everything I have gone over so far okay with you?

A.   Yes.

Q.   Now, the concept of beyond a reasonable doubt is a concept that is used in criminal matters.  A -- if you were on a jury panel before, and I'm sure they went over it with you to some degree, reasonable doubt?

A.   Yes.

Q.   But it's more than words.  It's the strongest burden of proof known in the law.  Because in our criminal cases, we do not guess people's guilt.  It has to be proven beyond a reasonable doubt.  But beyond a reasonable doubt is not a tough concept.

First of all, there is no legal definition. The law does not define it.  It leaves it up to you in your mind and your conscience.  It is a personal standard or individual standard.  And so you decide whether or not,

@
232

if you have any doubt at all, is that doubt a reasonable doubt?  And quite honestly we use -- we use this every day in our every day life.  And just as illustration, you and I make decisions every day based upon beyond a reasonable doubt.

If we are sitting here in the courtroom and perhaps we heard thunder outside and heard the lightening

Busby - Vol 6

strike or whatever and in a minute a guy comes in the back of the courtroom and he has got his umbrella and shaking it and dripping and doing like this and that sort of thing, we could probably conclude beyond a reasonable doubt it is raining outside, wouldn't it?

A.   Right.

Q.   Now, I guess it is conceivable that there is a men's room down the hall and he has been down there in his overcoat taking a shower.  But not likely.

A.   Yes.

Q.   Have you ever watched Wheel of Fortune?

A.   Yes.

Q.   You remember how Vanna White goes around and she flips the little deals?

A.   Yes.

Q.   You know, there comes a time when you are watching that, that you know beyond a reasonable doubt what the phrase is, don't you?

@                                                                233


A.   Right.

Q.   You don't see all of the letters, but you know beyond a reasonable doubt.  It is obvious to you, okay?

I just wanted to tell you because there are people who for some reason feel that is some sort of a mystery standard.  I just want you to be sure.  It is common, every day horse sense.

Now, in our cases we do this:  We use a two-step approach.  First of all -- and all of this is beyond a reasonable doubt, it's very simple.  Was there a crime committed?  Secondly, did the Defendant do it?  And

Busby - Vol 6

if we believe that beyond a reasonable doubt, the verdict is guilty. If you don't, it's not. That's all there is to it.

And so I just wanted to let you know that so you are not in any way taken by that particular term because, you know, it's not capable of a really good definition.

Now, a Defendant has a right not to testify. You heard about that, Fifth Amendment or whatever or, you know, all of the TV shows, you have a right to remain silent, anything you say can be used against you. And that is done all of the time. The Miranda warnings, they call it.

Now, a person has a right not to testify if

@
                                                                     234

they so choose. He can testify if he wants to. Now, as a practical matter, most of the time a decision to testify or not is a decision that is made between the Defendant and his or her lawyers. And they make a decision maybe to do it or not to do it depending -- for instance, at the end of the case the State rests, the Defense says they haven't proved their case or they feel like the State hasn't, they don't have to put on any evidence at all. The Defendant doesn't have to testify. The jury gets the case based on the evidence the State did bring and makes a decision, is there a guilt beyond a reasonable doubt.

Now, there may be some good reasons why he will testify. And we never know when we start whether there will be testimony by the Defendant or not. Because, one, that decision may not have been made and secondly,

Busby - Vol 6

they don't have to tell you until they get ready.

Now, if he does testify, there is no presumption that he tells the truth just because he is up there under oath, okay? There are people that lie under oath. I hate to tell you that, but it is true. And that doesn't really surprise you, does it?

A.   No.

Q.   Okay. And I have been doing this for 42 years and I have never seen a lightening bolt come down and zap somebody because they are lying on the stand. But at any

@                                                                                    235

rate, I'm still waiting, by the way. There is always that possibility.

Now, why may a Defendant not testify? Maybe -- maybe he is not a very articulate person. You know, you have students in class -- you coach tennis; is that right?

A.   Yes.

Q.   You do classroom work, also?

A.   Yes, I teach health.

Q.   There are kiddoes who really don't like to get up and talk in front of a crowd and they get up and they stumble and they stammer, whatever. And it may well be that the Defendant doesn't testify because of the fact that he and his lawyer decide he can't really articulate his position well enough and he is liable to make the jury think he is guilty.

But again, another reason is, he may not want me asking him a bunch of questions. You know, because I might ask him questions that he or she might not

Busby - Vol 6

want to answer. And most of the time that is the way it works. So just to tell you, there is all kinds of reasons why they don't testify. However, the key and bottom line to this, Ms. Thigpen, is that you cannot hold it against him if he did not testify even though you might like to have heard his side of the story. You can't say, well, if

@                                                                         236

he hadn't been guilty, he would have got up and told us he was. That is done when he pleads not guilty. That's it, okay?

Does it cause you any heartburn or problem that if the Defendant -- if you are instructed in this case, ladies and gentlemen of the jury -- the Defendant elected not to testify and you cannot consider that as a fact or circumstance against him, you can abide by that instruction?

A. Yes.

Q. Okay. Now, let me talk to you a minute about intent. And this is a legalistic kind of definition. Take a look at it there, if you would. It actually just articulates the things that the law says when you do something and intend to do it, you have the requisite intent, as opposed to accident or mistake, okay? And if it is your conscious objective to engage in the conduct or cause the result.

You know, if a person intends to kill somebody with a pistol and shoots at them and misses, they have the intent to kill even though they might not have accomplished it, see? All right. That is kind of a definition that you will be talking about.

Busby - Vol 6

But one of the most interesting things you need to talk about -- and here again, I hate to keep

237

relating to television, but I do find that most people that come before us for jury service have gleaned some information from TV shows, particularly of late.

Premeditation you hear talked about. And there are people that say, I couldn't find somebody guilty of murder unless it is premeditated. Well, premedition is not required in murder or capital murder.

Now, you may have a murder or a capital murder that is premeditated. A person goes in to rob the convenience store and he tells his buddy on the outside, I'm not going to leave any witnesses. And he goes in and he kills the clerk and he leaves, you can pretty well kind of say that was premeditated. However, you don't have to have premeditation in order to be guilty of murder. Premeditation is not an element of murder.

So my question to you is: That if you believe at the end of any case that a Defendant might not have engaged in premeditation, but yet he had the intent to kill and he killed intentionally, would it cause you any problem to find a person guilty if you found the requisite intent?

A. No.

Q. As opposed to premeditation? Okay.

Now, punishment options: In a capital murder case -- and this is where we kind of start getting

238

Busby - Vol 6

into some sticky stuff here and I'll kind of go over it with you.  There is two possible options if a person is guilty of capital murder.  And that is the murder with the aggravating factor.  And that is death by lethal injection or a life sentence.  Which means under the law that is applied that you have to actually do 40 calendar years before you are eligible for parole and that is the way the law works.  So it is one of the two.  There is no in between -- excuse me -- I'm sorry.

Do any of those punishments cause you a problem when somebody is guilty of capital murder --

A.   No.

Q.   -- it is life or death?  Okay.

Now, under our law you must be able in a case -- and I'll elaborate on this a little more in a few minutes -- all the juror has to do when they get in the jury box is to be in neutral and not being going forward, not be going backward and not have any preconceived opinion as to what punishment might be appropriate.  All they have to do is to say that they would be willing to fairly consider the full range of punishment.

In other words, some crimes have a punishment -- and I'll mention this to you -- murder has a range of punishment from five years to 99 or life, you see.  It is a wide, wide range because the Legislature has

@                                                                    239

figured out that there is lots of reasons why people get murdered.  Some of which might work toward the shallow end.  Some of which might work toward the heavy end.  And it gives the juries and the Judges a lot of latitude

Busby - Vol 6

there.

And if you were taken as a juror in a case in which the range of punishment came up, would you be able to keep an open mind as to all of the ranges of punishment, whatever they happen to be, and make the call based on the facts as you heard them?

A.   Yes.

Q.   So you don't have a preconceived opinion that you could never grant as little as five years on a murder case or as -- you would always have to give life?  You are not locked into one extreme or the other, okay?

A.   No.

Q.   Now, in a capital case we have what is called special issues and all this means is these are questions asked of the jury at the conclusion -- if our cases -- our law is in two parts.  They may have explained this to you before -- excuse me -- but there is a guilt-innocence stage and a punishment stage.  And obviously if an individual is not found guilty, you never get to the punishment stage.  But if an individual is found guilty and in particular in this case or any capital case, of

@                                                              240

capital murder, then in the punishment stage there is more evidence put on.  You can consider all of the evidence you heard in the first part of the trial, plus any additional evidence that is put on by both the State and the Defense in considering the answers to these questions.  And I'm going to outline for you and show you what these questions are and see if you have any questions or thoughts about them.

Page 209

Busby - Vol 6

The first issue we call the future danger issue and that is kind of shorthand, but here is the question that gets asked of the jury right there.

You see, they're asking you, if you find beyond a reasonable doubt that there is a probability, not just a possibility, but a probability or likelihood, not a certainty --

MR. STRICKLAND:  Your Honor, we are going to have to object to Mr. Shannon interjecting, "not a certainty".  When he says "not a certainty", he is interjecting his own -- his own personal definition --

THE COURT:  Okay.  I'll sustain it.

MR. SHANNON:  All right.  I'll withdraw it.

Q.   (By Mr. Shannon)  The law says there is a probability that the Defendant will commit criminal acts of violence that would consititute a continuing threat to society.  And you answer that question beyond a reasonable

@                                                            241

doubt based upon the evidence that you heard in both parts of the trial.

Now, here is the interesting part of this which you need to know.  In order for a yes answer to be given to that question by the jury as a whole, all 12 jurors must agree that yes is the correct answer.  There is a probability of future acts or violence.  In order to answer that question no there must be ten or more jurors agreeing that no is the proper answer, okay?

A.   Okay.

Q.   All right.  Just so you will know that is the way it works.  That is question number one.

Page 210

Busby - Vol 6

Now, if question number one is answered no, you don't ever get to question number two. However, if question number one is answered yes, then we go to -- oh, and I forgot. Who -- I forgot this is true.

Who has the burden of proof on number one? The State of Texas has the burden. We have to prove beyond a reasonable doubt that the answer should be yes, okay? And that is just like in the guilt phase of the trial.

Now, if you get to that and the answer is, yes, then the jury goes to answer number -- issue number two. And we call this the mitigation issue. And this is a rather lengthy question and let me put it up there and

@                                                                                      242

then we'll talk about it in just a moment.

All right. Now, issue number two is -- and we call it, for lack of a better term, maybe a fail-safe position. Here is an individual who has been found guilty of capital murder and a jury has found that there is -- beyond a reasonable doubt that there is a probability that he will commit future acts of violence and would be a danger to society.

Now, once that has been done, then this question pops up. And basically what that question says: Is there anything about the offense, the Defendant's character, background and personal, moral culpability that sufficiently mitigates so as to warrant a life sentence rather than death. And it's kind of a -- we'll take one last look at this, okay? And if there is mitigation or something that says to you as a juror and the jury as a

Busby - Vol 6

group, life is a better punishment in this situation than death, then in this case to answer no to that question, again, you have got to have all 12 jurors agree. If you say no, there is no mitigation, then all jurors agree on that. But, however, if you say yes, there is some mitigation, that would require at least ten to agree to that point, okay?

Now, who has the burden of proof on issue number two? Now, you remember the State had the burden of

@

243

proof on issue number one. The answer is neither side has the burden of proof on this issue. There is no burden of proof involved.

We do submit evidence on mitigation and if there is some reasons why a person should not be assessed a death penalty, that evidence is brought out. You weigh it. You put it in your scales of justice in your own mind, in your own head, and as a collective jury, you come out. But the State doesn't have to prove there is no mitigation and the Defense doesn't have to prove there is. It is a collection of all of the facts and circumstances.

So do you see how that is a fail-safe position?

In other words, before a person gets a death penalty, we are going to be make darn sure that we have looked under every rock and every cranny to make certain it is the correct result.

Now, given all of this explanation, do you think you can sit and serve as a juror in a case where a jury would be required to, one, pass judgment on guilt or

Busby - Vol 6

innocence of capital murder and, secondly, to answer one or both special issues?  Could you do that?

A.    Yes, I could.

Q.    Right.

Now, I mentioned briefly the possibility of

244

some other punishment issues and I did mention murder and I told you a while ago it is five to 99 or life.

Now, there is certain circumstances, and we never know how the proof is going to go, where in certain cases the punishment for murder is 15 to 99 or life and sometimes 25 to 99 or life and that depends on the evidence submitted.  And we can't forecast exactly what evidence will be brought up, but the Judge will instruct the jury at the end as to what the correct range of punishment is.  One of those three.

Now, the only way you get to the murder issue is this:  If a Defendant in a capital murder charge has been found not guilty of capital murder, then they do what is called a lesser included offense.

Let's say, for instance, in a case where the State has alleged that the murder was committed during the course of a kidnapping and let's just say for a moment the jury decides that the evidence does not prove beyond a reasonable doubt that the victim was kidnapped, then a person would be not guilty of capital murder.  However, the jury would then proceed to consider whether or not the lesser offense, which is one notch lower, of murder would be appropriate.  And then you decide if that person guilty of murder, okay?

Busby - Vol 6

Now, here is the thing.  As I told you

245

before, and I want to reiterate one more time because there are people who feel like, if a person takes another person's life intentionally, they could never under any set of facts or circumstances consider as little as five years.  But the Legislature has said that is the range.

Can you fairly consider as little as five years in an intentional murder the same as you could consider a life sentence?

A.   Yes.

Q.   Either one?

A.   Yes.

Q.   You will keep an open mind.  That is what you are telling us, okay?

All right.  Now, I was going to take a quick look at -- oh, I know one thing.

I noticed that you like to read mystery stories?

A.   Yes.

Q.   Do you have any particular authors that you enjoy reading?

A.   Kellerman, Patricia Cornwell.

Q.   Ever read any Margaret Truman mysteries?

A.   No.

Q.   Okay.  Do you ever read any John Grisham novels?

A.   Yes.

246

Busby - Vol 6

Q.   Some of those are not really mysteries.

A.   Suspense.

Q.   Yeah.  He is a lawyer that got smart, quit practicing law and started writing, okay?

A.   Yes.

Q.   Let me see, one more thing.

So far all of the things I have asked you you seem to be in agreement with.  Is there anything before I go any further that I have said or mentioned or alluded to that maybe you wish I would slow down and you could ask me a question?

A.   No, I have understood everything.

Q.   Not a problem.  Oh, yeah, one thing I did want to ask you about.

In your answer to question number 85, they have asked you various shades of opinion on the death sentence and death penalty and I can tell by the way you answered these that you have given thought to both sides of that argument.

And one of the things that you have said is one of the best arguments in favor of a confinement for life is that, we are not God, should not be able to decide who lives or dies.  And there are people who have that belief so strong to a point that they could not sit in judgment of a case like this because that is a personal,

@                                                            247

deep-seated, abiding belief.  And they might be a perfectly good juror in a non-death penalty case, but not this type of case.

Do you fall into that category, or are you

Busby - Vol 6

merely articulating what you understand is a good argument for not imposing the death penalty?

A. I think it is a good argument.

Q. Okay. And there are many people who subscribe to that. And so I take it that by stating that, it doesn't mean that you couldn't serve as a juror in a capital murder case where the death penalty was a requested punishment?

A. Correct.

Q. And one of the things that you wanted to know about whether or not life or death would be proper, was it on purpose. And I explained to you that, you know, murder requires the intentional taking of a human life. So obviously that would include, would it not, I guess -- I'm not trying to put words in your mouth -- would that include your understanding of on purpose?

A. Yes.

Q. And we have already talked about, another thing you want to know about the Defendant is, is it their first crime? And I think we hit on that a little bit when we talked about beginners versus people who have been

@                                                                  248

violating the rules for a long time.

And I take it that you would feel a lot better about them if it wasn't their first opportunity or first encounter with the criminal justice system than multiple encounters, would you not?

A. Yes.

Q. And that is fairly normal.

Now, whether I have asked you or not -- I'm

Busby - Vol 6

fixing to give Mr. Strickland a chance to ask you some questions. Whether I have asked you or not, is there anything that you can think of that would in any way impact your ability for or against the State, or for or against the Defense, that would impact your being anything other than a fair and impartial juror in this case?

A. No.

Q. And if you were selected as a juror, would you take the jury box with your mind completely in neutral, an open mind, able to consider all of the opportunities and wait until you hear the evidence and then call it like you see it?

A. Yes.

Q. We couldn't ask for any more. Thank you, Ms. Thigpen.

MR. SHANNON: I'll pass the juror.

THE COURT: I'll recognize the Defense.

@                                                                    249

MR. STRICKLAND: Thank you, Judge.

VOIR DIRE EXAMINATION

BY MR. STRICKLAND:

Q. Ms. Thigpen, I'm Jack Strickland.

Are you good to keep going here for a bit?

A. No problem.

Q. All right. The court reporter probably hopes that I talk a little faster than Mr. Shannon, so we can conclude this. Why do you think she is glaring at me?

Having heard this, and all things being equal, what is your -- what is your feeling about serving on this jury?

Busby - Vol 6

A.   I guess I really don't have any feelings on it one way or the other.  I think -- I don't have any problems doing it, yes.

Q.   I take it that -- I take it that your answer is that you -- you're not anxious to do it, but that you recognize it as a civic duty; is that correct?

A.   Correct.

MR. STRICKLAND:  Can you hear me all right, Barbara?  Would you rather it --

THE COURT REPORTER:  A little louder.

MR. STRICKLAND:  Do you mind turning it off?

THE COURT:  This is the last one today.  I

@
250

think its the blower, Barbara said earlier.

MR. SHANNON:  It takes a minute to cool down.

Q.   (By Mr. Strickland) Ms. Thigpen, I think that you could tell, not only the questionnaire, but the nature of the questions that Mr. Shannon asked you, as well as just your own common sense, that the gut issue here is the question of the death penalty and how you feel about the death penalty and how you feel about the procedures that the State of Texas has instituted for the death penalty -- potential death penalty prosecution.

Not binding yourself to the form of the questions in the questionnaire, just try and explain to me, as best you can, how you feel about the death penalty. What place it has in our society and what role will you see yourself in a death penalty prosecution such as this.

Busby - Vol 6

A.    Well, as I answered, you know, we are not God to decide, but I have real strong feelings as far as -- and this goes back with students, too, that if you know what the rules are, then you also have to know what the consequences are and, you know, take responsibility for that.

And, you know, I may not agree with the death penalty, but I do agree with, you know, knowing the consequences and taking charge of them and, you know,

@                                                                                  251

accepting what comes to you.

Q.    Is there any feeling on your part that accepting the consequence of, say, a life imprisonment under the terms that Mr. Shannon described, that is, a minimum of 40 calendar years, that that is -- that is a satisfactory means of accepting responsibility, or do you believe that the death penalty may be appropriate even beyond that?

A.    No, I think if, you know, the 40 years is what the standard or what is accepted for that crime, then that is acceptable, anywhere from the range from five to, you know, life.

Q.    Do you believe that -- do you believe in a perfect world that if you were writing the laws that an extended term of, say, 40 years in the penitentiary, minimum, would be a better -- would be a better way to address problems such as this than utilization of the death penalty?

A.    In a perfect world?  Personally, yes.  I mean, I don't know.  That final decision of taking someone's life is final.  And if there is better ways to solve it, then,

Busby - Vol 6

yes. But again, in a perfect world, which we are not in so --

Q. Well, if a person is convicted -- I hope we made this clear -- it is so significant that I think it may bear repeating.

@                                                                                                    252

In a death penalty prosecution, if the jury finds somebody guilty of capital murder, and you understand how a prosecution would segue, I guess, from murder to capital murder?

A. Yes.

Q. It is a murder plus?

A. Right.

Q. Really two offenses in a single incident.

If a person is found guilty of that offense, the only possible alternatives available to the jury or to the Judge, that actually renders the punishment, is either life for a minimum of 40 years or the death penalty. The term of years is five, ten, 15, only comes into play if the jury finds the Defendant guilty of something other than capital murder.

A. Correct, yes.

Q. Do you understand that?

How do you feel about -- how do you feel about the either/or, black or white, option of life or death for the death penalty as opposed to having other options open?

A. I guess if you are found guilty of capital murder, at least to me it is still somewhat reassuring that you still have two more issues to decide whether it

Busby - Vol 6
is the death penalty or just life.

@                                                                          253

Q.   That raises a very important point and I'm glad that you seized upon that or at least recognized that.

I suspect there are those that believe that if a person is guilty of capital murder that that ought to be the end of the inquiry; that the be all and the end all should be the death penalty.  So without further -- without further consideration of additional evidence or additional facts, if you are guilty of that offense, that is sufficient and serious that the death penalty automatically will result.

That is not what the law says, but notwithstanding there may be people that believe that way.

And I take it from the answer that you just gave us that you do not include yourself among that number?

A.   I don't.

Q.   As a general proposition, there is nothing automatic about this process with the exception of this: If the jury finds someone guilty of capital murder and if the jury answers question number one yes, and question number two no, then it is automatic that the Judge must impose the death penalty.  He has no discretion in that. He cannot impose his own judgment and supersede that.

Beyond that, however, there is nothing automatic.  Just because someone is charged with capital

@                                                                          254

murder, it is not automatic they are found guilty of

Busby - Vol 6

capital murder. Just because they are found guilty of capital murder, there is nothing automatic in answering those two questions. Each step along the way, there is a -- I don't want to trivialize this. There is sort of an off ramp. The jury can decide not to continue down that road to the death penalty, find the Defendant guilty of a lesser offense. The jury can answer question number one in the negative and question number two in the affirmative and that has the result of derailing the death penalty.

Do you understand that?

A. Yes.

Q. I take it you also understand that the process is such that because unanimity in all three of those areas of inquiry of guilt, question one, question two, is required by our statutes. And since we have got 12 jurors, that means that there is 36 decisions made -- if you take that 12 times three -- that have to be made unanimously in order for the death penalty to be imposed.

Does that -- does that seem like a fair burden or a fair obligation to put upon the State before the death penalty can be imposed?

A. Definitely, yes.

Q. Because 35 won't do it.

A. Right.

@

255

Q. 34 won't do it. The obverse of that is as to those two special issues, unanimity is not required to answer in such a manner the death penalty will not be imposed. It only takes ten people to say no to question number one. That is the end of it. You don't even get to

Busby - Vol 6

question number two in the death penalty. And the same is true of the mitigation issue. Ten people can answer that negatively, wherein it takes all 12 to subscribe their name and answer in the affirmative.

Does that seem like an undue burden?

A. No.

Q. I take it, then, that you are of the opinion that if we are going to -- we are going to take another life, that certainty and unanimity of purpose has to be and should be required?

A. Yes, definitely.

Q. No qualms about that?

A. Right.

Q. Now, let me ask you, since we are still on the death penalty here, about a couple of answers that you will get. And understand that by asking you these questions, I am not quibbling with you or arguing with you. You are entitled to hold whatever opinion you want to, certainly you are entitled to do any time. You are particularly entitled to hold the opinion any time before

@                                                                                      256

you are sworn in as a juror. But once you are a juror, that is a different deal. You have got to agree to follow. Up to that point, you are free to agree or disagree as you see fit.

Question 78 asks you, which of the following best describes your view of the death penalty. You indicated it was generally appropriate with very few exceptions. That is not quite in the middle. That is tending toward the imposition of the death penalty. And,

Busby - Vol 6

of course, the concern, not to beat around the bush -- the concern that it raises in my mind as to whether or not, since it is not -- not dead center, but tending toward the death penalty, that that is indicative of any sort of predisposition, pre-inclination, if you will, toward the imposition of the death penalty of someone who is found guilty of capital murder.

Is there such a predisposition or inclination?

A.   No, not at all.

Q.   When you say you believe it is generally appropriate with very few exceptions, do you have any particular exceptions in mind or was this just a general statement?

A.   Just a general statement.  More the facts proved to be correct.

@                                                              257

Q.   Remember as we just said, there is nothing automatic.  Just because someone is found -- I said, just because I'm not trivializing -- just because someone is found guilty of capital murder, that does not mean that jurors automatically can take the position to answer question number one in the affirmative.  Well, he is guilty of capital murder, so that must automatically mean he will be a continuing danger.  So I'm always going to answer that in the affirmative.

You could see how that is not consistent with the responsibility.

A.   Right.

Q.   You also -- you also said that at one point --

Busby - Vol 6

and I think maybe this was just in terms of academic argument, what is the best argument against a sentence -- a sentence for confinement of life for someone convicted of capital murder.  You said, why take up space of someone convicted of murder?

Is that an indication of feeling of belief -- belief on your part or is that just an academic sort of --

A.   Purely an argument.

Q.   All right.  You had to say something and that was an argument.

A.   Yes.

@                                                                        258

Q.   Is there any concern on your part that if you were seated as a juror and had to make the decision on those special issues, like death, that concerns about cost or economic -- economic hardship on the State would factor into your decision on deciding whether or not a person lives or dies?

A.   No, not at all.

Q.   Some people would.  Some people are rabid about it.

A.   No.

Q.   I take it you are not one of them?

A.   No.

Q.   Any belief that -- that you harbor that the death penalty -- that the offenses for which the death penalty is available should be broadened?

Here is what I mean by that:  There is a pretty small list or universe, if you will, of offenses to

Busby - Vol 6

which you can receive the death penalty.  It didn't used to be that way.  It used to be able -- over 250 years ago in England, there was like -- I read there was like 221 -- 218 offenses for which you could get the death penalty, even stealing bread.  But we, over the years, narrowed and narrowed and narrowed the number of offenses of which you can receive the death penalty.

Any feeling on your part that society or

@

259

the criminal justice system would better be served were that list to be expanded somewhat, not to include stealing?

A.   No, not at all.

Q.   How about just for the offense -- what I'm going to call, with no disrespect, ordinary murder.  That is the murder, the intentional taking of the life without the attendant aggravating offense, without kidnapping or robbery alleged in this case.

Any feeling on your part that for an ordinary murder, that is intentionally killing somebody, the death penalty should be available, that is not now --

A.   No, I don't think it should be.

Q.   You think it's -- it should be something more, murder plus?

A.   Correct.

Q.   Do you understand how we might get from talking about capital murder to the lesser included offense of murder or kidnapping or robbery?

A.   Yes, I understand.

Q.   In theory the Prosecution can allege murder plus

Busby - Vol 6

kidnapping and the murder was proven to the juror's satisfaction, but kidnapping was not.  In given a choice by the Judge, as the law sometimes requires the Judge to do, the jury might say, we find the Defendant guilty of

@                                                                                    260

the murder, not the murder or kidnapping.  Hence not a capital murder.  Hence the death penalty is now off the table.

Now the jury would be charged with the responsibility of assessing the punishment prescribed for the term, ordinary murder.  And as Mr. Shannon has told you, ordinary murder is a first-degree felony under those circumstances, five to 99 years or life.

Now, Mr. Shannon used a couple of phrases that I -- I'm going to quibble with just a little bit because I want to make sure I understand how you truly feel about this.

Mr. Shannon said, all that the law requires is that you say that you would be willing to consider the options.  The law -- what I'm quibbling with, when he says, "all the law requires".

What the law requires is that you -- that you be willing to give fair consideration.  Not just say it.  But that you honest to God, in your heart of hearts, be willing to give fair consideration as you sit there right now, from the entire range of punishment from the very minimum of five years to the very maximum to life.  In other words, not pay lip service because you feel that is what we want you to say right now.

But that you truly believe and adhere to

Page 227

@

the obligation to give fair consideration to it.  Not having a predisposition towards five years.  Not having a predisposition for life.

Now, notice I didn't say that you would give five years or give life, but that you would fairly consider it as you sit here now.

Once you hear the facts, once you hear the evidence, once you hear the witnesses, then clearly you make up your mind what to give, right?

A.    Right.

Q.    But what we are saying is that by keeping an open mind now, you adhere to the responsibility to be fair and impartial until something changes your mind, one way or the other?

A.    Yes.

Q.    Can you do that?

A.    Yes, that makes sense.

Q.    And when you say that you would be willing, I take it that you would be committed to actually doing that as opposed to just saying it?

A.    Yes.

Q.    I'm not going to dwell on this question of future dangerousness.  I think even though the law, for reasons I suspect not known to any of us in this courtroom, steadfastly refuses to define some of those

@

262

terms.  The law is what the law is.  The issue is what the

Busby - Vol 6

issue is.  We are stuck with it.  And generally it is a look to the future, to the best that you can and say, well, based on everything I have heard here, here is my best judgment as to the probability of what is going to occur.

The second special issue is a bit more complicated because that is the mitigation issue.  You understand the concept of mitigation?  The lesser issue, if you will?

A.   Yes.

Q.   And the law does not provide you any guidance in that regard.  It does not tell you, for example, what you must consider or even what a mitigating circumstance is.  It means it is in your judgment.

Do you believe that your -- have enough life experiences and education and intellect to be able to make a reasoned judgment as to what is mitigating and what is not once you hear it?

A.   I would hope so, yes.

Q.   Well, you know, I suspect it is kind of like our Supreme Court said, you couldn't define an object and say, well, it may be.  Mitigation is the same thing.  I can't tell you what it is, but I would hope that you would be able to recognize it when you saw it.  Mitigation may be

@                                                                    263

different things to different people.

I mean, lack of intellectual capacity might be mitigating to one juror, it might be of scant consequence to another.  A bad circumstances, upbringing, there is all kinds of things might be mitigating to one

Busby - Vol 6

juror and no consequence to another.

But I take it that, if it was a consequence to you, you would give it the weight that you deem it definitely should have?

A.  Yes.

Q.  You have never served on a jury before, have you?

A.  No, I haven't.

Q.  And you are having second thoughts about serving on this one, aren't you?

A.  Not yet.

Q.  We are not trying to scare you off.  We do feel that it is only fair that jury service of this seriousness and the amount of commitment that you have to make to serve on a jury like this, it is only fair that we tell you all the news, good and bad.  Probably more bad news than good.  Probably we tell you everything here, so you go into it with your eyes wide open.

A.  Uh-huh.

Q.  I forgot what I was going to say.

@

264

What was I talking about?

MR. SHANNON:  A senior moment.

MR. STRICKLAND:  Senior moment.

I have got no other questions, Judge.

(Laughter)

Q.  (By Mr. Strickland) Well, I just -- I wanted to make sure -- you understood that was a comeback.

Even though you haven't served on a jury before, that the jury is not ruled by a majority vote.  It

Busby - Vol 6

is 12 independent people.  That does not mean that they do not deliberate, that they don't reason.  They may argue with one another and try, you know, and bring a juror who has -- holds an opposite opinion to their own position.

But when it comes right down to the licklog, the verdict has to be your verdict.  You have to be convinced beyond a reasonable doubt.  If you are not convinced beyond a reasonable doubt, even if 11 other people are, that is up to them.

But it is an individual verdict in the sense that the State has to prove beyond a reasonable doubt, not only the guilt as to all of these elements, but also prove beyond a reasonable doubt the probability of future -- future danger to society.

If you are not convinced, you understand that it is as much your obligation as consistent with your

@                                                                      265

oath and with the law, that you -- that you continue to vote your conscience as it is for those other folks to vote their conscience?

A.   Yes.

Q.   Do you think you are a strong enough person to do that?

A.   Definitely.

Q.   Well, some people aren't.  Some people think, if I am outnumbered 11 to one, that is it.  Let's go get pizza.

I take it you are not that sort of person?

A.   No, I'm not.

Q.   I suspect dealing with the high school kids

Page 231

Busby - Vol 6

causes you to -- causes you to develop that sort of approach to things?

A.    Yes.

Q.    And how long have you been teaching, ma'am?

A.    Ten years.

Q.    Do you intend to continue doing that?

A.    I guess.  Yes, I love it.

Q.    Tell me how you feel about -- we are just about finished here.

Tell me how you feel about your ability to continue to be fair and impartial and open-minded on this case until you hear all of the evidence?

266

A.    I don't have a problem at all with that.  I have learned it is better just to listen and take it all in and never assume anything.  I learned that a long time ago. Never make any assumptions about anything.

Q.    I would -- I would suspect, and I don't expect any disagreement here from anybody, that the evidence to be adduced in this case, the evidence that the jury will hear in this case, is going to be graphic and disturbing. I anticipate that the evidence will show in this case that a person named in the Indictment as the victim, Laura Crane, was an elderly person.  It shows she is 77 years of age at the time of her death.

However, you need to know whether or not you think even in the face of disturbing and gruesome and, very frankly, likely emotional testimony, you would be able to retain your objectivity and impartiality until such time as the Judge instructed you it was time to

Busby - Vol 6

deliberate.

A. I would hope so, yes.

Q. Nobody can fail to be affected by facts and circumstances that are serious and all murders are serious and some are pretty hard to deal with, I suspect. And this may well be one of those cases. But it is important that jurors be just as fair and impartial and law-abiding in tough cases as it is in the easy cases. Anybody can be

267

fair and impartial, I guess, in a traffic ticket case. But this is really where it is put to the test. And you are dealing with a very serious crime and difficult testimony, difficult evidence, photographs.

Do you think you can do that? Are you up to that?

A. I think so, yes.

Q. Would you be satisfied to have a juror of your mind sit in judgment of you?

A. Definitely.

Q. Or your loved ones? Your family?

A. Yes.

Q. That's really the test, isn't it?

Any questions you would like to ask me?

A. Not that I can think of, no.

Q. Has this been terrible this afternoon?

A. No. I got out of a day of work.

Q. Well, I don't know. It's like the guy the other day would rather have a root canal than come here. I guess, probably that says something about the process.

Well, you have been very generous with your

Busby - Vol 6

thoughts and we appreciate it.  Thank you.

MR. STRICKLAND:  Pass the witness.

THE COURT:  Now, I need to tell you a thing or two, Ms. Thigpen.  You are not on the jury yet, but you

268

are on the panel that the jury is going to be selected from.  You will be brought back at some point.  We are not sure exactly when.  And at that point you will either be selected to be on the jury or you will be released, one of the two.  You will have to come back one more time.

We are going to take two pictures of you before you leave.  We are going to do that because this is going to go on a month.  You have already seen senior moments.  So they can remember who you are and put your words with your questionnaire.

In the meantime, don't look up anything on the case.  Don't try to do any research.  Don't get on the Internet looking for it.

As the trial gets closer, there may very well will be some publicity.  Don't read it.  If you walk through, it is on TV, get out of the room real quick.  When this is all over, you can read what you want to.  Until you are released, don't do anything to seek out information on the case.

And also since you will be contacted to come back, if you change your address or phone number or anything, you need to let us know because you will be contacted at some point.  So if you change it, let us know.

Here is the lady who is going to take your

269

Busby - Vol 6

picture.  We'll let you go.

(Prospective Juror retires)

(Off-the-record discussion)

MR. STRICKLAND:  Your Honor, outside the jury and presence of the jury, we have spoken with Mr. Busby about the agreement to excuse Prospective Juror No. 23, the man who has got some surgery scheduled.  And in light of all of the circumstances, we have agreed to excuse him.

And Mr. Busby, likewise agrees; is that correct, sir?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  If it's up to me, I'll approve that agreement.

Are we all on the same page tomorrow?  I know we are starting at 9:00.

MR. STRICKLAND:  9:00?

MR. SHANNON:  9:00, 10:00, 11:00, 1:30 2:30, 2:30.

MR. STRICKLAND:  We are going to try six again, are we?

THE COURT:  Yeah.  We'll get six in.

(Proceedings concluded for the day at 4:17 p.m.)

@

270

STATE OF TEXAS

COUNTY OF TARRANT

Busby - Vol 6

I, Barbara Lynn Chapman, Official Court Reporter in and for the Criminal District Court No. 2 of Texas in and for Tarrant County, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties, if requested.

WITNESS MY OFFICIAL HAND, on this the _____ of _____, 2006.

_____
BARBARA LYNN CHAPMAN, CSR
Texas CSR No. 500, Exp: 12/31/06
Official Court Reporter
Criminal District Court No. 2
401 W. Belknap, 6th Floor
Fort Worth, Texas  76196-0214
Telephone:  (817)884-2837
email: bchapman@tarrantcounty.com

@

CHRONOLOGICAL INDEX
VOLUME 6
HEARING ON MOTION TO SUPPRESS
AND
JURY VOIR DIRE

October 4, 2005

| | PAGE | VOL. |
|---|---|---|
| Proceedings Begin | 3 | 6 |

Busby - Vol 6

State's Argument on Motion to Suppress      3      6

Defendant's Argument on Motion to Suppress  9      6

Court's Ruling on Motion to Suppress        15     6

DEFENSE WITNESSES    DIRECT  CROSS  VOIR DIRE    VOL.

Edward Busby          24                           6

JURY VOIR DIRE

PROSPECTIVE JURORS:                         PAGE   VOL.

DANIEL STAIR
     State's Voir Dire by Mr. Miller        6      6
     Defense Voir Dire by Mr. Strickland    64     6
     Prospective Juror accepted             83     6
THOMMIE PRATT
     State's Voir Dire by Mr. Shannon       86     6
     Defense Voir Dire by Mr. Strickland    113    6
     Prospective Juror accepted             134    6
MELISSA HEADRICK
     State's Voir Dire by Mr. Miller        137    6
     Defense Voir Dire by Mr. Strickland    177    6
     Prospective Juror accepted             199    6
GREGORY MILLER
     State's Voir Dire by Mr. Shannon       202    6
     Prospective Juror claimed exemption    208    6
EDDY LIN
     State's Voir Dire by Mr. Miller        210    6
     Prospective Juror excused/agreement    213    6
TERESA THIGPEN
     State's Voir Dire by Mr. Shannon       215    6
     Defense Voir Dire by Mr. Strickland    249    6
     Prospective Juror accepted             267    6

@

CHRONOLOGICAL INDEX CONTINUED
VOLUME 6

Proceedings Adjourned ................... 270    6

Reporter's Certificate .................. 270    6

ALPHABETICAL WITNESS INDEX

WITNESSES:            DIRECT   CROSS    VOIR DIRE  VOL.

BUSBY, EDWARD         113                          6

ALPHABETICAL PROSPECTIVE JUROR INDEX

PROSPECTIVE JURORS:                         PAGE   VOL.

Busby - Vol 6

HEADRICK, MELISSA
    State's Voir Dire by Mr. Miller          137     6
    Defense Voir Dire by Mr. Strickland      177     6
    Prospective Juror accepted               199     6
LIN, EDDY
    State's Voir Dire by Mr. Miller          210     6
    Prospective Juror excused/agreement      213     6
MILLER, GREGORY
    State's Voir Dire by Mr. Shannon         202     6
    Prospective Juror claimed exemption      208     6
PRATT, THOMMIE
    State's Voir Dire by Mr. Shannon         86      6
    Defense Voir Dire by Mr. Strickland      113     6
    Prospective Juror accepted               134     6
STAIR, DANIEL
    State's Voir Dire by Mr. Miller          6       6
    Defense Voir Dire by Mr. Strickland      64      6
    Prospective Juror accepted               83      6
THIGPEN, TERESA
    State's Voir Dire by Mr. Shannon         215     6
    Defense Voir Dire by Mr. Strickland      249     6
    Prospective Juror accepted               267     6

@