1

REPORTER'S RECORD

VOLUME 21 OF 38 VOLUMES

TRIAL COURT CAUSE NO. 0920589A

THE STATE OF TEXAS            )    IN THE CRIMINAL DISTRICT

vs.                           )    COURT NUMBER TWO

EDWARD LEE BUSBY, JR.         )    TARRANT COUNTY, TEXAS

JURY VOIR DIRE

On the 26th day of October, 2005, the following proceedings came on to be heard in the above-titled and numbered cause before the Honorable Phillip Vick, Judge Presiding, held in Fort Worth, Texas, reported by machine shorthand utilizing computer-aided transcription.

Barbara Lynn Chapman, CSR
Official Court Reporter
Criminal District Court No. 2
Tarrant County, Texas

2

APPEARANCES

HONORABLE JOE SHANNON, JR. - SBOT NO. 18107000
HONORABLE GREGORY T. MILLER - SBOT NO. 14073650
Assistant District Attorneys
401 W. Belknap Street
Fort Worth, Texas  76196
Telephone:  (817) 884-1400

                   Attorneys for The State of Texas.

HONORABLE JACK V. STRICKLAND - SBOT NO. 19397000
Attorney at Law
909 Throckmorton Street
Fort Worth, Texas  76102
Telephone: (817) 338-1000


HONORABLE STEPHEN GORDON - SBOT NO. 00785918
Attorney at Law
101 Summit Avenue, #610
Fort Worth, Texas  76102
Telephone: (817) 338-1877


                   Attorneys for The Defendant.

P R O C E E D I N G S

October 26, 2005
Wednesday, 9:07 a.m.
(Defendant Present)

THE COURT:  Do y'all want to talk about 85?
Are we ready to bring her in or is there an agreement on 85?

MR. SHANNON:  Is it a her or a he?

THE BAILIFF:  Her.  Lacie.  Lacie Livingston.

MR. SHANNON:  We have got two out there or one?

THE BAILIFF:  Two.

(Off-the-record discussion)

THE COURT:  As to Number 85, Juror Lacie Livingston, is there an agreement to excuse her?

MR. MILLER:  Yes, Your Honor, I think both sides have reviewed her jury questionnaire.  And it appears, at least from my reading on it, that she couldn't find someone guilty in this matter unless she actually witnessed it.  So that isn't going to work.

So -- and there was a lot of answers on her jury questionnaire about the death penalty that she did not really provide any answers at all.  Or if she did provide any answers, they were one or two words.

Yes, we would agree to excuse her.

4

MR. STRICKLAND:  Your Honor, that's correct.  While the reason cited by Mr. Miller would not necessarily, in and of itself, be bad for the Defendant. Other answers contained on her questionnaire, we think would.

She appears to be overly religious to the extent that our real concern is that she might substitute what she considers to be religious precepts for the instructions given by the Court and be guided in her deliberations by religious feelings rather than the law and the facts.

So for that reason, we would agree to excuse her and Mr. Busby concurs.

Is that correct, sir?

THE DEFENDANT:  Yes, sir.

THE COURT:  I'll approve the agreement.  85 is excused.  And we'll talk to 86?

MR. STRICKLAND:  Can we have just a minute, Judge, on 86?  Before we talk to 86.

(Off-the-record discussion)

THE COURT:  Are we ready on 86?

MR. STRICKLAND:  Sure, Judge.

I guess y'all want to do 86?

MR. SHANNON:  I guess.

(Prospective Juror Enters)

THE COURT: If you will raise your right hand?

(Prospective Juror Sworn)

THE COURT: You filled out a juror questionnaire. Were the answers you put on there true and correct?

THE BAILIFF: Yes, sir.

THE COURT: My name --

PROSPECTIVE JUROR: Judge, I think I put the wrong phone number down. I wrote a phone number down backwards or something on it. The lady informed me of.

THE COURT: Okay. My name is Phillip Vick. I'm the Judge presiding in this proceeding. Judge Wayne Salvant will try this case. And we think it will start around November 7th. Maybe a day or so after that, the way it is looking now.

The attorneys representing the State are Mr. Joe Shannon and Mr. Greg Miller. The attorneys representing the Defendant are Mr. Jack Strickland --

MR. STRICKLAND: Good morning.

THE COURT: -- and Mr. Steve Gordon.

MR. GORDON: Good morning.

THE COURT: They will have some questions for you, but I'll ask you first: Is there anything happening in your life, medical, travel, job, anything

that would interfere with you being a juror in this case?

PROSPECTIVE JUROR:  The only thing that might would be that my mother-in-law had surgery this past Friday for a kidney operation.  She is doing well.  She is home.  I do not see that as being a problem, but that is the only thing that might.  But I do not see that as being a problem.

THE COURT:  Does she live with you?

MR. MILLER:  No, sir, she does not.

THE COURT:  Okay.  I'll recognize the State.

JAMES R. SASSMAN, having been first duly sworn to make true answers to questions propounded concerning qualifications and service as a juror, testified as follows:

VOIR DIRE EXAMINATION

BY MR. MILLER:

Q.  Good morning, Mr. Sassman.  How are you doing?

A.  I'm fine, sir.

Q.  Thank you for coming down here this morning.

Do you work at Lockheed?

A.  Yes, sir, I do.

Q.  I sort of gathered that you did, but I didn't know for sure.  And I guess you have been out there a long time?

7

A.    Been a while.

Q.    Been a while?  Okay.  You also told us -- and we appreciate you telling us this -- that evidently you know Mr. Carpenter, who is Juror Number, I guess, 88.

A.    Yes, sir.

Q.    And we haven't talked to him yet.  We'll be talking to him -- I don't know if it is this morning or after lunch.

What is the deal there between the two of you?

A.    We work about ten feet apart.

Q.    Okay.  And you have worked together for a long time, I guess?

A.    It has been a while.

Q.    Okay.  And I know you don't care for him.  Is the feeling mutual, I guess?

A.    I'm not certain that it is, no.

Q.    Okay.  All right.  Well, we are a little concerned about that.  Because if both you and he make it on the jury, that might not be a good thing.  So you can see why --

A.    I can see your point of view.

Q.    We appreciate you telling us that.

Okay.  Let me explore your mother-in-law situation just a minute.  I'm sorry I was writing

something when the Judge asked you this question.

Is your mother-in-law living with you now?

A.   No, sir, she is not.

Q.   She is not living with you?

A.   No.

Q.   Okay.  Is she here in the area?

A.   No, she lives in Arkansas.

Q.   Arkansas?  Okay.  Let me ask you about -- and I'm just going to throw this out there because we don't know if it will occur in this case or not, but it is a possibility it could occur.

I think Judge Salvant told the jury panel about a month ago that, at least, at this point we didn't anticipate the jury being sequestered.

And you know what that means?

A.   Yes, sir.

Q.   I guess in any capital murder case there is a possibility that that would -- could occur, okay?  And really, we are about a couple of weeks away from starting the trial and we just don't know.

But how would you feel about that?

A.   As long as I didn't have to pay for it.

Q.   Well, number one, you wouldn't have to pay for it.  I can guarantee -- I can actually answer that question.

I guess that we might be concerned about -- because we haven't talked to Mr. Carpenter yet -- because as you sit here right now, if you get qualified to serve on the panel, you and he would both have about a 33 percent chance of getting selected to be on the jury.

But in the event that both you and he ended up on the jury, number one, you have to stay together, at least, during working hours.

A.    Yeah.

Q.    And then during the event --

A.    We stay together during working hours now.

Q.    I'm sorry?

A.    We stay together during working hours now.

Q.    I mean, let me ask you this -- because, I mean, I've certainly over the years run into people on jury panels that knew one other.  In all honesty, I don't think I have encountered this situation.  And I think all of the lawyers are concerned about it, that if the two of you ended up on the jury -- I mean, and only you can tell us -- how big a friction is that going to be?

A.    The only friction I have with Mr. Carpenter is that he has an absenteeism problem and it doesn't -- and it -- to me it affects the price of my airplane that we are building.  And we are having to pay him a salary and me a salary, too.  And he doesn't get anything done and I

do.

And it's kind of a -- you know Lockheed as well as most people do, but it goes in cycles.  And when we are making good profits, we are making a lot of airplanes and everybody is happy.

Well, we are in a cycle out there right now, we're cutting back and things.  And to me, if a man is not performing his task, it looks bad on everybody and that's a problem I have with Mr. Carpenter.

Q.   Okay.  Do you -- do you supervise him in any capacity?

A.   No.

Q.   You are just two co-workers?

A.   We are both the same label.

Q.   But because of his absenteeism, you have to pick up the slack, I bet?

A.   Yes, sir.

Q.   Well, only you can tell us this.  I mean, this is the biggest case that a person can be called on to potentially be a juror.  There is no doubt about that.  The stakes are incredibly high here for both sides.  And we don't want -- I guess we need to make sure, as lawyers, that if the two of you ended up on the jury, that whatever feelings you have for him and whatever feelings he has for you, that wouldn't interfere with your ability to just sit

and listen to the evidence.

I mean, I guess -- I guess what the lawyers on both sides will be concerned about is that your feelings are such that -- that you wouldn't listen to his point of view in deliberations and he wouldn't listen to yours and that is what we want jurors to do.  We want the 12 jurors to speak freely, fully discuss the issues and, I guess, we are just concerned about that.

And I don't -- you are the only person that could answer that question.

A.   Well --

Q.   Or you and Mr. Carpenter are the only people that can answer that question.

A.   I understand.  As for having discussions, we have discussions quite often and look at each other's point of view.  We don't always agree with each other, as with everybody --

Q.   Sure.

A.   You know, with anyone, but I can't see that it would -- because of an opinion that he expressed, I cannot see that it would be any more important or less important to me than anyone else.

Q.   Well, in the event you ended up on the jury -- let me just ask it this way:  Can you -- being down here certainly isn't being at work.  And you understand what

the difference is between being down here and out there at Lockheed?

A.   Yes, sir, I served on a trial before.

Q.   Okay.  I noticed you served on a civil jury.

A.   Yes, sir.

Q.   If I read correctly, you were the foreman.  So you sort of know what this is about.

A.   Yes.

Q.   And you know that the jury -- regardless of whether you are on a civil case or a criminal case, the jury has to be able to discuss the issues.

And if there is a personality or a group on there that shuts out the other group, that is usually a recipe for disaster.

You see how that works?

A.   Yes.

Q.   You mentioned something about -- and I couldn't tell if it was a prior knee surgery you had or one coming up.

A.   Yes, sir, I have had knee surgery before.

Q.   Okay.  There is nothing about that that would impair your ability to serve, I guess?

A.   Only in that, like, when I sit for a while --

Q.   Okay.

A.   -- as if -- you know, when we go to a restaurant

13

and have dinner, my wife and family and I, I'll often need to adjust, move my knees, stretch my leg out a little bit so that, you know, it doesn't stay in one position too long.  Other than that, I have no problems.

Q.  At work are you normally standing during the day or is that --

A.  50-50.

Q.  50-50.  Okay.  Let me ask you a question because I couldn't -- I didn't know how to interpret it and I'm just going to ask you about it.

One of the questions asked:  What are your hobbies, favorite recreation pastime and spare time activities?  And it looks like you wrote, American Association of Nude --

A.  Nude Recreation.

Q.  -- Recreation.  What is that?

A.  It's a group of people who get together, different places.  There's one that I am a member of that is in Decatur.

Q.  Okay.

A.  We swim, play volleyball, have dinners, have pot luck dinner every Saturday, associate with each other, become friends.  It's --

Q.  Okay.

A.  It has -- excuse me -- I met a gentleman there

one time -- and you can understand how we were clothed at the time -- and I didn't think a lot of him. I mean, I didn't dislike him. It was not -- but after I met him I found out that he was a very intelligent person. And I -- it showed me that I could not make judgments on people by what they were wearing because we were both naked, okay?

Q. Uh-huh.

A. And because of that I learned or I try not to make fast judgments to people when I first meet them.

Q. Okay. Good. Thank you.

Well, let's talk a little bit about the law here. And because you've been on a jury before, some of these things -- although you were on a civil case, some of them probably sound familiar to you.

Have you been -- have you been summoned down for jury service on a criminal case before?

A. No, sir, I have not.

Q. And was the civil case -- was the civil case here in Tarrant County?

A. I think I -- I think it was -- there was another time that I was on a jury pool doing much the same as we are doing here, but I never got interviewed. So I never -- other than meeting the first two days that we had already done like today. But I was never -- they picked the jury before I got interviewed.

Q.   What did you think of your prior jury service? Like it?  Dislike it?

A.   It was interesting.  It -- it helped me understand a lot of things about -- I often went home and said to my wife -- we're watching some detective show, and I say, that ain't the way it is going to happen.

Q.   Well, it's interesting to hear you say that because, unfortunately, in our business as either Prosecutors or Defense lawyers, we have to weekly combat the images that are -- that everyone sees on TV.  And quite frankly, it -- it causes us all problems regardless of which side of the lawsuit you are on.

Okay.  Let's talk a little bit about some of these legal things here for just a minute.

An Indictment in a felony case is just simply the piece of paper that starts it off.  In your civil trial it was either the complaint or the petition or whatever it is called.

Well, so too in a criminal case.  We call it an Indictment.  And the State only has to prove the elements of the Indictment to the juror's satisfaction beyond a reasonable doubt and nothing else, including we do not have to prove motive, why somebody did a particular crime.  You may hear evidence about it, but we are not required to prove it beyond a reasonable doubt.

Do you see how that works?

A.   Okay.

Q.   What is murder?  Well, you know what that is.  A person commits murder if a person intentionally or knowingly causes the death of an individual.  Pretty straight forward legal definition.  It's a first-degree felony which we'll talk about a little later.

What bumps it up to a capital murder?  What makes that murder the next most serious -- well, the most serious case that we have in our penal laws in the State of Texas.  It has to be the same intentional murder, but we add something to it and we call it -- the lawyers usually call it an aggravating factor.

In this case we are alleging that those factors are either kidnapping or robbery.  Do you see how that works?

It is an intentional killing with some other crime being involved, okay?

A.   That is the way doctor -- Judge Salvant -- yes.

Q.   Exactly.

Kidnapping, you probably know what that is, where somebody intentionally or knowingly abducts another person against their will.  That is a pretty straightforward.  It's a low-range felony.

Kidnapping -- excuse me -- robbery,

although it has a lot more words to it, it is really pretty straightforward.  A person can commit a robbery if they come running up to you, punch you in the face, throw you to the ground, take your wallet or your watch and run off with it to get your property.  That is one way because they caused you bodily injury while in the course of getting your property.

Another way that a robbery can occur is if that same person just comes running up to you with a gun and says, hey, man, give me your wallet.  And you give him your wallet and off he runs with your wallet.  He certainly hasn't shot you or actually physically harmed you, but he nonetheless has placed you in fear of imminent bodily injury or death.

Do you see how that works?

A.  Yes.

Q.  Let's talk about what is alleged in this particular Indictment.  And these are the elements of the Indictment that I spoke of just a moment ago:  Tarrant County, Texas, on or about a certain date, January 30th of 2004, intentionally killed a lady by the name of Laura Crane by covering her mouth and nose with tape while he was in the course of committing or attempting to commit one of those aggravating -- one or both of those aggravating factors, kidnapping or robbery.

Now I, think you said you didn't -- if I remember correctly -- you didn't know anything about this case.

Yes. Having seen what is specifically alleged in this case, does that jog your memory or anything about this case?

A. No, sir.

Q. Thank you.

You have heard of the presumption of innocence before?

A. Yes, sir.

Q. It's just the starting off place for any criminal case and it's -- you know, you know what that is.

Let's talk about beyond a reasonable doubt. Because unlike some of the words that we have looked at up to this point, beyond a reasonable doubt does not have a legal definition. So when a word or a phrase does not have a legal definition, that means that you, James Sassman, gets to decide what the term or phrase means, okay? And beyond a reasonable doubt is such a phrase.

However, you know -- you know from being in the community, that that is the standard that is used in this courthouse and all of the other courthouses throughout the State of Texas, day in and day out. And juries are able to reach decisions one way or the other.

19

The Defendant is either guilty, the State has proved it beyond a reasonable doubt, or the State hasn't proved it beyond a reasonable doubt.

Do you see how that goes?

A.   Yes.

Q.   You know jurors are able to resolve cases?

A.   Yes.

Q.   So we know it is not an impossible burden. Because if it were an impossible burden for the juries, we would never get anywhere.  We would never resolve anything, would we?

A.   That's true.

Q.   Okay.  It really breaks down to this:  Was the crime committed?  And if so, is the person that the State has charged with the crime, is that the individual responsible for the crime?

Do you see how that works?

A.   Yes, sir.

Q.   Let's talk about any Defendant in any criminal case.  All of the Defendant's have the right not to testify.  The so-called Fifth Amendment right --

A.   Yes.

Q.   -- not to give testimony if they don't want to.

You have heard of that before?

However, on the other end of the spectrum,

any Defendant in any criminal case may testify if they want to. They can get in the same witness stand, the chair that you are seated in right now, turn to the jury and tell them, either why they did something or didn't do something or what was going through their mind. They are entitled to do that.

As we sit here this morning, it is unknown whether the Defendant in this case is going to testify. But I just want to point out, that if he does choose to testify, you judge him the same way you judge all of the other witnesses in the case. While the presumption of innocence is very important, it only goes so far. It doesn't mean or it doesn't include that if the Defendant takes the stand, that you -- he is presumed to be telling the truth. You gauge his credibility just like you did in the other trial that you were in.

I guess there was probably three things that you probably did in that trial with the various witnesses that came in and testified. You can believe everything the witness told you. Conversely, you can believe nothing that the witness told you. Or somewhere in between. Well, I believe this part because it matches with the other evidence, but I don't believe that part.

You know what I'm talking about?

And that is probably what you did in the

earlier trial that you served as a juror.  So you understand about how you get -- you get to decide what the credibility of the witness is.

A.   Yes, sir.

Q.   Are you okay with that?

A.   I'm fine with that.

Q.   Okay.  A criminal case is a little different. Other than, you know, in your civil case the Defendant or the respondent in the civil case can be forced to get on the witness stand and answer questions and maybe that happened -- probably did happen in your case.

In a criminal case, if the Defendant does not testify, the Judge always instructs the jury that you cannot hold that against the Defendant for any reason whatsoever.  In other words, you just have to set it aside.  It's of no consequence.

And I take it you are okay with that?

A.   I am.

Q.   Thank you.

Intent or intentionally is another one of those words that has a legal definition.  When you are talking about the intent in a murder or a capital murder case, it is really focusing in on the last part of that phrase where it's the Defendant's conscious objective or desire to engage in the conduct or cause the result.  And,

of course, the results in a murder case is:  He intended to cause the death.

Do you see how that works?

A.   Yes, sir.

Q.   What you do not see -- and I mention it briefly -- you don't see the word "premeditation."  It makes for interesting, you know, TV stuff and ink between the pages of a novel, but it's not required in any criminal case that the State prove that it was a premeditated murder.

Now, there may be evidence of that.  And if there is, the State can certainly bring it to you.  But we are not required to prove it to you.  It is not a sixth element that we spoke about earlier.

Are you okay with that?

A.   I'm okay with that.

Q.   Venue is a little different in capital murder cases because there are -- as you know, there are two components.  There is the murder -- the murder component and then there is one of the aggravating factors or possibly both of the aggravating factors.

So what we know about in a capital murder case -- let's just take a kidnapping scenario for a moment, sort of keeping with what the nature of a kidnapping is.  Perhaps the individual is initially

kidnapped or abducted in Tarrant County.  The abductors move out of Tarrant County into Dallas County or Lord knows where else, maybe even goes into another state where perhaps the murder actually occurs.

Our law says you can prosecute that entire capital murder here in Tarrant County as long as something occurred here in Tarrant County.

Do you see how that works?

A.   Yes, sir.

Q.   Do you have any problem with that?

A.   No, sir.

Q.   You know, I think, that -- or at least by now -- you recall what Judge Salvant told the jury:  If, and only if, a person is convicted of capital murder, there are only two possible punishments.  Two legally permissible punishments.

The first being, of course, death by lethal injection.  And the second one being a life sentence, where in this scheme of a capital murder conviction, it's 40 calendar years, day-for-day, that the individual has to serve in prison before they are even eligible to be considered for release.  They may never -- they may die in prison because 40 years is a long time, I think you'll agree with that.

Did you -- before you came down here about

a month ago, did you know that these were the two options?

A.   I did not know those were the only two options. No, sir.

Q.   Well, those are the ones that we are going to spend the -- the rest of my time with talking about.

And let me -- you probably recall from Judge Salvant's comments, that what we do is we don't ask the jury to say life or death.  We instead ask the jury to look at two special issues.  And well -- before we get into those, I want to give you just a little contextual information here.

Obviously a criminal trial is broken into two stages.  The first part is you simply determine whether or not the Defendant is guilty of the capital murder that he has been charged with.  And if the jury finds that unanimously, you move on to the punishment stage of the trial.  And I think you know how that works.

What normally happens in a capital murder case during the punishment stage, is that additional information is brought to the jury to help them answer these questions, if it helps them answer the questions at all.

And here's -- this won't come as any surprise to you.  This is how the categories of the evidence shake out.

The Prosecutors normally bring the bad evidence about a Defendant; bad background, bad character bad reputation, been in trouble with the law before.  Has he been in jail or prison before?  If he has, how does he react?  How has he done in that situation.  Anything that has a bad connotation to it, somebody like me would probably bring it to a jury, okay?

You see how that works?

A.   Yes, sir.

Q.   And conversely, even though the Defense attorneys have no burden in this case whatsoever, they may, if they want and generally they do.  They will bring you the good evidence of a Defendant, his good character, his good background, employment history.  What do people think of about him?  What kind of person is he?  Do people like him?  Things of that nature.

I mean, that is -- and you can see by the roles of the attorneys, that just sort of logically flows.  The Prosecution gives you the bad evidence.  The Defense attorneys, if they want to, can give you the good evidence.

Do you see how that works?

A.   Yes.

Q.   So I just want you to know, before we get into these special issues, there is going to be more -- you are

not just considering the facts of the murder, although you are certainly entitled to and the law requires you to. There is going to be more stuff you can hear.

Do you see how that works?

A.   Yes.

Q.   All right.  Now, let's talk about these first two special issues.  The first one is future danger.  It is actually in front of you there on the screen.  If you would just read that to yourself just a moment.

This one is asking the jury to, after they have heard all of the evidence and virtually everything in the case, to make a prediction about the Defendant.

Do you see that?

A.   Yes.

Q.   It starts out with beyond a reasonable doubt. So you know from the first stage of the trial, that whenever you see that, the burden is on the Prosecution to prove what the proper answer to that question should be. And in every death penalty case, the Prosecution sets out to convince a jury that the proper answer to that question is yes.  Yes, indeed we believe he is going to be a future danger.

The word "probability" is another one of those words that does not have a legal definition.  We do know -- our Courts have told us over the years -- that it

has to be something more than a mere possibility.  But it doesn't have to be to a certainty.  It is just whatever probability means to you.

Criminal acts of violence is not really defined.

And the last word of that phrase, society, is not defined.  And a lot of times when people come in here, they properly think, society, that is the world I live in, you and I live in, which is true.  There is no doubt about that.

But our Courts have told us over a number of years that in death penalty cases, especially with Special Issue Number One, society can also include a prison or a jail society.

Are you with me there?

A.   Yes, sir.

Q.   And actually you get to define it however you want to.  I mean, a society can be, I guess, any time more than one or two people are gathered together, they conceivably could have a society.

What the law asks that you be able to do at this point this morning when you are visiting with us, is to keep an open mind and wait until you hear the facts and circumstances of the case before you decide what the appropriate answer to that first special issue is.

Can you do that?

A.   Yes, sir.

Q.   In other words, what the law is not looking for and the lawyers certainly are not looking for, people that would automatically answer these special issues one way or another just because they found somebody guilty of a capital murder, which no doubt is bad.  Certainly not a good thing.

But we want jurors to be able to keep their mind in neutral until they have heard all of the evidence and then make some decisions.

Do you see how that works?

A.   I understand how that works.

Q.   In other words, you might hear -- you know, you might hear a set of facts and circumstances that leads you to believe that, I just don't think that the State has proved it beyond a reasonable doubt to my satisfaction, so I'm going to answer that question no.

And conversely you may hear a set of facts and circumstances that allows you to answer the question yes.  You just sort of call it like you see it.

Can you do that?

A.   Yes, sir.

Q.   Here is how it works:  To answer the question, yes, we believe he is going to be a future danger, it

takes all 12 jurors to agree.

Do you see that?

A.   Yes, sir.

Q.   To answer it no, it takes ten or more jurors must agree.  That is how the scheme works.

We have already talked about that we have the burden, so we'll move on to the second special issue.

This is -- we call this one the mitigation issue.  Take just a moment and look at that one, please.

That one is a little more wordy than the first one and -- but let's talk about it for just a moment.

Over the years I have named this question the fail-safe question.  That is Greg Miller's version of this question.  And I call it that because, by the time the jury gets to this special issue, you have already found two things.  You have certainly found that he committed a capital murder and you, likewise, have found that the answer to the first special issue is yes and he is going to be a future danger.

So it is really only this question and how this question gets answered that is standing between the Defendant and the possible imposition of the death sentence.

Do you see how that works?

A.   Yes, sir.

Q.   And the reason I call -- bless you.

And the reason I call it a fail-safe question is, I think this question is asking the jury to say, wait a minute.  Let's stop for just a moment.  Let's step back again and reanalyze everything we have heard in this case.

And when I say everything, I literally mean everything.  The bad evidence that the Prosecutors have brought.  The good evidence the Defense attorneys have brought, if they chose to do so.  You look at everything that you have heard in this case and then you answer this question.

And it really comes down to this:  Have you heard sufficient mitigation in this case that allows you to conclude that I'm going to spare his life?

Do you see how that works?

A.   Yes.

Q.   And one of the things -- the very first question that we asked concerning the death penalty, was how you felt about the death penalty.  We gave you five forced choices which actually, you know, probably wasn't the right way to do it.  This is what we did.  You said, it was appropriate in some cases, inappropriate in other cases.  You struck out the word "most" and put "other".

But what I really liked about your answer is your explanation that you gave.  You said, would want to look at each case on its own.

Do you remember writing that?

A.   Vaguely, yes.

Q.   You did.  Trust me.

A.   Yes.

Q.   And that sums up what these special issues are perfectly, okay?  Because we don't want any automatic answers.  We want the juries to look at the case on its own and make a decision after hearing the facts.  And I assume by your answer that you could do that with Special Issue Number Two?

A.   Yes, sir.

Q.   In other words, you might -- after hearing everything, you might say, well, look, yeah, I found him guilty of capital murder and that is bad.  And yes, indeed I believe he is going to be a future danger.  But you know what?  I heard sufficient mitigation here that just tells me as an individual that I think the appropriate sentence in this case is a life sentence, especially when you know that life sentence is going to be 40 calendar years.

Do you see how that works?

A.   I understand.

Q.   On the other hand you may say, well, you know, I

have heard some mitigation here but, you know, it's just not sufficient enough for me to set aside a death sentence here, and based on the facts and circumstances -- and quite, frankly, the Defendant, I'm going to vote to impose the death penalty.

Do you see how that works?

A.   Yes, sir.

Q.   Can you just promise us, that if you get selected on this jury, that you will just wait and listen to everything you hear and then decide how the answers should come out?

A.   I will try.

Q.   Can you do that?  Okay.

It's sort of the flip side of the first one.  To answer it no -- no, we don't think there is enough mitigation to spare his life, all 12 jurors must agree.  To answer it yes, ten or more jurors must agree.

This one -- the second one is different because neither side has the burden to convince you what the proper answer to Special Issue Number Two should be.

The group of people, though, that do have the burden is you and your fellow jurors.  You have the burden to listen to whatever the evidence is, at not only the first stage of the trial, but the punishment stage of the trial, and then make a decision.

Can you do that?

A.   Yes, sir.

Q.   Let me talk about something that may not even come up.  You know, I guess it's like it's possible it may come up, but maybe it's not probable that it is going to come up.

A.   Excuse me -- is this water -- may I have a drink?

Q.   Oh, absolutely.

THE COURT REPORTER:  Make sure you pull the top.

MR. MILLER:  Poor it slow.  It comes out fast.

PROSPECTIVE JUROR:  Thank you.

Q.   (By Mr. Miller)  The last thing that I want to visit with you about -- it is possible it can come up.  It may not.  But we have to sort of visit with you now about it or we don't get to talk about it.

And that is the lesser offense of murder -- the lesser included offense of murder.  And let's see how that might come up in a capital murder context where one of the aggravating factors is kidnapping.

Let's assume during the first phase of the trial that the jury heard the facts and evidence that led them to conclude positively, beyond a reasonable doubt,

34

really no question about it that the Defendant on trial killed the victim, okay?

Are you with me so far?

A.  Uh-huh.

Q.  But let's say the same evidence that the jury heard, the evidence on the kidnapping, the aggravating factor, was tenuous, speculative, maybe not even there, okay?  And the jury -- the jury just said, you know, it's obvious he killed her, but we just don't believe the State has proved it beyond a reasonable doubt that it happened during a kidnapping.  Maybe the evidence came out at trial that the victim left voluntarily with the suspect.

A.  Uh-huh.

Q.  Well, I think you can see that in that scenario the aggravating factor that makes it a capital murder is out the door.

A.  Yes.

Q.  But obviously the Defendant is nonetheless guilty of a murder.  So in that case it doesn't mean the Defendant gets to walk out the door with you.  You get to decide.  The Judge would instruct you to consider -- to next consider whether the Defendant is guilty of the lesser offense of murder, okay?

Are you with me so far?

A.  I'm with you so far, yes.

Q.   Murder:  If you find somebody guilty of murder, it has a completely different range of punishment and there it is.  It on the board.  It goes all the way from a low of five years confinement up to 99 years or life.

And I can tell you that a life sentence for a murder conviction is not a 40-year life.  It is a 30-year life, 30 years, day-for-day, in the penitentiary.  Still a significant amount of time.

And depending on what the evidence the jury hears, the minimum could be 15 or the minimum could be 25.  It just depends on how the evidence shakes out.

And it is sort of the same inquiry here that I -- we talked about on the Special Issues -- and based on your answer, I am pretty sure I know the answer to this question.

The law contemplates now that you be able to keep an open mind and be able to tell us that you can give fair consideration to that entire broad range of punishment.

A.   Yes, sir.

Q.   Can you do that?

A.   I can do that.

Q.   And I think there is -- there is a broad range because, you know, history has told us that no murders -- there is not one size fits all for murders.  Murders

happen under a variety of circumstances and certainly a variety of relationships between people.  Everything from a stranger on stranger murder, to people that have known each other for a gazillion years.  For whatever reason the relationship went south and somebody killed the other one.

And that is why we have such a broad range because -- it is just like you said, it -- when you look at the range of punishment for murder, it's the same thing.  It asks you to just look at each case on its on merits.

A.   Yes, sir.

Q.   Can you do that?

A.   Yes, sir.

Q.   We have covered a lot of things here this morning.  Have I thoroughly confused you or did it make a little bit of sense?

A.   I hope I have answered your questions.

Q.   You have.

Let me ask you this, Mr. Sassman:  How would you feel about serving as a member on this jury?

A.   It -- it is not one thing that I want to do, but it is yet, not a thing that I wish to try to avoid.

Q.   Well, you certainly didn't do that because you might find this interesting.  That when you came down here on September 30th with 214 other people, you might find it

interesting to know that we summoned 1,000 people.  So, I guess, 79 percent of the people that were summoned, not only did try to get out of it, but they succeeded in getting out of it.  So you ought to be commended, you and 214 other people, for just coming up.

A.    Well, thank you, sir.

Q.    And we appreciate you coming back today.

You are not necessarily looking forward to it, but if you -- if you did get picked here in a couple of weeks or so, ten days or so or whenever we do this, that you could give us your attention for maybe up to two weeks --

A.    Yeah.

Q.    -- and just call it like you see it?

A.    Well, the only question I have is when it would start.  And if it ran through Thanksgiving, what kind of break there would be or anything?

Q.    Well, let me tell you what we're shooting for, okay?  We're trying to start the trial somewhere during the week of November 7th.  It might be November 8th, November 9th, something like that.  But I feel fairly confident we'll start the trial sometime the week of November 7th.

We anticipate this trial will take no more than two weeks.  This is not California where trials seem

to take an ungodly amount of time.  We don't anticipate the trial getting into the Thanksgiving week.  We just don't -- we don't anticipate that.

Does that make you feel a little better?

A.  Some.

Q.  Some?  Okay.

Anything else I can answer for you or try to answer for you?

A.  How many jurors have been selected?  Or if they have been -- or do you argue that every afternoon after we all leave, whether the six or 12 of us --

Q.  Well, what we are trying to do in this process is qualify a group of about 50.  And as of last night, we are at 35.

A.  All right.

Q.  So we're looking for about 15 more.  A few good men and women.

A.  All right.

Q.  Thank you.  I appreciate it.

MR. MILLER:  And I'll pass the juror.

THE COURT:  I'll recognize the Defense.

MR. STRICKLAND:  Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MR. STRICKLAND:

Q.  Mr. Sassman, Steve Gordon and I have been

appointed to represent Mr. Busby in this case.

A.    Uh-huh.

Q.    I appreciate you taking the time to show up, fill out the questionnaire, come back here today and answer the questions.

A.    You are welcome, sir.

Q.    Talk to us about yourself, about the law.

One of the things that -- that Mr. Miller did talk to you about -- and I don't want to belabor this, but is your association or non-association with Mr. Carpenter.

And Mr. Miller was exactly correct when he said, one of the things that concerns lawyers for both sides and, frankly, I suspect concerns the Court is that --

A.    Is whether we would gang up on the rest of the jurors.

Q.    Well, yeah.  And whether or not, if when you are back there deliberating, if Mr. Carpenter says yes, that means you automatically say no.  If he says black, you automatically say white, simply because of your not so satisfactory relationship.

A.    I don't see that happening.

Q.    Okay.  Was he aware that maybe you harbor some dislike for him, would you guess?

A.   I -- possibly.

Q.   Well, we don't intend to tell him.  I just wondered if that had come out.

A.   Like I said, we work about ten feet from each other and we may speak or we may not during the day.

Q.   Let me -- you know, lawyers like to parade horribles.  They like to take a situation and go to the worse possible scenario in order to see, you know, if they are on the right track about something.  And here is the horrible I'm going to parade before you.

The Court has informed you that the likelihood is that the jury would be not be sequestered and you and Mr. Miller have talked about that.

A.   Uh-huh.

Q.   You said that that wouldn't pose a problem for you.  But let me parade this horrible.  Mr. Carpenter is only two away from you in the scenario now.  If both of you are selected on the jury -- they don't put men and women in the same room -- but, you know, they do so numerically and it may well be that you have to spend two weeks with him in the hotel.

A.   As long as I didn't have to sleep in the same bed with him.

Q.   Well, we can -- we can make that a condition that you not have to sleep in the same bed with him.

41

All right. Well, here's the deal. I can take about 35 or 40 minutes and try to cozy up to you, you know, and try to talk to you about my view of the law. But what is important is the law that the Judge gives you at the conclusion of the case. And what is important that you enter upon this process with a -- with an open mind.

A.   Yes, sir.

Q.   You have not made up your mind about the guilt of the Defendant?

A.   I cannot say that I have heard of the Defendant. I do not know.

Q.   The mere fact that he's -- he's been indicted and he is on trial is not enough to convince you that he is guilty, is it?

A.   No, sir.

Q.   I know the answer to this, but I am compelled by my obligations here to ask it anyway. The mere fact that he is an African-American man would not in any way influence your verdict?

A.   No, sir.

Q.   I take it that you believe that you could be a fair and impartial juror?

A.   I would do my best. Yes, sir.

Q.   And that that impartiality and fairness extends not only to the question of guilt, but it extends to the

question of punishment if you do find him guilty?

A.   Yes, sir.

Q.   As you sit here now, I take it you do not have a leaning toward or a predisposition toward the death penalty as always being the appropriate penalty when someone is convicted of capital murder?

A.   No, sir.

Q.   You will weigh all the facts and circumstances, you will follow your oath, you'll follow the law, you'll deliberate with your fellow jurors and you will arrive at a conclusion consistent with those things and consistent with your own conscience; is that correct?

A.   Yes, sir.

Q.   Any reason that you can think of that any of us should have concerns about your ability to do so?  When I say any of us, I mean the lawyers on either side.

A.   None that I can think of.

Q.   Is your -- is your work at Lockheed such that production would grind to a halt if you were out of there for two weeks?

A.   No, sir.

Q.   All right.  Thank you.  We appreciate you coming down.

MR. STRICKLAND:  That is all of the questions I have, Judge.

43

THE COURT:  Okay.  I get to talk to you now.

PROSPECTIVE JUROR:  All right.

THE COURT:  You are not -- you are not on the jury, but you are on the list that the jury is going to be selected from.

PROSPECTIVE JUROR:  I understand that now.

THE COURT:  You will be required to come down at some point.  We don't know exactly when.  We're not exactly sure when you will be required to come down.  You will be selected for the jury or released.

We are going to take two pictures of you.  The only reason we are doing that is so the lawyers can look at your face and remember your answers and think about it.

In the meantime, don't talk about the case.  If you were out there with another person that may be on this jury, whatever, you don't talk to him.  I know, you don't talk to him a lot.  Don't talk about the case.

Don't look anything up.  Don't get -- you get your news from the Internet, so don't get on the Internet and start looking up anything about this case.

If something comes on TV, you probably ought to walk out of the room.  Mute it and walk out of the room.

44

PROSPECTIVE JUROR:  Like Judge Salvant said, he advised us that there was going to be an article in the paper about selecting the jury.  And I remember the next day opening the paper up and seeing it there.  And I said, oh, turn the page.  And I turned the page and went on.

THE COURT:  You can put it aside and read it when this is all over.  When you are released as a juror, you can read it.  Until then, don't do it.

Do we have your right phone number now?  You said there was some question.

PROSPECTIVE JUROR:  Yes, sir.  I put down -- I transposed some numbers or something.  I don't remember what it was right now, but she called and got a hold of me.

THE COURT:  If any of that changes, let us know because you will get a phone call telling you when to come back.

If you will go with this guy right here.  He will get your picture.

PROSPECTIVE JUROR:  Is this a $6.00 day or $10.00 day?

THE COURT:  I think you are still on $6.00.

MR. STRICKLAND:  I think so.

MR. SHANNON:  How many days have you got to

go before you get $10.00.  Third day?

MR. STRICKLAND:  I bet it's $10.00 before its over, Judge.

PROSPECTIVE JUROR:  I don't have a clue.

THE COURT:  I tell you what, we don't call your work and say he is released?

(Prospective Juror Retires)

THE COURT:  We are in recess.

MR. SHANNON:  Judge, we are going to excuse the next one.

THE COURT:  Oh, are you?  Number 97?

MR. SHANNON:  Yeah.  We have both looked at him.

THE COURT:  You have looked?

MR. STRICKLAND:  We have, but we both still need to recess to catch our breath after that.

MR. SHANNON:  You know --

THE COURT:  Are y'all ready to agree on number 97?

MR. STRICKLAND:  Yes, sir.

(Pause in Proceedings)

THE COURT:  Back on the record.

I understand there has been an agreement as to Juror Number 97 whose name -- whose name is Brenda Armstead.

Is there an agreement?

MR. SHANNON:  Yes, Your Honor.  Both the State and, I think, the Defense have both agreed we can excuse Juror Number 97, Ms. Armstead.  Among other things, she indicated she hadn't given any thought whatsoever to the death penalty.  She also hadn't done -- doesn't seem to have any particular thoughts on whether a person ought to have to give testimony against themself.  And she indicates that -- also, gives no opinion on her questionnaire about her opinion of criminal Defendants or her opinion of verdicts.  And she also supervises her grandchildren in the afternoon.

With all of those things coupled together, we feel like -- the State believes that it would not be wise to put somebody in a position of having to make a decision on the infliction of the death penalty on somebody who has never even thought about it.  We think that is an appropriate person to excuse.

MR. STRICKLAND:  We agree with those observations, Your Honor.  We do agree to excuse her and Mr. Busby concurs with that.

Is that correct, sir?

THE DEFENDANT:  Yes, sir.

THE COURT:  I'll approve the agreement. We'll excuse Brenda Armstead, Number 97.

Are we through until 1:30?

(Recess from 10:05 a.m. to 1:30 p.m.)

THE COURT:  Why don't we talk to her.  She may claim the exemption.  Ms. Dietel.

(Prospective Juror Enters)

THE COURT:  Hi.

PROSPECTIVE JUROR:  Hello.

THE COURT:  If you will raise your right hand?

(Prospective Juror Sworn)

THE COURT:  If you would state your name?

PROSPECTIVE JUROR:  Kristin Dietel.

THE COURT:  Ms. Dietel, you filled out a juror questionnaire.  Were the answers you put on there true and correct?

PROSPECTIVE JUROR:  Yes.

THE COURT:  My name is Phillip Vick.  I'm the Judge presiding over this proceeding.  Judge Wayne Salvant will try this case.  We think it will start November 7th and it should last about two weeks.

I'll introduce the attorneys.  Representing the State is Mr. Joe Shannon and Mr. Greg Miller.  Representing the Defendant is Mr. Jack Strickland and Mr. Steve Gordon.

They'll have questions for you, but I'll

ask the first question:  Is there anything happening in your life, either medical, travel, work or anything that would keep you from being a juror during that period of time?

PROSPECTIVE JUROR:  No.

THE COURT:  Okay.  I'll recognize the State.

MR. SHANNON:  Thank you, Your Honor.

KRISTIN DIETEL,

having been first duly sworn to make true answers to questions propounded concerning qualifications and service as a juror, testified as follows:

VOIR DIRE EXAMINATION

BY MR. SHANNON:

Q.  Ms. Dietel, as the Court told you, my name is Joe Shannon and I'm an Assistant District Attorney.  And I, along with Greg Miller, will represent the State of Texas in this case.

I noticed -- and I'll just kind of cut right to this.  We noticed from your questionnaire -- which by the way we really appreciate you taking the time to fill out because it has obviously shortened this procedure considerably.

You have got some youngsters at home, I take it, a two-and-a-half-year-old and a 14 -- well, I

49

guess, maybe 15-month-old by now.

A.   Almost.

Q.   And you are aware, are you not, that a person who has children at home under ten has the ability to claim some exemptions if it is a problem or hardship or some issue with regard to somebody being able to take care of kiddos while you are on jury duty.  You have that right.

And we found, from talking to some of these folks, that that may not have been explained to everybody downstairs in the jury room when the panel was originally drawn.

Was that something that you were particularly aware of?

A.   I was aware of it.  I'm a full-time attorney and so I have a childcare for my children every day.  So it is not an issue for me.

Q.   All right.  How about your husband?  Is he employed outside the home?

A.   He is.

Q.   Okay.  And you are working now at the firm in Dallas, I take it?

A.   I am.

Q.   What type of practice are you engaged in?

A.   Commercial litigation and labor employment.

Q.   And let me ask you this -- and I'll just throw this one more spin at you here.  And we never know for sure in one of these kinds of cases, particularly a case that is apt to generate some significant press and high profile type of media coverage, there is always the possibility that a jury can be sequestered during the time of its duties.

We anticipate that this case -- trial will take approximately two weeks.  There is a possibility that a juror might be sequestered for that period of time.  In which case you would be put up in a hotel and, you know, you get to eat on the county, so to speak.

But it could be -- and I didn't know if it might be.  If that were the case, would that be an issue with you in regard to the little ones for a two-week period?

A.   I'm sure they would miss me and I would miss them, but I have plenty of family in town that would be able to help in the event I was selected.

Q.   So in the event of that eventuality, you could make arrangements?

A.   Absolutely.

Q.   Okay.  All right.  Is jury service something that you kind of want to do?  Being a lawyer, it would be a natural thing.

A.   I have never been able to serve on a jury. Every time I have been called with my summons, I was in school.  So this is my first time.  And I do think it is our civic duty to be available and provide that service.

Q.   Okay.  Well, they took me on a jury about six years ago.  Surprisingly enough, was an interesting experience.

Okay.  Then I take it that this is something that, you know, you feel like that -- well, let me back up just a little bit.

Of course, in a death penalty case obviously some decisions will be made that, you know, will be heavy decisions.  They will be decisions, I mean, literally life or death.  And that is -- of all of the juries you could have been called on to be, this is the top of the heap.

So my question is:  Coupled that with your other situations, your work, your kiddos, all the other things; does that in any way impinge upon your ability or continued willingness to serve in this type of case?

A.   No, it does not.

Q.   Okay.  All right.

MR. STRICKLAND:  Your Honor, we do have some matters to take up with the Court outside the Venireperson's presence.

THE COURT: Okay. If you will step out for just a minute.

(Prospective Juror Retires)

MR. STRICKLAND: Your Honor, the exemption issue notwithstanding, I believe there is an agreement between Counsel to dismiss Ms. Dietel for several reasons, most significantly because she is an attorney.

And as we have expressed in regards to Mr. Walls, I think the juror yesterday, there is concern for both sides that in a case such as this that the person, if they were selected to serve on the jury, might be looked to by fellow jurors to provide elaborations upon the law that the Court gives them in the Charge, that they may have undue influence on the other members of the jury.

Notwithstanding the fact, that this lady appears to have no criminal experience and is only recently a licensed attorney. And that they might -- they might also attempt to interject in some manner their opinion of the law and the rulings of the Court, the weight of the evidence, and thereby unduly influence the other jurors.

So based on all of that, I believe that there is an agreement between both sides that she be excused?

MR. SHANNON: That is agreed, Your Honor.

MR. STRICKLAND:  And we have discussed this with Mr. Busby and Mr. Busby concurs.

Is that correct, sir?

THE DEFENDANT:  Yes.

MR. STRICKLAND:  Thank you.

THE COURT:  Per the agreement, we'll excuse Juror 89, Kristin Dietel.

Are we ready for Mr. Carpenter?

MR. SHANNON:  Yes.

THE COURT:  If you will bring him in.

(Prospective Juror Enters)

THE COURT:  Okay.  Sir, if you will raise your right hand?

(Prospective Juror Sworn)

THE COURT:  If you will state your name?

PROSPECTIVE JUROR:  James Anthony Carpenter.

THE COURT:  Mr. Carpenter, you filled out a juror questionnaire.  Are the answers you put on there true and correct?

PROSPECTIVE JUROR:  I believe so.

THE COURT:  Okay.  My name is Phillip Vick. I'm the Judge presiding at this proceeding.  Judge Wayne Salvant will try this case.  We think that it will probably start somewhere around November 7th and last

54

about two weeks.

I'll introduce the attorneys in the case. Representing the State is Mr. Joe Shannon and Mr. Greg Miller.  Representing the Defendant is Mr. Jack Strickland and Mr. Steve Gordon.

MR. GORDON:  They will have some questions for you, but I'll ask the first question:  Is there anything happening in your life, your work, travel plans, medical problems, anything to keep you from being a juror in this case?

PROSPECTIVE JUROR:  I am diabetic, but I don't know that that will be a problem.

THE COURT:  Okay.  I think -- what do you take?

PROSPECTIVE JUROR:  I take insulin with my meals.

THE COURT:  Okay.  I think we will be able to work around that.  If you are on the jury, make sure the bailiff and the Court knows.  They can work around that, not a problem.

Okay.  I'll recognize the State then.

MR. SHANNON:  Thank you, Your Honor.

JAMES ANTHONY CARPENTER, having been first duly sworn to make true answers to questions propounded concerning qualifications and service

as a juror, testified as follows:

                    VOIR DIRE EXAMINATION

BY MR. SHANNON:

Q.   As the Court told you there, Mr. Carpenter, my name is Joe Shannon and I'm an Assistant District Attorney representing the State in this case.  I, along with Greg Miller, also an Assistant District Attorney, will be prosecuting this matter.  And we work for the elected District Attorney Tim Curry.

I need to ask you a few questions.  Some of which have arisen as a result of information which we appreciate the fact that you have given us on your questionnaire.  And also to perhaps explain to you a little bit about some of the law that you might come in contact with if, in fact, you are chosen as a juror in this case.

And let me assure you, there are no right or wrong answers.  Feel free to ask me any questions, if I don't explain something totally to your satisfaction or whatever because this is really the only chance that we will get to visit with any jurors before they are selected.  And after that we are kind of limited to saying good morning and that's about it.  We can't have a conversation with you, nor you with us, later.

So you and I will probably get along fine

56

with a nod of the head or a gesture, but Ms. Chapman is not able to get that down. So if you can, answer out loud. And I'll be happy to try to go over a few things with you, hopefully, briefly and see if you have any questions or issues about serving as a juror in this case.

You mentioned the diabetic. Is it a Type One or Type Two?

A.    Type Two.

Q.    All right. And you are insulin-dependent at this time?

A.    I'm on insulin-dependent at this time.

Q.    And have you been able to keep the sugar in control with the insulin for the most part?

A.    I am able to perform my job and go on daily activities, yes.

Q.    All right. And do you ever have any issues from time to time that maybe your sugar should drop and you need to get something to eat?

A.    Sometimes, yes.

Q.    Do you carry some sort of candy or something with you?

A.    Yes, I do.

Q.    Okay. Like most diabetics I know. And my father was one and I do understand where you are coming from.

A.    Yes, sir.

Q.    All right.  Let me do this, let me ask you just a couple of questions about your questionnaire.  And the way this questionnaire was phrased, it wasn't totally real clear, but you are currently working at Lockheed?

A.    That is correct.

Q.    What kind of work are you doing there?

A.    I'm a machinist.

Q.    Do you happen to know Mr. Sassman who is on this jury panel?

A.    Yes, I do.

Q.    Okay.  Have y'all worked together?

A.    We work in the same department.  We do not work on the same projects at the same time.

Q.    Okay.  He is just a co-worker of yours in the same area and that sort of thing?

A.    Right.

Q.    Y'all get along all right?

A.    I have had really very little interaction with Mr. Sassman.

Q.    Okay.  So you don't really have an opinion much one way or the other?

A.    Not much of an opinion one way or the other.

Q.    Okay.  Now -- well, let me ask you this:  There is a possibility that he might be taken as a juror, also.

58

It is kind of strange we get both of you out of the same department.  It is just kind of the luck of the draw.

Would there be any problem that you might have if you were taken as a juror and it happened to be that he was also on the jury?  Would that be a plus or minus on either side of the equation?

A.  I don't think it would make any difference one way or the other.

Q.  Okay. Good.  All right.  Well, I mean, you know sometimes people work together and just as soon as not see each other outside the office, so to speak.  Y'all don't have that problem; is that right?

A.  We don't associate outside of work, but that has nothing to do with anything.

Q.  Okay.  There is a pot load of people at the plant you don't associate with after work, I'm sure.

A.  Yes.

Q.  What is the employment load out there now?  How high is it?  Do you know?

A.  I'm not exactly sure.  I think it is around 17,000, something like that.

Q.  Let me ask you another thing, too.  You indicated on your sheet, question number 36, that you had had an unpleasant or bad experience with a lawyer.

Do you recall that question?  It said, have

59

you ever had a bad experience with a lawyer?  Yes, divorce.

A.    Yes, divorce lawyer.

Q.    Okay.  Was that the lawyer on your side or the lawyer on the other side or both?

A.    The lawyer on the other side.

Q.    Okay.  Well, they generally don't get in those things to win friends on the other side.

A.    No, that is exactly correct.

Q.    But what about your own lawyer?  Did you and that lawyer get along all right?

A.    I believe so, yes.

Q.    Okay. Good. Okay.  Well, it's not uncommon for people, who have gone through a divorce, to have, shall we say, less than fond feelings of folks on the other side.  Not a problem then.

        I take it by that, you don't have any opinion that, you know, all lawyers are bad or all lawyers are good or anything like that as a result of that particular unpleasant experience in your life?

A.    No, sir, no opinion one way or the other.

Q.    All right.  Good.  And also you had question number 54 had -- kind of raised a question in my mind.  It asked you, if you, any family members or close friends have ever been a witness in a criminal case?  You said,

not yet.

Do you expect to be?

A.   I do expect to be a witness.

Q.   What kind of case?

A.   On an assault case.

Q.   Were you a witness to the assault?

A.   I was the only eye witness.

Q.   And was somebody seriously injured in that event?

A.   I don't think they were seriously injured, but there was bodily injury.

Q.   And is it a civil case or criminal case growing out of that?

A.   I believe it will be a criminal case.

Q.   And so -- you -- I guess you have given a statement to the police or something like that?

A.   That is correct.

Q.   Do you expect to be a witness for the injured party or for the Defendant or do you know?

A.   I have no clue at this time.

Q.   You are just going to tell them what you saw?

A.   I just told them what I saw which was very little.

Q.   Okay.

A.   And I don't know where it will go from there.

Q.   Sure.  Is that case set for trial or coming up any time soon?

A.   I have no idea.

Q.   It's not to your knowledge going to in any way interfere if you were taken as a juror in this case?

A.   I wouldn't think so, no, sir.

Q.   You just happened to be in the wrong place at the right time or the right place at the wrong time, one of those two.

A.   That is correct.

Q.   You indicated also that -- let's see, question 61.  You had prior jury service and you said the final verdict or decision is you had one guilty, one committed and one for the plaintiff.

So do I understand correctly that you have been a juror in a criminal case, in a mental commitment case and in a civil case?

A.   That's correct.

Q.   So you've hit the lucky number three different times.  All right.

A.   Yes, sir.

Q.   Well, you must be something that engenders a lot of confidence in you from a lot of people because not too many people get taken on that many.

A.   It has been over many years.

Q.   Okay.  So it has been over a pretty good spread.

A.   Yes.

Q.   Let me kind of go over with you a few things, like I said, that may come up because the purpose is to explain to you the law that works in a capital murder case.  Because it's really kind of an animal all of its own.  It is a little different procedure and a little different approach.

And the purpose of my questions and explanations is to make sure that you feel comfortable in taking a seat in the jury box if this is the law that is going to be applied.  Because, you know, there are people who disagree with certain laws that we have.  But, of course, we are all obligated to obey those laws until such time they are legally changed.

You would agree with that, would you not?

A.   Yes, sir.

Q.   Well, nobody wants to put somebody in the jury box who has strong personal feelings against certain laws.  And, you know, we all have laws that we disagree with.  Some people it is 55 miles an hour speed limit.  Some people it is income tax.  All kind of things that we disagree with.

And we are not going to ask you to sit in judgment in a case where you might be called upon to

participate in a law because you have some strong, personal, religious, philosophical disagreement, okay?

All right. Now, I'm going to go through a few things here. And you have been through a criminal trial before, so I'm not going to explain to you Indictments and reasonable doubt and stuff like that because you have already had that experience. And so some of these slides are prepared for people who have not really ever been down that road.

But the main thing I need to tell you about an Indictment is -- and you know this -- it is not evidence of guilt. It just means that is the way we start the case.

The main thing I want to tell you, too, is that in any criminal case the State is never required to prove motive. Now, that may be something you would like to know and it might be something we would like to know. But, you know, the only person who really knows what motive prompted an individual to do something, is the individual himself. We can't open his head and look in it.

So if we know motive, we are entitled to bring you evidence of motive. But the State is not obligated as a part of the Indictment to prove why an individual did something. We merely need to prove that

the law was violated and that individual did it.

So if the State -- if the law didn't require us to prove motive, would you want us to prove motive in addition?

A.   It wouldn't be necessary.

Q.   But it might be an interesting thing to know, wouldn't you agree?

A.   It might be.

Q.   And a lot of times we see people do things and you may scratch your head and say why in the heck did that guy do that?  But we may never know the answer to that question, all right?

Let me kind of skip along here just quickly and I'm going to show you -- talk to you a little bit about what makes a murder different from a capital murder.

A capital murder is an intentional killing of a human, like regular murder, plus we have an aggravating factor.

And in this case it is alleged that the aggravating factor is kidnapping or robbery.  So a murder that occurs in the course of a kidnapping or a robbery is a capital murder, in which case the penalty is higher and the death penalty is a possibility.

Now, there are other capital murders out there.  A person kills a child under the age of six, kills

a police officer in the line of duty, that sort of thing, can be a capital murder, also.

A.  Yes, sir.

Q.  But in this case we expect the allegations to be kidnapping or robbery.

Now, let me show you a couple of things here.  I'm not going to spend a lot of time on kidnapping or robbery, but I would be surprised if you didn't know what that was.  Most everybody does.

Now, I'm going to show you what is alleged in this particular Indictment and let me tell you that we are not able in a criminal case to give you any of the facts up front.

Because, one, it wouldn't be fair to you because we are the lawyers.  We are not the witnesses.  And you need to get that information, like you did in the previous cases, from the witness stand, the documents, the pictures, things like that.

But what I can tell you is that these are the allegations in the Indictment.  And this is what the State has to prove:  That in Tarrant County, Texas the Defendant on or about January 30, 2004, intentionally killed Laura Crane by covering her mouth and nose with tape while he was in the course of committing or attempting to commit kidnapping or robbery.

Now, that is what the State has to prove in order to prove the Defendant guilty of capital murder.

Now, is there anything about what I have told you here that has caused you perhaps to remember or recollect anything that you might have heard on the news media, read in the papers or anything about this particular event and what is alleged to have occurred?

A.   No, sir.

Q.   All right.  So obviously you have no opinion as to the guilt or innocence of Mr. Busby?

A.   No, I have no opinion.

Q.   All right.  Now, you -- you know what a presumption of innocence is.  You have already used the standard of beyond a reasonable doubt.  And the main thing that we try to tell people on what beyond a reasonable doubt means, is it is a decision you make because it is not legally defined.  It is, in effect, something for each individual juror to weigh in his or her own mind based on the evidence.

Actually, it is one of those things that I tell people a lot that we use it everyday.  If you are in a place -- say we are in here and we hear thunder strike, lightning going and thunder clapping and that sort of thing.  And in a minute somebody comes in and they are dripping wet.  You know, we could probably conclude beyond

67

a reasonable doubt it is raining outside.

A.   Yes.

Q.   We haven't looked out, but it wouldn't be a quantum leap to do that.  Would you agree with that?

A.   Yes, sir.

Q.   And it is pretty much kind of a daily life type thing.  But when you get right down to the bottom line and what we have got to do is two different things on the bottom here:  Was a crime committed?  And did the Defendant do it?

And if you as a juror are taken and you believe that beyond a reasonable doubt, it would be a guilty verdict.  If again you had a reasonable doubt of it, the State didn't prove it, it would be a not guilty verdict.  You have kind of been there before.

The same principles in a capital murder case.  However -- and I'm going to just hit a couple of high spots here.

A Defendant is not obligated to testify.  I think you are probably aware of that.

A.   I'm aware of that.

Q.   The Fifth Amendment of the United States prevents us from making him talk.  He has a right to talk if he wants to.  And if he does then you, as a juror, get to weigh what he says.  You can believe all of it.  You

68

can believe none of it.  You can believe part of it, not part of it.

A.   Yes, sir.

Q.   Not a tough job.  He has a right to testify.

Now, let me kind of -- I am going to skip on past here a little bit.

Intentional is kind of a legal definition.  But really the bottom line is, if you have a conscious objective or desire to engage in the conduct or to cause the result, you have done something intentionally.  And, of course, murder and capital murder requires intentional action, okay?

A.   Yes, sir.

Q.   You pick up a gun.  You fire it at somebody.  You shoot them.  A pretty good indication you intended to hurt them or kill them --

A.   Yes, sir.

Q.   -- just by that.  I noticed you said you had a gun collection.  What type of gun?  Hunting weapons or --

A.   Hunting weapons mostly.

Q.   Okay.  Different kinds of rifles?  Shot guns?

A.   I have some military antique weapons.

Q.   Okay.  What kind of antique military weapons?

A.   Unusual.  Some Japanese weapons that are not very common.

Q.   Oh, really?  And do you make -- do you get these through gun shows and things like that or do you get them through a network of dealers?

A.   Different ways over the years I have come across some World War II weapons.

Q.   Okay.  And are they operable?

A.   I have never tried them.

Q.   Be --

A.   I have always figured all guns are always loaded.

Q.   Yeah.

A.   So I have not tried to use these weapons.

Q.   Was -- I was going to say some of those, they get a little age on them, you might be a little hankie about using them for that.

A.   With ammunition prices, it is not feasible to just go out and play with them.

Q.   I got you.  Okay.  And you collect them just to have them; is that right?

A.   Mostly just to have them.  I do hunt.

Q.   Okay.  All right.  One thing we don't have to prove, like motive, is also premeditation.  And you hear this on TV all the time.  You know, there was a premeditated murder.  Well, basically that just means somebody thought about it for a long time when they did

it.

But would you agree with me that the intent to kill can be formed in the blink of an eye?  Something happens, somebody lights a fuse on somebody and, wham, they pick up a weapon and blew it.  Something bad happens. You agree with me?

A.   I believe that could happen.

Q.   Sure.  Well, that is why premeditation is not required.  Because, you know, sometimes people think about it a long time, make elaborate plans and do things.  I guess you could say that is premeditated murder.  But our definition of murder is the intentional, taking of another human life in a circumstance not justified.  That excludes self-defense, things like that.

A.   Yes.

Q.   By the way, do you happen to carry a concealed handgun permit?

A.   Yes.

Q.   So you studied a little bit about deadly force and the right to use deadly force and when you can do it and you had to take a test on it?

A.   Many times.

Q.   Well, of course, we are not getting into that in this particular case.  But an intentional murder, the intentional taking of a human life, becomes murder when it

is not justified.  Makes sense?

A.  Yes.

Q.  Venue, I'll make that kind of brief.  But by and large it just means the county in which the crime is committed.  And because capital murder is a little different breed of cat, it has two component parts, the actual murder and the aggravating factor.  And then the case can be prosecuted in the county where any part of the crime occurs.

A person might be kidnapped in one county, taken away to another county, murdered in the other county, you could prosecute the case in either county where the crime occurred.

That doesn't cause you any problem, does it?

A.  No, sir.

Q.  Now, in capital murder, if a person is convicted, there is only two possible punishments.  That is death by lethal injection or a life sentence.  And under the case which we are talking about now, that means 40 calendar years before you are eligible for parole.  That means eligible.  Doesn't mean you are going to get it.  It means 40 calendar years.

Now, how do we get there?  We don't just submit a question for the jury and say life or death, fill

in the blanks.

What we do is we have two questions that get asked.  And since you found somebody guilty in a previous criminal case, did y'all do punishment in that case or did it go to the Judge?

A.  Yes, we did punishment.

Q.  So you are familiar with the fact that we have two halves of a trial.  The first half you find whether somebody is guilty or not guilty.  And the second half is the punishment part, okay?

A.  Yes.

Q.  We do that in capital murder, too.  But if you find a person guilty of capital murder, then we move into the punishment phase.  Where?  Like in your other case, additional evidence is put on.  You can consider all of the facts you heard in the first part of the trial.  And both sides have a right to put on any evidence that they want to.  The Defendant does not have to put on evidence, but he has that opportunity.

Here is the way we do it.  We ask the jury two questions and the jury goes out and they have two questions on written instructions and you start with question number one.  And it is what we call our future danger question.  And this is it.  And what this boils down to is, it is asking the jury if the State has proven

73

beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.

Now, you listen to the evidence.  If the State has proven that to your satisfaction beyond a reasonable doubt, then obviously answer yes.

Now, it says probability.  It doesn't say certainty.  It doesn't say mere possibility.  It says, is there a probability?  Which kind of means more likely than not.

Now, the word "society" is used in there. And society can be a society in the free world in which we live or it can be a prison society.  Is there apt to be a problem in prison, that sort of thing.

And so consequently, if the jury goes back and they all get together and they decide the answers should be yes, all 12 jurors have to agree that the answers should be yes.

To answer that question no, ten or more must agree that the answer should be no, okay?

A.   I understand.

Q.   Now, that is the first question.  The State again has the burden of proof on Special Issue Number One. The Defendant does not have a burden to prove anything. Up until now, the State has had the burden of proof in the

74

whole case.  It's our job to prove it to you.

Now, we go to Special Issue Number Two because, if the jury should answer Special Issue Number One no, there is no probability of future danger, then we don't ever get to question number two.  Because it's over.  You come back in.  The Judge sentences the person to life in prison.

Now, if the jury should answer no to question one, then we move to question two.  We call that our mitigation issue.  And here is that question right here.

And it's a little more wordy.  And by and large, Mr. Carpenter, what it does is it says, take everything into consideration, everything you have heard, all of the good, the bad -- you know, you may have heard some good about the Defendant.  You may have heard bad about him.  We don't know.  And think about his moral responsibility, moral culpability or culpability meaning blameworthiness and that sort of thing.  You consider his character and all of the circumstances of the offense.

And then what we ask the jury to do is say, are there sufficient mitigating factors that justify a life sentence over a death sentence.  And that is just purely a jury's call.  You think about all of the stuff you have heard and you kind of call it like you see it.

If you think there is sufficient mitigation, then obviously the answer to this question would be yes. If you don't think there is, the answer to this question would be no.

And here is the way that one works out. To answer no, all 12 jurors have to agree no, there is no mitigation. To answer yes, ten of you have to agree.

Now, if the first question of probability of future danger is yes, and the second question is there is no sufficient mitigation, the Judge has no choice but to impose a sentence of death.

If however question one should be answered, yes, but question two is also answered yes, then a Judge would impose a life sentence.

A.  I understand.

Q.  And so the jury doesn't write life or death, but you answer these questions. The answers go to the Judge. His actions are dictated by what the jury says.

So we are not hiding the ball. You know exactly what the result is going to be based upon how those answers come out, you see? And so what we do is ask you to look at really two things: Is there a probability of future danger? And is there mitigation that works against a death sentence? And it's the jury's call.

Now, what we take -- we do on this last

issue, we kind of say, look, this is the jury's opportunity to look-back, look at everything, shake it all out, look at it any way you want to and say, should this man's life be taken by the State or not?  And that is what your call this.

Do you think you could do that and follow this procedure under the law?

A.   I believe I could follow that procedure.

Q.   Okay.  Good.  It doesn't cause you any problem about the way we do it?

A.   No, sir.

Q.   Okay.  And you see, it's -- there is 36 votes got to happen before a death penalty is imposed.  You have got 12 on guilt or innocence.  You have got 12 on probability of future danger.  You have got 12 on no mitigation.

So you see what I mean?  It is a pretty big hill to climb.  But if the State climbs that hill -- but let me mention one last thing on this issue.  The State does not have the burden of proof on number two.  Finally, the State doesn't have a load to carry.  But neither does the Defendant.  The Defendant does not have to prove there is mitigation.  The State doesn't have to prove there isn't.  That is purely for the jury to decide, okay?  That is how it all works out.

You haven't got any problem with any of that procedure, do you?

A.   No problem with that, sir.

Q.   All right.  One other thing that I need to mention to you about what law might come into effect.

Let's suppose that the jury hears the evidence and they decide that, well, there was a murder, but there wasn't a kidnapping for some reason.  Maybe they decide the person went voluntarily.  In which case you have got a person you believed killed another person intentionally, but you don't -- he doesn't walk out the door just because there wasn't a kidnapping.

What happens then is, you move -- the Judge will tell you, that if you find him not guilty of capital murder, then you proceed to consider the lesser charge of straight murder.

The punishment for murder in Texas is what is on the board.  It's five to 99 or life.  And under certain facts, which we don't know will come up or not, it could be the floor on the punishment is 15 years or the floor is 25 years.

But whatever the floor is, the Judge will tell you what the range is.  Because you have done punishment before, you know, you go back, you take the Court's parameters, the instructions they give you, what

78

it is between and you make the punishment fit the crime, correct?

A.    Correct.

Q.    Now, what I need to know from you is, if a person were convicted of intentionally taking the life of another, before you have heard any evidence -- and I'm not asking you to prejudge anything.  That would not be fair to you.

I'm asking you if you could give fair consideration to the full range of punishment, all the way from five years to 99 years to life depending -- and set the punishment within that range somewhere, depending on what the facts were that you heard?

A.    Yes, sir.

Q.    Could you do that?

A.    Yes, sir.

Q.    And you realize, do you not, there is all kinds of reasons why one person kills another person, but it doesn't make it legal.  It doesn't make it right, but it might change the punishment that would apply, you see?

A.    Yes, sir.

Q.    Do you see that?

A.    (Nods head affirmatively)

Q.    A perfect illustration, your concealed handgun. You learned the law of self-defense when you have the

right to use deadly force.

Well, let's suppose somebody is charged with murder and it comes out that, you know, that individual acted under what he believed to be a right of self-defense, but the jury disagreed. No, you didn't have a reasonable belief that you were in fear of life, him or serious bodily injury, you see? And the jury finds him guilty of murder.

But it may well be that that is the kind of the case that you might feel like the punishment should be on the lower end rather than the higher end because he thought he was acting under a certain belief, but the jury found no, no, no that wasn't reasonable and so we are grading your paper a little differently.

Do you see where I'm coming from?

A.   Yes, sir.

Q.   Do you see why that might change how you might think about it? As opposed to just somebody walking up to a total stranger and blowing their head off?

Do you see what I mean?

A.   Yes.

Q.   So the Legislature has created this wide range of punishment. Do you have any problem saying you will consider the full range of punishment if we ever get to this point?

A.   No problem whatsoever.

Q.   Okay.  You will keep an open mind, would you not?

A.   Yes, sir.

Q.   That is all we really need to ask you to do, is keep an open mind to anything that might come up.  Listen to the instructions that the Judge gives you.  Go by those instructions.  Call it like you see it.  If it is a ball, it's a ball.  If it is a strike, it's a strike.

A.   Yes.

Q.   All right.  Anything I have asked you about, Mr. Carpenter, that would in any way cause you any questions or problems or anything like that?

A.   No problems that I can see.

Q.   All right.  You indicated on your questionnaire on number 36 about some lawyers.  You know Tom Carr, Ken Dice. (phonics)

A.   Yes, I know Ken.

Q.   How do you know Ken?

A.   He was an acquaintance of a friend of mine many years ago.

Q.   Kind of a social acquaintance?

A.   Not directly.  Just socially.  Just casual.

Q.   And how about Tom?  Has he ever represented you or anything like that?

A.   Yes, he was my divorce lawyer.

Q.   All right.  Tom still offices out on the west side?

A.   Yes.

Q.   You have no problem with Tom?

A.   No.

Q.   I did not know he did divorce work, but Tom kind of does a little of everything.

A.   Well, he was referred to me by my accountant.  I knew Tom and then my accountant said that I probably should use Tom.

Q.   Okay.  I almost kind of want to ask you who was on the other side of the divorce case, but I don't know if that makes a flip.  I'll let it go.  My curiosity is getting the better of me here because I probably know him.

A.   Let's not hold it against him.  He was trying to earn his living, I guess.

Q.   There you go.  Okay.  All right.  Well, you know, as well as I do, some of them earn it in a way that is honorable and ethical and some of them don't.  As much as I hate to admit it, that is really true.  Not pointing any fingers at Co-Counsel here because everybody in this room is pretty much straight up.  Operative word, being pretty much.

Okay.  Any questions you want to ask me,

Mr. Carpenter, about anything I have asked you or anything you want to go over?  Because I am going to pass you over to the other side and they will ask you a few questions, too?

A.   I don't have any questions, sir.

Q.   Any reason you would not want to serve on this jury?

A.   I guess no different than anybody.  I would just rather be someplace else.

Q.   That is completely understandable.  You know, we only have one form of compulsory service in this country and that is jury duty, okay?

A.   I guess it is my term in the barrel.

Q.   You just got lucky.  If you had played the lottery this week, you might have done well.  Who knows?

Thank you very much.  I appreciate your courtesies.

THE COURT:  Very well.  I will recognize the Defense.

VOIR DIRE EXAMINATION

BY MR. STRICKLAND:

Q.   Well, the jury may be out as to whether you got lucky or unlucky.  I am not sure yet how I would characterize it.

I'm Jack Strickland.  Steve Gordon and I

have been appointed by the Court to represent Mr. Busby in this case. And I am going to have some questions of you, also.

I kept hoping when you were talking about that divorce lawyer on the other side, that you didn't like him, it would be Joe Shannon. But, I guess, that would be too much to hope for. So I'm assuming that it was not -- and I'm assuming that you don't know any of us?

A. No, I don't know anyone in this room.

Q. Well, you are not missing much.

Well, you indicated, Mr. Carpenter, that you have been out at Lockheed for 28 years, correct?

A. 28 years seniority next month.

Q. And you have been doing essentially the same job ever since you have been there?

A. I have been a machinist the whole time I have been there, but I have done different -- different jobs, different aspects of aerospace work.

Q. And are you working on the new project now?

A. Several.

Q. Several of them.

You indicated that in 1990, I think, you got a security clearance.

A. Yes, I did.

Q. Not unexpected given the nature of the work that

you do.  What level of security clearance was that?

A.  Just a secret.

Q.  Secret.  Is that security clearance still in effect?

A.  I'm still bound by it, but I am not actively working with a security clearance today.

Q.  Your work doesn't require a security clearance?

A.  Right.

Q.  You also indicated in your questionnaire -- which we appreciate your having filled out for us -- that your hearing was moderate.  And I noticed several times during the afternoon here that sometimes it looked like maybe you are straining a bit to hear us.

A.  A little, yes.

Q.  Tell me about the hearing situation, if you would.

A.  I work around loud machinery and it is more like shell shock than it is a hearing loss.  The longer I'm away from the noises, the better my hearing improves.  I did work around loud machinery last night and the day before.  And I do have some recovery, like if I am off a week on vacation, it becomes very good again.  I do wear hearing protection at work.

Q.  All right.  Is the hearing loss such -- the hearing difficulty such that you would be concerned about

your ability to keep up with the evidence in the courtroom?

A.   No, sir.  I don't think it would be a problem. It hasn't been in the past.

Q.   Well, the jury -- as you well know, the jury box is seated next to the witness stand for a good reason. And so usually there is not much difficulty hearing the witnesses in the case.  Sometimes there may be difficulties or a blessing, depending on how you look at it, hearing the lawyers in the case.

But usually if a juror indicates to the Judge that they are having -- having trouble hearing, the Judge will ask people to speak up.  And unlike in this courtroom, it may well be that the lawyers and the witnesses all have their voices amplified.  I don't -- not sure what setup is going to be used over there.

A.   I don't believe that will be a problem.  And the other times I have been on juries, my hearing was still as it is now.  I had no problem.

Q.   You wouldn't be shy about raising your hand if you didn't hear something?  You would say, hey, I need somebody to speak up.

A.   I'm not shy at all.

Q.   Well, I was beginning to get that impression, that you were going to tell us exactly what you thought

and so that -- I think that is what everybody would hope that you would do, and as people's voices kind of tend to trail off as they get tired toward the end of the day. But you can't do much of a job for either side and the Court if you can't hear what is going on.

A.   That's true.

Q.   All right.  You indicated and made mention several times to the fact that you are divorced.  When did you divorce, please, sir?

A.   I was divorced June the 16th of last year.

Q.   All right.  Fairly recently.

And prior to the time of the divorce, what line of work, if any, was your wife involved in?

A.   She had been involved in several different things from retail sales to service work.

Q.   You told us about -- about some family members with -- and friends with law enforcement background and indicated that you, yourself, actually had applied for a law enforcement job sometime in the past.

A.   At one time when I was very young.

Q.   All right.  And that was prior to you going to work for Lockheed, I assume?

A.   Yes, quite sometime before.

Q.   And sounds like maybe they had some budgetary problems and did you a favor as it turned out?

A.    Possibly.

Q.    All right.  When did you get your concealed handgun license?

A.    I believe it was in 1996.

Q.    Was there anything in particular that prompted you to get that?  Any sort of event in your life or did you just think it was a good idea generally?

A.    It's a long story, but I'll tell you.

Q.    Okay.  Sure.

A.    I shot in NRA pistol matches for many, many years and exhibition matches before I became diabetic and I was always carrying a handgun from one place to another.

I have been stopped many times and sometimes an officer just doesn't understand that you are coming home from a match in another state when it is 10:00 o'clock at night.

Q.    Sure.

A.    And I'm glad we have reciprocal licensing agreements from the neighboring states.  I don't do that any more, but I might still want to attend the match sometime.

Q.    Any of those times that you got stopped, did they actually -- actually charge you with possession of unlawful carrying of a weapon or were you always able --

A.    Not during any of the regular matches.  I had

purchased some guns from a fellow that was having an estate sale. I was returning home. This was after a match and I did have some trouble with a Benbrook policeman. I had to show him my NRA score card from that day before he would believe that I had even been to a match.

Q. But you were able to resolve all of that?

A. We resolved it right there on the side of the highway.

Q. Well -- and Mr. Shannon in discussing -- discussing the law regarding lesser included offenses with you, talked about the fact that, you know, there is all kinds of reasons that somebody might -- might be inclined, if they were a juror, to consider a lesser punishment even if they had found somebody guilty of murder. And he used the concealed handgun premises as a basis of one of his questions, if you will remember?

A. Yes.

Q. That somebody might do that.

It would probably do well for you to think too, that because the jury is the exclusive judges of the facts, some jurors might say, well, under those circumstances indeed maybe a lesser punishment would be appropriate for somebody, this concealed handgun licensing.

But the law is such that if other members of the jury wanted to, they could look at it and say, well, I'm going to treat him more seriously.

A.   I agree.

Q.   Because we think he has got -- he should know better.

A.   That is true, too.

Q.   You have got a better understanding of the law and, by golly, we are going to attach some years on because we think that maybe we are going to hold him to a higher standard.

So you see how that works and you see how that single circumstance might cause some jurors to think that a lesser punishment is appropriate and some might think that a more serious punishment was appropriate.

A.   I understand.

Q.   It all depends on the facts.

A.   Yes, sir.

Q.   But even maybe more importantly than that, it is up to the individual juror.  And you know that from your prior jury service; is that correct?

A.   Yes, sir.

Q.   All right.  Let's talk about the prior jury service.  I won't beat around the bush.  I'm going to ask you what type of criminal case that was?

A.   It was a drug case.

Q.   Did it involve possession or sales or --

A.   It was the first sting case in Fort Worth.

Q.   Okay.  So when you say sting case, the police officers were presumably holding themselves out as being willing buyers of drugs?

A.   They were selling the drugs.

Q.   They were selling -- they were selling to people.

A.   I had a problem with that.

Q.   Okay.  And tell me what the problem was that you had with that.

A.   They came to court with very, very flimsy evidence.  We had to have the Judge submit the evidence to us.  It was not introduceable in court.  We had to ask for it specifically.  To tell you the truth, the guy almost walked.

Q.   Okay.  Do you remember what kind of punishment the person got?

A.   He got the minimum.

Q.   All right.  So jurors may have finally resolved their problem about guilt, but they kind of maybe made up for it when it came time to assess the punishment, is that fair to say?

A.   I would say that.

Q.   Well, that's not uncommon.  You know, that a juror might grudgingly say, well, yeah, I do believe there is enough evidence that if you push me on it, but by golly I'm going to hang tough when it comes to the issue of punishment.  Hang tough meaning, I'm not going to be anxious to give the maximum punishment.  And we probably see that very, you know, pretty -- pretty frequently in cases.

When it was all said and done, were you satisfied with the way it all turned out?

A.   Not really.

Q.   Okay.

A.   Not really.

Q.   Did you find yourself in the minority on that jury when the deliberations --

A.   Yes, I did.  I was in the minority.

Q.   Well, you know then what I'm going to say to you next.  And that is that maybe initially on a jury vote, either for guilt or on the issue of punishment if a person is guilty, there may be a real split of opinion between the jurors.

A.   It's very possible.

Q.   And in the case that you were on before, it sounds like the jurors that were in the majority managed to persuade you, but maybe not -- you weren't real happy

about it, but they managed to persuade you.

But you understand that just because you are in the minority, that doesn't mean you have got give in.

A.   That's correct.

Q.   Regard -- whether it is a minority for guilt or minority for not guilty.  It is up to you.

A.   Correct.

Q.   And jury -- jury decisions aren't by majority rule.  It takes all 12 to find somebody guilty and all 12 to assess the penalty.

A.   Yes, sir.

Q.   Do you think that that is a good law?  That it ought to be unanimous like that?

A.   Yes, sir.  I guess, I do.  I feel like it should be unanimous.

Q.   You know, in civil cases, if you are going to give some money to somebody, they have got ten/two verdicts in Texas in a lot of jurisdictions.

A.   Yeah.

Q.   Well, it doesn't have to be unanimous.  Ten is enough.

But when you are talking about someone's liberty, or in this case potentially talking about someone's life, the law says ten isn't good enough.  11 is

93

not good enough.  It takes all 12 or you are not going do it.

A.   Yes, sir.

Q.   And Mr. Shannon described that to you as the burden of proof, the obligation that the State has to convince all 12 jurors on all three issues, meaning a total of 36 votes in his favor, if you will, before the death penalty could be imposed.

A.   Yes, sir.

Q.   35 won't cut it.  34 won't cut it.  It takes all 36.  With 12 guilty, 12 yes to Special Issue Number One, 12 no to Special Issue Number Two.

A.   Yes, sir.

Q.   Short of that, it is either not guilty or if guilty, life.

A.   Yes, sir.

Q.   Is that okay with you?

A.   That is okay with me.

Q.   All right.  And I take it, although they were able to convince you and persuade you in that first case, that you didn't -- you didn't give in just because you were tired of arguing?

A.   The other jurors didn't influence the change in my decision.  The evidence did.

Q.   Exactly.  That is exactly -- you put your finger

exactly on the point.  You have got to be convinced in your own mind.

A.   Yes, sir.

Q.   And you are not the sort of person -- or it strikes me that you are not the sort of person who is going to give up and do something contrary to your conscience just because you were outnumbered.

A.   I was very unpopular in that trial.

Q.   Really?

A.   Yes, I was.

Q.   Well, you know, we can't listen at the jury room doors.  30 years ago, I am not going to tell you lawyers didn't.  It is a practice pretty much frowned on.  But sometimes you don't have to be at the door to listen. Sometimes you can be out here and you can hear the -- you can hear the carrying on in the jury room.  And so that is to be expected when you get 12 fair-minded people who believe strongly in their positions.

A.   Yes, sir.

Q.   All right.  Did you know -- did you know the procedure that we have been discussing before you came up here?  That is how capital murder cases progress?  That juries only have two options if they find somebody guilty? Those options are either life or death.

A.   I wasn't completely familiar with it.

Q.   Well, here is the deal:  At the first stage the State has got to prove everything that they allege.  They have got to prove that the person intentionally killed somebody.  It wasn't by accident.  It wasn't in self-defense.  It wasn't a mistake.  They weren't insane. They intentionally did it.

And they have got to prove that that intentional murder of another person was in the course of something even -- even serious in and of itself, kidnapping, robbery, sexual assault.

A.   Yes, sir.

Q.   Then, and only then, can the jury find the person, if the evidence is sufficient, guilty, all right?

A.   Yes, sir.

Q.   Then we get to that Special Issue Number One. And essentially that asks you whether or not you believe that the evidence shows you beyond a reasonable doubt that they are a future danger to society.  Whatever happens, okay?

A.   Yes, sir.

Q.   Is there any thought in your mind, as you sit here right now, that if you found somebody guilty of capital murder, that is that intentional murder in the course of another offense, that that automatically means that they would be a future danger?  Or automatically

means that they should receive the death penalty?

A.   I don't believe it would automatically mean that I think they would commit further capital crimes.

Q.   Okay.

A.   It doesn't mean they wouldn't.

Q.   Yeah.  No, exactly.  It doesn't mean they wouldn't.  And let me tell you that the State doesn't have to show that they would commit future capital crimes. They just have to show that they would commit future acts of violence against society or criminal acts of violence, I think, is the wording of the statute against society.

But the point is, you can't say, well, because we found A, I'm automatically going to find B. Because I found B, I'm automatically going to say there is no mitigation as to C.

Each of these decisions builds on the proceeding.  There is nothing automatic about going from A to B and B to C, all right?

A.   I guess you wouldn't have to ask that question if it automatically went that way.

Q.   Precisely.  Precisely.  And when they started rewriting death penalty laws in this country about 30 years ago, some states tried to do that.  They tried to say, well, if you are guilty, you are going to get death.

Well, you can imagine it took the Supreme

Court about 15 minutes to strike that down.  And they said, no.  Look, this is such a serious, permanent penalty -- nothing much more permanent than being put to death -- we are going to require you to make some other inquiries before we get that to that point.  That is only fair.  That is what we need to do.

A.    I agree.

Q.    All right.  As you sit here now, I take it you don't have any leaning towards death as being appropriate for capital murder any more than life is because you haven't heard the evidence.

A.    I haven't heard the evidence.

Q.    And it may well be in one case, a capital murder case, that you would think it is appropriate that the person get the death penalty.

And then turn right around and be on a jury the following week, heaven forbid, a capital murder case and find that that person was not deserving of a death penalty, all depending upon the facts that you hear and the evidence that you consider, right?

A.    Strictly the evidence.

Q.    All right, sir.

Did you understand the explanation that Mr. Shannon was able to give you concerning lesser included offenses and how we might get to that?

That is where somebody -- even though we start off with a capital murder, maybe the jury finds that based on the evidence they are not guilty of that, but guilty of murder.

A.   I understand that.

Q.   The name comes from -- it's lesser.  Murder is less serious -- first-degree murder is less serious than capital murder.  But it is also included within it because it is part of what capital murder is.  Capital murder is murder plus another offense.  So it is included, but it is also lesser in severity.

A.   I understand.

Q.   The range of punishment for that, as Mr. Shannon explained, is from a minimum of five to a maximum of life.

A.   Yes, sir.

Q.   Any reservation in your mind, as you sit here right now without having heard any of the evidence, that if you were to find somebody guilty of an intentional murder -- remember without excuse or justification -- find them guilty of an intentional murder, that you would be able to give fair consideration to as little as five years in the penitentiary for that?

A.   I could probably do that.

Q.   Lawyers get nervous when you say probably, I'll just tell you.

A.    Well --

Q.    And I know we are putting you in a box because we are asking you --

A.    I could consider pretty much any phases of punishment, but it all depends on evidence and --

Q.    Well, and the instructions the Judge will give you.  The Judge might say, well, in this particular case you wouldn't have to consider five minimum because maybe the minimum would be 15.  He is the one that determines the law.  You are the one that determines the facts, right?

A.    I understand.

Q.    And if he tells you, 15 is the minimum, you could give fair consideration to 15 or five or 25, whatever he says?

A.    I could.

Q.    All right.  You don't have your mind made up right now?

A.    No, sir.

Q.    Okay.  Well, I'm going to make this a little bit harder.  I'm going to tell you that everybody, even a capital murderer under the law that we are operating under here, is eligible for parole unless you get a death sentence.  Everybody else is eligible for parole.

       If it is capital murderer that gets a life

sentence, he is eligible in 40 years.  If it is any other category of offender, first degree murder, he is eligible for parole when he serves 50 percent of his sentence.  If he gets 30 years, he is eligible in 15.

A.  I understand.

Q.  If he gets 50, it is 25.  If he gets five, because remember that may be the minimum, he is eligible for parole in two and a half.  That ain't very long for an intentional killing.

A.  No, it's not.

Q.  I think you'll agree with that.

Here is the deal, the Court will tell you in an offense such as a murder offense, a person is eligible for parole -- for parole in two and a half years on a five year sentence.  Eligible for parole in 50 percent of the time.

A.  Yes, sir.

Q.  Then the Court will turn around and tell you, now that I have told you that, you can't consider it when you assess the sentence.

It is kind of like ignoring the elephant in the corner of the room.  They tell you it is there and it is hard to ignore, but then they tell you you have got to ignore it.

Do you think you could follow that

instruction?

A.   Yes, I can.

Q.   See the purpose of that instruction is so a juror won't say, well, I really want him to get five, but I know he is eligible in two and a half, so I'll give him ten so he won't be eligible for 5.  It keeps the jury from adding on to the sentence to kind of make up for what might be a parole sentence, you see?

A.   I see.

Q.   Could you follow that?

A.   Yes, I can.

Q.   So even if you were made aware of the fact that a person convicted of an intentional murder might be eligible for parole in as little as two and a half years of a five years sentence, could you still give fair consideration to the five years sentence if the law allowed for it and the facts justified it?

A.   I could.

Q.   All right.  Once again, you don't have your mind made up?

A.   I don't have my mind made up.

Q.   All right.  On this criminal assault case that you witnessed, did you know the parties?

A.   No, I did not.

Q.   Next thing you know, the people were acting like

fools.

A.   Pretty much.

Q.   Okay.  Were you the one that contacted the police?

A.   I sent for the police, yes.

Q.   And you cooperated in their investigation and continue to cooperate; is that correct?

A.   Absolutely.

Q.   All right.  How long have you known Mr. Sassman?

A.   Since I went to work for General Dynamics which is now Lockheed.  And I wouldn't say that I know him.  I just know who he is.

Q.   Okay.  Well, hear is the reason -- here is the reason I suspect people are asking the question is because it is very unusual for two people that -- even if they don't know each other, but apparently work fairly close to one another -- to be called not only on the same jury, but potential jury, but also be called very close in time to one another.  You remember in the Central Jury Room, you and he were pretty close.

A.   Two seats apart accept we were split by rows. He was on one end.  I was on the other.

Q.   I think -- I think the lawyers and the Courts always -- you know, they think, well, what could this mean in the future after we spent six weeks in trial.

One thing it could mean is these guys are such good friends and they are always going to be like this --

A.    Absolutely not.  Let me explain about the case with Mr. Sassman and myself.

Q.    Sure.

A.    The Lockheed facility is over a mile long.

Q.    Right.

A.    For probably 20 some odd years that we've been there, I worked on one end of the plant.  He worked on the other.  Opposite shifts.  Only just recently have we been in an area where we run the same type of machinery.  And even at that we are not in a communications type situation.  I know very little about Mr. Sassman whatsoever and we do not communicate.

Q.    All right.  Well, that answers it.  We just want to make sure that we don't have two people that are going to be voting as one.  Or the opposite side of the coin is we have two people who hate each other's guts and if one says black, the other one is going to say white automatically.  It sounds like neither situation applies.

A.    I tell you, Lockheed Martin is one of the coldest places you ever worked.  And I was told when I hired in, if you worked there for 25 years and retire, you may have three people who you associate with.  We just do

not associate out there.

Q.   Well, you are kind of busy, aren't you?

A.   Part of that is for security reasons.  We were told when we first hired in, be careful who you talk to.  So we don't.

Q.   Okay.  All right.  You talked to us a little bit about your hearing and that is not a problem.  You talked to us about diabetes and that appears not to be a problem.

A.   Not a major problem.

Q.   The diabetes situation is not such that you find yourself ill a great deal of the time or have to --

A.   Only if I overexert myself physically.  And I don't think that would happen sitting in a courtroom.  Maybe mowing the yard or chopping wood or something, after a while I might have a problem with it, but --

Q.   See, that is why we became lawyers, so we wouldn't have to exert ourselves.

A.   Okay.

Q.   Okay.  Well, I just wanted to make sure you think you are in generally good health.  We wouldn't want to put you on a jury where you were worried about maybe calling in sick for two days a week or something on the jury and you presume --

A.   I don't think that would be a problem.

Q.   We have not told you about sequestration.  I

don't think that that will be a problem.  But you may remember the Judge said he thought, when you first came up here, that the jury would not be sequestered which means locked up essentially.

But in fairness, all of us have talked to jurors about the fact that the possibility always exists. If --

A.   It would be an inconvenience, but I don't think it would be --

Q.   It wouldn't be a deal breaker?

A.   No.

Q.   Well, as long -- I mean, we can't imagine that it would be convenient for anybody.  It is not very convenient for the Court or any of the parties either. But if it came to it and you had to do it, you could do it?

A.   I could do it.

Q.   I mean, have you got a house and animals and things --

A.   That is correct.

Q.   -- that people could take care of for you?

A.   Yes.

Q.   And you usually have a little bit of notice. Maybe only a day or so notice.  Maybe enough to get people lined up to help you.

A.   That would be fair.

Q.   Any reason you can think of that you wouldn't be fair to both sides?

A.   No.

Q.   Anything about this case or what you have heard about this procedure here today that causes you to doubt your ability to be an impartial juror?

A.   I have no problems.

Q.   If you don't have any questions of me, I have run out of questions for you.

A.   No questions.

Q.   Okay.  Thank you very much.

MR. STRICKLAND:  Pass the witness.

THE COURT:  Now, I get to talk to you, Mr. Carpenter.

You are not on the jury, but you are on the panel that the jury is going to be selected from.  You will get a phone call at some point.  You have to come back in.  At that point the jury will be selected and you'll be told you are either on the jury or you are released.  We are not exactly sure when that is going to be.  Sometime within the next -- not this week, but hopefully toward the end of next week.  You may get a phone call.  So if you change address and phone number, let us know and we'll contact you.

We are going to take two pictures of you before you leave.  We are doing that because this is going on, so they can put your face with the lawyers and figure out what you said.

In the meantime, don't look up anything about the case.  You are right there with a co-worker --

MR. GORDON:  We have not discussed it at this point.

THE COURT:  Don't read.  Don't do the Internet.  If something comes on TV, probably should mute it, walk out of the room.  If you see it in the newspaper, set it aside.  When you are released, you can read the paper.

PROSPECTIVE JUROR:  All right.

THE COURT:  Until then, if you will go with the lady right there, she will get a picture and you are released.

(Prospective Juror Retires)

(Off-the-record discussion)

THE COURT:  She is here now.

Okay.  I understand there is an agreement as to Juror Number 90, Traci Bogoski.

MR. STRICKLAND:  That is correct.

THE COURT:  Bogoski.

MR. STRICKLAND:  She is very young.  She is

only 20, Your Honor.  She appears not to taking the filling out of the questionnaire very seriously.  She has had an aunt that has been murdered.  She thinks that Defense lawyers clearly are one level below pond scum.  She -- her questionnaire was answered in such a manner that it appears that she does not take her responsibilities or potential responsibilities seriously.

An agreement has been reached and Mr. Busby concurs.

Is that correct, sir?

THE DEFENDANT:  Yes, sir.

MR. MILLER:  And we also agree.  And that also for the record, she also indicated her mother had been robbed at some point.

MR. STRICKLAND:  That is true.

MR. MILLER:  Yes.  We'll agree.

THE COURT:  I'll approve the agreement and excuse Juror 90, Traci Bogoski.

Can we take a break?

MR. STRICKLAND:  Yes, sir.

(Proceedings concluded at 2:42 p.m.)

STATE OF TEXAS

COUNTY OF TARRANT

I, Barbara Lynn Chapman, Official Court Reporter in and for the Criminal District Court No. 2 of Texas in and for Tarrant County, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties, if requested.

WITNESS MY OFFICIAL HAND, on this the _____ of _____, 2006.

_____
BARBARA LYNN CHAPMAN, CSR
Texas CSR No. 500, Exp: 12/31/06
Official Court Reporter
Criminal District Court No. 2
401 W. Belknap, 6th Floor
Fort Worth, Texas  76196-0214
Telephone:  (817)884-2837
email: bchapman@tarrantcounty.com

```
                              VOLUME 21
                           JURY VOIR DIRE

     October 26, 2005


     PROSPECTIVE JURORS:                    PAGE      VOL.

     LACY LIVINGSTON
     Excused by agreement                   3         21

     JAMES SASSMAN
     State's Voir Dire by Mr. Miller        6         21
     Defense Voir Dire by Mr. Strickland    38        21
     Accepted                               43        21

     BRENDA ARMSTEAD
     Excused by agreement                   46        21

     KRISTIN DIETEL
     State's Voir Dire by Mr. Shannon       55        21
     Excused by agreement                   53        21

     JAMES CARPENTER
     State's Voir Dire by Mr. Shannon       55        21
     Defense Voir Dire by Mr. Strickland    82        21
     Accepted                               106       21

     TRACI BOGOSKI
     Excused by agreement                   108       21


     Proceedings Concluded                  108       21

     Reporter's Certificate                 109       21
```

ALPHABETICAL PROSPECTIVE JUROR INDEX

PROSPECTIVE JURORS:                         PAGE    VOL.

BRENDA ARMSTEAD
Excused by agreement                         46      21

TRACI BOGOSKI
Excused by agreement                        108      21

JAMES CARPENTER
State's Voir Dire by Mr. Shannon             55      21
Defense Voir Dire by Mr. Strickland          82      21
Accepted                                    106      21

KRISTIN DIETEL
State's Voir Dire by Mr. Shannon             55      21
Excused by agreement                         53      21

LACY LIVINGSTON
Excused by agreement                          3      21

JAMES SASSMAN
State's Voir Dire by Mr. Miller               6      21
Defense Voir Dire by Mr. Strickland          38      21
Accepted                                     43      21